IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; GLENN THOMPSON; MIKE KELLY; JOHN JOYCE; GUY RESCHENTHALER; REPUBLICAN NATIONAL COMMITTEE; MELANIE STRINGHILL PATTERSON; and CLAYTON DAVID SHOW, | ) CIVIL ACTION ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. _2-20-CV-966_____ ) |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania; ADAMS COUNTY BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD OF ELECTIONS; ARMSTRONG COUNTY BOARD OF ELECTIONS; BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD COUNTY BOARD OF ELECTIONS; BERKS COUNTY BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD COUNTY BOARD OF ELECTIONS; BUCKS COUNTY BOARD OF ELECTIONS; BUTLER COUNTY BOARD OF ELECTIONS; CAMBRIA COUNTY BOARD OF ELECTIONS; CAMERON COUNTY BOARD OF ELECTIONS; CARBON COUNTY BOARD OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER COUNTY BOARD OF ELECTIONS; CLARION COUNTY BOARD OF ELECTIONS; CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON COUNTY BOARD OF ELECTIONS; COLUMBIA COUNTY BOARD OF ELECTIONS; CRAWFORD COUNTY BOARD OF ELECTIONS; CUMBERLAND COUNTY BOARD OF ELECTIONS; DAUPHIN COUNTY BOARD OF ELECTIONS; DELAWARE COUNTY BOARD OF ELECTIONS; ELK COUNTY BOARD OF ELECTIONS; ERIE COUNTY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

BOARD OF ELECTIONS; FAYETTE )
COUNTY BOARD OF ELECTIONS; )
FOREST COUNTY BOARD OF )
ELECTIONS; FRANKLIN COUNTY )
BOARD OF ELECTIONS; FULTON )
COUNTY BOARD OF ELECTIONS; )
GREENE COUNTY BOARD OF )
ELECTIONS; HUNTINGDON COUNTY )
BOARD OF ELECTIONS; INDIANA )
COUNTY BOARD OF ELECTIONS; )
JEFFERSON COUNTY BOARD OF )
ELECTIONS; JUNIATA COUNTY BOARD )
OF ELECTIONS; LACKAWANNA )
COUNTY BOARD OF ELECTIONS; )
LANCASTER COUNTY BOARD OF )
ELECTIONS; LAWRENCE COUNTY )
BOARD OF ELECTIONS; LEBANON )
COUNTY BOARD OF ELECTIONS; )
LEHIGH COUNTY BOARD OF )
ELECTIONS; LUZERNE COUNTY BOARD )
OF ELECTIONS; LYCOMING COUNTY )
BOARD OF ELECTIONS; MCKEAN )
COUNTY BOARD OF ELECTIONS; )
MERCER COUNTY BOARD OF )
ELECTIONS; MIFFLIN COUNTY BOARD )
OF ELECTIONS; MONROE COUNTY )
BOARD OF ELECTIONS; MONTGOMERY )
COUNTY BOARD OF ELECTIONS; )
MONTOUR COUNTY BOARD OF )
ELECTIONS; NORTHAMPTON COUNTY )
BOARD OF ELECTIONS; )
NORTHUMBERLAND COUNTY BOARD )
OF ELECTIONS; PERRY COUNTY BOARD )
OF ELECTIONS; PHILADELPHIA )
COUNTY BOARD OF ELECTIONS; PIKE )
COUNTY BOARD OF ELECTIONS; )
POTTER COUNTY BOARD OF )
ELECTIONS; SCHUYLKILL COUNTY )
BOARD OF ELECTIONS; SNYDER )
COUNTY BOARD OF ELECTIONS; )
SOMERSET COUNTY BOARD OF )
ELECTIONS; SULLIVAN COUNTY )
BOARD OF ELECTIONS; SUSQUEHANNA )
COUNTY BOARD OF ELECTIONS; TIOGA )
COUNTY BOARD OF ELECTIONS; UNION )
COUNTY BOARD OF ELECTIONS; )

VENANGO COUNTY BOARD OF                    )
ELECTIONS; WARREN COUNTY BOARD             )
OF ELECTIONS; WASHINGTON COUNTY            )
BOARD OF ELECTIONS; WAYNE                  )
COUNTY BOARD OF ELECTIONS;                 )
WESTMORELAND COUNTY BOARD OF               )
ELECTIONS; WYOMING COUNTY                  )
BOARD OF ELECTIONS; and YORK               )
COUNTY BOARD OF ELECTIONS,                 )
                                           )
                    Defendants.            )

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned counsel, hereby complain of Defendants as follows:

## INTRODUCTION

1.       Free and fair elections are essential to the right of Americans to choose through their vote whom they elect to represent them.  Upending our entire election process and undermining ballot security through unmonitored by-mail voting is the single greatest threat to free and fair elections.  To be free and fair, elections must be transparent and verifiable.  Yet, Defendants have inexplicably chosen a path that jeopardizes election security and will lead - and has already led - to the disenfranchisement of voters, questions about the accuracy of election results, and ultimately chaos heading into the upcoming November 3, 2020 General Election.  This is all a direct result of Defendants' hazardous, hurried, and illegal implementation of unmonitored mail-in voting which provides fraudsters an easy opportunity to engage in ballot harvesting, manipulate or destroy ballots, manufacture duplicitous votes, and sow chaos.  Contrary to the direction of Pennsylvania's General Assembly, Defendants have sacrificed the sanctity of in-person voting at the altar of unmonitored mail-in voting and have exponentially enhanced the threat that fraudulent or otherwise ineligible ballots will be cast and counted in the upcoming General Election.

2.      All of this was on full display in Pennsylvania's June 2, 2020 Primary Election. That election proved that Defendants are unwilling to properly administer the Pennsylvania General Assembly's new mail-in voting law, Act 77, that made significant changes to Pennsylvania's elections, and instead have opted to promote unlimited use of unmonitored mail-in voting.  Defendants' failure is the direct result of their election administration decisions, many of which exceed the legal power or authority of the decision makers.  For example, despite the Pennsylvania General Assembly's clear and unambiguous mandate that absentee and mail-in[1] ballots by non-disabled electors are to be mailed or personally delivered to the county boards of elections, approximately twenty (20) counties in this Commonwealth, with the knowledge, consent and/or approval of the Secretary of the Commonwealth, allowed absentee and mail-in ballots to be returned to other locations, such as shopping centers, parking lots, fairgrounds, parks, retirement homes, college campuses, fire halls, municipal government buildings, and elected officials' offices.  Also, the Governor of the Commonwealth issued an Executive Order the *day before* the June 2, 2020 Primary Election changing the rules of mail-in balloting, but only for some counties and not all.  Further, Allegheny County not only issued duplicate mail-in and absentee ballots to voters because of a glitch in the state's Statewide Uniform Registry of Electors (SURE) system,

---

[1] Article VII, Section 14 of the Constitution of the Commonwealth of Pennsylvania provides that absentee voting shall be permitted for those "qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee[.]"  Pa. Const. art. VII, § 14.  Act 77 (as hereinafter defined, and codified, in part, at 25 P.S. § 2602) makes a distinction between a "qualified mail-in elector" and a "qualified absentee elector."  *See* 25 P.S. § 2602(w) & (z.6).  In general use, however, the terms "mail-in" and "absentee" are used interchangeably to discuss the use of the United States Postal Service to deliver ballots to and from electors.  For the purposes of this complaint, the terms "mail-in" and "absentee" refer to the general usage unless the specific is indicated.

but also instituted severe polling place consolidations that caused long lines and confusion among voters, candidates, and political parties. Moreover, Philadelphia County could not sustain its vote counting process and, without warning, stopped counting ballots on June 4, 2020, and then, without formal notice, started counting again on June 9, 2020.

3.       Defendants, through their haphazard administration of Act 77, have burdened voters, candidates, and political committees with the arbitrary and illegal preclusion of poll watchers from being present in all locations where votes are being cast because (a) the locations where mail-in or absentee ballots are being returned do not constitute a "polling place" within the meaning of Sections 102(q) and 417(b) of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, as amended ("Election Code"), 25 P.S. §§ 2602(q) and 2687(b); and (b) the poll watchers may only serve in the county of their residence under Election Code Section 417(b), 25 P.S. § 2687 (b). The result is that a significant portion of votes for elections in Pennsylvania are being cast in a fashion that denies any procedural visibility to candidates, political parties, and the public in general, thereby jeopardizing the free and fair public elections guaranteed by the United States and Pennsylvania Constitutions. The most recent election conducted in this Commonwealth and the public reaction to it demonstrate the harm caused by Defendants' unconstitutional infringements of Plaintiffs' rights. The continued enforcement of arbitrary and disparate policies and procedures regarding poll watcher access and ballot return and counting poses a severe threat to the credibility and integrity of, and public confidence in, Pennsylvania's elections, so long as absentee or mail-in voting is continued to be extensively used.

4.       The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is validly cast. An individual's right to vote is infringed if his or her vote is cancelled by a fraudulent vote or diluted by a single person voting multiple times. The United

States Supreme Court has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 77 U.S. 533, 554-55 & n.29 (1964).

5.     Accordingly, along with equitable and other relief, Plaintiffs seek an order, declaration, and/or injunction that prohibits Defendants from permitting the return of absentee and mail-in ballots to locations other than the respective offices of the county boards of elections as prescribed by the Pennsylvania Election Code, particularly with regard to mobile ballot collection centers and other inadequately noticed and unmonitored ad hoc drop boxes.  Further, Plaintiffs seek an order, declaration, and/or injunction that bars county election boards from counting absentee and mail-in ballots that lack a secrecy envelope or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference. Finally, Plaintiffs seek an order, declaration, and/or injunction that permits poll watchers, regardless of their county of residence, to be present in all locations where votes are cast, including without limitation all locations where absentee or mail-in ballots are being returned.

## JURISDICTION AND VENUE

6.     Under 28 U.S.C. §§ 1331 & 1343, this Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States and involves a federal election.  Also, this Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

7.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and several of the Defendants reside in this District and all of the

Defendants are residents of the Commonwealth of Pennsylvania in which this District is located. 28 U.S.C. § 1391.

## **PARTIES**

8.      Plaintiff Donald J. Trump for President, Inc. (hereinafter, the "Trump Campaign"), is the principal committee for the reelection campaign of Donald J. Trump, the 45th President of the United States of America (hereinafter, "President Trump").   President Trump is the presumptive Republican nominee for the office of the President of the United States of America in the upcoming November 3, 2020 General Election.  The Trump Campaign brings this action for itself and on behalf of its candidate, President Trump.  President Trump is a "candidate" as that term is defined in Election Code Section 102(a), 25 P.S. § 2602(a).  *See Rowland v. Smith,* 83 Pa. D. & C. 99, 101-2 (Pa. Ct. Com. Pl. Dauphin 1952) ("candidate" under the Election Code includes one who is a candidate for nomination for President of the United States).

9.      Plaintiff Glenn Thompson (hereinafter, "Representative Thompson") is an adult individual who is a qualified registered elector residing in Centre County, a member of the Republican Party, and the United States Representative for the 15th Congressional District of Pennsylvania.   Representative Thompson is currently running for reelection in the 15th Congressional District which includes all of Warren, McKean, Forest, Venango, Elk, Cameron, Clarion, Jefferson, Armstrong, Clearfield, and Indiana counties, most of Cambria and Centre counties, and parts of Butler county.  Representative Thompson constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Thompson brings this suit in his capacity as a candidate for federal office and a private citizen.

10.     Plaintiff Mike Kelly (hereinafter, "Representative Kelly") is an adult individual who is a qualified registered elector residing in Butler County, a member of the Republican Party, and the United States Representative for the 16th Congressional District of Pennsylvania. Representative Kelly is currently running for reelection in the 16th Congressional District which includes all of Erie, Crawford, Mercer, and Lawrence counties, as well as part of Butler County. Representative Kelly constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Kelly brings this suit in his capacity as a candidate for federal office and a private citizen.

11.     Plaintiff John Joyce (hereinafter, "Representative Joyce") is an adult individual who is a qualified registered elector residing in Blair County, a member of the Republican Party, and the United States Representative for the 13th Congressional District of Pennsylvania. Representative Joyce is currently running for reelection in the 13th Congressional District which includes all of Blair, Huntingdon, Bedford, Fulton, Franklin, and Adams counties, most of Somerset County, and parts of Westmoreland, Cambria, and Cumberland counties.  Representative Joyce constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Joyce brings this suit in his capacity as a candidate for federal office and a private citizen.

12.     Plaintiff Guy Reschenthaler (hereinafter, "Representative Reschenthaler") is an adult individual who is a qualified registered elector residing in Washington County, a member of the Republican Party, and the United States Representative for the 14th Congressional District of Pennsylvania.  Representative Reschenthaler is currently running for reelection in the 14th Congressional District which includes all of Fayette, Greene, and Washington counties, as well as the western part of Westmoreland County.  Representative Reschenthaler constitutes both a

"candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Reschenthaler brings this suit in his capacity as a candidate for federal office and a private citizen.

13.     Plaintiff Republican National Committee (hereinafter, the "RNC") is a national political committee that leads the Republican Party of the United States (hereinafter, the "Republican Party").  The RNC works to elect Republican candidates to state and federal offices throughout the United States, including in the Commonwealth of Pennsylvania, and it organizes and operates the Republican National Convention through which its members nominate their candidates for President and Vice President of the United States.  The Republican Party includes over thirty million (30,000,000) registered Republicans in all fifty (50) states, the District of Columbia, and the U.S. territories, and constitutes a "political party" as that term is defined in Election Code Section 801, 25 P.S. § 2831.  The RNC brings this action for itself, the Republican Party, all of its members, all registered Republican voters, and all nominated Republican candidates in the November 3, 2020 General Election in the Commonwealth of Pennsylvania.

14.     Plaintiff Melanie Stringhill Patterson (hereinafter, "Ms. Patterson") is an adult individual who is a qualified registered elector residing in Belle Vernon, Fayette County, Pennsylvania.  Ms. Patterson resides in the 14th Congressional District and desires to engage in poll watching for the re-election campaigns of both President Trump and Representative Reschenthaler in counties other than Fayette County.  Ms. Patterson constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t).  Ms. Patterson brings this suit in her capacity as a private citizen.

15.     Plaintiff Clayton David Show (hereinafter, "Mr. Show") is an adult individual who is a qualified registered elector residing in Hopwood, Fayette County, Pennsylvania.  Mr. Show

resides in the 14th Congressional District and desires to engage in poll watching for the re-election campaigns of both President Trump and Representative Reschenthaler in counties other than Fayette County.  Mr. Show constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t).  Mr. Show brings this suit in his capacity as a private citizen.

16.     Defendant Kathy Boockvar (hereinafter, "Secretary Boockvar") is the Secretary of the Commonwealth.  In this role, Secretary Boockvar leads the Pennsylvania Department of State.  As Secretary, she is Pennsylvania's Chief Elections Officer and a member of the Governor's Executive Board.  The Pennsylvania Constitution vests no powers or duties in Secretary Boockvar. *Perzel v. Cortes,* 870 A.2d 759, 764 (Pa. 2005).  Instead, her general powers and duties concerning elections are set forth in Election Code Section 201, 25 P.S. § 2621.  Under the Election Code, Secretary Boockvar acts primarily in a ministerial capacity and has no power or authority to intrude upon the province of the Pennsylvania General Assembly.  *Perzel*, 870 A.2d at 875; *Hamilton v. Johnson*, 141 A. 846, 847 (Pa. 1928).  Secretary Boockvar is sued in her official capacity.

17.     Defendants Adams County Board of Elections, Allegheny County Board of Elections, Armstrong County Board of Elections, Beaver County Board of Elections, Bedford County Board of Elections, Berks County Board of Elections, Blair County Board of Elections, Bradford County Board of Elections, Bucks County Board of Elections, Butler County Board of Elections, Cambria County Board of Elections, Cameron County Board of Elections, Carbon County Board of Elections, Centre County Board of Elections, Chester County Board of Elections, Clarion County Board of Elections, Clearfield County Board of Elections, Clinton County Board of Elections, Columbia County Board of Elections, Crawford County Board of Elections, Cumberland County Board of Elections, Dauphin County Board of Elections, Delaware County

Board of Elections, Elk County Board of Elections, Erie County Board of Elections, Fayette County Board of Elections, Forest County Board of Elections, Franklin County Board of Elections, Fulton County Board of Elections, Greene County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Jefferson County Board of Elections, Juniata County Board of Elections, Lackawanna County Board of Elections, Lancaster County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Lehigh County Board of Elections, Luzerne County Board of Elections, Lycoming County Board of Elections, McKean County Board of Elections, Mercer County Board of Elections, Mifflin County Board of Elections, Monroe County Board of Elections, Montgomery County Board of Elections, Montour County Board of Elections, Northampton County Board of Elections, Northumberland County Board of Elections, Perry County Board of Elections, Philadelphia County Board of Elections, Pike County Board of Elections, Potter County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Somerset County Board of Elections, Sullivan County Board of Elections, Susquehanna County Board of Elections, Tioga County Board of Elections, Union County Board of Elections, Venango County Board of Elections, Warren County Board of Elections, Washington County Board of Elections, Wayne County Board of Elections, Westmoreland County Board of Elections, Wyoming County Board of Elections, and York County Board of Elections (collectively hereinafter, the "County Election Boards"), are the county boards of elections in and for each county of the Commonwealth of Pennsylvania as provided by Election Code Section 301, 25 P.S. § 2641.  The County Election Boards "have jurisdiction over the conduct of primaries and elections in such count[ies], in accordance with the provision of [the Election Code.]"  *Id.* at § 2641(a).  The County Election Boards' general powers and duties are set forth in Election Code Section 302, 25 P.S. § 2642.  The County Election Boards

are executive agencies that carry out legislative mandates, and their duties concerning the conduct of elections are purely ministerial with no exercise of discretion. *Shroyer v. Thomas*, 81 A.2d 435, 437 (Pa. 1951); *Perles v. Hoffman*, 213 A.2d 781, 786 (Pa. 1965) (Cohen, J., concurring). *See also Deer Creek Drainage Basin Authority v. County Bd. of Elections,* 381 A.2d 103, 109 (Pa. 1977) (Pomeroy, J., dissenting) ("A board of elections, it has been well said, "does not sit as a quasi-judicial body adjudicating contending forces as it wishes, but rather as an executive agency to carry out legislative mandates. Its duties are ministerial only."); *In re Municipal Reapportionment of Township of Haverford*, 873 A.2d 821, 833, n.18 (Pa. Commw. Ct. 2005) ("The duties of a board of elections under the Election Code are ministerial and allow for no exercise of discretion."), *appeal denied* 897 A.2d 462 (Pa. 2006).

## <u>FACTUAL ALLEGATIONS</u>

### I.     Federal Constitutional Protections for Free and Fair Public Elections.

18.     Free, fair and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

19.     The most fundamental principle defining credible elections in a democracy is that they must reflect the free expression of the will of the people.

#### A.     *The Right to Vote in Federal Elections.*

20.     The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 665 (1966). *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").

21.     The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.

22.     "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

23.     "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

24.     Fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

25.     "The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

26.     Practices that promote fraud or fail to contain basic minimum guarantees against fraud can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See*

*Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

**B.**    ***The Equal Protection Clause of the Fourteenth Amendment.***

27.    "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-5 (2000).  *See also Harper*, 383 U.S. at 665 ("Once the franchise is granted, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

28.    The Equal Protection Clause of the Fourteenth Amendment proscribes that "one person's vote must be counted equally with those of all other voters in a State."  *Reynolds*, 377 U.S. at 560.  In other words, "whenever a state or local government decides to select persons by popular election to perform governmental functions, [equal protection] requires that each qualified voter must be given an equal opportunity to participate in that election …." *Hadley*, *v. Junior College District*, 397 U.S. 50, 56 (1968).

29.    Accordingly, the Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'"  *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray*, 372 U.S. at 380 ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions.").

30.     "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

31.     The use of "standardless" procedures can violate the Equal Protection Clause. *Bush*, 531 U.S. at 103.   "The problem inheres in the absence of specific standards to ensure … equal application" of even otherwise unobjectionable principles. *Id.* at 106.  Any voting system that involves discretion by decision makers about how or where voters will vote must be "confined by specific rules designed to ensure uniform treatment." *Id.* at 106.

32.     Allowing a patchwork of different rules from county to county in a statewide election involving federal and state candidates implicates equal protection concerns.  *Pierce v. Allegheny County Bd. of Elections*, 324 F. Supp. 2d 684, 698-699 (W.D. Pa. 2003).  *See also Gray*, 372 U.S. at 379-381 (a county unit system which weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties violates the Equal Protection Clause and its one person, one vote jurisprudence).

   **C.     *Constitutional Commitment of Federal Election Regulation to the State Legislature*.**

33.     In statewide elections involving federal candidates, "a State's regulatory authority springs directly from the United States Constitution."  *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing *Cook v. Gralike*, 531 U.S. 510, 522-523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995)).

34.     The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. Art. I, § 4, cl. 1 (emphasis added).  Likewise,

the Electors Clause of the United States Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President."  U.S. Const. Art. II, § 1, cl. 2 (emphasis added).

35.     The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id*. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (U.S. 2015).

36.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

37.     Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections.  *Id.* at 2668.

38.     "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question"  *Bush*, 531 U.S. at 113   (Rehnquist, J., concurring); *Smiley*, 285 U.S. at 365.

## II.     Pennsylvania Constitutional Protections for Free and Fair Public Elections.

39.     The Pennsylvania Constitution also bestows the right to vote upon qualified citizens and guarantees them equal protection in the enjoyment of that right. *See* Pa. Const. art. VII, § 1 & art. I, § 28.

40.     Further, Article I, Section 5 of the Pennsylvania Constitution, entitled "Elections" and commonly referred to as the "Free and Equal Elections Clause," provides:

> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

Pa. Const. art. I, § 5.

41.     The Free and Equal Elections Clause "is contained within the Pennsylvania Constitution's 'Declaration of Rights,' which … is an enumeration of the fundamental individual human rights possessed by the people of the Commonwealth that are specifically exempted from the powers of the Commonwealth government to diminish."   *League of Women Voters v. Commonwealth*, 178 A.3d 737, 803 (Pa. 2018).

42.     "[E]lections are free and equal within the meaning of the [Pennsylvania] Constitution when they are public and open to all qualified electors alike; when every voter has the same right as every other voter; ***when each voter under the law has the right to cast his ballot and have it honestly counted***; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him."   *Winston v. Moore,* 91 A. 520, 523 (Pa. 1914) (emphasis added).

43.     *Winston*'s mandate set forth in the preceding paragraph represents "the minimum requirements for 'free and fair' elections" in this Commonwealth.  *League of Women Voters*, 178 A.3d at 810.

44.     The rights protected by the Free and Equal Elections Clause of the Pennsylvania Constitution, including without limitation the right to free and fair public elections, may not be taken away by an act of the Commonwealth's legislative or executive branches, and both branches are prohibited by this clause from interfering with the exercise of those rights, even if the interference occurs by inadvertence. *League of Women Voters*, 178 A.3d at 810.

45.     The rights protected by the Free and Equal Elections Clause of the Pennsylvania Constitution, including without limitation the right to free and fair public elections, apply to the election of both federal and state candidates.  *League of Women Voters*, 178 A.3d at 811.

### III.     Poll Watching Ensures Free and Fair Public Elections.

46.     The Pennsylvania Constitution gives the Commonwealth's General Assembly the authority to enact legislation governing the conduct of elections.  *See* Pa. Const. art. VII, § 6; *Winston*, 91 A. at 522.

47.     "Pennsylvania's election laws apply equally to federal and state elections."  *Project Vote*, 805 F. Supp. 2d at 174 (citing *Kuznik v. Westmoreland County Board of Elections*, 902 A.2d 476, 490-493 (Pa. 2006)).

48.     Elections in Pennsylvania are governed and regulated by the Election Code.

49.     "Although the [Commonwealth] is ultimately responsible for the conduct and organization of elections, the statutory scheme [promulgated by the Election Code] delegates aspects of that responsibility to the political parties.  This delegation is a legislative recognition of 'the critical role played by political parties in the process of selecting and electing candidates for state and national office.'"  *Tiryak v. Jordan*, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979 (quoting *Marchioro v. Chaney*, 442 U.S. 191, 195 (1979)).

50.     Election Code Section 417, 25 P.S. § 2687, creates the position of poll-watcher and entrusts to each candidate for nomination or election at any election, and each political party and each political body which has nominated candidates for such elections, the power to appoint poll watchers to serve in each election district in the Commonwealth.  *See* 25 P.S. § 2687(a).

51.     Under the Election Code, "poll watcher[s] perform[] a dual function on Election Day.  On the one hand, because [poll watchers] are designated and paid by [candidates, political parties, and/or political bodies], [their] job is to guard the interests of [their] candidates [or political

parties or bodies].  On the other hand, because the exercise of [their] authority promotes a free and fair election, poll watcher[s] serve to guard the integrity of the vote.  Protecting the purity of the electoral process is a state responsibility and [poll watchers'] statutory role in providing that protection involves [them] in a public activity, regardless of [their] private political motives." *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979).

52.     Election Code Section 417 dictates the number of poll watchers allowed, the qualifications and manner of their appointment, their provision of a watcher's certificates from the County Election Boards, their location within the polling place[2], the activities permitted by poll watchers, and the maximum amount of compensation to be paid to poll watchers.  25 P.S. § 2687(a)-(c).

53.     Under Election Code Section 417(b), poll watchers may observe the election process from the time the first polling place official appears in the morning to open the polling place until the time the polls are closed and the election returns are counted and posted at the polling place entrance.  25 P.S. § 2687(b).  However, until the polls close, only one poll watcher representing each political party and its candidates at a general, municipal, or special election can be present in the polling place outside the enclosed space from the time that the election officers meet to open the polls and until the counting of the votes is complete.  *Id*.  *See also* Election Code Section 1220, 25 P.S. § 3060(a) & (d).  Once the polls close and while the ballots are being counted, then all the poll watchers for candidates and political parties or bodies are permitted to be in the polling place outside the enclosed space.  25 P.S. § 2687(b).

---

[2] "Polling place" is a defined term under the Election Code which means "the room provided in each election district for voting at a primary or election."  Election Code Section 102(q), 25 P.S. § 2602(q).

54.     Under Election Code Section 417(b), poll watchers are permitted to keep a list of voters, and during times when voters are not present or voting, watchers can ask the Judge of Elections to inspect the voting check list and either of the two numbered lists of voters, but cannot mark or alter those lists.  25 P.S. § 2687(b).

55.     In addition to the activities authorized by Election Code Section 417(b), poll watchers are among those who are authorized under Election Code Section 1210(d), 25 P.S. § 3050(d), to challenge any person who presents himself or herself to vote at a polling place on Election Day concerning the voter's identity, continued residence in the election district, or registration status.  *See* 25 P.S. § 3050(d) ("any person, although personally registered as an elector, may be challenged by any qualified elector, election officer, overseer, or ***watcher*** at any primary or election as to his identity, as to his continued residence in the election district or as to any alleged violation of the provisions of section 1210 of this act, …") (emphasis added).

56.     Also, prior to October 31, 2019, poll watchers were authorized under Election Code Section 1308(e), 25 P.S. § 3146.8(e) (repealed), to be present at the polling place on Election Day when absentee ballots were examined by local election boards and to assert challenges to the mail-in ballots' validity.

57.     Moreover, poll watchers' functions go beyond the activities authorized under Election Code Sections 417(b) and 1210(d) on Election Day.

58.     For example, under Election Code Section 310, 25 P.S. § 2650, poll watchers appointed by parties, political bodies, or bodies of citizens may appear at any public session of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines, in which case such poll watchers may exercise the same rights as watchers at polling places and may raise objections to any ballots

or machines for subsequent resolution by the county board of elections and appeal to the courts. 25 P.S. § 2650(a) & (c).

59.     Without poll watchers, the integrity of the vote in elections is threatened and the constitutional right to free and fair public elections under the United States and Pennsylvania Constitutions is denied.

60.     Poll watchers serve as an important check to ensure transparency and guard against wrongdoing by election officials.  The need for poll watchers was demonstrated by the case of *United States v. DeMuro*, Criminal No. 20-112 (E.D. Pa. unsealed May 21, 2020).  In that case, a former Judge of Elections in South Philadelphia pled guilty to adding fraudulent votes to the voting machines during Election Day -- also known as "ringing up" votes -- and then falsely certifying that the voting machine results were accurate for specific federal, state, and local Democratic candidates in the 2014, 2015, and 2016 primary elections.  The scheme involved a political consultant who purportedly solicited monetary payments from the candidates as "consulting fees," and then used portions of those funds to pay election board officials, including DeMuro, in return for ringing up votes.  DeMuro was able to commit the fraud because there were no poll watchers at his precinct.  *See United States v. DeMuro*, Criminal No. 20-112, Information (Doc. #1) (E.D. Pa Mar. 03, 2020); M. Cavacini, *"U.S. Attorney William M. McSwain Announces Charges and Guilty Plea of Former Philadelphia Judge of Elections Who Committed Election Fraud,"* U.S. Attys. Office – Pa., Eastern (May 21, 2020) (available at *https://www.justice.gov/usao-edpa/pr/us-attorney-william-m-mcswain-announces-charges-and-guilty-plea-former-philadelphia*).

61.     Poll watchers also serve a "get out the vote" function.  Traditionally, poll watchers have a list of all registered voters and keep track of those who voted to aid their respective candidates, campaign committees, and political parties in encouraging reliable supporters to vote

on election day.  If polling locations fail to open or are relocated and changed, then poll watchers serve to help redirect voters to proper locations in the absence of state guidance.  Poll watchers also aid candidates, parties, and the state by quickly identifying issues with polling locations or rogue election officials, thus facilitating the rapid resolution of those issues before voters are disenfranchised.

## IV.    The Perils of Hastily Moving to an Unmonitored Mail-In Voting System.

62.    "States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45, 50 (1959).

63.    However, failing to enact even basic transparency measures or safeguards against fraud creates an obvious opportunity for ineligible voters to cast ballots, invites fraud, and undermines the public's confidence in the integrity of elections — all of which violate the fundamental right to vote, the guarantee of equal protection, and the right to participate in free, fair, and transparent elections as guaranteed by the United States and Pennsylvania Constitutions.

64.    If a state fails to enact even basic integrity and transparency measures it violates the right to free, fair, and transparent public elections because its elections are no longer meaningfully public and the state has functionally denied its voters a fair election.

65.    "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 195-96 (2008) (plurality op. of Stevens, J.).  As the Commission on Federal Election Reform - a bipartisan commission chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, and cited extensively by the United States Supreme Court - observed, "the 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'" *Building Confidence*

*in U.S. Election,* Report of the Commission on Federal Election Reform, p. 46 (Sept. 2005) (available at https://bit.ly/3dXH7rU, and referred to and incorporated herein by reference) (hereinafter, the "Carter-Baker Report").

66.     According to the Carter-Baker Report, mail-in voting is "the largest source of potential voter fraud." Carter-Baker Report, p. 46. Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines*, p. 2 (Mar. 31, 2020) (available at *https://ssrn.com/abstract=3564829* or *http://dx.doi.org/10.2139/ssrn.3564829,* and referred to and incorporated herein by reference) (hereinafter, "Morley, Redlines"). Such fraud is easier to commit and harder to detect. As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). *See also id.* at 1130-31 (voting fraud is a "serious problem" and is "facilitated by absentee voting.").

67.     Courts have repeatedly found that mail-in ballots are particularly susceptible to fraud. As Justice Stevens has noted, "flagrant examples of [voter] fraud ... have been documented throughout this Nation's history by respected historians and journalists," and "the risk of voter fraud" is "real" and "could affect the outcome of a close election." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 195-196 (2008) (plurality op. of Stevens, J.) (collecting examples). Similarly, Justice Souter observed that mail-in voting is "less reliable" than in-person voting. *Crawford*, 553 U.S. at 212, n.4 (Souter, J., dissenting) ("'election officials routinely reject absentee ballots on suspicion of forgery'"); *id*. at 225 ("absentee-ballot fraud … is a documented problem in Indiana"). *See also Veasey v. Abbott,* 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc) ("mail-in ballot fraud is a significant threat" — so much so that "the potential and reality of fraud is much

greater in the mail-in ballot context than with in-person voting."). *See also id.* at 263 ("[M]ail-in voting ... is far more vulnerable to fraud."); *id.* (recognizing "the far more prevalent issue of fraudulent absentee ballots").

68.     Pennsylvania is not immune from mail-in ballot fraud.  For example, in 1999, former Representative Austin J. Murphy was indicted by a Fayette County grand jury and then convicted of absentee ballot fraud for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge.  *See* B. Heltzel, "Six of seven charges against Austin Murphy dismissed," Pittsburgh Post-Gazette (June 22, 1999) (available at *http://old.post-gazette.com/regionstate/19990622murphy6.asp,* and referred to and incorporated herein by reference).  Similarly, in 2014, Richard Allen Toney, the former police chief of Harmar Township in Allegheny County pleaded guilty to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council.  *See* T. Ove, "Ex-Harmar police chief pleads guilty to ballot tampering," Pittsburgh Post-Gazette (Sept. 26, 2014) (available    at    *https://www.post-gazette.com/local/north/2014/09/26/Ex-Harmar-police-chief-pleads-guilty-to-ballot-tampering-Toney/stories/201409260172*, and referred to and incorporated herein by reference).  Further, in 2015, Eugene Gallagher pled guilty to unlawfully persuading residents and non-residents of Taylor in Lackawanna County to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election.  *See* J. Kohut*,* "Gallagher resigns from Taylor council, pleads guilty to three charges," The Times-Tribune (Apr. 3,  2015)  (available  at  *https://www.thetimes-tribune.com/news/gallagher-resigns-from-taylor-council-pleads-guilty-to-three-charges/article_e3d45edb-fe99-525c-b3f9-a0fc2d86c92f.html*, and referred to and incorporated herein by reference).  *See also Commonwealth v. Bailey*, 775 A.2d 881, 886 (Pa. Commw. Ct. 2001) (upholding defendant's conviction for absentee ballot violations,

holding that a county district attorney has jurisdiction to prosecute such claims even in the absence of an investigation and referral by the Bucks County elections board); *In re Center Township Democratic Party Supervisor Primary Election*, 4 Pa . D. & C.4th 555, 557-563 (Pa. Ct. Com. Pl. Beaver 1989) (court ordered a run-off election after evidence proved that fifteen absentee ballots were applied for and cast by non-existent individuals whose applications and ballots were handled by a political ally of the purported winner).

69.     Mail-in voting is vulnerable to abuse in several ways.  For one, mail-in ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted."  Carter-Baker Report, p. 46.  For another, absentee or mail-in voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation."  *Id*.  And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id*.  For example, "[i]ndividuals can sign and sell their absentee ballot," or "[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently." *Id.*

70.     This risk of abuse by absentee or mail-in voting is magnified by the fact that "many states' voter registration databases are outdated or inaccurate."  Morley, Redlines, p. 2.  A 2012 study from the Pew Center on the States - which the U.S. Supreme Court cited in a recent case - found that "[a]pproximately 24 million - one of every eight - voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state."  *See* Pew Center on the States*, Election Initiatives Issue Brief*, "Inaccurate, Costly, and Inefficient: Evidence That America's Voter Registration System Needs an Upgrade," (Feb. 2012) (available    at    *https://www.issuelab.org/resources/13005/13005.pdf*,    and    referred    to    and

incorporated herein by reference) (cited in *Husted v. A. Philip Randolph Inst*., 138 S. Ct. 1833, 1838 (U.S. 2018)).

71.     Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that roughly 9% of "listed registration records in the United States … are estimated to be invalid." *See* Ansolabehere, S., Hersh, E.*,* Report, Caltech/MIT Voting Technology Project, *The quality of voter registration records: A state-by-state analysis*, "Summary," (Jul 14, 2010) (available at *https://elections.wi.gov/sites/default/files/publication/65/the_quality_of_voter_registration_recor ds_harvard__10685.pdf*, and referred to and incorporated herein by reference).  On top of those invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant is listed multiple times." *Id.*  The same study found that "[i]n the typical state, 1 in 40 counted votes in the 2008 general election cannot be matched to a registrant listed as having voted" and that "1 in 100 listed registrants is likely to be deceased." *Id.*

72.     The risks of abuse by mail-in voting are compounded by the practice of ballot harvesting: *i.e.*, coordinated efforts to have third parties collect mail-in ballots from voters and drop them off at polling places or elections centers.

73.     Ballot harvesters are usually third parties (*i.e.,* campaign workers, union members, political activists, paid personnel, volunteers, or others).  They go door-to-door and offer to collect and turn in ballots for voters. "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."  S. Crabtree, "Amid Covid Mail-In Push, CA Officials Mum on Ballot Harvesting," RealClear Politics (Apr. 24, 2020) (available  at  *https://www.realclearpolitics.com/articles/2020/04/24/amid_covid_mail-in_push_ ca_officials_mum_on_ballot_harvesting__143036.html,* and referred to and incorporated herein by reference).

74.     "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in a number of ways.  Morley, Redlines, p. 5.  For instance, "[h]arvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

75.     These forms of misconduct are incredibly difficult to detect.  The practice is "especially concerning when third parties who are not related to the voter -- and who may not even be known to the voter -- are permitted to harvest unlimited numbers of ballots, frequently without having to identify themselves to election officials or note their identity on the ballots' envelopes." Morley, Redlines, p. 4.

76.     Ballot harvesting can have a substantial negative impact on elections.  For example, in 1993, the Honorable Clarence C. Newcomer of the United States District Court for the Eastern District of Pennsylvania enjoined the Philadelphia County Board of Elections from counting over a thousand voted absentee ballots that had been delivered by Democratic committee members and several campaign workers of William Stinson who was the Democratic candidate for the  2nd senatorial district for the Pennsylvania Senate.  *See Marks v. Stinson,* C.A. No. 93-6157, 1994 WL 1461135, 1994 U.S. Dist. LEXIS 5273, at *83 & *96-*99 (E.D. Pa. April 26, 1994).   Judge Newcomer found that approximately six hundred (600) of the illegally delivered ballots involved unregistered voters who could not have voted in person at the polls.  *Id.*, 1994 U.S. Dist. LEXIS 5273, at *44-*45.  Accordingly, because the ballot harvesting violated the Pennsylvania Election Code and the fundamental right to vote protected by the Fourteenth Amendment, Judge Newcomer declared Bruce Marks, the Republican candidate, the winner of that election.  *Id.* at *77-*92.

77.     To be sure, absentee or mail-in voting can be a legitimate feature of a state's election process when coupled with adequate procedural safeguards to deter fraud.  But given the many risks discussed above, in most states, it is an *alternative* implemented carefully and slowly and *only with* such safeguards in place.

78.     One procedural safeguard is prohibiting a third party's ability to collect and return another person's absentee or mail-in ballot.  As the Carter-Baker Report explains: "States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots."  Carter-Baker Report, p. 46.

79.     Another procedural safeguard is specifying the location where absentee or mail-in ballots can be returned and providing for state officials or poll watchers to monitor the return or delivery of ballots to those location.

80.     Federal law also recognizes the risks of unmonitored absentee or mail-in voting and thus requires certain first-time voters to present identification.  *See* 52 U.S.C. § 21083(b).

**V.      Pennsylvania Enacts All-Voter Mail-in Voting.**

81.     The Pennsylvania General Assembly may enact laws governing the conduct of elections.  *Winston v. Moore*, 91 A. 520 (Pa. 1914).  However, "no legislative enactment may contravene the requirements of the Pennsylvania or United States Constitutions."  *Shankey v. Staisey*, 257 A. 2d 897, 898 (Pa. 1970), *cert. denied*, 396 U.S. 1038 (1970).

82.     "Prior to the year 1957, the Pennsylvania Constitution permitted absentee voting only by individuals engaged in actual military service (Art. 8, § 6 of the Pennsylvania Constitution (1874)), and by bedridden or hospitalized veterans (Art. 8, § 18 added to the Pennsylvania Constitution (1949))."  *Absentee Ballots Case*, 224 A.2d 197, 199 (Pa. 1966).

83.     In 1957, the Pennsylvania Constitution was further amended to permit absentee voting for those "qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee[.]"  Pa. Const. art. VII, § 14.

84.     In 1960, the Election Code was amended to implement the 1957 amendment to the Pennsylvania Constitution.  *Absentee Ballots Case*, 224 A.2d at 200.  *See also* The Act of January 8, 1960, entitled "An Act amending the Act of June 3, 1937," P.L. 2135, 25 P.S. §§ 3149.1-3149.9 (Supp. 1960).

85.     "Absentee voting has consistently been regarded by the Pennsylvania courts as an extraordinary procedure in which the safeguards of the ordinary election process are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d 419, 420 (Pa. Ct. Com. Pl. Phila. 1964).

86.     Specifically, "in the casting of an absentee ballot, the ordinary safeguards of a confrontation of the voter by the election officials and watchers for the respective parties and candidates at the polling place are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420.

87.     Because "it is fraught with evils and frequently results in void votes," Pennsylvania's laws regarding absentee voting are "strictly construed and the rights created thereunder not extended beyond the plain and obvious intention of the act." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420-21 (citing *Decision of County*

*Board of Elections*, 29 D.&C.2d 499, 506-7 (Pa. Ct. Com. Pl. 1962)).  *See also Marks,* 1994 U.S. Dist. LEXIS 5273, at *78.

88.     On October 31, 2019, the Pennsylvania General Assembly enacted Act 77.  *See* Act 2019-77 (S.B. 421), § 8, approved October 31, 2019, eff. October 31, 2019.

89.     Act 77 made significant changes to Pennsylvania's elections, including the adoption of no excuse mail-in voting for all qualified electors.  *See, e.g.,* 25 P.S. §§ 3150.11-3150.17.

90.     For both absentee and mail-in voting, Act 77 retains the requirement that to ensure the ballot's secrecy and to prevent fraud, "the [non-disabled] elector shall send [his or her absentee or mail-in ballot] by mail, postage, except where franked, or deliver it in person to [the] county board of elections," in order for the ballot to be properly cast under Act 77.  *See* 25 P.S. §§ 3146.6(a) & 3150.16(a).  Accordingly, as it did prior to the enactment of Act 77, the Election Code bars ballot harvesting of absentee and mail-in ballots cast by non-disabled voters.  *See In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d 1223, 1225 (Pa. 2004); *Marks,* 1994 U.S. Dist. LEXIS 5273, at *83.

91.     Also, for both absentee and mail-in voting, Act 77 retains the requirement that in order for such ballot to be properly cast:

> [T]he [non-disabled] elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope.

*See* 25 P.S. §§ 3146.6(a) & 3150.16(a).  Moreover, as it did prior to the enactment of Act 77, the Election Code bars the counting of an absentee or mail-in ballot that either lacks an "Official Election Ballot" or contains on that envelope "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference."  *See* Election Code Section 1308(g)(i)-(iv), 25 P.S. § 3146.8(g)(4)(i)-(iv).  These provisions serve to ensure the secrecy of absentee and mail-in ballots and to prevent fraud.

92.    However, in contrast to prior provisions of the Election Code, all absentee and mail-in ballots are no longer sent to polling places on Election Day and are no longer inspected by the local election boards or subject to challenge by poll watchers at the polling places.  Instead, Act 77 mandates that all properly cast absentee and mail-in ballots are to remain with the county boards of elections until they are to be canvassed by them.  *See* Election Code Section 1308(a), 25 P.S. § 3146.8(a).

93.    Additionally, contrary to the prior provisions of the Election Code, Act 77 requires the county boards of elections to conduct a pre-canvass of all absentee and mail-in ballots received to that point before 7:00 a.m. on Election Day.  Poll watchers are not permitted to attend this pre-canvass meeting; rather, only one "representative" for each candidate and political party can be present.  *See* Election Code Section 1308(g)(2), 25 P.S. § 3146.8(g)(2).

94.    Further, contrary to prior provisions of the Election Code, Act 77 mandates that the county boards of elections meet no earlier than the close of polls on Election Day and no later than the third day following the election to begin canvassing absentee and mail-in ballots.  But, like prior provisions of the Election Code, poll watchers are permitted to be present when the envelopes containing official absentee and mail-in ballots are opened and when such ballots are counted and recorded.  *See* Election Code Section 1308(g)(2) & (b), 25 P.S. § 3146.8(g)(2) & (b).

95.     Similar to prior provisions of the Election Code, Act 77 specifies the county board of elections as the location for where voters must mail or personally deliver all cast absentee and mail-in ballots.   *See* Election Code Section 1306(a), 25 P.S. § 3146.6(a); 25 P.S. § 3150.16. Accordingly, other locations, including without limitation mobile locations and polling places, are not authorized for the return or delivery of absentee or mail-in ballots under Act 77.  *Id.*

96.     Act 77 prohibits an elector from casting both a mail-in ballot and in-person ballot. Specifically, Act 77 provides:

> Any elector who receives and votes a mail-in ballot under section 1301-D shall not be eligible to vote at a polling place on election day.  The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who voted a mail-in ballot to vote at the polling place.

25 P.S. § 3150.16(b)(1).

97.     Further, Act 77 provides that an elector who requests a mail-in or absentee ballot and who is not shown on the district register as having voted may vote only by provisional ballot at the polling place on Election Day, unless the elector remits the unvoted mail-in or absentee ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement under penalties of perjury that he or she has not voted the absentee or mail-in ballot.  25 P.S. § 3150.16(b)(2) & (3).

## VI.    **Defendants' Administration of Pennsylvania's 2020 Primary Election Resulted in Violations of the Election Code and Infringement of Constitutional Rights to Free, Fair and Transparent Public Elections.**

98.     On June 2, 2020, Pennsylvania held its Primary Election which was the first election that followed the enactment of Act 77 and its unmonitored all voter mail-in voting alternative.

99.     Prior to the Primary Election, Pennsylvania election officials estimated that as many as two million (2,000,000) voters would apply to vote by mail.  *See Crossey v. Boockvar*, No. 266 MD 2020 (Pa. Commw. Ct. May 18, 2020), "Decl. of Jonathan Marks, the Deputy Secretary for Elections and Commissions for Pennsylvania," ¶ 32  (hereinafter, "Marks Decl." and referred to and incorporated herein by reference).   "Ultimately, more than 1.8 million voters applied for a mail-in or absentee ballot."  *See "*Trump, Biden win Pennsylvania primary contests amid unrest, pandemic," TRIBLive–Associated Press (June 2, 2020) (available at *https://triblive.com/news/pennsylvania/pennsylvania-primary-begins-amid-unrest-pandemic/,* and referred to and incorporated herein by reference).

100.    According to Secretary Boockvar, "nearly 1.5 million voters cast their vote by mail-in or absentee ballot [in the June 2, 2020 Primary Election.]"  *See* K. Boockvar, "FixGov: Historic primary paves way for successful general election in Pennsylvania," The Brookings Institution (June 22, 2020) (available at *https://www.brookings.edu/blog/fixgov/2020/06/22/historic-primary-paves-way-for-successful-general-election-in-pennsylvania/*, and referred to and incorporated herein by reference).

101.    Despite the record number of requested and voted absentee or mail-in ballots, Defendants failed to take adequate measures to ensure that the provisions of the Election Code concerning absentee or mail-in ballots, including without limitation the newly enacted Act 77, were followed.

102.    For example, on May 14, 2020, Allegheny County reported that an issue with the State's SURE system was causing the printing and mailing of duplicate mail-in and absentee ballots to voters within its county.  *See* A. Downs, "Elections Division Statement on State SURE System Issue Impacting County," Allegheny County Dept. of Adm. Servs. – Div. of Elections

(May 14, 2020) (available at *file:///H:/Downloads/Elections%20Division%20Statement% 20on%20State%20SURE%20System%20Issue%20Impacting%20County%20(2).pdf*, and referred to and incorporated herein by reference). Further, several Allegheny County residents reported that they never received their mail-in or absentee ballots, and of the more than 280,000 mail-in ballots requested, only 75% of the ballots were received back, as of June 4, 2020. *See* "Allegheny County voters identify 5 issues to address before November presidential election," PublicSource (Jun. 4, 2020) (available at *https://www.publicsource.org/allegheny-county-voters-identify-5-issues-to-address-before-november-presidential-election/*, and referred to and incorporated herein by reference).

103. Despite the Election Code's clear and unambiguous mandate that absentee and mail-in ballots by non-disabled electors were to be mailed or personally delivered to only the county boards of elections, approximately twenty (20) County Election Boards, with Secretary Boockvar's knowledge and consent, allowed absentee and mail-in ballots to be returned to other locations, such as shopping centers, parking lots, fairgrounds, parks, retirement homes, college campuses, fire halls, municipal government buildings, and elected officials' offices. *See* "Voting by Absentee or Mail-In Ballot: County drop boxes and drop-off locations," Pa. Dept. of State (2020) (available at *https://www.votespa.com/Voting-in-PA/Documents/2020Primary-County-DropLocations.pdf*, and referred to and incorporated herein by reference). *See also* Joe Brandt and Deanna Durante, *"Can You Drop Off a Pa. Mail-In Ballot? It Depends Where You Live,"* Channel 10 Philadelphia (May 26, 2020) (available at *https://www.nbcphiladelphia.com/news/local/can-you-drop-off-a-pa-mail-in-ballot-it-depends-where-you-live/2408168/*, and referred to and incorporated herein by reference); Shaunice Ajiwe, "Here Are All the Places You Can Drop Off Your Mail-In Ballot," Philadelphia Magazine (May 29, 2020) (available at

*https://www.phillymag.com/news/2020/05/29/drop-off-mail-in-ballot/*, and referred to and incorporated herein by reference).

104.    Additionally, the Philadelphia County Board of Elections partnered with the Committee of Seventy, a Philadelphia based, self-proclaimed non-partisan group, to implement a mobile mail-in ballot drop-off initiative to collect voted absentee and mail-in ballots from non-disabled voters.  The mobile collection occurred between May 30, 2020 and June 1, 2020 at certain schools and shopping centers within Philadelphia County, and was in addition to the Commissioner's "24/7 mail-in ballot drop-off locations" at "[Philadelphia] City Hall (south portal) and [the Philadelphia County] Board of Elections Office at 520 N. Columbus Blvd (Spring Garden entrance)."  *See* Office of the Philadelphia City Commissioners, "Mobile Drop Off Location for Mail-In-Ballot" (available at *https://www.philadelphiavotes.com/en/home/item/1814-mobile_drop_off_location-_for_mail_in_ballot,* and referred to and incorporated herein by reference).

105.    Most of the other locations that were used to collect mail-in or absentee ballots for the Primary Election involved the use of unmonitored and/or unsecured "drop-off boxes" and/or other similar means.

106.    Moreover, the amount of notice and the fashion in which notice was given concerning the existence, use, and location of the drop boxes and the mobile voting sites varied among the twenty counties that implemented such measures, and many of the notices failed to comply with the Election Code's notice publication requirements.  *See, e.g.,* Election Code Sections 106 and 526(c), 25 P.S. §§ 2606 & 2726(c).

107.   Under Act 77, the other locations that were used to collect mail-in or absentee ballots for the Primary Election do not constitute a "polling place" as defined in Election Code Section 102(q), 25 P.S. § 2602(q).

108.   Moreover, Election Code Sections 526 through 530, 25 P.S. §§ 2726-2729.1, set forth the requirements that must be met for a location to be selected and used as a "polling place." Notably, Election Code Section 529.1, 25 P.S. § 2729.1, mandates that "[n]o election shall be held in any of the following: … (5) A vacant lot[; or] … (7) An office, building or private residence of an elected official. … ."  Accordingly, many of the other locations that were used to collect mail-in or absentee ballots for the Primary Election violated Election Code Section 529.1, 25 P.S. § 2729.1.

109.   The other locations that were used to collect mail-in or absentee ballots for the Primary Election were used in violation of the Election Code's mandatory provisions, including without limitation the clear and unambiguous mandate that absentee and mail-in ballots were to be mailed or personally delivered by the electors to only the county boards of elections, *see* Election Code Section 1306(a), 25 P.S. § 3146.6(a); 25 P.S. § 3150.16, and that no election shall be held in a vacant lot or an office or building of an elected official, *see* Election Code Section 529.1, 25 P.S. § 2729.1.

110.   The use of illegal and inadequately noticed drop boxes or mobile drop-off facilities eviscerates the procedural protections that currently accompany Pennsylvania's vote by mail procedures by creating a gap in the ability of both the Commonwealth and political parties to observe the delivery process and ensure that Pennsylvania's election laws are being followed.

111.   Equally concerning is that, according to a recent report from the Philadelphia County Board of Elections, double voting (*i.e.*, voting by mail and in-person by the same elector)

occurred in the Primary Election.  *See*  Jonathan Lai, "Philly elections officials caught 40 cases of double voting. It's not fraud, but it's still a problem," The Philadelphia Inquirer (June 16, 2020) (available at https://www.inquirer.com/politics/election/pa-primary-election-mail-ballots-double-voting-20200616.html, and referred to and incorporated herein by reference).

112.    The double-voting occurred in Philadelphia despite Act 77's clear and unambiguous mandate that an elector cannot cast both a mail-in or absentee ballot and an in-person or machine ballot.  25 P.S. § 3150.16(b)(1)-(3).

113.    Moreover, not all counties followed the Election Code's mandate to not count absentee and mail-in ballots that either lacked an "Official Election Ballot" or contained on that envelope "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference."  For example, upon information and belief, Philadelphia County Board of Election counted such absentee and mail-in ballots, whereas Allegheny County Board of Elections did not.

114.    The casting of votes in violation of the Election Code's mandatory provisions renders them void.  *Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234.

115.    Further, for statewide elections involving federal candidates, Defendants' allowance, by act or omission, of the collection and counting of absentee and mail-in ballots in a manner and at locations that are contrary to the Election Code's mandatory provisions constitutes legislative action by the Executive Branch in violation of the Elections and Electors Clauses of the United States Constitution.

116.    Finally, the lack of statewide standards governing the location of drop boxes and the subsequent use of a patchwork of ad-hoc rules that vary from county to county in a statewide

election involving federal and state-wide candidates violates the equal protection clause of the Fourteenth Amendment. *Pierce*, 324 F. Supp. 2d at 698-699.

**VII.   Pennsylvania's Poll Watching is Unconstitutionally Restrictive.**

117.   When initially enacted, Election Code Section 417 restricted a poll watcher's geographical territory to a single appointed election district within the county in which the person was a qualified registered elector. *See* 25 P.S. § 2687 (1947).

118.   In 2004, Election Code Section 417 was amended to expand the poll watcher's geographical territory from a single election district to all election districts in the county in which the watcher is a qualified registered elector.  25 P.S. § 2687(b) (2004).

119.   In 2019, when Act 77 was enacted, no changes were made to Election Code Section 417 or the county residency requirement of poll watchers.

120.   Consequently, as currently written, Election Code Section 417 does not permit a candidate or political party or any other body to appoint a poll watcher to serve in an election district in a county in which the watcher is not a qualified registered elector. *See* Election Code Section 417, 25 P.S. § 2687(b).

121.   In this upcoming November 3, 2020 General Election, there are both federal and state-wide candidates, including President Trump and Representatives Thompson, Kelly, Joyce, and Reschenthaler, whose election will be impacted by the manner in which the voting in all sixty-seven (67) counties of the Commonwealth is conducted.

122.   Moreover, the Election Code sets forth the uniform standards that all sixty-seven (67) counties must follow in order to conduct any election in this Commonwealth and to cast and count votes, and the provisions of the Election Code do not create different standards for one or more classes of counties.  Rather, the standards apply equally to all 67 counties.

123.    Accordingly, the manner in which the November 3, 2020 General Election is conducted and in which votes are cast and counted should be uniform across the counties of the Commonwealth.

124.    The Equal Protection Clause mandates that the Commonwealth provide and use the same statewide uniform standards and regulations when conducting statewide or multi-county elections involving federal candidates, including without limitation the standards and regulations providing for the casting and counting of votes.  *Pierce*, 324 F. Supp. 2d at 698-699.  In other words, the Equal Protection Clause requires every county in the Commonwealth to enforce and apply the same standards and procedures for an election, and it does not allow a select few counties to either decline to enforce or employ those standards or develop their own contradicting standards that benefit their voters to the detriment of  voters outside their counties.  *Id.*

125.    Because the standards in the conduct of statewide elections involving federal and state candidates, including without the without limitation the casting and counting of votes, are to be uniform, all Pennsylvania registered voters, regardless of location, have a vested interest in ensuring that the electoral process is properly administered in every election district.

126.    The Commonwealth has not, and cannot, articulate a constitutionally-recognized basis to restrict poll watchers from serving in counties other than their county of residence.

127.    The Commonwealth's arbitrary rule against voters serving as poll watchers in counties other than their county of residence has real, demonstrable impacts on all Plaintiffs to this action.

128.    In Pennsylvania, all Congressional electoral districts contain portions of multiple counties, and President Trump will appear on every ballot that will be cast in the November 3, 2020 General Election in all 67 counties of the Commonwealth.  Consequently, all Plaintiffs have

an interest in having their poll watchers monitor the polls in multiple counties to ensure the integrity of the vote on behalf of themselves and the other federal and state electoral candidates and to protect the integrity of the vote on behalf of its registered electors who are voting for federal and statewide Republican candidates.

129.    According to statistics collected and disseminated by the Pennsylvania Department of State, there is a significant gap between the number of voters registered as Democrats and the number of registered Republicans in some Pennsylvania counties.  *See* "2019 Voter Registration Statistics – Official," Pa. Dept. of State (Nov. 5, 2019) (available at *https://www.dos.pa.gov/ VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/2019%20Election%20 VR%20Stats%20%20final.pdf*, and referred to and incorporated herein by reference) (hereinafter, the "2019 Voter Registration Statistics").

130.    For example, in Philadelphia County, there exist 66 voting wards which are divided into 1,686 divisions (hereinafter, the "Philadelphia Divisions").  *See* Political Maps, Office of the Phila. City Commissioners (2020) (available at *http://www.philadelphiavotes.com/en/resources-a- data/political-maps*, and referred to and incorporated herein by reference).  Republicans are not a majority of registered voters in any ward in Philadelphia County.  *See* Department Reports and Data, "Historical Citywide Voter Registration Data," Office of the Phila. City Commissioners (1940- 2019) (available at *https://files7.philadelphiavotes.com/department-reports/Historical_Registration_ 1940-2019G.pdf#_ga=2.206750996.604579856.1592778750-1031414694.1591725640*,          and referred to and incorporated herein by reference).

131.    In some contiguous geographic areas of the Commonwealth, such as in Fulton, Franklin, Bedford, Huntingdon and Perry counties, Republicans account for almost 70% of the

voters, thereby placing Democrats at a disadvantage in staffing polling places with Democratic poll watchers.  *See* 2019 Voter Registration Statistics.

132.    As a result of the Commonwealth's arbitrary restriction on poll watchers, candidates, political parties, and political bodies are unjustifiably burdened in their attempts to locate available, qualified registered electors who can serve as poll watchers.

133.    Additionally, Pennsylvania law does not speak to the ability of poll watchers to be present at the other locations that were used to collect mail-in and absentee ballots for the Primary Election to ensure that no third-party delivery or other ballot-harvesting has occurred.  *See* Election Code Sections 417 & 102(q), 25 P.S. §§ 2687(b) &  2602(q).

134.    Nor are poll watchers permitted to be present during the pre-canvass meetings held on Election Day by the county boards of elections of the absentee and mail-in ballots.  *See* Election Code Section 1308(g)(2), 25 P.S. § 3146.8(g)(2).

135.    In the June 2, 2020 Primary Election, approximately half of the cast votes were by absentee and mail-in ballots.

136.    For the upcoming November 3, 2020 General Election, the predictions are that the same or greater percentage of absentee and mail-in ballots will be cast.

137.    Plaintiffs have a substantial interest to ensure that the upcoming November 3, 2020 General Election is conducted in a free, open, and honest manner and that the votes cast are legitimate.

138.    The Commonwealth has not articulated and cannot articulate a constitutionally-recognized basis to restrict poll watchers from being present at locations that are used to collect mail-in and absentee ballots prior to or on Election Day (to the extent such collections at locations beyond the County Election Boards' offices or through inadequately noticed and unmonitored ad

hoc drop boxes are authorized by the Election Code, which Plaintiffs assert they are not), or the pre-canvass meeting of such voted absentee and mail-in ballots.

139.    The Commonwealth's arbitrary exclusion of poll watchers from being present at locations that are used to collect mail-in and absentee ballots prior to Election Day (to the extent such collections at locations beyond the County Election Boards' offices or through inadequately noticed and unmonitored ad hoc drop boxes are authorized by the Election Code, which Plaintiffs assert they are not), or the pre-canvass meeting of such ballots has real, demonstrable impacts on all Plaintiffs to this action.

140.    Poll watchers serve the important purpose of assuring voters, candidates, political parties, and political bodies, who may question the fairness of the election process, that the same is conducted in compliance with the law, and is done in a correct manner which protects the integrity and validity of the vote and ensures that all elections are free, open, fair, and honest.

141.    Arbitrarily restricting a registered voter from serving outside of the county of his or her residence and/or limiting his or her activities to only those which occur at a polling place on Election Day results in an unconstitutional infringement on the fundamental right to vote, the guarantee of equal protection, and the right to participate in free and fair public elections as guaranteed by the United States and Pennsylvania Constitutions.

**VIII.   Need for Judicial Intervention.**

142.    The current voting regime as employed by Defendants has needlessly resulted in the denial of free and fair elections and other fundamental rights during the Pennsylvania Primary Election.  Absent judicial intervention, there is no reason to believe things will be different during the November 3, 2020 General Election.

143.    This Court should act now to prevent a recurrence of the problems that manifested in the Pennsylvania Primary Election.  Although the November General Election is still months

away, presenting these issues to the Court now allows this Court and the parties sufficient time to develop a record and adequately consider the legal merits of Plaintiffs' claims.

144.   Plaintiffs respectfully request that this Court prevent Defendants from making the same mistake twice.  In addition to any other affirmative relief that the Court may deem necessary and proper, Plaintiffs seek an order, declaration, and/or injunction that prohibits Defendants from permitting the return of absentee and mail-in ballots to locations other than the respective office of the county boards of elections as prescribed by the Pennsylvania Election Code.  In the alternative, if the challenged conduct is not found to be illegal, Plaintiffs seek an order, declaration, and/or injunction instructing Defendants to publish uniform state-wide guidance on absentee ballot drop boxes explaining that the locations for absentee ballot drop boxes are subject to the same notice and determination requirements that Pennsylvania law currently provides for polling places. Further, Plaintiffs seek an order, declaration, and/or injunction that bars County Election Boards from counting absentee and mail-in ballots that lack an "Official Election Ballot" secrecy envelope or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference.  Finally, Plaintiffs seek an order, declaration, and/or injunction that permits poll watchers, regardless of their county of residence, to be present in all locations where votes are cast, including without limitation where absentee or mail-in ballots are being returned before and on Election Day and at any pre-canvass meetings.

## COUNT I

**First and Fourteenth Amendments**
**U.S. Const. Art. I § 4, cl. 1; Art. II, § 1, cl. 2; Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Invalid Enactment of Regulations Affecting the**
**Time, Place and Manner of Election by Pennsylvania's Executive Branch**

145.   Plaintiffs refer to and incorporate Paragraphs 1 through 144 of this Complaint as though the same were repeated at length herein.

146.     Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution.

147.     The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process.  *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (lst Cir. 1978).

148.     The United States Constitution entrusts state legislatures to set the time, place, and manner of congressional elections and to determine how the state chooses electors for the presidency.  *See* U.S. Const. Art. I, § 4, cl. 1 & Art. II, § 1, cl. 2.

149.     In Pennsylvania, "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representative."  Pa. Const. Art. II, § 1.  *See also Winston*, 91 A. at 522 ("The power to regulate elections is legislative, and has always been exercised by the lawmaking branch of the government."); *Patterson v. Barlow,* 60 Pa. 54, 75 (1869) ("It is admitted that the Constitution cannot execute itself, and that the power to regulate elections is a legislative one, which has always been exercised by the General Assembly since the foundation of the government.").

150.     Defendants, as a member of the Governor's Executive Board and county executive agencies, are not part of the General Assembly and cannot exercise legislative power.  Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed."  Pa. Const. Art. IV, § 2.

151.     Although the Pennsylvania General Assembly may enact laws governing the conduct of elections, "no legislative enactment may contravene the requirements of the Pennsylvania or United States Constitutions."  *Shankey v. Staisey*, 257 A. 2d 897, 898 (Pa. 1970), *cert. denied*, 396 U.S. 1038 (1970).

152.     The Pennsylvania Election Code mandates that all absentee and mail-in ballots by non-disabled electors "shall" be enclosed in the "Official Election Ballot" secrecy envelope with no text, mark, or symbol which reveals the elector's identity, political affiliation or candidate preference, and then "shall" be mailed or personally delivered to only the county boards of elections to ensure that the ballots are properly cast, kept secret, and not subject to fraud.  *See* 25 P.S. §§ 3146.6(a), 3150.16(a) & 3146.8(g)(4)(i)-(iv).

153.     Rather than heeding this mandate, Defendants have knowingly authorized, allowed, and/or permitted some, but not all, of the County Election Boards to collect absentee and mail-in ballots at locations other than their offices, including without limitations mobile sites and locations that the Election Code has mandated shall not serve as polling places, and/or to utilize "drop boxes" and other unmonitored and/or unsecured means.  Also, some, but not all, of the County Election Boards count absentee and mail-in ballots that lack the "Official Election Ballot" secrecy envelope or contain a text, mark, or symbol thereon despite the Election Code's contrary mandate.

154.     Permitting absentee and mail-in ballots of non-disabled electors to be collected at locations other than the offices of the county boards of elections and/or through "drop boxes" and other unmonitored and/or unsecured means and to be counted when not cast in the manner mandated by the Election Code allows illegal absent and mail-in voting, ballot harvesting, and other fraud to occur and/or go undetected, and will result in dilution of validly cast ballots.

155.     By unilaterally establishing drop boxes and other locations for the return of absentee and mail-in ballots and by counting improperly cast absentee and mail-in ballots, both in contradiction of Pennsylvania's statutory law, Defendants have increased the potential for ballot fraud or tampering, thus infringing the right to vote as secured to Plaintiffs and their members by

the First and Fourteenth Amendments to the United States Constitution, without any authority to do so.

156.    Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

157.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT II

**Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Equal Protection**
**Disparate Treatment of Nondisabled Absentee/Mail-In Voters Among Different Counties**

158.    Plaintiffs refer to and incorporate Paragraphs 1 through 157 of this Complaint as though the same were repeated at length herein.

159.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.

160.    The Equal Protection Clause prevents the government from treating similarly situated voters differently without a compelling justification for doing so.  *Bush*, 531 U.S. at 104-05 ("[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."

161.    The requirement of equal treatment is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

162.    The Pennsylvania Election Code mandates that all absentee and mail-in ballots by non-disabled electors "shall" be enclosed in the "Official Election Ballot" secrecy envelope with

no text, mark, or symbol which reveals the elector's identity, political affiliation or candidate preference, and then "shall" be mailed or personally delivered to only the county boards of elections to ensure that the ballots are properly cast, kept secret, and not subject to fraud. *See* 25 P.S. §§ 3146.6(a), 3150.16(a) & 3146.8(g)(4)(i)-(iv).

163.    Rather than heeding this mandate, Defendants have knowingly authorized, allowed, and/or permitted some, but not all, of the County Election Boards to collect absentee and mail-in ballots at locations other than their offices, including without limitations mobile sites and locations that the Election Code has mandated shall not serve as polling places, and/or to utilize "drop boxes" and other unmonitored and/or unsecured means.  Also, some, but not all, of the County Election Boards count absentee and mail-in ballots that lack the "Official Election Ballot" secrecy envelope or contain a text, mark, or symbol thereon despite the Election Code's contrary mandate.

164.    Permitting absentee and mail-in ballots of non-disabled electors to be collected at locations other than the offices of the county boards of elections and/or through "drop boxes" and other unmonitored and/or unsecured means and to be counted when not cast in the manner mandated by the Election Code allows illegal absent and mail-in voting, ballot harvesting, and other fraud to occur and/or go undetected, and will result in dilution of validly cast ballots.

165.    Defendants, through their intentional, negligent, or reckless acts or omissions, have violated the Elections and Electors Clauses of the United States Constitution and infringed upon the equal protection rights of Plaintiffs, their members, and all qualified Pennsylvania voters.

166.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection Clause of the United States Constitution.

167.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT III

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Invalid Enactment of Regulations**
**Affecting the Time, Place and Manner of Election by Pennsylvania's Executive Branch**
**and Denial of Equal Protection via Disparate Treatment of Absentee/Mail-In Voters**
**Amongst Different Counties**

168.     Plaintiffs refer to and incorporate Paragraphs 1 through 167 of this Complaint as though the same were repeated at length herein.

169.     The Pennsylvania Constitution also bestows the right to vote upon qualified citizens and to equal protection in the enjoyment of that right.  *See* Pa. Const. art. VII, § 1 & art. I, § 28.

170.     Further, the Free and Equal Elections Clause of the Pennsylvania Constitution, provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. I, § 5.

171.     A free and fair election requires ballot security.

172.     For the same reasons Defendants have violated the United States Constitution's Elections and Electors Clauses and its First and Fourteenth Amendments and Equal Protection Clause by their intentional, negligent, or reckless failure or refusal to enforce the Election Code's mandated concerning the collection of absentee and mail-in ballots (as stated more fully in Paragraphs 145 through 167 of this Complaint), Defendants have violated the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and have infringed upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

173.     Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

174.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT IV

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against Dilution of Vote by Fraud or Tampering: Poll Watcher Residency Restriction & Polling Place Restriction**

175.     Plaintiffs refer to and incorporate Paragraphs 1 through 174 of this Complaint as though the same were repeated at length herein.

176.     In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Plaintiffs and all qualified voters in the Commonwealth of Pennsylvania, regardless of their location or residence, have a vested interest in ensuring that the electoral process is properly administered in every election district.

177.     Defendants have a duty to establish basic minimum safeguards to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.

178.     In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Election Code Section 417, 25 P.S. § 2687, arbitrarily and unreasonably distinguishes between qualified voters within the Commonwealth of Pennsylvania by limiting their service as a poll watcher to only the county of their

residence and by limiting their service as a poll watcher to monitoring only in-person voting at the polling place on Election Day.

179.    The Commonwealth has no legitimate interest in arbitrarily restricting the right of any of its qualified voters from serving as a poll watcher to monitor the drop off of absentee and mail-in ballots before Election Day, regardless in what county those ballots may be cast.

180.    By failing to allow Pennsylvania voters to serve as poll watchers in counties other than their county of residence or monitor the drop off of absentee and mail-in ballots, Election Code Section 417, 25 P.S. § 2687 makes it extremely difficult or functionally impracticable for candidates and parties to ensure that they have poll watchers at all locations that ballots are being cast in connection with the November 2020 General Election – including remote drop boxes (which Plaintiffs contend are not permitted under the Election Code) – thus fostering an environment that encourages ballot fraud or tampering, and preventing the Commonwealth, candidates, and political parties from ensuring that the General Election is free, fair, and transparent.

181.    By failing to take basic precautions to protect against ballot fraud or tampering, Defendants have infringed the right to vote as secured to Plaintiffs and their members by the First and Fourteenth Amendments to the United States Constitution without any compelling reason to do so.

182.    On its face and as applied to the 2020 General Election, Election Code Section 417's residency requirement and its "polling place" requirement deny qualified voters in the Commonwealth of Pennsylvania of their fundamental right to a free, fair, and transparent public election process.

183.     Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

184.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT V

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Poll Watcher Residency Restriction &**
**Polling Place Restriction**

185.     Plaintiffs refer to and incorporate Paragraphs 1 through 184 of this Complaint as though the same were repeated at length herein.

186.     For the same reasons Election Code Section 417's county residency requirement and polling place restriction violate the United States Constitution's First and Fourteenth Amendments and its Equal Protection Clause (as stated more fully in Paragraphs 175 through 184 of this Complaint), Election Code Section 417's county residency requirement and polling place restriction violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and infringe upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

187.     Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

188.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT VI

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Failure to Notice Drop Box Location**

189.     Plaintiffs refer to and incorporate Paragraphs 1 through 188 of this Complaint as though the same were repeated at length herein.

190.     In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Plaintiffs and all qualified voters in the Commonwealth of Pennsylvania, regardless of their location or residence, have a vested interest in ensuring that the electoral process is properly administered in every election district.

191.     In the June 2, 2020 Primary Election, some of the County Election Boards, with Secretary Boockvar's knowledge and consent, established drop box and mobile drop box drop off locations for absentee and mail-in ballots in contradiction of state law while providing insufficient public notice regarding the location of these drop boxes or mobile locations.

192.     The Election Code requires the County Election Boards to provide not less than twenty (20) days' public notice of the location of all polling places where an election is to be held, and not less than five (5) days' public notice before closing or opening a new polling place.  *See* Election Code Section 526(a) & (c), 25 P.S. § 2726(a) & (c); *see also* Election Code Section 106, 25 P.S. § 2606.

193.     Moreover, the Election Code provides certain criteria that govern the selectin of sites for polling places.  *See* Election Code Sections 527-529.1, 25 P.S. §§ 2727-2729.1.

194.     Defendants failed to comply with either the Election Code's notice requirements or these site selection requirements when establishing drop boxes and mobile drop boxes for absentee and mail-in ballots in connection with the June 2, 2020 primary election.

195.     In doing so, Defendants increased the likelihood that they would confuse voters and prevent candidates or political parties from notifying voters about the availability and location of the drop boxes or adequately monitoring the drop boxes, thus fostering an environment that encourages ballot fraud or tampering, and preventing the Commonwealth, candidates, and political parties from ensuring that the General Election is free, fair, and transparent.

196.     On information and belief, Plaintiffs believe that Defendants intend to repeat this practice in the upcoming November 3, 2020 General Election.

197.     Defendants have a duty to establish basic minimum safeguards to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.

198.     By failing to comply with Pennsylvania's statutory notice, Defendants have failed to enact minimal safeguards against dilution of the right to vote by fraudulent ballots or tampering and thus infringe the right of qualified voters in the Commonwealth of Pennsylvania to a free, fair, and transparent public election process.

199.     Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

200.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT VII

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Failure to Notice Drop Box Location**

201.    Plaintiffs refer to and incorporate Paragraphs 1 through 200 of this Complaint as though the same were repeated at length herein.

202.    For the same reasons Defendants' failure to provide the statutory or otherwise adequate notice of drop box locations violates the United States Constitution's First and Fourteenth Amendments and its Equal Protection Clause (as stated more fully in Paragraphs 189 through 200 of this Complaint), Defendants' failure to provide the statutory or otherwise adequate notice of drop box locations violates the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and infringes upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

203.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

204.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

WHEREFORE, Plaintiffs ask this Court to enter judgment in their favor and provide the following relief:

A.    An order or declaration that the return of absentee and mail-in ballots by non-disabled electors to locations other than the respective office of the County Election Boards violates the Pennsylvania Election Code and the United States and Pennsylvania Constitutions;

B.      In the alternative to the relief requested in Subparagraph (A), an order or declaration that Defendants must comply with Pennsylvania laws governing notice of changes to polling locations and site criteria for polling locations when establishing locations other than their respective offices to which voters may return absentee and mail-in ballots, and ensure that all counties utilize that option;

C.      An order or declaration that the counting of absentee and mail-in ballots that lack an "Official Election Ballot" secrecy envelope or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference violates the Pennsylvania Election Code and the United States and Pennsylvania Constitutions;

D.      An order or declaration enjoining the enforcement of Election Code Section 417's residency and "polling place" requirements for poll watchers as a violation of the rights secured by the United States and Pennsylvania Constitutions;

E.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from collecting absentee and mail-in ballots in locations other than in the office of each of the County Election Boards and/or through unsecured and unmonitored drop boxes and other similar means;

F.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from counting absentee and mail-in ballots that lack an "Official Election Ballot" secrecy envelope or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference;

G.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from restricting poll watchers, regardless of their county of residence, to be present in all locations where votes are cast, including without limitation where

absentee or mail-in ballots are being returned before and on Election Day and at any pre-canvass meetings;

      H.      Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

      I.      All other relief that Plaintiffs are entitled to and that the Court deems just and proper.

Date:  June 29, 2020                  Respectfully submitted,

                                  PORTER WRIGHT MORRIS & ARTHUR LLP

                    By:   */s/ Ronald L. Hicks, Jr.*
                            Ronald L. Hicks, Jr. (PA #49520)
                            Jeremy  A. Mercer (PA #86480)
                            Russell D. Giancola (PA #200058)
                            Six PPG Place, Third Floor
                            Pittsburgh, PA 15222
                            (412) 235-4500 (Telephone)
                            (412) 235-4510 (Fax)
                            rhicks@porterwright.com
                            jmercer@porterwright.com
                            rgiancola@porterwright.com

                            and

                            Matthew E. Morgan (DC #989591)
                            Justin Clark (DC #499621)
                            (both to be admitted pro hac vice)
                            Elections, LLC
                            1000 Maine Ave., SW, 4th Floor
                            Washington, DC 20224
                            (202) 844-3812 (Telephone)
                            matthew.morgan@electionlawllc.com
                            justin.clark@electionlawllc.com

                            *Counsel for Plaintiffs*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have

reviewed the foregoing Complaint and that the factual allegations are true and correct.


Date: June 29, 2020

*/s/ James J. Fitzpatrick*
James J. Fitzpatrick, PA EDO Director
Donald J. Trump for President