# EXHIBIT B

Received 6/18/2020 1:36:29 PM Commonwealth Court of Pennsylvania

Filed 6/18/2020 1:36:00 PM Commonwealth Court of Pennsylvania
364 MD 2020

Sozi Pedro Tulante (Pa. 202579)
Julia Chapman (Pa. 315959)
Tiffany Engsell (Pa. 320711)
Craig Castiglia (Pa.  324320)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
215.994.4000

Neil Steiner (*pro hac vice* forthcoming)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
212.698.3822

Ronald Fein (*pro hac vice* forthcoming)
John Bonifaz (*pro hac vice* forthcoming)
Ben Clements (*pro hac vice* forthcoming)
Free Speech For People
1320 Centre Street #405
Newton, MA 02459
617.244.0234

*Attorneys for Petitioner*

_____

|  |  |
|---|---|
| NAACP PENNSYLVANIA STATE CONFERENCE, | : COMMONWEALTH COURT |
| | :     OF PENNSYLVANIA |
| | : |
| Petitioner, | : |
| | : |
| v. | : ORIGINAL JURISDICTION |
| | : |
| | :     No._____ |
| | : |
| KATHY BOOCKVAR, | : |
| SECRETARY OF THE COMMONWEALTH, | : |
| AND JESSICA MATHIS, DIRECTOR OF THE | : |
| BUREAU OF ELECTION SERVICES AND | : |
| NOTARIES, | : |
| | : |
| Respondents. | : |

_____

## NOTICE TO DEFEND

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within 20 days after this Petition and Notice are served by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any claim or relief requested by the Petitioner.

YOU SHOULD TAKE THIS PAPER TO A LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**DAUPHIN COUNTY BAR ASSOCIATION**
**Lawyer Referral Service**
**213 North Front Street**
**Harrisburg, PA 17101**
**(717) 232-753**

_____

|                                          |                                    |
|------------------------------------------|------------------------------------|
| NAACP PENNSYLVANIA STATE CONFERENCE,     | : :COMMONWEALTH COURT : OF PENNSYLVANIA |
| Petitioner,                              | : : |
| v.                                       | : ORIGINAL JURISDICTION : |
|                                          | : : No._____ : |
| KATHY BOOCKVAR, SECRETARY OF THE COMMONWEALTH, AND JESSICA MATHIS, DIRECTOR OF THE BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : |
| Respondents.                             | : : : |

_____

## PETITION FOR REVIEW
## <u>ADDRESSED TO THIS COURT'S ORIGINAL JURISDICTION</u>

Petitioner the National Association for the Advancement of Colored People Pennsylvania State Conference ("NAACP-PSC") files this Petition for Declaratory and Injunctive Relief against Defendants Kathy Boockvar in her official capacity as Secretary of the Commonwealth and Jessica Mathis in her official capacity as the Director of the Bureau of Election Services and Notaries, and alleges as follows:

## INTRODUCTION

1.     There is no right more fundamental under our state constitution than the right to vote.  *Bergdoll v. Kane*, 731 A.2d 1261, 1268 (Pa. 1999) ("The interest sought to be protected is the fundamental right to vote); *cf. id.* at 1269 ("The right

[to vote] is pervasive of other basic civil and political rights, and is the bed-rock of our free political system.") (quoting *Moore v. Shanahan*, 486 P.2d 506, 511 (Kan. 1971)).

2.     To that end, the Pennsylvania Constitution's Free and Equal Elections Clause provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. I, § 5.

3.     Petitioner the NAACP-PSC brings these claims because Pennsylvania's response to the novel SARS-CoV-2 coronavirus ("coronavirus") pandemic has created the perfect storm for depriving Pennsylvania citizens of their fundamental right to vote in the midst of an unprecedented public health crisis, in violation of the Free and Equal Elections Clause.

4.     Absent judicial intervention, Pennsylvania's voting regime will disenfranchise large numbers of Pennsylvanians in the upcoming November General Election and in future elections as long as the pandemic continues.

5.     In just a few months since the first confirmed case of the Coronavirus Disease 2019 ("COVID-19") in Pennsylvania, almost 80,000 Pennsylvanians have

confirmed cases of COVID-19, the disease caused by the novel coronavirus, and more than 6,000 have lost their lives.[1]

6.     The coronavirus will continue to spread for the foreseeable future as there is no known cure nor available vaccine.  The recent efforts to reopen the economies in several states, including Pennsylvania, do not change the imminent threat posed by the coronavirus.  In fact, nearly half of the states—the bulk of them that reopened weeks ago—are now seeing a devastating surge of cases, including record numbers in Texas and Arizona.[2]  There is no reason that Pennsylvania will escape this fate once social distancing practices and other strict rules are relaxed. In fact, public health experts, and the Commonwealth of Pennsylvania itself, project that the crisis will persist at least until the end of 2020, and that the second "wave" of COVID-19, which is expected to occur in Fall 2020, will be even more dire than the initial wave of Spring 2020.  This devastating second wave will directly impact the November 2020 General Election.  Further, there are likely to be a number of additional "waves" of COVID-19 going forward, unless and until a

---

[1] Pennsylvania Department of Health, *COVID-19 Data for Pennsylvania* (last updated June 17, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.
[2] Sheryl Gay Stolberg and Noah Weiland, *As Coronavirus Infections Climb, Washington Moves On to Other Business*, N.Y. Times (June 10, 2020), https://www.nytimes.com/2020/06/10/us/politics/coronavirus-washington-trump.html?action=click&module=RelatedLinks&pgtype=Article.

vaccine is developed and becomes widely available, and elections beyond November 2020 may be impacted.

7.     There are multiple ways Pennsylvania has failed to take appropriate steps to protect voters amid the pandemic and has otherwise prevented voters from casting their ballots.  These issues were apparent in the June 2, 2020 Primary Election and the very same issues will persist for the November General Election, unless this Court takes action.

8.     First, for the Primary Election, Pennsylvania allowed county board of elections to consolidate polling places, in some instances by 84 percent, and operate with fewer poll workers.  Indeed, four counties presented consolidation plans calling for more than 60% consolidation of polling places, and Respondents approved those consolidation plans without adjustment or question.

9.     Pennsylvania's reduction of polling places and failure to have adequate numbers of poll workers at each polling place to service large crowds resulted in long lines and overcrowding at polling places that did not allow voters to practice necessary social distancing measures to prevent the risk of transmission of COVID-19.  As a result, Pennsylvanians who voted in person are at increased risk for COVID-19.  Because the pandemic will not subside by, and is predicted to in fact be worse in, November, the same concerns will motivate polling place

consolidation during the general election.  Pennsylvanians will again be required to risk their health and lives to ensure that their votes are counted.

10.     Second, Pennsylvania has not established any state-wide deadlines or procedures sufficient to notify voters of changed or consolidated polling places. Notice of changes in polling locations was required to be posted only 15 days before the elections and only at the county board of elections office and on the Internet.  Many Pennsylvania voters did not learn of the change in their regular polling place for the June 2020 Primary Election until it was too late, or they never learned the correct location of their new polling place at all, and as a result, were unable to cast their votes.  Absent different deadlines or procedures in November, many Pennsylvanians will again be prevented from voting based on factors outside their control.

11.     Third, Pennsylvania permitted counties to require all voters to vote on repeat-touch electronic voting machines and did not make hand-marked paper ballots available to voters.  Because coronavirus can be spread on contaminated surfaces and electronic voting machines are difficult to decontaminate, voters forced to use electronic polling machines were again subjected to an increased risk of transmission of coronavirus.  At polling places where poll workers attempted to adequately clean electronic voting machines, long lines and overcrowding were common results, making social distancing difficult, which again increased the risk

of transmission.  When Pennsylvania faces a second coronavirus wave in November, COVID-19 will be just as contagious.  Without effective safety precautions, Pennsylvanians will again be required to risk their health and lives to exercise their right to vote in person.

12.     Pennsylvania's mail-in voting procedures are similarly deficient. Because voting in person poses grave risks to people's health and lives while coronavirus is in our communities, Pennsylvanians turned in unprecedented numbers to voting by mail—or at least they tried to do so.  Applications to vote by mail for the June 2020 primary skyrocketed across the Commonwealth.  By May 20, 2020, more than 1.4 million Pennsylvanians had requested a mail-in ballot.[3] Philadelphia voters alone requested more mail-in ballots than voters across the entire state did in 2016.[4]  But the rules for mail voting in Pennsylvania—and particularly, the deadline by which county boards of elections must receive

---

[3] Associated Press, *Election official: Number of Pa. mail-in ballot applications 'off the charts,'* Pittsburgh Post-Gazette (May 21, 2020),  https://www.post-gazette.com/news/politics-state/2020/05/21/pennsylvania-applications-mail-in-ballots-june-primary/stories/202005210104; Jonathan Lai, *Philly voters have requested more mail ballots than all of Pennsylvania did in 2016*, Phila. Inquirer (May 20, 2020), https://www.inquirer.com/politics/election/coronavirus-philadelphia-mail-ballot-requests-20200520.html.
[4] Lai, *Philly voters have requested more mail ballots than all of Pennsylvania did in 2016*, Phila. Inquirer (May 20, 2020), https://www.inquirer.com/politics/election/coronavirus-philadelphia-mail-ballot-requests-20200520.html

completed absentee and mail-in ballots—do not account for difficulties in voting by mail during a pandemic.

13.     The deadline for Pennsylvania voters to apply for an absentee or mail-in ballot is just one week before Election Day.  For the many voters who applied for a ballot on or near this deadline before the Primary Election, the county boards of elections were unable to process and approve the application and/or send the voter a ballot via the U.S. Postal Service ("USPS") in time for the election.

14.     Ballot applications overwhelmed county boards of elections, many of which experienced staff shortages as a result of the pandemic, and there were tremendous backlogs in processing applications in advance of Election Day.

15.     As an added layer of difficulty, USPS experienced its own delays due to the pandemic. As a result, many Pennsylvanians who timely requested an absentee or mail-in ballot did not receive their ballots in adequate time to return them by mail to be counted and, in many instances, never received a ballot by mail at all.  And many voters who received their ballots late and returned them by mail in the few days immediately prior to the election were left uncertain if their ballots were received by the county board of elections in time to be counted.

16.     Faced with this chaotic situation, Governor Wolf—on the day before the Primary Election—extended the mail-in ballot deadline by seven days, but the extension inexplicably applied only to voters in Philadelphia, Delaware,

7

Montgomery, Allegheny, Dauphin, and Erie Counties—not to the entire state.  This late change of course in turn created even more confusion for voters, who were left uncertain as to when their ballots must be received and whether the extension applied to them.  In addition, counties such as Bucks County and Delaware County sought judicial intervention to obtain the necessary relief.[5]

17.     Voters who received their ballots late faced a dilemma that the Pennsylvania Constitution does not tolerate:  either mail the absentee or mail-in ballot and risk that it will arrive too late and will not be counted, or vote in person and risk not only their own health and lives, but the health and lives of their families and neighbors.

18.     As the Primary Election made clear, many Pennsylvanians have been burdened by the hardships of voting in a pandemic under Pennsylvania's current scheme.  Still, these burdens were not, and in the future will not be, shared equally among Pennsylvania voters.  For some voters, finding out about relocated polling places depends on Internet access because traveling to the county board of elections during a public health crisis is risky.  Likewise, for some voters, relocated polling places means using public transportation to travel longer distances, which

---

[5] Jonathan Lai, *Courts extend Pa. mail ballot deadlines in Bucks and Delaware Counties*, Phila. Inquirer (June 2, 2020), https://www.inquirer.com/politics/election/bucks-delaware-county-mail-ballot-deadlines-extended-20200602.html.

increases their risk of being infected with the coronavirus.  In both cases, African-American or Latino voters are most likely to be impacted.[6]  Thus, while some voters can vote burden-free, African-American and Latino voters are more likely to face an unacceptable and unnecessary risk to their lives and health.

19.     In Pennsylvania, like elsewhere, African-American and Latino persons have been disproportionately affected by COVID-19, experiencing higher incidences of infection, hospitalization, and fatalities from the disease.  Thus, the risks of voting in an overcrowded polling place are particularly severe and disparate for these populations.

20.     Without judicial intervention before the November general election, Pennsylvania voters who vote in person—either by choice or necessity—will be faced with excessive crowding due to an insufficient number of polling locations, long lines, and potentially contaminated electronic voting machines and other surfaces, all at great risk to their health.  And those who try to vote by mail to avoid the risk of traveling to a polling place may never have their vote counted at all or may still be forced to vote in person.  These substantial burdens amount to a

---

[6] *See, e.g.*, Andrew Perrin & Erica Turner, *Smartphones help blacks, Hispanics bridge some – but not all – digital gaps with whites*, Pew Research Center Fact Tank (Aug. 20, 2019), https://www.pewresearch.org/fact-tank/2019/08/20/ smartphones-help-blacks-hispanics-bridge-some-but-not-all-digital-gaps-with-whites; Monica Anderson, *Who relies on public transit in the U.S.*, Pew Research Center Fact Tank (Apr. 7, 2016), https://www.pewresearch.org/fact-tank/2016/04/07/who-relies-on-public-transit-in-the-u-s/.

denial of an individual's right to vote, and undermine free and equal elections in Pennsylvania in violation of its Constitution.

21.    In short, the current voting regime needlessly permitted the crisis to disenfranchise the voting rights of Pennsylvanians during the Primary Election. Absent judicial intervention, there is no reason to believe things will be different in the fall.[7]

22.    Now is the time to address the problems of voting in a pandemic that manifested in the Pennsylvania Primary Election and in the weeks and months that follow.  Although the November General Election is still months away, presenting these issues to the Court now allows the Court sufficient time to develop a record and adequately consider the legal merits of Petitioner's claims.  Petitioner respectfully requests that the Court enjoin Respondents from making the same mistake twice:  In addition to any other affirmative relief that the Court may deem necessary and proper, the Court should also require a sufficient number of polling places, expand early voting, provide for safe in-person voting conditions, and increase access to mail-in voting for the General Election and any other voting

---

[7] For instance, counties in other states have already acknowledging the likelihood that polling places will be reduced in November.  *See* Morgan Timms, *Taos County reduces polling locations to slow spread of virus*, Taos News (May 14, 2020), https://www.taosnews.com/stories/taos-county-polling-locations-coronavirus-primary,63888.  There is no reason to believe Pennsylvania is situated any differently from these counties when it comes to a second wave of COVID-19 in the fall.

during the pandemic.  Doing so will ensure that Pennsylvania's election scheme

does not impermissibly deny the right to free, fair, and equal elections.

## PARTIES

**Petitioner**

23.    NAACP-PSC is a non-partisan organization operating in Pennsylvania

and is affiliated with the National Association for Advancement of Colored People

operating across the United States.   NAACP-PSC has approximately 10,000

members in 44 branches across the state.   Among other organizational missions,

the NAACP-PSC Political Action Committee is dedicated to ensuring that all

eligible Pennsylvania citizens are given a full and equal opportunity to exercise

their fundamental right to vote.   In furtherance of these purposes, NAACP-PSC

conducts voter registration, education, and turnout efforts.   It also has been

involved in voting rights litigation in the Commonwealth and has sought to prevent

efforts to suppress or disenfranchise African American voters.  Indeed, since its

inception in 1934, NAACP-PSC has focused on "securing voting rights for all

citizens."  Because of the current Pennsylvania election regime, some specific

NAACP-PSC work related to the Primary Election involved voter registration

which included on-line registration.  The COVID-19 pandemic greatly impacted

the manner in which the NAACP-PSC needed to communicate with the

communities.  Therefore, besides having to mail information to individuals, it was

also necessary to use social media, emails, and phone calling as additional efforts to get out the information.   Utilization of the option for mail-in ballots was important because the polling places everywhere had been cut in half.   This meant that for most voters the places were no longer easily accessible to where they lived, and now contained approximately three precincts per polling location.   Thus, reducing polling places and restricting access to mail-in ballots will injure NAACP-PSC members who will face unreasonable burdens on their right to suffrage.  Further, NAACP-PSC itself will have to divert substantial resources away from traditional voter registration and get-out-the-vote efforts in order to educate and assist voters in applying for mail-in voting, submitting mail-in ballots, locating polling places, and traveling to polling places.

**Respondents**

24.     Kathy Boockvar is the Secretary of the Commonwealth of

Pennsylvania.  In this role, Boockvar leads the Pennsylvania Department of State.

As Secretary, she is Pennsylvania's Chief Election Official and a member of the

Governor's Executive Board.  The Secretary is charged with the general

supervision and administration of Pennsylvania's elections and election laws.

Among her numerous responsibilities in administering elections, she is charged

with tabulating, computing, and canvassing all votes cast, as well as certifying and

filing the votes' tabulation, 25 P.S. § 3159, and ordering county boards to conduct

recounts and recanvasses, *id.* § 2621(f.2).

25.     Respondent Jessica Mathis is the Director of the Bureau of Election

Services and Notaries ("Bureau").  The Bureau is responsible for planning,

developing, and coordinating the statewide implementation of the Election Code,

voter registration process, and notaries public.

## JURISDICTION

26.     This Court has original jurisdiction of this action pursuant to 42 Pa.

Cons. Stat. § 761(a) (2019) because it is a civil action against an officer of the

Commonwealth government, acting in her official capacity.

## FACTUAL ALLEGATIONS

### I.   The Pandemic and Its Impact in Pennsylvania

27.   The coronavirus has been spreading throughout the United States since approximately January 2020.

28.   Once contracted, coronavirus can have a range of effects, from passing without any symptoms at all, to flu-like symptoms, to causing a severe immune system response that can cause fluid to build in the person's lungs and lead to death.[8]

29.   To date, COVID-19 has killed more than 116,000 people across the country.[9]

30.   Pennsylvania has been one of the hardest hit states in the country.  As of June 17, 2020, the Pennsylvania Department of Health and Human Services has reported over 6,319 confirmed fatalities and 77,543 confirmed cases of COVID-19 in Pennsylvania.[10]  Because Pennsylvania currently tests only a small percentage of

---

[8] Centers for Disease Control and Prevention ("CDC"), *People Who Are at Higher Risk for Severe Illness?*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 30, 2020).
[9] CDC, Coronavirus Disease 2019 (COVID-19*)–Cases in the US*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[10] Pennsylvania Department of Health, *COVID-19 Data for Pennsylvania*, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last updated June 17, 2020).

its residents for coronavirus infection, it is likely that the true rate of infection and fatalities is higher than reported.[11]

31.     The coronavirus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[12]  The coronavirus has been found to survive on glass surfaces for four days and on plastic surfaces for three days.[13]

32.     The risk that the coronavirus will spread to another person increases when the infected person sneezes or coughs, or when an infected person stands within 6 feet of other people for an extended period of time.[14]

33.     The coronavirus can also spread when a person touches a surface or object that has the virus on it and then touches their own mouth, nose, or eyes.[15]

---

[11] Pennsylvania Department of Health, *Plan for Pennsylvania: Testing Strategy*, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Testing-Strategy.aspx (describing the Department of Health's goal for testing 2% of the population per month).

[12] CDC, Coronavirus Disease 2019 (COVID-19) Factsheet, *What you should know about COVID-19 to protect yourself and others*, https://www.cdc.gov/coronavirus/ 2019-ncov/downloads/2019-ncov-factsheet.pdf.

[13] Jill Seladi-Schulman, Ph.D., *How Long Does the Coronavirus Live on Different Surfaces?*, Healthline (Apr. 29, 2020), https://www.healthline.com/health/how-long-does-coronavirus-last-on-surfaces.

[14] CDC, Coronavirus Disease 2019 (COVID-19) Factsheet, *What you should know about COVID-19 to protect yourself and others*, https://www.cdc.gov/coronavirus/ 2019-ncov/downloads/2019-ncov-factsheet.pdf.

[15] *Id.*

34.     Because of the highly contagious and potentially deadly nature of COVID-19, on March 13, 2020, President Trump declared a national state of emergency.

35.     Pennsylvania is among the 48 states that have declared local states of emergency.[16]  On April 1, Governor Wolf issued a state-wide stay-at-home order, closing schools and non-life-sustaining businesses and restricting large gatherings, as well as urging residents to maintain social distancing guidelines in order to combat the virus's spread.  On May 7, 2020, the order was extended to June 4.[17] All Pennsylvania schools will remain closed for the remainder of the academic year.[18]

---

[16] Adam Edelman et al., *Trump declares national emergency to combat coronavirus, authorizes waiving of laws and regulations*, NBC News (Mar. 13, 2020, updated 4:00 PM), https://www.nbcnews.com/politics/donald-trump/trump-hold-friday-afternoon-press-conference-coronavirus-n1157981; Rosie Perper et al., *Almost all US states have declared states of emergency to fight coronavirus— here's what it means for them*, Bus. Insider (Mar. 17, 2020, 1:34 AM), https://www.businessinsider.com/california-washington-state-of-emergency-coronavirus-what-it-means-2020-3.
[17] *See Gov. Wolf, Sec. of Health Take Actions on Stay-at-Home Orders, Issue Yellow Phase Orders*, Press Release (May 7, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-take-actions-on-stay-at-home-orders-issue-yellow-phase-orders.
[18] Avi Wolfman-Arent, *Pa. closes schools for the rest of academic year, urges online learning*, WHYY (Apr. 9, 2020), https://whyy.org/articles/pa-schools-ordered-to-remain-closed-until-end-of-academic-year.

36.     While Pennsylvania has implemented a phased approach to lifting the

stay-at-home order,[19] the risk of COVID-19 remains.  Even as certain businesses

reopen and activities resume within Pennsylvania, social distancing guidelines

remain in effect because a high risk of community spread remains.[20]  And

individuals who are at higher risk for serious illness from COVID-19 are still

encouraged to "stay home if possible."[21]

37.     Further, the Commonwealth recognizes that closing portions of

Pennsylvania, or the entire state, may again become necessary for the health and

safety of Pennsylvanians, as the pandemic is ongoing.  On June 3, 2020, Governor

Wolf renewed the 90-day disaster declaration that he originally signed on March 6,

2020.[22]

---

[19] *See* Responding to COVID-19 in Pennsylvania: Stay at Home Order,
https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last
updated May 11, 2020, 8:45 PM); Avi Wolfman-Arent, *Pa. closes schools for the
rest of academic year, urges online learning*, WHYY (Apr. 9, 2020),
https://whyy.org/articles/pa-schools-ordered-to-remain-closed-until-end-of-
academic-year.
[20] Governor Tom Wolf: *Process to Reopen Pennsylvania*,
https://www.governor.pa.gov/process-to-reopen-pennsylvania/ (last updated June
11, 2020); Stacey Burling, *Coronavirus cases trend downward around
Philadelphia, but masks are here to stay*, Phila. Inquirer (June 11, 2020),
Philadelphia Inquirer, https://www.inquirer.com/news/philadelphia-coronavirus-
cases-down-masks-necessary-pennsylvania-new-jersey-20200611.html.
[21] CDC, Coronavirus Disease 2019 (COVID-19), *People who need extra
precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/what-you-can-do.html.
[22] Governor Tom Wolf: *Gov. Wolf Renews COVID-19 Disaster Declaration for
State Response and Recovery, Stay-at-Home Order Ends June 4*, Press Release

38.     There are already clear warnings that coronavirus is not going away anytime soon.  In fact, as states begin to retreat from their strict shutdown orders, the number of COVID-19 cases has jumped.[23]  On June 10, 2020, Texas reported the highest one-day total during the pandemic, while Florida has reported the highest seven-day average of new cases during the pandemic.[24]  Arizona has also seen a stunning increase of new cases, and its hospitals have been forced to activate their emergency plans.[25]

39.     In addition to the recent uptick in cases, "experts are steeling for autumn, when changes in weather and back-to-school plans could have damaging repercussions."[26]  Indeed, the Director of the Centers for Disease Control and Prevention ("CDC") has warned that the United States will likely face a second and worse wave of coronavirus infections in the fall of 2020, which will "be even more difficult than the one we just went through."[27]  Another renowned public

---

(June 3, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-renews-covid-19-disaster-declaration-for-state-response-and-recovery-stay-at-home-order-ends-june-4.

[23] Emma Court and David R Baker, *Second U.S. Virus Wave Emerges as Cases Top 2 Million*, Bloomberg (June 10, 2020. 1:34 PM), https://www.bloomberg.com/news/articles/2020-06-10/second-u-s-virus-wave-emerges-after-state-reopenings.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Lena H. Sun, *CDC director warns second wave of coronavirus this winter will likely be* worse, Phila. Inquirer (Apr. 21, 2020), https://www.inquirer.com/health/coronavirus/coronavirus-second-wave-covid-19-cdc-20200421.html.

health expert, Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases and member of the White House's coronavirus task force, has also warned that "we could be in for a bad fall and a bad winter",[28] and that "there is a real risk that you will trigger an outbreak that you may not be able to control" upon broadly reopening the economy.[29]  More recently, Dr. Fauci described COVID-19 as his "worst nightmare" and warned, "Where is it going to end? We're still at the beginning of really understanding."[30]  Many other experts agree.  For instance, Yale physician and researcher Nicholas Christaki warned that "there will be a second wave and we will have to prepare ourselves for it."[31]  Similarly, Harvard epidemiologist Marc Lipsitch has told the Journal of the American Medical Association that "[w]e will have a harder time controlling coronavirus in the fall."[32]  Dr. Gregory Poland, an expert based with the Infectious

---

[28] J. Edward Moreno, *Fauci: Second wave of coronavirus 'inevitable,'* The Hill (Apr. 29, 2020), https://thehill.com/homenews/news/495215-fauci-second-wave-of-coronavirus-in-fall-inevitable.

[29] *Top Health Experts Paint Bleak Picture of Pandemic*, N.Y. Times (May 12, 2020), https://www.nytimes.com/2020/05/12/us/coronavirus-live-news-updates.html.

[30] Denise Grady, *Fauci Warns That the Coronavirus Pandemic Is Far From Over*, N.Y. Times (June 9, 2020), https://www.nytimes.com/2020/06/09/health/fauci-vaccines-coronavirus.html?action=click&module=RelatedLinks&pgtype=Article.

[31] Len Strazewski, *What's ahead on COVID-19? Expert offers forecast for summer, fall*, AMA (Apr. 6, 2020), https://www.ama-assn.org/delivering-care/public-health/what-s-ahead-covid-19-expert-offers-forecast-summer-fall.

[32] Len Strazewski, *Harvard epidemiologist: Beware COVID-19's second wave this fall* AMA (May 8, 2020), https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall.

Diseases Society of America, has said, "Nobody has a crystal ball.  We'd all like to know definitively.  We can only look at what other seasonal coronaviruses and seasonal influenzas do.  Based on that, most of us feel comfortable that there will be a second wave."[33]

40.      Various public and private entities have already began implementing plans for the fall based upon the strong likelihood of resurgence of the virus.  By way of example, the nation's largest four-year public university system cancelled on-campus classes for the fall semester because researchers and experts are predicting another wave of coronavirus in the summer, "followed by a very significant wave in the fall and another wave in the first quarter of next year."[34] And Pennsylvania hospitals and nursing homes are already preparing for a second wave of coronavirus.[35]

---

[33] Quentin Fottrell, *Yes, America needs to brace itself for a second wave of coronavirus*, Marketwatch (June 10, 2020), https://www.marketwatch.com/story/the-coronavirus-only-knows-one-thing-and-that-is-to-infect-another-host-why-america-should-brace-for-a-second-wave-2020-06-10.

[34] Shawn Hubler, *Fearing a Second Wave, Cal State Will Keep Classes Online in the Fall*, N.Y. Times (May 12, 2020), https://www.nytimes.com/2020/05/12/us/cal-state-online-classes.html (internal quotation marks omitted).

[35] *Pandemic far from over in nursing homes*, Phila. Inquirer (June 8, 2020), https://www.inquirer.com/opinion/editorials/nursing-home-residents-employees-deaths-infections-coronavirus-pennsylvania-new-jersey-20200608.html; *see also* Alan Yu, *Were hospitals unprepared for the pandemic? How are they planning for a 2nd wave?*, WHYY (May 23, 2020), https://whyy.org/articles/were-hospitals-unprepared-for-the-pandemic-how-are-they-planning-for-a-2nd-wave/.

41.     The Surgeon General of the United States, Dr. Jerome Adams, recognized in April that people of color experience higher rates of infection, illness, and death, perhaps because they are less likely to be able to work from home, more likely to live in dense areas, and more likely to live in multi-generational housing.[36]  Underlying inequities like environmental racism, lack of fair employment opportunities, unaffordable housing, poverty, and inadequate health care have increased the vulnerability of African-American and Latino communities to coronavirus outbreaks.[37]  This is true in Pennsylvania, as well as throughout the United States.

42.     There is no known effective treatment for COVID-19, and vaccines are at best a year away.[38]  Public health officials therefore urge the public to practice social distancing (that is, maintain a distance of at least 6 feet from other people and avoid going to crowded places), wash their hands often, clean and disinfect frequently touched surfaces often, and wear masks when in public.  The

---

[36] Juana Summers, *U.S. Surgeon General: People Of Color 'Socially Predisposed' To Coronavirus Exposure*, N.P.R. (Apr. 10, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/10/832026070/u-s-surgeon-general-people-of-color-socially-predisposed-to-coronavirus-exposure.
[37] *Id.*
[38] Patrick Ercolano, *A Coronavirus Vaccine Is In The Works—But It Won't Emerge Overnight*, Johns Hopkins University (April 16, 2020), https://hub.jhu.edu/2020/04/16/coronavirus-vaccine-timeline.

CDC cautions that wearing cloth face covers is not a substitute for social distancing.[39]

43.    Contracting coronavirus could be significantly more dangerous, as well as more costly, for African Americans and Latinos.  In Pennsylvania, people without health insurance will have less access to coronavirus testing, and less access to treatment and care once they begin exhibiting symptoms of infection.  By race, 10.2% of African Americans and 16.8% of Latinos are uninsured, as compared with only 6% of White people.[40]

44.    COVID-19 also disproportionately afflicts and kills more African Americans and Latinos than other people:  "The disparity is especially stark in Pennsylvania, where African Americans account for just 11.3% of the state's population but represent almost a third of . . . COVID-19 cases where the race of the patient was recorded."[41]  In Philadelphia, for instance, "African Americans account for over 56 percent of positive cases where the patient's race is known",

---

[39] CDC, Coronavirus Disease 2019 (COVID-19) Factsheet, *What you should know about COVID-19 to protect yourself and others*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[40] Sarah Gantz, *In Pa., N.J., and across the country, the ACA has narrowed racial gaps in health-care access*, Phila. Inquirer (Jan. 16, 2020), https://www.inquirer.com/health/consumer/aca-medicaid-insurance-racial-disparities-20200116.html.

[41] Ryan Briggs, Racial disparity grows as the coronavirus disproportionately claims Black lives in Pa., Jersey and Delaware, WHYY (May 15, 2020), https://whyy.org/articles/racial-disparity-grows-as-the-coronavirus-disproportionately-claims-black-lives-in-pa-jersey-and-delaware.

despite making up 42.3% of the city's population.[42]  In York City, "Latinos represent 33.3 percent of the population but account for 71.6 percent of the confirmed cases of COVID-19."[43]  According to Dr. Fauci, "[t]he coronavirus has been a 'double whammy' for black people" because "they are more likely to be exposed to the disease by way of their employment in jobs that cannot be done remotely" and "they are more vulnerable to severe illness from the coronavirus because they have higher rates of underlying conditions like diabetes, high blood pressure, obesity and chronic lung disease."[44]

---

[42] Yun Choi, Philadelphia's coronavirus numbers show stark racial and income disparities, 6abc.com (Apr. 8, 2020), https://6abc.com/coronavirus-philadelphia-philly-racial-disparity-income/6087689.

[43] Mike Argento, *Latinos in York City infected with COVID-19 at higher rate than others: 71.6% of cases*, York Daily Record (Apr. 16, 2020), https://www.ydr.com/story/news/2020/04/16/why-latinos-becoming-infected-covid-19-higher-rate-than-others/5145512002.

[44] Denise Grady, *Fauci Warns That the Coronavirus Pandemic Is Far From Over*, N.Y. Times (June 9, 2020),  https://www.nytimes.com/2020/06/09/health/fauci-vaccines-coronavirus.html?action=click&module=RelatedLinks&pgtype=Article.

## II.    Elections in Pennsylvania

### A.    Elections to Be Held in Pennsylvania During the Pandemic

45.    Pennsylvania has already held one election during the pandemic, without adequately implementing the CDC's guidance or taking sufficient other measures to protect Pennsylvanians.

46.    On Friday, March 27, Governor Wolf signed Senate Bill 422, also known as Act 12,[45] which made several changes to Pennsylvania's election process, including rescheduling the 2020 Primary Election from April 28 to June 2, 2020.  The Primary Election went forward on June 2, even though the stay-at-home order remained in effect for many counties in the state.

47.    As a result of the many failures to adequately adapt Pennsylvania's voting regime to the context of voting during the COVID-19 pandemic, thousands of Pennsylvanians were disenfranchised.

48.    The General Election is scheduled for November 3, 2020, at a time when many experts agree that the nation is likely to be in the midst of the second and even more devastating wave of the COVID-19 pandemic.  This is a presidential election year, and hence voter participation in the general election, at

---

[45] Pennsylvania General Assembly, *2020 Act 12–Pennsylvania Election Code – Omnibus Amendments* (Mar. 27, 2020), https://www.legis.state.pa.us/cfdocs/Legis/LI/uconsCheck.cfm?txtType=HTM&yr=2020&sessInd=0&smthLwInd=0&act=12.

least in normal times, would be significant and likely higher than that in other elections, including the 2020 Primary Election.  For context, over 6 million Pennsylvanians voted in the general election in November 2016.

49.    "Due to the COVID-19 crisis, in March the Pennsylvania General Assembly passed, and Governor Wolf signed, Act 12 of 2020 . . . to reduce crowding at polling places and encourage voters to use mail-in ballots."[46]  Without judicial intervention, there will be more Pennsylvania voters who are disenfranchised in the General Election than were in the recent Primary Election. Because many more people will seek to vote and the likelihood that pandemic will be worse in November, the Commonwealth will face these problems again.

### B.    Risks of Coronavirus at Polling Stations

50.    The COVID-19 pandemic endangers voters' health and life while voting.[47]  Because people can spread the coronavirus through person-to-person contact, any dense grouping of people might result in person-to-person spread of COVID-19, especially in enclosed spaces inside of voting locations.  In addition, coronavirus can be spread through frequently touched surfaces.

---

[46]Governor Tom Wolf: *Gov. Wolf Signs Executive Order Extending Mail Ballot Deadline in Six Counties to June 9*, Press Release (June 1, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-signs-executive-order-extending-mail-ballot-deadline-in-six-counties-to-june-9/.

[47] Dr. Joia Mukherjee, Mark Ritchie, et al., *Safe Voting During the COVID-19 Pandemic* (Apr. 2020), https://freespeechforpeople.org/wp-content/uploads/2020/04/FSFP-Report-on-Safe-Voting-04-07-2020-11.pdf.

51.     At many polling places, voters waiting to vote must stand in line with other voters, often indoors and in confined spaces, sometimes for extended periods of time.  Once inside the polling location, the typical "flow" involves interacting with multiple poll workers to check in; proceeding to a semi-private voting booth or area that may be quite close to another voter's voting booth; and then interacting with another poll worker to check out.  All of these interactions offer opportunities for an infected voter or poll worker to transmit the coronavirus directly to others. Any additional crowding only enhances these concerns.

52.     Additionally, the coronavirus may be shed onto voting machines, voting booths, and other materials required for voting, contaminating those surfaces.[48]  The virus could remain present on those materials for hours or days.[49]

53.     To that end, the CDC has issued guidance for actions that election officials and workers should take in advance of election day and encouraged the adoption of "voting methods that minimize direct contact with other people and reduce crowd size," including mail-in voting and early voting.[50]  In addition, the

---

[48] CDC, Coronavirus Disease 2019 (COVID-19), *Election Polling Locations* (May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.
[49] *Id.*
[50] *Id.*

CDC recommends routine cleaning and disinfection of polling locations areas and voting equipment.[51]

### C.      Consolidation of Polling Places in Response to the Pandemic

54.      For the June 2020 Primary Election, multiple Pennsylvania counties, including those with highest concentration of African-American and Latino residents, consolidated polling places.  Some eliminated more than 80 percent of their normal number of polling places.[52]

55.      Consolidation of polling places for the June 2020 Primary Election was done pursuant to Act 12.  Act 12 introduced Election Code § 1802-B(a)(3), which provides as follows:

> Two or more polling places may be consolidated, except that the consolidation of polling places may not result in more than a 60% reduction of polling place locations in the county, except for necessitous circumstances and as approved by the Department of State. Two or more polling places may be located in the same building.[53]

56.      Act 12 further provided that the polling place for an election district could be moved to any other election district anywhere in the county.[54]  In consolidating polling places, election officials were not required to consider

---

[51] *Id.*

[52] Letter from Mike Turzai, Jason Oritaty, Bob Brooks, Michal Pukaric, Natalie Mihalek and Lori Mizgorski to Kathy Broockvar (May 21, 2020) ("May 21, 2020 Turzai Letter"), http://www.pahousegop.com/Display/SiteFiles/1/2020/alleghenypoll.pdf.

[53] 25 Pa. St. § 3582(a)(3).

[54] *Id.* § 3582(a)(1).

whether the new locations were accessible to voters, within a reasonable distance from the old polling place, or easily reachable by public transportation. Indeed, there was no requirement that election officials consider community input or seek input from legislators when selecting new locations.

57.    Further, Act 12 did not require county election boards to consider different municipalities' populations to determine whether there should be a larger number of polling places based on the number of registered voters in the areas.

58.    Counties were not required to provide any evidence as to why they decided to consolidate or close down certain polling places, or make findings that reducing the number of polling locations will be safer, or that the consolidation plan included an adequate number of polling places to allow for social distancing, time for disinfecting polling machines and other surfaces, and otherwise keep voters safe. As a common-sense matter, if polling places were reduced disproportionately to the reduction in in-person voting (e.g., in-person voting declines by 20% but polling places are reduced by 60%), that would actually *increase* crowding of voters at the polling site, in turn increasing the chances of voter lines and the number of voters in each location—expanding the public health risk.

59.    Further, election officials were given no criteria for determining which polling places should be closed. Thus, in deciding to close a polling place

as part of consolidation, election officials may have considered the demographics or political preferences of voters that are assigned to that polling place.

60.     Based on these concerns, several members of the state House of Representatives from Allegheny County wrote a letter alleging that Allegheny County's consolidation plan was unlawful because the county had not provided evidence to justify reducing the polling places, and the county failed to get appropriate public input on the plan.[55]  The letter sought return to Allegheny County's regular number of polling places.

61.     For the Primary Election, county boards of elections were required to decide upon consolidation of polling places no later than 20 days prior to the Primary Election.[56]

62.     Some counties consolidated polling places at the 60% threshold.  For example, Montgomery County opened just 140 locations instead of 352.[57]

---

[55] May 21, 2020 Turzai Letter.
[56] Act 12 Guidance, *Election Operations During COVID-19*, at § 3.3.1 (Apr. 28, 2020),  https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_ElectionOperationsDuringCOVID19.pdf.
[57] Jonathan Lai & Julia Terruso, *Philly wants the state to let it cut a lot of polling places — or send the National Guard to help*, Phila. Inquirer (May 8, 2020), https://www.inquirer.com/news/philadelphia-2020-primary-polling-places-poll-workers-20200508.html.

63.     At least four other counties asked Respondents to grant exemptions for the reduction of polling places by more than 60%.[58]  The Department of State granted those exemptions in all instances.

64.     Respondents authorized Philadelphia County to reduce polling places by over 75 percent, from 1,703 to 190.[59]

65.     Likewise, Respondents authorized Allegheny County, which normally has 1,323 polling sites, to reduce the number of polling places to 211:  one for each ward district in Pittsburgh, and one for each other municipality.[60]  The Pittsburgh districts average around 34,000 residents each; some of the other municipalities in the county have under 1,000 (in at least one case, under 100) residents.

66.     The consolidated polling places caused traffic jams around the polling sites.  The challenge for some voters "was getting into line to begin with."[61]  In

[58] Jonathan Lai & Julia Terruso, *Philly wants the state to let it cut a lot of polling places — or send the National Guard to help*, The Philadelphia Inquirer (May 8, 2020),  https://www.inquirer.com/news/philadelphia-2020-primary-polling-places-poll-workers-20200508.html.

[59] Alecia Reid, *Pandemic Forces Philadelphia Elections Officials To Consolidate Polling Sites By 75% For Primary*, CBS Philly (May 13, 2020 at 6:29 pm), https://philadelphia.cbslocal.com/2020/05/13/pandemic-forces-philadelphia-elections-officials-to-consolidate-polling-sites-by-75-for-primary.

[60] May 21, 2020 Turzai Letter.

[61] Chris Potter, *Polling Places Draw Long Lines, Report Few Problems, Amid Pandemic And Unrest*, Pittsburgh's NPR News Station (June 2, 2020), https://www.wesa.fm/post/polling-places-draw-long-lines-report-few-problems-amid-pandemic-and-unrest#stream/0.

Penn Hills, the parking lot became full and some voters could not walk one quarter mile to "[t]he nearest parking [that] was down a hill with no sidewalk."[62]

67.     The problem of the reduced number of polling places was exacerbated by reduced numbers of poll workers.  Poll workers tend to be older individuals, typically retired, and therefore in the most vulnerable demographic should they contract COVID-19.  Some counties actually affirmatively encouraged older and more high-risk election workers not to volunteer for the June election.  For that reason, some counties reported that they were missing over 30 percent, if not more, of their poll workers on Election Day.[63]

> **D.     Inadequate Notice of New Polling Locations**

68.     Further, Pennsylvania does not provide for adequate procedures to notify voters of their new polling place upon reduction of polling places.

69.     For most Pennsylvania voters, their polling place has been in the same location for many years.

---

[62] *Id.*

[63] Ivey DeJesus, *As counties look to consolidate polling places, advocates worry about voter disenfranchisement*, PennLive (Apr. 28, 2020), https://www.pennlive.com/coronavirus/2020/04/as-counties-look-to-consolidate-polling-places-advocates-worry-about-voter-disenfranchisement.html; *see also* Avi Wolfman-Arent et al., *On unprecedented Pa. primary day, high turnout in West Philly, too-big ballots in Bucks*, WHYY (June 2, 2020), https://whyy.org/articles/polls-open-in-pa-amid-historic-mix-of-civil-unrest-economic-strife-and-covid-19/ (reporting on poll workers in Philadelphia, Delaware, and Montgomery counties dropping out due to coronavirus).

70.     For the June 2020 primary, the only required notice of the change in the location of a polling place was as follows:

> "[A] county board of elections shall, not less than 15 days prior to the election . . . , post in a conspicuous place at the office of the county board of elections, a list of each place at which the election is to be held in each district of the county.  The list shall be available for public inspection at the office of the county board of elections and posted on the county's publicly accessible Internet website."[64]

71.     These notice methods were insufficient for persons who may not be able to travel to the county board of elections office or who do not have access to the Internet.  Those persons are disproportionately African American, Latino, and low-income Americans.[65]  At least four other counties asked the Pennsylvania Department of State to grant exemptions for the reduction of polling places by

---

[64] Pennsylvania General Assembly, *2020 Act 12–Pennsylvania Election Code – Omnibus Amendments* (Mar. 27, 2020), https://www.legis.state.pa.us/cfdocs/Legis/LI/uconsCheck.cfm?txtType=HTM&yr=2020&sessInd=0&smthLwInd=0&act=12.

[65] Andrew Perrin & Erica Turner, *Smartphones help blacks, Hispanics bridge some – but not all – digital gaps with whites*, Pew Research Center Fact Tank (Aug. 20, 2019),  https://www.pewresearch.org/fact-tank/2019/08/20/smartphones-help-blacks-hispanics-bridge-some-but-not-all-digital-gaps-with-whites; Monica Anderson, *Who relies on public transit in the U.S.*, Pew Research Center Fact Tank (Apr. 7, 2016),  https://www.pewresearch.org/fact-tank/2016/04/07/who-relies-on-public-transit-in-the-u-s; Monica Anderson & Madhumitha Kumar, *Digital divide persists even as lower-income Americans make gains in tech adoption*, Pew Research Center Fact Tank (May 7, 2019),  https://www.pewresearch.org/fact-tank/2019/05/07/digital-divide-persists-even-as-lower-income-americans-make-gains-in-tech-adoption.

more than 60%.[66]  The Department of State granted those exemptions in all instances without question.

72.     As evidenced by voters' experiences during the Primary Election, these notice procedures failed to alert many people of the changes in their polling place.[67]  Many people showed up at their old polling location and were confused about the location of their new polling place, due to inadequate notice.[68]  For example, "Jacqueline Brower showed up to her normal voting location at Heston School near 54th Street and Lancaster Avenue, only to be told her polling place

---

[66] Jonathan Lai & Julia Terruso, *Philly wants the state to let it cut a lot of polling places — or send the National Guard to help*, Phila. Inquirer (May 8, 2020), https://www.inquirer.com/news/philadelphia-2020-primary-polling-places-poll-workers-20200508.html.

[67] Julia Shanahan, *Voting Rights' Advocates Warn Of Bumpy Fall Unless PA. Addresses Primary Day Glitches*, Pennsylvania Capital-Star (June 4, 2020), https://patch.com/pennsylvania/across-pa/voting-rights-advocates-warn-bumpy-fall-unless-pa-addresses-primary-day.

[68] Jan Murphy, *Voter confusion abounds in places around Pennsylvania due to consolidated polling places*, PennLive (June 2, 2020), https://www.pennlive.com/news/2020/06/voter-confusion-abounds-in-places-around-pennsylvania-due-to-consolidated-polling-places.html ("[A]round the state, voters showed up at their standard polling place only to be met with a sign directing them to another location or simply seeing no notice at all.").

had been moved."[69]  Others only learned about their new polling place after

standing in line at polling places that "lacked signs directing people to new sites."[70]

73.    Although the emergency election procedures in Act 12 by its terms

applied only to the Primary Election, there is a real threat that substantially similar

legislation will be passed that will be applied to the November 2020 election to

reduce the number of polling places, without adequate notice to voters.  The

COVID-19 pandemic—which was the express motivation for enacting Act 12—

will continue up to and through the November 2020 election.  Indeed, experts

predict the wave of disease could be more severe in November 2020.

74.    Moreover, multiple counties asked the Pennsylvania Department of

State to grant exemptions for the reduction of polling places by more than 60%,

and the Department of State granted those exemptions whenever requested,

without publishing any findings as to whether voters would have adequate access

to polling places.  Thus, the problems with the state's procedures for reducing

polling places will continue to exist for the November 2020 General Election.

---

[69] Avi Wolfman-Arent et al., *On unprecedented Pa. primary day, high turnout in West Philly, too-big ballots in Bucks*, WHYY (June 2, 2020), https://whyy.org/articles/polls-open-in-pa-amid-historic-mix-of-civil-unrest-economic-strife-and-covid-19.
[70] Michaelle Bond et al., *Polling locations in Northwest Philly got the wrong voting machines, causing confusion and long lines: 'It was a mess,'* Phila. Inquirer (June 2, 2020), https://www.inquirer.com/politics/election/northwest-philadelphia-voting-lines-2020-pa-primary-20200602.html.

### E.    Repeat-Touch Voting Machines

75.    Many counties in Pennsylvania require all voters to vote on repeat-touch electronic voting machines and do not make hand-marked paper ballots available to voters.

76.    Electronic voting machines have glass and plastic components that are touched by each voter who uses the machine, as well as by poll workers who set up the machines and assist voters when necessary.

77.    Other coronaviruses, including Severe Acute Respiratory Syndrome (SARS) coronavirus and the Middle East Respiratory Syndrome (MERS) coronavirus, have been found to persist on glass for 4-5 days, and to persist on plastic for up to 6 days, with one coronavirus strand surviving on plastic for up to 9 days.[71]

78.    A study on the aerosol and surface stability of the novel coronavirus has determined that the novel coronavirus can remain viable on plastic for up to 3 days.[72]

---

[71] G. Kampf et al., *Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation With Biocidal Agents*, 104 J. of Hospital Infection 246 (Mar. 1, 2020), https://doi.org/10.1016/j.jhin.2020.01.022.

[72] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared With SARS-CoV-1*, Letter to the Editor, New England Journal of Medicine (Mar. 17, 2020), https://bit.ly/2Uibd28.

79.     Many of the electronic voting machines use touch screens, tested and intended to be used by voters touching their fingers to the screen to make selections.  These machines are not certified for use with styli or by the gloved hand, and they have not been tested for effectiveness or accuracy of using styli or gloved hands.

80.     CDC guidance advises that poll workers must "[c]lean and disinfect voting-associated equipment (e.g., voting machines, laptops, tablets, keyboards) routinely."[73]

81.      Manufacturers of voting machines have provided very specific cleaning instructions for their machines.[74]

82.     Manufacturers of voting machines have warned that failure to clean the machines according to their instructions may cause the machines to malfunction.

83.     For example, Election Systems & Software ("ES&S"), which manufactures voting machines used in Philadelphia and 12 other counties, warns that poll workers must be careful to not touch the sensors on the edges of the

_____

[73] *See* CDC, *Recommendations for Election Polling Locations*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (revised Mar. 27, 2020).

[74] *See* Election Assistance Comm'n, *Vendor and Manufacturer Guidance on Cleaning Voting Machines and Other Election Technology*, https://www.eac.gov/election-officials/vendor-and-manufacturer-guidance-cleaning-voting-machines-and-other-election (last visited June 9, 2020).

screen, "scratch touch screens," or allow moisture to "linger[] on the external surface."[75] ES&S also warns poll workers not to apply cleanser directly to the screens, or to use too much cleaner on the cloth, or else the equipment may become "damaged during cleaning."[76]

84.    Similarly, Dominion Voting, which manufactures voting machines used in Luzerne County and other counties, warns that some CDC-recommended products "may not be appropriate for your hardware and may cause problems." Dominion further warns that the cleaning instructions must be followed precisely "to prevent damage to your voting system touchscreens and tabulators," and that "[c]leaning the units while they are powered ON is *not recommended*."[77]

85.    If a poll worker inadvertently deviates from the cleaning instructions and damages a machine, this will further reduce polling place capacity and thus lead to longer lines, creating an increased risk of person-to-person transmission.

86.    Several manufacturers recommend cleaning equipment with 50% or higher isopropyl alcohol solution without disclosing that the CDC recommends

---

[75] Election Assistance Comm'n, ES&S, *Best Practices – Voting System*, at 1-2 (Mar. 2020), https://www.eac.gov/sites/default/files/electionofficials/coronavirus/ESS_BestPractices_Cleaning_Disinfecting.pdf.
[76] *Id.* at 3.
[77] Election Assistance Comm'n, Dominion Voting, *Customer Notification: COVID-19 ('Coronavirus') Information*, at 1 (Mar. 9, 2020), https://www.eac.gov/sites/default/files/electionofficials/coronavirus/DVS_CoronavirusCleaningNotice_030920.pdf (emphasis in original).

cleaners of at least 60% alcohol solution.  Other manufacturers warn against applying cleaner directly to the screen and using only enough cleaner to "lightly dampen" cloths.  While these methods may limit the likelihood of damaging the equipment, neither the Respondents nor the voting machine manufacturers have demonstrated that these methods are sufficient to sanitize the machines.

87.     Cleaning each machine properly takes time.  In many cases, following manufacturers' recommended cleaning guidelines would cause long lines.

88.     For example, Dominion Voting (which manufactures machines used in Luzerne and two other counties) warns that its touchscreen-based voting machines must be powered down before cleaning, noting that "[m]oist wipes may alter the touch sensitivity of screens until the moisture is removed" and that "some screen buttons may be inadvertently activated during wipe down."[78]

89.     Powering down a voting machine before cleaning, and then restarting it after cleaning, takes time, especially because many machines will require a special administrator login after rebooting. Even without rebooting, the delicate and complex procedures are time-consuming.

---

[78] Election Assistance Comm'n, Dominion Voting, *Customer Notification: COVID-19 ('Coronavirus') Information*, at 1 (Mar. 9, 2020), https://www.eac.gov/ sites/default/files/electionofficials/coronavirus/DVS_CoronavirusCleaningNotice_ 030920.pdf.

90.     If the poll worker uses the wrong cleaner, accidentally touches a button during cleaning, uses too much liquid cleaner or does not clean according to manufacturer instructions, the machine could break or malfunction.

91.     If the machine is not cleaned after each person casts a ballot, the coronavirus and other pathogens will remain on the machine's surfaces, such as the screen or keypad.

92.     If poll workers clean each machine after every voter, particularly at the necessary level of care and following the precise cleaning procedures recommended by manufacturers, then voter lines will increase in counties in which all voters are required to use electronic voting machines.

93.     Many of these problems have manifested in other states.  For example, in the early voting phase of Georgia's primary election, where voters are required to use the Dominion ImageCast X ballot marking device that is also used in Luzerne and several other Pennsylvania counties, one county found it necessary to use only half of the normal complement of voting machines for social distancing purposes, while another county's election director noted that "[t]he process is much slower than before due to distancing and sanitation requirements."[79]

---

[79] Mark Niesse et al., *Social distancing leads to some lines as Georgia early voting begins*, Atlanta Journal-Constitution (May 18, 2020), https://www.ajc.com/news/state--regional-govt--politics/social-distancing-leads-some-lines-georgia-early-voting-begins/LsXxsSUxD8XTMfMAnNKVZN.

94.     Several Pennsylvania counties have acknowledged that the cleaning procedures are inadequate.  For example, in Northampton County, where citizens must cast their ballot on an electronic voting machine and do not have the option of paper ballots, Registrar Amy Cozze encouraged voters to bring their own gloves.[80]

95.     Allowing counties to require all voters to vote by electronic voting machine places people at high risk for contracting the coronavirus.

96.     The risk was higher for individuals who would have liked to vote by mail (perhaps because of age or underlying conditions that renders them particularly vulnerable to becoming seriously ill if they contract COVID-19), but instead were required to vote at their polling place because they did not receive their mail-in ballot or had concerns about their completed ballot being received in time to be counted.

97.     The coronavirus does not survive as long on paper and cardboard as it does on glass and plastic.[81]

---

[80] Laura Olson and Tom Shortell, *Lehigh Valley Voters may want to bring their own pen, gloves to vote in coronavirus-plagued primary*, The Morning Call (May 4, 2020), https://www.mcall.com/news/pennsylvania/capitol-ideas/mc-nws-pa-primary-election-june-2-vote-by-mail-20200504-ztdn33oq2bcmfhi4oqou24b77u-story.html.

[81] *See, e.g.*, Cleveland Clinic, *How Long Will Coronavirus Survive on Surfaces?* (Apr. 24, 2020), https://health.clevelandclinic.org/how-long-will-coronavirus-survive-on-surfaces.

98.     While universal-use electronic voting machines are handled repeatedly by poll workers and by all voters, hand-marked paper ballots are handled only by the poll worker who hands it to the voter, and by the voter.

99.     Hand-marked paper ballots can be filled out on surfaces that are easily wiped clean with any cleaner approved by the CDC.

100.    The Secretary of the Commonwealth has provided guidance to polling place workers that acknowledges the relative simplicity of pathogen control with paper ballots.  The Secretary's guidance contains two simple suggestions: "[u]se plastic folders that can be wiped off or sprayed with disinfectant before being handed to another voter" and "[u]se single-use sheets of large-sized paper (e.g. 11' X 17') that can be folded to cover the ballot but may then be discarded by voters following their usage."  These steps illustrate that it is much easier, faster, and effective to protect voters from virus transmission via the medium of paper ballots, as opposed to electronic voting machines.[82]

101.    If hand-marked paper ballots are made available to voters across Pennsylvania, rather than in a limited number of counties, as they were for the Primary Election, it will reduce voters' risk of exposure to potentially unsafe electronic voting machines, limit lines, provide poll workers with more time to

---

[82] *See* Dep't of State, *Election Operations During COVID-19*, at 8 (Apr. 28, 2020), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/ Documents/PADOS_ElectionOperationsDuringCOVID19.pdf.

clean the machines properly without causing back-ups or delays, and increase the likelihood that voters who need or prefer to use electronic voting machines will have prompt access to a sanitized machine that has not been touched by hundreds of other voters.

102.   Several Pennsylvania counties that were planning to use electronic voting machines for all voters decided, at least for the June 2020 Primary Election, to switch to hand-marked paper ballots for general use, reserving the electronic voting machines for those voters who need or prefer them.[83]  In Luzerne County, the county manager announced that voters would use hand-marked paper ballots due to concerns about the coronavirus, explaining that "the use of paper ballots and individual pens for each voter will be much safer than using touchscreen machines."[84]  In Crawford County, the board of elections voted unanimously to use paper ballots for the primary, because "[t]he switch will allow for a less potential spread of the virus than using the electronic voting machines, according to board

---

[83] Eric Mark, *County to use paper ballots for primary due to virus concerns*, Citizens' Voice (Apr. 29, 2020), https://www.citizensvoice.com/news/county-to-use-paper-ballots-for-primary-due-to-virus-concerns-1.2623147; Keith Gushard, *Paper ballots at polling places for June 2 election*, Meadville Tribune (Apr. 23, 2020), https://www.meadvilletribune.com/news/paper-ballots-at-polling-places-for-june-2-election/article_72d77f4a-850c-11ea-bcf2-abc7ccd89009.html.
[84] Eric Mark, *County to use paper ballots for primary due to virus concerns*, Citizens' Voice (Apr. 29, 2020), https://www.citizensvoice.com/news/county-to-use-paper-ballots-for-primary-due-to-virus-concerns-1.2623147.

members.  The electronic voting machines would require cleaning of touch screens after each use by a voter which could slow the process."[85]

103.   On Primary Election day, voters in those counties who primarily used paper ballots were not exposed to a potential vector of disease transmission to which those voters in counties using electronic voting machines were forced to be exposed.

**F.    Pennsylvania's Lack of Early Voting Will Lead to Overcrowding**

104.   Experts agree that a critical measure for reducing the threat of coronavirus exposure is physical distancing and prevention of overcrowding.

105.   It is axiomatic that forcing citizens to congregate in a fixed space over a limited number of hours leads to more crowding than permitting the same number of citizens to enter that space on multiple days spanning a greater total amount of time.

106.   Early voting permits citizens to cast ballots in person at a polling place prior to Election Day.  In states that permit no-excuse early voting, a voter does not have to provide an excuse for being unable to vote on Election Day itself.

107.   Pennsylvania does not allow in-person early voting at polling places.

---

[85] Keith Gushard, *Paper ballots at polling places for June 2 election*, Meadville Tribune (Apr. 23, 2020), https://www.meadvilletribune.com/news/paper-ballots-at-polling-places-for-june-2-election/article_72d77f4a-850c-11ea-bcf2-abc7ccd89009.html.

108.   Act 12, purportedly enacted to address voter safety concerns for the Primary Election, did not provide for early voting.  Thus, it is unlikely that the Pennsylvania General Assembly will provide for early voting for the General Election, despite the ongoing pandemic.

109.   Thus, for the upcoming General Elections, Pennsylvanians will have a period of thirteen hours on one day to vote at the polls.[86]

110.   In states with early voting, polling places are often open for several days over the course of a week or several weeks, rather than one day for a particular election.

111.   Pennsylvania's current failure to provide for early voting unnecessarily put lives of voters at risk during the Primary Election and will again put the lives and health of voters at risk, and force voters to choose between their right to vote and risking their health, for the General Election in November, especially since the fall wave of the pandemic is expected to be much worse.

---

[86] The 2020 Pennsylvania Elections Calendar, https://www.votespa.com/About-Elections/Pages/Election-Calendar.aspx.

### G.    Mail-in Voting During the Pandemic

112.    Pennsylvania allowed mail-in voting for the first time for the Primary Election, which occurred during the pandemic.

113.    Pennsylvania officials, including Governor Wolf, have encouraged as many Pennsylvanians as possible to vote by mail, lauding it as safer than in-person voting.[87]  However, Pennsylvania's expansion of mail-in voting does not remedy the burdens and public health concerns created by polling place consolidation and failure to provide paper ballots.  Rather, the mail-in voting regime imposes its own burdens on voters, particularly African-American and Latino and impoverished persons, and therefore does not resolve the burdens of consolidation of polling risks and the health risks of voting in persons.

114.    On October 31, 2019, Governor Wolf signed Act 77 of 2019 into law. Whereas previously only electors who were not eligible for absentee ballots were permitted to vote with mail-in ballots, under Act 77, voters who did not qualify for absentee ballots also can vote by mail.  Thus, Pennsylvania law provides for two categories of voters who are permitted to vote by means other than voting in person at a polling location: absentee voters and mail-in voters.

---

[87] Ron Southwick, *Dealing with mail-in ballots emerges as major challenge for Pa. primary election*, PennLive (May 28, 2020), https://www.pennlive.com/news/2020/05/dealing-with-mail-in-ballots-emerges-as-major-challenge-for-pa-primary-election.html.

115.   Under Pennsylvania's current mail-in voting regime, the deadline for voters to apply for an absentee ballot or a mail-in ballot is "five o'clock P.M. [on] the first Tuesday prior to the day of any primary or election."  25 P.S. §§ 3146.2a(a) (2019), 3150.12a(a) (2019).  This was the same deadline that was in place when only voters who qualified for absentee ballots could vote by mail. Thus, although the population of persons who may vote by mail was greatly expanded, the county election offices were not given additional time to process greater numbers of applications.

116.   Voters can apply to vote-by-mail online, but only if they have a Pennsylvania driver's license or non-driver photo identification from the Pennsylvania Department of Transportation (PennDOT).  If they do not have a PennDOT identification card, they can download and print an absentee or mail-in ballot application, complete it on paper, and mail it to their county board of elections.

117.   If a voter submits an application and the county board of elections determines that the voter meets the statutory requirements for an absentee ballot or a mail-in ballot, the board sends a ballot to the voter.  *See* 25 P.S. §§ 3146.2a(a.3)(3), 3150.12b(a)(1).

46

118.   To be counted, the voter's absentee or mail-in ballot must be received by the county board of elections "on or before eight o'clock P.M. the day of the primary or election."  25 P.S. §§ 3146.6(a)(1)(), 3146.8(g)(1)(ii), 3150.16(c).

119.   "'These deadlines have real consequences,' said Delaware County Council Member Christine Reuther. 'And one of them is, people are going to be disenfranchised.'"[88]

120.   During the June 2020 Primary Election, Governor Wolf signed an executive order extending the deadline for county election offices to receive absentee or mail-in ballots by mail to 5:00 p.m. on June 9, 2020, but only for six counties:  Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia counties.[89]  There was no explanation provided for why the deadline did not apply statewide.  In fact, Governor Wolf attributed the need for an extension not to the pandemic, but to protests over the death of George Floyd (an unarmed black man killed by a Minneapolis police officer), and curfews put in place in some Pennsylvania municipalities in response to protests, not to the challenges of voting

---

[88] Jonathan Lai, *Tens of thousands of Pennsylvania mail ballots were turned in after the deadline. November could be worse.*, Phila. Inquirer (June 10, 2020), https://www.inquirer.com/politics/election/pa-mail-ballots-deadline-2020-primary-election-20200610.html?utm_medium=referral&utm_source=ios&utm_campaign=app_ios_article&utm_content=XZXYGZCE4RHBVJCWYNN3DG26CI.
[89] Governor Tom Wolf: *Gov. Wolf Signs Executive Order Extending Mail Ballot Deadline in Six Counties to June 9*, Press Release (June 1, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-signs-executive-order-extending-mail-ballot-deadline-in-six-counties-to-june-9/.

during a pandemic.  If not for the protests, Governor Wolf may not have granted

any extensions.

121.   Limiting the extension to certain counties led to significant confusion

among Pennsylvanians as to when mail-in ballots were actually due.  Indeed,

Governor Wolf initially announced at a June 1, 2020 press conference that the

extension would apply throughout the entire state, only to later correct himself.

122.   Voters who timely request an absentee or mail-in ballot, but do not

receive the ballot with sufficient time before election day, face significant hurdles

in exercising their right to vote.  As a default rule, voters who request an absentee

or mail-in ballot may not vote by regular ballot in person on Election Day, even if

they have not cast the absentee or mail-in ballot.  25 P.S. §§ 3146.3(e), 3150.13(e).

If a voter requested an absentee or mail-in ballot but wishes to vote in person on

election day, the voter may cast a regular ballot at a polling place only if the voter

brings the absentee or mail-in ballot to the polling place (along with the envelope

that came with it), "remits" (or "spoil[s]") the absentee or mail-in ballot, and

submits a sworn statement in substantially the following form:

> I hereby declare that I am a qualified registered elector who has
> obtained an absentee ballot or mail-in ballot. I further declare that I have
> not cast my absentee ballot or mail-in ballot, and that instead I remitted
> my absentee ballot or mail-in ballot to the judge of elections at my
> polling place to be spoiled and therefore request that my absentee ballot
> or mail-in ballot be voided.

25 P.S. §§ 3146.6(b)(3), 3150.16(b)(3).

123.   If the voter does not bring the absentee or mail-in ballot and the accompanying envelope to the polling place, the voter may cast only a provisional ballot.  25 P.S. §§ 3146.3(e), 3150.16(b)(2).

124.   For the June 2020 primary, the county elections officers received tremendous increases in applications to vote by mail beyond numbers received in previous elections when only absentee ballots were available.  Pennsylvania election officials estimated that as many as 2 million voters total would apply to vote by mail.[90]  "Ultimately, more than 1.8 million voters applied for a mail-in or absentee ballot."[91]

125.   In the weeks before the Primary Election, the county election offices tried to add extra personnel to process applications and procure additional print and mailing services to prepare ballots for delivery.  As acknowledged by Jonathan Marks, the Deputy Secretary for Elections and Commissions for Pennsylvania, due to the impact of COVID-19, many county election offices were still unable to keep up with the applications and experienced a tremendous backlog in applications.

---

[90] Decl. of Jonathan Marks, the Deputy Secretary for Elections and Commissions for Pennsylvania, *Crossey v. Boockvar*, No. 266 MD 2020 (May 18, 2020) [Marks Decl.] ¶ 32.

[91] *Trump, Biden win Pennsylvania primary contests amid unrest, pandemic*, TRIBLive–Associated Press (June 2, 2020), https://triblive.com/news/pennsylvania/pennsylvania-primary-begins-amid-unrest-pandemic/.

Some counties were unable to catch up with their pending applications and process new applications that were received just prior to the application deadline.

126.   Just weeks before the election, other counties, including Philadelphia, had only began mailing out their ballots.

127.   For other county election offices that were able to process and send out a large percentage of mail-in ballots for approved applicants by May 19, 2020, only about 20% of ballots mailed out had been received as voted ballots by the county election offices.[92]

128.   Jonathan Marks, the Deputy Secretary for Elections and Commissions for Pennsylvania, noted that the United States Postal Service ("USPS") is experiencing delays in processing of first-class mail that extended, and will extend, mailing times during the pandemic, which in turn, resulted in delays at all steps of the mail-in voting process: (1)  county election offices receiving voters' applications, (2) voters receiving their ballots, and (3) county election officers receiving Pennsylvanians' voted ballots for counting.

129.   Many voters who timely requested an absentee or mail-in ballot one week before Election Day were precluded from voting in the Primary Election because they did not have sufficient time to receive and return the ballot to the

---

[92] Marks Decl. ¶ 32.

board of elections by Election Day.[93]  Those voters did not have their votes

counted.

130.   For a large portion of those voters who did not receive their ballots or

were unable to mail it back in time, the insufficient number of polling places open

on Primary Election day, including that their new polling place might be far away

or not easily accessible, interfered with voters' capacity to safely vote by regular

ballot in person.

**H.   Severe Burdens on Pennsylvanians Under Pennsylvania's Current Election Regime During the Pandemic**

131.   The experiences of Pennsylvania voters in the Primary Election

detailed throughout this Petition is just a preview of what is going to happen during

the November General Election, given that greater numbers of voters are likely to

vote in presidential election and the second wave of COVID-19 is expected by

health experts to be far worse.  Due to closed polling places and reduced numbers

of poll workers on June 2, long lines were seen outside polling places throughout

the state.  Other states, such as Wisconsin, that had similar lines and crowding at

their polling places for the primary election, observed large increases in the state's

---

[93] Ivey DeJesus, *In communities of color, Pa. primary was marred by irregularities, including voter intimidation, advocates say*, PennLive (June 3, 2020),  https://www.pennlive.com/news/2020/06/in-communities-of-color-the-primary-was-marred-by-a-slew-of-irregularities-including-voter-intimidation-say-pa-voting-advocates.html ("Legions of voters reported having never received the mail-in ballot.").

number of COVID-19 cases.[94]  According to researchers who studied the

Wisconsin primary and patterns of COVID-19 cases, the data suggest that counties

with higher numbers of voters per polling location saw notably higher increases in

their positive test rate in the weeks following the election, relative to those with

lower in-person votes per location realities.[95]  There is nothing to suggest that

Pennsylvania will not experience the same uptick in COVID-19 cases in the

coming weeks.

132.   In addition, the difficulties experienced by many Pennsylvania voters

in the Primary Election is likely to discourage them and other Pennsylvanians,

especially those vulnerable to COVID-19, from voting in-person in November.

133.   As observed with the June Primary Election, a dramatic reduction in

the number of polling places means voters have to travel longer distances to cast

ballots.  It also means congregating more voters into fewer polling places,

increasing their contact with others and the risk of spreading the coronavirus.

Although Act 12's provisions for consolidation expire after the Primary Election,

that multiple counties sought to reduce their polling places—including, four

counties that consolidated polling places beyond 60%—and the Department of

---

[94] Meghan Roos, *Wisconsin's In-Person Voting May Have Led To 'Large' Increase In Coronavirus Cases, Study Suggests*, Newsweek (May 18, 2020), https://www.newsweek.com/wisconsins-person-voting-may-have-led-large-increase-coronavirus-cases-study-suggests-1504801.
[95] *Id.*

State improved all plans to reduce polling places suggests that reduction will also proceed for the November General Election.

134.   In addition, changing polling place locations causes voter confusion.[96] This problem was exacerbated in the June primary by the fact that notice of the change in polling locations was required only to be posted at the county board of elections office and on the website.  Voters who were unable to travel to the county board of elections office and/or do not have access to the Internet experienced significant hardship in determining their polling location.  In Philadelphia, for instance, "some voters showed up at their normal location to find facilities shuttered with no signs directing them to a consolidated location."[97]

135.   Although the Department of State issued guidance for polling locations to follow social distancing and for disinfecting polling sites during the pandemic and said it would supply masks, gloves, hand sanitizer and other cleaning sanitizers, and tape to mark the floor for distance markers, and the Department may issue similar guidance or provisions for the November election,

---

[96] *Id.*
[97] Amy Gardner, Elise Viebeck, & Natalie Pompilio, *Primary voters in 8 states and D.C. faced some confusion, long lines and poor social distancing*, Wash. Post (June 2, 2020), https://www.washingtonpost.com/politics/in-pennsylvania-officials-prepare-for-coronavirus-civil-unrest-to-disrupt-tuesday-primary/2020/06/02/96a55c40-a4be-11ea-b619-3f9133bbb482_story.html.

these measures did not, and will not, alleviate all risks of in-person voting, especially to vulnerable populations, or in the event of crowding at polling places.

136.   On June 2, a number of polling places experienced significant crowding, and social distancing was not maintained.  In some instances, polling places lacked markings on the floor for social distancing and workers neglected to wear masks, forcing voters to feel unsafe and leave before casting votes.[98]  In other instances, voters reported "crowded" polling rooms and "voice[d] concerns about the safety of voting . . . during a pandemic."[99]

137.   Pennsylvania's inadequate vote-by-mail procedures do not present a viable alternative for many Pennsylvanians during the pandemic, considering the severe burdens imposed on many voters by Pennsylvania's vote-by-mail scheme: The deadlines for mail-in applications and submission of mail-in ballots proved to be unworkable for the Primary Election.  Voters were advised that they may apply

---

[98] *See, e.g.*, Christine Vendel, *Man refuses to vote after some Dauphin County poll workers wouldn't wear masks*, PennLive (June 2, 2020), https://www. pennlive.com/news/2020/06/man-refuses-to-vote-after-some-dauphin-county-poll-workers-wouldnt-wear-masks.html; *Lehigh County poll workers refusing to wear PPE, and other election day challenges*, FOX56 Newsroom (June 2, 2020), https://fox56.com/news/local/lehigh-county-poll-workers-refusing-to-wear-ppe-and-other-election-day-challenges (reporting that some poll workers refused to wear PPE).

[99] Avi Wolfman-Arent et al., *On unprecedented Pa. primary day, high turnout in West Philly, too-big ballots in Bucks*, WHYY (June 2, 2020), https://whyy.org/articles/polls-open-in-pa-amid-historic-mix-of-civil-unrest-economic-strife-and-covid-19.

for mail-in ballots up until one week before the election.  But many voters waited until that deadline or close to that deadline because the Pennsylvania election scheme only requires that voters receive fifteen days' notice of a change in polling places—a change that will be dispositive of many voters' voting methods.  By then, the right to vote depended on the actions of third parties—the county board of elections and a postal service experiencing difficulties, delays, and budget shortfalls—and there was insufficient time to resolve logistical challenges.[100]  The requirement that mail ballots be received on or before Election Day did not take into account disruptions in mail delivery or in processing by the county board of elections during the COVID-19 pandemic.

---

[100] According to the National Association of Letter Carriers, as of mid-April, 900 postal workers tested positive for the coronavirus, 600 additional workers were presumed positive, and more than 8,000 were in quarantine.  Alanis King, *'The supervisor coughed in a coworker's direction as a joke': As coronavirus cases at the US Postal Service surpass 1,200, employees say a lack of supplies and care is putting them at risk*, Business Insider (Apr. 25, 2020), https://www.businessinsider.com/postal-workers-usps-worry-for-their-safety-amid-coronavirus-pandemic-2020-4.  Postal workers in Pennsylvania are no different.

## I.      Severe, Unequal Burdens on African-American and Latino Pennsylvanians Under Pennsylvania's Current Election Regime During the Pandemic

138.    African-American and Latino populations are severely and disproportionately impacted by the current election scheme in place for the primary and General Elections during the pandemic.

139.    Studies show that African-American and Latino voters are less likely to vote by mail,[101] and face greater difficulties in voting by mail than the general population.  For example, "[t]he online ballot application form is also available only in English."[102]

140.    Across all U.S. census racial and ethnic classifications, African Americans are least likely to use vote-by-mail options.  For example, during the 2018 midterm elections, only about 11 percent of African-American voters cast ballots by mail, compared with 23.5 percent of white voters.  To vote by mail, an individual must first receive a ballot at their address, which may prove challenging for people who frequently move or lack permanent addresses.  African Americans have the highest move rates in the United States and are about 3 percentage points

---

[101] Reid J. Epstein & Stephanie Saul, *Does Vote-by-Mail Favor Democrats? No. It's a False Argument by Trump.*, N.Y. Times (Apr. 10, 2020, updated June 10, 2020),  https://www.nytimes.com/2020/04/10/us/politics/vote-by-mail.html.
[102] Nick Corasaniti, *What Pennsylvania's 'Dry Run' Election Could Reveal About November*, N.Y. Times (June 2, 2020, updated June 3, 2020), https://www.nytimes.com/2020/06/02/us/politics/pennsylvania-primary-election.html.

more likely to move than their white counterparts.  Additionally, African Americans account for nearly 40 percent of the U.S. homeless population—those who lack a "fixed, regular, and adequate nighttime residence," according to the U.S. Department of Housing and Urban Development.  For voters who frequently move or lack permanent addresses, in-person voting options often offer the only means by which they can cast a ballot.

141.   African-American and Latino voters, especially in urban areas like Philadelphia, are also less likely to have access to private means of transportation and more likely to rely on public transportation.[103]  Thus, it is more difficult for African-American and Latino voters to travel farther distances to vote at consolidated polling locations, or return their mail-in ballots at county election offices, should they be unable to return the ballot by mail.

142.   As a result, African-American and Latino voters are severely and disproportionately impacted by consolidation of polling places because, without adequate mail-in protections, they must forgo their right to vote or accept public health risks on public transit, where social distancing may be unmanageable.  This was born out in the June 2 Primary Election.  "For example, in Penn Hills, a community on the outskirts of Pittsburgh that has a large black population, more

---

[103] Monica Anderson, *Who relies on public transit in the U.S.*, Pew Research Center Fact Tank (Apr. 7, 2016), https://www.pewresearch.org/fact-tank/2016/04/07/who-relies-on-public-transit-in-the-u-s/.

than 50 polling locations are being consolidated into one location."[104]  And

"polling places in communities of color saw longer lines than other areas."[105]

143.   The unequal burden is compounded by the consolidation of polling

places in locations that are not easily accessible through means of public

transportation during the pandemic.  Due to consolidated polling places, some

voters "described walking three-quarters of a mile to get there instead of to their

usual polling place in one of the densest parts of the city."[106]  For people without

transportation or reliable public transit, reaching a polling place may be

impossible.

## COUNT I

**During this Pandemic, the Commonwealth's Election Laws and Practices
Severely Burden the Right to Vote of Many Pennsylvania Voters in Violation
of Article I, § 5 of the Pennsylvania Constitution**

144.   Petitioner hereby incorporates the foregoing Paragraphs 1-143 as if

they were fully set forth herein.

---

[104] Nick Corasaniti, *What Pennsylvania's 'Dry Run' Election Could Reveal About November*, N.Y. Times (June 3, 2020), https://www.nytimes.com/2020/06/02/us/politics/pennsylvania-primary-election.html.

[105] Ivey DeJesus, *In communities of color, Pa. primary was marred by irregularities, including voter intimidation, advocates say*, PennLive (June 3, 2020), https://www.pennlive.com/news/2020/06/in-communities-of-color-the-primary-was-marred-by-a-slew-of-irregularities-including-voter-intimidation-say-pa-voting-advocates.html.

[106] Avi Wolfman-Arent et al., *On unprecedented Pa. primary day, high turnout in West Philly, too-big ballots in Bucks*, WHYY (June 2, 2020),  https://whyy.org/articles/polls-open-in-pa-amid-historic-mix-of-civil-unrest-economic-strife-and-covid-19.

145.   The Pennsylvania Constitution's Free and Equal Elections Clause declares that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

146.   Elections are free and equal only if "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him." *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914).  The clause prevents interference with the exercise of the right to vote "even if the interference occurs by inadvertence."  *League of Women Voters v. Commonwealth*, 178 A.3d 737, 811 (Pa. 2018); *In re New Britain Borough Sch. Dist.*, 145 A. 597, 599 (Pa. 1929) (noting that purpose of legislation was "meritorious" but that "in attempting to secure a laudable result, legislation cannot be enforced which violates fundamental rights secured by the Constitution").  The "plain and expansive sweep of the words 'free and equal'" is "indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of the Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in the government."  *League of Women Voters*, 178 A.3d at 804.

147.   Requiring voters to risk their health by voting at a polling place on Election Day would be a severe burden.   If a voter cannot complete a mail-in ballot safely at home (for any reason) and also cannot safely vote in person (because of the conditions of the polling place), then their vote has effectively been denied.

148.   Requiring voters to risk their health by voting at a polling place that uses unsafe practices is a severe burden on the right to vote.

149.   Expanded access to mail-in voting is critical in the pandemic for those people who cannot or prefer not to vote in person.

150.   All voters should have an adequate opportunity to vote by mail.

151.   There must be an adequate number of polling places open to allow voters to enter and vote safely without overcrowding.

152.   Voters should be able to cast votes without touching common plastic or metal surfaces that have been touched repeatedly by dozens or hundreds of other voters.

153.   Polling places should be open for early access voting in order to help alleviate crowds at polling places, allow for social distancing measures, and help to provide some measure of comfort for those with health concerns.

154.   Early voting (which Pennsylvania lacks) would reduce crowding at the polls and thus help reduce the spread of COVID-19 because some voters who

otherwise would have crowded into polling places on Election Day would naturally

stagger their voting over multiple days or weeks.  At least several days of early

voting could dramatically reduce the number of voters congregating in polling

places at any one time.

## COUNT II

### During this Pandemic, the Commonwealth's Election Laws and Practices Will Disproportionately and/or More Severely Burden Many Pennsylvania Voters in Violation of Article I, § 5 of the Pennsylvania Constitution

155.   Petitioner hereby incorporates the foregoing Paragraphs 1-143 as if

they were fully set forth herein.

156.   The Pennsylvania Constitution's Free and Equal Elections Clause

declares that "[e]lections shall be free and equal; and no power, civil or military,

shall at any time interfere to prevent the free exercise of the right of suffrage." Pa.

Const. art. I, § 5.

157.   As noted above, the Free and Equal Elections Clause requires that

elections be "equal."  Pa. Const. art. I, § 5.  This clause ensures "that the power of

[an individual's] vote in the selection of representatives be equalized to the greatest

degree possible with all other Pennsylvania citizens." *League of Women Voters*,

178 A.3d at 817.  The clause is "specifically intended to equalize the power of

voters in our Commonwealth's election process." *Id*. at 812.  Because the Free and

Fair Elections Clause protects "a voter's individual right to an equal,

nondiscriminatory electoral process," *League of Women Voters*, 178 A.3d at 810, "open to all qualified electors alike," *Winston*, 91 A. at 523, onerous burdens on some people's right to vote are impermissible.

158.   In addition, the Pennsylvania Constitution's Equal Protection Clause prohibits the Commonwealth or any of its political subdivisions from "discriminat[ing] against any person in the exercise of any civil right."  Pa. Const. art. I, § 26.

159.   The burdens and risks faced by voters who must or prefer to vote in person are substantially and unjustifiably increased as compared to voters who can easily vote by mail.  These burdens and risks will fall disproportionately and more severely on African-American and Latino voters, because they are disproportionately likely to have to stand in long lines and be subject to large crowds in order to vote, placing them at greater risk for person-to-person transmission of coronavirus, as well as disproportionately likely to suffer from other risk factors that make them more susceptible to the coronavirus.

160.   Thus, Pennsylvania's current voting scheme violates voters' constitutional right to free and equal elections.

## COUNT III

**During this Pandemic, the Commonwealth's Election Laws and Practices Will Disproportionately and/or More Severely Burden Many Pennsylvania Voters in Violation of Article I, §§ 1 and 26**

161.   Petitioner hereby incorporates all foregoing Paragraphs 1-143 as if they were fully set forth herein.

162.   Article I, Section 1 of the Pennsylvania Constitution provides:  "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

163.   Article I, Section 26 provides: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right."

164.   This Court applies three standards of scrutiny depending on the type of government classification at issue. *See William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 457-58 (Pa. 2017).  Pennsylvania's election scheme violates equal protection under any of this Court's standards.

165.   When "a fundamental right has been burdened," this Court applies "strict scrutiny."  *Id.* at 458. And the "right to vote" is a "fundamental" right. *Banfield v. Cortés*, 110 A.3d 155, 176 (Pa. 2015); *In re Nader*, 858 A.2d 1167, 1181 (Pa. 2004) ("[W]here the fundamental right to vote is at issue, a strong state

interest must be demonstrated."); *Smith v. City of Phila.*, 516 A.2d 306, 311 (Pa. 1986) ("The most protected rights, fundamental rights, are those which have their source, explicitly or implicitly, in the Constitution.").

166.   Pennsylvania's election scheme is subject to strict scrutiny because it disproportionately burdens some individuals in connection with their fundamental right to vote.  Reducing polling places and restricting access to mail-in and early voting will necessarily result in differential treatment of similarly situated voters— some disenfranchised and some not.  And enforcement of the election scheme amid the COVID-19 pandemic necessarily will give rise to another, more pernicious form of differential treatment:  The ability of citizens to cast their votes will depend on their capacity and willingness to risk their health and safety by voting in person as an alternative to submitting a timely requested mail-in ballot that otherwise would not be counted.

167.   The Commonwealth has no legitimate interest, let alone a compelling one, in reducing polling places and restricting access to mail-in and early voting that will inevitably cause this arbitrary disenfranchisement. The abstract goals of ensuring that elections are orderly and administered uniformly is not sufficient to support widespread, arbitrary disenfranchisement in the face of a public-health crisis.  And even if it were, reducing polling places and restricting access to mail-in and early voting is not necessary to further that interest.

168.   Even if strict scrutiny did not apply, the challenged provisions would be subject to an "intermediate" (or "heightened") standard of review because they unquestionably involve an "important" right. *William Penn Sch. Dist.*, 170 A.3d at 458.  For a law to pass intermediate scrutiny, "the government interest [must] be an 'important' one" and "the classification be drawn so as to be closely related to the objectives of the legislation." *James v. SEPTA*, 477 A.2d 1302, 1307 (Pa. 1984). Reducing polling places and restricting access to mail-in and early voting amid the COVID-19 pandemic fail intermediate scrutiny as well.

169.   Finally, even absent heightened scrutiny, enforcing the challenged scheme during the COVID-19 crisis violates equal protection under this Court's rational-basis test.  "[T]reating people differently under the law" must further a legitimate state interest and must be reasonably related to that interest. *Curtis v. Kline*, 666 A.2d 265, 268 (Pa. 1995).  In other words, government classifications must be "reasonable rather than arbitrary." *Id.*

170.   Reducing the number of polling places, without access to early voting or sufficient access to mail-in voting, will arbitrarily disenfranchise voters and thus does not pass the rational-basis test.  There is "no rational reason" to disenfranchise certain, arbitrarily selected voters based on these inevitable overcrowding and delays that are entirely outside their control, and to offer, as the

only potential recourse, that those voters risk their lives to vote in person.  *Curtis*, 666 A.2d at 260.

171.   Similarly, compelling voters in certain counties to repeatedly touch surfaces previously touched by dozens or hundreds of strangers without adequate disinfection, or to undergo the risk of excessive and unsafe time spent waiting in line due to time-consuming disinfection and/or equipment downtime, will arbitrarily disenfranchise voters and thus does not pass the rational-basis test.

## REQUEST FOR RELIEF

WHEREFORE, Petitioner requests that this Court enter judgment in its favor and:

     a.    Direct Respondents to require each county board of election to maintain a sufficient a number of polling places such that each resident can exercise his or her right to vote;

     b.    Direct Respondents to provide that each county board of election give adequate notice to voters of any change in polling place by mailing notice to voters sufficiently in advance of the General Election, as well as posting at old polling places;

c.  Permit early voting for the General Election in advance of election day;

d.  Require increased access to vote by mail across the Commonwealth, by among other things, automatically sending mail-in ballot applications to all registered voters in accordance with their language preferences; ensuring that absentee and mail-in ballots are available in formats that are accessible to voters with disabilities without requiring assistance from another person; requiring each county to provide ballot dropboxes, and accepting ballots returned to a drop-box by close of polls on Election Day; and providing adequate guidance to election officials when verifying mail ballots through signature matching and require notice and an opportunity to cure a mail ballot flagged for signature mismatch;

e.  Require that all polling places in the Commonwealth use hand-marked paper ballots for the 2020 General Election, while retaining at least one accessible voting machine per polling place for those who request one and as required by federal law; and

67

   f.  Grant such other relief as may be just and proper.

Date: June 18, 2020

           */s/ Sozi Pedro Tulante*

           Sozi Pedro Tulante (Pa. 202579)
           Julia Chapman (Pa. 315959)
           Tiffany Engsell (Pa. 320711)
           Craig Castiglia (Pa.  324320)
           DECHERT LLP
           Cira Centre
           2929 Arch Street
           Philadelphia, PA  19104
           215.994.4000

           Neil Steiner (*pro hac vice* forthcoming)
           DECHERT LLP
           Three Bryant Park
           1095 Avenue of the Americas
           New York, NY 10036
           212.698.3822

           Ronald Fein (*pro hac vice* forthcoming)
           John Bonifaz (*pro hac vice* forthcoming)
           Ben Clements (*pro hac vice* forthcoming)
           Free Speech For People
           1320 Centre Street #405
           Newton, MA 02459
           617.244.0234

           *Attorneys for Petitioner NAACP State*
           *Conference of Pennsylvania*

## **VERIFICATION**

I, Kenneth L. Huston, the President of the National Association for the Advancement of Colored People Pennsylvania State Conference, verify that the facts set forth in the foregoing complaint are true and correct to the best of my information, knowledge and belief. I understand that the statements contained herein are subject to the penalties of 18 PA. C.S. § 4904 relating to unsworn falsification to authorities.

Dated: June 11, 2020

## **CERTIFICATION**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsyvlania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Date: June 18, 2020                    */s/ Sozi Pedro Tulante*
                                        Sozi Pedro Tulante (Pa. 202579)