**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC. ; *et al.* ,      ) | CIVIL ACTION No. 2-20-cv-966 |
|             ) | |
|             ) | |
|        Plaintiffs,             ) | |
|             ) | |
|        v.             ) | |
|             ) | |
| KATHY BOOCKVAR, in her capacity as    ) | |
| Secretary of the Commonwealth of        ) | |
| Pennsylvania *al.* , ,             ) | |
|             ) | |
|        Defendants.             ) | |
|             ) | |
| _____ ) | |

## BRIEF IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS BY CITIZENS FOR PENNSYLVANIA'S FUTURE AND SIERRA CLUB

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   DESCRIPTION OF PROPOSED INTERVENOR-DEFENDANTS. ...............................3

    A.    PennFuture. ..............................................................................................3

    B.    Sierra Club. ...............................................................................................6

III.   ARGUMENT .........................................................................................................8

    A.    The Court Should Grant Intervention As Of Right Under Rule 24(a)(2). .............8

         1.    Applicants Have A Significant Interest In The Outcome Of This Litigation. .................................................................................8

         2.    The Disposition Of This Action Could Impair Applicants' Interests. ......12

         3.    The Existing Parties Do Not Adequately Represent the Interests of Applicants. ...............................................................................13

         4.    Intervention Is Timely. ..............................................................17

    B.    Alternatively, Permissive Intervention Is Appropriate To Protect The Intervenors' Interests. ...............................................................................17

IV.   CONCLUSION....................................................................................................18

# I.     INTRODUCTION

Citizens for Pennsylvania's Future ("PennFuture") and the Sierra Club (together "Applicants") by and through the undersigned counsel, respectfully submit this brief in support of their motion to intervene as a defendant in this action. Applicants seek to intervene as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure or, in the alternative, permissively under Rule 24(b)(1)(B).

Plaintiffs attack several protections that Pennsylvania has had in place to provide its voters with a safe voting experience, as well as measures recently adopted to keep voters safe during a pandemic. Ironically, Plaintiffs seek to reduce the choices Pennsylvania voters have to vote while staying close to home, but increase the choices that outsiders have to harass and intimidate those voters. The policies at issue are a matter of great public importance to all Pennsylvania voters, Democrats, Republicans and independents, and the named Defendants cannot fully and adequately protect all the voters and the organizations that represent them.

Plaintiffs, including the Republican National Committee, President Trump's reelection campaign, and four members of Congress, have sued Commonwealth Secretary Boockvar and all of Pennsylvania County Boards of Election regarding the administration of Act 77 (enacted in 2019 as Act 2019-77) which allows all Pennsylvania voters to vote by mail, and several provisions concerning poll watchers under Election Code Sections 102(q), 417 and 1308(g). Plaintiffs seek sweeping relief predicated on the false premise that voting by mail "invites fraud, and undermines the public's confidence in the integrity of elections." *See* Compl. ¶ 63. Notably, Plaintiffs do not acknowledge—much less attempt to mitigate—the harms that would result if they were successful in their lawsuit.

As a nonprofit, non-partisan, organizations, Applicants are not aligned with either political party. PennFuture is dedicated to advocating for just environmental policies that protect the air,

land, and water in Pennsylvania, including by working to enable and empower Pennsylvanians' participation in the electoral process. *See* Decl. of Jacquelyn Bonomo in Support of Mot. to Intervene, Exhibit A, (hereinafter "Bonomo Decl. ") ¶ 3. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. *See* Decl. of Jennifer Hensley in Support of Mot. to Intervene, Exhibit B, (hereinafter "Hensley Decl.") ¶ 4. The Sierra Club works to advance this mission by encouraging and enabling diverse citizens who seek to protect the environment and enact climate policy reforms to participate in the democratic process. *Id.* ¶ 5. This year, Applicants' voter education efforts have and will focus on informing voters about how to request and cast their ballots by mail so that voters may safely exercise their right to vote during the Covid-19 pandemic. *Id.* ¶ 10.

Plaintiffs' lawsuit seeks to impose unnecessary burdens on Pennsylvanians' ability to vote that will increase risk to voters and, as a result, is a direct threat to Applicants' interests. ***First***, Plaintiffs' attempt to delegitimize vote-by-mail in Pennsylvania by imagining a novel constitutional barrier to vote-by-mail. This runs contrary to Applicants' goals of creating broader access to the democratic process through, among other things, expanding access to and use of mail ballots. ***Second***, Plaintiffs' attempt to limit the means of returning mail ballots; the Plaintiffs' relief would require some voters to travel long distances or incur expense to have their ballot counted. This would directly undermine Applicants' efforts to use mail ballots as a turnout tool among registered voters in Pennsylvania. ***Third***, Plaintiffs attempt to eliminate longstanding measures under Pennsylvania law that protect Pennsylvania voters against intimidation and harassment by outside interlopers. If successful, Plaintiffs would undercut Applicants' efforts to encourage

traditionally marginalized community members to participate in the political process because they are disproportionately harmed by climate impacts and are forceful advocates for climate policy reform and environmental justice. ***Fourth***, Plaintiffs attempt to limit which government actors can take proactive steps to increase participation and access. This is at odds with PennFuture's model of promoting election and other reforms among a diverse array of governmental actors at all levels of government, and could undermine the authority of redistricting commissions that the Sierra Club has successfully campaigned for in Michigan and Missouri.

If Plaintiff were successful in this lawsuit, Applicants' past, present, and future efforts of engaging and activating voters would be undermined. Additionally, the accompanying loss of political strength would impair Applicants' ability to lobby and seek political support for their environmental objectives. Applicants would have to divert resources to pivot to a new strategy for making sure that their voters, and the agenda they advocate for, are heard in this election. As set forth below, Applicants meet the standards for both intervention as of right and permissive intervention. PennFuture and Sierra Club therefore request their motion to intervene be granted as of right under Rule 24(a) or alternatively, by permission under Rule 24(b).

## II.    DESCRIPTION OF PROPOSED INTERVENOR-DEFENDANTS.

### A.    PennFuture.

Created in 1998, PennFuture is a non-profit, nonpartisan 501(c)(3) advocacy organization. Bonomo Decl. ¶ 3. PennFuture advocates for just environmental and climate policies in Pennsylvania by working to promote civic engagement among Pennsylvanians, including through programs focused on increasing voter participation in traditionally underrepresented communities and environmental justice communities. *Id.* PennFuture is the state affiliate of the National Wildlife Federation and is a strategic partner of the Conservation Voters of Pennsylvania. *Id.* ¶ 5. It is also the state lead for the Choose Clean Water Coalition and

the Coalition for the Delaware River Watershed, is a member of the Growing Greener Coalition and the Clean Power Coalition, and works with the Fair Districts PA Coalition and Pennsylvania Voice. *Id.* PennFuture has staff located throughout the state, including in Harrisburg, Philadelphia, Pittsburgh, Mount Pocono, and Erie, and serves more than 915 members, including many eligible and registered voters. *Id.* ¶¶ 4, 6.

PennFuture works to achieve its goal of empowering traditionally underrepresented communities in the electoral process by engaging in voter-education, outreach, and registration programs focused on these communities, *id.* ¶¶ 7-10, and advocating for easing the burdens on voting, including promoting expansion of access to and use of mail ballots, *id.* ¶¶ 7, 11-12.

As part of its education and outreach efforts, the organization has a budget of $93,400 for radio and digital advertisements targeted at the Black and Latinx communities in Pennsylvania encouraging people to vote, and commissioned an art piece in Allentown, Pennsylvania displaying a message in Spanish encouraging community members to register and vote. *Id.* ¶ 8. The organization also employs dedicated voter engagement staff and pays contract employees to reach out to eligible Pennsylvanians reminding them to register to vote, to exercise their votes, and how to vote safely. *Id.* ¶ 9. PennFuture's budget and plan call for significant expansion of these efforts leading up to the November election. *Id.* Through these efforts, PennFuture has a goal of reaching at least 50,000 eligible Pennsylvania voters and registering at least 500 new voters prior to the election. *Id.* ¶ 10.

With respect to its advocacy efforts, PennFuture successfully lobbied the Pennsylvania General Assembly for the passage of Act 77, one of the pieces of legislation challenged by Plaintiffs' lawsuit in this case, which allowed for no-excuse vote-by-mail, significantly eased the burden of casting a ballot by mail, and extended the deadline to register to vote from 30 days to

15 days before the election. *Id.* ¶ 12. PennFuture's advocacy efforts are not limited to the state General Assembly, but also extend to local officials throughout the state. *Id.* In addition, PennFuture has partnered with other organizations, such as Pennsylvania Voice to work toward democracy reform because of its belief that free, fair, and accessible elections—in which all of Pennsylvania's diverse voters can participate and safely cast their ballots—are essential to achieving the organization's environmental policy goals. *See id.* ¶¶ 3, 9. Indeed, one pillar of PennFuture's strategic plan is to support environmental advocates in traditionally underrepresented communities in building power, and to do so by increasing voter participation. *Id.* ¶¶ 3, 7. [1]

In light of the current pandemic and public health crisis, PennFuture believes that increasing eligible Pennsylvanians' access and ability to cast their ballots by mail is one of the two most important issues in effectuating its goal of increasing voter turnout among historically underrepresented communities in the 2020 General Election (along with voter registration); accordingly, PennFuture has been taking active steps to educate and encourage voters to vote by mail. *Id.* ¶ 11. Indeed, mail voting surged in Pennsylvania's June primary as voters opted to cast their ballots closer to home during the pandemic.[2] That is why a focus of PennFuture staff members, phone banker contractors, and other volunteers' outreach efforts will be on educating voters about requesting and casting their ballots by mail in the 2020 General Election. *Id.* PennFuture is currently fundraising to expand its resources to effectively educate and advocate

---

[1] *See also* PennFuture, *Strateigic Plan 2019-2022*, https://www.pennfuture.org/Files/Admin/PennFuture_StrategicPlan_2019-22-%289%29.pdf

[2] More than 1.8 million Pennsylvania voters requested mail ballots for the June primary — almost 17 times the 107,000 requests made in the 2016 primary. *See* Jonathan Lai, *Pennsylvania held an election. We won't know the results for days. Here's what that means for November*, Phil. Inquirer (June 2, 2020), https://www.inquirer.com/politics/election/pa-2020-primary-election-results-mail-ballots-20200602.html.

for Pennsylvanians to vote-by-mail within the state in light of the pandemic and public health concerns raised by in-person voting. *Id.*

**B.      Sierra Club.**

Founded in 1892, the Sierra Club is a 501(c)(4) non-profit, nonpartisan advocacy organization incorporated and headquartered in California. Hensley Dec. ¶¶ 3-4. The Sierra Club has 67 chapters nationwide and approximately 799,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. *Id.* ¶ 4.

In furtherance of this mission, the Sierra Club's democracy team works to encourage and enable diverse citizens seeking to protect the environment and enact climate policy reforms to participate in the democratic process. *Id.* ¶ 5. The Sierra Club, with its state chapters across the country, advocates in support of policies that expand access to the ballot and that make elected leaders more accountable to the public, and against policies that make it harder for voters to cast their ballots. *Id.* ¶ 6. On a nonpartisan basis, the Sierra Club also endorses candidates and makes recommendations to its members identifying local, state, and national candidates who are likely to support the environmental and climate policy reforms that align with the organization's mission. *Id.* ¶ 7.

The Sierra Club believes that a strong democracy in Pennsylvania requires participation from citizens across the Commonwealth and that voters must be able to participate in democracy this year while staying safe. *Id.* ¶ 11. To make sure that Americans can vote safely during the Covid-19 pandemic without putting their personal health at risk, this year, the Sierra Club has devoted resources to educating voters about mail voting. *Id.* ¶ 10.

The Sierra Club plans to roll out a state-by-state messaging campaign later this year to educate voters on the policy changes in their states with respect to mail voting and to provide information on how voters can cast mail ballots for the November election. *Id.* ¶ 9. In particular, the Sierra Club is working to ensure that voters in poor and minority communities—which have the highest pollution burdens and face the greatest risk from Covid-19—can vote by mail or can take the necessary precautions if they must cast their ballots in person. *Id.* ¶ 12.

The Sierra Club's Pennsylvania Chapter has offices in Harrisburg, Pittsburgh, Philadelphia, and Lehigh Valley, along with nine active regional groups all across the state. *Id.* ¶ 13. The Pennsylvania Chapter has approximately 32,000 members and between 130,000 and 140,000 constituents. *Id.* ¶¶ 14-15. Like PennFuture, the Pennsylvania Chapter of the Sierra Club is a member of the Fair Districts PA Coalition. *Id.* ¶ 18.

This year, after the passage of Act 77, the Pennsylvania Chapter sent an email to its constituents (and later posted a message on its website) explaining how Pennsylvanians could cast a mail in ballot for the June 2, 2020 primary, advising constituents about mail voting deadlines, and emphasizing the importance of voting by mail during the pandemic.[3] *Id.* ¶ 19. The Pennsylvania Chapter plans to send similar additional messaging to its constituents for the November election. *Id.* ¶ 20. In addition, the Pennsylvania Chapter held a meeting earlier this year with a group of volunteers and residents, comprised of primarily Black and low income Pittsburgh residents, to offer information on vote-by-mail and how members could request and cast their mail ballots. *Id.* ¶ 21.

---

[3] *See* Jen Quinn, *Vote By Mail In PA*, Sierra Club Pennsylvania Chapter Blog (May 12, 2020) https://www.sierraclub.org/pennsylvania/blog/2020/05/vote-mail-pa.

### III.    ARGUMENT

#### A.    The Court Should Grant Intervention As Of Right Under Rule 24(a)(2).

The Third Circuit has established a three-part test for when a court must allow intervention as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure. Specifically, a party may intervene by right if it demonstrates: "(1) a sufficient interest in the litigation; (2) a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and (3) that its interest is not adequately represented by the existing parties to the litigation." *Commonwealth of Pennsylvania v. President United States of America*, 888 F. 3d 52, 57 (3d Cir. 2018) (quotation marks and citation omitted). Applicants satisfy each part of the Third Circuit's test for as of right intervention, particularly when considered (as the Third Circuit requires) with a liberal construction in favor of intervention. Consequently, this Court should permit PennFuture and Sierra Club's intervention as of right.

#### 1.    *Applicants Have A Significant Interest In The Outcome Of This Litigation.*

An applicant's right to intervene is conditioned on having "an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Kliessler v. United States Forest Serv.* , 157 F. 3d 964, 972 (3d. Cir. 1998). An intervenor must show it has "a cognizable legal interest, and not simply an interest of a general and indefinite character." *Pennsylvania*, 888 F. 3d at 58 (quotation marks and citation omitted). "An applicant must therefore demonstrate that its interest is 'specific to [it], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.'" *Id.* (quoting *Kliessler*, 157 F. 3d at 972).

Applicants have strong interests in this litigation, sufficient to meet the requirements of Rule 24(a). As a part of its core goal of promoting Pennsylvania's ability to adopt just environmental and climate policies by empowering traditionally underrepresented communities,

PennFuture has an interest in ensuring that all eligible persons have equal opportunity to register to vote, can safely and accessibly vote for the candidate of their choice, and ensure that their vote has been counted. To this end, PennFuture advocated for the passage of Act 77, which significantly eased the burden of casting a ballot by mail. Bonomo Decl. ¶ 12. PennFuture is also an advocate for increased vote-by-mail access particularly during this election cycle to ensure that vulnerable voters within underrepresented communities may safely cast their ballot and have their voices heard. *Id.* ¶ 11.

Similarly, the Sierra Club has an interest in making sure that citizens from across the Commonwealth can participate in the democratic this year while staying safe. Hensley Dec. ¶ 11. That is why the Sierra Club is working to ensure that voters in poor and minority communities— which have the highest pollution burdens and face the greatest risk from Covid-19—can vote by mail or can take the necessary precautions if they must cast their ballots in person. *Id.* ¶ 12. The Sierra Club's Pennsylvania Chapter has already devoted resources to educating voters on Pennsylvania's new vote-by-mail system and plans to send additional messages this year to its tens of thousands of constituents to educate them on how to request and cast their mail ballots. *Id.* ¶¶ 19-21.

Mail ballot drop-boxes are essential to ensuring that these communities can and will cast their ballots, given that unreliable mail service that is common in poor and minority

communities[4] and lower levels of trust in the Postal Service among voters of color.[5] Indeed, a

focus on Applicants' voter advocacy and education plans for the fall is educating voters about

how they may request and return mailed ballots to ensure that their vote is counted. Hensley Dec.

¶¶ 19-21, 23; Bonomo Decl. ¶ 11. In addition, PennFuture is expending considerable resources to

ensure high voter turnout among eligible Pennsylvanians within these communities, including

through phone-banking and digital and radio advertisements. Bonomo Decl. ¶¶ 8-9.

Applicants' interests in empowering traditionally underrepresented communities to

participate in the electoral process alone, including through advocacy for and education about

Act 77 and their current voter outreach efforts, are more than sufficient to satisfy Rule 24(a). *See*

*Pennsylvania*, 888 F. 3d 52. In *Pennsylvania*, this Court permitted a religious group to intervene

based on its interest in preserving its religious exemption, noting that the entities were parties in

---

[4] *See, e.g.*, Richard L. Hasen, *When Is Uniformity of People, Not Counties, Appropriate in Election Administration? The Cases of Early and Sunday Voting*, 2015 U. Chi. Legal F. 193, 209 n.36 (2015) ("[m]any of the people from lower-income backgrounds that I've worked with do not trust voting by mail." (quotation marks and citation omitted)); Ihaab Syed, *How Much Electoral Participation Does Democracy Require? The Case for Minimum Turnout Requirements In Candidate Elections*, 66 UCLA L. Rev. 2024, 2046 (2019) ("For example, in Maricopa County, Arizona, 140,000 new voters who registered in advance of the May 2018 primary (as far back as December 2017) were never mailed voter registration cards"); Dayna Cunningham, *Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States*, 9 Yale L. & Pol'y Rev. 370, 393 (1991) ("The problem of lower mail delivery and response rates in minority and poor neighborhoods has been documented. Responses to Internal Revenue and Census forms, documents that are mailed by the government and to which replies are mandatory, provide useful models for estimating possible outcomes of voter address verification requests. Both Internal Revenue data and preliminary survey data regarding the 1990 census suggest that a major contributor to low response rates in minority communities may be ineffective mail delivery.") (citations omitted).
[5] *The California Voter Experience Study: A Statewide Survey of Voter Perspectives on Vote-By-Mail and Vote Centers*, The California Voter Experience Study, Issue 3, UC Davis California Civic Engagement Project (Sept. 2017) at 2 https://static1.squarespace.com/static/57b8c7ce15d5dbf599fb46ab/t/59b1bacc4c0dbf34e91dac0d/1504819977791/UCDavisCCEPIssueBrief3VoteCenterStatewideSurveyBrief.pdf (finding voters of color were less likely to trust the Postal Service than white voters).

prior litigations showing a "unique interest." *Id.* at 58. Applicants and their membership benefit from Act 77 because the law promotes and protects Pennsylvanians' practical ability to cast their vote and participate in the electoral process. And Applicants have significant protectable interests in ensuring that, consistent with the provisions of Act 77, Pennsylvania voters have the ability to cast their ballots without incurring an unreasonable burden, such as being able to return a mail ballot to a polling location – a practice Plaintiffs challenge in this case. *See id.*

Intervention in voting rights cases is favored, and the courts have routinely allowed it. *See, e. g. , Texas v. United States*, 798 F. 3d 1108, 1111 (D. C. Cir. 2015) (allowing intervention by civil rights advocacy groups among others); *Pub. Interest Legal Found. , Inc. v. Winfrey*, No. 19-13638, 2020 WL 2781826, at *2 (E. D. Mich. May 28, 2020) (allowing voting rights organizations to intervene as defendants); *Bellitto v. Snipes*, No. 0:16-cv-61474, 2016 WL 5118568 (S. D. Fla. Sep. 21, 2016) (allowing intervention by labor union); *Kobach v U. S. Election Assistance Comm'n*, No. 13-cv-04095, 2013 WL 6511874 (D. Kan. Dec. 12, 2013) (allowing non-profits, nonpartisan advocacy groups, and a state senator to intervene); *Veasey v. Abbott*, No. 2:13-cv-00193 (S. D. Tex. Sep. 19, 2013), (Doc. 29) (allowing the Texas League of Young Voters Education Fund, among others, to intervene); *LaRoque v. Holder*, No. 1:10-cv-00561 (D. D. C. Aug. 25, 2010), (Doc. 24) (permitting intervention by civil rights organization, among others). Courts and Congress have often recognized that the right to vote—that is central to Applicants' work and the bedrock of American democracy—is "a fundamental right." 52 U.S.C. § 20501(a)(1). And the Supreme Court has long recognized that voting-related restrictions implicate "interwoven strands of liberty" that "rank among our most precious freedoms": "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Anderson v. Celebrezze*, 460 U. S. 780, 787 (1983) (citations and quotation marks omitted). Such

an interest, and Applicants' role in furthering it, is more than sufficient to merit intervention.

   2.      *The Disposition Of This Action Could Impair Applicants' Interests.*

      In addition to demonstrating an interest in the underlying litigation, intervention should

be granted where the applicant shows that it is "so situated that the disposing of the action may

as a practical matter impair or impede [its] ability to protect its interest . . . ." Fed. R. Civ. P.

24(a)(2). "To meet this requirement, an applicant 'must demonstrate that [its] legal interests may

be affected or impaired[] as a practical matter by the disposition of the action. '" *Pennsylvania*,

888 F. 3d at 59 (quoting *Brody ex rel. Sugzdinis v. Spang*, 957 F. 2d 1108, 1122 (3d Cir. 1992).

"It is not sufficient that the claim be incidentally affected; rather, there must be a tangible threat

to the applicant's legal interest." *Id.* at 1123 (quotation marks and citation omitted). The focus is

on "practical consequences" of the litigation, and the court may "consider any significant legal

effect on the applicant's interest, including a decision's stare decisis effect or a proposed

remedy's impact on the applicant for intervention." *Id.* at 1122 (quotation marks and citation

omitted). Policy preferences can also be considered when there can be possible "subsequent

collateral attacks." *Id.* at 1123. Applicants' interests here will be directly and tangibly impaired

by a disposition in favor of Plaintiffs for several reasons.

      Applicants' interests in ensuring an open and accessible electoral process and

empowering traditionally underrepresented communities participation in that process would be

severely impaired if Plaintiffs prevail. In particular, Plaintiffs seek a sweeping declaration that

would unnecessarily burden Pennsylvanian voters' ability to cast mail ballots, and impair their

ability to vote safely in light of the current public health crisis facing the nation. If Plaintiffs are

successful in imposing unnecessary burdens on returning mailed ballots (such as requiring them

to be returned directly to County Election Boards rather than deposited at a local precinct) and impeding vote-by-mail, Applicants would be forced to divert resources to develop and execute new plans to educate voters on how to return mail ballots and to reconfigure their voter participation program to place additional emphasis on returning mail ballots early and staying safe while delivering a mail ballot to a County Board. Bonomo Decl. ¶ 15; Hensley Decl. ¶ 25.

Plaintiffs' unduly narrow interpretation of the term "legislature" in the Elections Clause, if adopted, could preclude efforts to reform election laws by state lawmaking bodies and officers in Pennsylvania and across the country. Plaintiffs' attempts to limit which government actors can take proactive steps to increase participation and voter access would undercut PennFuture's efforts to promote election and other reforms among a diverse array of actors at all levels of government, Bonomo Decl. ¶ 12, and could undermine the authority of redistricting commissions across the country, including the commissions that the Sierra Club successfully campaigned for in Michigan and Missouri, Hensley Decl. ¶¶ 7, 26.

### 3. The Existing Parties Do Not Adequately Represent the Interests of Applicants.

The Third Circuit looks to see if the applicant's "interests are not adequately represented if they diverge sufficiently from the interests of the existing party, such that 'the existing party cannot devote proper attention to the applicant's interests.'" *Pennsylvania*, 888 F. 3d at 60 (quoting *United States v. Territory of the Virgin Islands*, 748 F. 3d 514, 520 (3d Cir. 2014). Under this standard, courts will look at this burden and "generally treat[ it] as minimal" if the applicant shows that representation of its interest "*may be* inadequate." *Pennsylvania*, 888 F. 3d at 60 (quotation marks and citation omitted, emphasis in original).

Though there is a rebuttable presumption that a party's interest is adequately represented if one party is a government entity "charged by law with representing the interest of the applicant

for intervention," the burden to rebut that presumption varies with each case. *Id.* (quotation marks and citation omitted). Where, as here, the government party's "views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light." *Id.* at 60-61 (quoting *Kleissler*, 157 F. 3d at 972). Rule 24 "underscores both the burden on those opposing intervention to show the adequacy of the existing representation and the need for a liberal application in favor of permitting intervention." *Nuesse v. Camp*, 385 F. 2d 694, 702 (D. C. Cir. 1967). Applicants here easily meet the "minimal" burden of showing that the existing defendants *may not* adequately represent its interests. *Pennsylvania*, 888 F. 3d at 60.

In this case, while there may be some overlap between the interest of the existing Defendants (governmental officials and local election boards), other existing or proposed Intervenors (political parties, broad voter coalitions, and individual voters), and that of Applicants, each has their own discrete areas of interest, making it far from "undoubted" that the other defendants would, or are "capable and willing" to, make all of Applicants' proposed arguments. *Id*.

With regards to the current Defendants, as governmental officials with substantial public responsibilities and limited resources tied to the public treasury, their positions in this litigation necessarily turn on their inherent authority and responsibility to properly administer election laws. These officials may need to take into account their respective offices' narrow institutional interests and staff capabilities, and are subject to political pressures that do not align perfectly given their different constituencies. Because of those institutional interests, the existing Defendants cannot be expected to focus perfectly on the interests of a groups like PennFuture and the Sierra Club, or their efforts to protect the environment and reform climate policy by

empowering traditionally underrepresented groups. Moreover, political forces could affect Defendants' defense of the case in ways that are very much in conflict with Applicants' interests, particularly in maximizing eligible voter engagement and participation among traditionally underrepresented communities. To be sure, governmental officials should be responsive to their constituents, but Applicants will give primacy to the interests of their members and other voters in a way that governmental officials simply cannot replicate. As one example, Applicants both believe that Pennsylvania should adopt a universal vote-by-mail system (similar to that used in a number of states like Colorado, Utah, and Washington) in which all registered voters in the state would receive a mail ballot, a policy which has not been adopted by Defendants in this action. Bonomo Decl. ¶ 13; Hensley Decl. ¶ 22.

Because of their different interests and areas of expertise, courts have recognized in dozens of cases that governmental parties cannot adequately represent the interests of private intervenors, even if they take the same position on underlying merits. For example, in *Trbovich v. United Mine Workers*, 404 U. S. 528 (1972), the Court allowed a union member to intervene in an action brought by the Secretary of Labor to set aside union elections for violation of the Labor-Management Reporting and Disclosure Act of 1959, even though the Secretary was broadly charged with protecting the public interest. The Court reasoned that the Secretary could not adequately represent the union member because of their "duty to serve two distinct interests," *id.* at 538, a duty to protect both the public interest and the rights of union members. *See also Kleissler*, 157 F. 3d at 967 (concluding a proposed intervenor showed a reasonable doubt that a government agency would adequately protect its environmental interests); *Pennsylvania*, 888 F. 3d at 61 (finding that a religious group had a specific interest that was outside of the government's more general interest).

Applicants are also differently situated to the other existing and proposed defendant-intervenors. The Pennsylvania State Democratic Party group are partisan political parties and candidates concerned with ensuring their party members and constituent voters have the opportunity to vote in the upcoming election, and advancing their overall electoral prospects. Applicants are not affiliated with any particular political party or group of constituents in the arguments it may make in this litigation. *See* Bonomo Decl. ¶ 3; Hensley Decl. ¶ 3. Indeed, Applicants are seeking to engage and activate individuals who have not already been registered by the political parties. *See* Bonomo Decl. ¶¶ 3, 7-10; Hensley Decl. ¶ 12. Moreover, it is not uncommon for Applicants to have stark policy disagreements with the state democratic party. Bonomo Decl. ¶ 14; Hensley Decl. ¶¶ 22-23.

With respect to the other 501(c)(3) proposed intervenors, none of those groups strive to turn out the voters that are the constituents of Applicants—voters who are especially concerned about environmental issues. Moreover, PennFuture has made a specific organizational commitment to register Spanish-speaking and Latino voters, a fast growing constituency in Pennsylvania,[6] *see* Bonomo Decl. ¶ 8, that has not been the focus of extensive voter engagement efforts and was not the constituency the other intended intervenors were founded to serve.

The nature of this litigation could leave Applicants without sufficient time to remedy any adverse disposition here before critical elections. If the existing parties were to settle or otherwise reach a resolution on the merits that adversely affected the interests of Applicants and their members, Applicants could lack meaningful avenues of relief as a non-parties to this case.

---

[6] From 2010 to 2019, Pennsylvania's Latino population grew by 273,900, while the state's overall population increased by only 90,800. *See* Jens Manuel Krogstad, *Hispanics have accounted for more than half of total U.S. population growth since 2010*, Pew Research Center, (July 10, 2020), https://www.pewresearch.org/fact-tank/2020/07/10/hispanics-have-accounted-for-more-than-half-of-total-u-s-population-growth-since-2010/.

For this reason—and many others—Applicants' interests are threatened by the relief sought by Plaintiffs in this action.

### 4. Intervention Is Timely.

The instant motion is timely under all the circumstances. *See Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F. 2d 970, 974 (3d Cir. 1982) (presenting three factors for determining timeliness: how far proceedings have progressed; prejudice caused by a delay and the reason for the delay). Plaintiffs filed the instant lawsuit on June 29, 2020 and, only served Defendants on July 6, 2020. *See* July 2, 2020 Order, Dkt. 7. Pursuant to the Court's July 17, 2020 Scheduling Order, Defendants have until at least July 24, 2020 to file a responsive pleading. Dkt. 124. The Court has yet to enter any substantive orders in this case, nor have entries of appearance been filed on behalf of all 68 Defendants.

Applicants are prepared to meet the schedule set forth in the Court's July 17 scheduling order, Dkt. 124, and any other briefing schedule the Court may set for proposed Defendant-Intervenors.

## B. Alternatively, Permissive Intervention Is Appropriate To Protect The Intervenors' Interests.

Applicants satisfy not only the standard for intervention as of right, but also the criteria for Rule 24(b)(1)(B) permissive intervention. Under that rule, courts may permit intervention upon "timely motion" where the applicant "has a claim or defense that shares with the main action a common question of law or fact," (Fed. R. Civ. P. 24(b)(1)(B)), and must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," (Fed. R. Civ. P. 24(b)(3)). According to the Third Circuit, "[a] litigant seeking to intervene pursuant to Fed. R. Civ. P. 24(a)(2) must establish: (1) a timely application for leave to intervene, (2) a sufficient interest in the underlying litigation, (3) a threat that the interest will be

impaired or affected by the disposition of the underlying action, and (4) that the existing parties to the action do not adequately represent the prospective intervener's interests." *NCAA v. New Jersey*, 520 Fed. Appx. 61, 62 (3d Cir. 2013) (quotation marks and citation omitted).

As discussed above, Applicants' motion is timely, and, for the same reasons, their intervention will not unduly delay or prejudice the adjudication of the original parties' rights. Nor do the Applicants present any jurisdictional issues—this Court independently has subject matter jurisdiction over Applicants under federal question jurisdiction because the dispute involves a question of constitutional law. The questions of law and fact presented in this action address the core issues that Applicants seek to litigate. Applicants do not propose to add a counterclaim or expand the questions presented by the Complaint—in fact, Applicants will confer with Defendants, existing intervenors, and any other intervenors the court sees fit to permit to seek to avoid redundant filings before the Court, including in opposition to Plaintiffs' motion for a preliminary injunction. Furthermore, Applicants will lend their perspectives and expertise to the case, thereby enhancing development of the relevant issues in the case. *See Miller v. Silbermann*, 832 F. Supp. 663, 674 (S. D. N. Y. 1993) (finding permissive intervention appropriate where the applicants, because of their "knowledge and concern," would "greatly contribute to the Court's understanding" of the case). Accordingly, if the court finds that Applicants may not intervene as of right, Applicants respectfully request that the Court allow intervention under Rule 24(b).

## IV.    CONCLUSION

For the above and foregoing reasons, Applicants respectfully request that the Court grant their motion to intervene in this action as defendants. If the Court believes it would assist with the management of this case, Applicants' counsel have a long history of working cooperatively

with counsel for the other intervenors and have no objection to coordinating discovery efforts

and briefing to reduce duplication of efforts.

Respectfully submitted,

/s/  Charles A. Pascal, Jr.

CHARLES A. PASCAL, JR. , ESQ.
**LAW OFFICES OF CHARLES A. PASCAL, JR.**
402 GRANT AVENUE
LEECHBURG, PA  15656
Telephone:  724.954.3770
attorney.pascal@gmail.com


AND



MYRNA PÉREZ (*pro hac vice forthcoming*)
ELIZA SWEREN-BECKER (*pro hac vice forthcoming*)
**BRENNAN CENTER FOR JUSTICE**
  **AT  NYU SCHOOL OF LAW**
120 BROADWAY, SUITE 1750
NEW YORK, NY  10271
Telephone:  646.292.8310
myrna.perez@nyu.edu
eliza.sweren-becker@nyu.edu


*Counsel for Proposed Defendant-Intervenors
Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this date, the foregoing Motion to Intervene, Proposed Order,

Memorandum in Support, and exhibits thereto were filed electronically and served on all counsel

of record via the ECF system of the U. S. District Court for the Western District of Pennsylvania.

Dated: July 20, 2020

Respectfully submitted,

/s/  Charles A. Pascal, Jr.

CHARLES A. PASCAL, JR. , ESQ.
**LAW OFFICES OF CHARLES A. PASCAL, JR.**
402 GRANT AVENUE
LEECHBURG, PA  15656
Telephone:  724.954.3770
attorney.pascal@gmail.com