**NEWMAN | WILLIAMS**

A PROFESSIONAL CORPORATION

Gerard J. Geiger, Esq.
IDENTIFICATION NO. PA44099
712 MONROE STREET
P.O. BOX 511
STROUDSBURG, PA 18360-0511
(570) 421-9090 (voice)
(570) 424-9739 (fax)
ggeiger@newmanwilliams.com

Attorneys for Defendants: Carbon County Board of Elections, Monroe County Board of Elections, Pike County Board of Elections, Snyder County Board of Elections, and Wayne County Board of Elections

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*, Plaintiffs | No. 2:20-CV-00966-NR |
| v. | Judge J. Nicholas Ranjan |
| KATHY BOOCKVAR, *et al.*, Defendants | Electronically Filed Document |

### Motion to Dismiss Amended Complaint (ECF No. 232) on Behalf of Defendants, Carbon County Board of Elections, Monroe County Board of Elections, Pike County Board of Elections, Snyder County Board of Elections, and Wayne County Board of Elections

Defendants, Carbon County Board of Elections, Monroe County Board of Elections, Pike County Board of Elections, Snyder County Board of Elections, and Wayne County Board of Elections, move to dismiss the Plaintiffs' Amended Complaint (ECF No. 232) pursuant to Fed. R. Civ. P. 12 (b) (3), and (6) for the following reasons:

1

## Rule 12 (b) (3) Motion

1.  Carbon, Monroe, Pike, Snyder, and Wayne Counties are all in the Middle District of Pennsylvania and are not alleged to have acted in the Western District.

2.  The Western district does not have venue over the moving defendants, and it is burdensome to require the defendants to bring their witnesses to the Western District.

3.  The moving Counties ask either that the plaintiffs' claim be dismissed for lack of venue or that the claims against them be transferred to the U.S. District Court for the Middle District of Pennsylvania, which is the appropriate forum for this case.

## Rule 12 (b) (6) Motion

4.  The Plaintiffs' Amended Complaint makes broad allegations of the wrongdoing of all Pennsylvania counties' boards of election without specifying the specific deficiencies attributable to the moving counties.

5.  For example, the plaintiffs reference just twenty of Pennsylvania's sixty-seven counties, as having conducted the recent primary election as violating Act 77, without identifying them.

6.    In addition, Plaintiffs have made a claim for attorneys' fees against the moving counties without alleging that they did anything wrong in the past or will do anything wrong in the future.

7.    The Plaintiffs have not alleged the statutory basis for claiming attorneys' fees.  If their claim is under 42 U.S.C. Section 1988, their claim fails because they have not alleged a deprivation of a Constitutional right caused by the moving counties.

8.    For these reasons, all claims against the moving counties should be dismissed.

## Pullman Abstention

9.    If the Court should decide that it has jurisdiction over the claims against the moving Defendants, the Defendants ask that the Court abstain from deciding this case under the Pullman Abstention Doctrine.

10.    The claims raised by the Plaintiffs are closely related, if not nearly identical, to the claims currently pending before the Pennsylvania Commonwealth Court in a case filed by the Pennsylvania Democratic Party and others.

11.    A copy of the Commonwealth Court filing, which includes all the Defendant Counties, is attached as Exhibit A and is a matter of public

record on the dockets of the Commonwealth Court.  Although the Complaint is attached, the Defendants ask the Court to take judicial notice of this filing.

12.    The plaintiff, DONALD J. TRUMP FOR PRESIDENT, INC., moved to intervene in the Commonwealth Court case on July 27, 2020. See [Commonwealth Court docket entries](#), 407 MD 2020.

13.    The Plaintiffs seek relief in this case based on recent amendments to Pennsylvania's election law, which have not been decided by the Commonwealth Court, but which will be decided in the related Commonwealth Court case.

14.    Before this Court rules on whether the Counties have violated the Plaintiff's Constitutional rights, it should allow the Commonwealth Court to decide and interpret Pennsylvania election law on the issues Plaintiffs raise in this case.

15.    Having both the Commonwealth Court and this Court decide similar issues on a parallel track could lead to inconsistent results.  The Commonwealth Court is the better forum for these issues to be resolved since they relate to recent Pennsylvania election law which has not been previously interpreted by the Commonwealth Court.

16.   For these reasons, the Defendants ask the Court to abstain pursuant to the Pullman Abstention Doctrine.

## Colorado River Abstention

17.   For similar reasons to the Pullman Abstention arguments, the moving parties also ask the Court to abstain from deciding this case pursuant to the Colorado River Abstention Doctrine.

18.   Given this Court's lack of venue over all of the Defendant Counties situated in the Middle and Eastern Districts of the State, it is more appropriate for the Commonwealth Court to be deciding questions of unsettled Pennsylvania law which are currently pending before it rather than having three separate district courts decide the claims. This could conceivably result in three district courts and the Commonwealth Court all deciding similar claims at the same time and just prior to the November election which could call into question the lawfulness of the Pennsylvania vote count.

19.   Not only is this an unwieldy process unfair to the parties to have to litigate in multiple jurisdictions, but it also could result in inconsistent decisions which would further complicate the national election when time is of the essence in deciding these questions before November.

20.   For these reasons, abstention under the Colorado Abstention

Doctrine is also appropriate.

WHEREFORE, the Defendants, Carbon County Board of Elections,

Monroe County Board of Elections, Pike County Board of Elections, Snyder

County Board of Elections, and Wayne County Board of Elections, ask the

court to dismiss Plaintiffs' Complaint.

NEWMAN | WILLIAMS

By: _____
      Gerard J. Geiger, Esq.
      Attorney ID: PA44099

Date: July 29, 2020

6

## Certificate of Non-Concurrence

The plaintiffs do not concur.

NEWMAN | WILLIAMS

By: _____
          Gerard J. Geiger, Esq.
          Attorney ID: PA44099

Date: July 29, 2020

## Certificate of Service

I hereby certify that on this date, a copy of this document was served upon all counsel of record via the Court's CM/ECF system, which will provide electronic notice to all parties of record.

NEWMAN | WILLIAMS

By: _____
         Gerard J. Geiger, Esq.
         Attorney ID: PA44099

Date: July 29, 2020

Received 7/10/2020 10:10:18 PM Commonwealth Court of Pennsylvania

Filed 7/10/2020 10:10:00 PM Commonwealth Court of Pennsylvania
407 MD 2020

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSYLVANIA DEMOCRATIC PARTY, NILOFER NINA AHMAD, DANILO BURGOS, AUSTIN DAVIS, DWIGHT EVANS, ISABELLA FITZGERALD, EDWARD GAINEY, MANUEL M. GUZMAN, JR., JORDAN A. HARRIS, ARTHUR HAYWOOD, MALCOLM KENYATTA, PATTY H. KIM, STEPHEN KINSEY, PETER SCHWEYER, SHARIF STREET, and ANTHONY H. WILLIAMS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ELECTION MATTER |
| Petitioners, | ) ) ) | |
| v. | ) ) ) | No. _____ MD 2020 |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania; | ) ) ) ) ) | |
| ADAMS COUNTY BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD OF ELECTIONS; ARMSTRONG COUNTY BOARD OF ELECTIONS; BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD COUNTY BOARD OF ELECTIONS; BERKS COUNTY BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD COUNTY BOARD OF | ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Exhibit A

ELECTIONS; BUCKS COUNTY )
BOARD OF ELECTIONS; BUTLER )
COUNTY BOARD OF ELECTIONS; )
CAMBRIA COUNTY BOARD OF )
ELECTIONS; CAMERON COUNTY )
BOARD OF ELECTIONS; CARBON )
COUNTY BOARD OF ELECTIONS; )
CENTRE COUNTY BOARD OF )
ELECTIONS; CHESTER COUNTY )
BOARD OF ELECTIONS; CLARION )
COUNTY BOARD OF ELECTIONS; )
CLEARFIELD COUNTY BOARD OF )
ELECTIONS; CLINTON COUNTY )
BOARD OF ELECTIONS; )
COLUMBIA COUNTY BOARD OF )
ELECTIONS; CRAWFORD COUNTY )
BOARD OF ELECTIONS; )
CUMBERLAND COUNTY BOARD )
OF ELECTIONS; DAUPHIN )
COUNTY BOARD OF ELECTIONS; )
DELAWARE COUNTY BOARD OF )
ELECTIONS; ELK COUNTY BOARD )
OF ELECTIONS; ERIE COUNTY )
BOARD OF ELECTIONS; FAYETTE )
COUNTY BOARD OF ELECTIONS; )
FOREST COUNTY BOARD OF )
ELECTIONS; FRANKLIN COUNTY )
BOARD OF ELECTIONS; FULTON )
COUNTY BOARD OF ELECTIONS; )
GREENE COUNTY BOARD OF )
ELECTIONS; HUNTINGDON )
COUNTY BOARD OF ELECTIONS; )
INDIANA COUNTY BOARD OF )
ELECTIONS; JEFFERSON COUNTY )
BOARD OF ELECTIONS; JUNIATA )
COUNTY BOARD OF ELECTIONS; )
LACKAWANNA COUNTY BOARD )
OF ELECTIONS; LANCASTER )
COUNTY BOARD OF ELECTIONS; )
LAWRENCE COUNTY BOARD OF )

Exhibit A

ELECTIONS; LEBANON COUNTY )
BOARD OF ELECTIONS; LEHIGH )
COUNTY BOARD OF ELECTIONS; )
LUZERNE COUNTY BOARD OF )
ELECTIONS; LYCOMING COUNTY )
BOARD OF ELECTIONS; MCKEAN )
COUNTY BOARD OF ELECTIONS; )
MERCER COUNTY BOARD OF )
ELECTIONS; MIFFLIN COUNTY )
BOARD OF ELECTIONS; MONROE )
COUNTY BOARD OF ELECTIONS; )
MONTGOMERY COUNTY BOARD )
OF ELECTIONS; MONTOUR )
COUNTY BOARD OF ELECTIONS; )
NORTHAMPTON COUNTY BOARD )
OF ELECTIONS; )
NORTHUMBERLAND COUNTY )
BOARD OF ELECTIONS; PERRY )
COUNTY BOARD OF ELECTIONS; )
PHILADELPHIA COUNTY BOARD )
OF ELECTIONS; PIKE COUNTY )
BOARD OF ELECTIONS; POTTER )
COUNTY BOARD OF ELECTIONS; )
SCHUYLKILL COUNTY BOARD OF )
ELECTIONS; SNYDER COUNTY )
BOARD OF ELECTIONS; )
SOMERSET COUNTY BOARD OF )
ELECTIONS; SULLIVAN COUNTY )
BOARD OF ELECTIONS; )
SUSQUEHANNA COUNTY BOARD )
OF ELECTIONS; TIOGA COUNTY )
BOARD OF ELECTIONS; UNION )
COUNTY BOARD OF ELECTIONS; )
VENANGO COUNTY BOARD OF )
ELECTIONS; WARREN COUNTY )
BOARD OF ELECTIONS; )
WASHINGTON COUNTY BOARD )
OF ELECTIONS; WAYNE  COUNTY )
BOARD OF ELECTIONS; )
WESTMORELAND COUNTY )

Exhibit A

BOARD OF ELECTIONS;                    )
WYOMING COUNTY  BOARD OF        )
ELECTIONS; and YORK  COUNTY       )
BOARD OF ELECTIONS,                    )
                                                      )
Respondents.                                    )

Exhibit A

## PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF

In support of this Petition for Declaratory and Injunctive Relief, Petitioners, the Pennsylvania Democratic Party, Dwight Evans, Nina Ahmad, Anthony H. Williams, Arthur Haywood, Sharif Street, Jordan A. Harris, Stephen Kinsey, Danilo Burgos, Austin Davis, Isabella Fitzgerald, Edward Gainey, Manuel M. Guzman, Jr., Malcolm Kenyatta, Patty H. Kim, and Peter Schweyer, by and through undersigned counsel, respectfully request that the court issue declaratory and injunction relief so as to protect the franchise of absentee and mail-in voters and respectfully aver as follows:

### I.   Introduction

1.      The forthcoming General Election occurs in the midst of uncertainty arising from a recent revamping of the Commonwealth's election laws.   In late 2019 and early 2020, pursuant to its Constitutional authority, the General Assembly made significant changes to how Pennsylvania runs its elections. *See* Act 77 of 2019, Act 12 of 2020.  Major legislative changes made to a complicated regulatory scheme inadvertently create uncertainty while those changes are implemented.    Some snags in implementation may be resolved administratively, while others require Court intervention or corrective action over time.  These shake-out issues are "normal."

Exhibit A

2.      The stakes in this forthcoming election could not be higher.  And any uncertainty or other inconsistency, creates heightened space for mischievous havoc and genuine concern.  One national candidate, trailing in the polls, has already invoked the specter of *Bush v. Gore* and the 2000 Presidential election in an overly dramatic and transparently irrelevant attempt to create such havoc.

3.      Indeed, just this morning, President Trump again spread false information regarding the use of mail-in ballots in the midst of a global pandemic so severe that renders standing in line at a polling place a significant health risk.



Donald J. Trump
[LRI]@realDonaldTrump[PDK]

Mail-In Ballot fraud found in many elections. People are just now seeing how bad, dishonest and slow it is. Election results could be delayed for months. No more big election night answers? 1% not even counted in 2016. Ridiculous! Just a formula for RIGGING an Election....
7/10/20, 7:51 AM



Donald J. Trump
[LRI]@realDonaldTrump[PDK]

….Absentee Ballots are fine because you have to go through a precise process to get your voting privilege. Not so with Mail-Ins. Rigged Election!!! 20% fraudulent ballots?
7/10/20, 7:51 AM

Exhibit A

4.     Even the clear fact that mail-in voting is safe and an important health measure in these times has not stopped litigants in pending federal court litigation from making wild unsupported assertions or challenging even clear provisions of Pennsylvania statutes.  (*See Trump v. Boockvar*, No. 20-CV-00966 (W.D. Pa.) (Ranjan, J.) (the "*Trump* Litigation")).

5.     The 2020 Primary was the test run for the implementation of some of the Act 77 changes.  Analysis of the Primary identified implementation snags that needed to be smoothed in time for the November General Election.

6.     Legislation has been introduced in the Pennsylvania General Assembly to correct some of these issues, but in light of the existing extreme partisanship, may never be adopted.  *See, e.g.,* H.B. 2626.  Given that reality, the Petitioners here are compelled, to file this petition with this Court, but could not do so until after the results of the primary election were certified on July 7, 2020.

7.     Petitioners raise a number of issues: some appropriately require a statewide solution; and others require a statewide objectives or policies, with county-specific implementations.  Statewide policies must address the statewide objectives but do so with consideration given to the 67 different county densities, developed environments, transportation networks, and public services infrastructure across Pennsylvania's counties.

Exhibit A

8.      While voting by mail has been available for absentee electors in Pennsylvania for decades, in 2019, the General Assembly passed Act 77 to expand mail-in voting to all registered Pennsylvania voters who choose that option to exercise their constitutional franchise to vote.

9.      Voting by mail is generally safe and reliable.  Some states have conducted all-mail elections for many years.  Prior to Act 77, Pennsylvania was one of the states that most significantly restricted the right of citizens to vote from home.

10.    By expanding mail-in balloting to all registered voters, the Pennsylvania General Assembly made a series of choices to promote the exercise of the franchise, even before the shelter-in-place and health concerns caused by COVID-19).

11.    Expansion of mail-in voting also called for standardized protocols, but flexible enough for each county to adjust to account for the specific geographic and populations of each county.

12.    For example, larger populated counties need multiple collection sites in order to accommodate for the increased demand.

## II.  Jurisdiction

Exhibit A

13.     This Court has original jurisdiction in cases relating to statewide election matters.  *See* 42 Pa. C.S. § 764(2); *see also Mohn v. Bucks County Republican Committee*, 218 A.3d 927 (Pa. Super. 2019).

## III.  Parties

14.     Petitioner, the Pennsylvania Democratic Party (the "Party"), is a major statewide political party pursuant to 25 P.S. § 2831 with offices in Harrisburg, Pennsylvania. The Party brings this action for itself, the Democratic Party, all of its members, all registered Democratic voters, and all nominated Democratic candidates in the November 3, 2020 General Election in the Commonwealth.

15.     Petitioner Dwight Evans is a resident of the 10th Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as Congressman for the 3rd District in the 2020 General Election. Representative Evans is both a "candidate" and a "qualified elector" as those terms are defined under the Election Code.  *See* 25 P.S. §§ 2602(a), (t).  Representative Evans brings this suit in his capacity as a candidate for federal office and a private citizen.

16.     Petitioner Nilofer Nina Ahmad is a resident of the 9th Ward in Philadelphia, Pennsylvania, and is the Democratic nominee for Auditor General in

9

Exhibit A

the 2020 General Election. Ms. Ahmad brings this suit in her capacity as a candidate for state office and a private citizen.

17.     Petitioner Anthony H. Williams is a resident of the 3rd Ward in Philadelphia, Pennsylvania, and serves as the State Senator for 8th District.  Senator Williams brings this suit as a private citizen.

18.     Petitioner Arthur Haywood is a resident of Wyncote, Pennsylvania, and serves as the State Senator for the 4th District.  Senator Haywood brings this suit as a private citizen.

19.     Petitioner Sharif Street is a resident of the 32nd Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Senator for the 3rd District in the 2020 General Election.  Senator Street brings this suit in his capacity as a candidate for state office and a private citizen.

20.     Petitioner Jordan A. Harris is a resident of the 43rd Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 186th District in the 2020 General Election. Representative Harris brings this suit in his capacity as a candidate for state office and a private citizen.

21.     Petitioner Stephen Kinsey is a resident of the 59th Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 201th District in the 2020 General Election.

Exhibit A

Representative Kinsey brings this suit in his capacity as a candidate for state office and a private citizen.

22.    Petitioner Danilo Burgos is a resident of the 43rd Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 197th District in the 2020 General Election. Representative Burgos brings this suit in his capacity as a candidate for state office and a private citizen.

23.    Petitioner Austin Davis is a resident of McKeesport, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 35th District in the 2020 General Election.  Representative Davis brings this suit in his capacity as a candidate for state office and a private citizen.

24.    Petitioner Isabella Fitzgerald is a resident of the 10th Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 203rd District in the 2020 General Election. Representative Fitzgerald brings this suit in her capacity as a candidate for state office and a private citizen.

25.    Petitioner Edward Gainey is a resident of Pittsburgh, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 24th District in the 2020 General Election.  Representative Gainey brings this suit in his capacity as a candidate for state office and a private citizen.

Exhibit A

26.     Petitioner Manuel M. Guzman, Jr. is a resident of Reading, Pennsylvania, and is the Democratic nominee running for election as State Representative for the 127th District in the 2020 General Election.  Mr. Guzman brings this suit in his capacity as a candidate for state office and a private citizen.

27.     Petitioner Malcolm Kenyatta is a resident of the 47th Ward in Philadelphia, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 181st District in the 2020 General Election. Representative Kenyatta brings this suit in his capacity as a candidate for state office and a private citizen.

28.     Petitioner Patty H. Kim is a resident of Harrisburg, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 103rd District in the 2020 General Election.  Representative Kim brings this suit in her capacity as a candidate for state office and a private citizen.

29.     Petitioner Peter Schweyer is a resident of the Allentown, Pennsylvania, and is the Democratic nominee running for reelection as State Representative for the 22nd District in the 2020 General Election.  Representative Schweyer brings this suit in his capacity as a candidate for state office and a private citizen.

Exhibit A

30.    Respondent Kathryn Boockvar is Secretary of the Commonwealth. Her office address is 302 North Office Building, 401 North Street, Harrisburg, Pennsylvania.  She is a respondent solely in her official capacity.

31.    The 67 County Boards of Elections are also named as individual respondents.  Boards "have jurisdiction over the conduct of primaries and elections in such count[ies]." *Id.* at § 2641(a).  The Boards' powers are set forth under the Election Code.  *See* 25 P.S. § 2642.

## IV.    Questions of Suffrage Must Be Construed in the Voter's Favor

32.    It has long been the law in the Commonwealth that:

> In the sphere of popular elections . . . nothing can be more vital in the accomplishment of an honest and just selection than the ascertainment of the intention of the voter. Election laws will be strictly enforced to prevent fraud, but ordinarily will be construed liberally in favor of the right to vote. All statutes tending to limit the citizen in his exercise of the right of suffrage should be liberally construed in his favor. Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage. Technicalities should not be used to make the right of the voter insecure. No construction of a statute should be indulged that would disfranchise any voter if the law is reasonably susceptible of any other meaning. . . .

> The power to throw out a ballot for minor irregularities . . . must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for

13

Exhibit A

> compelling reasons.  The purpose in holding elections is
> to register the actual expression of the electorate's will
> and that computing judges should endeavor to see what
> was the true result.

*In re James Appeal*, 105 A.2d 64, 65-66 (Pa. 1954) (citing *Bauman's Election*

*Contest Case*, 41 A.2d 630 (Pa. 1945) (internal quotations omitted).

33.    This longstanding policy is inextricably intertwined with the

challenges posed by COVID-19.

34.    Put simply, it is the desire of the people of the Commonwealth to vote

in the upcoming election.  Through Act 77, the General Assembly created a

universal right to vote by mail in Pennsylvania elections.  Unfortunately, COVID-

19 presents unpredictable constraints upon in-person voting that, in turn, raises

questions about ambiguities in Act 77.  Petitioners call upon the Court to make

commonsense declarations to ensure that the 2020 General Election registers "the

actual expression of the electorate's will."  *Id.*


V.    Act 77

35.    On October 31, 2019, Governor Wolf signed Act 77 into law. Act 77

is a sweeping election reform bill aimed to improve Pennsylvania's elections and

make voting easier and more accessible for all Commonwealth citizens.

36.    Significantly, Act 77 permits no excuse mail-in voting for all qualified

electors. See 25 Pa. C.S. §§ 3150.11-3150.17.

Exhibit A

37.     Under Act 77, the general mail-in process for a voter is as follows:

> In secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelop shall be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board and the local election of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope.  Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

Act 77 § 1306-D(a) (there are special provisions for those in need of assistance).

38.     Act 77 bars counting an absentee or mail-in ballot that has "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference" on the privacy envelope.  *See* 25 Pa. C.S. § 3146.8(g)(4)(i)-(iv).

39.     As discussed in more detail below, and unlike the express statutory language applicable to provisional ballots, Act 77 contains no requirement or authorization for Boards to exclude ballots solely because the voter forgot to utilize the inner secrecy envelope.

40.     Voters who vote by mail-in or absentee ballots must return their ballots to their county Board using the envelope provided by the Commonwealth, or by dropping it off in person to a facility of the county Board of Elections. The

Exhibit A

Board of Elections must receive the voted ballot by 8:00 pm on election day. *See*

Act 77 § 1306-D.

41.    Act 77 also allows Boards to begin conducting a pre-canvass of all

absentee and mail-in ballots no earlier than 7:00 am on Election Day.  A single

canvass observers for each candidate and political party can attend. 25 Pa. C.S. §

3146.8(g)(2).


## VI.  The Novel Coronavirus

42.     The novel coronavirus began infecting humans in China in December

2019 and as of March 11, 2020, the World Health Organization announced that the

coronavirus was officially a pandemic. *See Friends of Danny Devito v. Wolf*, No.

68 MM 2020, at *3 (Pa. Apr. 13, 2020).

43.    COVID-19 has impacted nearly every facet of people's lives and the

General Assembly and Governor Wolf responded accordingly.

44.    Governor Wolf declared a disaster emergency due to the pandemic on

March 6.  *See* Governor Wolf, "Proclamation of Disaster Emergency," (Mar. 6,

2020), Commonwealth of Pennsylvania Office of the Governor,

https://www.scribd.com/document/450457202/2020-3-6-COVID19-Digital-

Proclamation-pdf#from_embed.

Exhibit A

45.     On March 19, 2020, consistent with his earlier disaster emergency declaration, the Governor issued an order closing businesses that were not considered life-sustaining.  *See* Governor Wolf, "Order of the Governor of Pennsylvania Regarding the Closure of All Businesses That Are Not Life Sustaining,"  (Mar. 19, 2020), Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

46.     On June 3, 2020, the Governor renewed the Disaster Emergency Proclamation for an additional ninety days.  *See* Governor Wolf, "Amendment to the Proclamation of Disaster Emergency," (June 3, 2020), Commonwealth of Pennsylvania Office of the Governor https://www.pema.pa.gov/Governor-Proclamations/Documents/06.03.2020%20TWW%20amendment%20to%20COVID%20disaster%20emergency%20proclamation.pdf.

47.     Despite the efforts of the Commonwealth's elected officials and the resolve of its citizens, as of this writing, 90,202 Pennsylvania citizens have been confirmed to have been infected with COVID-19 and 6,848 have died. Department of Health, "COVID-19 Data for Pennsylvania," https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed July 10, 2020).

Exhibit A

48.     Unfortunately, there is no evidence to suggest that we will defeat COVID-19 by the November election.  Day by day, the United States records record high cases. *See* Derek Hawkins, Marisa Iati and Jacqueline Dupree, *Coronavirus Updates:  Seven-Day Average Case Total in the U.S. Sets Record for 27th Straight Day*, Washington Post, July 5, 2020, *available at* https://www.washingtonpost.com/nation/2020/07/05/coronavirus-update-us/.

49.     In May, President Trump admitted that a second wave was "a very distinct possibility . . . it's standard."  Fox News First, *Trump Vows 'Second Wave' of Coronavirus Won't Shut Down US*, May 22, 2020, *available at* https://www.foxnews.com/us/trump-vows-second-wave-of-coronavirus-wont-shut-down-us.

50.     The Federal Administration's top infectious disease expert, Dr. Anthony Fauci, has also made clear that "we will have coronavirus in the fall . . . I am convinced of that."  Berkeley Lovelace Jr., *Dr. Anthony Fauci Says a Second Wave of Coronavirus is 'Not Inevitable,'* CNBC, May 27, 2020, https://www.cnbc.com/2020/05/27/dr-anthony-fauci-says-a-second-wave-of-coronavirus-is-not-inevitable.html.

51.     As such, it is highly probable – if not a certainty – that medical risks and government restrictions will remain in place that change Pennsylvanians' day to day life, including voting procedures.

Exhibit A

52.     In the words of our Supreme Court, "[t]he enforcement of social distancing to suppress transmission of the disease is currently the only mitigation tool." *Wolf*, No. 68 MM 2020, at *28.

53.     COVID-19 impacted the 2020 Primary Election and how citizens cast their ballots.'

54.     On March 25, 2020, the General Assembly passed Act 12, which delayed the date of the primary election from April 28 to June 2.

55.     In response to concerns from counties that COVID-19 threatened their ability to staff polling locations, Act 12 also allowed counties to temporarily consolidate polling places without court approval and eased other rules related to location and staffing of polling places.  Act 12 of 2020 § 1802-B.

56.     As a result of Act 12, the state's two most populous counties, Philadelphia and Allegheny, shifted from the more than 2,100 polling places they open in a typical election to fewer than 500.  *See* Allegheny County 2020 Primary Election Polling Places, *available at* https://www.alleghenycounty.us/uploadedFiles/Allegheny_Home/Dept-Content/Elections/Docs/2020%20Primary%20Election%20Polling%20Places.pdf; Sarah Reyes, *Election Day Guide: June 2, 2020*, Philadelphia Office of the Mayor, June 1, 2020, *available at* https://www.phila.gov/2020-05-29-election-day-guide-june-2-2020/.

Exhibit A

57.     Similarly, Montgomery County officials reduced the number of polling places by 60% for the Primary Election in response to the COVID-19 outbreak and in Delaware County there were 238 fewer polling places than in a typical election.  Carl Hessler, Jr., *Montgomery County Officials Reduce Polling Places Under 'Pandemic Election Plan*,*'* Pottstown Mercury, May 12, 2020, *available at* https://www.pottsmerc.com/news/montgomery-county-officials-reduce-polling-places-under-pandemic-election-plan/article_925f3e3e-93a8-11ea-8c91-2369be893bb1.html; Kathleen E. Carey, *Pandemic Forces Dramatic Changes in Delco Election Procedures*, Delaware County Times, May 8, 2020, *available at* https://www.delcotimes.com/news/coronavirus/pandemic-forces-dramatic-changes-in-delco-election-procedures/article_389603b4-90a2-11ea-a4c4-1b7d54d5ea21.html.

58.     Act 12 also amended the Election Code to allow a "pre-canvass" which permitted Boards to begin counting mail-in ballots at 7:00 a.m. on Election Day.

59.     But the most significant change is the increase to approximately 1.8 million of the number of voters who participated solely by mail, with the concurrent impact on the number of ballots rejected for imperfectly following the complicated procedures.

Exhibit A

VII.  The Implementation Challenges of Starting Elections by Mail

60.     A failure to accurately complete mailed ballots is not new – this has long been an issue with Pennsylvania absentee ballots.  In 2018, under a law that had not changed materially in over a decade and without a flood of new mail participants, approximately 3.7 percent of ballots were rejected from voters who had already proven their eligibility and applied to vote, leading to 8,137 voters being disenfranchised.

61.     According to nationwide data from the Election Assistance Commission, in the 2018 General Election, 8.2 percent of the total number of returned ballots were not counted or, 2,491,998 votes.  *2018 Comprehensive Report: A Report to the 116th Congress*, United States Election Assistance Commission at 14, June 2019, available at

https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

62.     We do not yet know the numbers for the 2020 Primary, but the volume of mailed ballots in the current environment, and the increase of people who are new to the process, the issue of disqualified ballots was exacerbated, with some reports estimating that as many as ten percent of ballots were rejected.

63.     A significant percentage of ballots are returned without being completely and properly processed.  *See* Enrijeta Shino, Mara Suttmann-Lea, and Daniel A. Smith, *Here's the Problem with Mail-In Ballots, They Might Not be*

Exhibit A

*Counted*, The Washington Post, May 21, 2020, *available at*

https://www.washingtonpost.com/politics/2020/05/21/heres-problem-with-mail-in-

ballots-they-might-not-be-counted/;  Colleen O'Dea, *One in 10 Ballots Rejected in*

*Last Month's Vote-By-Mail Elections*, NJ Spotlight, June 10, 2020, *available at*

https://www.njspotlight.com/2020/06/one-in-10-ballots-rejected-in-last-months-

vote-by-mail-elections/.

     64.    Completing a mail-in ballot is not a simple task.  It starts with

obtaining an application (on paper or online).  Then the voter must complete the

application, including proving their identity.  At a later time, sometimes weeks

later, the ballot arrives, and the voter must then open the envelope, review the

directions, and complete the ballot.  After completing the ballot, the voter is

instructed to package the ballot into the Privacy Envelope, seal the Privacy

Envelope, and then place the sealed privacy envelope inside the outer envelope

(the "Mailing Envelope").  After sealing the Mailing Envelope, the voter must then

complete some information on the outside of the mailing envelope, including a

voter's declaration.  Finally, the voter must return the Mailing Envelope to the

Board, either by taking it to a Board's location (discussed further, *infra*) or by

stamping and mailing the mailing envelope through the United States mail.

     65.    In Pennsylvania, the issues with absentee or mail-in ballots have

generally been threefold: first, many ballots are returned without the Privacy

Exhibit A

Envelope (a "Naked Ballot"); second, many ballots are returned with an incomplete Mailing Envelope – this could be an envelope not completed at all or could be one where the declaration is missing a date or a signature; and third, many ballots are not timely returned because of delays – some from the Boards, some from the voter, some from the Postal Service, and some due to a combination of factors from all three sources.

<u>VIII.  The Need for a Better Ballot Distribution and Collection Process</u>

66.    When faced with an unanticipated flood of mail-in ballot applications arising from the global pandemic, most county Boards fell behind in sending ballots to voters; almost all Boards, except in the smallest counties, failed to meet the 48-hour requirement set in Act 77.

67.    In the Primary, this issue led to an as-applied infirmity in the statute.

68.    Despite the opinion of some, COVID-19 did not magically disappear in warmer months, but, instead, will continue to present an unpredictable challenge to the operation and functioning of the upcoming General Election and thus the as-applied infirmity is certain to reoccur in the Fall.

69.    When mail-in ballot applications are received, the Board must verify the information submitted in the application against the voter's record in the SURE system.  *See* Act 77 § 1302.2-D(a).  The Board then "shall commence to deliver or

Exhibit A

mail official mail-in ballots as soon as a ballot is certified and the ballots are available." *Id.* at § 1305-D.  At which point, the voter has until 8:00 p.m. on Election Day to return the ballot to the Board. *See* 25 P.S. §§ 3146.6(c), 3146.8 (g)(1(ii) and 3150.16(c).

70.     Given the new right to do so, and the COVID-19 necessity to avoid large gatherings at polling places, Pennsylvanians applied in overwhelming numbers to vote by mail in the 2020 Primary Election.  This crush of applications created massive disparities in the distribution and return of mail-in ballots in the primary election.

71.     By May 4, 2020, nearly one million voters sent applications to vote by mail.  Of that number, almost a quarter million voters (241,170) still had not yet been sent a ballot by their Board 17 days later.  5/22 Supplemental Declaration of Jonathan Marks at ¶ 4, *Crossey v. Boockvar*, No. 266 MD 2020 (Pa. Commw. Ct.), attached hereto as Exhibit A.

72.     In fact, as of May 20, Philadelphia voters had requested more mail-in ballots than the statewide total from 2016 and *twenty-three* times as many as in Philadelphia County in 2016.  *See* Jonathan Lai, *Philly Voters Have Requested More Mail Ballots Than All of Pennsylvania Did in 2016*, Philadelphia Inquirer, May 20, 2020, *available at* https://www.inquirer.com/politics/election/coronavirus-philadelphia-mail-ballot-requests-20200520.html.

Exhibit A

73.     By the May 26 application deadline, approximately 1.8 million voters had requested to vote by mail.

74.     In other litigation, the Department of State has admitted that counties where the prevalence of COVID-19 was highest, like Philadelphia and its collar counties, experienced the compounding problem of a "surge of paper ballot applications" and "COVID-19 related staffing shortages and social distancing rules" which, it worried would cause "difficulties in promptly processing all of the outstanding applications."  *See* Marks 5/22 Decl. ¶¶ 13-15.

75.     A study by local media found disparities between counties in the time it took to approve applications and mail ballots to voters.  *See* 6abc Action News Analysis, *Action News Data:  Huge Disparities Found Among Pa. Voters for Mail-In Ballot Wait Times*, May 27, 2020, *available at* https://6abc.com/absentee-ballot-vote-by-mail-in-voting-election/6215538/.

76.     As of May 27, 2020, the statewide average was seven days from the receipt of an application by the Board to when a ballot was mailed to a voter.  *See id.*  However, that average time varied significantly by county.  For instance, in Delaware County where 77,123 applications were requested, the wait time was an average of 20.4 days.  *Id.*  Contrarily, in neighboring Chester County, where 90,016 applications were requested, the wait time was 6.6 days.  *Id.*  Some smaller counties were mailing ballots out on the day received.  *Id.*

Exhibit A

77.     In Delaware County the processing was so delayed that thousands were not mailed out until the night of the election, and thousands more were mailed out at great expense as overnight mail in the days leading into the election. *See In re: Extension of Time for Absentee and Mail-In Ballots to Be Received by Mail and Counted in the 2020 Primary*, No. CV-2020-003416 (Del. Co. C. P. June 2, 2020) (permitting an "election to be conducted whereby [qualified electors] could be deprived of their opportunity to participate because of circumstances beyond their control would be inconsistent with the Election Laws of this Commonwealth").

78.     This Petition thus requests that the Court extend the deadline for receipt of mail-in ballots in the certainty that the Boards are once again inundated with an influx of mail-in ballot requests later in the cycle.

79.     It is normal in elections with significant public attention for there to be a flood of registrations received right before deadlines.  That pattern in the Primary clearly extended to vote-by-mail applications as voters considered the situation and decided not to go to the polls to avoid putting themselves at risk.

VIII. a.  The Need for Drop Boxes and Satellite Sites

Exhibit A

80.     One of the choices made by the General Assembly was to allow Boards to collect ballots at any location controlled by the Board, not limited to a central office.  *See* Act 77 at § 1306-D.

81.     The General Assembly's decision clearly authorizes this action, but that legislative determination is not being implemented by some counties due to a concern over allegations about authorization and federal litigation that mischaracterizes this issue of Pennsylvania law.

82.     The Primary election showed us that counties need to be creative in handling the challenges presented by the massive influx of mail-in ballots, the challenges of COVID-19, and the need to timely collect and canvass the votes of their residents.

83.     The actions of certain county Boards provided examples of how, moving forward, counties may craft solutions that make sense for their geography, citizens and realities.

84.     In Delaware County, at the last minute, the Board permitted its voters to return their sealed ballots to any polling location throughout the county.  *See June 1 Update on the Primary Election in Delaware County*, Delaware County Press Release, June 1, 2020,

https://www.delcopa.gov/publicrelations/releases/2020/primaryupdate_june1.html.

Exhibit A

The Board noted that the drop boxes inside polling locations were "under observation by the poll workers." *Id.*

85.   Similarly, Montgomery County created ten drop-off locations at various county township buildings, firehouses and parks throughout the county where voters could return mail-in ballots. *See 2020 Primary Election Secure Ballot Box Drop-Off Locations*, Montgomery County Board of Elections, https://www.montcopa.org/ArchiveCenter/ViewFile/Item/5177.  The Montgomery County Board specifically stated "[y]ou may not return any ballot that does not belong to you.  County Security will be on-site at each location and there will be video surveillance.  Anyone depositing a ballot that does not belong to them will be referred to the District Attorney's office."

86.   Philadelphia County partnered with a non-partisan organization, the Committee of Seventy, to execute the County's mail-in ballot collection initiative. *See Mobile Drop Off Location For Mail-In-Ballot*, Philadelphia Commissioners, https://www.philadelphiavotes.com/en/home/item/1814-mobile_drop_off_location-_for_mail_in_ballot.  The Philadelphia Board created 24/7 drop off locations at City Hall and the Board of Elections Office and temporary stations throughout the City from Saturday, May 30, to Monday, June 1. *Id.*  Personnel from the City Commissioners Office, including Commissioner Al Schmidt (R), personally greeted voters at schools and community centers

Exhibit A

throughout the City and Board staff were the only personnel receiving ballots from the voters.  As was required by statute, voters were only permitted to drop off their own ballot.  *Id.*

87.   The foregoing actions are all under attack in the federal court as allegedly violating both federal and state law.  *See* Trump Litigation Complaint at Counts I, II, III, VI, VII.

88.   If invalidated, the requirement that a single collection site only be used will have a greater and disparate impact on the citizens of larger counties and those who rely on suddenly unsafe public transportation systems.

89.   Notably, the United States Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA") has issued guidance on election security.  CISA's Elections Infrastructure Government Coordinating Council and Sector Coordinating Council's Joint COVID Working Group released guidelines on how to administer and secure election infrastructure during the pandemic.  *See* CISA Guidance, *Ballot Drop Boxes*, https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf (the "CISA Guidance").

90.   The first sentence of the CISA Guidance states that "[a] ballot drop box provides a secure and convenient means for voters to return their mail ballot." *Id.*

Exhibit A

91.     The CISA Guidance provides that "[b]allot drop boxes should be placed in convenient, accessible locations, including places close to public transportation routes, near or on college campuses, and public buildings, such as libraries and community centers familiar to voters and easy to find" and recommends one drop box for "every 15,000-20,000 registered voters." *Id.* at 2.

92.     The Delaware, Montgomery and Philadelphia counties examples above followed the recommended guidance by choosing easily accessible locations.

93.     In fact, according to the CISA Guidance, the volume of drop-boxes available in the Primary election were woefully inadequate.

94.     Unlike other claims, such as review of ballots submitted, the process cannot be identical from county-to-county as not all counties are identical, or even similar.

95.     When it comes to how to best provide services, and for many other issues, classes of counties are classified by their population and history and are treated differently in many ways in applicable law.  This makes sense in terms of service delivery because there are different challenges servicing a densely packed metropolis or an openly expansive rural county.

96.     Counties separately administer elections in many varying ways, and this county-based structure has been upheld repeatedly by the Pennsylvania courts.

Exhibit A

97.     Once a voter is properly registered, qualified, and has applied for his or her ballot, and has completed it, each county Board should use all reasonable measures to encourage and facilitate the return of that ballot.

98.     This is particularly true in situations where mail delivery would not be an acceptable option, such as returns over the last few days before Election Day, or areas where there is not daily mail collection at each voter's door.  In fact, there are no appropriate reasons to attempt to impede the true return of a ballot.

99.     This Petition requests a declaratory judgment that the Boards take reasonable and commonsense steps to facilitate the return of mail-in ballots – as some counties did in the primary election by sponsoring secure drop-off locations – and enjoin them from requiring electors to mail or deliver their mail-in ballots to the Boards' central offices.

100.   A prompt resolution of this petition is required to allow Boards to buy and install necessary equipment (such as collection mail boxes) and to arrange for site-control for collection locations.

## b.  The Need to Extend the Mail Receipt Deadline

101.   In the Primary, at least tens of thousands of voters ultimately did not receive their ballots with enough time to return them by the close of the polls on Election Day.

Exhibit A

102.   When this Court addressed this issue in early June, it did so without the full body of evidence now available after the post-mortem on the Primary.

103.   In the Primary election, at least two counties (Bucks and Delaware) were so behind in mailing out ballots that the Boards themselves sought, and received, authorization to accept ballots for up to 7 days post-election so long as the ballots were mailed by the day of the Primary.  *See In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No. 2020-02322-37 (C.P. Bucks) (McMaster, J.); *In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No.-CV 2020-003416 (C.P. Delaware).

104.   This Court addressed this issue generally in a decision issued on Primary Day, stating in an unpublished memorandum opinion that while the petitioners in that case had not alleged facts to show that enforcement of the received-by deadline will result in an unconstitutional *statewide* deprivation of the right to vote, the Court sided with the petitioners and directed the petitioners to seek relief in Common Pleas court on a county-by-county basis.  *See Delisle v. Boockvar*, Dkt. 319 M.D. 2020 (Pa. Commw. Ct., June 2, 2020).

105.   While county-by-county litigation may have been necessary based on the evidence before the Court in June, at this time, the Petitioners assert that a broader remedy is appropriate both because of the evidence gathered at the June

32

Exhibit A

primary and because the election will be more efficient, and less subject to challenge on federal Equal Protection grounds, if this issue were to be addressed on a statewide basis.

106.   In six counties, there are, or will be, available the number of ballots counted that were received between Election Day and the UOCAVA Deadline, as the postmark rule was ordered by the Governor, due to the State of Emergency resulting from the unrest following the police murder of George Floyd.  *See* Executive Order No. 2020-20 at ¶ 1.

107.   Petitioners' requested remedy seeks to lift the deadline in the Election Code across the state in a uniform standard to allow any ballot postmarked by 8 pm on Election Night to be counted if it is received by the deadline for ballots to be received under the Uniformed and Overseas Citizens Absentee Voting Act, specifically the end of business on Tuesday, November 10 (the "UOCAVA Deadline").

108.   As an alternative remedy, Petitioners propose that the Court tailor the extension of ballot deadlines on a ballot-by-ballot basis to the date that is 21 days after the ballot is mailed by the county, provided that (i) in no extent would the deadline be extended past the UOCAVA Deadline, and (ii) no extension would apply if the ballot was mailed within 24 hours of receipt of a completed application from the qualified elector.

Exhibit A

## IX.  Boards Must Allow Imperfectly Completed Envelopes to be Corrected

109.   Voters who did receive their ballots timely but returned their ballot with certain procedural defects were disenfranchised because they were not notified of the defects and given an opportunity to cure them.

110.   The Pennsylvania Constitution expressly guarantees to voters the right to participate in a free and fair election.  Pa. Const. art. I § 5.

111.   And, it is well-settled that the Election Code should be "liberally construed to protect . . . the voters' right to elect the candidate of their choice." *In re 2003 General Election for Office of Prothonotary*, 849 A.2d 230, 237 (2004) (citations omitted).

112.   Consistent with this principle, the Pennsylvania Constitution and the spirit of the Election Code require Boards to provide qualified electors a grace period to cure minor defects in their ballots.

113.   The vote-by-mail ballot packet contains no fewer than five separate items. After reading the directions, voters must (1) complete their ballot in either black lead pencil, indelible pencil or blue, black or blue-black ink, or fountain pen or ball point pen; (2) fold the ballot and place it in the Official Election Ballot envelope or Privacy Envelope; (3) place the Privacy Envelope inside the Mailing

Exhibit A

Envelope; and (4) complete the back of the Mailing Envelope, the so-called voter declaration. *See* 25 Pa. C.S. §§ 3146.6(a), 3150.16(a).

114.   This process inevitably leads to minor errors like a voter forgetting to complete the voter declaration or completing the ballot in colored ink.

115.   Voters, many of whom are new to mail ballots, should not be disenfranchised by technical errors or incomplete ballots.

116.   Indeed, "[a]ll statutes tending to limit the citizen in his [or her] exercise of the right of suffrage should be liberally construed in his [or her] favor. Where the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage.  Technicalities should not be used to make the right of the voter insecure. . ." *James Appeal*, 105 A.2d at 65-66.

117.   Courts have cautioned that "[t]he power to throw out a ballot for minor irregularities . . . must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for compelling reasons. . . .  The purpose in holding elections is to register the actual expression of the electorate's will and that computing judges should endeavor to see what was the true result. *In re Pennsylvania General Election*, 841 A.2d 593, 597 n. 6 (Pa. Cmmw. Ct. 2003) (citations omitted).

Exhibit A

118.    Accordingly, Petitioners seek a declaratory judgment requiring that when a Board has knowledge of an incomplete ballot and has the elector's contact information, the Board should notify the qualified elector using the most expeditious means feasible and provide the individual a chance to cure the facial defect until the UOCAVA Deadline. Petitioners also request this Court enjoin any Board from not providing a qualified elector until the UOCAVA Deadline to remedy facial defects on their mailing envelope.

119.    With these precepts in mind, where Boards have both (a) knowledge of an incomplete or incorrectly filled out ballot and (b) the elector's contact information (i.e., email or telephone number), Boards should be required to contact the electors and provide them the opportunity to cure the facial defect until the UOCAVA Deadline.

120.    There is no governmental interest in requiring that the formalities of the outside of the Mailing Envelope be completed prior to mailing rather than prior to counting.

121.    Nor is there any timeliness governmental interest in rejecting a ballot count as long as ballots continue to arrive under federal law, which is required until the UOCAVA Deadline.

Exhibit A

122.   Having Boards contact electors when they have knowledge of an incomplete or incorrectly filled out ballot ensures that all electors, who desire to cast a ballot, have the opportunity to do so and for their ballot to be counted.

123.   Balancing the impacts of disenfranchising electors for minor inconsistencies, against the (non-existent) governmental interest the harm to the voter is overwhelming; thus, electors should be allowed to cure a facial defect on their Mailing Envelope.

X.  Imperfectly Packaged "Naked Ballots" Must be Clothed and Counted

124.   Once ballots were received, some county Boards were unsure of what to do with ballots returned by voters without the secrecy envelope (the "Naked Ballots") under Act 77.

125.   In advance of the Primary, several Boards communicated this confusion to the Department of State.

126.   The Department considered their concerns, reviewed the law, and on May 28 issued clear direction from the Secretary of the Commonwealth, which was distributed to the counties on May 28, 2020, after this issue appeared to arise. *See* Directive of the Pennsylvania Department of State sent to the county election directors on May 28, 2020, a copy of this correspondence is attached as Exhibit B (the "Marks Guidance").

Exhibit A

127.    The Department of State instructed as follows:

> Though the Election Code requires county boards of elections to set aside absentee or mail-in ballots enclosed in official election ballot envelopes that contain "any text, mark or symbol which reveals the identity of the elector," there is no statutory requirement, nor is there any statutory authority, for setting aside an absentee or mail-in ballot solely because the voter forgot to properly insert it into the official election ballot envelope. See 25 P.S. § 3146.8(g)(4)(ii).

> To preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official election ballot envelopes or privacy sleeves until such time as they are ready to be tabulated.

*Id.* A significant majority of counties followed the Marks Guidance and counted the Naked Ballots, but some did not.

128.    During the Primary, several county Boards, including specifically the Lawrence County Board, in the canvass of mail-in and/or absentee ballots which were marked and returned by voters, refused to count ballots that were returned to the Board without a Privacy Envelope, or inner-envelope. That is, voters placed their ballot in the outer envelope, the Mailing Envelope.

129.    A challenge to the rejection of the Naked Ballots was filed on Election Day in Lawrence County but was later abandoned as moot as the results of all elections covered by such order would not have been affected.  *See In re: Canvass of Mail-In Ballots for the 2020 General Primary*, No. _____

Exhibit A

(Lawrence Co. C.P. June 2, 2020).

130.   The refusal by certain Boards to canvass and count ballots which lack the Privacy Envelope is in violation of the provisions of the Pennsylvania Election Code and the rights of Electors to vote and have their ballots counted under the Pennsylvania Constitution.

131.   While voters are instructed to use a Privacy Envelope in submitting the ballot, there is nothing in the Election Code allowing or authorizing a Board to discard a ballot cast without a Privacy Envelope.  *See* 25 P.S. § 3146.8.

132.   This Court has addressed the issue of voter intent in a case where a form of ballot was argued to override the will of the voter and stated that the intent of the voter should control in the absence of a clear indication of fraud. *See In re Pennsylvania Gen. Elec. for Snyder County Comm'r*, 841 A.2d 593, 597 (Pa. Commw. 2003).

133.   The clear legislative intent to allow these votes to be counted can be seen by comparison to the statute applicable to provisional ballots, which expressly includes language authorizing/requiring the Board to not count *provisional* ballots that are not in a privacy envelope.  *See* 25 P.S. § 3050(a.4)(5)(ii)(C).

134.   No parallel language is located in the statute applicable to the mail-in or absentee ballots.  *See* 25 P.S. § 3146.8.

135.   If the General Assembly had wanted to incorporate this language into

Exhibit A

the absentee and mail-in ballots when those statutes were being revised in 2019 and 2020, it could have done so; the choice not to include that language evidences the intent to allow valid votes to count and for the Boards to do what is necessary to count the votes while reasonably protecting the privacy of voters.

136.    The Legislative decision not only is express, but also logical. Provisional ballots run a much greater theoretical risk from the compromise of privacy as they are voted at polling places, oftentimes in front of local precinct officials who are neighbors and friends.

137.    As a result, the General Assembly logically determined that this potentially greater risk of pressure on the voters offsets the risk of disenfranchisement from the failure to use a ballot envelope and chose to mandate rejection of a provisional ballot without a Secrecy Envelope.

138.    On the other hand, mail-in and absentee ballots are packaged in the privacy of the voter's home and are only removed from the envelope at all in a central process, en masse with other ballots, by sworn election officials under the scrutiny of authorized representatives and poll watchers.  Understanding this difference, and the lack of possible pressure from a negligent failure to use a secrecy envelope, the General Assembly made a conscious choice not to require disenfranchisement in the situation of absentee and mail-in ballots.

139.    In this case of Naked Ballots, the choice is thus to either (i)

Exhibit A

completely disenfranchise the voter in contravention of the Election Code, or (ii) take corrective measures to protect privacy – such as placing the ballot inside a replacement Privacy Envelope before examination – and not disenfranchise a vote from a valid and qualified elector.

140.   While each Board is empowered, and expressly authorized, to review the facts and circumstances where the situation is unclear, both federal and state law require equal treatment of similarly situated voters.

141.   Where, as is the case here, there is a clearly right course of action that can be adopted statewide, the Court can and should issue a declaratory judgment and injunctive relief to cause Naked Ballots to be counted, but after the county undertakes reasonable measures to protect the privacy of voter ballots and allow the ballots to be intermingled before review and tabulation.


## XI.  The Poll Watcher Law Remains Valid

142.   Despite raising this issue election after election, the *Trump* litigants are again asserting – in the Western District – the same argument about poll watchers that was rejected in 2016 by the Eastern District, and which they did not raise in any Commonwealth court in the last four years.

143.   Poll watchers should be required to be residents of the county, if only to allow local law enforcement access and jurisdiction to enforce after Election

Exhibit A

Day penalties for any malicious shenanigans that out-of-county or out-of-state poll watchers may be more willing to undertake.

144.   This Petition asks this Court to resolve ambiguities associated with the interpretation and implementation of Act 77 against the backdrop of a global pandemic and the presumptive nominee of one political party routinely spreading misinformation about the legitimacy of mail-in and absentee ballots.

145.   There is nothing more sacrosanct in democracy than the right to vote, this Petition seeks only to protect that right uniformly for all qualified electors in the Commonwealth.

146.   The Commonwealth simply cannot invite a post-election attack on the fairness of Pennsylvania's elections like was alleged in *Bush v. Gore.*

147.   When initially enacted, the poll watcher provisions of the Election Code restricted a poll watcher's geographical territory to the election district in which the elector lived. *See* 25 Pa. C.S. § 2687 (1947).

148.   In 2004, the Pennsylvania General Assembly amended the Election Code to allow poll watchers to work anywhere within their county. *See* 25 Pa. C.S. § 2687(b).

149.   Four years ago, on the eve of the last Presidential election, the Republican Party of Pennsylvania sued the Secretary of the Commonwealth, Pedro Cortes, seeking to enjoin the enforcement of the geographic restriction and to allow

Exhibit A

registered voters to poll watch anywhere in the Commonwealth. *See Republican*

*Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 402 (E.D. Pa. 2016) (Pappert, J.). The

*Cortes* plaintiffs asserted two primary arguments: (1) poll watchers uncover

election law violations and that when an unqualified elector votes within a district,

the legitimate votes of qualified electors in the district are diluted and their

fundamental right to vote is violated; and (2) the poll watcher geographic

restriction violated the Equal Protection and Due Process Clause by "arbitrarily

and unreasonably distinguish[ing] between voters within the same electoral district

by allowing some, but not others, to serve as poll watchers." *Id*. at 407.

150.   The District Court for the Eastern District of Pennsylvania, however,

declined to enjoin the enforcement of the geographic restriction. In so doing, the

Court found that the poll watcher residency requirement did not dilute the

complainants' votes because the theory was based purely on speculation that

fraudulent voters may be "casting ballots elsewhere in the Commonwealth and the

unproven assumption that these alleged instances of voter fraud would be

prevented by the affected poll watchers were they not precluded from serving at

those locations." *Id.*

151.   The *Cortés* Court also found that the poll watcher residency

requirement did not burden the plaintiff's fundamental right to vote and therefore

Exhibit A

the state need only provide a rational basis for the poll watcher residency requirement. *Id.*

152.   The *Cortés* Court deferred to the General Assembly's decision to limit poll watchers to county residents because the choice was "rationally related to the state's interest in maintaining from their own county is rationally related to the state's interests in maintaining its county-run election system [under which] each county election official is tasked with managing credentials for a discrete part of the state's population." *Id.* at 410.

153.   After losing the injunction hearing, the *Cortés* plaintiff abandoned those arguments and did not raise the issue for the next four years in either Pennsylvania state or federal court.

154.   Nor did the Republican leadership in the General Assembly offer any changes to the applicable statutes when they drafted the bills that became Acts 77 and 12.

155.   Apparently undeterred by continuous clear and unambiguous ruling, the *Trump* plaintiffs again sued the Pennsylvania Secretary of the Commonwealth and the 67 Boards in the Commonwealth seeking, inter alia, an injunction that permits poll watchers regardless of their county of residence, to be present in all locations where votes are cast, including without limitation all locations where absentee or mail-in ballots are being returned. *See Trump Lawsuit*, Complaint, ¶ 5.

Exhibit A

The Plaintiffs in the *Trump* Lawsuit make virtually the same arguments made by the *Cortés* plaintiffs and appear doomed to suffer the same fate under both federal and Pennsylvania Law.

156.   Neither Act 77 nor Act 12 altered or amended the Election Code requirement that poll watchers may only watch polls at polling locations within the county where the poll watcher is registered to vote.

157.   That is not to say that the General Assembly did not consider this provision – Act 77 specifically created the position of Canvass Authorized Representative who do not have to be registered voters in the county or the Commonwealth who can observe canvass activities. *See* Act 12 of 2020 § 1308(g)(1.1).

158.   This choice is also consistent and reflects the distinction between an activity in a polling place away from watchful eyes and activity taking place under the watch of sworn election officials.

159.   The changes to Pennsylvania election processes and procedures enacted under Acts 77 and 12 in no way makes the Election Code's poll watcher residency requirement violative of either the United States or Pennsylvania Constitution nor does it alter the outcome in *Cortés*.

160.   As explained in *Cortés*, the poll watcher residency requirement does not dilute any voters' vote and continues to serve the "state's interests in

Exhibit A

maintaining its county-run election system; each county election official is tasked with managing credentials for a discrete part of the state's population." *Cortés*, 218 F. Supp. 3d at 410.

161.   The fact that counties are using fewer actually polling locations and more drop off of absentee and mail-in ballots locations due to a global pandemic does not change the state's interests in the poll watcher geographic restriction. The Commonwealth still has an interest in maintaining its county-run election system.

## COUNT I

**DECLARATORY JUDGMENT THAT COUNTY OFFICES ARE NOT LIMITED SOLELY TO A CENTRAL OFFICE, AND THAT SECURE BALLOT DROP-BOXES ARE PERMITTED UNDER THE ELECTION CODE; AND FOR AFFIRMATIVE INJUNCTION REQUIRING BOARDS TO USE ALL REASONABLE MEASURES TO ENCOURAGE AND FACILITATE THE RETURN OF MAIL-IN BALLOTS**

162.   Petitioners refer to and incorporate Paragraphs 1 through 161 of this Complaint as though the same were repeated at length herein.

163.   Pursuant to the Declaratory Judgment Act, the Court may declare the rights, status, or other legal relations of any interested person under a statute or contract. *See* 42 Pa. C.S. § 7533.

164.   Section 1306-D of Act 77 outlines the manner in which mail-in ballots may be returned.  An elector shall, after completing the ballot "send same by mail,

46

Exhibit A

postage prepaid, except where franked, or deliver it in person to said county board of election." *Id.*

165.   Petitioners seek a declaration that a reasonable interpretation of Act 77 permits Respondents to provide secure, easily accessible locations as the Board deems appropriate, including, where appropriate, mobile or temporary collection sites, and/or drop-boxes for the collection of mail-in ballots.

166.   Additionally, Petitioners seek relief in the form of an affirmative injunction requiring that county Boards are required to evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots.

167.   A party seeking a permanent injunction must establish three elements: (1) a clear right to relief; (2) that an injunction is necessary to avoid an injury that cannot be compensated by damages; (3) that a greater injury will result from refusing the injunction." *Mazin v. Bureau of Prof's Occupational Affairs*, 950 A.2d 382, 389 (Pa. Commw. Ct. 2008).

168.   So long as ballots are returned by the elector to the Board in a manner that respects the integrity of the election, creative solutions by county Boards to facilitate ballot return are permitted by the Election Code. Thus, there is a clear right to relief.

Exhibit A

169.   The right to allow an elector to exercise the franchise without fear of death is not a harm even potentially compensable by damages.  Until a vaccine is available, which is not anticipated before November, and widespread precautions are taken, which many are actively discouraging, the impact of COVID-19 on the administration of 2020 General Election is unpredictable. As such, procedures from county Boards will prevent disenfranchisement, which cannot be compensated by damages.  *See Kuznik v. Westmoreland Cty. Bd. of Com'rs*, 902 A.2d 476 (Pa. 2006).

170.   Despite what the President has asserted on Twitter, enhanced collections will not change the likely date of the announcement of election returns – with the volume of mail-in vote it will take days, and potentially weeks, until final numbers are known.  In the Primary, it was 35 days before returns were certified earlier this week.  The threat of disenfranchising thousands of voters through no fault of their own and a potentially inaccurate election poses a greater threat than depriving candidates of "big election night answers."

## COUNT II

### INJUNCTION THAT MAIL-IN AND ABSENTEE BALLOTS POSTMARKED BY 8 P.M. ON ELECTION DAY AND RECEIVED BY THE BOARDS BY THE UOCAVA DEADLINE MUST BE TABULATED

171.   Petitioners refer to and incorporate Paragraphs 1 through 170 of this Complaint as though the same were repeated at length herein.

Exhibit A

172.   Act 77 requires electors who vote via mail-in or absentee ballot must return their ballots to the county Board and the Board must receive the voted ballot by 8:00 pm on Election Day. *See* Act 77 § 1306-D.

173.   Due in part to COVID-19, in the 2020 Primary, numerous Boards saw a crushing late cycle influx in requests for mail-in and absentee ballots overwhelming the resources of even the best funded Voter Services Offices.

174.   More qualified electors vote in General elections than in primaries.

175.   A larger number of voters combined with a potential "second wave" of COVID-19 will likely lead to an even greater demand for mail-in and absentee ballots, causing similar, if not worse delays in getting voters their ballots.

176.   The Free and Fair Election Clause requires that all voters have a bona fide and fair right to participate in each election and that the Boards of Elections may not interfere with that right through a failure to timely take required action. *See* Pa. Const. art. I § 5.

177.   The Election Code provides Pennsylvania courts with the power to decide matters pertaining to the election as may be necessary to carry out the intent of the Election Code, including ensuring fair elections including an equal opportunity for all eligible electors to participate in the election process. *See* 25 P.S. § 3046.

Exhibit A

178.   In order to protect the right of voters under the Free and Fair Elections Clause, Petitioners seek an injunction ordering Respondents to lift the deadline in the Election Code across the state to allow any ballot postmarked by 8:00 p.m. on Election night to be counted if it is received by the Boards by the deadline for ballots to be received by the UOCAVA Deadline, at 5 pm on Tuesday, November 10.

179.   Alternatively, this Court could enjoin the Counties to extend a more tailored ballot extension deadline to the date that is 21 days after the particular voter's ballot is mailed by the county, provided that (i) in no extent would the deadline be extended past the UOCAVA deadline, and (ii) no extension would apply if the ballot was mailed within 24 hours of receipt by the Board of Election of a completed application from the qualified elector.

180.   A party seeking a permanent injunction must establish three elements: (1) a clear right to relief; (2) that an injunction is necessary to avoid an injury that cannot be compensated by damages; (3) that a greater injury will result from refusing the injunction." *See Mazin*, 950 A.2d at 389.

181.   As exhibited by the Courts in Bucks and Delaware Counties in the Primary election, where ballots are not able to be timely mailed, there is a significant barrier to the exercise of the franchise, and given the experience in the Primary, the state of the pandemic in the United States, and the known increase in

Exhibit A

activity just before deadlines in Presidential elections, similar delays are inevitable. To avoid disenfranchising innocent electors there is a clear need for and right to relief.

182.   An injunction will prevent disenfranchisement, which cannot be compensated by damages.  *See Kuznik*, 902 A.2d at 476.

183.   The balancing of harm falls on the side of granting of relief, as there is no harm on an extension to the UOCAVA Deadline, as federal law already requires that ballots continue to be allowed to be received by such date.

## COUNT III

### INJUNCTION REQUIRING BOARDS TO CONTACT ELECTORS WHOSE MAIL-IN OR ABSENTEE BALLOTS CONTAIN FACIAL DEFECTS AND PROVIDE THOSE ELECTORS AN OPPORTUNITY TO CURE THE FACIAL DEFECTS BY THE UOCAVA DEADLINE

184.   Petitioners refer to and incorporate Paragraphs 1 through 183 of this Complaint as though the same were repeated at length herein.

185.   The Pennsylvania Constitution expressly guarantees to voters the right to participate in a free and fair election.  Pa. Const. art. I § 5.

186.   The procedure for mail-in ballots often leads to minor errors, which result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote.

Exhibit A

187.   Petitioners are not seeking to impose a pre-election review requirement on Respondents, however, where Respondents undertake such a review, whether before, on, or after Election Day, and have knowledge of an incomplete or incorrectly filled out ballot and has the elector's contact information (i.e., email or telephone number), Respondents should contact the potentially disenfranchised electors and provide each of them the opportunity to cure the facial defect until the UOCAVA Deadline.

188.   A party seeking a permanent injunction must establish three elements: (1) a clear right to relief; (2) that an injunction is necessary to avoid an injury that cannot be compensated by damages; (3) that a greater injury will result from refusing the injunction." *Mazin*, 950 A.2d at 389.

189.   There is no government interest in requiring that the formalities of the outside of the Mailing Envelope be completed prior to mailing rather than prior to counting, nor is there a governmental interest in denying a ballot on timeliness grounds so long as ballots continue to arrive under federal law, which is required until the UOCAVA Deadline.  Thus, a right to relief is clear.

190.   An injunction will prevent disenfranchisement, which cannot be compensated by damages.  *See Kuznik*, 902 A.2d at 476.

Exhibit A

191.   There is no governmental interest in disenfranchising the votes of valid, qualified electors, and for the reasons set forth above there is no temporal benefit from any deadline to cure errors prior to the UOCAVA Deadline.

## COUNT IV

**DECLARATORY JUDGMENT THAT, UNDER ACT 77, BOARDS MUST CLOTHE AND COUNT NAKED BALLOTS AND NOTHING IN THE UNITED STATES CONSTITUTION, THE PENNSYLVANIA CONSTITUTION OR FEDERAL OR STATE LAW MANDATES OTHERWISE; AND INJUNCTION AGAINST BOARDS FROM EXCLUDING SUCH BALLOTS FROM THE CANVASS.**

192.   Petitioner's refer to and incorporate Paragraphs 1 through 191 of this Complaint as though the same were repeated at length herein.

193.   Pursuant to the Declaratory Judgment Act, the Court may declare the rights, status, or other legal relations of any interested person under a statute or contract.  *See* 42 Pa. C.S. § 7533.

194.   The Pennsylvania Constitution bestows the right to vote upon qualified citizens and to equal protection in the enjoyment of that right. *See* Pa. Const. art. VII, § 1 & art. I, § 28.

195.   The Free and Equal Elections Clause of the Pennsylvania Constitution, provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right to suffrage." Pa. Const. art. I, § 5.

Exhibit A

196.   Voting is a fundamental right also protected by the Fourteenth Amendment to the United States Constitution.

197.   Act 77 requires Boards to set aside absentee ballots or mail-in ballots enclosed in official election ballot envelopes that contain "any text, mark or symbol which reveals the identity of the elector." 25 P.S. § 3146.8(g)(4)(ii).

198.   Petitioners request a declaration that there is no statutory authority for Respondents to set aside an absentee or mail-in ballot solely because the voter forgot to properly insert it into the official election ballot envelope.

199.   Additionally, Petitioners seek an injunction prohibiting Respondents from invalidating Naked Ballots which are otherwise satisfactory.

200.   A party seeking a permanent injunction must establish three elements: (1) a clear right to relief; (2) that an injunction is necessary to avoid an injury that cannot be compensated by damages; (3) that a greater injury will result from refusing the injunction." *Mazin*, 950 A.2d at 389.

201.   There is no statutory authority that permits Defendants to refuse to clothe and count Naked Ballots, the right to relief is clear.

202.   An injunction will prevent disenfranchisement, which cannot be compensated by damages. *See Kuznik*, 902 A.2d at 476.

203.   If the Commonwealth were to determine to count all Naked Ballots on a uniform basis, pursuant to an order of this Court, there would be no potential

Exhibit A

Equal Protection claim arising from the fact that such votes were wrongfully disqualified in a few counties.

## COUNT V

**DECLARATORY JUDGMENT THAT THE POLL WATCHER RESIDENCY REQUIREMENT DOES NOT VIOLATE THE FIRST OR FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, EQUAL PROTECTION CLAUSE, OR EQUAL PROTECTION AND FREE AND EQUAL ELECTIONS CLAUSES OF THE PENNSYLVANIA CONSTITUTION.**

204.   Plaintiffs refer to and incorporate Paragraphs 1 through 203 of this Complaint as though the same were repeated at length herein.

205.   Pursuant to the Declaratory Judgment Act, the Court may declare the rights, status, or other legal relations of any interested person under a statute or contract. *See* 42 Pa. C.S. § 7533.

206.   The Election Code only permits a poll watcher to serve in an election district in a county in which the watcher is not a qualified registered elector. *See* Election Code 417, 25 Pa. C.S. § 2687(b).  The state's interest in the poll watcher residency requirement remains the same today as it was in 2016.

207.   Petitioners request a declaration that Election Code's poll watcher residency requirement does not violate the United States Constitution's First and Fourteenth Amendments, its Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

Exhibit A

WHEREFORE, Petitioners pray this Honorable Court to order make the above declarations and issue the requested injunctive relief.

Respectfully submitted,

Greenberg Traurig, LLP

*/s/ Kevin Greenberg*

Kevin Greenberg, Attorney ID 82311
A. Michael Pratt, Attorney ID 044973
Adam Roseman, Attorney ID 313809
George J. Farrell, Attorney ID 324521
1717 Arch Street, Suite 400
Philadelphia, Pennsylvania 19103
(215) 988-7818
greenbergk@gtlaw.com
prattam@gtlaw.com
rosemana@gtlaw.com
farrellg@gtlaw.com

Lazar M. Palnick, Attorney ID 52762
Lazar M. Palnick, Esq.
1216 Heberton Street
Pittsburgh, Pennsylvania 15206
(412) 661-3633
lazarpalnick@gmail.com

*Attorneys for Petitioners*

July 10, 2020

Exhibit A

## <u>PUBLIC ACCESS POLICY CERTIFICATE OF COMPLIANCE</u>

It is hereby certified by the undersigned that this filing complies with the

provisions of the *Public Access Policy of the Unified Judicial System of*

*Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing

confidential information and documents differently than non-confidential

information and documents.

<div style="margin-left:40%">

Respectfully submitted,
**GREENBERG TRAURIG, LLP**

*/s/ Kevin Greenberg*

Kevin Greenberg (No. 82311)
1717 Arch Street, Suite 400
Philadelphia, PA  19103
(t) 215.988.7818
(f) 215.988.7801
greenbergk@gtlaw.com

</div>

Dated:          July 10, 2020

Exhibit A

# **EXHIBIT A**

Exhibit A

Received 5/22/2020 9:05:44 PM Commonwealth Court of Pennsylvania

Filed 5/22/2020 9:05:00 PM Commonwealth Court of Pennsylvania
266 MD 2020

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |
|---|---|
| MICHAEL CROSSEY, *et al.*, | : |
|  | : |
| Petitioners, | : |
|  | : |
| v. | : No. 266 MD 2020 |
|  | : |
| KATHY BOOCKVAR, SECRETARY | : |
| OF THE COMMONWEALTH, *et al.*, | : |
|  | : |
| Respondents. | : |
|  | : |

## SUPPLEMENTAL DECLARATION OF JONATHAN MARKS

I, Jonathan Marks, declare under the penalty of perjury pursuant to 18 Pa.C.S. § 4902 that:

I am the Deputy Secretary for Elections and Commissions for the Department of State (the "Department") of the Commonwealth of Pennsylvania. This Declaration supplements the Declaration I submitted to the Court on May 18, 2020.

1.     In my May 18, 2020 Declaration, I gave statistics on the Pennsylvania counties' progress in processing applications for mail in and absentee ballots and mailing out ballots.

2.     I stated that the Election Code requires counties to mail absentee and mail-in primary election ballots for all approved applications by Tuesday, May 19,

Exhibit A

2020, and that I would update the Court after that date.  *See* May 18 Declaration ¶¶ 14-43.

3.      Statewide, a large majority of counties are keeping up with mail-in and absentee voting applications, with ballots being mailed out as applications are processed.

4.      Some counties, however, are facing obstacles, especially those in areas where the prevalence of COVID-19 is highest.  If these obstacles persist into next week, there is a possibility that they could result in significant delays in voters' receipt of ballots.

5.      As of Thursday, May 21, 2020, the counties had reported receipt of approximately 1,701,141 applications for absentee and mail-in ballots.

6.      The counties had approved 1,528,212, or approximately 90%, of the applications.

7.      Preliminary data indicates that the counties have mailed 1,459,871 million ballots, or approximately 96% of the applications approved so far, to voters.

8.      The counties have received 441,012 voted ballots, which accounts for approximately 29% of applications approved so far.

9.      Counties have continued to take steps to deal with the high volume of applications by, for example, reassigning staff to assist with ballot processing and,

Exhibit A

in some cases, adding extra shifts at their election offices.

10.     The vast majority of counties do not appear to be having difficulty managing the application process.  As of May 21, 2020, more than half of the counties in the Commonwealth had mailed ballots in response to more than 90% of their approved applications.

11.     Certain counties, however, are experiencing delays or backlogs.

12.     For example, preliminary data shows that Montgomery County has mailed out 131,932 ballots out of the 138,363 applications it has approved. However, for reasons not within Montgomery County's control, many ballots that the county has mailed have been delayed in arriving at voters' homes.  These delays may make it more difficult for voters who requested ballots well in advance of the application deadline to return those ballots on time.

13.     Philadelphia County recently began receiving a surge of paper ballot applications.  Because these applications take longer to process than online applications, and because of COVID-19 related staffing shortages and social distancing rules, Philadelphia's staff will face difficulties in promptly processing all of the outstanding applications.

14.     A recent outage in Philadelphia's Verizon connection, which covered the network connection with the election database, further impeded Philadelphia's progress.

Exhibit A

15.     Preliminary data shows that as of May 21, Philadelphia County had received 181,655 applications, rejected 2,114 of them, approved 159,772, and mailed out 142,836 ballots.

16.     Of the counties identified in my May 18 declaration, other than Philadelphia and Montgomery, preliminary data reported by the counties shows that:

- Allegheny County had received 242,349 applications, rejected 20,120 of them, approved 222,757, and mailed out 205,646 ballots;

- Delaware County had received 78,333 applications, rejected 4,290 of them, approved 53,851, and mailed out 42,904 ballots;

- Lawrence County had received 9,400 applications, rejected 623 of them, approved 8,813, and mailed out 8,654 ballots;

- Lehigh County had received 47,057 applications, rejected 3,991 of them, approved 43,220, and mailed out 43,011 ballots; and

- Mercer County had received 11,067 applications, rejected 807 of them, approved 9,746, and mailed out 9,569 ballots.

17.     The last day for applying for a mail in or absentee ballot is Tuesday, May 26.

18.     I understand that because of COVID-19 related staffing shortages or technical difficulties, a small number of other counties may face challenges in keeping up with their outstanding applications as the application deadline approaches.

19.     After May 26, unless the Court instructs otherwise, I will give the

Exhibit A

Court further information about the counties' application numbers and the existence of any backlogs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 22, 2020.

_____

Jonathan Marks

Exhibit A

# **EXHIBIT B**

Exhibit A

**From:** Marks, Jonathan <jmarks@pa.gov>
**Sent:** Thursday, May 28, 2020 7:44 PM
**To:** Marks, Jonathan <jmarks@pa.gov>
**Subject:** Important DOS Email re: Absentee/Mail-in Ballot Canvass
**Importance:** High

To all county election officials.

I hope you are all safe and well.

The department has received some questions from county officials in recent days regarding the proper disposition of absentee or mail-in ballots cast by voters who did not enclose their voted ballots in the official election ballot envelope ("secrecy" or "inner" envelope).

Though the Election Code requires county boards of elections to set aside absentee or mail-in ballots enclosed in official election ballot envelopes that contain "any text, mark or symbol which reveals the identity of the elector," there is **no statutory requirement, nor is there any statutory authority,** for setting aside an absentee or mail-in ballot solely because the voter forgot to properly insert it into the official election ballot envelope. See 25 P.S. § 3146.8(g)(4)(ii).

To preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official election ballot envelopes or privacy sleeves until such time as they are ready to be tabulated.

Please consult with your solicitor about your plans to deal with such instances should they occur during the pre-canvass or canvass.

Thank you for everything you are doing to administer the 2020 Primary while coping with the unique challenges presented by COVID-19.

Kind regards,

Jonathan M. Marks
Deputy Secretary for Elections & Commissions
Pennsylvania Department of State
302 North Office Building | Harrisburg, PA 17120
☎ 717.783.2035  🖷 717.787.1734
✉ jmarks@pa.gov

Exhibit A