

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

———————————

No. 2:20-cv-966

———————————

DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*,

                                        Plaintiffs

v.

KATHY BOOCKVAR, in her capacity as Secretary of the
Commonwealth of Pennsylvania, *et al.*,

                                        Defendants.

———————————

## OPINION

———————————

**J. Nicholas Ranjan, United States District Judge**

Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's recent implementation of a mail-in voting plan.

In their complaint, Plaintiffs point to the 2020 primary election, where "no excuse" mail-in voting was first implemented in Pennsylvania, and describe an election plagued by chaos. They say the primary was a "hazardous, hurried, and illegal implementation of unmonitored mail-in voting which provides fraudsters an easy opportunity to engage in ballot harvesting,

manipulate or destroy ballots, manufacture duplicitous votes, and sow chaos." [ECF 234, ¶ 1]. They fear the same will occur in the November general election, where much more, of course, is at stake.

According to Plaintiffs, Pennsylvania's mail-in voting plan is not just bad, but unconstitutional. They say it is a product of overreach by the Pennsylvania Secretary of the Commonwealth, Kathy Boockvar, that will lead to "vote dilution" (*i.e.*, if unlawful votes are counted, then that "dilutes" lawful votes). They also allege that because of the patchwork, inconsistent implementation of the Secretary's guidance across Pennsylvania's 67 counties, equal-protection principles are violated. Due to the imminent election, and at Plaintiffs' request, the Court ordered expedited discovery and scheduled an evidentiary hearing in mid-September, where Plaintiffs would be required to present evidence of these constitutional violations.

Defendants are Secretary Boockvar and all 67 county boards of elections in Pennsylvania. Several organizations have also intervened claiming a stake in the election.[1] Many of these Defendants and Intervenors have moved to dismiss, arguing that the Court lacks the legal authority to decide this case. They argue that Plaintiffs lack standing; that their claims are moot, unripe, or legally flawed; and that venue is improper in this District. Short of dismissal, Defendants argue that the Court should "abstain" from deciding the merits and temporarily stay the case, so that the state courts can resolve many of these same issues that are pending before them.

After carefully considering the arguments raised by the parties, the Court finds that the appropriate course is abstention, at least for the time being. In other words, the Court will apply the brakes to this lawsuit, and allow the Pennsylvania state courts to weigh in and interpret the

---

[1] Those organizations include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, and the Pennsylvania Alliance for Retired Americans.

state statutes that undergird Plaintiffs' federal-constitutional claims.

Under the abstention doctrine set forth in *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), federal courts decline to decide federal-constitutional claims if (1) doing so requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important states policies[.]" *Chez Sez III Corp. v Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991).

Here, most of Plaintiffs' federal claims turn on interpretations of the Pennsylvania election code, as amended by Act 77, and allegations that Secretary Boockvar's guidance violates it. Because Act 77 was only recently enacted, in October 2019, no Pennsylvania state court has interpreted the provisions on which Plaintiffs rely. What's more, for nearly all these claims, the correct interpretation of the statutory text is unclear. And while Plaintiffs do assert one facial constitutional challenge and allege a few violations of statutory provisions that are probably not ambiguous, these claims are intertwined with those that are less clear. Thus, the state court's resolution of the uncertain questions could narrow even these claims, or at least cause Plaintiffs to present them in a different posture. Under these exceptional circumstances, the mandatory elements of *Pullman* abstention are satisfied.

Discretionary considerations also weigh heavily in favor of abstention. With a national election less than three months away, several parallel proceedings pending in state court, and all this unfolding amid an unprecedented pandemic that has paralyzed much of the world, this Court cannot afford to issue a decision that could be rendered advisory, unnecessary, or erroneous if the Pennsylvania courts adopt a different interpretation of ambiguous state law. Additionally, state-court resolution of these uncertain statutory issues would not merely remove ambiguity from, or narrow the scope of, Plaintiffs' federal claims—it may afford Plaintiffs any relief they are entitled to. Indeed, if Plaintiffs are right, a state court

could simply decide whether Defendants' conduct violates the election code and, if it does, enjoin it on that basis. Conversely, a state-court finding that Secretary Boockvar's guidance was lawful could defeat, or at least play a critical role in the Court's analysis of, Plaintiffs' constitutional claims that are based on that guidance.

For these reasons, discussed in detail below, the Court is persuaded that the important principles underlying the *Pullman* abstention doctrine—federalism, comity, constitutional avoidance, error prevention, and judicial efficiency—all weigh strongly in favor of letting state courts decide predicate disputes about the meaning of Pennsylvania's state election code.

The Court will thus grant Defendants' motions to the extent that they request *Pullman* abstention, and otherwise stay all proceedings until the Pennsylvania courts have weighed in on the unsettled state-law issues. To be clear, the Court is not abdicating its responsibility to decide the federal-constitutional issues that are potentially presented by the case. Rather, the Court is waiting until the state courts have interpreted the predicate statutory provisions, which may avoid the need for the Court to hear Plaintiffs' constitutional claims, or at least change the dimension of those claims. Once that has happened, if any of Plaintiffs' federal claims remain viable, Plaintiffs may return to this Court to re-start proceedings for those claims to be heard.

## BACKGROUND

### I.   Factual background.[2]

Plaintiffs seek declaratory and injunctive relief from certain policies allegedly adopted by the Commonwealth of Pennsylvania and its county election boards. Plaintiffs believe these policies are at odds with the Pennsylvania

---

[2] The following facts are drawn from the allegations in Plaintiffs' operative complaint, which the Court must accept as true when analyzing Defendants' motions under Fed. R. Civ. P. 12(b)(6). At this early stage, the Court has not made any factual findings based on the review of any evidence, and other parties have not had an opportunity to challenge that evidence or present evidence of their own.

election code and violate their rights under the federal and state constitutions. *See* [ECF 234].

### A. Secretary Boockvar's guidance.

On June 2, 2020, Pennsylvania held a primary election—the first since the legislature's adoption of "no excuse" mail-in voting under Act 77. [*Id*. at ¶ 91]. In anticipation of that election, Secretary Boockvar issued three sets of "guidance" to the various county election boards. This guidance purported to "define both what is required by Act 77 and what is permissible under Act 77 or some other portion of the Election Code." [*Id*. at ¶ 117]. The relevant guidance provided as follows:

#### 1. Guidance on verifying mail-in and absentee ballots without an objection.

First, according to Secretary Boockvar's January 10, 2020, guidance, "[a] county board of elections **cannot decline** [a] voter's application for a mail-in or absentee ballet [sic], unless there is a bona fide objection to the mail-in or absentee ballot application." [*Id*. at ¶ 118] (emphasis in original).

During the recent primary election, several counties relied on Secretary Boockvar's guidance and approved all applications for absentee or mail-in ballots without acting to verify each applicant's qualifications absent a "bona fide objection." [*Id*. at ¶ 121].

#### 2. Guidance on "drop boxes" and other ballot-collection locations.

Second, the Secretary's guidance also stated that "county election boards may provide for mail-in and absentee application processing and balloting at more than one [county elections office] located within county borders." [*Id*. at ¶ 122]. Further, the Secretary advised that "[w]hen choosing a location for the [county elections office], counties should consider, at a minimum, . . . choos[ing] locations that serve heavily populated urban/suburban areas, as well as rural areas," including locations "near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes." [*Id*.].

During the recent primary election, about 20 county election boards followed the Secretary's guidance by permitting absentee and mail-in ballots to be returned to locations such as shopping centers, parking lots, fairgrounds, parks, retirement homes, college campuses, fire halls, municipal government buildings, and elected officials' offices. [*Id*. at ¶ 126]. In most cases, ballots were collected at these locations by using "unmonitored and/or unsecured drop-off boxes" or similar means. [*Id*. at ¶ 129].

Additionally, the Philadelphia County Board of Elections partnered with a non-partisan group to implement a mobile mail-in ballot drop-off initiative to collect absentee and mail-in ballots from non-disabled voters within Philadelphia County. [*Id*. at ¶ 127]. And the Delaware County Board of Elections authorized third-party delivery of absentee and mail-in ballots to any polling location on Election Day through "unmonitored" drop-boxes, where voters would "not be required to check in with the [poll] workers." [*Id*. at ¶ 128]. Delaware County also allowed voters who returned and completed absentee or mail-in ballots to cast provisional ballots in-person on Election Day. [*Id*.].

The amount and type of notice that was given concerning the existence, use, and location of drop boxes or other mobile voting sites varied among the 20 counties that implemented such measures. [*Id*. at ¶ 130]. Many of the sites and notices did not comply with the site and notice requirements that apply to "polling places" under the election code, although the parties dispute whether, as a matter of law, those requirements apply to drop boxes or other mail-in ballot collection sites. [*Id*.].

### 3. Guidance regarding in-person voting by voters who requested a mail-in or absentee ballot.

Third, on January 30, 2020, the Pennsylvania Department of State, with the "knowledge, approval[,] and/or consent of Secretary Boockvar," published guidance advising that "[a]s soon as a voter requests a civilian absentee ballot or mail-in ballot, they are <u>only</u> entitled to vote by provisional ballot if they show up at their polling place, and the voter is not shown on the district register as

having voted an absentee or mail-in ballot." [*Id*. at ¶¶ 138, 140]. The guidance also specified that provisional balloting was "the <u>only</u> option for voters to cast their vote in the event their absentee or mail-in ballot is not returned to the county by 8:00 p.m. on election day." [*Id*. at ¶ 140] (emphasis in original). This was repeated by the Department of State on March 5, 2020, when it issued "Pennsylvania Provisional Voting Guidance" stating that "[i]f a voter is issued an absentee or mail-in ballot for the upcoming election, they cannot vote a regular ballot." [*Id*. at ¶¶ 143, 145].

During the recent primary election, some (but not all) of the counties followed this guidance by "den[ying] electors who had applied for but not voted their absentee or mail-in ballots the right to vote a regular ballot in person at the polling location[]." [*Id*. at ¶ 149]. This led to alleged instances of "double voting" in Philadelphia. [*Id*. at ¶¶ 150-151].

### 4. Guidance regarding mail-in and absentee ballots that violate procedural requirements.

Fourth, Secretary Boockvar approved a May 28, 2020, email advising counties that although the election code "requires county boards of elections to set aside absentee or mail-in ballots enclosed in the official ballot envelopes that contain 'any text, mark or symbol which reveals the identity of the elector,' there is no statutory requirement, nor is there any statutory authority, for setting aside an absentee or mail-in ballot solely because the voter forgot to properly insert it into the official election ballot envelope." [*Id*. at ¶¶ 154-155]. The Secretary's email further suggested that "[t]o preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official election ballot envelopes or privacy sleeves until such time as they are ready to be tabulated." [*Id*. at ¶ 155].

Many counties followed this May 28, 2020, directive and counted absentee and mail-in ballots that were not placed in a secrecy envelope or violated other procedural requirements set forth in the election code. [*Id*. at ¶¶ 157-

158].  Other counties disagreed with the Secretary's view and disqualified mailed ballots that skirted these rules. [*Id*.].  The result was uneven treatment of such ballots throughout Pennsylvania.  [*Id*. at ¶ 161].

## B.   Election-code provisions pertaining to poll watchers.

A few of Plaintiffs' claims pertain to provisions of the election code restricting the qualifications and activities of poll watchers.  [*Id*. at ¶¶ 165-189, 223-236].  According to Plaintiffs, poll watchers "serve the important purpose of assuring voters, candidates, political parties, and political bodies . . . that [elections are] conducted in compliance with the law, and [are] done in a correct manner which protects the integrity and validity of the vote and ensures that all elections are free, open, fair, and honest."  [*Id*. at ¶ 188].

Pennsylvania's election code does not permit poll watchers to serve in an election district outside the county where the watcher resides as a registered elector.  [*Id*. at ¶ 168].  Pennsylvania also does not permit poll watchers to monitor  "pre-canvass  meetings,"  although  a "representative" for each candidate and political party is permitted to attend.  [*Id*. at ¶¶ 97, 182, 186].  Poll watchers are permitted to observe "polling places" from the time the first polling-place official appears in the morning until the time the polls are closed and the election returns are counted and posted at the polling-place entrance.  [*Id*. at ¶ 54].  But until the polls close, only one poll watcher representing each political party and its candidates can be present in the polling place outside of an enclosed area. [*Id*.].  Once the polls close, and while ballots are being counted, all poll watchers are permitted to be in the polling place outside the enclosed space.  [*Id*.].  Consequently, as it pertains to mail-in ballots, poll watchers are unable to monitor the drop off or mail in of ballots before Election Day.  [*Id*. at ¶¶ 226-227].

In many Pennsylvania counties, there is a significant gap between the number of voters registered as Democrats and the number registered as Republicans.  [*Id*. at ¶ 177].  Because of county boards' intended use of numerous drop-box locations, Plaintiffs allege that it will be difficult for candidates and political parties to find poll

watchers to monitor all locations where ballots will be cast in the November 2020 general election. [*Id*. at ¶¶ 179-182].

## II.   Procedural background.

Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered certain limited discovery before that hearing. [ECF 123, 124].

After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action. The Court granted all intervention motions. [ECF 309].

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original complaint but added two new counts and made a variety of other drafting changes. *See* [ECF 242 (redline comparison of original and amended complaints)]. At bottom, Plaintiffs continue to seek declaratory and injunctive relief compelling Secretary Boockvar and the various county boards of elections to comply with provisions of Pennsylvania's election code.

According to Defendants and Intervenors, the amended complaint has not cured the deficiencies they identified in their original motions. They further argue that the new claims in the amended complaint are similarly deficient. As a result, Defendants and Intervenors have filed renewed motions to dismiss the amended complaint.

While all of this was happening, on July 10, 2020, another group of plaintiffs sued these same Defendants in the Commonwealth Court of Pennsylvania, seeking construction of certain election-code provisions, including several of the critical ones that are at issue here. *See* [ECF 291-1]. The state-court petitioners also applied to expedite a judicial interpretation of the relevant provisions of Act 77. [ECF 291, p. 7].

Certain Plaintiffs here have moved to intervene in that action. [ECF 264-2]. Their motions remain pending

- 9 -

as of the date of this opinion, although the Commonwealth Court has allowed them to file *amici curiae* briefs while the applications are pending.

Additionally, on August 16, 2020, Secretary Boockvar applied to the Pennsylvania Supreme Court, asking that court to assume immediate jurisdiction over the pending Commonwealth Court case.   [ECF 388-1]. Secretary Boockvar filed this application under 42 Pa. Cons. Stat. § 726, often called the "King's Bench power," asking the Pennsylvania Supreme Court to invoke its "extraordinary jurisdiction" and resolve issues of "immediate public importance."   [ECF 388, p. 1].   That application remains pending.

## LEGAL STANDARD

When it comes to motions requesting abstention under one or more of the various abstention doctrines recognized by the Supreme Court, courts have disagreed on what standard to apply—Rule 12(b)(1), Rule 12(b)(6), or neither.   *Compare Wells Fargo Bank, N.A. v. Carnell*, No. 16-130, 2017 WL 1498087, at *3 (W.D. Pa. April 25, 2017) (Gibson, J.) (applying the 12(b)(6) standard), *with Strom v. Corbett*, No. 14-1518, 2015 WL 4507637, at *4 (W.D. Pa. July 24, 2015) (Cercone, J.) (suggesting the 12(b)(1) standard is more appropriate), *with Christian Action Network v. Maine*, 679 F. Supp. 2d 140, 143. n.2 (D. Me. 2010) ("Because abstention is involved, I do not consider myself limited to the facts that the plaintiff pleaded to determine whether comity and federalism counsel against my exercise of jurisdiction, and I do not rely upon the pleading or burden requirements of either Rule 12(b)(1) or Rule 12(b)(6).").

Here, because the Court is deciding the issues presently before it under the *Pullman* abstention doctrine, the Rule 12(b)(6) standard is more appropriate.   Or, it is perhaps more accurate to say that the Rule 12(b)(1) standard is not a good fit.

Rule 12(b)(1) allows the Court to dismiss a case if the plaintiffs lack standing or the Court lacks subject-matter jurisdiction over a dispute. In deciding whether the *Pullman* abstention doctrine applies, however, the Court essentially takes jurisdiction over the dispute. This is

because the Court, in abstaining under *Pullman*, is postponing its exercise of proper jurisdiction rather than concluding it lacks jurisdiction. *See, e.g., Harrison v. NAACP*, 360 U.S. 167, 177 (1959) ("[*Pullman* abstention] does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise."); *Georgevich v. Strauss*, 772 F.2d 1078, 1094 (3d Cir. 1985); Wright & Miller, *Federal Practice and Procedure* § 4243 ("The Supreme Court has frequently justified *Pullman*-type abstention by saying that it 'does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise.' In line with this principle a federal court, when it has determined to abstain, should not dismiss the action but should stay it and retain jurisdiction pending the proceedings in the state courts." (footnotes omitted)). This differentiates *Pullman* abstention from other forms of abstention. *See Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017).

As such, the Court concludes that Rule 12(b)(1) is not applicable here. If the Court lacked subject-matter jurisdiction, it could not abstain under *Pullman,* for the Court could not, after the state-court proceedings concluded, renew its exercise of jurisdiction that it lacked to begin with.   Accordingly, the standard of review applicable to deciding whether there is a lack of jurisdiction (*i.e.*, the Rule 12(b)(1) standard) does not seem appropriate where *Pullman* forms the basis for abstention.

For these reasons, to the extent a choice must be made at all, the Court finds that the 12(b)(6) standard, rather than the 12(b)(1) standard, is appropriate, and thus analyzes the *Pullman* issue under that standard.

The Court therefore accepts "all well-pleaded allegations in the complaint as true," "viewing them in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

The plaintiff must allege "sufficient factual matter to show that the claim is facially plausible" and permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (cleaned up).  Allegations that are

"conclusory or bare-bones," such as "threadbare recitals of the elements of a cause of action," will not suffice. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). However, "detailed pleading is not generally required." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). Rather, the complaint need only contain a "short and plain statement" showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up).

When evaluating a defendant's motion under Rule 12(b)(6), the Court may review the allegations contained in the complaint, exhibits attached to the complaint, any documents that are integral to or explicitly relied on by the complaint, and matters of public record. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 113 (W.D. Pa. 2019) (Stickman, J.) (citations omitted). Thus, the Court may consider relevant state-court proceedings that are pending. *See, e.g., Wells Fargo Bank*, 2017 WL 1498087, at *3 (citation omitted).

## DISCUSSION & ANALYSIS[3]

The *Pullman* abstention doctrine "directs that federal courts should abstain from rendering a decision

---

[3] As noted above, Defendants and Intervenors have moved for dismissal on a number of other bases, including a variety of other threshold justiciability grounds (standing, ripeness, mootness, venue, sovereign immunity, *Colorado River* abstention, *Burford* abstention, *Wilton/Brillhart* abstention, and indefiniteness). Because the Court is abstaining based on *Pullman*, it need not address these other issues. *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 280 n. 3 (3d Cir. 2017). Additionally, Defendants moved to dismiss, challenging the legal merits of some of Plaintiffs' claims. The Court specifically declines to address those arguments, as that would be inconsistent with *Pullman. See Conover v. Montemuro,* 477 F.2d 1073, 1079 (3d Cir. 1972) ("*Pullman* abstention involves no decision on the merits of the claim[.]") (cleaned up); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 17–18 (1987) ("We of course express no opinion on the merits of those challenges.").

when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Grode v. Mut. Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 956 (3d Cir. 1993) (cleaned up). More precisely, abstention under *Pullman* "is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149 (3d Cir. 2000) (cleaned up).

The purpose of abstaining is "twofold." *Id.* First, abstention avoids a "premature constitutional adjudication which could ultimately be displaced by a state court adjudication of state law." *Id.* (quoting *Pullman*, 312 U.S. at 500). Second, abstention prevents "needless friction with state policies." *Id.* These twin aims reflect the federal judiciary's "scrupulous regard for the rightful independence of the state governments." *Pullman*, 312 U.S. at 501 (cleaned up). They also promote "principles of comity and federalism by avoiding needless federal intervention into local affairs," *Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 53 (1st Cir. 1994), and reflect federal courts' longstanding reluctance to reach weighty constitutional questions where a decision grounded in statute will do. *See Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149–50 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions."); *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").

In these respects, the doctrine serves a critical constitutional and prudential function.

Of course, in deciding whether to abstain, the Court must exercise the utmost caution. *Pullman* creates only a narrow exception to the Court's otherwise "virtually unflagging" obligation to decide the cases before it. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989) (cleaned up). The Supreme Court has repeatedly emphasized that "abstention is not to be

- 13 -

ordered unless the state statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Zwickler v. Koota*, 389 U.S. 241, 251 n.14 (1967).

To balance these considerations, "three 'exceptional circumstances' must be present" before abstention is appropriate. *Farmer*, 220 F.3d at 149. The Court must find: "(1) that uncertain issues of state law underlie the federal constitutional claims brought in the district court; (2) that the state law issues are amenable to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claim; and (3) that important state policies would be disrupted through a federal court's erroneous construction of state law." *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996) (citation omitted). If all three circumstances are present, the district court is then required to determine, in its discretion, "whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Id.* (citation omitted).

Applying these legal principles to the allegations of the amended complaint, the Court is convinced that it must abstain from deciding this case under *Pullman*, at least until the parallel litigation in the Pennsylvania Commonwealth Court, and potentially the Pennsylvania Supreme Court, has resolved.

As discussed below, Plaintiffs' claims depend on uncertain questions of state law, arising under a recently enacted state statute, that challenge Defendants' purported exercise of their core constitutional authority to administer elections. How the state courts interpret the unsettled state-law questions will dramatically alter the nature and scope of the federal-constitutional claims before the Court. Many of the federal claims may even be mooted entirely. If the Court were to act now, it would risk issuing a decision that is at odds with the state courts' interpretation of the election code or is an advisory opinion—the precise risks that *Pullman* abstention seeks to mitigate. Given these circumstances, bedrock principles of federalism and constitutional avoidance favor *Pullman* abstention.

## I.   *Pullman's*   first   prong:   uncertainty   of underlying state-law issues.

"For *Pullman* to apply, the state or local law underlying the federal constitutional issue must be uncertain." *Chez Sez III Corp.*, 945 F.2d at 632.  The "initial inquiry" is whether the language of the state statute or regulation is "clear and unmistakable." *Id.*; *see also Hughes v. Lipscher*, 906 F.2d 961, 965 (3d Cir. 1990) ("The first of the three special factors centers on uncertainty of the state law.  In this case that inquiry focuses on whether the bulletin's language is clear and unmistakable.").

Here, nearly all of Plaintiffs' federal-constitutional claims hinge on violations of the Pennsylvania election code—and, for the most part, on violations of statutory language amended by the recently enacted Act 77.  To rule on nearly all of Plaintiffs' federal (and coextensive state) constitutional claims, the Court would need to first decide (1) how to interpret the relevant election-code provisions; and (2) whether Secretary Boockvar's guidance violated each provision as the Court has interpreted it.  Only then would the Court reach the further matter of whether the Secretary's guidance, or the counties' inconsistent implementation of it, violated the federal Constitution.

Plaintiffs don't dispute this.  Instead, they argue that the underlying state-law issues are clear.  The Court disagrees. The amended complaint asserts nine separate counts, but they can be sorted into three overarching categories.  The Court will address each category, and the statutory provisions they implicate, in turn.  As discussed below, many of the state statutes at issue are either ambiguous or otherwise subject to competing plausible interpretations.

### A.   Claims alleging voter dilution due to unlawful ballot collection and counting procedures (Counts I, II, III, VI, VII).

The first category covers claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. These include claims related to: (1) Defendants' uneven use

of "drop boxes" and other satellite ballot-collection sites; (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots; and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contain stray marks on the envelope).

In Count I, Plaintiffs allege violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs assert that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs allege that Secretary Boockvar's guidance on the use of mail-in ballot drop boxes, whether county boards of elections must independently verify in-person mail-in ballot applications, and the counting of non-compliant ballots is an executive overreach, in that the Secretary's guidance allegedly violates certain provisions of the election code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claim that the Secretary's unlawful guidance has increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they say, amounts to additional violations of the First and Fourteenth Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-203].

In Count II, Plaintiffs allege a violation of the Equal Protection Clause under the Fourteenth Amendment. Plaintiffs assert that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) has been different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-213].

In Count III, Plaintiffs assert a violation of the Pennsylvania State Constitution. Plaintiffs allege that the same actions and conduct that comprise Counts I and II also violate similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs allege that Defendants have violated provisions of the federal and state constitutions by disregarding the election code's notice requirements applicable to "polling places." [*Id.* at ¶¶ 237-252]. Plaintiffs allege that the drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶ 240]. Plaintiffs assert that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, will create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

Before deciding whether any of this alleged conduct amounts to a constitutional violation, the Court would have to interpret each of the underlying provisions of the state election code. In doing so, the Court would have to answer at least the following unsettled questions of Pennsylvania state law:

> **1.** **Whether delivery "to said county board of elections" means delivery to the board's headquarters or to a location designated by the board.**

Plaintiffs allege that the election code prohibits the counties from accepting in-person delivery of absentee and mail-in ballots at locations other than the election board's central office or headquarters, such as satellite drop-boxes. [*Id.* at ¶¶131-134]. But the statutory language is not so clear.

The code says only that ballots must be delivered in person "to said county board of election." 25 P.S. § 3146.6(a). This language could mean that delivery must be made to the physical office of the county board's headquarters, as Plaintiffs suggest. But it also could mean what Secretary Boockvar has, at least implicitly, interpreted it to mean—that ballots may be delivered in-person to any location *designated* by the county board. Separately, the election code also authorizes counties to "provid[e] such branch offices for the [election] board in cities other than the county seat, as may be necessary," 25 P.S. § 2645(b), and that may provide arguable justification for some or all of the satellite collection locations, as well.

Plaintiffs argue that because the code provides that the "address of the elector's county board of election must be printed on the outer envelope" of the ballot, it is clear that "the only place where the absentee or mail-in ballot can be mailed or delivered is to the address of the elector's county board of election." [ECF 320, p. 57 (cleaned up)]. But the language Plaintiffs cite does not necessarily lead to that conclusion. It could just be that the physical address of the county board of election must be included in case the elector wants to mail in the ballot, rather than deliver it in person. Without the physical address, mail service would not be possible. Including that address, on its face, does not preclude an elector dropping off the ballot in person at another designated location, if he or she so chooses. Such an alternative reading at least arguably gives effect to the address language while preserving the crux of Secretary Boockvar's interpretation.

Unfortunately, since Act 77 is new, no state court has interpreted this language. *Cf. Chez Sez III Corp.*, 945 F.2d at 632 (affirming abstention under *Pullman* where ambiguous "sections of the Union Township Zoning Ordinance" had "never been interpreted by the New Jersey courts"). And under Pennsylvania law, Secretary Boockvar's interpretation is arguably afforded some deference (though Plaintiffs dispute that). *See Banfield v. Cortes*, 110 A.3d 155, 174 (Pa. 2015) ("As the question of whether an electronic system has adequate security measures against tampering necessarily results in a subjective determination, the Legislature delegated this discretionary decision to the Secretary, who is the Pennsylvania's chief election official. We have previously held that a reviewing court will ordinarily defer to an agency's interpretation of a regulation or a statute it is charged to enforce.") (cleaned up).

Given all this, whether delivery of mail-in or absentee ballots to collection locations, such as satellite offices or drop boxes, constitutes delivery to the "county board of elections" is unclear and unsettled under the election code. *Cf. Chez Sez III Corp.*, 945 F.2d at 632 ("[I]t is unclear whether the term ['motion picture theater'] encompasses only large, auditorium-style uses, as the Board found, or whether it could instead be read more

broadly to also include private video viewing booths of the type involved here.").

### 2. Whether ballots submitted without a "secrecy envelope" may be counted.

A novel question of state law is also presented by Plaintiffs' allegation that Defendants have violated the election code by authorizing the counting of so-called "naked ballots"—ballots submitted by voters without being placed in the required "secrecy envelope." [ECF 234, ¶¶153-161]. While Plaintiffs rely on 25 P.S. § 3146.6(a) and § 3146.8(g)(4)(i)-(iv) for this argument, those provisions only describe the procedures for placing ballots in secrecy envelopes and setting aside ballots when the envelopes contain any "mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference[.]"

The issue raised by Plaintiffs' claims—whether to count mail-in or absentee ballots not placed in secrecy envelopes—is not addressed by these provisions. This contrasts with other provisions of the election code applicable to provisional ballots, which specifically direct that such ballots will not be counted without a secrecy envelope. *See* 25 P.S. § 3050(a.4)(5)(ii)(C) ("A provisional ballot shall not be counted" if "a provisional ballot envelope does not contain a secrecy envelope[.]"). This difference could suggest a contrary interpretation, since it seems "the legislature knew how to specify unambiguously" that ballots should not be counted without secrecy envelopes and yet "did not do so with regard to" mail-in ballots. *Monoson v. United States*, 516 F.3d 163, 167 (3d Cir. 2008).

In opposing abstention, Plaintiffs argue that the statutory language is clear that the requirement of the secrecy envelope is mandatory, and therefore a ballot that is not placed inside one is void and should not be counted. [ECF 320, pp. 56-58]. To support this argument, Plaintiffs rely heavily on *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223 (Pa. 2004). In *Absentee Ballots*, the court held that "Section 3146.6(a)'s 'in person' delivery requirement is mandatory, and that the absentee ballots of non-disabled persons who had their ballots

- 19 -

delivered in contravention of this mandatory provision are void." *Id.* at 1234. That case, however, is potentially distinguishable for at least two reasons. First, the issue in *Absentee Ballots* was whether third parties could deliver the ballots of non-disabled voters, not whether naked ballots could be clothed and subsequently counted. *Id.* at 1225, 1232. Second, when the court decided *Absentee Ballots*, Sections 3050 (the provisional ballot provision cited above) and 3150.16(a) (authorizing voting by mail-in electors) of the code had not yet been enacted.

Thus, an interpretation contrary to the one Plaintiffs put forth remains at least plausible on its face. The state courts should therefore have an opportunity to weigh in on the matter.

> ### 3. Whether a drop box or other mail-in ballot collection site must satisfy the site and notice criteria applicable to "polling places."

Another unsettled question arises from Plaintiffs' somewhat novel allegation that Defendants' authorization of drop-boxes and other ballot-collection sites violates certain statutory site-selection and notice criteria that apply to "polling places." [ECF 234, ¶ 132 (citing 25 P.S. §§ 2726, *et seq.*)].

Initially, the election code's definition of "polling place" is "the room provided in each election district for voting at a primary or election." 25 P.S. § 2602(q). The question then becomes whether a drop box where mail-in ballots are collected is "the room provided in each election district for voting." If it isn't, then the criteria for "polling places" wouldn't apply.

On one hand, the election code's provisions concerning "polling places" all seem to suggest locations where electors can go to cast their votes in person—*i.e.*, rooms with voting machines. *See, e.g.*, 25 P.S. § 2730(a) ("The county board of elections shall cause all rooms used as polling places to be suitably provided with heat and light, and, in districts in which ballots are used, with a sufficient number of voting compartments or booths with proper supplies, in which electors may conveniently mark

- 20 -

their ballots, with a curtain, screen or door in the upper part of the front of each compartment or booth so that in the marking thereof they may be screened from the observation of others.").

On the other hand, the election code does contemplate "portable or movable polling places," 25 P.S. § 2727(c),  and so, arguably, one might be able to construe the statute to conclude that mobile drop boxes (or at least certain kinds of mobile drop boxes) may fall within the definition of "polling place," and thus need to comply with the relevant criteria.[4]  At a minimum, then, there are two plausible, competing interpretations of the state statute, which can be narrowed in a way that would impact the constitutional claims regarding notice of drop boxes. *Cf. Georgevich*, 772 F.2d at 1090 ("We believe, however, that as counsel for the defendants insists, the parole legislation can and must be read as a whole. When so read, it is possible to construe the statutory scheme to afford procedural safeguards to the plaintiff class. At the very minimum, the coexistence of these two plausible interpretations gives rise to an ambiguity.").

### 4. Whether the election code requires verification of voter qualifications when accepting in-person, mail-in ballot applications.

Finally, Plaintiffs allege that several counties violated the election code when they followed Secretary Boockvar's guidance and "approved all applications for absentee or mail-in ballots without performing the requisite verification of the applicant's qualifications or identification by comparison to the applicant's permanent registration card."  [ECF 234, ¶ 121].  According to Plaintiffs, Secretary Boockvar's guidance that all applications should be accepted unless someone makes a "bona fide objection" contravenes Act 77's requirement that counties independently verify the status and eligibility of each applicant.  [*Id.* at ¶¶ 199-203].  Defendants and Intervenors counter that the guidance only applied to in-person applications, and that there is at least one plausible

---

[4] Adding to the uncertainty of this issue is how the law would treat drop boxes that are located at polling places.

interpretation of the election code that supports finding that the verification requirements do not apply to such applications.

Again, this issue turns on competing plausible interpretations of unsettled state law. Section 3146.5(b)(2) of the election code states that "[n]otwithstanding any other provisions of this act . . . [i]f a voter presents the voter's application within the county board of elections' office . . . a county board of elections may not deny the voter's request to have the ballot presented to the voter while the voter is at the office unless there is a bona fide objection to the absentee or mail-in ballot application." 25 P.S. § 3146.5(b)(2).

But, later, the election code states that "[t]he county board of elections, upon receipt of **any** application of a qualified elector under section 1301-D, shall determine the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card."    25 P.S. § 3150.12b(a) (emphasis added).

There is some unresolved tension between these two provisions. *See Georgevich*, 772 F.2d at 1091 ("The need for state court interpretation results not only from unclear language on the face of a single statute, but also from the juxtaposition of clear, but contradictory state provisions."); *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 361 (3d Cir. 1986) ("A statute is unsettled for *Pullman* purposes when two of its provisions are contradictory.").

On one hand, the election code mandates that, "[n]otwithstanding any other provisions" in the code, when a voter applies in person for a mail-in or absentee ballot, the county board of elections must provide the ballot "while the voter is at the office" unless a "bona fide objection" is made. *See* 25 P.S. § 3146.5(b)(2). This seems consistent with Secretary Boockvar's guidance. But on the other hand, the election code states that upon receipt of "any application," the counties "shall" verify the elector's identification and qualifications before approving the application and providing the ballot. *See* 25 P.S. § 3150.12b(a). This phrasing comes closer to the affirmative

- 22 -

"duty to verify" that Plaintiffs assert the county boards have.   And the term "any application" would seem to include any "in-person applications."

Pennsylvania courts usually take pains to ensure that "[e]very statute" is "construed, if possible, to give effect to all its provisions."  1 Pa. Cons. Stat. § 1921(a).  Keeping that canon in mind, it is plausible that the Commonwealth Court or Pennsylvania Supreme Court might interpret those dueling provisions so that the arguable duty of verification does not apply to "in-person" applications.  If they did, Plaintiffs' application-verification claims would be significantly narrowed, if not eliminated altogether.

### B.   Poll-watching claims (Counts IV, V).

The second category of claims consists of challenges to the constitutionality of election code provisions related to poll watchers.

In Count IV, Plaintiffs allege violations of the First and Fourteenth Amendments.  These claims have both a facial and an as-applied component.  [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election . . .")].

First, Plaintiffs allege that 25 P.S. § 2687 is facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day.  [*Id.* at ¶ 226].   Second, Plaintiffs allege that the same provision is unconstitutional as applied in the context of Pennsylvania's new vote-by-mail system, where Plaintiffs claim that these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution.  [*Id.* at ¶ 228].  Plaintiffs' contention is that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected given the widespread use of remote drop boxes and other satellite collection sites.  [*Id.*].

Count V is the same as Count IV, but alleges that the same poll-watching restrictions violate the Pennsylvania Constitution, too.  [*Id.* at ¶ 234].

- 23 -

None of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute. But the scope and viability of Plaintiffs' as-applied challenges turns directly on the Court's resolution of the disputed issues discussed above.

That is, the constitutional harm Plaintiffs allege here turns on their inability to recruit enough resident poll-watchers, or distribute them to all key locations within each county, to protect against fraudulent or "invalid" voting that Plaintiffs say is associated with the use of "unmonitored" drop-box sites, the counting of ballots without secrecy envelopes, and the other supposed ill-effects of Defendants' policies. *See, e.g.*, [ECF 234, ¶ 228 ("By failing to allow Pennsylvania voters to serve as poll watchers in counties other than their county of residence or monitor the drop off of absentee and mail-in ballots, Election Code Section 417, 25 P.S. § 2687, makes it extremely difficult or functionally impracticable for candidates and parties to ensure that they have poll watchers at all locations where ballots are being cast in connection with the November 2020 General Election – including remote drop boxes (which Plaintiffs contend are not permitted under the Election Code) – thus fostering an environment that encourages ballot fraud or tampering, and preventing the Commonwealth, candidates, and political parties from ensuring that the General Election is free, fair, and transparent.")].

If the state courts narrowly interpret the election code to forbid drop boxes or the counting of ballots submitted without secrecy envelopes, any alleged need for expansive poll-watching—and any hardship imposed by the county-residency restriction—may be eliminated. If that happens, Plaintiffs might well obtain meaningful relief on statutory grounds, and this Court would not have to decide whether authorizing poll-watching by non-residents is constitutionally necessary in this context.[5]

---

[5] Unlike Plaintiffs' as-applied challenges to the poll-watching restrictions, Plaintiffs' facial challenge does not turn on or require interpretation of any ambiguous state statute. To resolve that piece of the puzzle, the Court need only decide if a county-residency restriction on poll

## C.    In-person voting claims (Counts VIII, IX).

In Counts VIII and IX, Plaintiffs assert that the election code allows an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot.  [*Id.* at ¶¶ 253-267].  Plaintiffs assert that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election.  [*Id.* at ¶ 255].  Plaintiffs also assert that some counties allowed electors who had voted by mail to vote in person, in violation of the election code.  [*Id.* at ¶¶ 257-258].  Plaintiffs argue that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection.  [*Id.* at ¶¶ 261, 265].

These claims would not require the Court to resolve contested matters of state law before reaching the relevant constitutional question.  Indeed, the relevant statutory text and the Secretary's guidance are clear (although the parties dispute whether it applies to the upcoming general election).  But as explained below, the fact that these discrete claims are unambiguous does not preclude abstention.

## II.   *Pullman's* second prong: constitutional avoidance by resolving state-law questions.

The second prong of *Pullman* asks whether allowing state courts to resolve the unsettled state-law questions would avoid or substantially narrow the plaintiff's federal-constitutional claims. This prong recognizes that "where state law appears to resolve the sole issue in the case to plaintiffs' satisfaction, and where the parties' only real disagreement concerns the propriety of federal

---

watching is *per se* unconstitutional.  However, as discussed in Section IV below, the Court will nonetheless exercise its inherent authority to stay this and a few other discrete aspects of Plaintiffs' claims to which *Pullman* abstention does not independently apply.  Simply put, because almost all of Plaintiffs' case is subject to *Pullman* abstention, it makes little sense to proceed in piecemeal fashion on the few parts that are not.  And, in any event, Plaintiffs have not requested that the Court proceed in such a fashion.

intervention, the case may be more appropriately resolved in state court." *Georgevich*, 772 F.2d at 1094–95.

Here, as noted above, any analysis of Plaintiffs' claims would begin with an interpretation of the election-code provisions that Plaintiffs allege Defendants have violated. But it could also end there.

In fact, any state-court resolution of those issues would eliminate the need for this Court to decide whether the alleged statutory violations infringe any constitutional right. That's because a state court could grant Plaintiffs the exact relief they seek here by enjoining any conduct that violates the election code, without further consideration of whether that conduct also violates the Constitution. "In this sense the plaintiffs hoist on their own petard." *Phila. City Council v. Schweiker*, 40 F. App'x 672, 677 (3d Cir. 2002) ("Throughout their complaint [plaintiffs] allege that Acts 46 and 83 violate numerous state law and constitutional provisions. If this is indeed so, then the acts are illegal under state law or unconstitutional under the state constitution, and a federal court would not need to decide whether they violate the federal Constitutions."); *see also Pierce v. Allegheny Cnty. Bd. Of Elections*, 324 F. Supp. 2d 684, 706 (W.D. Pa. 2003) (Conti, J.) ("[I]f the state courts find the phrase 'in person' in section 3146.6(a) is mandatory, the policies at issue may be determined to be invalid under state law and, thus, the constitutional issues need not be reached.").

By way of example, if the state courts find that the election code must be narrowly construed to allow mail delivery only to the physical locations of the county election boards' headquarters (and not to drop boxes), then Plaintiffs would, in effect, prevail, obviating the need for federal-court relief. By contrast, if the state courts interpret state law to allow drop boxes, the federal claims before this Court materially change—the question then becomes more of a facial attack on the statute and whether Pennsylvania law's allowance of drop boxes violates the federal constitution.[6] And in that circumstance, the main

---

[6] Plaintiffs have not asserted facial challenges to the election code in the alternative to their claims that Secretary Boockvar's guidance violates the election code

thrust of Plaintiffs' narrative—that of a rogue Secretary exercising powers the legislature did not give her—would no longer be viable.  Thus, the danger in the Court deciding this issue now is that it could end up issuing a wholly advisory opinion, or an opinion addressing a materially different claim than the one that will ultimately remain after the state courts weigh in.

This risk is particularly acute in the context of two species of claims here.  Recall that one type of claim that Plaintiffs raise is under the Elections Clause of the Constitution, accusing Secretary Boockvar of issuing instructions at odds with the election code, and thus overstepping her role as an executive.  This federal-constitutional claim essentially asks the Court to consider whether Secretary Boockvar violated state law.  And that claim may change if the state courts either adopt narrowing constructions of the unsettled law above or, instead, determine that Secretary Boockvar's guidance is consistent with the election code.

The other claims that are particularly susceptible to narrowing are Plaintiffs' claims under the equal-protection clause.  Those claims are such that the purported constitutional harm *is* the uncertainty caused by the absence of a definitive interpretation of state law.  That is, assuming Plaintiffs' equal-protection theory is legally viable, any such violation could be cured by adopting *either* Plaintiffs' interpretation or Defendants' interpretation of each disputed election-code provision.  So long as that interpretation is shared and applied equally by all of Pennsylvania's counties, there would be no uneven treatment.

Under similar circumstances, other district courts have found that *Pullman's* second prong is satisfied, and

---

(other than the challenge to the poll-watching residency requirement, discussed above).  Thus, the Court could not, at this juncture, avoid the need for abstention by assuming that Secretary Boockvar's interpretation of the election code is correct and asking whether, if it is, that would violate the Constitution.  In any event, absent a definitive interpretation of the election code, such a decision would be effectively advisory.

ultimately abstained, where state-court remedies of
election-law violations were enough to avoid the need for
federal-constitutional adjudication. *See Fuente v. Cortes*,
207 F. Supp. 3d 441, 450 (M.D. Pa. 2016) ("If the state court
concurs with Plaintiff's interpretation of the statute and
finds that a presidential primary is not within the purview
of § 2911(e)(5), then the state law does not apply to Plaintiff
whatsoever, and the basis for Plaintiff's constitutional
claim would be eliminated.") (cleaned up); *Pierce*, 324 F.
Supp. 2d at 704 ("[T]he construction of the absentee ballot
provision at issue by Pennsylvania courts as either
mandatory or directory, as discussed in this opinion, could
obviate the need to determine whether there has been a
violation of equal protection under the Fourteenth
Amendment."); *NAACP Phila. Branch v. Ridge*, No. 00-
2855, 2000 WL 1146619, at *6 (E.D. Pa. Aug. 14, 2000)
(abstaining from interpreting a statute that was subject to
a "saving construction" because "a state court may conclude
that the PVRA precludes all ex-felons from voting during
the five year period following their incarceration").

The Court agrees with the foregoing cases and finds
that the second prong of the doctrine is satisfied here.

### III.   *Pullman's* third prong: erroneous reading of the statute disrupts important state policies.

The final prong of *Pullman* abstention asks whether
"important state policies would be disrupted" if this Court
were to erroneously interpret the unsettled state law.
Here, they clearly would.

To begin with, important state policies will be
implicated if this Court intervenes in Pennsylvania's
election on federal-constitutional grounds. Ultimately,
*Pullman* abstention is a doctrine "rooted in basic principles
of federalism." *Serio*, 261 F.3d at 150. And under the
Constitution, the critical responsibility of administering
elections is reserved for the states. U.S. Const. art. I, § 4,
cl. 1. In discharging this duty, the powers of state
government are at their apex. States have considerable
discretion to conduct elections as they see fit, and federal
courts intervene only when the decisions of state officials
threaten to infringe the fundamental right to vote or deny
citizens the equal protection of law. *See Griffin v. Roupas*,

385 F.3d 1128, 1130 (7th Cir. 2004) (explaining that the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones"); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) ("[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject.").

The dictates of federalism require no less. In our constitutional order, "[s]tates are free to serve as laboratories of democracy." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1141 (2016) (Thomas, J. concurring) (cleaned up). And in this arena, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted).  In practice, this means that "[f]ederal law . . . generally defers to the states' authority to regulate the right to vote." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016) (citation omitted).

This case strikes at the very heart of that authority. As has been discussed, Plaintiffs' constitutional claims presume the alleged violation and uneven enforcement of state election statutes by the state officials charged with interpreting and enforcing them.  Important state policies and constitutional powers are clearly in play.

It is also clear that federal intervention could "disrupt" Pennsylvania's exercise of this core, constitutional power.  A federal-court constitutional decision, premised on an erroneous interpretation of ambiguous state law, coming less than three months before a contentious national election, amid a global pandemic, would risk electoral chaos and undermine the integrity of the democratic process in the minds of voters. *Cf. Fuente*, 207 F. Supp. 3d at 450 ("An erroneous decision so temporally close to the election could seriously disrupt Pennsylvania's election process. Furthermore, in the past, courts have held that a mistaken interpretation of Pennsylvania's election law could also damage the

integrity of that election process."); *Pierce*, 324 F. Supp. 2d at 704 ("[A]n erroneous construction of the absentee ballot provision of the election code could disrupt extremely important state policies concerning voting rights."); *Ridge*, 2000 WL 1146619, at *7 ("The court finds that voting regulations implicate important state policies and that an erroneous construction of the PVRA would be disruptive.").

Put simply, the path Plaintiffs walk here is rife with the "needless friction" abstention aims to avoid. *Fuente*, 207 F. Supp. 3d at 452. What they are asking is for this Court "to find that state officials have wrongly interpreted state law, and to replace [the officials'] interpretations with [Plaintiffs'] own." *Id.* "This role is not [the Court's] to assume where, as here, an alternative appropriately exists with the Pennsylvania state courts." *Id.*; *see also Pullman*, 312 U.S. at 498 (explaining that where a federal-constitutional claim "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open," the need for constitutional adjudication should be "avoided if a definitive ruling on the state issue would terminate the controversy").

For these reasons, the third prong of *Pullman* is also satisfied.

## IV.   Discretionary considerations under *Pullman*.

"Having found that all three factors necessary for this Court to abstain are satisfied," the Court must now make "a discretionary determination of whether abstention is appropriate given the particular facts of this case." *Fuente*, 207 F. Supp. 3d at 450. In making its determination, a court may "weigh[] such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Id.* at 451. At this stage of the analysis, abstention is appropriate "absent significant reasons to the contrary[.]" *Chez Sez III Corp.*, 945 F.2d at 633.

Plaintiffs argue that because the general election is imminent, the Court should not exercise its discretion to abstain. [ECF 320, p. 60]. They also argue that, even if abstention is appropriate, this Court has an independent

obligation to decide all requests for preliminary relief. [*Id.* at pp. 59-60]. Neither of these arguments is well-taken.

The Court acknowledges that the imminence of the general election weighs in favor of this Court acting as quickly as possible. But Plaintiffs have at least three options to obtain substantial relief through speedy resolution of the unsettled state-law questions.

First, there is pending litigation in Pennsylvania state court that appears likely to resolve many of the unsettled state-law issues. The Pennsylvania Democratic Party filed a lawsuit in Commonwealth Court, which is now pending. [ECF 291-1]. Certain Plaintiffs here have moved to intervene in that case and have been allowed leave to file *amici* briefs. [ECF 264-2]. The issues in that case involve two of the critical unsettled state-law issues noted above: (1) whether Act 77 requires county election boards to count non-compliant ballots, such as those not in the secrecy envelope; and (2) whether the county board of elections office is the only location to which mail-in ballots may be delivered, or whether drop boxes are permitted under Act 77. *See, e.g.*, [ECF 291-1, pp. 46-55]. On August 16, 2020, Secretary Boockvar applied to the Pennsylvania Supreme Court to exercise jurisdiction in the first instance over this case. [ECF 388-1]. Thus, soon, the Pennsylvania state courts will be able to provide conclusive interpretations of the state-law issues that serve as the basis for many of Plaintiffs' claims here.[7]

---

[7] Another claim in the state case is whether the poll-watching residency requirement violates the state and federal constitutions—which is also one of the claims here. [ECF 264-1, ¶¶ 142-161]. Thus, there is the potential for an inconsistent decision between this Court and the Pennsylvania Supreme Court if this Court acts now. While the risk of an inconsistent judgment isn't usually the main concern of *Pullman* abstention, it is a factor to consider generally in the Court's exercise of its discretion to abstain. *See Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 103 (3d Cir. 1999) ("The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of consideration designed to

Second, Plaintiffs certainly can file their own case in state court to have the state courts interpret the unsettled state-law issues. In fact, Plaintiffs will now have a head start in any state-court proceeding because this Court ordered expedited discovery here, which is substantially complete and will be equally applicable in any state-court proceeding. [ECF 124, pp. 4, 6 ("All written discovery requests must be served by July 24, 2020"; "All responses to written discovery, including producing all items and documents, shall be made by August 5, 2020"; "All fact-witness depositions must be completed by August 26, 2020"; "All affirmative expert reports shall be completed and simultaneously produced by August 12, 2020. Rebuttal expert reports shall be completed and produced by August 19, 2020. All expert depositions shall be completed by August 26, 2020.")]; [ECF 374, p. 2 ("Plaintiffs shall provide supplemental responses and documents" responsive to certain written discovery requests "no later than August 14, 2020.")].

Third, Plaintiffs can also appeal this Court's abstention ruling to the Third Circuit on an expedited basis, and, as part of any appeal, seek certification of any unsettled and ambiguous state-law questions that have not otherwise been raised in the pending Commonwealth Court case.[8] Abstention is, no doubt, a "blunt instrument"—which is why certification of thorny state-

---

soften the tensions inherent in a system that contemplates parallel judicial processes.") (citation omitted).

[8] An order staying a case based on *Pullman* abstention is immediately appealable under the collateral-order doctrine. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712–13 (1996) (holding that an abstention-based remand to state court was immediately appealable under collateral order doctrine); *Schweiker*, 40 F. App'x at 674 ("Under our jurisprudence an abstention-based stay order can be a final order under § 1291 even when the District Court retains jurisdiction."). And the Third Circuit's local rules allow parties to file applications to expedite appeals. 3d Cir. L.A.R. 4.1 (2011) ("A party who seeks to expedite a case must file a motion within 14 days after the opening of the case setting forth the exceptional reason that warrants expedition.").

law questions is oftentimes preferable. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1156–57 (2017) (Sotomayor, J., concurring). While this Court has no authority to certify state-law questions to the Pennsylvania Supreme Court, the Third Circuit does. *See* Pa. R.A.P. 3341(a)(2) ("[A]ny of the following courts may file a petition for certification with the Prothonotary of the Supreme Court: (1) The United States Supreme Court; or (2) Any United States Court of Appeals.").

As for Plaintiffs' argument that the Court, even if it abstains, must still decide any motions seeking preliminary relief, that misses the mark. True, if Plaintiffs had filed a motion for a preliminary injunction, the Court would have likely been required to rule on it before abstaining. *See, e.g., Chez Sez III Corp.*, 945 F.2d at 634 n.4 (noting that the district court had to consider appellants' request for preliminary relief even though the court decided to abstain under the *Pullman* doctrine); *Pierce*, 324 F. Supp. 2d at 704 ("Notwithstanding a decision to abstain on the merits, this court is still obliged to consider plaintiffs' request for preliminary relief.") (citations omitted).

But Plaintiffs didn't file one. Plaintiffs intentionally opted to forgo seeking any preliminary provisional relief, instead requesting a speedy hearing for declaratory relief under Rule 57. [ECF 6, ¶ 9 n.3 ("Plaintiffs recognize that the current length of time until the upcoming 2020 General Election counsels against the filing of a preliminary injunction motion if other means of case expedition will lead to the necessary relief in a timely manner. Thus, to conserve judicial resources, Plaintiffs are attempting to meet that need by way of a speedy declaratory judgment hearing and expedited discovery.")].

A request for declaratory relief is a final adjudication on the merits, not a request for preliminary relief. *See Cnty. of Butler v. Wolf*, No. 20-677, 2020 WL 2769105, at *5 (W.D. Pa. May 28, 2020) (Stickman, J.) ("Contrary to a request for preliminary injunctive relief, the entry of a declaratory judgment is a complete and final order.") (citing *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 211 (3d Cir. 2001)). Plaintiffs' deliberate choice on how to proceed obviates the Court's need to take any

immediate action. *See Fuente*, 207 F. Supp. 3d at 453 ("[T]hough courts in the past have entertained parties' requests for emergency relief contemporaneously with a decision to abstain on the merits of the case, this scenario is distinguishable from such instances, as indeed no motion has even been filed for such relief.") (cleaned up).

Finally, there's one more issue about this Court's discretion that no party has raised. What to do about some of the stray claims or sub-parts of the claims that don't concern unsettled questions of state law? While what appear to be the main claims in this case resolve around unsettled state-law questions, a few don't.

Specifically, Counts VIII and IX concern Defendants' allegedly permitting improper provisional voting by voters who requested mail-in or absentee ballots. As mentioned above, there are no real ambiguities of state law underlying these claims, and so no real reason to abstain from deciding these claims under *Pullman*.

The same is true of one subset of Plaintiffs' voter-dilution claims. As a narrow aspect of Counts I-III, Plaintiffs allege that third-party delivery of mail-in ballots for non-disabled voters is clearly forbidden by the election code, and that Delaware County allowed third-party delivery in the primary election and is likely to do so in the general election. The Pennsylvania Supreme Court has already clearly spoken to this issue, so it is not unsettled. *See Absentee Ballots*, 843 A.2d at 1234 ("For the forgoing reasons, we hold that Section 3146.6(a)'s 'in person' delivery requirement is mandatory, and that the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are void.").

Likewise, Plaintiffs' facial challenge to the poll-watching residency provision does not require resolution of any real thorny issues of state law. The Court could interpret the unambiguous state statute on its face and judge it against the Constitution.

Even though the above subset of claims may not independently require the Court to abstain, the Court will nonetheless stay the entire case. This is so for two reasons.

- 34 -

First, typically, when a court is confronted with some claims that implicate *Pullman* principles, the court has the authority and discretion to stay the entire action. This is consistent with the Supreme Court's and Third Circuit's instructions that *Pullman* abstention is appropriate where construction of a state statute may even "in part" avoid the necessity of federal-constitutional adjudication. *Farmer*, 220 F.3d at 149 ("[A]bstention under *Pullman* 'is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary which might avoid ***in whole or in part*** the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.") (quoting *Bellotti v. Baird*, 428 U.S. 132, 147 (1976) (emphasis added)). As such, staying the entire case here based on the existence of some *Pullman*-implicated claims is consistent with, and fully within, the Court's discretion. And in any event, Plaintiffs have not asked the Court to proceed in a piecemeal fashion.

Second, staying the entire case here, as opposed to carving out aspects of it, is consistent with the Court's broad discretion to manage its docket. *See Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.") (cleaned up); *Mendez v. Puerto Rican Intern. Cos., Inc.*, 553 F.3d 709, 712 (3d Cir. 2009) (decision to stay litigation is "left to the district court . . . as a matter of its discretion to control its docket") (cleaned up).

This discretion includes the inherent authority to stay proceedings after considering "(1) the promotion of judicial economy; (2) the balance of harm to the parties; and (3) the duration of the requested stay." *Cirulli v. Bausch & Lomb, Inc.*, No. 08-4579, 2009 WL 545572, at *2 (E.D. Pa. Mar. 4, 2009) (cleaned up). The Court may exercise this inherent authority *sua sponte*. *See First Nonprofit Ins. Co. v. Alexander*, No. 09-465, 2009 WL 2256473, at *4 (E.D. Pa. July 27, 2009). And federal courts often do so in cases where a pending state-court action related to the case will substantially affect it or be dispositive of the issues. *See, e.g., Bechtel Corp. v. Local*

*215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) ("In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues."); *Alexander*, 2009 WL 2256473, at \*4 ("[T]he Court is . . . empowered to stay proceedings pending the outcome of related proceedings.") (citations omitted).

Here, staying the entirety of the case, as opposed to proceeding with a speedy hearing on a small subset of claims (only to have to do it again once the state courts have weighed in), is a much more efficient use of judicial resources and the parties' time, effort, and expense. That approach minimizes piecemeal litigation (at least in this Court) and ensures that this Court will know the scope and nature of Plaintiffs' constitutional claims before it decides them.

Given these considerations, a discretionary stay of those few claims not subject to *Pullman* abstention is appropriate. *See Farms v. Kuehl Poultry LLC,* No. 19-3040, 2020 WL 2490048, at \*5 (D. Minn. May 14, 2020) ("As an alternative to *Pullman* abstention, Defendants argue that the case should be stayed as a matter of sound discretion. The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants . . . A federal district court has broad discretion to stay proceedings when doing so is appropriate to control its docket.") (cleaned up); *Monk v. Johnson & Johnson*, No. 10-4841, 2013 WL 436514, at \*2 (D.N.J. Feb. 5, 2013) ("[T]he Court notes that it possess the 'inherent authority' to impose a stay of these proceedings. . . . [B]oth the newly asserted and previously pled claims relate to the same basic events. Permitting discovery to proceed with respect to the latter while imposing a stay as to the former, will undoubtedly cause confusion and conflict over the permissible scope of discovery.").

The Court will therefore exercise its discretion to stay the entire action, rather than just the claims subject to *Pullman*, but with one important caveat. If there is a prolonged delay in the state courts' adjudication of the

state-law issues that are subject to *Pullman* abstention, Plaintiffs may file a motion with this Court to lift the stay and proceed on any claims not subject to *Pullman*.

## **CONCLUSION**

For all the reasons discussed, the Court will abstain under *Pullman* and stay this case until the Pennsylvania state courts provide clarity on the unsettled state-law issues that underly Plaintiffs' central claims. Defendants' pending motions will be granted insofar as they request such abstention. In all other respects, Defendants' motions will be stayed along with the rest of these proceedings.

DATED this 23rd day of August, 2020.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge