# EXHIBIT A-1

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4   DONALD J. TRUMP FOR        )
     PRESIDENT, INC., et al.,   )
 5                              )
              Plaintiffs,       )
 6                              )
         vs.                    )No.
 7                              )2:20-cv-966-RN
     KATHY BOOCKVAR, et al.,    )
 8                              )
              Defendants.       )
 9
                        - - -
10

         Videotape Video Conference Deposition of
11              JONATHAN MARKS
12          Wednesday, August 19, 2020
13                      - - -
14       The videotape video conference deposition of
     JONATHAN MARKS, called as a witness by the plaintiffs,
15   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
16   taken before me, the undersigned, Lance E. Hannaford,
     Notary Public in and for the Commonwealth of
17   Pennsylvania, at 2568 Aldon Drive, Sewickley,
     Pennsylvania  15143, commencing at 9:15 o'clock a.m.,
18   the day and date above set forth.
19                      - - -
20          NETWORK DEPOSITION SERVICES
            SUITE 1101, GULF TOWER
21          PITTSBURGH, PENNSYLVANIA
               866-565-1929
22
                        - - -
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 42

1  don't know whether I would characterize it as
2  preferred.  But it was certainly, historically, the
3  most common method throughout the Commonwealth's
4  history until the past few decades.
5      Q    Isn't it also true in-person voting is a
6  more secure method to cast one's ballot?
7          MR. BRIER:  Objection.  Are you referring
8  to something in the code, that you want him to
9  look at?  Or are you asking him an opinion?
10     Q    You can answer the question.
11         MR. BRIER:  Objection.
12     A    My opinion is that in-person voting -- I
13 don't know they would again characterize it as more or
14 less secure.  But it certainly has more elements of
15 sort of chain of custody.  Meaning that a person is
16 appearing in person at a polling place.  And they are
17 seen -- not necessarily seen casting their ballot.
18 But seen in the act of voting.
19     Q    Ray, you can take down the exhibit.
20         Mr. Marks, when one votes in person, the
21 elector is required to sign his or her name in the
22 presence of the election officers, and the election
23 officers are required to compare that signature to the
24 signature on file in the voter registration books.
25         Correct?

Page 43

1      A    That's correct.  Yes.  When I said chain of
2  custody, that is what I was referring to there.
3  Strict procedures followed at the polling place for
4  in-person voting.
5      Q    When one votes in person, the election
6  officers have the ability to challenge the identity
7  and residence of any elector they believe is not a
8  qualified elector.
9          Correct?
10     A    There is a process for challenging a voter
11 at the polling place, yes.
12     Q    And when one votes in person, the election
13 officers are required to actually announce the name of
14 that voter after they have signed their name.
15 Correct?
16     A    Yes.  They are required to announce the
17 name of the voter, so it can be heard by any poll
18 watchers who may be in the polling place.
19     Q    It is not just any poll watchers, correct?
20 Isn't it true under the election code any person in a
21 polling place, when they hear a name announced, has
22 the ability to challenge that voter in terms of their
23 identity and residence.  Correct?
24     A    I have to look -- I would have to look at
25 the statutory provision.  But yes, there is a process

Page 44

1  by which challenges can be made, good faith
2  challenges.  I believe there are limitations.  Without
3  looking at the statute, I have to take your word that
4  those limitations are identity and residence.
5      Q    These procedures of signing one's name in
6  the presence of an election officer, having one's name
7  announced, and then being subject to challenge as to
8  identity and residence are all in the -- all
9  provisions the General Assembly put in the election
10 code to prevent the casting of votes by those who are
11 not qualified electors.  Correct?
12     A    I think that is a fair characterization of
13 the purpose, yes.
14     Q    Would you also agree with me that the
15 Pennsylvania Constitution provides for absentee
16 voting?
17     A    It does.  Yes.
18     Q    And under the Constitution the absentee
19 voting law or the absentee voting provision under the
20 Constitution limits those to those who are either
21 going to be absent from the municipality because of
22 their work duties, cannot get to the polls because of
23 physical disability or illness, those who are
24 observing a religious holiday, or those who cannot
25 vote because of their Election Day duties.

Page 45

1      Correct?
2      A    That sounds correct.  Again, I don't have
3  that in front of me.  So I will have to take your word
4  for it.  That generally sounds correct.
5      Q    Isn't it true that as a result of that
6  constitutional provision, the General Assembly enacted
7  what we have referred to as the absentee ballot law?
8          MR. BRIER:  Objection to form.  You are
9  asking him to opine why the General Assembly did
10 something?
11         MR. HICKS:  Objection is noted.  You can
12 answer.
13     A    Frankly, I don't know all of the
14 motivations of the General Assembly.  But certainly it
15 seems fairly obvious, to me anyway, they wanted to
16 provide for an absentee voting process for voters who
17 could not attend their polling place for one reason or
18 another.
19     Q    Isn't it true as part of the absentee
20 ballot law, the General Assembly also enacted certain
21 provisions to ensure the secrecy of absentee ballots
22 and to prevent fraud?
23     A    Yes.  There are provisions in place to
24 ensure both the secrecy of the absentee ballots, and
25 also to prevent the possibility of fraud.

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 46

1    Q   Ray, if you could pull up JM8.
2        VIDEOGRAPHER: I believe what happened is
3    the files that were missing this morning were 4
4    through 9, JM4 through 9. I could just resend
5    those. I can get them ready to go quickly rather
6    than receiving each one individually.
7        It has been shared with the group on the
8    egnyte folder as well as on the screen.
9    Q   I have this as Exhibit 5.
10       (Thereupon, Exhibit No. 5 was marked for
11   identification.)
12   Q   Mr. Marks, I am showing you what has been
13   marked Exhibit 5. For the record, this is the
14   codified section of the election code, codified
15   section 3146.6 as it was enacted prior to 2019.
16       Mr. Marks, are you familiar with this
17   particular document?
18   A   I am, yes.
19   Q   And just so we are clear, because I know
20   this has happened in other cases.
21       If you could turn to the last page of the
22   exhibit, please.
23       Underneath where it says 1937, June 3rd.
24   A   Yes.
25   Q   Is it your understanding that this section

Page 47

1    is actually 1306 -- actually, 1306 of the election
2    code?
3    A   Yes. It is section 1306, codified in
4    3146.6.
5    Q   And this is the version of section 1306 of
6    the election code as codified at 3146.6 prior to
7    enactment of Act 77. Correct?
8    A   Yes.
9    Q   If we take a look at subsection A of
10   3146.6, we see in the first paragraph certain
11   requirements of the General Assembly put in place for
12   one to cast an absentee ballot. Correct?
13   A   Yes. It discusses what a voter --
14   receiving an absentee ballot from the county board of
15   elections.
16   Q   One of the first requirements that the
17   General Assembly requires under 3146.6A was elector
18   shall in secret mark their ballot.
19       Correct?
20   A   That's correct. Yes.
21   Q   And the General Assembly used the word
22   "shall." Correct?
23   A   The word "shall," yes, precedes "in
24   secret." Yes.
25   Q   It also continues on to the next page that

Page 48

1    then once the ballot is marked, they then shall hold
2    the ballot enclosed and securely seal the same in an
3    envelope on which it is printed, stamped or endorsed,
4    quote, "official absentee ballot."
5        Correct?
6    A   Correct. Yes.
7    Q   The General Assembly then says that in
8    order to cast an absentee ballot, this official
9    absentee ballot envelope shall then be placed in the
10   second one on which is printed the form of the
11   declaration of the elector, and the address of the
12   elector's county board of election in the local
13   election district of the elector.
14       Correct?
15   A   Correct. Yes.
16   Q   And this outside envelope, that is what is
17   commonly referred to as the return envelope. Is that
18   correct?
19   A   The return envelope or the declaration
20   envelope.
21   Q   And the declaration envelope has the
22   address to where this ballot is to be returned.
23   Correct?
24   A   That's correct. Yes.
25   Q   The General Assembly also then requires the

Page 49

1    elector to, again, using the word "shall," quote,
2    "fill out, date and sign the declaration printed on
3    the declaration envelope."
4        Correct?
5    A   That's correct. Yes.
6    Q   Finally, the General Assembly requires the
7    elector to then securely seal the declaration envelope
8    and, quote, "shall send same by mail, postage prepaid
9    except where franked or delivered in person to said
10   county board of elections."
11       Correct?
12   A   That's correct. Yes.
13   Q   And this is the -- strike that.
14       Codified section 3146.6A is the only
15   section under the election code which tells an elector
16   how to vote an absentee ballot. Correct?
17       MR. BRIER: Objection to form to the extent
18   it seeks a legal conclusion.
19   A   I am not aware of another section in the
20   election code that provides direction to voters on
21   completing an absentee ballot.
22   Q   It is your understanding the requirements
23   that were set forth in section -- codified section
24   3146A were adopted by the General Assembly to
25   protect the secrecy and sanctity of the ballot and to

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

14 (Pages 50 to 53)

Page 50

1    prevent fraud.
2        Correct?
3        MR. BRIER:  Objection.
4        A    Again, I don't know the exact motives of
5    the General Assembly at the time.  But I think logic
6    tells me that it certainly serves a function of
7    protecting the integrity of the process and preserving
8    the secrecy of the voter.
9        Q    Are you aware of the fact that section --
10   codified section 3146.6A was interpreted by the
11   Pennsylvania Supreme Court?
12       MR. BRIER:  Objection.
13       A    I don't understand the question, it was
14   interpreted by the Pennsylvania Supreme Court.
15       Q    Are you aware the Pennsylvania Supreme
16   Court has actually interpreted the section 3146.6A
17   that is sitting in front of you?
18       A    I believe you probably have to cite a case.
19   I believe the Supreme Court has opined on aspects of
20   absentee voting and potentially including this one.  I
21   am looking for it in the notes of decision, but I am
22   not sure if all those pages are provided here.
23       Q    Are you aware of the fact that in 2004 the
24   Pennsylvania Supreme Court issued a unanimous decision
25   on the interpretation of 3146A?

Page 51

1        A    Yes.  That does sound familiar to me.  Yes.
2        Q    Let me show you what we will mark as
3    Exhibit 6.
4        (Thereupon, Exhibit No. 6 was marked for
5    identification.)
6        Q    Ray, if you could pull up JM9.  You should
7    have JM9 in your email box.
8        Mr. Marks, you have been shown what is
9    marked as Exhibit 6.  Have you ever reviewed the
10   opinion of the Pennsylvania Supreme Court captioned In
11   Re:  Canvass of absentee ballots of November 4, 2003
12   general election reported at 843A 2nd 1223, 2004?
13       A    Yes.  I have had occasion to review this,
14   yes.
15       Q    When was the last time you reviewed this
16   opinion?
17       A    It has probably been some number of weeks
18   since I last reviewed it.
19       Q    Could you turn to page 8 of the exhibit?
20   Would you agree with me this particular
21   opinion refers to the Supreme Court's interpretation
22   of codified section 3146A?
23       A    You said page 8 of 11?
24       Q    Yes.  It starts at the bottom of page 7.
25   Starts with section 3146.6A unequivocally provides the

Page 52

1    elector shall send the absentee ballot by mail.
2        A    Without reading it in the context of the
3    full opinion, certainly it does indicate, beginning at
4    the bottom of page 7 and moving on to page 8, that the
5    Supreme Court opined on the interpretation of section
6    3146.6 subsection A.
7        Q    Do you also see at the top of page 8 where
8    it says the word "shall" carries an imperative or
9    mandatory meaning with regard to 3146.6A?
10       MR. BRIER:  Mr. Hicks, I think this
11   questioning is totally inappropriate of a lay
12   witness.  You can make your arguments to the
13   court based on what the Pennsylvania Supreme
14   Court gave in their opinion.
15       But I will direct him not to answer.  You
16   are cherry picking sections out of an opinion
17   that he hasn't read in advance of the deposition.
18   I think it is inappropriate.
19       Q    Mr. Marks, what was the reason for why you
20   reviewed this opinion a couple weeks ago?
21       A    I reviewed it probably dozens of times over
22   my career.  At least at the election bureau, it is
23   sometimes useful to review as we are looking at draft
24   guidance, et cetera, on issues related to absentee
25   balloting.

Page 53

1        Q    You would agree with me this decision in
2    2004 was a fairly significant decision by the
3    Pennsylvania Supreme Court.  Correct?
4        A    It was certainly significant from Allegheny
5    County's perspective.
6        And yes, it was significant in sort of
7    guiding countys' activities regarding absentee
8    balloting moving forward.
9        Q    Section 3146.6A was not limited to just
10   Allegheny County.
11       Was it?
12       MR. BRIER:  Objection.
13       A    No.  The statute is not limited to
14   Allegheny County.  And certainly the court's opinion
15   is not binding just on Allegheny County.  But the
16   issue that was at hand in this case, as I recall, was
17   a practice that the Allegheny County board of
18   elections had put into place regarding the receipt of
19   absentee ballots.
20       Q    It was a practice that was inconsistently
21   being applied across all 67 counties.  Correct?
22       MR. BRIER:  Objection.  This line of
23   questioning is inappropriate, sir.
24       MR. HICKS:  Your objection is noted.  You
25   can answer the question, Mr. Marks.

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 54

1    MR. BRIER: He will not answer the
2   question. You are asking him about a Supreme
3   Court opinion. First of all --
4    MR. HICKS: I didn't ask him about a
5   Supreme Court opinion. I asked him about the
6   practice of third party delivery of absentee
7   ballots. That was being inconsistently applied
8   across the Commonwealth in 2004. Correct?
9   Counties were using it, some counties were not,
10  correct?
11   MR. BRIER: Could I make my objection,
12  please? This relates to conduct that was
13  occurring 16 years ago. You are asking him to
14  opine on how 67 counties were doing things 16
15  years ago. It has no relevance to this case
16  whatsoever.
17   MR. HICKS: It certainly does.
18   MR. BRIER: I think the Judge made it quite
19  clear in light of the expedited schedule we are
20  under, that the discovery should be focused on
21  the issues relating to the primary in 2020, and
22  the general election in 2020. That is what he is
23  here for.
24   You can make your arguments to the court
25  about how a Supreme Court case from 16 years ago

Page 55

1   might apply to your theory. You are not going to
2   ask him about how counties 16 years ago were
3   doing things on absentee ballots. It is not
4   appropriate.
5    MR. HICKS: Objection is noted. You can
6   answer the question.
7    MR. BRIER: No. He is not answering the
8   question.
9    Q   Mr. Marks, are counties still today
10  allowing third party delivery of absentee ballots?
11   A   Are counties today allowing third party
12  delivery of absentee ballots? That is the question
13  now?
14   Q   Yes.
15   A   I am not aware that counties are allowing
16  third party delivery of ballots outside of that
17  provided for. This case, I believe, also carved out
18  an exception. Again, I am not the lawyer here. So
19  this is my opinion.
20   There was a discussion in the court's
21  opinion regarding the DiPietri case from Philadelphia
22  back in the 1990s. And my recollection is the court
23  carved out an exception for voters with disabilities.
24   Q   Setting aside disabled voters, isn't it
25  true counties are still engaging and permitting third

Page 56

1   party delivery of non-disabled voters' ballots despite
2   the fact this has been in place since 2004?
3    MR. BRIER: Objection. He answered your
4   question.
5    MR. HICKS: No, he didn't.
6    A   I'm not aware that counties are allowing
7   third party delivery outside of that specific
8   allowance for voters with disabilities.
9    Q   Mr. Marks, did you review the discovery
10  responses that have been served in this case by the
11  various county boards of election?
12   A   The discovery responses from the various
13  county boards of elections?
14   Q   Yes.
15   A   I don't recall that I have.  No.
16   Q   Ray, if you could pull up JM11, please.
17   (Thereupon, Exhibit No. 7 was marked for
18  identification.)
19   Q   Mr. Marks, I will indicate on the record
20  that what has been marked as Exhibit 7 is a copy
21  of Montour County board of elections answers to the
22  plaintiffs' written interrogatories and request for
23  production of documents.
24   Ray, if you could turn your --
25   MR. BRIER: I'm sorry, we don't have this

Page 57

1   document. Has it been emailed to us? I want to
2   print it so he has the entire document in front
3   of him. Let's take a short break. We will print
4   the document.
5    The witness needs to use the restroom, too,
6   so we will take a short break.
7    VIDEOGRAPHER: Now off the record. The
8   time is 10:36 and 34 seconds.
9    (Recess taken.)
10   VIDEOGRAPHER: Back on the record. The
11  time is 10:48 and 45 seconds.
12   MS. MERKEL: This is Ellison Merkel
13  speaking for Citizens for Pennsylvania's Future
14  and Sierra Club Intervenors. I don't believe we
15  were ever served with these interrogatory
16  responses. So I just want to put that objection
17  on the record before you begin your questioning.
18   Q   Mr. Marks -- Ray, if you could pull up
19  JM11.
20   Mr. Marks, you have in front of you what
21  has been marked Exhibit 7, as I indicated on the
22  record was a copy of Montour County board of elections
23  answers to plaintiffs' set of written interrogatories
24  and requests for production of documents.
25   Have you seen this document before?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

16 (Pages 58 to 61)

Page 58

1    A    I have not.  No.
2    Q    If you look on page 7 of the document.
3    There is an interrogatory that asked Montour County to
4    identify whether third parties may deliver in-person
5    absentee and mail-in ballots cast by non-disabled
6    electors.
7         Do you see that question?  Page 7.
8         Ray, could you turn to page 7, please?
9         Can you highlight and cull out -- it should
10   be the fourth line from the bottom.  Mr. Marks, you
11   may be able to see it on the screen better.
12        Do you see that question?
13   A    This is question No. 3 on page 7.
14   Q    Question 3, page 7.
15   A    Okay.  You are asking the county to
16   identify all procedures, practices, rules, regulations
17   and/or instructions that the county implemented or
18   followed or communicated in the June 2nd primary
19   election, and all of the procedures, practices, rules,
20   regulations, and/or instructions, that you intend to
21   implement or communicate in the November 3rd general
22   election concerning or relating to the return of
23   delivery by electors of voted absentee and/or mail-in
24   ballots including, without limitation, whether franked
25   or prepay the postage for any and all absentee and/or

Page 59

1    mail-in ballots and/or whether third parties may
2    deliver in person absentee and/or mail-in ballots cast
3    by non-disabled electors.  And if there are any
4    differences, please identify the reasons why you are
5    making a change in such procedures, practices, rules,
6    regulations and instruction for the November general
7    election.
8    Q    On page 8 is Montour's answer to this, or
9    where it begins.
10        Correct?
11   A    Yes.  It appears.
12        It starts with Montour County objects to
13   this interrogatory as overly broad.  So yes, that
14   appears to be their answer.
15   Q    You see down at the bottom where it says
16   for the June 2nd, 2020 primary election?  Then there
17   are a number of bullet points.  Correct?
18   A    Yes.
19   Q    If you could turn to page 9.  Take a look
20   at the -- should be the third bullet point.  The
21   second on that page.
22   A    Shouldn't we read -- this is all one
23   answer.  Shouldn't we read starting with bullet 1?
24   Q    I just want to point out the one that deals
25   with third party delivery.

Page 60

1    A    Okay.  I think there is some context that
2    might be missed.  We will start with bullet 3.
3    Q    It says, quote, "Montour County has in the
4    past allowed a nursing home representative to both
5    pick up applications and deliver voted ballots.  Past
6    practice has also been to allow spouses to deliver a
7    voted ballot back to the board of elections.  Montour
8    County is considering whether to change this practice
9    for the November 3rd, 2020 general election."
10        Did I read that correctly?
11   A    You did, yes.
12   Q    Were you aware of the fact Montour County
13   has since 2004 allowed spouses to deliver voted
14   ballots?
15        MR. BRIER:  Objection to form.  Where does
16   it say since 2004?  Note my objection.  You can
17   answer.
18   A    Yes.  It doesn't specify how long in the
19   past.  But yes, it appears that the county has allowed
20   spouses to deliver ballots.  I don't know -- I'm
21   scanning through the bullets here.  I don't know if
22   there is additional context about whether those
23   spouses are voters with disabilities or not.
24   Q    The question that was asked was the third
25   party delivery of non-disabled voters' ballots.

Page 61

1    Correct?
2    A    Right.  Yes.  Assuming they answered it
3    accurately with that in mind, it appears they allowed
4    spouses to deliver ballots.  Again, there is really no
5    time frame or any kind of idea of the volume or how
6    long this practice has been in place.
7    Q    Well, as Deputy Secretary have you ever
8    asked Montour County about whether they have barred
9    third party delivery of absentee ballots and mail-in
10   ballots?
11   A    Well, we provided guidance that third party
12   delivery with the exception of ballots from voters
13   with disabilities is barred.  I believe we cited the
14   Supreme Court decision that we reviewed earlier.
15        And we did ask counties in the context of
16   our Act 35 report whether there was -- whether ballots
17   were delivered in a method other than those authorized
18   by the statute.
19        I don't recall -- I know there were some
20   counties who indicated that people attempted to
21   deliver ballots on behalf of other voters.  I can't
22   recall what county is one of them.
23   Q    Montour County also says they allowed
24   nursing home administrator to deliver voter ballots.
25   Correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 62

1    A   Yes.  That is in the first line of that
2   bullet.
3    Q   Do you know how long that practice has been
4   going on?
5    A   I do not.  No.
6    Q   Do you know how many ballots have been
7   delivered by this nursing home representative over the
8   years?
9    A   I do not.
10    Q   Has anybody from Department of State told
11   Montour County to stop this practice of allowing third
12   party delivery of absentee or mail-in ballots?
13    A   Well, we told all counties that third party
14   delivery of absentee and mail-in ballots for
15   non-disabled voters is not authorized.  This is the
16   first time I saw this document.  So I actually have to
17   contact the county, look into it to ensure that they
18   answered the question as it was asked.
19        I can certainly see in the case of a
20   nursing home representative, that perhaps the voters
21   in that location are, in fact, voters with
22   disabilities.  But assuming that they are not, then
23   our historical guidance is not being followed by
24   Montour County.
25    Q   When is the last time the Department of

Page 63

1   State issued guidance reminding the county boards that
2   third party delivery of absentee or mail-in ballots
3   for non-disabled voters is prohibited?
4    A   I don't recall, off the top of my head,
5   when we most recently circulated it.
6    Q   You are aware of the fact, however, Montour
7   County isn't the only one -- the only county to permit
8   third party delivery of non-disabled voter ballots.
9   Correct?
10    A   I am not aware of that.  No.
11    Q   Did you have any involvement -- you
12   mentioned the Act 35 report.  Do you have any
13   involvement in the preparation of that report?
14    A   I did.  Yes.
15    Q   I will show you what we will mark Exhibit
16   8.
17        (Thereupon, Exhibit No. 8 was marked for
18   identification.)
19    Q   If you could pull up JM12.
20        Mr. Marks, is this the Act 35 report you
21   referred to earlier?
22        MR. BRIER:  We are waiting for it to come
23   through.
24    Q   It was sent to you five or ten minutes ago.
25   It was during the break.

Page 64

1        MR. BRIER:  Which one am I looking for?
2   JM --
3        MR. HICKS:  12.
4        MR. BRIER:  Thank you.  I see it now.
5    Q   Exhibit 8 -- is Exhibit 8 the Act 35 report
6   you referred to earlier?
7    A   Yes.  It appears to be.
8    Q   I want to turn your attention to page 39 of
9   the report.  While he is pulling that up, what actual
10   involvement did you have in the report's preparation?
11    A   Well, I drafted some sections of the
12   report.
13    Q   Which sections?
14    A   I drafted portions of this section.  And I
15   believe on issues or incidents involving voting
16   machines.
17    Q   Who else was involved in the preparation of
18   the Act 35 report?
19    A   There were a number of people involved in
20   the preparation and review, including individuals from
21   our policy office, our legislative office.  As well as
22   individuals who worked in the three bureaus, two of
23   the three bureaus, election security and technology,
24   and election services and notaries.
25    Q   Did Secretary Boockvar have any involvement

Page 65

1   in the preparation of this report?
2    A   She reviewed the report.  Yes.
3    Q   Did she make any changes to the report
4   before it was issued?
5    A   I believe she may have made some edits to
6   the report before it was issued.
7    Q   What edits did Secretary Boockvar make?
8    A   I don't recall all of the various edits
9   that were made to the report.  There would have been
10   typographical errors that were corrected.  There would
11   have been wording changes.  Formatting changes.  But I
12   can't recall -- as I said, there were a number of
13   people editing the document.  So there were quite a
14   few edits as the document was being prepared.  I don't
15   recall all of them.
16    Q   Do you have those edits?  The electronic
17   versions of all those edits?
18    A   I don't know that I have an electronic
19   version of all of the edits.  No.
20    Q   Does somebody at the Department of State
21   have the electronic copies of all the various versions
22   of this Act 35 report?
23    A   I would have to check to find out if there
24   was a record of that.
25    Q   Do you know why the various versions of the

Page 66

1   Act 35 report have not been produced in discovery?
2       MR. BRIER: Counsel, I can answer the
3   question. Because the final report is what was
4   issued and is public. A public report. It is
5   what the court understood we were issuing.
6       MR. HICKS: Are you asserting a privilege
7   for the ESI versions of the report?
8       MR. BRIER: If you are making a request, I
9   will take it under consideration.
10      MR. HICKS: It was already a written
11  request, it was provided as part of the discovery
12  request, we requested all copies of the drafts of
13  this report.
14      MR. BRIER: We will take that under
15  consideration.
16      Q    Mr. Marks, to the best of your knowledge,
17  there are drafts of this report that were edited and
18  marked up before it was finally published. Correct?
19      A    Yes. Before it was finalized, it was a
20  shared document that was being edited by various
21  individuals.
22      Q    According to your prior testimony, you said
23  you had involvement in the section of the report
24  titled "Review of actions taken." Is that correct?
25      A    Yes.

Page 67

1       Q    And that begins on page 38 and carries over
2   to page 39. Correct?
3       A    That's correct. Yes.
4       Q    If we look at the top of page 39, please.
5       A    Okay.
6       Q    Is there a reference on the second to last
7   sentence of the first paragraph that Lycoming County
8   also reported that approximately 20 ballots were being
9   delivered -- had been delivered by voters' spouses?
10      A    Yes. It also goes on to say that the
11  county took steps to ensure that its staff no longer
12  accepts that type of delivery in the future.
13      Q    Do you know how long Lycoming County had
14  been allowing third party delivery of non-disabled
15  voter ballots prior to the June 2020 primary?
16      A    I don't. As I understand it, I don't
17  believe that it has been a historical practice. It
18  sounded like this was an employee of the county
19  election office, who was allowing that. I don't
20  recall that it has been a longstanding practice.
21      Q    Did you actually -- were you the one who
22  put in this sentence about Lycoming County reporting
23  the approximately 20 ballots being delivered by
24  voters' spouses?
25      A    I don't recall. I may have put this

Page 68

1   sentence in.
2       Q    Who from Lycoming County reported this
3   incident?
4       A    I would think it would have been the
5   election director. As required by Act 35, we provided
6   a mechanism for counties to respond to the various
7   requests for information, and that consists of a
8   survey.
9       Q    Is the elections director for Lycoming
10  County Forrest Lehman?
11      A    He is, yes.
12      Q    Did you have any conversations with
13  Mr. Lehman about this particular incident?
14      A    I don't recall having a direct conversation
15  with Mr. Lehman about this specific incident. No.
16      Q    Who told the Department of State that the
17  county was taking steps to ensure that its staff
18  doesn't accept this type of delivery in the future?
19      A    That was their response in the survey, as I
20  recall.
21      Q    As Deputy Secretary, you haven't confirmed
22  directly with Lycoming County whether that response is
23  accurate?
24      A    I haven't personally confirmed it with
25  Lycoming County.

Page 69

1       Q    Has anybody in your staff confirmed that
2   with Lycoming County?
3       A    I believe we do have individuals who are
4   sort of county liaisons, they are points of contact
5   for each county. But the survey response was actually
6   very explicit that the county had taken steps to
7   ensure it would not occur in the future.
8       Q    Mr. Marks, do you think it is appropriate
9   for county boards of election, whenever they are
10  confronted with a situation where somebody is
11  delivering a non-disabled voter's ballot, which is not
12  their own, to tell that voter that they should just
13  simply go to the post office and drop the ballot in
14  the mailbox?
15      A    No. As noted in this report, the counties
16  that did have these occurrences, Mercer County being
17  the other one, they indicated that the ballots would
18  not be counted. Because they were returned in a
19  method that was not authorized by statute.
20      Q    Would you agree with me that it is
21  inappropriate for a county board of election officer
22  to tell somebody, who is delivering somebody else's
23  voter ballot, to just simply go to the post office and
24  drop it in the mailbox? You think that is clearly a
25  violation of the election code. Correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

19 (Pages 70 to 73)

---

Page 70

1      A    Yes.  If it is not the voter's own ballot,
2   then yes, I would not instruct that individual to
3   insert that in the mailbox.
4      Q    As you understand it, the Supreme Court was
5   quite clear in 2004 that third party delivery, whether
6   to the mailbox or to the county election office, is
7   not permitted.  Correct?
8      A    That's correct.  Yes.
9      Q    Let me show you what we marked as Exhibit
10  9.
11     A    Again, the court did carve out exceptions
12  for voters with disabilities.
13     Q    Right.  My question was non-disabled
14  voters.
15     A    Correct.
16     Q    I will show you what has been marked
17  Exhibit 9.
18         (Thereupon, Exhibit No. 9 was marked for
19  identification.)
20     Q    Ray, if you could pull up JM13, please?
21         Mr. Marks, showing you what has been marked
22  Exhibit 9.  This is a set of answers by the defendant
23  Columbia County board of elections to the
24  interrogatories filed in this case.  Have you ever
25  seen this document before?

---

Page 71

1      A    I have not.  No.
2      Q    Please jump again to page 8.  We see
3   interrogatory 3.  Which is the same interrogatory that
4   was directed to Montour County.  Is that correct?
5   Page 7.
6      A    Yes.  It starts at the bottom of page 7.
7      Q    At the top of page 8 starts Columbia
8   County's objections and then answer.  Correct?
9      A    Yes.
10     Q    That goes over on to page 9.  Correct?
11     A    Yes.  Starts on page 8, I believe, with
12  Columbia County followed the applicable laws contained
13  in the Pennsylvania election code.  Another list of
14  bullets.
15     Q    And for the June 2nd, 2020 primary the last
16  bullet that Columbia County says or provided says,
17  quote, "In accordance with the election code and
18  related law and guidance, Columbia County asked
19  individuals that come to our counter whether they are
20  delivering their own ballot.  If the individual
21  indicates that the ballot is not theirs, Columbia
22  County directs them to the Bloomberg post office to
23  mail the ballot."
24         Did I read that correctly?
25     A    You did.

---

Page 72

1      Q    So in your opinion, Mr. Marks, what
2   Columbia County is doing in terms of permitting third
3   party delivery of ballots is in violation of the
4   election code.  Correct?
5      A    If they are directing people, who are
6   returning someone else's ballot, to go to the post
7   office to mail the ballot, then yes.  It looks like
8   the county was attempting to do its due diligence in
9   this regard.  But didn't quite get it right.
10     Q    Isn't it also true many county boards of
11  election don't actually have procedures in place to
12  verify the person returning a ballot is the
13  non-disabled voter who has cast the ballot?
14     A    I'm sorry.  I didn't catch -- you are
15  asking --
16     Q    I will reask it.  Isn't it true many county
17  election boards actually have no procedures in place
18  to verify that the person returning a ballot is the
19  non-disabled person who voted the ballot?
20     A    I don't know.  I don't know whether that is
21  true or not.
22     Q    In the Act 35 response -- survey responses,
23  didn't many of the county boards of election indicate
24  they have no procedures in place to verify who is
25  delivering the ballot?

---

Page 73

1      A    I don't recall that.  No.
2      Q    Mr. Marks, I mean it has been since 2004
3   when the Pennsylvania Supreme Court issued its
4   opinion.  You said the Department of State has issued
5   guidelines.
6          What guidelines did the Department of State
7   issue after the 2004 decision to make certain that the
8   county boards of election would not be accepting third
9   party delivery of non-disabled voters' ballots
10  including in the June 2nd, 2020 primary election?
11     A    Well, we issued direction to the counties
12  after the 2004 decision that merely outlined under
13  what circumstances, what the one exception to the rule
14  was.
15         And the expectation is counties would be
16  following the -- that would -- whereby an individual
17  who was delivering a ballot on behalf of a voter with
18  a disability was duly designated by that voter to
19  deliver their ballot on their behalf.
20     Q    When was this guidance issued by the
21  Department of State?
22     A    I don't recall the exact date and when the
23  guidance was issued.
24         I'm sure it's been circulated and issued to
25  the counties multiple times since 2004.  But I

---

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 74

1  couldn't give you a list of dates.
2      Q    Was it included in any guidance involving
3  Act 77?
4      A    I would have to doublecheck. I don't
5  recall if that was explicitly included in previous
6  versions of the Act 77 guidance.
7      Q    Now, in 2019, the General Assembly enacted
8  Act 77 as an amendment to the election code. Correct?
9      A    That's correct. Yes.
10     Q    Act 77 did not eliminate absentee voting.
11  Correct?
12     A    It did not. Correct.
13     Q    Instead it added an alternative to voting
14  known as non-excuse mail-in voting. Correct?
15     A    Actually, I believe they call it mail-in
16  balloting or mail-in voting.
17     Q    Do you agree with me the difference between
18  absentee voting and mail-in voting is that mail-in
19  voting doesn't require an excuse for the request for
20  the mail-in ballot?
21     A    Correct. It doesn't require the voter to
22  provide a reason on their application. Otherwise, the
23  process is the same. The same application process.
24  The same identification requirement. The same
25  verification process applies.

Page 75

1          But that is the one difference is that on a
2  mail-in ballot request, as opposed to an absentee
3  request, the voter does not have to supply a reason
4  for voting the ballot.
5      Q    Let me show you what we will mark as
6  Exhibit 10.
7          (Thereupon, Exhibit No. 10 was marked for
8  identification.)
9      Q    Ray, if you could pull up JM14.
10         What has been marked as Exhibit 10, is that
11  a current version of codified section 3146.6?
12     A    No. This is 3150.16.
13     VIDEOGRAPHER:  What one do you want him to
14  look at?
15     Q    Should be codified section 3146.6, should
16  be JM14.
17     A    Okay. Yes. I have it now.
18     Q    Mr. Marks, would you agree with me -- first
19  off, let me ask you, are you familiar with this
20  particular section of the election code?
21     A    I am. Yes.
22     Q    Have you reviewed it since it was placed
23  into the election code in 2019?
24     A    I have. Yes.
25     Q    Under the current version of 3146.6, does

Page 76

1  an elector still have to mark his ballot in secret?
2      A    Yes.
3      Q    Does an elector still have to place that
4  marked ballot in a secrecy envelope and securely seal
5  it?
6      A    Yes. You are referring to subsection A,
7  where it talks about the voter marking. Yes. It also
8  requires them to mark it in black lead pencil,
9  indelible pencil or blue ink. So there is a number of
10  things in subsection A.
11     Q    And under the current version of
12  3146.6A, the voter is required to place that sealed
13  secrecy envelope in the outer envelope on which is
14  printed both the elector's declaration and the address
15  of the elector's county election board.
16         Correct?
17     A    Yes. It directs the voter to enclose their
18  absentee ballot in the inner envelope, and that is
19  enclosed then in the outer or the declaration
20  envelope.
21     Q    Under the current section of 3146.6A, the
22  elector is still required to fill out, date and sign
23  the declaration printed on the envelope and securely
24  seal that outside envelope. Correct?
25     A    That's correct. Yes.

Page 77

1      Q    And under the current version of
2  3146.6A, the elector is still required to send the
3  completed or voted ballot back by mail or delivered in
4  person to their said county board of election.
5  Correct?
6      A    That's correct. Yes.
7      Q    Would you agree with me that the only
8  change that Act 77 made to the former 3146.6 section
9  is the introductory paragraph or the introductory
10  sentence, where it defines the time when that absentee
11  ballot has to be returned?
12     A    I don't have the legislative markup in
13  front of me. But my recollection is that was the only
14  substantive change was the deadline to return the
15  ballot.
16     Q    So you will agree with me that the language
17  about what an elector shall do in order to cast an
18  absentee ballot that was in existence before the
19  Pennsylvania Supreme Court 2004 opinion is still in
20  existence today. Correct?
21     MR. BRIER:  Objection. I think you are
22  asking for a legal opinion.
23     A    The statute has not been changed. I know
24  there has been additional case law I think on the ink
25  question specifically. But the statute itself has not

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

21 (Pages 78 to 81)

Page 78

1  changed.  Correct.
2      Q    The case law on the ink question was with a
3  case that was decided years before the 2004 decision.
4  Correct?
5      A    I believe that is correct.  I don't recall
6  the dates.  The notes of decision aren't included.  So
7  I can't check them.  But yes, I believe that did
8  predate the Supreme Court decision.
9      Q    And under Act 77, the current section of
10  3146.6A still uses the word "shall" for all those
11  things that an elector must do in order to cast an
12  absentee ballot.  Correct?
13     A    Yes.  It does say the elector shall.
14     Q    Now, let me show you what we will mark as
15  Exhibit 11.
16         (Thereupon, Exhibit No. 11 was marked for
17  identification.)
18         MR. BRIER:  Which one is it, please?
19     Q    The codified section 3150.16.  That should
20  be JM15.
21         MR. BRIER:  And it is Exhibit 11?
22         MR. HICKS:  Yes.
23     Q    Mr. Marks, are you familiar with what has
24  been marked Exhibit No. 11?
25     A    I am.  Yes.  This is section 3150.16 of

Page 79

1  Title 25.
2      Q    Section 3150.16 of the election code, that
3  is the provision that deals with the mail-in voting
4  option?
5      A    It is.  Yes.
6      Q    Under subparagraph A, does that provision
7  provide what the legislature requires an elector to do
8  in order to properly cast a mail-in ballot?
9      A    It references what a mail-in elector shall
10  do once he or she has received their ballot.  Yes.
11     Q    And does the language in 3150.16A track the
12  language in 3146.6A regarding absentee balloting?
13         MR. BRIER:  Objection.  I don't think that
14  is a fair question.
15     A    If you are asking are the procedures
16  essentially the same, then the answer is yes.  The
17  process by which a voter votes the ballot, inserts it
18  in the envelopes, that procedure as outlined here is
19  basically virtually identical to that outlined for
20  absentee balloting, yes.
21     Q    In fact, isn't the language exactly the
22  same in terms of beginning with elector shall in
23  secret proceed to mark the ballot only in black lead
24  pencil, and going all the way to the end?
25     A    I will have to do a comparison here.  I

Page 80

1  believe the answer is yes.  But I will confirm it.
2      Q    I didn't hear your answer?
3      A    Yes.  I'm sorry.
4      Q    In terms of the procedure between whether
5  you vote absentee, or whether you do mail-in, the
6  elector is being asked to do all of the same things in
7  order to properly cast that ballot.  Correct?
8      A    That's correct.  Yes.
9      Q    Section 3150.16A, the legislature again
10  uses the word "shall" instead of "may."  Correct?
11     A    Talking about second line of that section
12  where it says mail-in elector shall, which precedes
13  those various things.
14     Q    Yes.  It uses "shall," looks like a total
15  of five times?
16     A    Yes.
17     Q    As part of Act 77, there is a provision
18  under the election code that pertains to the counting
19  of absentee and mail-in ballots.  Correct?
20     A    That's correct.  Yes.
21     Q    Just so we have a comparison, let me first
22  show you JM10.
23         MR. BRIER:  Which one is JM10?
24         MR. HICKS:  JM10 is the old version of
25  3146.8.

Page 81

1          MR. BRIER:  This is going to be an exhibit?
2          MR. HICKS:  That will be Exhibit 12.
3          (Thereupon, Exhibit No. 12 was marked for
4  identification.)
5      Q    Mr. Marks, you have been shown what has
6  been marked Exhibit 12, which has actually also been
7  marked JM10.  Mr. Marks, are you familiar with this
8  version of codified section 3146.8 of the election
9  code?
10     A    I am.  Yes.
11     Q    If you go to the last page of the exhibit.
12  You will see under the -- after the language of the
13  statute, we see the reference to the election code
14  section number as being 1308.  Is that correct?
15     A    That's correct.  Yes.
16     Q    But it has been codified as 3146.8.
17  Correct?
18     A    Right.
19     Q    The title for this particular statute is
20  called "Canvassing of official absentee ballots."
21  Correct?
22     A    That's correct.  Yes.
23     Q    And this particular section or this
24  particular codified section had a subsection E; is
25  that correct?

Page 110

1    about how to cast a vote in their county on their
2    county's particular voting system, would go to that
3    page, PA site.
4        Yes, you are correct.  This document does
5    not provide information about voters -- doesn't
6    provide information to voters about casting their
7    ballot.
8        Q   It also doesn't provide that information to
9    the county board of elections, correct?
10       This document doesn't tell the county board
11   of elections that in order for an absentee or mail-in
12   ballot to be properly cast and counted, certain things
13   have to be done.  Correct?
14       A   I don't believe -- I have to read the whole
15   document.  But I don't believe this document does.
16   No.
17       Q   And then the next section of the document
18   starts page 3.  That is the mail-in and absentee
19   ballot application process.  Correct?
20       A   Correct.
21       Q   That carries all the way over to page 5.
22   Correct?
23       A   Correct.
24       Q   At which point, then, there is the next
25   section, the last section of the document is dealing

Page 111

1    with mail-in and absentee ballots and their delivery.
2    Correct?
3        A   That's correct.  Yes.
4        Q   You have two sections, one called a
5    delivery, one called a collection.  Correct?
6        A   Yes.  Correct.
7        Q   In neither of those sections is there any
8    statement by the Department of State that third party
9    delivery of non-disabled voters' voted ballots is
10   prohibited?
11       A   I don't see anything in that section.  No.
12       Q   Is there anything in this last section of
13   the guidance, which talks about when a county should
14   count or whether -- strike that.
15       Is there anything in this last section of
16   the guidance, which provides the counties any guidance
17   as to whether an absentee or mail-in ballot, when it
18   is voted, has actually been properly cast?
19       MR. BRIER:  Objection to form.
20       A   No.  I think this guidance was largely
21   aimed at the application and return process.  So no,
22   it does not.
23       Q   Now, on page 5 of the document under the
24   heading "Collection of mail-in and absentee ballots,"
25   it says, quote, "in addition to CEOs," and CEOs means

Page 112

1    county election officers.  Correct?
2        A   Correct.
3        Q   "In addition to CEOs, counties may provide
4    for other secure ballot collection locations that the
5    county deems appropriate to accommodate in-person
6    return of voted mail-in and absentee ballots."
7    Correct?
8        A   Correct.
9        Q   What section of the election code as
10   amended by Act 77 provides for the other secure ballot
11   locations?
12       A   Well, I believe the county would have the
13   authority under their general authority, that we
14   reviewed earlier, to provide different mechanisms by
15   which voters could return their ballots to the custody
16   of the county board of elections.
17       Q   Prior to Act 77, had any county used a,
18   quote, "other secure ballot collection location," in
19   order to collect absentee ballots?
20       A   My recollection, I can't speak for every
21   county.  I believe Erie County had a box in their
22   office at the front counter that they used to drop off
23   their ballots in person.
24       Q   How many years had Erie County been using
25   this box?

Page 113

1        A   I don't recall.
2        Q   Is there any languages in the Act 77 which
3    authorizes the use of other secure ballot collection
4    locations?
5        A   I don't believe the statute explicitly
6    provides for the use of that.  But it does authorize
7    the county commissioners, or whoever the authority is
8    to provide for small county election offices.
9        And again, it provides each county board of
10   elections the general authority to issue rules and
11   regulations for voting machine custodian for poll
12   workers as well as for electors.
13       But in this case, I believe the county
14   board of elections has the authority to -- for
15   alternative means for individuals to return their
16   ballots in person to the custody of the county board
17   of elections.
18       The county board of elections isn't a
19   place.  It's a body.
20       Q   Isn't it true that the Pennsylvania
21   Department of State website identifies the addresses
22   for each of the county boards of election?
23       A   Yes.  It identifies the address for each
24   county boards of election.
25       Q   Isn't it also true that on the application

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

30 (Pages 114 to 117)

Page 114

1   **to submit your mail-in ballot, the county -- the**
2   **Pennsylvania Department of State website identifies,**
3   **again, the address for the county board of election?**
4       A    It provides the mailing address for the
5   county board of elections, yes.
6       **Q    Isn't it also true that on the ballot, the**
7   **return envelope for the ballot, there is again the**
8   **return address for the county board of elections.**
9   **Correct?**
10      A    That's correct.
11      **Q    Now, prior to Act 77, if it's your belief**
12  **county boards of election could adopt or enact other**
13  **location, why wasn't it done before Act 77?**
14          MR. BRIER:  Objection to form.  And
15      objection to the hypothetical.  How does he know
16      why 67 counties do things?
17      **Q    You can answer my question.**
18      A    I mean, I'm not sure Act 77 was the
19  trigger.  But certainly Act 77 providing for mail-in
20  balloting increased the percentage of ballots that
21  would be coming in by mail or in person.
22          COVID-19, I think, was really the trigger
23  in a lot of counties, because we expected a larger
24  volume as a result of the General Assembly's enactment
25  of mail-in balloting and Act 77.

Page 115

1           I don't think anybody anticipated that by
2   the middle of March, we would be in the midst of a
3   global pandemic that would significantly impact
4   voters' attitudes about showing up in person to vote
5   on Election Day.
6           So certainly, the volume, which in the
7   primary was well over a million voters who availed
8   themselves of that option created some statistical
9   challenges for counties and for voters, and counties
10  appropriately responded to that need.
11      **Q    Is there any pandemic exception under the**
12  **election code?**
13      A    Any pandemic exception to what?
14      **Q    To the provisions of the election code?**
15      A    I don't know that there are any
16  emergency -- aside from those defined in Act 12
17  enacted earlier this year, that were temporary
18  provisions, I am not aware of any pandemic related
19  exceptions in the election code.
20      **Q    Can you point to me the specific language**
21  **in the election code which authorizes the county board**
22  **of election to use other secured locations, collection**
23  **locations?  Are those words anywhere found in the**
24  **election code?**
25          MR. BRIER:  This has been asked and

Page 116

1   answered.
2       A    The answer is no.  That term is not used in
3   the election code.  But the county within their
4   discretion can provide for other county election
5   offices, and can provide for rules and regulations
6   governing how electors return their ballots.  I
7   believe that is within the purview of the county board
8   of elections.
9           MR. BRIER:  Ron, it is almost 12:30.  Do
10      you want to take a break?  What are your plans?
11      We can go off the record if you want.
12      **Q    Let me finish with this particular**
13  **document.  Then we will take a break.**
14          **As I understand your testimony, Mr. Marks,**
15  **you are relying on the provision under the county**
16  **board of election powers, 2642F, to make rules,**
17  **regulations and policies.  Correct?**
18          MR. BRIER:  Objection to form.
19      A    That is -- yes, again, I'm not the
20  attorney.  But yes, that is my layman's understanding
21  of that provision.
22          And also the provision that provides for
23  the county to -- in addition to office at the county
24  seat, to provide for other offices, as they deem
25  necessary throughout the county.

Page 117

1       **Q    And is that a provision in the election**
2   **code?**
3       A    It is.  Yes.
4       **Q    What section of the election code provides**
5   **for that?**
6       A    You are quizzing me now, counselor.
7           It's in the section, I believe, that talks
8   about expenses of the county board of elections.  And
9   it basically imposes upon the -- I don't recall the
10  section number.
11          But it imposes upon whoever holds the purse
12  strings in the county to provide for offices not only
13  in facilities not only at the county seat, but also at
14  other such locations as the county deems necessary.
15      **Q    On page 5 at the bottom, in addition to the**
16  **reference to other secure ballot locations, you then**
17  **say, quote, "If a county decides to provide for other**
18  **ballot collection locations, the county should**
19  **consider the following best practices."  Correct?**
20      A    Correct.
21      **Q    And those practices are then bullet pointed**
22  **on page 6 of the document.  Correct?**
23      A    That's correct.  Yes.
24      **Q    And there are seven bullet points that the**
25  **Department of Transportation -- the Department of**

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 122

1    Notaries.
2         It also includes folks in the executive
3    office and our Office of Chief Counsel.
4         MR. BRIER:  Ron, how about time for a
5    break?
6         Q    One last question.  With regard to this
7    January 10, 2020 guidance, at that time COVID wasn't
8    an issue.  Was it?
9         A    It was not.  No.
10        Q    And so the motivation for the other secure
11   collection locations had nothing to do with COVID.
12   Correct?
13        A    Correct.  It would have been the Act 77.
14        Q    There is nothing, though, in Act 77 that
15   expressly uses the word "other secure collection
16   locations," correct?
17        A    Correct.
18             I mean, I think we reviewed this.  Your
19   earlier question was about why the counties that used
20   these, why these weren't used more broadly in the
21   past.  And I believe the trigger for that was COVID.
22             The trigger for this guidance was Act 77,
23   just to make sure I'm clear about the distinction.
24        MR. BRIER:  Let's take a break.
25        MR. HICKS:  Half hour?  45 minutes?

Page 123

1         MR. BRIER:  Yes.  Do you have any sense how
2    long you are going to go?
3         VIDEOGRAPHER:  Stand by.  Off the record.
4    The time is 12:35 and 56 seconds.
5             (Thereupon, a luncheon recess was taken
6    from 12:35 p.m. until 1:15 p.m.)
7                         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1         A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N
2         VIDEOGRAPHER:  We are now back on the
3    record.  The time is 1:15 and 42 seconds.
4         Q    Good afternoon, Mr. Marks.
5         A    Good afternoon.
6         Q    When we broke for lunch, you were talking
7    about one of the reasons for the basis for the January
8    10th, 2020 guidance was your belief that the expense
9    provision of the election code authorized the use of
10   drop boxes.
11             Let me show you what has been marked as
12   Exhibit 16.
13             (Thereupon, Exhibit No. 16 was marked for
14   identification.)
15        Q    You have the election code in front of you.
16   It's a copy of codified section 2645.
17             Mr. Marks, can you tell me which provisions
18   of -- first off, is section 2645 the section that you
19   were referring to earlier this morning in terms of a
20   justification for the use of drop boxes by county
21   board of elections?
22        A    Yes.  2645 is the section I was referring
23   to.
24        Q    What particular language in 2645 are you
25   relying upon as a justification for the county board

Page 125

1    of elections to use drop boxes?
2         A    It doesn't explicitly reference drop boxes.
3    But I think, as I said earlier, the counties' general
4    authority in 2642, as well as this, which provides --
5    it is actually subsection B.
6             The commissioners or other appropriate
7    authorities of the county shall provide the county
8    board with suitable and adequate offices at the county
9    seat, properly furnished for keeping its records,
10   holding its public sessions and otherwise performing
11   its public duties.  And shall, also, provide such
12   branch offices for the board in cities other than the
13   county seat as may be necessary.
14        Q    So under that section, which is subsection
15   B of 2645, that is the county commissioners are
16   basically ordered to provide both at the county seat
17   and at branch offices suitable and adequate offices.
18   Correct?
19        A    Yes.  That's correct.
20        Q    And those offices are necessary, they have
21   to be properly furnished for keeping of records,
22   holding public sessions, and otherwise performing the
23   board's public duties.  Correct?
24        A    That's correct.  Yes.
25        Q    Where does it say in there that drop boxes

Page 126

1  can be used in other locations outside the county
2  board of elections' office?
3      A   As I said, it doesn't explicitly reference
4  drop boxes.  This is sort of the underpinning for the
5  idea of county election offices, plural, as opposed to
6  singular.
7          So I would point that to the general
8  authority of the county board of elections at 2642
9  regarding rules and regulations.
10         I mean, I will concede you are not going to
11  find the term "drop box" here or another section of
12  the election code.
13     Q   Nor do we see the word "other collection
14  locations."  Correct?
15     A   Correct.
16     Q   What 2645B refers to is setting up branch
17  offices that are fully furnished for the keeping of
18  records, holding public sessions.
19         Correct?
20         MR. BRIER:  Objection.  That is not what it
21  provides.  You are asking him for a legal
22  opinion.
23         MR. HICKS:  Objection is noted.
24         MR. BRIER:  That is not what the statute
25  says.

Page 127

1      A   I won't provide a legal opinion.  But I
2  don't think it says fully furnished.  It says such
3  branch offices for the board in cities other than the
4  county seat, as may be necessary.
5      Q   But it does require these offices be
6  established for the keeping of records and holding of
7  public sessions, correct?
8          MR. BRIER:  Objection.  You are asking him
9  a legal opinion.
10         MR. HICKS:  This is the Deputy Secretary of
11  elections and commissions.  He already
12  established he reads the election code, and he
13  interprets it.  I'm asking him for his
14  interpretation.
15     Q   You understand I am not asking you as a
16  lawyer.  I'm asking you as Deputy Secretary of
17  elections and commissions in Pennsylvania.
18     A   Yes.  I can tell you my understanding.  My
19  understanding is that this does not require that these
20  branch offices be set up to hold -- keep records, hold
21  public sessions.  I don't think this imposes that in
22  all branch offices.  I'm kind of using a common sense
23  approach to this.
24         MR. BRIER:  You answered the question.
25     Q   Would you agree with me an office is

Page 128

1  generally something that is staffed?
2      A   Generally, yes.
3      Q   An office is not a drop box.  Correct?
4          MR. BRIER:  Objection.  He explained his
5  rationale.
6      Q   I asked the question.  An office is not a
7  drop box.  Correct?
8      A   Correct.
9      Q   A drop box is not an office.  Correct?
10     A   Correct.
11     Q   How many counties in Pennsylvania have
12  branch offices for their county board of elections?
13     A   I don't know off the top of my head how
14  many counties have branch offices.  I know many
15  counties have -- they will have a main county board of
16  elections office at the county courthouse, voter
17  registration, or some other portion of the county's
18  election activities housed in an administrative -- I'm
19  hearing a lot of background noise, I'm not sure if you
20  are getting my answer.
21     Q   I am.
22         MR. BRIER:  I think you answered.
23     A   I think if he heard my answer.
24     Q   When the January 10th, 2020 guidance was
25  rolled out not everyone in the Pennsylvania Department

Page 129

1  of State was made aware of the fact that counties were
2  being told that they could use drop boxes to collect
3  absentee and mail-in ballots.
4          Isn't that correct?
5      A   You are asking whether everyone that works
6  in the Department of State was aware of the guidance?
7      Q   Yes.  I will narrow it down.  Everybody who
8  had an either direct or indirect report to you within
9  those three bureaus.
10     A   I don't know that for sure.  But that may
11  be true.
12     Q   We saw earlier in the morning that there
13  was a gentleman by the name of Adam Yake.  Are you
14  familiar with him?
15     A   I am, yes.
16     Q   How long has Mr. Yake been working at the
17  Department of State and the Bureau of Elections and
18  Notaries?
19     A   I believe he has been working for the
20  Department in that position for probably 17 or 18
21  years.
22     Q   So he has been at the Department the same
23  time you have been there?
24     A   Well, I am dating myself.  I was actually
25  at the Department nine years earlier working in the

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

38 (Pages 146 to 149)

Page 146

1      Did I read that correctly?
2    A    You did.  Yes.
3    Q    What specs did you provide to Ms. McKinley
4  prior to May 8th, 2020?
5    A    I don't recall that I did.  It says "with
6  the specs you, DOS, provided."  So she was referring
7  to something provided by the Department.
8    Q    What specs were provided by the Department
9  to Ms. McKinley prior to May 8, 2020?
10   A    I don't know if she was referring to
11  guidance from January 10th, or something else.
12   Q    Your reply message is on the second page of
13  the exhibit.
14      Correct?
15   A    Correct.
16   Q    And you sent that on May 14th, 2020 at
17  1:30 p.m.
18      Correct?
19   A    Correct.
20   Q    You included Mr. Moser in that reply
21  message.  Correct?
22   A    Yes.  I replied to all.
23   Q    Your reply says, quote, "I'm sorry that
24  this got lost in the shuffle.  Your description gives
25  me confidence that this complies with the election

Page 147

1  code and our guidance related to additional county
2  election offices.  It appears to have robust security
3  in place to prevent attempts at tampering as well."
4      Did I read that correctly?
5    A    Correct.
6    Q    Now, is there anything in the message that
7  was provided to you by Ms. McKinley, or in your reply
8  to her that discusses preventing third party delivery
9  of non-disabled voter ballots to this drop box?
10   A    No.  I don't see any reference to that in
11  this email thread.
12   Q    But you do say on May 14th that you refer
13  to the ballot drop box as a, quote, "additional county
14  election office," end quote.  Correct?
15   A    I say that your description gives me
16  confidence this complies with the election code and
17  our guidance related to additional county election
18  offices.
19   Q    Were you intending to imply that a ballot
20  drop box is an additional county election office?
21   A    I don't know that I was intending to imply
22  that.  No.
23   Q    If we take a look at the first page.  This
24  is a subsequent email message you sent back to
25  Ms. McKinley.  Correct?

Page 148

1    A    Correct.
2    Q    And in this message Mr. Moser is not on the
3  email chain.  Correct?
4    A    That's correct.  Yes.
5    Q    Your message to Ms. McKinley says -- that
6  you sent on May 19th at 8:48 p.m.  You say, quote, "I
7  wanted to follow up about the drop box to make sure
8  that the county has also ensured that there is
9  physical security such as locks and tamper evident
10  seals, and that only authorized election officials
11  designated by the county board of elections have
12  access to the keys.  What chain of custody will be in
13  place to ensure that ballots are properly secured when
14  they are removed from the drop box?"
15      Did I read that correctly?
16   A    You did.  Yes.
17   Q    What caused you to send this additional
18  message to Ms. McKinley between May 14th and May 19th?
19   A    Well, just going back through the thread, I
20  am imagining that I was curious about the process the
21  county would give.  So she described the drop box
22  itself in the previous thread that there was not a
23  description of the chain of custody.  So I imagine I
24  wanted to follow up to get additional information
25  about how the county was going about ensuring that

Page 149

1  that was in place.
2    Q    And the additional issue you raised on May
3  19th did not involve what efforts Centre County was
4  going to take to prohibit third party delivery of
5  non-disabled voter ballots.  Correct?
6    A    That's correct.  Yes.
7    Q    Did you ever get a reply from Ms. McKinley
8  to your May 19, 2020 email message?
9    A    I don't recall if I got a written reply.
10   Q    If you could pull up JM22?
11      (Thereupon, Exhibit No. 20 was marked for
12  identification.)
13   Q    We will mark this as Exhibit 20.
14      Mr. Marks, this is a photo we found online
15  in the Centre Daily News.  Do you recall, or does this
16  picture of the Centre County ballot drop box look
17  familiar to you?
18   A    I don't recall if this specific picture
19  looks familiar to me.
20   Q    Do you know whether this drop box --
21   A    Drop boxes look the same.
22      Yes, this appears to be the drop box in
23  front of the administration building in Centre County.
24  It fits the description in the email thread.
25   Q    Is this the drop box that you approved in

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 150

1  May 2020 for Centre County to use?
2      A    This is a drop box that Centre County
3  contacted us about.  It appears to be, anyway.
4      Q    Do you agree with me that this drop box has
5  no means to prevent anyone from delivering more than
6  their own ballot?
7      A    I'm not sure I understand the question.
8          MR. BRIER:  If you don't understand it, ask
9  him to rephrase it.
10     A    Could you rephrase the question?
11     Q    Is there anything in this drop box which
12 prohibits someone from delivering more than one ballot
13 at a time?
14     A    I know these drop boxes are designed --
15 they are not designed to take large packages.  They
16 are designed for mail.  So I would expect if somebody
17 tried to insert multiple ballots, they would have to
18 open the door and close it several times.
19     Q    For example, there is nothing on this
20 particular ballot drop box that requires whoever is
21 approaching the ballot box to key in a voter ID that
22 is keyed directly to the voter of that ballot.
23 Correct?
24     A    No.  There is no -- it's a drop box.  And
25 as I understand it, based on her description, it was

Page 151

1  monitored by video surveillance camera, which I don't
2  think is captured in this picture.
3      Q    Well, anything on the video surveillance
4  camera, would that have stopped anybody from coming up
5  and dropping off more than one ballot in the box at a
6  time?
7      A    Would it have physically prevented them
8  from doing that?
9      Q    Correct.  Do you see anything that would
10 prohibit a person from coming up to this box and
11 dropping in more than one ballot?
12     A    Again, I don't see anything that would
13 physically prevent somebody from putting more than one
14 ballot into the ballot drop box.
15     Q    You mentioned that this particular box had
16 a video surveillance camera.  Have you ever seen the
17 video surveillance of this particular box during its
18 time of usage?
19     A    I have not.  No.
20     Q    Have you requested Centre County or any
21 other county that had video surveillance to provide
22 copies of those video surveillance tapes to the
23 Department of State, so they could be reviewed?
24     A    We have not requested that, to my
25 knowledge.

Page 152

1      Q    This particular drop box appears to be set
2  outside.  Is that correct?
3      A    Yes.  It appears to be outside.  My
4  understanding, again, based on the description in the
5  email is it was directly outside the administrative
6  office building where the board -- where the board of
7  elections offices are contained.
8      Q    Is there anything in this drop box that
9  would prevent somebody from spilling liquids into the
10 drop box?
11     A    It would be hard.  But it wouldn't be
12 impossible to put liquids in.  It is designed very
13 much like a mailbox, in that it is designed to accept
14 flat envelopes.  But I couldn't say that it would be
15 impossible to put liquid in the box.
16     Q    You agree with me that not all of the
17 counties that use drop boxes had boxes that were
18 similar to Centre County.  Correct?
19         MR. BRIER:  I am sorry.  I object to form.
20 You lost me.  Could you rephrase it, please?
21     Q    Sure.  You agree with me that there was not
22 one standard drop box being used throughout the
23 Commonwealth during the 2020 primary.  Correct?
24     A    That's correct.  Yes.  There are a variety
25 of different drop box designs that are suitable for

Page 153

1  the purpose.  Some obviously are much larger than
2  others depending on the volume.  But yes, that is
3  correct.
4      Q    Let me show you what we will mark Exhibit
5  21.
6          MR. BRIER:  JM23.
7          (Thereupon, Exhibit No. 21 was marked for
8  identification.)
9      Q    JM23 is a photograph involving Erie County
10 drop box.  Located outside the Erie County courthouse.
11         Have you seen this picture before?
12     A    I have.  Yes.
13     Q    According to the photo caption it says this
14 is Erie County's new drop box for mailed ballots
15 located outside the Erie County courthouse on West
16 Sixth Street.  Does that comport with your knowledge
17 as to where this particular box was placed?
18     A    It does.  Yes.
19     Q    Now, this is not the box that you had
20 mentioned previously that Erie County had inside its
21 offices.  Correct?
22     A    That's correct.  Yes.
23     Q    The drop box that Erie County had used
24 prior to 2020 was inside its office in view of its
25 election personnel.  Correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

40 (Pages 154 to 157)

Page 154

1    A    As I recall, it was a number of years ago.
2  But as I recall, it was attached sort of like to the
3  front counter of the office where election staff were
4  housed.  Yes.
5    Q    Is there anything in this Erie County drop
6  box, that is located outside the Erie County
7  courthouse, which would prevent a person from
8  delivering more than one ballot to the drop box?
9    A    There is nothing that would physically
10  prevent somebody from delivering more than one ballot
11  to the drop box.
12    Q    This particular -- would you agree with me
13  it looks a little weathered and worn?
14    MR. BRIER:  Objection.  Not by Scranton's
15  standards.
16    A    Yes.  It appears to be a used -- does not
17  appear to be brand new.  If that is what you are
18  asking.
19    Q    Do you know from which manufacturer Erie
20  County received this particular box?
21    A    I don't recall which manufacturer.
22    Q    Did you approve this box before it was used
23  by Erie County?
24    A    The county did notify us.  And we did in
25  discussing with the county were assured the county

Page 155

1  took every necessary step to make sure -- I'm hearing
2  a lot of background noise again.
3    But yes, we were, after those discussions,
4  we were assured that the county was taking every step
5  necessary to ensure that the drop box was secure.
6    Q    Do you know whether Erie County had video
7  surveillance on that drop box?
8    A    I believe they did.  Because it is directly
9  in front of their office.  I believe it was subject to
10  video surveillance.  But I would have to doublecheck
11  that.  I don't think it is mentioned explicitly in
12  this news article.
13    Q    As you sit here today, do you recall
14  reviewing any video surveillance tapes of the Erie
15  County drop box?
16    A    I do not.
17    Q    Let me show you what we will mark Exhibit
18  22.  Ray, if you could pull up JM24.
19    (Thereupon, Exhibit No. 22 was marked for
20  identification.)
21    Q    Mr. Marks, are you aware this is a document
22  also for the record that was produced by Bedford
23  County board of election at BED12?  Have you seen this
24  photograph or this box before today?
25    A    I don't recall seeing this.  No.

Page 156

1    Q    Is this a drop box that the Department of
2  State approved for use by Bedford County?
3    A    I don't believe the Department, at least my
4  own recollection the Department did not receive
5  information about this or review this.
6    Q    You agree with me this particular box is
7  less secure than the boxes that were being used by
8  Centre County and Erie?
9    A    I don't know that I can tell that entirely
10  from this picture.  It is certainly of a different
11  type.  It appears to be a ballot box that would be
12  used in a polling place.  So it would have some --
13  many of the security features -- same security
14  features as the drop boxes we just recently reviewed.
15    I don't know whether it is fastened to --
16  it's hard to tell from this picture whether it is
17  fastened to anything.  It is certainly different than
18  the two we just reviewed.
19    Q    Do you know whether the Bedford County drop
20  box was located inside or outside the building?
21    A    I don't know.  I can't really tell from
22  this picture.
23    Q    You agree with me there is nothing on this
24  particular drop box that would prevent somebody from
25  returning more than one ballot for a non-disabled

Page 157

1  voter?
2    A    Correct.  There is nothing that would
3  physically prevent somebody from doing that.  Yes.
4    Q    If you could go back to Exhibit 18, Ray.
5  JM20.
6    Mr. Marks, in your email message to
7  Ms. Humphrey on May 20th, you have nine bulleted items
8  as to things that you suggested Bucks County consider
9  or keep in mind in order to provide a box for voters
10  to return their ballots in person.  Correct?
11    A    Correct.
12    Q    Missing from your bullet list was not only
13  the third party delivery, but there was also no
14  mention at this time that ballots should not be
15  returned after 8:00 p.m. on election night.  Correct?
16    A    Correct.  Yes.
17    Q    And did there come a time when you started
18  advising the county that they should also consider
19  making certain that they have systems in place to
20  ensure ballots are not dropped off after 8:00 p.m. on
21  election night?
22    A    Yes.  I am sure there was a time where we
23  reiterated that requirement.
24    Q    Let me show you what is marked as Exhibit
25  23, which will be JM25.

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

42 (Pages 162 to 165)

Page 162

1    non-disabled voters' ballots.
2        Q    Were you aware of the fact that
3    Philadelphia had placed signs on its drop boxes that
4    said voters must drop off their own ballot?
5        A    I did not get details about all of the
6    other locations. But my understanding was that yes,
7    they did provide signage that indicated that.
8        Q    Do you know whether or not that signage was
9    effective to stop third party delivery of non-disabled
10   voters' ballots?
11       A    I don't know whether it was effective or
12   not.
13       Q    Let me show you what has been marked
14   JM28 -- JM27. We will mark this Exhibit 24.
15           (Thereupon, Exhibit No. 24 was marked for
16   identification.)
17       Q    Mr. Marks, this is an article that was
18   dated August 16, 2020 in the Philadelphia Inquirer.
19   Do you see -- Ray, if you could move to the second
20   page and highlight the description under the photo.
21   Right underneath. There it is.
22           According to the description of the photo
23   it indicates a voter is preparing to drop off their
24   ballot into a drop box at Philadelphia city hall
25   during the May primary -- the wrong election.

Page 163

1            Did you understand that the drop box was --
2    one of the drop boxes Philadelphia was using was a
3    drop box at the Philadelphia city hall?
4        A    Yes.
5        Q    If you can take a look on the first page,
6    which shows the photograph.
7        A    Yes. I see the photograph.
8        Q    Do you see the fact that the voter has two
9    ballots in her hand?
10       A    I can't say for sure. But it looks like
11   she may have two documents in her hand. It's hard to
12   tell for certainty.
13       Q    Let's take a look at 28A then, which we
14   will mark Exhibit 25.
15           (Thereupon, Exhibit No. 25 was marked for
16   identification.)
17       Q    Exhibit 25 is a tweet posted outside of
18   Philadelphia city hall by a person who goes by the
19   name of the Foodie Barrister. Do you see that he
20   posted his location as being Philadelphia city hall,
21   correct?
22       A    Correct.
23       Q    In his hand, there is no question he is
24   holding two ballots. Correct?
25       A    Yes. He is holding two envelopes. They

Page 164

1    both appear to be ballot envelopes. Yes.
2        Q    He goes on to say "Doing my civic duty and
3    dropping off my votes," plural, "in a designated
4    ballot drop box in front of city hall."
5            Did I read that correctly?
6        A    I'm sorry, I'm missing that.
7        Q    Right below the photograph it says "doing
8    my civic duty and dropping off my votes in a
9    designated ballot drop box in front of city hall."
10       A    Yes. I see that.
11       Q    And the particular box that Philadelphia
12   was using actually looks like a mailbox. Correct?
13       A    Yes. Very much looks like a mailbox.
14       Q    There is nothing that stops a voter or any
15   person from dropping off more than one ballot at the
16   time -- at a time. Correct?
17       A    Just like a mailbox, there is nothing that
18   physically prevents someone from dropping off more
19   than one.
20       Q    There is also nothing with regard to a drop
21   box, at least with regard to these drop boxes that
22   were being used by the county, that required the
23   person, whenever they are dropping off their ballot,
24   in order to access the box to enter into any type of
25   voter specific code. Correct?

Page 165

1        A    That is the second time you said that. I
2    am trying to imagine. It sounds like you are
3    imagining there is some sort of key pad or something
4    else that would require the voter to enter a
5    credential.
6        Q    Correct.
7        A    I can confirm that that does not exist on
8    this box or the other ones we discussed.
9        Q    So in addition to the fact that this
10   particular box or the other boxes doesn't prohibit
11   somebody from dropping off more than one ballot at a
12   time, this particular type of system doesn't even
13   prevent a person from dropping off somebody else's
14   ballot without being questioned -- without question.
15   Correct?
16       A    Correct.
17       Q    Are you aware of the fact, for example, in
18   Colorado, are you aware of the fact in Colorado
19   whenever they go to vote, and they use drop boxes,
20   they are required to key in voter ID codes in order to
21   prevent third parties from delivering somebody else's
22   ballot and voting that ballot?
23       A    I'm not aware if that is universally true
24   in all jurisdictions in Colorado. But I do -- it is
25   my understanding that some of their drop box -- ballot

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

43 (Pages 166 to 169)

Page 166

1   drop off locations do have that additional
2   requirement.
3       Q   Is there any reason why the Department of
4   State didn't implement or require that type of
5   security to ensure that third party delivery of
6   ballots would not occur?
7       A   I don't know that the technology is widely
8   available.  I mean, I can't -- it is certainly an
9   interesting thing to look at.
10      Q   Would you agree with me when somebody casts
11  two ballots that don't belong to them, they diluted
12  the vote of somebody who only casts one ballot that
13  belongs to them?
14          MR. BRIER:  I object.  You may answer.
15      A   Again, I am not a lawyer.  I will agree
16  that if somebody casts their ballot and another
17  voter's ballot, that they are violating the election
18  code.
19      Q   Also diluting the vote of somebody who
20  properly complied with the election code.  Correct?
21          MR. BRIER:  He just answered the question.
22      Q   You can answer my question again.
23      A   I don't know that that directly dilutes the
24  vote of another -- as I understand it.  Again, I'm not
25  an attorney.  If my wife took my absentee ballot and

Page 167

1   drops it in the mail along with hers, I don't know
2   that I would consider that diluting my vote.  But it
3   certainly would not be authorized by the election
4   code.
5       Q   Let me show you what is marked JM28B.  We
6   will mark this as Exhibit 26.
7           (Thereupon, Exhibit No. 26 was marked for
8   identification.)
9       Q   This is another post we found online.  This
10  one here refers to the Montgomery County drop box at
11  One Montgomery Plaza.  Would you agree with me this
12  box looks very similar to the Centre County box?
13      A   Yes.  It does.
14      Q   According to the post, she indicates she
15  has voted for Cory and herself.  Correct?
16          MR. BRIER:  Objection.
17      A   No.  I don't think -- it says "Cory and I
18  voted."
19      Q   It says "I miss my sticker."  Correct?
20      A   Yes.
21      Q   She is referring to the fact when you vote
22  in person you get a sticker or a little card
23  indicating what your voter ID number was for that
24  particular day.  Correct?
25      A   I don't know that.  That is not what I

Page 168

1   would infer from that anyway.
2       I would infer she misses her "I voted"
3   sticker, which is just a little sticker that says I
4   voted.
5       Q   Do you agree with me the picture showed one
6   person's hand casting two ballots or placing two
7   ballots in the box?
8       A   It is difficult to say for certain.  But it
9   looks like there may be two documents there.
10      Q   Much like the Centre County box, there is
11  nothing that stops a person from dropping in more than
12  one ballot into the box at any given time.  Correct?
13      A   Again, yes.  Nothing that physically
14  prevents someone from dropping more than one ballot
15  in.
16      Q   And there is also nothing at the Morris
17  County drop box which requires a voter to put in any
18  type of unique voter ID so they can only deliver their
19  ballot as opposed to somebody else's ballot.  Correct?
20          MR. BRIER:  Objection.  I think you said
21  Morris County.
22      A   You meant Montgomery County?
23      Q   I'm sorry.  I meant Montgomery County.
24  Sorry.
25      A   That's correct.  Yes.

Page 169

1       Q   Mr. Marks, isn't it true that not all
2   county board of elections believe that the use of a
3   drop box was permitted or is permitted under the
4   election code?
5       A   I don't know that for sure.  But it would
6   not surprise me to learn.  I have been doing this for
7   a long time.  It is very rare all 67 county boards of
8   elections agree on anything.
9       Q   Isn't it important to make certain with
10  regard to delivery of ballots, that each of the
11  counties have uniform procedures on the collection and
12  return of those ballots?
13          MR. BRIER:  Objection.  You may answer.
14      A   It is.  And that is why we issue guidance
15  to counties to ensure that they are doing things
16  properly.
17      Q   Because if you don't have uniformity among
18  the collection and return of absentee and mail-in
19  ballots, you are violating the one person, one vote
20  rule.
21          Correct?
22          MR. BRIER:  Objection.  I think you are
23  asking for a legal opinion.  It is not a fair
24  question of this lay witness.
25      Q   I'm not asking a legal opinion.  This is

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

Page 186

1  executive board, which is made up of I forget how many
2  members. The county commissioners who serve as
3  members on the executive board. So I'm not sure -- I
4  don't know the answer to the question. If she is not
5  referring to the elections reform committee, I don't
6  know that she is.
7       MR. BRIER: You don't know.
8       THE WITNESS: I don't know.
9       Q   Following the agenda, then, there is a
10  document called "comments from Forrest Lehman,"
11  correct?
12      A   That's correct. Yes.
13      Q   And Mr. Lehman is the executive director --
14  the elections director for Lycoming County. Correct?
15      A   He is. Yes.
16      Q   And in the first paragraph of his comments
17  he refers to drop boxes. Correct?
18      A   Yes. Paragraph 1, he does.
19      Q   And the first comment he makes about drop
20  boxes is he said, quote, "It would be nice to have
21  clarity on the question of whether drop boxes are
22  permitted. I would prefer clarity from the
23  GA, General Assembly, but a court will do." Did I
24  read that correctly?
25      A   You did. Yes.

Page 187

1       Q   He then goes on to talk about aside from
2  the legality of the drop boxes, there are more, quote,
3  "troubling logistical problems posed by drop boxes."
4       Did I read that correctly?
5       A   You did. Yes.
6       Q   Part of those troubling logistical problems
7  that he raises was how was a county to keep a drop box
8  secure but accessible by voters. Correct?
9       A   Correct. Yes.
10      Q   He also talks about drop boxes could be a
11  target for political sabotage or mean-spirited
12  vandalism. Correct?
13      A   That's correct. Yes.
14      Q   He, in fact, references someone could pour
15  water into a drop box and ruin the ballots inside. He
16  also suggests bodily fluids, gasoline and a lit match.
17  Correct?
18      A   Correct.
19      Q   He even comments on the fact you can have
20  them monitored by a camera, but that isn't going to
21  stop the fact the ballots have gotten destroyed.
22  Correct?
23      A   Yes. That appears to be his proposition
24  there.
25      Q   He also suggests there is a problem with

Page 188

1  where to locate them, and how you make that decision,
2  whether it is based on geographical, political, racial
3  representation, urban versus rural, et cetera.
4       Correct?
5       A   Yes. Correct.
6       Q   And has anybody at the Department of State
7  ever taken a look at these concerns that were raised
8  by Mr. Lehman?
9       MR. BRIER: Let me just state an objection.
10  I think the witness testified that there is
11  nobody in the Department involved in this
12  meeting. And the witness did not author this
13  document.
14      Q   Objection is noted. You can answer my
15  question.
16      A   I don't know that -- these are a lot of
17  hypotheticals that are outlined here in this first
18  paragraph. Some more plausible than others. But we
19  have certainly learned lessons from the primary. We
20  also listened to concerns expressed to us by county
21  elected directors and are updating our guidance
22  accordingly.
23      Q   Well, has the Department of State, as we
24  sit here today, issued any guidances to address any of
25  the concerns Mr. Lehman has raised regarding drop

Page 189

1  boxes?
2       A   I believe we are about to issue updated
3  guidance related to, among other things, ballot drop
4  boxes based on lessons learned in the primary. Some
5  of these issues -- again, there are a lot of
6  hypotheticals here. So I can't, as I sit here, say
7  that it is going to point by point address each one of
8  these hypothetical things that could happen.
9       But I do believe it addresses many of the
10  questions counties have asked since the date of the
11  June 2nd primary.
12      Q   Is this new guidance going to address where
13  to locate these drop boxes and what factors are to be
14  used to make that decision?
15      MR. BRIER: I think the particulars are
16  part of deliberative process. So guidance will
17  be issued. You will have it. I don't think it
18  is appropriate to explore that until the
19  Secretary issues it.
20      Q   Is there any reason why the consideration
21  of where to locate them was not addressed back in
22  January 10, 2020, when the guidance came out then?
23      MR. BRIER: Objection. That invades
24  deliberative process. The guidance is what it
25  is. You have it. You are not entitled to

Page 198

1    A    Yes.  I am actually reading the article.  I
2  just want to make sure I am familiar with the specific
3  incident.
4    Q    Yes.
5        You see in the second paragraph it
6  indicates they discovered the ballots when they were
7  picking up the first ballot being returned for the
8  2020 presidential primary election?
9    A    Yes.  It says, "The letter stated the
10  ballots were discovered when picking up the first
11  ballots returned for the 2020 presidential primary
12  election," meaning what I am gathering from this is
13  that the drop box was not appropriately cleared from
14  the previous election.
15    Q    And then according to the next paragraph,
16  it indicates there were 574 ballots found in this drop
17  box, which was located right outside the Mesa County
18  central services building where the election office is
19  located.
20        Correct?
21    A    That's correct.  Yes.
22    Q    And then if you take a look at the last
23  page of the article, they have a copy of the drop box
24  that was at issue.
25    A    Yes.  There is a photo of presumably the --

Page 199

1  it seems to identify that is the drop box that is the
2  subject of this article.
3    Q    Did you have any conversations with anyone
4  in Colorado about how that occurred?  Or how this
5  issue occurred?
6    A    I don't recall having any conversations
7  with anyone in Colorado about this specific issue.
8    Q    Did you have any conversations with anyone
9  within your department to ensure that this type of
10  issue doesn't happen in Pennsylvania?
11    A    Well, yes.  I think, again, this issue
12  seemed to be a fairly sort of a no brainer election
13  administration issue.
14        And I think that is why we issued guidance
15  prior to the primary, and certainly will be
16  reaffirming it in updated guidance that counties have
17  to have proper chain of custody procedures in place
18  and document those procedures as they are implementing
19  drop boxes in their county.
20    Q    For the June 2020 primary in Pennsylvania,
21  did the Department of State maintain a list of those
22  counties that used drop boxes?
23    A    We did.  We posted a list on our website of
24  the counties who indicated to us that they were
25  providing drop boxes.

Page 200

1    Q    Let me show you what we will mark Exhibit
2  31.
3        (Thereupon, Exhibit No. 31 was marked for
4  identification.)
5    Q    JM33.
6        Mr. Marks, have you seen Exhibit 31 before?
7    A    Yes.  This appears to be a copy of
8  the list.
9    Q    How was this list compiled?
10    A    I believe it was compiled during outreach
11  directly with counties.
12    Q    Who conducted that outreach?
13    A    A variety of staff would have conducted the
14  outreach.
15    Q    When was this list actually published on
16  the Pennsylvania Department of State website?
17    A    I don't recall the exact date.
18  Unfortunately, it does not appear the list is dated.
19  But I believe it was probably within the last couple
20  of weeks prior to the June 2nd primary.
21    Q    Would there be any electronic data that
22  would identify precisely when it was posted on the
23  Pennsylvania Department of State website?
24    A    I would have to look into that, whether we
25  could ascertain exactly when it was posted.

Page 201

1    Q    Would you agree with me this list has been
2  removed from the Department of State website.
3  Correct?
4    A    That's correct.  It is no longer relevant.
5    Q    With regard to, for example, Allegheny
6  County, they maintain their drop box in the office
7  where the county election department is located.
8  Correct?
9    A    Yes.
10    Q    And that is the same, also, for Bedford and
11  Bucks.  Correct?
12    A    Correct.  Yes.
13    Q    Chester, on the other hand, had drop boxes
14  in locations where their county board of election
15  office was not located.  Correct?
16        MR. BRIER:  Objection.
17    A    Well, I will say Bedford, it has Bedford
18  County courthouse, but it appears it was actually at
19  or in the entrance of the parking garage next to the
20  courthouse.
21        But yes, Chester has a number of locations.
22  One being at their government services center.  One
23  being at a public safety training campus.
24    Q    Others, looks like three of them -- one was
25  in a parking lot.  Correct?  Two of them -- one was at

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

52 (Pages 202 to 205)

Page 202

1  Longwood Garden south parking lot.  Correct?
2      A    Correct.  Yes.
3      Q    Another one was at --
4      A    It appears that the one with Gardens, it
5  appears it is actually at a test site greeter station,
6  which would be I would imagine a small building at the
7  parking lot.
8      Q    Then there was also one at the Battle of
9  the Clouds parking lot.  Correct?
10     A    Correct.  Yes.
11     Q    So Bedford had theirs in a parking lot.
12  Correct?
13         MR. BRIER:  Objection.
14     A    It says -- Bedford County says parking
15  garage - second floor near courthouse entrance.  It
16  appears it was inside of a parking garage attached to
17  the courthouse.
18     Q    That particular one was one that was
19  accessible 24-7 according to the Pennsylvania
20  Department --
21     A    Yes.  According to the list, yes.
22     Q    Whereas, Allegheny County is only
23  accessible during business hours, correct, or certain
24  designated hours, correct?
25     A    Correct.  Yes.

Page 203

1      Q    Bucks County only had theirs available
2  three days from 7:00 a.m. to 7:00 p.m.  Correct?
3      A    Yes.  That appears to be the case.
4      Q    And Chester County also had time
5  limitations on when their particular drop boxes were
6  available.  Correct?
7      A    Correct.  I'm sorry, that is not correct.
8  The first one in reading this, the one at the county
9  government services center was 24-7.  The other
10  locations have specific hours.
11     Q    Clinton County had its drop box right
12  outside its elections office, correct?
13     A    You said Clinton County?
14     Q    Yes.
15     A    Yes.
16     Q    It indicates it was available 24-7.
17  Correct?
18     A    Correct.
19     Q    Are you aware whether or not Clinton County
20  had someone watching that box the entire time?  24
21  hours, seven days a week?
22     A    I do not know.  No.
23     Q    Luzerne indicates that they had a drop box
24  in Wilkes-Barre Penn Place, 2 North Pennsylvania
25  Avenue, correct?

Page 204

1      A    Yes.  At Penn Place.  In Wilkes-Barre.
2  Yes.
3      Q    That is not the county board of election
4  office.  Correct?
5      A    I would have to -- I would have to check.
6  But I don't believe that is where their county
7  election office is located.
8         MR. BRIER:  I actually believe that is
9  where it is located.  I have been there.
10     Q    In addition they indicate they had two drop
11  box counters both at post offices.  Correct?
12     A    Yes.  That appears to be the indication
13  here.  Hazleton and Wilkes-barre post offices.
14     Q    Do you know whether or not those drop off
15  counters were manned by anybody from the county board
16  of elections?
17     A    If they were staffed around the clock or
18  during business hours for the post office, I don't
19  know that.
20     Q    Taking a look at Montgomery County, is
21  there, in any of the ten addresses that they identify
22  where they place drop boxes, the address for the
23  Montgomery County board of election?
24     A    The Swede Street address in Norristown
25  sounds familiar.  It may be.  I don't know if that is

Page 205

1  where their main office is.  But I believe that is one
2  of their county offices.
3      Q    What about at Montgomery County community
4  connections office, is that a county board of election
5  office?
6      A    It may be a county facility.
7      Q    It's not the county board of election
8  office, is it?
9      A    I don't know it is the main county board of
10  election office.  I don't know whether there are other
11  county offices inside there other than what is listed
12  in the name.
13     Q    What about Green Lane Park, is that an
14  office for county board of election?
15     A    I would -- I don't know.  I would expect it
16  is not.
17     Q    What about Spring Mill Fire Company, is
18  that an office of a county board of election?
19     A    No.  That would be a fire hall as I
20  understand it.
21     Q    What about Wall Park on 600 Church Road, is
22  that a county board of election office for Montgomery
23  County?
24     A    I don't believe so, no.
25     Q    Go down to Philadelphia.  You see a number

Page 206

1   of both mobile dropoff locations as well as dropoff
2   offices, correct?
3       A   Correct, yes.
4       Q   When did Department of State learn that
5   Philadelphia was doing mobile dropoff locations?
6       A   It was some time after the May I believe
7   24th email regarding the drop box at city hall.
8       Q   Would you agree with me this list wasn't
9   posted on the Pennsylvania Department of State website
10  until some time after May 24th, after that
11  conversation?
12      A   I don't know if the list was posted after
13  that. But I don't expect that the Philadelphia County
14  specific information at the bottom of this list would
15  have been posted prior to then.
16      Q   According to the Philadelphia mobile
17  dropoff locations, there were ten mobile dropoff
18  locations, correct?
19      A   Correct.
20      Q   Those locations consisted of high schools,
21  shopping centers and a PLA center.  Correct?
22      A   Correct.  As I understand it, this was a
23  mobile dropoff that would move from one location to
24  the other throughout the city at specific dates and
25  times.

Page 207

1       Q   None of other locations identified on the
2   mobile dropoff location represent an office of the
3   county board of elections for Philadelphia County,
4   correct?
5       A   I don't believe so, no.
6       Q   Taking a look at the drop off locations
7   underneath that, there is represented to be ten drop
8   off boxes that were used in Philadelphia on Election
9   Day.
10          Correct?
11      A   Correct.
12      Q   Only one of those drop boxes was at the
13  city commissioner's office.  Correct?
14      A   Correct.  Yes.
15      Q   I think you testified earlier that the
16  Philadelphia city commissioner's office is the board
17  of elections in Philadelphia County.  Correct?
18          MR. BRIER:  Objection.
19      A   No.  The city commissioners are the board
20  of election.  But the city commissioner's office
21  obviously houses the board members.
22      Q   So the address that appears there at city
23  commissioner's offers, that is not the address for the
24  Philadelphia County board of elections?
25      A   It is the mailing address and physical

Page 208

1   location for the city commissioner's office, yes.
2       Q   If somebody wanted to return their ballot,
3   the address that would be -- that was imprinted on the
4   outside declaration envelope would be 520 North
5   Columbus Boulevard.  Correct?
6       A   I don't know if that is correct.  I would
7   have to look at the envelope.  I know some counties
8   actually have a P.O. Box that their mail goes to,
9   which may be different than the physical address.  I
10  am not -- I don't recall if that was the case in
11  Philadelphia or not.
12      Q   The other district offices where drop boxes
13  were located involved schools and libraries.  Correct?
14      A   Yes.
15      Q   It shows three libraries, a couple schools,
16  and a rec center.  Correct?
17      A   Correct.
18      Q   Also drop boxes were placed at elected
19  officials' district offices, correct?
20      A   Yes.
21      Q   And you understand under the election code
22  that if this was in-person voting, these types of
23  places would not be considered appropriate polling
24  places under the election code.  Correct?
25          MR. BRIER:  Objection.

Page 209

1       A   Yes.  If you are asking whether -- are you
2   talking about the entire list?  Or are you talking
3   about the elected officials' district offices,
4   specifically?
5       Q   Talking about specifically the election
6   officials' offices.
7       A   That is correct.  They could not serve as a
8   polling place.
9       Q   In fact, it is expressly banned under the
10  election code to have a polling place at elected
11  officials' offices, correct?
12      A   Correct.
13      Q   It is also banned under the election code
14  to have elections or a polling place located in a
15  parking lot.  Correct?
16      A   I don't know that that is the case.  I
17  think it is banned -- I think the term is vacant lot.
18  I don't know that I would consider a parking lot a
19  vacant lot.
20      Q   Has Pennsylvania ever conducted an election
21  in a parking lot?  Voting in a parking lot?
22      A   I don't recall.  I know the election code
23  does provide for the use of temporary polling places,
24  which could be staged in a parking lot.  I don't
25  recall, I know Mercer County was looking at that in

Page 226

1   was appropriate for the board to count them or not.
2   I mean, every board of elections certainly
3   has the authority to adjudicate these matters and to
4   make decisions. And those can be appealed. Those
5   decisions, whatever they are, can be appealed to the
6   Court of Common Pleas. That is how the process works.
7       Q   Do you agree with me that under the
8   **election code as amended by Act 77, electors were told**
9   **to deliver their ballots to the county board of**
10  **election by 8:00 p.m. on election night?**
11      A   I agree that the election code sets the
12  deadline for counties to receive voted ballots --
13  voted absentee and mail-in ballots at 8:00 p.m. on the
14  night of the election.
15      Q   **Doesn't the election code also set the**
16  **place of delivery, which is the county boards of**
17  **elections office, correct?**
18      A   Again, I will go back to the beginning, I
19  don't know that necessarily is a place. The county
20  board of elections is a body, that may have multiple
21  places where you can turn your ballot over to the
22  custody of the county board of elections.
23      Q   **Are you suggesting that the polling place**
24  **is a place where people can return their absentee and**
25  **mail-in ballots on Election Day?**

Page 227

1       A   I am not suggesting that. What I am
2   suggesting is that the county board of elections may
3   designate locations where electors can return their
4   ballots. And if they designate the polling place as a
5   location to return their ballots, then it would be
6   appropriate under that circumstance.
7           You are showing me two bullet points here
8   and asking me to infer a whole lot of information
9   about the circumstances surrounding two mail-in
10  ballots in Mifflin County.
11          I don't have the information necessary to
12  determine whether I agree with the board's decision to
13  count them or not. What I will say is it's the board
14  decision, not mine.
15      Q   **We also don't know who turned in these**
16  **ballots or gave them to someone at the polling**
17  **location, correct?**
18      A   That's right. None of that information is
19  in this email.
20      Q   **And during the June 2020 primary we do**
21  **know, however, Mifflin County did not designate**
22  **polling places as a place for where absentee and**
23  **mail-in ballots could be returned. Correct?**
24      A   Are we referring back now to the list of
25  drop boxes that was posted on our website?

Page 228

1       Q   **I am just asking the question. I'm not**
2   **aware of Mifflin County making an edict that absentee**
3   **mail-in ballots could be delivered during the June**
4   **2020 primary at polling places, are you aware of that?**
5       A   You and I both. I am also not aware of
6   that.
7       Q   **So we talked previously about whether the**
8   **Department of State had published any standards to**
9   **ensure that the 67 counties followed the same rules**
10  **concerning counting of absentee or mail-in ballots.**
11          **You do know that in May you did, in fact,**
12  **issue a directive to all the county boards with regard**
13  **to the inner secrecy envelope. Correct?**
14      A   I issued an email to the counties
15  that provided the Department's opinion on the question
16  of whether those ballots should be counted or not.
17      Q   **What prompted you to issue that email?**
18      A   As I recall, there was a discussion going
19  on that we talked about earlier. And I was alerted by
20  actually I believe it was Jerry Feaser of Dauphin
21  County, that there there was a difference of opinion
22  on that matter.
23          And he believed that it might be necessary
24  for the Department to weigh in. And I heard, I think,
25  from a couple of additional counties, that there

Page 229

1   was some confusion on that point.
2       Q   **Did you talk to any of the counties before**
3   **you issued your May 28, 2020 email?**
4       A   I can't recall who I talked to in addition
5   to Gary Feaser. I may have spoken to -- I may have
6   spoken to Forrest Lehman, I don't recall. I think I
7   may have spoken to at least one other county. But
8   more importantly, I consulted with our legal counsel
9   just to make sure that my understanding of the
10  relevant case law was correct.
11      Q   **And before issuing your May 28th, 2020**
12  **email, were you aware of the fact that in**
13  **Philadelphia, they have for years counted ballots that**
14  **did not contain an inner secrecy envelope?**
15      A   I don't recall taking count of which county
16  did or didn't. My understanding, at least my
17  perception at that moment was that the majority of
18  counties did decide to count them.
19      Q   **Did you know that before you sent out your**
20  **May 28th, 2020 letter, or are you talking about after**
21  **you sent out your May 28, 2020 email?**
22      A   My perception at the time was that the
23  majority of counties counted them at the time I sent
24  them out. Based on my conversation with Jerry and the
25  discussion on the Listserv, what I gathered was the

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

59 (Pages 230 to 233)

## Page 230

1  majority of counties counted them.
2  **Q   Did you take a survey of the counties to**
3  **confirm that?**
4  A   I did not take a survey of the counties.
5  Once I discussed with our legal counsel, and we were
6  firmly convinced that it was appropriate under that
7  circumstance for the county to count the ballot, we
8  did not survey the counties.  We provided our opinion.
9  It is there in writing.
10  **Q   Were you aware of the fact that, for**
11  **example, Allegheny County has historically not counted**
12  **those ballots?**
13  A   I was not aware of it at the time I sent
14  the email.  No.
15  **Q   Are you aware of that now?**
16  A   I am.  Yes.
17  **Q   Let me show you what we will mark Exhibit**
18  **35.**
19  **(Thereupon, Exhibit No. 35 was marked for**
20  **identification.)**
21  **Q   Ray, could you pull up JM38?**
22  **For the record, Exhibit 35 is a document**
23  **that was previously -- that was produced by the**
24  **Department of State or by the Secretary and marked**
25  **PADOS539-1 through 4.**

## Page 231

1  **Is Exhibit 35 the email message you sent**
2  **out on May 28th, 2020 involving the inner secrecy**
3  **envelope issue?**
4  A   Yes.  It appears to be a copy of that
5  email.  Yes.
6  **Q   This particular email shows that you sent**
7  **it to yourself, and then a number of bcc:s.  Correct?**
8  A   Correct.  Yes.
9  **Q   All of the bcc: recipients are individuals**
10  **who work at each of the 67 county election**
11  **departments.  Correct?**
12  A   That's correct.  Yes.
13  **Q   You also sent it to Lisa Schaefer at the**
14  **CCAP.  Is that correct?**
15  A   Correct.  I typically send a courtesy copy
16  to CCAP when I am sending stuff out to the county
17  directors.
18  **Q   You also sent it to Michael Moser.**
19  **Correct?**
20  A   Yes.  Currently, we would copy internal
21  staff on these communications as well.
22  **Q   You also sent it to the Secretary,**
23  **Ms. Boockvar?**
24  A   Yes.  Correct.
25  **Q   Did the Secretary review the email before**

## Page 232

1  **it was sent out?**
2  A   Yes.  I believe she did.
3  **Q   And did you draft the email?  Or did**
4  **somebody else draft it for you?**
5  A   I drafted the email after consultation with
6  our legal counsel.
7  **Q   Who was the legal counsel you consulted?**
8  A   Well, I believe this one was assigned to
9  John Hartzell, one of our deputy counsel.
10  **Q   In your May 28, 2020 email, you bold in the**
11  **second paragraph, you say, "There is no statutory**
12  **requirement nor any statutory authority for setting**
13  **aside an absentee or mail-in ballot solely because the**
14  **voter forgot to properly insert it into the official**
15  **election envelope."  Correct?**
16  A   Correct.
17  **Q   You are assuming that the voter forgot to**
18  **insert the inner secrecy envelope.  Correct?**
19  A   Well, yes, I am assuming that the voter --
20  I'm not assuming that.  The question was what to do,
21  if the voter forgot, or for some other reason,
22  certainly I could see the circumstance where the voter
23  was never sent the secrecy envelope in the first
24  place.  So we covered both.
25  **Q   Does it also cover the fact of the ballot**

## Page 233

1  being placed in the hands of a third party, who opens
2  up the outer declaration envelope, throws out the
3  inner secrecy envelope with the ballot, and
4  substitutes it with a new ballot?
5  MR. BRIER:  Objection.
6  A   That is a hypothetical.  But
7  MR. BRIER:  It's also a crime.
8  A   Yes.  I was going to say it is also a
9  crime.
10  I mean, it would be hard to do without
11  evidence that you tampered with the outer envelope.
12  The declaration envelope is the envelope whose purpose
13  is to provide integrity to the process.  The secrecy
14  envelope is merely there to help protect the privacy
15  of the voter.
16  **Q   And there are requirements that the General**
17  **Assembly has put in place.  Correct?**
18  MR. BRIER:  Objection.  Seeks a legal
19  conclusion.
20  A   Yes.  There are requirements imposed on the
21  boards in terms of how to conduct absentee and mail-in
22  balloting.
23  **Q   Before you sent out this May 28th, 2020**
24  **e-mail, did you consult with anybody in the General**
25  **Assembly?**

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

61 (Pages 238 to 241)

Page 238

1  In response to that message, Mr. Greenburg
2  sent Ms. Mathis and you a request on June 2nd, the day
3  of the primary.  Correct?
4  A  Yes.  At 6:12 a.m.
5  Q  And he states, "We would appreciate any
6  information you believe is appropriate.  We still fall
7  back on 3146.6A as the prevailing statute.  But would
8  be more than happy to look at any other sections that
9  you believe apply.  If this is the case where the
10  statute is recommending each county take action based
11  on the guidance of its own solicitor, we will do so as
12  well."
13  Did I read that correctly?
14  MR. BRIER:  Actually, you didn't.  It says
15  "if this is a case where the state is
16  recommending." You said "statute."
17  MR. HICKS:  I'm sorry.
18  Q  If this is a case where the state is
19  recommending each county take action based on the
20  guidance of its own solicitor, we will do so as well.
21  Did I read that correctly?
22  A  You did.  Yes.
23  Q  The particular section that he is quoting
24  is the statement by Ms. Mathis about whether a voter
25  inadvertently fails to insert her ballot into a

Page 239

1  secrecy envelope.  Correct?
2  A  I'm sorry, you are saying he is referring
3  to the bullet in the guidance that she sent out?  Is
4  that the question?
5  Q  Correct.
6  A  Yes.
7  Q  If we go to the first page of the exhibit,
8  this is your reply email that was sent at 10:21 a.m.
9  Correct?
10  A  That's correct.  Yes.
11  Q  And you state in the message you are
12  providing him a copy, a summary of the research your
13  counsel did for you regarding the question of whether
14  such ballots should be rejected.
15  Correct?
16  A  That's correct.  Yes.
17  Q  And what follows is a paragraph that has a
18  lot of case citations.  Correct?
19  A  Correct.  Yes.
20  Q  And not one of those case citations is the
21  2004 Pennsylvania Supreme Court decision.  Correct?
22  A  Correct.  It is my understanding that
23  wasn't on point.
24  Q  In fact, all the cases cited here are all
25  cases from the Court of Common Pleas.  Correct?

Page 240

1  MR. BRIER:  That's not true.
2  Q  You agree with me all the cases cited in
3  this paragraph are before 2004?
4  A  Yes.  I can agree with that.
5  Q  You understood, by sending this email
6  message to Mr. Greenburg, that he was then going to
7  forward it on to other people.  Correct?
8  MR. BRIER:  Objection.  Form.
9  A  I understood that he was going to discuss
10  it with his counsel.
11  Q  Did you understand he was going to provide
12  it to other county board of elections?
13  A  I don't know that I understood that.  No.
14  MR. BRIER:  You have answered the question.
15  Q  Is it the Department of State's position
16  that every ballot that lacks an inner secrecy ballot
17  was done solely because the voter inadvertently failed
18  to enclose it?
19  MR. BRIER:  Objection.
20  A  I don't know that is our position.
21  Q  Isn't that what you state in your -- in
22  both your directive of May 28th and Ms. Mathis' email
23  of June 1st that it is all inadvertent voter failure?
24  A  It could be that, or it could be a failure
25  on the part of a board of elections to send the

Page 241

1  secrecy envelope in the first place.
2  Q  It also could be because of an issue of
3  fraud.  Correct?
4  MR. BRIER:  Objection.
5  A  I don't know that to be the case.  But I'm
6  not sure -- again, the secrecy envelope serves one
7  function.  And that is preserve the secrecy of the
8  ballot contained inside, the declaration envelope.
9  The other envelope is the one that maintains the
10  integrity of the process.
11  So I don't think the lack of a secrecy
12  envelope impairs the integrity of the process.  And I
13  think that is really the key distinction here.
14  Again, I am not the lawyer.  I am trying to
15  answer your questions based on my understanding of the
16  advice provided by our counsel.
17  The key distinction here is that there is
18  nothing about that secrecy envelope or lack of a
19  secrecy envelope that impairs the integrity of the
20  process.  If the question were about the declaration
21  envelope, then the answer would be different I would
22  expect.  But that is not the question here.
23  Q  Do you agree with me the ultimate answer to
24  the question is dictated by the General Assembly.
25  Correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

62 (Pages 242 to 245)

---

Page 242

1    MR. BRIER: Objection to form.
2    A    I think, yes, and I'm not aware of any
3 dictate from the General Assembly that prohibits
4 county board of elections from counting such a ballot.
5    Q    Are you aware of the fact that in the 2020
6 primary Luzerne County had over 440 absentee or
7 mail-in ballots that were not counted because they
8 lack an inner secrecy envelope?
9    A    I am not aware of what the final
10 disposition was. No.
11    Q    Let's go back to JM12. Exhibit 8. The Act
12 35 report.
13    A    Okay.
14    Q    Take a look at there are a number of charts
15 that are provided in the Act 35 report. Correct?
16    A    Correct.
17    Q    If you look at page 10. We see that this
18 is a summary of the total mail-in and absentee ballots
19 cast in the 2020 primary election, broken down by
20 county. Correct?
21    A    Correct.
22    Q    Over in the right hand column, the second
23 down from the top is Lawrence County. Correct?
24    A    Correct.
25    Q    It shows that over 8,003 ballots were cast

---

Page 243

1 either by absentee or mail-in ballots in the June 2020
2 primary election. Correct?
3    A    Correct.
4    Q    Now, if we go back to or jump ahead to page
5 38, review of actions taken. Is there any mention on
6 pages 38 or 39 to the fact that Lawrence County had
7 voided over 440 ballots because of the inner secrecy
8 envelope issue?
9    A    First of all, you said earlier Luzerne, not
10 Lawrence.
11    Q    I apologize.
12    A    We started off wrong. But I was aware the
13 county was in court shortly after the election because
14 of this apparent intention not to count that number of
15 ballots for that reason.
16    Q    There was no cull out of that decision by
17 Lawrence County in this report. Correct?
18    A    Correct. I am not aware that Lawrence
19 County provided any additional information in the
20 survey for this report.
21    Q    You indicate in the report that -- you say
22 "The causes of the remaining errors or irregularities
23 include the following." You say, quote, "Human error
24 when inserting ballot materials into envelopes." Did
25 I read that correctly?

---

Page 244

1    A    Where are you at right now?
2    Q    Page 38.
3    MR. BRIER: What paragraph?
4    Q    The fourth paragraph down. It has the
5 bullets. See the third bullet down says, quote,
6 "human error when inserting balloting material into
7 envelopes."
8    A    Correct.
9    Q    Was that intended to cover the situation
10 that occurred in Lawrence?
11    A    I don't know -- no. This is -- the context
12 of this is the information we obtained regarding
13 ballots that were incorrectly sent. These occurred at
14 the county election office.
15    So for example, a person at the county
16 election office made an error, when they were
17 inserting the balloting materials into envelopes that
18 were to go out to voters.
19    Q    Do you agree with me on page 38 and 39 you
20 make no mention of the 440 ballots that were not
21 counted in Lawrence County due to the lack of an inner
22 secrecy envelope?
23    MR. BRIER: Asked and answered. The
24    document speaks for itself. He told you the
25    court proceeding.

---

Page 245

1    A    I am not. And it was not reported in
2 response to this Act 35 survey request to the county.
3    Q    Do you agree with me that 440 ballots out
4 of 8,000 is a pretty high number to have inner secrecy
5 envelopes missing?
6    A    It is a significant percentage of 8,000,
7 yes.
8    Q    In fact, when you take a look at other
9 counties that had returned absentee ballots, if we go
10 back to page 10 of the report, we see, for example,
11 Allegheny County had over 213 ballots returned?
12    A    I'm sorry, what page?
13    Q    Page 10.
14    A    You said 213 or 213,000?
15    Q    213,000.
16    A    Okay. Yes.
17    Q    Did you receive any reports from Allegheny
18 County that they had over 400 ballots that were
19 returned with inner secrecy envelopes missing?
20    A    I don't recall receiving a report. I don't
21 recall that it was applied in the requests for the Act
22 35 report. In fact, I don't even recall that it was
23 information requested by Act 35.
24    Q    Is there a reason why that information
25 wasn't requested?

**NETWORK DEPOSITION SERVICES**
**Transcript of Jonathan Marks**

63 (Pages 246 to 249)

Page 246

1    A   Well, Act 35 identified what was to be
2  requested from the county election offices.
3    Q   The county -- did the Pennsylvania
4  Department of Election ask for more information beyond
5  what was required under Act 35?
6    A   We provided some more information, as I
7  recall, in this report, to provide context. I don't
8  believe that Act 35 asked for the number of registered
9  voters. But we provided that just for context. But
10 the content of the Act 35 report was outlined in Act
11 35. I don't know that that was even something that
12 was tested by Act 35 by the legislature.
13   Q   You do mention that you -- did you receive
14 information from each of the county board of elections
15 via request by the liaison to each of their county
16 boards?
17   MR. BRIER:  Objection.
18   A   We received information based on the
19 elements that were required by Act 35. What I am
20 saying is that I don't recall that that was an element
21 that was required by Act 35. So that would probably
22 explain why counties didn't provide it.
23      To the extent we provided any additional
24 information beyond what was explicitly required in Act
25 35, I believe that was to provide context or to

Page 247

1  provide if a county reported something to us.
2      As I said, Act 35 outlined what was to be
3  in the Act 35 report.
4    Q   And that information --
5    A   I don't recall that being requested by Act
6  35.
7    Q   Are you aware that the information that was
8  requested from the county board of elections was put
9  together in an Excel spreadsheet?
10   A   I believe it was an online survey that
11 ultimately the data was imported into a spreadsheet.
12 Yes.
13   Q   We sent to you what we will mark Exhibit
14 37.
15      (Thereupon, Exhibit No. 37 was marked for
16 identification.)
17   Q   If you could pull up JM41.
18      It's an Excel spreadsheet.
19      MR. BRIER:  I didn't get it yet.
20      MR. BRIER:  We have it electronically.
21   Q   Mr. Marks, are you familiar with the Excel
22 spreadsheet that has been marked collectively as
23 Exhibit 37?
24      MR. BRIER:  I don't think it is 37.
25      Is it?

Page 248

1    Q   Exhibit 37.
2    MR. BRIER:  I'm sorry.
3    Q   This is a printout version of the
4  spreadsheet. If we had just the spreadsheet itself,
5  the spreadsheet would go across several columns.
6  Correct?
7    A   Correct.
8    Q   So I want to turn your attention to it
9  should be page 19 of the exhibit.
10      Page 19 you should have the last three
11 columns with the county column on the left. Do you
12 see on the third column over it says, "Please provide,
13 to the extent consistent with federal and state law, a
14 review of any action taken by the county board of
15 elections or registration commission in response to
16 the aforementioned incidents, including determinations
17 made on the incident, legal actions filed and
18 referrals to law enforcement." Did I read that
19 correctly?
20   A   You did.
21   Q   If you go to the bottom of that column,
22 where Lawrence County is, we see a response for
23 Lawrence County.
24      Correct?
25   A   Yes.

Page 249

1    Q   That response reads, "Objection by the
2  democratic party for not canvassing approximately 440
3  ballots that were not enclosed in secrecy envelopes.
4  Objection withdrawn."
5      Did I read that correctly?
6    A   You did. Yes.
7    Q   By the time the Act 35 report was prepared,
8  the Department of State knew that, in fact, Lawrence
9  County had decided to not count 440 ballots out of its
10 8,000 that were cast, because they did not have inner
11 secrecy envelopes in them. Correct?
12   A   No. That's not correct.
13   Q   Well, what didn't you understand, when it
14 said "objection withdrawn"?
15   A   I don't understand why the objection was
16 withdrawn. The county may have decided to count the
17 ballots.
18   Q   Did you make any requests of Lawrence
19 County as to what happened?
20   A   I did not make an inquiry of Lawrence
21 County as to what happened.
22   Q   Have you checked the docket to see that, in
23 fact, the democratic state party withdrew its
24 objections to the board's determinations not to count
25 those ballots?