# EXHIBIT C-1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                         - - -
 4     DONALD J. TRUMP FOR          )
       PRESIDENT, INC., et al.,     )
 5                                  )
                  Plaintiffs,       )
 6                                  )
            vs.                     )No.
 7                                  )2:20-cv-966-RN
       KATHY BOOCKVAR, et al.,      )
 8                                  )
                  Defendants.       )
 9
                         - - -
10

       Videotape Video Conference Deposition of
11                   KATHRYN BOOCKVAR
12               Friday, August 21, 2020
13                       - - -
14        The videotape video conference deposition of
       KATHRYN BOOCKVAR, called as a witness by the
15     plaintiffs, pursuant to notice and the Federal Rules
       of Civil Procedure pertaining to the taking of
16     depositions, taken before me, the undersigned,
       Lance E. Hannaford, Notary Public in and for the
17     Commonwealth of Pennsylvania, at 2568 Aldon Drive,
       Sewickley, Pennsylvania  15143, commencing at 9:31
18     o'clock a.m., the day and date above set forth.
19                       - - -
20            NETWORK DEPOSITION SERVICES
                 SUITE 1101, GULF TOWER
21              PITTSBURGH, PENNSYLVANIA
                    866-565-1929
22
                         - - -
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

14 (Pages 50 to 53)

Page 50

1       A   I am not serving in a position where I
2   represent the Department of State or the Commonwealth.
3   But I think every day of my life I use my legal skills
4   in some capacity.
5       Q   I'm sorry, Ray, I'm not seeing the
6   Secretary on the TV set.
7       MR. DONOVAN:  We can see.
8       VIDEOGRAPHER:  I have her pinned on my
9   screen.  I can pin her for everyone, if you would
10   like.
11       MR. DONOVAN:  Not for me, because I'm
12   watching Ron.
13       VIDEOGRAPHER:  In order for that to work,
14   everyone will have to pin whoever they would like
15   so they are on the screen.
16       MR. DONOVAN:  Up top, Ron, there is a
17   little pin, when she is talking, it gives the
18   address up top.  We would like to see you all.
19   I'm sure you would like to see her.  But have
20   somebody do that.
21       Q   As a Secretary, what individuals at the
22   Pennsylvania Department of State report directly to
23   you?
24       A   So I think the -- I mean, by direct you
25   mean -- there are organizational charts.  There would

Page 51

1   be executive Deputy Secretary, and she and I together
2   oversee all the Deputy Secretaries and directors.  So
3   I'm not sure if you are asking technically what the
4   chain of organizational chart is.
5       Then the chief counsel has a dual role.  We
6   could look at an organizational chart and go through
7   it all.  There is directors of the various --
8   communication, legislative affairs, bureau of finance
9   and operations.
10       Again, Deputy Secretary of elections, who
11   you already know, Jonathan Marks, Deputy Secretary of
12   regulatory programs, and executive Deputy Secretary.
13   I am probably missing some.
14       Q   Let me show you what we will mark as
15   Exhibit 5.
16       (Thereupon, Exhibit No. 5 was marked for
17   identification.)
18       Q   This is KB4.
19       If you could scroll through the document,
20   so she can see all of it.
21       Madam Secretary, are you familiar with this
22   document from your -- from the Department of State
23   website?
24       A   I am.
25       Q   And this is the page that is called "About

Page 52

1   us," the senior staff.  Correct?
2       A   Correct.
3       Q   Now, you mentioned that in terms of the
4   chain of command, you are the Secretary, the head of
5   the Pennsylvania Department of State.  Correct?
6       A   Correct.
7       Q   Then if we turn to the second page, we see
8   that there is an executive -- an executive Deputy
9   Secretary, if you could turn to the second page.
10       We see there is an executive Deputy
11   Secretary.  Correct?
12       A   Correct.
13       Q   Then we also see two other Deputy
14   Secretaries, one of which is Jonathan Marks.  Correct?
15       A   Correct.
16       Q   Do the two Deputy Secretaries report to the
17   executive Deputy Secretary, or do they report directly
18   to you?
19       A   It's a mix.  We do both.  I mean, I was in
20   the Department before Sari came in.  So we do a lot of
21   the reporting interchangeably.
22       Q   The Department of State handles more than
23   just elections, correct?
24       A   Correct.
25       Q   But the person in charge of the elections

Page 53

1   in Pennsylvania under your watch is Jonathan Marks.
2   Correct?
3       A   Correct.
4       Q   And his title is Deputy Secretary for
5   elections and commissions.  Correct?
6       A   Correct.
7       Q   Underneath his department he has a number
8   of directors who report to him.  Correct?
9       A   Correct.
10       Q   If you could jump to -- let me ask before
11   we jump forward, with regard to Mr. Marks, does
12   Mr. Marks have the authority to act without your
13   knowledge or consent involving elections in
14   Pennsylvania?
15       MR. DONOVAN:  Objection to form.
16       A   I mean, he doesn't run every single thing
17   he does in every day by me.  If there is any
18   significant policy or practice decision, yes, I would
19   be involved in those decisions.
20       Q   So whenever the Department of State issues
21   any guidances that are distributed to the county board
22   of elections, or that are published on the Department
23   of State website, would Mr. Marks have done that in
24   conjunction with your knowledge and consent?
25       A   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

23 (Pages 86 to 89)

Page 86

1    are involved in drafting or reviewing drafts at
2    various different parts of the process.
3         So really it varies some by provision,
4    because some of the provisions were added by the
5    legislature later.  Or some were proposed but then
6    modified.  But there were -- different parts of the
7    Department of State were involved in different pieces
8    of the development of that law.
9         Q    And did the Department of State make
10   recommendations to the General Assembly on what
11   changes should be made to the election code in order
12   to enact this no excuse or all mail-in voting
13   provision?
14        MR. DONOVAN:  Objection to form.
15        A    We were in development of the law.  So we
16   were speaking -- we were certainly part of the
17   speaking of the change in the law.  Like I said, at
18   least for some -- I don't remember which section,
19   because as you know, Act 77 provided more changes and
20   options than any law passed in the last eight decades
21   relating to elections.
22        But yes, we certainly were pursuing several
23   of the opportunities that were available to voters.
24        Q    And during these negotiations, or prior to
25   the negotiations starting, did you and the Department

Page 87

1    of State examine the cases that had been issued by the
2    Pennsylvania Supreme Court about the various
3    provisions under the absentee ballot law?
4         A    Did I or the Department of State?
5         Q    Yes.
6         A    I'm sure the legal team reviewed cases.  I
7    can't say what cases.
8         Q    Well, were you personally aware of the fact
9    that in 2004, the Pennsylvania Supreme Court had
10   interpreted codified section 3146.6A of the election
11   code involving the aspects of what an elector must do
12   in order to cast -- properly cast an absentee ballot
13   in order to have it counted?
14        A    That was a long question.  Are you asking
15   me if I was aware of this particular case?
16        Q    Yes.
17        A    I don't think I was.
18        Q    Let me show you what we will mark as
19   Exhibit 6.
20        (Thereupon, Exhibit No. 6 was marked for
21   identification.)
22        Q    Ray, if you could pull up KB11.
23        Madam Secretary, this is a case decision In
24   Re:  Canvass of Absentee Ballots of the November 4,
25   2003 general election.  It is reported at 843A second

Page 88

1    1223.  It was issued by the Pennsylvania Supreme Court
2    on May 8th -- March 8th, 2004.
3         During your negotiations with the General
4    Assembly over Act 77, were you or the Pennsylvania
5    Department of State aware of this decision?
6         MR. DONOVAN:  Objection to form.
7         A    I can't answer that.  I was not.  I can't
8    answer that for other people.
9         Q    When was the first time you learned of this
10   decision?
11        A    By name?
12        Q    Yes.
13        A    Yesterday.
14        Q    So prior to yesterday, you had never heard
15   of the In Re:  Canvass of Absentee Ballots of the
16   November 4th, 2003 general election?
17        A    No.  And I apologize, because I understand
18   you were involved in this case.  But no, this is not
19   something I was aware of.
20        Q    Prior to your negotiations with the General
21   Assembly over Act 77, did you have any understanding
22   as to whether or not third party delivery of absentee
23   ballots was permitted in Pennsylvania?
24        A    Yes.  I had an understanding.
25        Q    What understanding did you have prior to

Page 89

1    the enactment of Act 77?
2         A    The same understanding I have now, which is
3    that third party delivery is not permitted under
4    Pennsylvania law except for with emergency absentee
5    ballots, or when a voter specifically designates an
6    agent, and the agent -- the voter with disabilities --
7    or disabilities designates an agent, and the agent
8    accepts that appointment by the voter.
9         Q    And on what do you base that understanding?
10   How did you learn of that?
11        MR. DONOVAN:  Based on your experience.
12   Not anything staff may have given you legal
13   advice on.  Your understanding.
14        A    It is long-time, well-established law in
15   Pennsylvania.
16        Q    Are you aware of any provision in the
17   election code which says that a ballot delivered by a
18   person other than the elector renders that ballot
19   void?
20        MR. DONOVAN:  Object to form.  To the
21   extent you know.  He is asking a specific code.
22        A    I don't know.
23        Q    Are you aware of the fact that the case
24   that we have marked Exhibit 6 is the case which
25   established, or at least reaffirmed the principle that

Page 90

1 when the General Assembly set forth the requirements
2 for casting an absentee ballot by an elector, that the
3 Supreme Court declared that third party delivery of a
4 non-disabled voter's ballot would render it void?
5        MR. DONOVAN: Ron, we are not going to do
6 this kind of question. She is not here as a
7 lawyer. She hasn't read this.
8    A   I have never read this decision. I still
9 have not read this decision, but it sounds consistent
10 with my understanding of longstanding law in
11 Pennsylvania.
12    I mean, except for -- I already answered
13 the question about whether there was specific
14 statutory provisions about voiding the ballot. But
15 again, the prohibition on third parties delivering
16 other people's ballots, except in the specific
17 circumstance I already mentioned -- circumstances.
18 And Act 77 did change those provisions some.
19    Q   I am sorry, you said Act 77 did change
20 those provisions?
21    A   Act -- again, the longstanding law that
22 third parties in most situations cannot deliver
23 another person's ballot, that didn't change.
24    But I think the processes governing
25 emergency absentee voting, I believe changed slightly

Page 91

1 under Act 77. I believe that now, for example, a
2 nurse on a hospital wing can deliver the ballots of
3 multiple people, emergency ballots of people who have
4 found themselves in the hospital after the deadline.
5    I think it may be combined two different
6 provisions into one. I don't remember all the
7 details. But I have some sense that Act 77 slightly
8 changed that limited circumstance.
9    Q   But to the best of your knowledge, Act 77
10 never changed the requirements an elector must follow
11 in order to properly cast whether it is an absentee or
12 a mail-in ballot. Correct?
13        MR. DONOVAN: Objection.
14    A   I am not real sure how you asked it. But I
15 will repeat whatever I said, which is except in very
16 limited circumstances that only involve emergency
17 absentee voting, or a voter who didn't specifically
18 designate an agent and that agent accepting it.
19 Except in those circumstances Act 77, nor any law I am
20 aware of, changed the prohibition on general third
21 parties not being able to deliver other individuals'
22 ballots.
23    Q   Isn't it true that despite this decision
24 being issued in 2004, many county election boards have
25 continued to accept and count absentee ballots cast by

Page 92

1 non-disabled voters that have been personally
2 delivered to the election board offices by somebody
3 other than the voter?
4    A   No. You used the word "many"? No.
5    Are there some examples that were reported
6 in the Act 35 report of a handful of counties who -- I
7 don't even know that it is a full handful. There were
8 several, at least one or two counties who said that
9 they realized that some of their staff had wrongly
10 accepted ballots from spouses of voters.
11    I think there was one that didn't count
12 when an aide, maybe, in a home health care setting
13 tried to deliver multiple ballots, but they did not
14 count them. So there were a couple of counties that
15 caught it.
16    Q   Isn't it true that despite the decision in
17 2004, many county election boards have no procedures
18 in place to verify that the person returning a ballot
19 is the non-disabled person who voted the ballot?
20        MR. DONOVAN: Ron, every time you try to
21 ask the question, I will object. If you just
22 want to ask a plain question, I would ask you do
23 that. Otherwise, it is an improper question.
24 Since you already established she has no
25 foundation to talk about this decision.

Page 93

1    Q   I will rephrase it.
2    Isn't it true that many county boards of
3 election have no procedures in place to verify that
4 the person returning a ballot, whether it is absentee
5 or mail-in, is the non-disabled person who voted the
6 ballot?
7    A   I would disagree with that. I think it is
8 a better question for each one of the 67 counties. I
9 can tell you that in my experience the overwhelming
10 number of counties do absolutely make sure of the
11 ballots that they are receiving, at least that are
12 within their control.
13    Obviously, when a ballot is delivered by
14 mail, there is no way to know how that ballot got in
15 the mail, but for hand delivery. I know when I
16 hand-delivered my ballot in person to the Bucks County
17 board of elections, the person who is picking it up in
18 the lobby of the courthouse, because they were closed
19 due to COVID, asked me if I was delivering my ballot.
20    So do they have practices? Yes.
21 Absolutely. Most of them do.
22    Q   When is the last time the Department of
23 State has ever surveyed -- strike that.
24    Are you aware of the Department of State
25 ever surveying the county boards of elections on the

Page 94

1   procedures that it has in place to verify a person
2   returning an absentee or mail-in ballot is the
3   non-disabled person who voted it?
4        A   I'm sorry, that was a convoluted question.
5   What is the question?
6        Q   Are you aware of whether the Department of
7   State has ever done a survey of the county boards of
8   election as to what procedures they have in place to
9   verify that the person returning a ballot, whether it
10  is absentee or mail-in, is the non-disabled person who
11  voted it?
12       A   Are you asking during the time I have been
13  with Department of State or Secretary of State?  Are
14  you asking about ever?
15       Q   At any time.  I assume once you became the
16  Secretary, you learned and were able to -- brought up
17  to speed on what was previously the practice of the
18  Secretary.
19           Correct?
20       A   Yes.  But there is hundreds of years of
21  Secretaries, I don't know.  Certainly decades under
22  certain practices.  I can't -- I'm sure that there is
23  many different old guidance probably versions of the
24  website many times.
25           This is not a questionable issue.  This is

Page 95

1   something that counties, again, overwhelmingly
2   understand, county election directors.  Now, how often
3   they train their staff to make sure that new staff
4   understand individuals, I can't speak to.
5           As you know, under Act 35 we asked all the
6   counties.  So very, very recently we surveyed the
7   counties on what their practices are, with regard to
8   third party delivery.  And made it clear to the
9   counties that reported, that they did accept them
10  mistakenly.  That that was not appropriate.
11          But again, we are talking about a couple of
12  counties who reported that.  Most counties reported
13  none, or reported that those ballots were rejected,
14  when they were brought for somebody else.
15       Q   Isn't it true many of the counties in
16  response to the Act 35 survey stated they had no
17  procedures in place to verify that the person
18  returning a ballot, whether it is absentee or mail-in,
19  was the non-disabled person who voted the ballot?
20       A   That was not a question in the Act 35
21  survey.
22       Q   During your tenure as either acting
23  Secretary or Secretary, have you ever conducted a
24  survey of the 67 counties to determine what procedures
25  they have in place to verify third party delivery of

Page 96

1   absentee and mail-in ballot by non-disabled voters is
2   not occurring?
3        A   Again, as I just reported, with the Act 35
4   report, any county that reported, that they had
5   accepted, other than the individual's own ballot, were
6   given instructions that that is not acceptable.  And
7   they need to make sure that every voter is delivering
8   their own ballot except under the limited
9   circumstances, which I discussed previously.
10       Q   Setting aside the Act 35 report, my
11  question was have you, either as acting Secretary or
12  Secretary, during your tenure, have you ever done a
13  survey of the county boards of election to determine
14  what procedures the 67 county boards have in place to
15  ensure that third party delivery of absentee and
16  mail-in ballots is not occurring for non-disabled
17  voters?
18          MR. DONOVAN:  I object to form, use of the
19  term "survey."  You can answer again.
20       A   The survey that we did was this year
21  pursuant to Act 35.  This is not rocket science.  When
22  a person walks in, the process is are you the person
23  whose ballot you are delivering?  It doesn't involve a
24  booklet or a treatise.
25       Q   Do you think it is appropriate for county

Page 97

1   boards of elections to tell people, who come in and
2   acknowledge that the ballot they are delivering is not
3   theirs, to simply go down the street and drop it in
4   the mailbox?
5        A   Absolutely not.
6        Q   Are you aware of the fact that one county
7   has actually indicated in its written interrogatory
8   answers in this case, that that is what they tell
9   people who bring in ballots, that are not theirs, to
10  just go down to the post office and drop the ballot in
11  there?
12          MR. DONOVAN:  Objection.  Foundation.
13  Misstates the document.  If you know, feel free
14  to answer.
15       A   I think I heard yesterday that there was a
16  county -- something about that.  That is not
17  appropriate.  I have had discussions with legislators,
18  and people on the county, and voters on the street,
19  and both political parties, this is not a contested
20  issue from our point of view and statutorily.
21          Only voters can deliver their own ballots,
22  except with limited circumstances that I described
23  earlier.  And that includes no, I would never say it
24  was acceptable to tell somebody to go mail somebody
25  else's ballot.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

26 (Pages 98 to 101)

Page 98

1      Q    Have you reviewed the written interrogatory
2  answers that have been submitted by the counties in
3  this case?
4      A    I think I reviewed or saw one page of one.
5      Q    Would you be surprised to learn many of the
6  counties state they have no procedures in place to
7  verify the person returning a ballot is the
8  non-disabled person who voted it?
9          MR. DONOVAN:  I will object to the
10  characterization of the response.  She hasn't
11  reviewed it.  She can't really answer that
12  question.
13      A    Define many.  Define practices, processes.
14          Again, this involves one question that is
15  required.  Is this your ballot?
16      Q    Doesn't the fact counties have indicated
17  they have no practices and procedures in place despite
18  the fact that this has been at least the stated law
19  since 2004, doesn't that give you concern that the
20  county boards of elections are not following the law?
21      A    It does give me concern, so we just put out
22  guidance for counties on ballot returns, and one of
23  the things is done, it specifies in several places, it
24  is only one's own ballot that one can deliver.
25          I intend -- repeat that multiple times

Page 99

1  throughout all 67 counties across the board between
2  now and November and beyond to make sure that every
3  county realizes.  And every county election director,
4  I would be willing to bet, understands this.  But not
5  all their staff may.  And we absolutely agree that
6  this should be done.
7      Q    When Act 77 was being discussed with the
8  legislature, was there a specific discussion about the
9  fact that -- you can take down the exhibit, Ray -- was
10  there a specific discussion with the legislature about
11  whether third party delivery or ballot harvesting of
12  absentee and mail-in ballots was going to be
13  permitted?
14      A    So you combined two things in one.  And
15  delivery of absentee ballots does not equate to ballot
16  harvesting.
17          So as I mentioned earlier, I believe Act 77
18  made some changes to the delivery of emergency
19  ballots.  And so yes, there was discussion, because
20  the emergency absentee ballot process in Pennsylvania
21  was and still is to some degree burdensome.  It is
22  better than it was.
23          And so I know that we had discussions
24  about -- and this is before COVID-19.  But certainly
25  COVID-19 has made it even more understandable, that

Page 100

1  there are circumstances, for example, under COVID-19,
2  when the senior care facilities were literally closed
3  to visitors.  And people couldn't leave, and people
4  couldn't come in, and people couldn't go out to their
5  county election offices because of all of the
6  shutdowns.
7          There are very significant circumstances,
8  where people, who are either disabled, or immobile, or
9  vulnerable should be able to designate somebody to
10  deliver a ballot for them.
11          So I think there was discussion with the
12  legislature about how to make it easier for a
13  vulnerable population.  And again, I think there were
14  limited changes made.
15          But at no point did any party, that I am
16  aware of, that were involved in the discussions, and I
17  think that is both legislators and us at the
18  Department of State, and the administration, I'm not
19  aware of anybody who thought -- nobody I know has ever
20  used the word "ballot harvesting" in a positive way.
21      Q    With regard to those issues involving
22  COVID, isn't it true that the General Assembly passed
23  legislation to address that specific issue, but only
24  because of the issue involving COVID.  Correct?
25          They haven't changed the election laws to

Page 101

1  apply beyond the emergency -- once the emergency had
2  expired in July.  Correct?
3      A    No.  I don't think Act -- I could be
4  confusing Act 77 and Act 12.  But either way, the
5  changes to the emergency ballot law, again, which
6  weren't extensive, but there were some changes, were
7  permanent.
8          They were not part -- the temporary
9  provisions of Act 12, to my recollection, and I am
10  happy to review the laws, but the temporary provisions
11  mostly related to things like consolidation and
12  expansion of counties to utilize poll workers outside
13  of the election districts, where they reside.
14          But the other provisions of Act 12, 2020,
15  were permanent.  Portions of that law, some of them
16  were permanent, some of them were not.  But Act 77 was
17  all permanent.
18      Q    Madam Secretary, were you present when the
19  legislature was in session on October 29th and voted
20  on passing Act 77?
21      A    Present -- was I present in the actual
22  physical legislature?
23      Q    Yes.
24      A    No.
25      Q    Have you ever read the legislative history

Page 102

1    and the questions and comments that were made by the
2    legislatures before they voted on the Act?
3        A    Have I read them?  No.  I mean, I think I
4    got probably some reporting by my legislative
5    director, who I think was there.  But I have not read
6    them.
7        Q    Was it ever reported to you that questions
8    were asked by legislators as to whether or not people
9    such as spouses or friends could deliver absentee or
10   mail-in ballots that had been cast by non-disabled
11   voters?
12       A    I don't recall.  I don't have knowledge of
13   that.
14       Q    Did anyone ever report to you that it was
15   specifically asked what would happen if somebody
16   hand-delivered a ballot to the county board of
17   elections, who was not the voter, what would happen
18   then?
19       A    A legislator asked that on the floor?
20       Q    Yes.
21       A    I was not aware of that.  No.
22       Q    Were you aware of the fact the response was
23   that the ballot had not been returned in the way
24   required by the legislation, and it should not be
25   counted?

Page 103

1        A    Who answered that?
2        Q    The Representative Everett was asked by
3    Representative Rothman.  Do you recall any of those
4    types of conversations occurring?
5        A    Again, this is not a controversial issue.
6    We would agree that a ballot being delivered by
7    somebody other than the voter would not be --
8        Q    Isn't it true following Act 77's -- strike
9    that.
10            Would you agree with me that Act 77 was a
11   compromise that had been reached between both
12   political parties and the administration?
13       A    Yes.  It was supported by former
14   Republicans and Democrats in the legislature, but yes,
15   it was a bipartisan compromise.
16       Q    Do you agree Act 77 utilized the same
17   language that previously existed under the absentee
18   ballot law in terms of what an elector must do in
19   order to cast a ballot whether that ballot was called
20   an absentee or mail-in ballot?
21            MR. DONOVAN: Objection to form.
22       A    So I don't remember the exact language that
23   was in the bill.  Some of it was new language for
24   both.  But I think what you need to be asking is do
25   the same procedures apply, in which case the answer is

Page 104

1    yes.
2            So eligibility checking from the front end,
3    the social security driver's license database, the
4    eligibility of the voter, against the voter record.
5    That is the same whether you are an absentee voter or
6    mail-in voter.
7            The process of precanvassing or canvassing
8    the ballot, same for mail-in voters and absentee
9    voters.  So if that is the question you are asking --
10       Q    Let me ask you this.  With regard to your
11   conversations with the legislature about Act 77, did
12   the administration and the Department of State look at
13   codified section 3146.6A and request any changes to
14   that section?
15       A    I will need more than a citation.
16       Q    Let me show you what we will mark as
17   Exhibit 7.
18            (Thereupon, Exhibit No. 7 was marked for
19   identification.)
20       Q    Which is KB10.
21            MR. DONOVAN:  Is this current or amended,
22   just so she knows what she is looking at?
23       Q    Madam Secretary, this is, if you take a
24   look at the third page --
25       A    Why don't you tell me the actual page

Page 105

1    number of the book, since it seems to be a book with
2    page numbers.
3            MR. DONOVAN:  We can't really follow, Ron.
4        Q    It's the third page of the exhibit.  Ray,
5    if you go to the last page of the exhibit, please.
6            And highlight or pull up the 1937 paragraph
7    right there in the middle.
8            Do you agree with me this is the version of
9    codified section 3146.6A prior to 2019?
10           MR. DONOVAN:  Objection, Ron.  She is not
11   here to answer that.  It either is or it isn't.
12       Q    I was trying to help her out.  I wanted to
13   show her --
14           MR. DONOVAN:  I appreciate that.  The hard
15   part we are having, which I think if we were all
16   in person, it would be easier.  We are getting
17   snippets.  It is getting oversized and
18   undersized.  I'm not blaming you.  I just don't
19   think that is what she is here to do.  She can
20   read it.
21       Q    I want to turn your attention, then, to the
22   first page.  Ray, if you could go back to the first
23   page, please.  Actually, scroll up the first page.  I
24   want to focus in, if you could pull out, starting with
25   3146.6, and just pull out section A.

Page 106

1    My question to you, first, Madam Secretary,
2  this was the version of 3146.6A prior to the enactment
3  of Act 77.  As part of the negotiations with the
4  General Assembly, did the Department of State or
5  anybody else in the administration request any changes
6  to this section of the law?
7    MR. DONOVAN:  To the extent you know.
8    A   I can't speak -- I can't answer the
9  question, because I certainly can't speak for anybody
10 in the administration or the Department of State who
11 had multiple meetings, multiple calls, I have no idea.
12   But there is a lot contained in these
13 paragraphs.  It even touches on a number of different
14 issues.  Why don't you just ask me -- is the question
15 did I or the Department of State advocate for third
16 party delivery, other than the specific limitations we
17 discussed before?  Is that your question?
18   Q   No.  I will ask it this way.
19   You agree with me that under this Act, this
20 is an order to cast an absentee ballot.  There are
21 requirements as to what an elector must do, correct?
22   A   Yes.
23   Q   For example, it starts off by saying an
24 elector shall in secret proceed to mark their ballot.
25 Correct?

Page 107

1    A   Correct.
2    Q   It also says the elector shall then hold
3  that ballot, and place it in an inner secrecy
4  envelope, or what is called the official absentee
5  ballot, correct?  That is another step the elector is
6  required to do?
7    A   That is what it provides in this law.  Yes.
8    Q   It goes on to say the inner secrecy
9  envelope shall then be placed in the second one, on
10 which is printed the declaration of the elector, and
11 the address of the elector's county board of election
12 and the local election district of the elector.
13   Correct?
14   A   Right.
15   Q   Then it says the elector shall then fill
16 out, date, and sign the declaration on the second
17 envelope.
18   Correct?
19   A   Yes.
20   Q   And then it says the envelope shall then be
21 securely sealed.  The second envelope shall be
22 securely sealed, and the elector shall then deliver
23 the same by mail postage prepaid except where franked
24 or delivered in person to said county board of
25 election.

Page 108

1    Correct?
2    A   Yes.
3    Q   That is the procedure the General Assembly
4  enacted in order for somebody to properly cast an
5  absentee ballot prior to Act 77.  Correct?
6    A   Again, I don't have the context on this
7  page.  But you have represented that such is the case.
8    Q   So my question is prior to the enactment of
9  Act 77, did either you or anybody in the
10 administration request that the word "shall" be
11 changed to "may"?
12   A   Are you talking about the delivery part of
13 this?  Because obviously --
14   Q   Any of the requirements here.  Did anyone
15 at the General Assembly state instead of using the
16 word "shall" they should use the word "may" in terms
17 of what an elector must do in order to cast an
18 absentee ballot?
19   A   So again, these paragraphs cover many
20 different issues.  Just the words on the envelope, the
21 actual language that needs to be used on an envelope,
22 or the format of an envelope, that was subject to
23 discussions, and changes were made.  I talked about --
24 so were these issues discussed?  I believe that they
25 were.

Page 109

1    So if you would narrow the question, maybe
2  I will be able to answer it.  But again, I wasn't in
3  the room.  And I can't speak for every party that was
4  involved.
5    Q   I thought I was asking a narrow question.
6    My question was did either you, or anyone
7  else ever ask the General Assembly to delete the word
8  "shall" and instead insert the word "may" in section
9  3146.6A?
10   A   I don't know.  And I see several shalls,
11 are you saying all the shalls, certain of the shalls?
12   Q   I'm talking about all of the shalls, I will
13 give you that one.  I am asking a very simple
14 question.
15   Did anyone ever ask the General Assembly to
16 remove all of the shalls out of 3146.6A and replace it
17 with the word "may"?
18   A   I will answer for myself.  And the answer
19 is no.  I never asked the General Assembly to delete
20 the word "shall" and replace with the word "may."
21   Q   Are you aware of anyone from the
22 administration or your Department ever asking for that
23 type of change to occur?
24   A   I don't know.  What I can tell you is that
25 none of us advocated for ballot harvesting or other

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

Page 110

1   circumstances like that.  But there were discussions.
2   Again, I don't remember all of the details.  But there
3   were discussions about making the process for
4   emergency voters easier.
5       Q    I'm not concentrating on emergency voting
6   right now.
7       So my next question, with regard to the use
8   of the inner secrecy envelope, prior to the enactment
9   of Act 77, did you ever ask the General Assembly to
10  delete the requirement of the inner secrecy envelope
11  as part of the absentee ballot voting process?
12      A    Did I ever ask the General Assembly to
13  delete -- prior to Act 77 to remove that step of the
14  process and no longer have a secrecy envelope?  Is
15  that your question?
16      Q    Yes.
17      A    No.  I did not.
18      Q    And did anybody from the Department of
19  State or the administration ever ask as part of the
20  negotiations with the legislature to delete the
21  requirement of an inner secrecy envelope as part of
22  the absentee ballot voting process?
23      MR. DONOVAN:  If you know.
24      A    Again, not that I am aware of.
25      Q    My last question about this section, is

Page 111

1   there any reference in 3146.6A to the use of a drop
2   box?
3       A    I'm sorry?
4       MR. DONOVAN:  We don't have the whole
5   provision on here, Ron.  She doesn't have the
6   book.  The words say what they say.  Let me make
7   a standing objection.
8       I would respectfully ask you to ask the
9   Secretary factual questions.  Because I let you
10  read things to her.  But I won't let that happen
11  all day.  She is an executive officer.  She is
12  here to answer questions for all the parties.
13      But kind of having her read, and does a
14  provision say something, I let you do it.  At
15  some point I will stop and move for protective
16  order.  I respectfully ask you to consider that
17  as you proceed.  Why don't you reask the
18  question?
19      Q    Is there anything under 3146.6A that
20  addresses the use of a drop box for the return of
21  absentee ballots?  Under the section I pulled out.
22      A    Are you asking me on the page that is being
23  viewed on my screen, do I see anything related to the
24  words "drop box"?
25      Q    Yes.

Page 112

1       A    I do not see the words "drop box" on this
2   page.
3       Q    As part of the negotiation for Act 77, were
4   there any negotiations with the General Assembly to
5   allow the use of drop boxes by the county boards of
6   election as part of the collection and return of
7   either absentee or mail-in ballots?
8       A    I don't know.  Not that I'm aware of.
9   There were already at least a couple counties, I
10  think, that had used them in some capacity.  But I
11  don't recall whether that was discussed by the group.
12      Q    What counties had used drop boxes prior to
13  the enactment of Act 77?
14      A    I think Erie is the one that I am most
15  aware of.  But I seem to recall there might have been
16  another one or two.  But Erie is the one that comes to
17  mind.
18      Q    How do you know that Erie County had used a
19  drop box prior to the enactment of Act 77?
20      A    I don't recall.  I feel like it might have
21  been when it was being reported preprimary.  Maybe a
22  general news article that was talking about Erie,
23  Erie's drop box.  It made some reference to them
24  having used it for some period of time.  I think it
25  was as simple as that.

Page 113

1       Q    Did you ever witness -- had you ever
2   witnessed a drop box being used by Erie County prior
3   to the enactment of Act 77?
4       A    Witnessed in person?  No.
5       Q    Yes.
6       A    No.
7       Q    Now let me show you what we will mark as
8   Exhibit 8.
9       (Thereupon, Exhibit No. 8 was marked for
10  identification.)
11      Q    I'm sorry, KB14.  I'm sorry, KB13.
12      If you could blow up the first paragraph
13  under A, Madam Secretary, do you know whether this is
14  the current version of 3146.6A after the enactment of
15  Act 77?
16      A    I am not going to be able to answer that in
17  the abstract.
18      Q    Are you aware of any provision of the
19  election code which expressly identifies or authorizes
20  the use of drop boxes after the enactment of Act 77?
21      MR. DONOVAN:  Objection to form.
22      A    So I don't think -- I'm not aware of the
23  word "drop box" being in the election code.  What I am
24  aware of is the county authority to designate
25  additional offices, and make additional rules and

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

Page 114

1   procedures to serve elections and their voters and
2   voting officials.
3       Q    Do you agree with me, under Act 77, the
4   requirement to use an inner secrecy envelope still
5   remained, whether it be an absentee or mail-in ballot?
6       A    Are you asking me if it did?  Yes.  It
7   continued to use the secrecy envelope.
8       Q    Would you agree with me that the language
9   which was adopted for the use of mail-in balloting
10  tracked the language that was used for absentee
11  ballot?
12      A    Yes.
13      Q    It also, in fact, used the word "shall" as
14  opposed to "may."
15          Correct?
16          MR. DONOVAN:  Object to form.
17      A    No.  If you want to point me to it, I am
18  happy to look at it.
19          MR. DONOVAN:  The statute says what it
20  says, Ron.
21      Q    I want to confirm, you did not believe that
22  when Act 77 was in place, that the legislature had
23  deleted the word "shall" and put in the word "may,"
24  correct, Secretary?
25      A    The law continued to have secrecy envelopes

Page 115

1   for ballots in secrecy envelopes, and secrecy
2   envelopes deposited in the outer envelope with the
3   declaration, whether it is absentee voting or mail-in
4   voting, and whether it is preAct 77 or post Act 77.
5       Q    And prior to the enactment of Act 77, you
6   never went to the legislature and said that the use of
7   an inner secrecy envelope was disenfranchising voters.
8   Correct?
9       A    I think I already answered, I never went to
10  the legislature and talked to them about eliminating
11  secrecy envelopes at all.
12      Q    But you, also, never told anybody in the
13  General Assembly that you felt that the use of an
14  inner secrecy envelope was disenfranchising voters.
15  Correct?
16      A    Well, because there was never reports of
17  disenfranchising voters.  So it's not the existence of
18  the secrecy envelope.  It's about what happens if
19  somebody inadvertently doesn't put their ballot in the
20  secrecy envelope.
21          So it's not the practice itself that is a
22  problem.  It is what to do in a scenario where there
23  is a mistake made.  A mistake that does not go to
24  voter fraud, does not go to the integrity of
25  elections.  And it goes to a simple mistake of a

Page 116

1   practice that is there, because it is a courtesy to
2   the voter.
3       Q    Who is determining -- so if that is your
4   understanding, did you understand that many counties,
5   prior to the enactment of Act 77, were discounting or
6   not counting absentee ballots that lack inner secrecy
7   envelopes?
8           MR. DONOVAN:  Object to form.  Foundation.
9       A    The first I ever heard any county not
10  counting ballots for lack of a secrecy envelope was in
11  this past election, in the primary.  That was the
12  first time I heard of any county not counting ballots
13  that did not contain secrecy envelopes.
14          There is a very explicit provision in the
15  provisional ballot laws that says provisional ballots
16  without a secrecy envelope shall not be counted.  It
17  could not be clearer.  There is no such equivalent
18  provision relating to absentee or mail-in ballot.  It
19  is not there.
20          And when the law -- when there is an
21  omission in the law, there is a presumption that you
22  want to interpret it in favor of allowing
23  enfranchising voters, not in disenfranchising for
24  errors that don't go to voter fraud election
25  integrity.

Page 117

1       Q    Do you agree with me that if a ballot is
2   placed in a declaration envelope, the envelope in
3   which it is placed now has a mark, text message, or
4   symbol identifying who the elector is?
5           MR. DONOVAN:  Could you read that -- could
6   you say that again, Ron, please?
7       Q    Yes.  Very simple question.  Isn't it true
8   that when an elector places a ballot inside a
9   declaration envelope without an inner secrecy
10  envelope, it has now been placed into an envelope that
11  has a text message, mark, or symbol that identifies
12  the elector?
13      A    I think --
14      Q    It's a yes or no question.
15      A    No.  It is not a simple question.
16      Q    Why?
17      A    It is not.  Because you are trying to get
18  me to say something about the fact that the law
19  says -- the law is clear, if a voter makes marks, or
20  writes their name or something on the inner secrecy
21  envelope, that is clear, that that vote shall not be
22  counted.
23          It does not say that about the outer
24  envelope.  But yes, of course the outer envelope has
25  marks on it, because it has the address of the board

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

31 (Pages 118 to 121)

## Page 118

1  of elections.  It has the voter's declaration.  It has
2  their name and precinct and so forth.  That is a
3  separate provision of the law.
4  **Q   No.  Let me ask you this way.**
5      **Isn't it true, I don't care about all the**
6  **other marks about the county.  I'm talking about isn't**
7  **an outer declaration envelope, does it not have a text**
8  **message -- I'm sorry, a text, mark or symbol, which**
9  **identifies who the elector is?  Yes or no?**
10  A   The outer envelope?
11  **Q   Yes.**
12  A   The outer envelope has marks on it, that
13  identify the voter.
14  **Q   In fact, it should have, if it is properly**
15  **cast, it should have the elector's name and signature.**
16  **Correct?**
17  A   Yes.
18  **Q   And when an envelope or a ballot is placed**
19  **inside that envelope without the inner secrecy**
20  **envelope, it has now been placed into an envelope,**
21  **which has a text mark or symbol which identifies the**
22  **elector.  Correct?**
23  MR. DONOVAN: Objection. Form.
24  A   Well --
25  **Q   Yes or no.**

## Page 119

1      MR. DONOVAN: She can answer. Ron --
2  **Q   They just placed a ballot in an envelope**
3  **which has text mark or symbol that identifies the**
4  **elector?**
5      MR. DONOVAN: Objection to form. Go ahead.
6  You can answer.
7  A   I mean, if a ballot is stuck in the outer
8  envelope, then yes, that is in all circumstances.
9  Whether you have six envelopes in there, or you have
10  zero envelopes in there, it is always going to be in
11  the outer envelope.  Because without the envelope --
12  without the outer envelope, and without the voter
13  information, then the counties wouldn't be able to
14  check that -- which voter cast the ballot.
15      So yes, it is information identifying the
16  voter on the outer envelope regardless how many
17  envelopes are inside.
18  **Q   Isn't it true that the General Assembly has**
19  **declared that if a ballot is placed into an inner**
20  **secrecy envelope that has a text message -- has a text**
21  **mark or symbol, which identifies the elector's**
22  **identity, it is not to be counted?**
23  MR. DONOVAN: Objection. Form. Misstates
24  the provision.
25  A   I would like to see the actual provision.

## Page 120

1  But my understanding is you can't mark -- like you
2  can't put the vote -- if the voter puts their name on
3  the inner secrecy envelope, that is clearly identified
4  in the statute as not being able to be counted.
5      Whereas, again, in the provisional ballot
6  law, it could not be clearer, it says they don't need
7  any markings -- no markings at all, if you include the
8  secrecy envelope in the provisional ballot.  It could
9  not be clearer.  The legislature knows how to make the
10  law clear.  It does not require that for absentee
11  mail-in ballots.
12  **Q   We are not talking about a provisional**
13  **ballot.  Are we?**
14  A   I just was.
15  **Q   Right.**
16      **I was talking about an absentee ballot.**
17  **And the General Assembly also made it clear as to what**
18  **an elector must do, or not do, in order to properly**
19  **cast an absentee or mail-in ballot.  Correct?**
20  MR. DONOVAN:  Ron, I know we are going to
21  have this litigation in front of the court.  She
22  is here today to answer factual questions, not to
23  engage in this debate.
24      Let's stick to facts.  It's not going to
25  say what the statute says, or what the General

## Page 121

1  Assembly -- at some point you will force this at
2  court.  That is not why the Secretary of the
3  Commonwealth is here.
4      MR. HICKS:  She advocated a position.  And
5  I am challenging her as to her position.
6      Could you have my last question read, and
7  could I have an answer, please?
8      MR. DONOVAN:  Let me finish, Ron.
9      She isn't challenging anything.  She is the
10  Secretary of the Commonwealth.  She issued
11  guidance.
12      In fact, it is her position the highest
13  court in the land of this Commonwealth should
14  answer that question.
15      So I'm not sure -- if you want to ask about
16  her guidance, that is fine.  But I don't think it
17  is proper, because we are now at 12:30, we will
18  have to take lunch, but you have her state what
19  the General Assembly thought.
20      She is here -- yes, she issued guidance.
21  That is fair game to ask her about that.  And she
22  is here to answer that.  But that is it.  I would
23  ask that you get to that.
24      Because you have already spent a day with
25  Jonathan Marks asking him what the statute says.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

Page 130

1  play at the Pennsylvania Department of State?
2      A   Same role she plays now, which is director
3  of election and notary services.
4      Q   We see down at the bottom of the second
5  page, that is a message she sent out on June 1st, 2020
6  at 3:39 p.m.  Do you see that?
7      A   Yes.
8      Q   And like Mr. Marks had done on May 28th,
9  she sent this to herself.  Would that indicate that
10  she then blind carbon copied all the county board
11  election officials?
12      A   I mean, based on the fact it says "Dear
13  county election official," I would imagine that is
14  correct.
15      Q   Did you see Ms. Mathis' June 1st, 2020 email
16  message before it was sent out?
17      A   I can only see part of it.  Can you show me
18  the rest of it, too?
19      Q   Scroll to the next page, please.  Go ahead
20  and scroll to the end, the last page as well.
21      A   I probably did see it, or saw it in some
22  capacity, just because I am often copied on emails to
23  election directors.  But it is June 1st of 2020 at
24  3:39 p.m., the day before the primary.  So I don't
25  have a specific memory that this is anything that I

Page 131

1  actually read that day or anything.
2      Q   If we could go to the second page at the
3  bottom, where Ms. Mathis' June 1st, 2020 letter begins.
4  The previous page, please.
5          If you could highlight the "Dear County
6  Election Official" and the rest of the paragraph.
7      A   I can see it.  You don't need to -- yes.
8      Q   Do you agree with me Ms. Mathis is
9  basically sending out a reminder regarding both the
10  precanvass and canvass process.  Correct?  I'm sorry,
11  did you hear my question?
12      A   I am reviewing the document.  Sorry.
13          It appears that it is an email about
14  precanvassing and canvassing.
15      Q   And Act 77 created the new process known as
16  a precanvass.  Correct?
17      A   Correct.
18      Q   And the precanvass pertained only to votes
19  that were counted by absentee or mail-in ballots
20  delivered before Election Day.  Correct?
21      A   Yes.  I mean, I am not 100% sure.  I can
22  review those laws, if you want.
23      Q   That is okay.  Let's go to under precanvass
24  reminders.  Ms. Mathis sets forth a couple what she
25  calls precanvassing procedures that follow the

Page 132

1  statutory principles of transparency and accuracy in
2  all processes.  Do you see that?
3      A   It says county board of elections will
4  adopt their own precanvassing procedures as follows,
5  statutory principles of transparency and accuracy in
6  all processes.  Then it goes on to say what they
7  should adhere to.
8      Q   And if we turn to the next page, we see the
9  continuation of the bullet points from the previous
10  page.  Correct?
11      A   Yes.
12      Q   We see under the second bullet item she
13  says, "Ensure that no envelope contain any text, mark
14  or symbol, which reveals the identity of the elector,
15  the elector's political affiliation, or the elector's
16  candidate preference, and if so, the envelopes must be
17  set aside unopened and declared void."
18          Did I read that correctly?
19      A   Well, it does say that.  But that doesn't
20  make any sense because, of course, the outer envelope
21  would contain text.  So it clearly meant the internal
22  secrecy envelope should not contain text messages.
23      Q   Have you talked to Ms. Mathis as to what
24  she meant by that statement in her June 1st, 2020
25  email message?

Page 133

1      A   No.  I have not.
2          (Discussion off the record.)
3      Q   Taking a look at the two more bullet points
4  down.  She refers to a process which the board is
5  supposed to develop, if the inner secrecy or the
6  privacy sleeve that she refers to, or secrecy
7  envelope, is missing.  Correct?
8      A   Where are we?
9      Q   It is in the two more bullet points down,
10  "in the event."
11      A   "In the event a voter inadvertently fails
12  to insert her ballot in a secrecy envelope, the board
13  may develop a process whereby the ballot can be
14  inserted into an envelope or privacy sleeve to
15  preserve the secrecy of the ballot."
16      Q   With regard to that, had the Department of
17  State already issued a policy that the inner secrecy
18  envelope would not be a basis for voiding a ballot?
19          MR. DONOVAN:  Objection to form.
20      A   If you are referring to Jonathan's email to
21  the counties that said it is the Department's opinion
22  that ballots that are inserted into the outer envelope
23  without a secrecy envelope should still be counted,
24  then I mean, that was -- I need to go back and look at
25  the language of the email.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

35 (Pages 134 to 137)

Page 134

1       What is your question, actually?
2       Q   Isn't it the policy that is stated here is
3   that the inner secrecy envelope -- I'm sorry, the
4   ballot is only to be counted, if the inner secrecy
5   envelope was inadvertently failed to be inserted by
6   the voter.  Correct?  That was the Department's
7   position on June 1st?
8       MR. DONOVAN: Objection. Form.
9       A   I am not really sure you are asking here.
10  The Department -- it was our position that a lack of a
11  secrecy envelope was not a reason to not count the
12  ballot.  So I am not really sure what you are asking
13  about this bullet point.
14      Q   Well, in the bullet point, doesn't it say
15  that the lack of a secrecy envelope is tied to whether
16  or not the voter inadvertently fails to insert it.
17  Correct?
18      A   Are you asking about the word
19  "inadvertently"?  Is that the question you are asking?
20      Q   No.  I'm asking about one, who failed to
21  insert it, and two, whether it was inadvertent or not?
22      A   I still don't understand your question.
23      Q   According to the June 1st, 2020 email
24  message, was it the Department's position that a
25  ballot that was cast without its inner secrecy

Page 135

1   envelope, if the voter intentionally failed to include
2   it, that that should not be counted?
3       A   No.  It was our position that the ballots
4   without a secrecy envelope, that that is not a reason
5   not to count the ballot.  It is also a presumption
6   there are no voters who are intentionally not
7   including their secrecy envelopes.  It can be
8   confusing.  The directions can be confusing.
9   Sometimes both envelopes are referred to as the
10  official envelope.
11      So I think what Jess is doing was saying
12  what we all know to be the case.  Which is that when
13  they are excluded, it is because the voter made a
14  mistake.
15      And it's a mistake that does not go to the
16  integrity of the vote.  It does not go to -- they made
17  a mistake, and it should not void the counting of the
18  vote.
19      Q   How do you know in all instances, when an
20  inner secrecy envelope is not enclosed, that a voter
21  made a mistake?  Did the Department do a survey on
22  this issue?
23      A   It is not actually part of our position.
24  We actually just put out guidance a couple days ago
25  that says a lack of secrecy envelope is not a reason

Page 136

1   to not count the vote.
2       Q   But your testimony was that your
3   presumption is that when an inner secrecy envelope is
4   missing, it is because a voter has mistakenly not put
5   it in there.  My question is how do you know that?
6       MR. DONOVAN: Let me object. I don't think
7       that was quite her testimony.  Why don't you
8       explain yourself so the record is clear?
9       A   If you look at our guidance that we just
10  put out two days ago, we didn't in any way make it
11  contingent on whether or not we know or don't know the
12  inadvertent -- it inadvertently or -- is there a word
13  advertently?  I don't know.  Intentionally fail to
14  include the secrecy envelope.
15      The point is if there is no inner envelope,
16  no secrecy envelope, it should not mean that the
17  ballot is not counted.
18      And as you know, we have asked the
19  Pennsylvania Supreme Court to decide this issue.  If
20  the Pennsylvania Supreme Court comes down a different
21  way, we will enforce that law as well.
22      Q   And the guidance that you are referring to
23  is the one that was provided this morning.  Is that
24  correct?
25      A   I don't know when it was provided.

Page 137

1       Q   We will mark -- I will show you what is
2   marked Exhibit 11.
3       (Thereupon, Exhibit No. 11 was marked for
4       identification.)
5       It is KB38.
6       MR. DONOVAN:  What is the date?
7       THE WITNESS:  August 19th.
8       Q   Is this the guidance to which you are
9   referring?
10      A   Could you show me the next page?  It looks
11  like it from the title page.
12      Q   Ray, can you scan to the second page,
13  please?  Can you highlight the text?
14      A   You don't need to highlight it.  I can see
15  it.
16      Q   Is this the guidance to which you are
17  referring?
18      A   Yes.
19      Q   And according to the first page --
20  actually, even on the second page, it says this
21  guidance was issued on August 19th, 2020.  Is that
22  correct?
23      A   Correct.
24      Q   It was authored by the Bureau of Election
25  Security and Technology?

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

36 (Pages 138 to 141)

Page 138

1    A    Correct.
2    Q    Do you know why this guidance isn't up on
3  the Department of State's website yet?
4    A    No.  Actually, I thought it was.  So it
5  must be a mistake.  I will pass that along.
6    Q    It does indicate on the upper -- I guess in
7  the top middle of the page "TLP:  White."  Is that
8  correct?
9    A    Yes.
10    Q    And when it says "TLP:  White," that means
11  it is approved for release to the public.  Is that
12  correct?
13    A    Yes.  I can't remember -- I sometimes
14  mistake white and green, which one is which.  But yes,
15  both of them are not -- not one of the elevated levels
16  of protection.
17    Q    So this procedure was a policy that had
18  been issued after the primary.  Correct?
19    A    Correct.
20    Q    It was meant to supplant or supplement --
21  or I guess supplant the guidance that was issued on
22  May 28th and June 1st, 2020.  Correct?
23    A    No.  What do you mean by supplant?  That
24  was an email that went out to give guidance before the
25  primary.  This is consistent with that.

Page 139

1        This is the first time I guess it is issued
2  as official guidance in our usual form.  So it was put
3  out to make sure we have consistency.
4        And as I said before, we have also asked
5  the Pennsylvania Supreme Court to make a decision on
6  this.  And if they find otherwise, then we will change
7  our guidance.  We want to make sure there is
8  consistency across the 67 counties.
9    Q    Will you agree with me the guidance that
10  you issued, that is dated August 19th, 2020, no longer
11  refers to the requirement that the voter inadvertently
12  fail to insert the ballot.
13        Correct?
14    MR. DONOVAN:  I will object.  I don't think
15  it did previously, Ron.  That wasn't her
16  testimony.
17    A    That wasn't -- I am not sure what you -- is
18  every email to you official guidance that needs to be
19  repealed and then replaced?  That is not how things
20  work.
21        Jess was trying to give them information
22  that guided them.  You are picking out the word
23  "inadvertent."  That is not something anybody else has
24  been taking out.
25        So the position is that the lack of a

Page 140

1  secrecy envelope should not be a reason not to count
2  the vote, period.  End of story.
3    Q    Well, what if the board learned that there
4  were 440 inner secrecy envelopes that had been deleted
5  out of absentee ballots, and they only had less than
6  5,000 ballots delivered that cycle?
7    MR. DONOVAN:  Objection.  Calls for
8  speculation.
9    Q    You don't believe the county board can
10  presume some fraud has been going on?
11    MR. DONOVAN:  Objection, calls for
12  speculation.  Answer, if you can.
13    A    I don't think that there is any presumption
14  of fraud.  Because there is a lot of people that do
15  it.  Sometimes it is due to -- it's probably due to
16  instructions that weren't clear.
17        Again, I know that in some counties, both
18  envelopes were referred to in the instructions as
19  official ballot envelope or something, or official
20  envelope.  And it can be unclear.  So that would
21  indicate to me that that county needs to have clear
22  instruction.
23    Q    Do you think it is unusual to have 440
24  absentee or mail-in ballots returned in a county that
25  only had 8,000 sent out?  And when they were returned,

Page 141

1  they didn't have the inner secrecy envelopes in them?
2  Is that unusual?
3    MR. DONOVAN:  Objection.  Hypothetical.
4  Calls for speculation.  Not consistent with the
5  evidence in the case.
6    Q    You can answer.
7    MR. DONOVAN:  If you can.
8    A    I can't answer that.  Again, what I would
9  go to is your instructions weren't clear.  You have to
10  do better.
11    Q    So are you telling me you are not aware of
12  the fact that in Lawrence County during the June 2020
13  primary over 440 absentee and mail-in ballots were
14  disqualified by the county, because they lacked inner
15  secrecy envelopes?  You are not aware of that?
16    A    That is a completely different question.
17  Yes, I'm aware of that.
18    Q    I asked you whether or not it was unusual
19  to have 440 ballots disqualified because of lack of an
20  inner secrecy envelope.  And you told me that you
21  never heard of that.  You said that was speculation.
22        So I'm asking you, isn't it true that in
23  the June 2020 primary, Lawrence County had 440
24  absentee mail-in ballots disqualified, because they
25  lacked inner secrecy envelopes?

Page 142

1     A    So I will again say, that is a different
2  question.  And my answer to that question is yes, I
3  was aware that Lawrence County had a lot of ballots
4  returned without secrecy envelopes.  I was also aware
5  Lawrence County did not count those ballots.  I
6  disagree with that decision by them.
7     Q    Did you or your office provide the
8  Democratic state committee with a copy of the
9  directive that was sent out on May 28th?
10    A    What directive?
11    Q    The Jonathan Marks' May 28, 2020 email
12 message that said "important IPOS directives"?
13         MR. DONOVAN:  Were you asking who it was
14 provided to?  I'm sorry.
15    Q    I asked whether or not -- I asked the
16 Secretary whether she or somebody in her department
17 provided the May 28th, 2020 directive from Jonathan
18 Marks to the Democratic state committee.
19    A    I did not.  I have no idea whether somebody
20 else was asked to provide it.  But I also don't think
21 Jonathan's email was a directive.  Did it say it was a
22 directive?  We issue directives on official forms.
23 And they are not usually just in the text of an email.
24    Q    So you didn't view the May 28th, 2020 email
25 message from Mr. Marks as a directive?

Page 143

1     A    I did not.  It has a specific meaning in
2  Pennsylvania law.
3     Q    What is that meaning?
4     A    There are certain categories under which I
5  have directive authority.  They usually relate to
6  voting systems and election security related issues.
7     Q    I will show you what we will mark Exhibit
8  12.
9         (Thereupon, Exhibit No. 12 was marked for
10 identification.)
11    Q    It is KB37.
12         Madam Secretary, have you seen this
13 document?  Go ahead and scroll through it, so you can
14 see all of it.
15    A    I can only see the first page.
16    Q    Ray, if you could scroll through, please.
17    A    I can just tell you I haven't seen this
18 before.  Madam Secretary, now that we scrolled through
19 the whole document, I believe you said you have not
20 seen this document before?
21    A    Correct.
22    Q    Are you aware that the Pennsylvania
23 Democratic state committee on June 2nd, 2020 had filed
24 an objection in the Court of Common Pleas of Lawrence
25 County over Lawrence County -- over the board of

Page 144

1  elections' decision in that county to not count over
2  440 absentee or mail-in ballots because they lacked
3  inner secrecy envelopes?
4     A    If your question was I aware a case was
5  brought?  Yes.
6     Q    If you take a look at the fourth page of
7  the exhibit.  Paragraph 15.  You will see it refers to
8  the May 28, 2020 email message from Mr. Marks as a
9  directive of the Pennsylvania Department of State.
10         Is it your understanding that what was sent
11 out on May 28, 2020 was not a directive of the
12 Pennsylvania Department of State?
13    A    Right.  It was not a directive of
14 Pennsylvania Department of State.
15    Q    As you sit here today, do you know how the
16 Pennsylvania state Democratic committee received a
17 copy of that email message that had been sent to all
18 of the county board of elections?
19    A    I do not know.  It is a public record.  So
20 anybody could have had access to an email that was
21 sent to the county boards of elections.
22    Q    Was it the Department of State that
23 publicized that email message on its website?
24    A    No.  Again, it wasn't a directive.  It was
25 an email message that went out to the county election

Page 145

1  directors, like many other emails that go out.  So
2  these are their words, whoever filed this pleading,
3  these are not our words.
4     Q    And as a poll worker in Bucks County, did
5  you count absentee ballots that lacked inner secrecy
6  envelopes?
7     A    I don't think I ever had that experience.
8     Q    Let me show you what we will mark Exhibit
9  13.
10         Before we go to Exhibit 13, do you believe
11 that the legislature -- strike that.
12         As I understand your position, a ballot
13 that is placed in the outside envelope should be
14 counted.  But a ballot placed in an inner secrecy
15 envelope with a mark on it should not be.
16 Correct?
17         MR. DONOVAN:  Objection.  Form.  Misstates
18 the testimony.
19    A    Let me state it.  So if a ballot does not
20 have a secrecy envelope, but it is in the outer
21 envelope with all of the information necessary, and
22 the voter is eligible, then that ballot should be
23 counted.
24         If the ballot is in a secrecy envelope, and
25 the secrecy envelope has marks or notations that are

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

38 (Pages 146 to 149)

Page 146

1  explicitly included in Pennsylvania law that says it
2  should not be counted, that should not be counted.
3      Q    It doesn't matter whether those marks were
4  placed on the inner secrecy envelope either
5  inadvertently or intentionally.  Correct?
6      A    I don't think the statute -- I would need
7  to look at the statute to see how it talks about it.
8  But my guess is that it does not discuss whether it is
9  intentionally or inadvertently.
10     Q    Now, after Act 77's enactment, isn't it
11 true you distributed a summary of the Act?
12     A    Yes.  I think we did several versions of
13 it.
14     Q    Let me show you what is marked as Exhibit
15 13.
16         (Thereupon, Exhibit No. 13 was marked for
17 identification.)
18     Q    It should be KB18, Ray.
19         For the record, Exhibit 13 is a document
20 produced by the Secretary and marked as PADOS620 and
21 621.
22         The first page of the exhibit, is that an
23 email message you sent out on November 25th, 2019?
24     A    Yes.
25     Q    The two recipients are identified as Doug

Page 147

1  Hill and Lisa Schaefer; is that correct?
2      A    Yes.
3      Q    And who are Doug Hill and Lisa Schaefer?
4      A    Doug Hill is the past executive director of
5  CCAP.  And Lisa Schaefer is the current executive
6  director of CCAP.  And they were kind of working in
7  tandem during the end of Doug Hill's tenure.
8      Q    Are you a member of CCAP?
9      A    No.  I am a -- Doug Hill, when I first
10 joined the Department, invited me to be a -- I don't
11 know if it is officially called an ex-officio, like a
12 nonvoting member of the election committee.  And
13 Jonathan, I think, is also some kind of nonvoting
14 member.
15         So basically, things relating to the
16 election committee, we are sometimes invited to those
17 meetings.  And other times not, depending on the
18 subject of those meetings.
19     Q    The three pages that follow that email
20 message, does that represent the summary that is
21 referenced or the attachment that is referenced and
22 described as, quote, "Act 77 election reform bill
23 summary"?
24     A    Yes.
25     Q    Did you have any involvement in the

Page 148

1  preparation of the summary that is attached to this
2  November 25th, 2019 email message?
3      A    I think I probably -- I mean, it was
4  probably a collective work, I think.  I can't remember
5  the order of things.  But I think Mike Moser had sent
6  an email to the county election directors some time
7  around this time that similarly laid out details.
8         And then I think -- that might have had
9  more details that were relevant to election directors
10 and sort of a technicality.  This was done to be more
11 a lay person.
12         I was going to be speaking at the CCAP
13 annual conference to the county commissioners.  So
14 this was to go to county commissioners.  So slightly
15 less technical.  And I just don't remember.  I am sure
16 I placed some editing or reviewing role in it.  But
17 not sure who actually wrote what.
18     Q    If you look at the attachment, it is three
19 pages long.  Correct?
20     A    Correct.
21     Q    Is there anything in the summary, which
22 states that Act 77 had changed the procedures for how
23 a voter must cast their absentee or mail-in ballot in
24 order for it to be counted?
25     A    You are referring to naked ballot?

Page 149

1      Q    No.  I'm referring to the entire process.
2  Placing it in an inner secrecy envelope, signing the
3  outside declaration, mailing and returning that back
4  to the county boards.  Is there anything in this
5  summary which says any of those things were changed by
6  the Act?
7      A    The section on absentee mail-in voting -- I
8  think the whole thing pretty much focuses on things
9  that had changed.  That was not something that had
10 changed.  The rules governing -- in our opinion, the
11 rules -- that a ballot should be counted without a
12 secrecy envelope was the same as it has always been.
13 Ballots should be counted, even if they are lacking a
14 secrecy envelope.  So no, it didn't -- it wasn't
15 included here, because that had not changed.
16     Q    Well, when was the first time that the
17 Department of State had issued a guidance or directive
18 which declared that an absentee or mail-in ballot that
19 lacked an inner secrecy envelope should be counted?
20     A    I can't speak to forever.  I can only speak
21 to what I know during my tenure.  During my tenure,
22 the first time was in those weeks before the primary
23 where the question was arising.
24     Q    You agree with me --
25     A    I'm sorry, let me take a step back.  Was

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

39 (Pages 150 to 153)

Page 150

1  your question, did you use the word "directive"?
2  Because there was no directive.
3  **Q   No.  I said guidance or directive.**
4  A    So guidance was given, as you showed me, by
5  email, emails to the counties, both generally and
6  specifically in response to questions.
7       But the first sort of official guidance
8  that is marked as "TLP:  White," and version number,
9  and so forth is the one issued earlier this week, that
10  I am aware of, in my tenure.
11  **Q   So the first one was a May 28th, 2020 email**
12  **message.  And then the written guidance that was just**
13  **produced today and dated August 19th, 2020.  Correct?**
14  A    That I am aware of during my tenure.  There
15  very well may have been old documents from a while
16  ago, that I am not aware of.
17  **Q   Is there anything in your summary which**
18  **indicates Act 77 authorized third party delivery or**
19  **ballot harvesting of non-disabled voters' absentee or**
20  **mail-in ballots?**
21  A    No.  Again, that did not change.  What did
22  actually, I see here, in the absentee and mail-in
23  voting section, it says the process for obtaining an
24  emergency absentee ballot has been simplified.
25  Multiple individuals may now designate the same

Page 151

1  individual to deliver their ballots.
2       Envision a scenario where the same hospital
3  employee delivers ballots from multiple locations.
4  That is the example I gave earlier today.  That is the
5  part of third party -- that is the only part of third
6  party delivery that had changed.
7       So that is why that part is in here.  As
8  far as Act 77, it didn't change anything else about
9  third party delivery for regular non-disabled or
10  non-emergency voters.
11  **Q   Is there anything in your November 2019**
12  **summary, which states that Act 77 authorized the use**
13  **of drop boxes or other collection locations for the**
14  **return of voted absentee or mail-in ballots?**
15  A    Could you ask your question again?  Was it
16  specific to drop boxes?
17  **Q   Yes.  Is there anything in the summary,**
18  **which you prepared in November 2019, which states that**
19  **Act 77 authorized the use of drop boxes or other**
20  **collection locations for the return of voted absentee**
21  **or mail-in ballots?**
22  A    There is nothing about drop boxes,
23  specifically.
24  **Q   Is there anything about creating other**
25  **collection locations?**

Page 152

1  A    Hang on.
2       I don't think in this one.  Not in this
3  one.
4  **Q   Go ahead.  I apologize.**
5  A    Not in this one.  This is, I think, very --
6  this was done -- the part of Act 77 actually required
7  the Secretary of State to communicate to the public
8  the changes in the election processes that occurred as
9  a result of Act 77.  So we started right away.
10       In fact, I think I had a conversation with
11  Doug and Lisa.  I think Jonathan Marks and I had a
12  conversation with Doug and Lisa either the night it
13  passed or the next day to start planning that.  But
14  this was, I think, the first real summary.  And we
15  were just trying to get out an overview without it
16  being 16 pages long.
17  **Q   On the second page, you also reference the**
18  **fact that one of the things that Act 77 did was they**
19  **are no longer going to be straight party voting.**
20  **Do you see that?**
21  A    Correct.
22  **Q   Was the fact that there was no longer going**
23  **to be straight party voting, was that part of the**
24  **compromise that was reached between the Democratic and**
25  **Republican party to get this legislation passed?**

Page 153

1  A    Yes.
2  **Q   Is it your understanding that if there is**
3  **any challenge to the Constitutionality of any**
4  **provision of the Act 77, that the whole deal then gets**
5  **set aside?**
6       MR. DONOVAN:  Objection.  To the extent you
7       know.  She is not testifying about what the
8       statute may or may not provide.
9  A    I mean, I don't want to give a legal
10  opinion on it.  I know there was a provision in a law
11  that involved -- what is the word?
12       MR. DONOVAN:  Severability.  Don't
13       speculate.
14  **Q   You weren't involved in discussions**
15  **involving the severability of the Act?**
16  A    No.  It was more of a legal analysis.
17  **Q   Following the November summary, the**
18  **Department did issue its first guidance with regard to**
19  **mail-in and absentee ballots.  That was done in**
20  **January 2020.  Correct?**
21  A    You mean actually officially titled
22  guidance -- why don't you show me the document?
23  **Q   Sure.  Why don't you pull up KB19.**
24  **(Thereupon, Exhibit No. 14 was marked for**
25  **identification.)**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

Page 198

1    A    There is -- I do not believe I have
2  enforcement penalty authority, if they do not.  This
3  is guidance.
4    **Q    If a county board of election doesn't**
5  **either submit a plan, or doesn't meet the 45 day**
6  **deadline, there is no action the Department of State**
7  **is going to take against them?**
8          MR. DONOVAN:  Objection.  Calls for
9  speculation.  We haven't reached that period yet.
10   **Q    Is that your understanding?**
11         MR. DONOVAN:  I object to form.
12   A    It is a different question anyway.  Because
13  we would -- if we -- frankly, we are very much in
14  close contact with the counties.  And so, usually we
15  know we are likely to hear what their plans are.  This
16  just formalizes it to some degree.
17         So if we hear that -- again, this is all
18  developing.  This is going to be the second election
19  in November since Act 77 was passed.  Some of the
20  provisions of Act 77 don't even take effect.  They are
21  taking effect for the first time in November.
22         So this is a continuing process, where we
23  want the counties to learn from their experiences in
24  the primary, other counties' experiences in the
25  primary.

Page 199

1          And one of the things I think we learned is
2  the more time ahead of time they could plan these
3  things, the easier it will be for voters to access to
4  the site and have awareness of what their options are.
5  This is all for those purposes.
6          So if we were to hear that a county was
7  developing what sounded like a plan and hadn't
8  submitted a plan, we would reach out and ask them for
9  a plan.
10   **Q    But if a county board of election did not**
11  **submit a plan, it's not being barred from using drop**
12  **boxes.  Correct?**
13   A    Again, I think that is a speculative
14  question.  I haven't gotten to that point yet, to see
15  what would happen at that point.  I, honestly, don't
16  expect it to happen, because this plan also provides
17  for supplemental plans to be submitted.
18         So what I expect to happen, again, this is
19  based on somewhat on what we saw in the primary, is
20  that 45 days out, they may not know all of the
21  circumstances.
22         We don't know -- for example, COVID-19, the
23  progression of how bad that got, the closures that
24  happened, and then some counties started opening up
25  towards the end, right before the primary.

Page 200

1          So things changed.  So this allows -- the
2  guidance recognizes that circumstances change.
3  Counties may decide that after -- like in the last two
4  weeks before the election, they may want to add
5  additional ballot collection sites.
6          So we are expecting this is going to be a
7  conversation with the counties about how to help them
8  provide the most secure and accessible options for
9  voting to voters, both in-person and by mail and
10  absentee.
11   **Q    If I understand correctly, the 45 day**
12  **deadline, that is September 19, 2020.  Correct?**
13   A    I didn't do the math.
14   **Q    Is that 45 day deadline somewhere in the**
15  **election code?**
16   A    I think I already answered that question.
17  No.  Not that I am aware.
18   **Q    Isn't it also true that absentee and**
19  **mail-in ballots and instructions are to start to be**
20  **mailed out to voters by Tuesday, August 25th, 2020?**
21   A    Sorry?
22   **Q    Isn't it true that absentee and mail-in**
23  **ballots and instructions are to be mailed to voters by**
24  **Tuesday, August 25th, 2020?**
25   A    No.  There are provisions in the law that

Page 201

1  talk about if there is not -- like right now, there is
2  pending challenges in court, statewide challenges to
3  the ballot.  So no, it is not mandated that ballots
4  start to be mailed out when there is pending court
5  cases.
6    **Q    Under section 1.1, you say that county**
7  **boards of election may establish multiple ballot**
8  **return locations where voters may return their own**
9  **voted ballot.**
10   **Did I read that correctly?**
11   A    Yes.
12   **Q    Is there any limitation on the number of**
13  **return ballot locations that a county may use?**
14   A    No.
15   **Q    Has the Department of State published any**
16  **guidance on what it would consider to be an**
17  **appropriate number of return ballot locations that a**
18  **county should use?**
19   A    No.  I mean, I think in here we give the
20  factors they may want to consider including heavy
21  traffic areas.  You can look at the list of bullets
22  under 1.2.1.
23         If a county -- and counties sometimes reach
24  out to us and ask us whether there is additional
25  information.  Whether it is this issue or others, just

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

52 (Pages 202 to 205)

Page 202

1  because this guy has these eight pages of information,
2  they know they can reach out to us and say, "Do you
3  have suggestions about a per capita number of drop
4  boxes or Ballot Return Sites that other states have
5  used and that won't be able to go to other resources?"
6  And follow up with them and give them additional
7  information.
8      Q    Have any counties asked you for that type
9  of information?
10     A    Me personally, no.  But I can't speak for
11 anybody else in the Department.
12     Q    You mentioned section 1.2.1 of the guidance
13 on page 3.  You identify a number of suggestions for
14 locations.
15     Correct?
16     A    Correct.
17     Q    Does section 1.2.1 authorize the use of
18 drop boxes in parking lots?
19     MR. DONOVAN:  Objection to form.
20     A    I mean, what this says is sites may
21 include, but are not limited to city and municipal
22 facilities, public libraries, county facilities, or
23 other locations designated by the board to receive
24 ballots.
25     It doesn't specifically prohibit --

Page 203

1  obviously, again, this is guidance.  I don't know that
2  it mentions anything about lots.  I can look through
3  this.
4      Q    Does the Department of State believe it is
5  appropriate to put drop boxes in a parking lot?
6      A    I think the Department --
7      MR. DONOVAN:  I object to form.  Go ahead.
8      A    I think what is important is that the
9  Department of State believes there needs to be --
10 other factors need to be met.  So if there is adequate
11 security.  If there is adequate equipment.  If there
12 is either staffing and/or cameras, if there is chain
13 of custody processes, if the collection site or
14 equipment is secure.  Obviously, there is eight pages
15 of stuff here.
16     If everything else is in place, that is
17 what matters more than the specific location of the
18 site.
19     Q    So the Department of State doesn't prohibit
20 a drop box from being in a parking lot?
21     MR. DONOVAN:  Objection.  Form.  Asked and
22 answered.
23     MR. HICKS:  I didn't get an answer.
24     Q    Is it the Department of State's position
25 that drop boxes in parking lots are permissible?

Page 204

1      MR. DONOVAN:  Mr. Court Reporter, could you
2  read back the last answer to the last question
3  she gave?  I think she did answer at the end,
4  Ron.
5      Q    Okay.  I didn't hear that.  We are missing
6  some communication sometimes.
7      Is it the Department of State's position
8  that drop boxes are okay in public parks?
9      A    What I would say, again, what is more
10 important is that the security, the durability, the
11 chain of custody, signage, accessibility, all these
12 other factors that go on for eight pages, this is what
13 matters.
14     There is a million different scenarios you
15 could ask about.  And my answer is always going to be
16 tell me all the details -- answers to these other
17 questions.  I can't know the answer to the question
18 without knowing whether all these other factors are
19 accounted for.
20     Q    Does the Department of State believe that
21 it is okay to have drop boxes in elected officials'
22 offices or in union halls?
23     A    I would prefer not to have drop boxes in
24 elected officials' facilities or union halls,
25 preferably.  That is my opinion.

Page 205

1      Q    Has the Department of State published a
2  list of acceptable versus unacceptable Ballot Return
3  Site locations for drop boxes?
4      A    We have published this document.
5      Q    Does this document, that has been marked KB
6  Exhibit 17, include a list of acceptable versus
7  unacceptable Ballot Return Site locations for drop
8  boxes?
9      MR. DONOVAN:  Is the question, Ron, an
10 explicit list of what is accessible and what is
11 not, rather than the factors?
12     MR. HICKS:  Correct.
13     MR. DONOVAN:  The question is do you have a
14 list of what is acceptable, what is not.
15     A    The factors is what is here.  Again, as I
16 said earlier, we see guidance particularly on a brand
17 new lot, brand new reach of voters to vote by mail and
18 so forth.
19     This is a continually evolving process.  So
20 may we, in getting specific questions from counties,
21 add to this, change this, alter this as we go?
22 Absolutely.
23     And as you know, we also asked the
24 Pennsylvania Supreme Court to give us an opinion on
25 issues relating to drop boxes.  So whatever they would

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

53 (Pages 206 to 209)

Page 206

1    issue, of course we would carry out their decision as
2    well.
3         Q    You do agree with me, that under section
4    1.2, that is the only portion of the advisory -- or
5    the guidance that refers to location of Ballot Return
6    Sites.
7         Correct?
8    A    I'm sorry?
9         Q    Do you agree with me that section 1.2 of
10   the August 19, 2020 guidance is the only section that
11   deals with the location of Ballot Return Sites?
12   A    I don't think that is right. I think
13   because the other factors impact that. So I would
14   have to look through every part of this.
15       But I think acceptability of Ballot Return
16   Sites goes to the location. I think security of the
17   Ballot Return Sites could go to location. I think
18   there is a lot of factors in here that touch on
19   location.
20       If you had all of the factors met, and you
21   had security, and you had accessibility, and you had
22   signage, and you had cameras, or staffing, or in
23   multiple languages. If you are in a county where that
24   is required and so forth, that all then touches on a
25   location and makes that location perfectly fine.

Page 207

1        Whereas, if you had that same location
2    without all those factors, then you might rule out
3    that location under those circumstances.
4         Q    So you are saying even if -- if all those
5    factors are in the positive, if they choose to put it
6    in a union hall, the Department of State would say
7    that's okay?
8         MR. DONOVAN: Objection to form.
9    A    That is not what I said. I said this is a
10   constantly evolving guidance. And it is something I
11   would talk about with the counties and with my team.
12       Q    So you do have some limits as to where you
13   would suggest drop boxes not be placed. But you
14   haven't published what those limits are.
15       Correct?
16       MR. DONOVAN: Objection to form. That is
17   not her testimony.
18   A    I think I already answered the question
19   that that is not in this document currently.
20       Q    Do you know whether Ms. Degraffenreid
21   relied on any studies to come up with the criteria
22   that is listed under 1.2.1?
23   A    I do not know.
24       Q    Did you provide any input into the criteria
25   of the bullet point items listed under 1.2.1?

Page 208

1    A    I can't remember if it is here. In the
2    guidance we put out on January 10th, I think there was
3    something about in rural areas -- something about
4    where it specified rural areas.
5        I think that same language was in here. I
6    deleted the word "rural." Because I thought it was
7    relevant for rural, and it was relevant for all areas,
8    not just rural.
9         Q    What is meant by proximity to language
10   minority communities?
11   A    People for whom English is not their
12   primary language.
13       Q    Why is a drop box pertinent or tied to
14   people who don't speak English?
15       MR. DONOVAN: Objection to form.
16   A    I think that there is -- as a general rule,
17   people who don't speak English well, it is harder for
18   them to know what options they have for voting.
19       And so the more that you have information
20   and locations and options for them where they live,
21   the more -- or near where they live, the more likely
22   some of them are going to learn about those options
23   and those locations. They are going to talk to each
24   other. They could explain to them that they used it.
25       So you know, it's like anything else, the

Page 209

1    more familiar your community is with something, the
2    more likely you are going to be comfortable with it.
3    Particularly for those who -- for whom may not -- who
4    may not speak English well, and don't have access to
5    all kind of resources that would be available in
6    English, but not in some of those other languages.
7         Q    Did the Department of State review any
8    demographic data to determine a different formula or
9    method for determining the location for Ballot Return
10   Sites?
11       MR. DONOVAN: Objection. There is no
12   formula. I object to the question to the extent
13   it is referring to this document.
14       THE WITNESS: Do I answer?
15       MR. DONOVAN: If you can.
16       Q    You can answer.
17   A    I don't know.
18       Q    Prior to the issuance of this guidance and
19   the information that appears under section 1, did the
20   Department of State conduct any survey to determine
21   how many voters use drop boxes to submit their
22   absentee and mail-in ballots for the June 2nd, 2020
23   primary?
24   A    I am sorry. Could you repeat the question?
25       Q    Yes. Did the Department of State conduct

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

54 (Pages 210 to 213)

Page 210

1  any analysis or study of how many voters used drop
2  boxes to submit their absentee or mail-in ballots
3  during the 2020 primary election here in Pennsylvania?
4      A   I don't think the Department of State has
5  that information.  So it really would be better
6  directed at the counties.
7      Q   Under section 1.2.2 of the August 19, 2020
8  guidance, you refer to hours of operation.  Do you see
9  that?
10     A   Yes.
11     Q   According to the guidance, you are
12  encouraging the drop boxes to be made available beyond
13  normal business hours, including on weekends and week
14  nights.  Correct?
15     A   Correct.
16     Q   So you are encouraging the use of unmanned
17  boxes.  Correct?
18         MR. DONOVAN: Objection.  Form.
19     A   This doesn't specify unmanned or manned.
20  This is consistent with what we said in the January
21  10th guidance.  I think the exact language refers
22  to -- again, this guidance is Ballot Return Sites,
23  some of which are CEOs, some of which may not be CEOs.
24         What we were saying is regardless of the
25  form, you should have options for voters that are

Page 211

1  outside normal business hours, if possible.
2      Q   Did you make any recommendation that if the
3  hours of operation are outside the normal business
4  hours, that they should be manned at all times?
5      A   Staffed?  No.  I think you could have -- so
6  it really depends on the circumstances.  I mean, you
7  could have a Ballot Return Site that is inside and
8  under surveillance.  Or have people -- it has a guard
9  in the building, but maybe not -- I mean, there is a
10  lot of different scenarios.
11         I think, again, what I would say is if the
12  other factors are covered, if it has security, if it
13  has signage, if it has -- if it is weather resistant,
14  or in a location where it is not under weather.  If it
15  is maintained, if there is chain of custody, if there
16  is languages where it is required, all those other
17  factors are what is most important.
18     Q   If we turn to the fourth page of the
19  exhibit.  You mentioned previously there was an
20  opportunity for further submission.  Is that what
21  appears under section 1.3?
22     A   No.  It is under 1.4.  It might also be
23  under 1.3.  Under 1.4 it says, "If county board of
24  elections determines it is in the best interest of
25  their voters to alter their plan or increase/decrease

Page 212

1  the number of Ballot Return Sites, they may submit a
2  supplemental plan to best no later than 25 days before
3  the election, with notice to the public within five
4  days of submission."  There may be other places where
5  something to that effect is also noted.
6      Q   Is the Department of State going to take
7  any action against a county whose plan is not
8  confirmed?
9      A   I can't answer that at this time.
10     Q   You talked about security.  I want to turn
11  your attention to section 2 of the guidance.
12     A   Yes.
13     Q   Under section 2.2, you refer to drop boxes
14  as secure receptacles.
15         Correct?
16     A   Yes.
17     Q   And then under 2.3, you refer to signage.
18  Correct?
19     A   Yes.
20     Q   Under section 2.3, you do not require 24-7
21  human monitoring or staffing.
22         Correct?
23         MR. DONOVAN:  Under 2.3?  The signage?
24         MR. HICKS:  Correct.
25     A   I don't know how you -- I don't know why

Page 213

1  staffing relates to signage.
2      Q   Your recommendation with regard to
3  preventing third party delivery is simply to have
4  signage posted.
5         Correct?
6         MR. DONOVAN:  Objection to form.
7      A   You are asking, like, unrelated questions,
8  and merging them as if they are one question.
9         In addition to the other things we already
10  talked about throughout here, security, chain of
11  custody, all the other factors in here, we also are
12  suggesting counties should provide signage that says
13  third party return of ballots is prohibited.
14         So it is another factor that helps.  It is
15  not the only factor that would provide that.
16     Q   Isn't it true that you know that signs do
17  not stop people from delivering somebody else's
18  ballot.  Correct?
19     A   I also know there is mailboxes that are in
20  shopping centers and on random street corners that are
21  24-7 not secured.  No chain of custody in the election
22  services.
23         I think drop boxes and Ballot Return Sites,
24  as we are describing them, are at least as secure as
25  that.

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

---

Page 214

1      Q    Well, isn't the difference between a
2  mailbox and a drop box is that a drop box is
3  designated as holding only election materials.
4  Correct?
5      A    Correct.
6      Q    A mailbox may have or may not have an
7  absentee ballot in it.  Correct?
8      A    Correct.
9      Q    Somebody walking by a U.S. post office
10  would have no idea what the contents of that mailbox
11  are.  Correct?
12      A    Correct.
13      Q    But somebody walking by a drop box that
14  said "The property of Montour County board of election
15  absentee ballot or mail-in ballots only" will know
16  what the contents of that drop box are.  Correct?
17      A    Yes.  And that is why we put out all these
18  suggestions on security, continual pickup of the
19  ballots, chain of custody, surveillance, all these
20  factors go to making it more secure.
21          Again, the key is the processes matter.
22  And if you have those processes in place, that means
23  you have the ability -- then you have far more
24  security and far more surveillance and far more
25  custody tracking than you would ever have with 90% of

---

Page 215

1  the mailboxes in the world.
2      Q    Isn't it true, Madam Secretary, that in
3  Philadelphia, they had signage on their drop boxes,
4  which said voters can only vote their ballots?
5      A    I don't know.
6      Q    Did Mr. Martin --
7      A    By the way -- I was going to say, by the
8  way, I just want to supplement.  Something like half
9  the states, or maybe even more across the country have
10  been using drop boxes for years.  And this has not
11  been an issue in most places.
12          If it is done well, again, it adds
13  security.  It adds accessibility so that voters can
14  have that peace of mind.  It adds confidence.  The
15  counties that use drop boxes in the primary, it gave
16  the counties and the voters confidence that their
17  ballot would be delivered timely and securely.
18          And that confidence is critical.  Not to
19  mention safety.  So they don't have to go into a post
20  office, or go buy a stamp, or also providing prepaid
21  postage, that still requires finding a mailbox or a
22  post office to go to.
23          So these are just making it more accessible
24  and safe for voters to make sure that they have the
25  confidence to know their ballots are delivered on

---

Page 216

1  time.
2      Q    Isn't it true that one of the significant
3  differences between Pennsylvania's mail-in ballot law,
4  and other states' ballot laws is that Pennsylvania's
5  ballot laws expressly prohibit third party delivery of
6  non-disabled voters' ballots?
7          MR. DONOVAN:  Ron, I want a stipulation
8  objection.  Any other state was not relevant.
9  Are you now agreeing other states are relevant?
10  It has to be either or.
11          MR. HICKS:  She just raised the fact, as
12  justification for this position, her reliance on
13  other states.
14          MR. DONOVAN:  You can answer.
15          MR. HICKS:  I don't have to stipulate on
16  anything.  Your witness said she is relying on
17  other states' use of mail-in ballots.  I'm
18  entitled to ask the question.
19      Q    Madam Secretary, isn't it true the other
20  states --
21          MR. DONOVAN:  Hold on.  Hold on, Ron.  Calm
22  down.  Don't raise your voice.
23          I want to say you are right.  You can ask
24  her that question.  But she wasn't saying she was
25  relying on other states for this.  That is what I

---

Page 217

1  wanted to clarify.  But that is fine.  You can
2  ask the question.  We can talk about other
3  states.  Go ahead.
4      A    I don't have information on every law and
5  provision in each of the other states that use drop
6  boxes.  But I don't believe that every one of them
7  allows third party delivery of ballots.
8      Q    Are you aware of the fact that in
9  Philadelphia there are photographs that were taken by
10  the news media and posted on social media where people
11  were dropping off more than one ballot into these drop
12  boxes?
13          MR. DONOVAN:  Objection.  Foundation.
14  Calls for speculation.
15      A    I have seen some of these pictures.  I
16  don't believe they show what you are alleging they
17  show.
18      Q    Secretary, do you have a Twitter account?
19      A    I do.
20      Q    Did you happen to tweet six days ago an
21  article that was posted by the Philadelphia Inquirer
22  titled "Pennsylvania to voters, don't panic about your
23  mail ballot"?
24      A    Yes.
25      Q    Did you happen to look at the picture you

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Kathy Boockvar**

56 (Pages 218 to 221)

Page 218

1    tweeted?
2        A    I did not at the time I tweeted it. But
3    yesterday, I was shown it. And I don't think that it
4    clearly shows multiple ballots being delivered.
5        Q    Is this the picture of the gentleman who is
6    wearing the water authority jacket?
7        A    I don't have it in front of me. Would you
8    like to show it to me?
9        Q    I can't do that with my phone.
10       MR. DONOVAN: She is happy you are a
11   follower, though. All kidding aside. Could we
12   take a short break? Whenever there is a break,
13   if we could take a short break. If you want to
14   finish this, go ahead.
15       Q    Do you believe that the signage requirement
16   that you have under section 2.3, do you believe that
17   will stop people from delivering ballots that don't
18   belong to them?
19       MR. DONOVAN: Objection to form.
20       A    This alone?
21       Q    Yes.
22       A    I think the language in one bullet point in
23   one section of one guidance probably on its own is not
24   magic. People have been wrongly delivering other
25   people's ballots into mailboxes.

Page 219

1            I get asked about this all the time from
2    Republicans, from Democrats, from Independents, from
3    legislators, from voters, from county officials.
4    Everybody is sure that whatever party they are not in,
5    that the other side is doing it. None of it is right.
6            And we will continually let the counties
7    know, make sure they are educating their voters. We
8    are putting out information, as much as we possibly
9    can, to say you can only deliver your own ballot,
10   except in the circumstances that we already discussed.
11           Voters with disabilities who designate
12   agents, and the agents accept, and emergency absentee
13   ballots. Again, we are all in agreement that that is
14   not appropriate. And everything we can do to make
15   sure the voters know that is great.
16       Q    But doesn't the use of drop boxes
17   exacerbate the problem?
18       A    No. I don't believe it does.
19       Q    We can take a break at this point.
20       VIDEOGRAPHER: We are off the record. The
21   time is 4:01 and 39 seconds.
22       (Recess taken.)
23       VIDEOGRAPHER: We are now back on the
24   record. The time is 4:06 and 36 seconds.
25       Q    Madam Secretary, if I could turn your

Page 220

1    attention to page 6 of Exhibit 17. You mentioned
2    previously that another one of the recommendations in
3    terms of security was also to make certain that there
4    be some type of video surveillance being used.
5    Correct?
6        MR. DONOVAN: Could you repeat the
7        question, Ron, about video surveillance?
8        Q    Under section 2.5 of the guidance, is one
9    of the recommended security measures, that the
10   Department of State is recommending, is that there be
11   some type of video security surveillance when
12   feasible?
13       A    Correct.
14       Q    You would agree with me, much like signage,
15   video surveillance will not actually stop somebody
16   from depositing more than their own ballot into a drop
17   box?
18       A    Correct. It wouldn't stop. And it would
19   allow, frankly, investigation after the fact, if there
20   was anything illegal or improper that was noted in
21   said case.
22       Q    And you say after the fact. Isn't it
23   accurate that once somebody deposits a ballot that is
24   not theirs into a ballot box, it is virtually
25   impossible to figure out which ballot had been

Page 221

1    deposited by the non-voter. Correct?
2        MR. DONOVAN: Object to form. Calls for
3        speculation.
4        A    I would think it wouldn't be that hard,
5    depending on if you could identify the person. I am
6    going to backtrack. I think it depends. The details
7    matter.
8            You might see a particular Joe Smith. And
9    there might be Mary Smith's ballot in the ballot box,
10   who happens to be married to Joe Smith. And maybe you
11   could make certain deductions based on that. Or is
12   that inductions? I don't know.
13           But either way, I think the details matter.
14   Sometimes you might, other times you might not.
15   Either way, I guess if you see -- if you are able to
16   identify an individual, and they are depositing 20
17   ballots into the box, then you know that that person
18   has done more than deposit their own.
19       Q    But you don't know which ballots they
20   deposit, unless the actual name on the ballot is
21   captured by the video surveillance. Correct?
22       A    I'm sorry?
23       Q    You won't know which ballots are actually
24   cast unless it is captured by the video surveillance?
25       A    I mean, you can -- again, there are

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**