# EXHIBIT K

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Michael Crossey, Dwayne Thomas, | : | |
| Irvin Weinreich, Brenda Weinreich, | : | |
| and the Pennsylvania Alliance | : | |
| for Retired Americans, | : | |
| Petitioners | : | |
| | : | |
| v. | : | 266 M.D. 2020 |
| | : | |
| Kathy Boockvar, Secretary of the | : | |
| Commonwealth, and Jessica Mathis | : | |
| Director of the Bureau of Election | : | |
| Services and Notaries, | : | |
| Respondents | : | |

## RECOMMENDED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### I. Introduction

On April 22, 2020, the Pennsylvania Alliance for Retired Americans and four individuals, two of whom are members of the Alliance (collectively, Petitioners), filed a Petition for Declaratory and Injunctive Relief (Petition) against the Secretary of the Commonwealth, Kathy Boockvar, and the Director of the Bureau of Election Services and Notaries, Jessica Mathis (collectively, Secretary) in this Court. Anticipating disruptions to the June 2, 2020, primary election from the COVID-19 pandemic, the Petition raised, *inter alia*, constitutional claims about provisions of the Pennsylvania Election Code (Election Code)[1] related to mail-in ballots, which is a method of voting that the General Assembly added to the Election Code by the Act of October 31, 2019, P.L. 552, No. 77 (Act 77). Petitioners filed a May 8, 2020, Emergency Application for Special Relief in the Nature of a

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2600-3591.

Preliminary Injunction and for Expedited Review (Preliminary Injunction Application).

This Court held a pre-hearing telephone conference call on the Preliminary Injunction Application, during which the Secretary confirmed her intention to challenge this Court's jurisdiction over the Petition in her preliminary objections.  The parties agreed to bifurcate the issue of jurisdiction over the Preliminary Injunction Application from the merits.  After briefing by the parties and intervenors,[2] this Court denied the Preliminary Injunction Application on May 28, 2020, on the basis that Petitioners were not likely to prevail on the issue of this Court's jurisdiction.

On June 17, 2020, this Court issued an opinion and order transferring the matter to the Supreme Court of Pennsylvania.  This Court agreed with the Secretary that the Petition's claims fell within the Supreme Court's exclusive jurisdiction over constitutional challenges to Act 77 under Section 13(b) of Act 77.[3]  *Crossey v. Boockvar* (Pa. Cmwlth., No. 266 M.D. 2020, filed June 17, 2020).

---

[2] After this Court transferred the matter to the Supreme Court, the Supreme Court granted the applications for leave to intervene filed on behalf of President Pro Tempore Joseph B. Scarnati, III, and Majority Leader of the Senate Jake Corman (collectively, Senate Intervenors) and on behalf of the Speaker of the House of Representatives Bryan Cutler and House Majority Leader Kerry Benninghoff (House Intervenors).  *See Crossey v. Boockvar* (Pa., No. 108 MM 2020, filed August 21, 2020).

The Supreme Court denied the application for leave to intervene filed by the Republican Party of Pennsylvania, the Republican National Committee, and the National Republican Congressional Committee.  *Id.*

[3] Specifically, this Court concluded that the Petition challenged Sections 1306 and 1306-D of the Election Code.  These sections relate to the date, time, and manner by which absentee or mail-in ballots must be returned to the county boards of elections.  They are listed in Section 13(b) of Act 77 as sections over which the Supreme Court had exclusive jurisdiction if a challenge was brought within 180 days of Act 77's effective date.

The Supreme Court accepted the transfer at 108 MM 2020 and granted Petitioners' Application for Leave to File an Amended Petition by July 13, 2020. The Amended Petition for Review (Amended Petition) sets forth constitutional claims arising from the Secretary's failure (1) to allow the return of absentee and mail-in ballots after the 8:00 p.m. Election Day deadline, because of alleged backlogs in the application process and delays by the United States Postal Service (USPS) in mail delivery; (2) to provide prepaid postage on mail-in ballots; and (3) to allow voters to obtain third-party assistance in the return of mail-in ballots. The Amended Petition alleges that the Secretary's failure to implement such procedures violates Article I, Sections 1,[4] 5,[5] and 26[6] of the Pennsylvania Constitution. Petitioners request the Supreme Court to declare that the above-listed barriers to voting by mail violate their constitutionally protected right to free access to a free and equal election during the pandemic. Petitioners request the Supreme Court to order the Secretary to implement additional safeguards for the November 3, 2020, general election and any other election held during the pandemic. These proposed safeguards include providing prepaid postage on all absentee and mail-in ballots; counting ballots delivered after the statutory deadline of 8:00 p.m. Election Day; and authorizing third-party assistance in the collection and submission of absentee and

---

[4] Article I, Section 5 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art. I, §1.

[5] Article I, Section 5 of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, §5.

[6] Article I, Section 26 of the Pennsylvania Constitution provides: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." PA. CONST. art. I, §26.

mail-in ballots to the extent the latter two measures do not trigger Act 77's non-severability provisions.

The Secretary and Intervenors filed preliminary objections to the Amended Petition.[7] Prior to disposition thereof, the Supreme Court issued an August 26, 2020, order appointing the undersigned as Special Master and directing the Court "to create an evidentiary record on claims raised in this case including the ability of the United States Postal Service to comply with deadlines for the November 3, 2020 general election." *Crossey v. Boockvar* (Pa., No. 108 MM 2020, filed August 26, 2020). The Supreme Court directed this Court to file with the Prothonotary of the Supreme Court its proposed findings of fact and conclusions of law and recommended disposition no later than Friday, September 4, 2020. *Id.*

On August 27, 2020, this Court issued a case management order that directed the parties and intervenors to file pre-hearing statements by Friday, August 28, 2020. It scheduled a pre-hearing telephone conference for Saturday, August 29, 2020, and an evidentiary hearing for August 31, 2020. It also ordered that the parties

---

[7] The Secretary objected on the basis that the Amended Petition (1) fails to state a constitutional claim because its allegations are hypothetical; (2) the Alliance lacks standing as an organization and asserts claims not ripe for review; and (3) fails to join indispensable parties, *i.e.*, the county boards of elections. The Secretary also objected on the basis that the Commonwealth enjoys sovereign immunity that bars mandatory injunctive relief.

On August 13, 2020, the Secretary withdrew her preliminary objections that the Amended Petition did not state a constitutional violation and was not ripe for review.

Senate Intervenors objected on the basis of (1) lack of jurisdiction and ripeness; (2) failure to join the county boards of elections as indispensable parties; (3) the claims raise non-justiciable political questions; (4) failure to conform to law; (5) insufficient specificity of the pleadings; and (6) lack of capacity to sue.

House Intervenors objected on the basis of (1) lack of standing of the Alliance because it does not vote; (2) failure to state a constitutional violation; (3) failure to present a justiciable claim; and (4) failure to join indispensable parties.

and intervenors file and serve proposed findings of fact and conclusions of law by
September 2, 2020, 9:00 a.m.

## II. Evidentiary Hearing of August 31, 2020

The Court summarizes the hearing testimony and documentary
evidence as follows.

## A. Petitioners' Witnesses[8]

## 1. Ronald Stroman

1. Ronald Stroman served as Deputy Postmaster General from 2011 to June
   2020. Notes of Testimony, [Aug. 31, 2020,] 13-15 (N.T. ____).

2. He holds a B.A. in government from Manhattan College and a J.D. from
   Rutgers University. N.T. 13.

3. Mr. Stroman was a member of the USPS Board of Governors, which
   oversees the strategic direction of the USPS. He served on the Postmaster
   General's Executive Leadership Team, which implements the directions of
   the Board of Governors. N.T. 15.

4. Mr. Stroman had responsibility to improve the communications between the
   USPS, election officials and the election mail community; to improve the
   internal training for USPS employees on election mail; and to develop a
   system for rapid response to election mail issues. N.T. 17; Petitioners' Ex.
   32.

---

[8] The Court took witnesses out of order so that the testimony relevant to each issue was addressed
at the same time. The Court further notes that the transcript of the evidentiary hearing is
incomplete. Paragraphs 16, 39, and 40 of the summary of Mr. Stroman's testimony is based upon
the notes of the court and staff, not the transcript. On September 4, 2020, a corrected transcript
was filed with the Court. The citations herein refer to the transcript filed with the Court on
September 1, 2020.

5.   The Court accepted Mr. Stroman as an expert in the USPS' operations and delivery standards, and the application of those delivery standards to voting by mail.  N.T. 19, 25.

6.   Mr. Stroman testified that there are three aspects to the USPS mail process: retail (local post office), processing and delivery. N.T. 26.

7.   Mail is collected by carriers or at a local post office.  All mail is collected and placed with similar types of mail (*e.g.*, First-Class Mail, Marketing Mail) and transported to the processing center.  At the processing center, mail is placed in sorting machines to find the correct zip code.  If the mail remains in the same zip code, it is taken to a truck for transportation to a delivery unit.  Carriers and clerks sort the mail by routes, and then the mail is placed on trucks for delivery to the addressees.  N.T. 26-27.

8.   If mail is designated for a location outside the boundaries of the processing center, it is transported to the appropriate processing center.  Upon receipt there, the same process is used to deliver the mail.  *Id.*

9.   Mr. Stroman was Deputy Postmaster General during the April 2020 Wisconsin primary, and he testified about the investigation the USPS conducted into its performance during that primary.  N.T. 28; Petitioners' Ex. 4.

10.  Mr. Stroman attributed the delay in the receipt of absentee ballots during the Wisconsin primary election to: (1) the different service standards depending on the class of mail; and (2) the date upon which a voter requested a ballot. N.T. 28, 29.

11.  Mr. Stroman testified about the July 29, 2020, letter that General Counsel and Executive Vice President of the USPS, Thomas J. Marshall, sent to

Secretary Boockvar.   That letter advised the Secretary that the Commonwealth's election law deadlines for requesting and casting mail-in ballots are incongruous with the USPS' delivery standards, and that this mismatch creates a risk that ballots requested near the deadline would not be returned in time to be counted under the law.  N.T. 34; Petitioners' Ex. 6.

12. The July 29, 2020, letter further advised that there are two main classes of mail used for ballots: First-Class Mail and Marketing Mail, the latter of which uses a nonprofit postage rate.  Petitioners' Ex. 6.

13. Mr. Stroman agreed with Mr. Marshall's statement that voters must use First-Class Mail (or an expedited service) to mail their ballots and ballot requests, while election officials may generally use First-Class Mail or Marketing Mail to mail ballots to voters.  N.T. 37.

14. Domestic First-Class Mail has a nationwide delivery standard of 2 to 5 days upon receipt at the post office.  N.T. 38, 75; Petitioners' Ex. 6, 32, ¶18.

15. Marketing Mail has a nationwide delivery standard of 3 to 10 days upon receipt at the post office.  N.T. 38, 75; Petitioners' Exs. 6, 32, ¶18.

16. Mr. Stroman agreed that the July 29, 2020, letter does not advocate for changes in Pennsylvania's election law to accommodate the USPS's delivery standards and was intended to be educational.

17. According to Mr. Stroman, mail delivered within the above-listed standards is considered timely under normal circumstances. N.T. 38, 39.

18. Mr. Stroman identified three circumstances that he does not consider normal at this time: the COVID-19 pandemic, new initiatives by the new Postmaster General and the increase in the volume of mail-in ballots.  N.T. 39, 45.

19. The pandemic has caused issues with USPS employee availability, which in turn affects the processing and delivery of mail in both the primary location and secondary location to which the mail is directed. N.T. 39, 40.

20. In the Pennsylvania June 2, 2020, primary, the pandemic affected the delivery of mail not only in the Philadelphia region but also in the entire mail-processing network.  N.T. 43, 44.

21. Mr. Stroman testified that the new Postmaster General, Louis DeJoy, issued a new directive that mail transportation trucks leave at the designated time. If the mail has not been processed before the scheduled departure, the truck leaves without all the mail.  In a cumulative fashion, this causes delays and backups on the delivery side of the process.  N.T. 45-47, 55.

22. The third factor affecting the delivery standards is the volume of ballots. States are amending their election laws, which requires the USPS to train its employees to process election mail.  N.T. 47.

23. The above factors will delay the USPS' ability to meet its delivery standards, according to Mr. Stroman.  N.T. 49.

24. Mr. Stroman testified about Petitioners' Exhibit 9, which is a Score Breakdown of Presort First-Class Mail on a nationwide basis and shows a decline in delivery times for three weeks in July 2020. He testified that Petitioners' Exhibit 9 was consistent with his knowledge of the Postmaster General's testimony in recent U.S. House and Senate Hearings.   N.T. 49-51; Petitioners' Ex. 9.

25. Exhibit 9 purports to show how close the USPS came to meeting its performance standards.  The decline in the score indicates that the USPS did not meet its service performance targets.  N.T. 52-54.

26. Mr. Stroman opined that the USPS' failure to hit its performance targets has a compounding effect and that delays in delivery will get worse as time runs. N.T. 54, 55.

27. Mr. Stroman testified that all ballots returned to the county boards of elections will be single-piece mailings, which requires them to go through the sorting process. This may cause delays.  N.T. 56, 85, 88.

28. Mr. Stroman testified regarding Petitioners' Exhibit 28, which is an Areas Inspiring Mail Chart.  The Chart uses a baseline performance standard of 96%, meaning that percentage of time the USPS meets its delivery standard of 2 to 5 days for First-Class Mail or 3 to 10 days for Mass Marketing Mail. N.T. 58-63; Petitioners' Ex. 28.

29. The Chart provides that in the 43rd week, the USPS' performance rates, when compared to its intended performance standard of 96%, was 72.86% for Central Pennsylvania; 85.68% for the Philadelphia Metropolitan area; and 90.01% for Western Pennsylvania.  N.T. 61; Petitioners' Ex. 28.

30. Mr. Stroman attributed the drop in the performance to the Postmaster General's changes in operations.  N.T. 60.

31. These numbers mean that the USPS is not meeting its service target rates by a large margin, according to Mr. Stroman.  N.T. 61, 62.

32. Mr. Stroman has a high degree of confidence in the data used in Petitioners' Exhibit 28 based on his personal knowledge of how the USPS operates and how such data is retrieved and compiled.  N.T. 101-02.

33. Mr. Stroman opined that the USPS cannot improve its performance before the November 2020 general election.  It takes time to fix the problems due

to the integrated nature of the USPS' network and to clear backlogs.  N.T. 62, 63.

34.  Mr. Stroman opined that there is a significant risk that the USPS will not meet its First-Class Mail service delivery standards of 2 to 5 days during the November 2020 election.  N.T. 66, 70.

35.  Mr. Stroman further observed that not all absentee ballots will be deposited in the mail from within the Commonwealth.  N.T. 71.

36.  Mr. Stroman testified that the USPS' delivery standard is 2 to 5 days within the Commonwealth, which includes mail deposited in the mail outside of the Commonwealth. N.T. 76, 77.

37.  Mr. Stroman did not know which class of mail Pennsylvania election officials will use to mail the ballots to voters or the class by which the ballots will be returned to election officials.  He believed that Pennsylvania's boards of elections are not using uniform mailing.  N.T. 78.

38.  Election mail is not separated from the general mail but the USPS attempts to prioritize it by tagging or coding election mail.  N.T. 83, 85.

39.  Mr. Stroman agreed that the county boards of elections play a very important role in getting the ballots to voters on time and are ultimately responsible for mailing ballots. N.T. 107.  The county boards of elections should ensure that the envelopes used are automation compatible, the proper weight and properly addressed.

40.  Mr. Stroman recommended that voters mail their completed ballots to the county election board at least 10 days prior to the election.

41.  Mr. Stroman testified that it was possible but highly unlikely that a voter who requested a mail-in ballot the Tuesday before the election could have

that ballot mailed to the voter and then received by the county board of elections before the Election Day 8:00 p.m. deadline.   N.T. 120-22; Petitioners' Ex. 32, ¶19.

**2. Devon Laudenslager**

1.   Devon Laudenslager is a resident of the City of Philadelphia and has been registered to vote for four years.  N.T. 282.

2.   Due to the COVID-19 pandemic, Ms. Laudenslager applied for a mail-in ballot from her county board of elections on May 5, 2020, and received a confirmation email the next day that her application had been received.  N.T. 282.

3.   On May 15, 2020, Ms. Laudenslager received a second email indicating that her ballot had been mailed on May 15, 2020, and if she did not receive the ballot by May 22, 2020, she should contact her board of elections.  N.T. 283.

4.   When Ms. Laudenslager did not receive her mail-in ballot by May 22, 2020, she attempted to contact her board of elections.  N.T. 283.  Initially, she received a busy signal and, when the line was not busy, no one answered the phone and there was no ability to leave a message.  N.T. 283-84.

5.   She attempted to locate an alternate phone number to contact the board from its website, but her attempts to reach the board through alternate phone numbers were unsuccessful.  N.T. 284.

6.   As of May 26, 2020, the deadline to apply for a mail-in ballot, Ms. Laudenslager had not received her ballot.  N.T. 283.

7.   Ms. Laudenslager contacted her state representative's office, which told her that it had been in touch with the City of Philadelphia Commissioners

Office, and had a list of voters that needed replacement ballots.  N.T. 285-86.

8.  On June 2, 2020, Ms. Laudenslager went to her polling place to vote because she had not received her mail-in ballot. N.T. 286.

9.  Her vote was counted.  N.T. 286.

10. Ms. Laudenslager received a ballot by mail on June 4, 2020.  N.T. 286.

11. Ms. Laudenslager intends to vote in the November 3, 2020, general election but doubts she will attempt to use a mail-in ballot due to her experience in the June 2020 primary and her fears that she cannot be assured that her county board of elections will receive her ballot in time to be counted even if she receives her ballot timely.  N.T. 287-89.

12. Ms. Laudenslager gave two other examples of issues she had with her mail. She expected a follow-up letter from a graduate school and she received a letter from the Department of Transportation indicating her license would be renewed but that she should expect a follow-up letter.  She never received either follow-up letter. N.T. 287.

**3. Dr. Joseph Eisenberg**

1.  Joseph N.S. Eisenberg, PhD, MPH, is the John G. Searle endowed Chair and Professor of Epidemiology in the School of Public Health at the University of Michigan.  He also has an adjunct appointment at the Universidad San Francisco de Quito in Ecuador.  He received his PhD in Bioengineering in the joint University of California, Berkeley/University of California, San Francisco program, and an MPH from the School of Public Health at the University of California, Berkeley (focusing on the science of infectious disease transmission).  Petitioners' Ex. 30 at ¶2.

2.   Dr. Eisenberg is an infectious disease epidemiologist who researches how pathogens move through the environment and society to cause infectious diseases.  Petitioners' Ex. 30 at ¶¶3, 5.

3.   Since February 2020, Dr. Eisenberg has provided expert advice on COVID-19 by serving on advisory panels (Bipartisan Policy Center, Washington D.C.); presenting Webinars (Alliance for Health Policy, Barsan Research Forum, The University of Michigan Club of Washington, D.C.); and participating in media interviews (Detroit Fox News, MSNBC, WXYX Detroit, New York Times, Washington Post). During the initial phase of the pandemic, Dr. Eisenberg was a member of a subcommittee informing the Governor of Michigan's task force on opening the economy. Dr. Eisenberg has consulted with companies such as Ford Motor Company and Gemline on best practices during the COVID-19 pandemic.  Petitioners' Ex. 30 at ¶6.

4.   The Court admitted Dr. Eisenberg as an expert in the field of epidemiology. N.T. 295.

5.   Dr. Eisenberg observed that COVID-19 cases in Pennsylvania have plateaued, but he expects significant transmission to continue in the fall. N.T. 297.

6.   The novel coronavirus that causes COVID-19 is spread from person to person through the air and on environmental surfaces.  The higher the concentration of virus to which one is exposed, the greater the chances of being infected.  Additionally, being close to people who are coughing, speaking with force, or sneezing is riskier than those who are just speaking normally. Transmissibility increases when people are in enclosed, poorly ventilated spaces, in crowded spaces and in close proximity to other people.

Public gatherings at polling places and ballot return locations in municipal buildings may contribute to the spread of the virus. Petitioners' Ex. 30 at ¶¶2, 14.

7.   Dr. Eisenberg acknowledged the [Centers for Disease Control and Prevention] has adopted "interim guidance for ensuring various voting options, encouraging physical distancing, personal prevention practices, and employing environmental cleaning and disinfection to lower COVID-19 transmission during elections." N.T. 307 (quoting Senate Intervenors Ex.17 at 2).

8.   Allowing voters to vote by mail is consistent with current public health guidelines to minimize the spread of the virus and prevent COVID-19 illness because it (1) decreases the number of people who need to vote in person; (2) allows high-risk individuals to avoid in-person voting; and (3) minimizes the chances that indoor ballot return locations, such as polling stations or county board of elections' offices, will contribute to the spread of the virus. Petitioners' Ex. 30 at ¶¶2, 36.

## B. Respondents' Witness

### 1. Kathy Boockvar, Secretary of the Commonwealth

1.   Kathy Boockvar was appointed as Secretary of the Commonwealth in January 2019 and confirmed by the Pennsylvania Senate in November 2019.

2.   Secretary Boockvar is the chief elections official for the Commonwealth of Pennsylvania with responsibility for assessing risks to the voting process, including obstacles to the accessibility, security and integrity of elections. She and the Department of State engage in a "constant assessment and evaluation" to ensure "the highest level of accessibility, security, and safety

to the voters of Pennsylvania to make sure that they can exercise their right to vote." N.T. 144.

3. At the inception of this litigation in April 2020, Secretary Boockvar opposed a statewide extension of the received-by deadline for mail-in ballots, preferring instead to deal with issues that would arise during the 2020 primary election on a county-by-county basis. N.T. 132.

4. The courts of common pleas in three counties extended the received-by deadline in the 2020 primary election. N.T. 133. An executive order by Governor Tom Wolf extended the received-by deadline by seven days in six counties due to civil unrest. *Id*. at 169.

5. On July 29, 2020, Secretary Boockvar received a letter from Thomas J. Marshall, General Counsel and Executive Vice President of the USPS. Respondents' Ex. 1.

6. In his letter, Mr. Marshall advised Secretary Boockvar that "most domestic First-Class Mail is delivered 2 to 5 days after it is received by the Postal Service, and most domestic Marketing Mail is delivered 3 to 10 days after it is received." Respondents' Ex. 1 at 1. Based on these guidelines, Mr. Marshall recommended that (a) where voters will both receive and send a ballot by mail, they should request a ballot from their election officials at least 15 days before Election Day; (b) election officials should use First-Class Mail to transmit blank ballots and allow one week for delivery to voters; and (c) domestic voters should mail their completed ballots at least one week before the state's due date. *Id*. at 1-2.

7. Observing that Pennsylvania's election laws require a ballot to be returned by Election Day and that voters may request a mail-in ballot as late as 7 days

before Election Day, Mr. Marshall opined that "to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted." Respondents' Ex. 1 at 2.

8.  Mr. Marshall sent the same letter to the Secretary of State of North Carolina on July 30, 2020, noting that in North Carolina "a voter may generally request a ballot as late as 7 days before the November general election, and that a completed ballot must be postmarked by Election Day and received by election officials no later than 3 days after the election." Petitioners' Ex. 7. Mr. Marshall's letter to North Carolina also described North Carolina's election law deadline for receipt of absentee and mail-in ballots "incongruous" and "incompatible" with the USPS nationwide delivery standards for First-Class Mail and Marketing Mail. *Id*. The letter went to 46 states. N.T. 135.

9.  Secretary Boockvar testified that Mr. Marshall's estimate that most domestic First-Class Mail is delivered 2 to 5 days after it is received by the USPS differed from her understanding that such mail typically has a 1 to 3 business day turnaround time, which is what voters would have expected in previous elections. N.T. 138.

10. A total of 1,462,254 ballots were cast by mail in the 2020 primary election. Respondents' Ex. 2. According to the Department of State's records, the mailed ballots were received by the county boards of elections in the following timeframes:

|                       |        |
|-----------------------|--------|
| 2/24/2020 – 3/31/2020: | 278    |
| 4/1/2020 – 4/30/2020:  | 51,743 |

16

| | |
|---|---|
| 5/1/2020 – 5/19/2020: | 292,412 |
| 5/20/2020 – 5/26/2020: | 320,032 |
| 5/27/2020 – 5/31/2020: | 436,701 |
| 6/1/2020: | 173,869 |
| 6/2/2020 (Election Day): | 89,018 |
| 6/3/2020: | 31,183 |
| 6/4/2020: | 14,177 |
| 6/5/2020: | 15,973 |
| 6/6/2020: | 3,966 |
| 6/7/2020: | 84 |
| 6/8/2020: | 10,240 |
| 6/9/2020 – 6/24/2020: | 22,578 |

*Id*.

11. The State of Washington conducts its elections solely by mail and experienced "significant mail delays and a huge increase in the number of ballots received after election day" in the 2020 primary election.  N.T. 141.

12. The Pennsylvania Department of State predicts that approximately 3 million voters will cast their votes by mail-in or absentee ballot in the November 2020 general election.  N.T. 181.  Based on voting patterns in the 2020 primary election, the Department expects that approximately half of the mail-in and absentee ballots will arrive in the last week of voting.  *Id*. at 150-51.

13. Based primarily upon Mr. Marshall's letter, Secretary Boockvar changed her position on a statewide change to the received-by deadline.  In addition, she has had discussions with other state election officials. Secretary Boockvar is concerned that Pennsylvania's deadlines for mail-in ballots are incompatible with the USPS' current delivery timeframes, which are applicable statewide.  She recommends that mail-in ballots should be counted if they are postmarked by Election Day, November 3, 2020, and received by the county

boards of elections no later than 3 days after the election, or by Friday, November 6, 2020.  N.T. 134-136.

14.   Secretary Boockvar opined that, in weighing the contours of an extension, she considered the balance between ensuring citizens can exercise their right to vote and conducting efficient election administration.  Based on voting patterns in the 2020 primary election, the majority of late mail-in ballots arrived within 3 days after the election.  N.T. 154; Respondents' Ex. 2.

15.   Secretary Boockvar opined that Petitioners' requested 7-day extension of the received-by deadline will adversely impact other deadlines.   N.T. 153. These deadlines include the deadline by which certain voters using mail-in or absentee ballots must provide identification, which is on the sixth day after the election;[9] the deadline for defeated candidates to give up any right to a recount or recanvass, which is on the eighth day after the election;[10] and the deadline for the Secretary to order a recount or recanvass, which is on the ninth day after the election.[11]

16.   County boards of elections are increasing their staffing in advance of the November 3, 2020, election and will mail out ballots beginning in September.   Federal funds are available to the boards for purchasing additional processing equipment.  N.T. 145.

17.   The Department of State will reimburse county boards of elections for the return postage they affix to the mail-in ballot envelopes, which will be done in different ways depending on the county, *i.e.*, business return mail, a stamp

---

[9] Section 1308(h) of the Election Code, added by the Act of March 6, 1951, P.L. 3, *as amended*, 25 P.S. §3146.8(h).
[10] Section 1404(h) of the Election Code, 25 P.S. §3154(h).
[11] Section 1404(g)(2) of the Election Code, 25 P.S. §3154(g)(2).

or a meter marking.  N.T. 158-59.  "[A]n overwhelming majority of times there's going to be a postmark."  *Id*. at 159.

18. The Department of State is conducting major efforts to educate voters about the process of voting by mail and the importance of doing so promptly.  N.T. 146-47.

19. When impediments to voting arise in individual counties, such as local emergencies or delays in issuing ballots, a county may seek relief from its own court of common pleas.  N.T. 132, 155-56.

## C. Senate Intervenors' Witness

## 1. Michael Plunkett

1. Michael Plunkett is a retired 25-year employee of the USPS. He holds a B.A. in Economics from the Pennsylvania State University, an M.B.A. from the Wharton School, University of Pennsylvania, and a second M.B.A. from the Massachusetts Institute of Technology. N.T. 205.

2. Mr. Plunkett worked for the USPS in various staff and management positions, including letter carrier and Associate Vice President of Business Development.  N.T. 193; Senate Intervenors (SI) Ex. 1, ¶¶1-3.  He retired from the USPS in 2011 and since 2016 has served as President and CEO of the Association for Postal Commerce, which is a trade association for companies that use the USPS in their business.  SI Ex. 1, ¶3.

3. Mr. Plunkett was admitted as an expert witness in USPS delivery performance standards and practices on postmarks.  N.T. 202, 211.

4. Mr. Plunkett used the quarterly reports filed by the USPS with the Postal Regulatory Commission, the regulator for the USPS, as the source of data

for his expert testimony about USPS operational performance in Pennsylvania and in the Eastern Area.  SI Ex. 1, ¶7.

5.   Pennsylvania has 8.5 million registered voters.  For purposes of his opinion, Mr. Plunkett assumed that all voters would vote by absentee or mail-in ballots in the November 2020 general election over the 50-day period permitted under the Election Code.  SI Ex. 1, ¶¶13, 15.

6.   Most outbound First-Class Mail is sent in batches known as "Presort First-Class Mail," which will be used to send ballots to voters by county boards of elections.  SI Ex.1,  ¶¶8, 10.

7.   Election mail is treated differently than other First-Class Mail because it is prioritized for faster delivery.  N.T. 267-268.

8.   Mr. Plunkett testified that USPS delivery standards are zip code specific. The service performance standard for First-Class Mail within the 48 contiguous states is 2 to 3 days, and 2 to 5 days for those states plus Alaska, Hawaii and Puerto Rico.  It is 6 days for Guam.  For mail within Pennsylvania, the service performance standard is 2 days, although it is 3 days for mail between Erie and Philadelphia.  For intra-county mail in Pennsylvania, the service performance standard is 2 days but up to 3 days for some counties.  N.T. 213, 244.

9.   Mr. Plunkett testified about the USPS report for the first quarter of 2020 covering the Eastern Area, made up of four districts that cover Pennsylvania identified as "Appalachian," "Central Pennsylvania," "Philadelphia Metro" and "Western Pennsylvania."  N.T. 217.  The report showed that 99.5% of outbound Presort First-Class Mail was delivered within 3 days.  This included mail originating within and outside Pennsylvania. Of that total,

98.3% was delivered within 1 day.  SI Ex. 1, ¶¶8, 10.  The service standard is 2 days for mail originating and ending in Pennsylvania.  N.T. 219.

10. The USPS report for the first quarter of 2020 showed that in the Eastern Area, 97.0% of First-Class Mail was delivered within 3 days.  Of that number, 92.5% of all First-Class Mail was delivered within 1 day. SI Ex. 1, Attachment A.

11. The USPS report for the second quarter of 2020 in the Eastern Area showed that approximately 99% of Presort First-Class Mail in Pennsylvania was delivered within 3 days, with 97.4% being delivered within 1 day.  SI Ex. 4 at 2; N.T. 217.

12. The second quarter of 2020 included the period of time the USPS experienced a reduction in employee availability caused by the COVID-19 pandemic.  N.T. 225.

13. The volume of First-Class Mail declined approximately 9% between 2019 and 2020, which suggests that the USPS has capacity to handle an increase in mail volume.  SI Ex.1, ¶18.

14. During the first quarter of 2020, the USPS processed approximately 700 million Presort First-Class Mail letters and postcards in the Eastern Area.  SI Ex.1 ¶11.  If all 8.5 million registered voters in Pennsylvania request an absentee or mail-in ballot for the November 2020 election, that would represent 1.2% of USPS capacity in the Eastern service area.  N.T. 144.  The Secretary anticipates that 3 million Pennsylvanians will vote by mail in 2020, which represents 0.4% of USPS capacity in the Eastern service area. N.T. 181.

15. Given the  volume of First-Class Mail handled by the USPS in the Eastern Area, Mr. Plunkett testified that the addition of 8.5 million ballots would not create an operational issue for the USPS.  N.T. 181; SI Ex. 1, ¶15.  Mr. Plunkett opined that "adding outbound and inbound election related mail in Pennsylvania would not impact the USPS' ability to provide reliable and timely mail service."  SI Ex. 1, ¶24.

16. Mr. Plunkett is "unaware of any significant disruptions to First-Class Mail service."  SI Ex. 1, ¶19.  Such disruptions would be known to him given his 25-year employment with the USPS and current employment with the Association for Postal Commerce, which continually monitors USPS performance.  N.T. 205.

17. Upon being shown Petitioners' Exhibit 28, Mr. Plunkett testified that the Postmaster General acknowledged that policy changes caused a temporary decline in service.  Because the Postmaster General has ended the practice of trucks leaving a processing center before all mail has been sorted, USPS service should return to pre-decision levels. N.T. 252-53.

18. "Postmarks" are applied to stamped mail to prevent reuse of the stamp.  N.T. 236; SI Ex. 1.  Commercial mail generally bears evidence of payment, such as permit imprints, that are linked numerically to postage accounts.  This mail does not bear traditional "postmarks" readable by the human eye.  SI Ex. 1, ¶29.

19. The USPS has created specific service type identification (STID) codes, which are encoded in an intelligent mail barcode, for use on election mail that will allow it to identify and track ballots as they move through the USPS network.  SI Ex. 1, ¶35.

20.  The marks imprinted by the USPS on this type of mail are not readable by the human eye and would require scanners and software to decode.  SI Ex. 1, ¶36.  Mr. Plunkett testified that the USPS "plans to isolate election mail and to postmark even where postmarks are not necessary."  N.T. 246, 261.

21.  Mr. Plunkett testified that a voter who requests a ballot on the last day in the general election cycle, Tuesday, October 27, 2020, would likely receive a ballot on Thursday or Friday.  If the voter mails her ballot on Saturday, it would likely be received on Monday or Tuesday, Election Day.  N.T. 271, 272.

22.  Mr. Plunkett testified that a 1-day delay in service would not mean that ballots would not be received on time.  N.T. 267.

## D. House Intervenors' Witness

## 1. Torren Ecker

1.  Mr. Ecker is a member of the House of Representatives and represents the 193rd District.  N.T. 331.

2.  He ran in the May 15, 2018, primary as one of four candidates for the office. N.T. 331.

3.  At 9:30 p.m. that day, the election results were posted and it appeared that Mr. Ecker lost by one vote.  N.T. 332.

4.  Election officials learned that one precinct had not counted its absentee ballots. When those ballots were counted, Mr. Ecker gained an additional vote.  At that point, the election was tied.  N.T. 332-33.

5.  When the county board of elections recanvassed its ballots, it found two provisional ballots.  An unqualified voter submitted one ballot, and the other voter cast a ballot in favor of Mr. Ecker.  N.T. 334.

23

6.  The losing candidate petitioned the court of common pleas for a recount, but after the recount Mr. Ecker remained the winner of the primary election. N.T. 335.

7.  Starting on May 15, 2018, the entire process took approximately one month. N.T. 335.

8.  As a candidate, Mr. Ecker agreed that he wanted constituents of the 193rd District to vote.  N.T. 338.

### III. Findings of Fact

1.  All witnesses testified credibly.  To the extent that the opinions of Mr. Stroman and the Secretary differ from the opinions of Mr. Plunkett, the Court finds Mr. Plunkett's opinions more credible and persuasive than those of Mr. Stroman and the Secretary, in light of his experience in statistical and financial analysis of USPS data both as a  25-year employee of the USPS and as current president of the Association for Postal Commerce.

2.  The USPS has a standard delivery performance of 2 to 3 days for First-Class Mail in the contiguous United States; 5 days for First-Class Mail sent to Alaska, Hawaii, and Puerto Rico; and 6 days for mail sent to Guam.

3.  Marketing mail has a nationwide standard delivery performance of 3 to 10 days.

4.  For First-Class Mail within Pennsylvania, the standard delivery performance is 2 to 3 days after collection by the USPS.  However, mail may take 3 days to be delivered from one end of the Commonwealth to the other (for example, from Philadelphia to Erie).

5.  These above-described standards for delivery performance have been in place for a long time and not been adjusted since the enactment of Act 77.

24

6.  For intra-county mail, the standard delivery performance is 2 days after collection by the USPS and, with limited exceptions, may take 3 days within some counties.

7.  Petitioners' Exhibit 9, entitled "USPS Service Performance Measurement, PMG Briefing, August 12, 2020," shows the percentage of time that the USPS met its performance target of 96% nationwide for the period of March 14, 2020, through August 1, 2020, for various classes of mail. Relevantly, the graph shows a downturn in the USPS' performance for the period of July 4, 2020, through July 18, 2020, for Presort First-Class Mail. The Court declines to draw an inference from this exhibit that there is a general decline in standard delivery performance because the graph is based upon a snapshot of three weeks of experience. Mr. Stroman attributed the downturn to the Postmaster General's new policy directive on transportation, and this policy directive has been terminated.

8.  Petitioners' Exhibit 28, which is a graph produced by Areas Inspiring Mail, shows that for the 41st through 43rd weeks there was a drop in the USPS's performance against the target of 96%. The graph shows that during those three weeks the USPS met its standard delivery target 72.86% of the time for Central Pennsylvania; 85.68% of the time for the Philadelphia Metro Area; 84.96% of the time for the Appalachian region; and 90.01% of the time for Western Pennsylvania. The Court declines to assign Exhibit 28 any weight. First, the document appears undated or the date is obscured. It does not show the year and month of the activity depicted. Second, Mr. Stroman testified that Exhibit 28 compares the USPS' performance for 2019 to that of 2020 and that the graph shows a sharp decline in the USPS' performance

25

targets between the 41st and 43rd weeks.  N.T. 59.  However, it is not clear that the weeks identified in the graph correspond directly to weeks of the calendar year.  We have not reached the 41st through 43rd weeks of calendar year 2020.  Third, the graph depicts a snapshot of three weeks and does not predict what the data will show for the 12-week period from June 1, 2020, to September 30, 2020.

9.   Mail for deposit with the USPS may be handed directly to a postal carrier or collected by a carrier from a voter's residential mail receptacle.

10.  There is no separate delivery performance standard for election-related First-Class Mail. The USPS prioritizes First-Class Mail identified as election-related.

11.   Although there was testimony and argument regarding USPS "delivery delays," there was no evidence to define a delay.  The USPS delivery standards are set in ranges, *i.e.*, 2 to 3 days in Pennsylvania.  There is no evidence that USPS performance in Pennsylvania extends beyond that range.  To the contrary, the USPS performance in Pennsylvania  falls within the range over 98% of the time.

12.   Pennsylvania's USPS performance exceeds the national average.  In the first quarter of 2020 for Pennsylvania, 99.5% of USPS outbound Presort First-Class Mail was delivered within 3 days.  More than 98% was delivered within 1 day.  In the second quarter of 2020 for Pennsylvania, 99.4% of USPS outbound Presort First-Class Mail was delivered within 3 days.  More than 98% was delivered within 1 day.

13.   If all 8.5 million registered voters in Pennsylvania elect to vote by absentee or mail-in ballot, the quantity of mail generated will represent only 1.2% of

USPS' capacity in the Eastern service area and will not overwhelm the system.

14.   A voter may cast a ballot in person at a polling location any time between 7:00 a.m. and before 8:00 p.m. on Election Day.  If the voter has applied for an absentee or mail-in ballot, she may personally return the ballot to the county board of elections by 8:00 p.m. on Election Day or mail the ballot to the county board in such time that the board receives the ballot no later than 8:00 p.m., Election Day (the "received-by deadline").

15.   A voter may elect to return the ballot by using a prepaid postage envelope if one is provided by the county board of elections, by placing a First-Class stamp on the return envelope or by purchasing expedited delivery from the USPS or other private delivery service.

16.   If a voter applies for an absentee or mail-in ballot but cannot return it to the county board of elections before the received-by deadline, the voter may cast a provisional ballot in person at her polling place, as Ms. Laudenslager did.

17.   There was no evidence that the county boards of elections anticipate consolidating polling places as they did in the primary election, that the county boards anticipate insufficient staffing or that the health and safety procedures used by the county boards during the June 2020 primary were ineffective.

18.   Section 1206 of the Election Code, 25 P.S. §3046, provides a remedy for emergencies arising on election day; that is, an individual or county may bring a controversy before the court of common pleas and have the matter decided expeditiously.  This was done in three counties during the 2020 primary election.  Where an individual is seeking a judicial order to vote,

the court must inform the individual of the provisional ballot process set forth in Section 1206 of the Election Code, 25 P.S. §3046.

19. Secretary's Exhibit 2, a chart identifying the number of mail-in ballots received by each county and the date of receipt, does not support a finding that the received-by deadline should be extended by three days, to Friday, November 6, 2020. The exhibit does not explain when the voters applied for their absentee or mail-in ballots, when the county boards of elections mailed the ballots to the voters or when the voters deposited the ballots in the return mail.

 Secretary's Exhibit 2 showed that 61,333 votes were received by county boards of elections during the three days that followed the primary election day. Of that total, 52,761 were received in counties where the Governor had extended the received-by deadline because of civil unrest or where the court of common pleas had extended the received-by deadline for receipt of absentee and mail-in ballots. Accordingly, all 52,761 were counted. Secretary's Exhibit 2 does not predict how many mail-in ballots will be received after 8:00 p.m. on Election Day because it is not known whether the mailing of ballots in the primary election was affected by the announced extension of the received-by deadline.

20. The Secretary is working with the county boards of elections and the USPS to design election-related mail envelopes. The Secretary is undertaking a public education campaign to inform voters of the need to apply for and return all mail ballots as early as possible.

21. Ms. Laudenslager was not disenfranchised because she voted at a polling place and her vote was counted.

22. Petitioners presented no evidence to support their request for third-party assistance in the delivery of ballots to either the USPS or the county boards of election or for their request for prepaid postage on all absentee and mail-in ballots.

23. Petitioners' claim for prepaid postage is moot in light of the Secretary's announcement that the Department of State will provide funding to the county boards of elections for postage.

24. There was no clear evidence presented on whether prepaid postage envelopes, which may be provided by the county boards of elections to voters for mailing their completed ballots, will be postmarked.  A postmark would evidence the date the voter placed the ballot in the mail.

25.  There was no evidence showing that COVID-19 was transmitted to an individual who appeared at a polling place in Pennsylvania during the primary election on June 2, 2020.

26. There was no evidence presented to address how an extension of the statutory deadline could be implemented without causing confusion among the 67 county boards of elections that are preparing to conduct the general election in accordance with the received-by deadline which has been in effect for all elections in Pennsylvania since 1964, and among the voting public.

### IV. Conclusions of Law

1. The deadline for receipt of absentee and mail-in ballots by 8:00 p.m. on Election Day represents a policy choice made by the legislative and executive branches in the enactment of Act 77.  This deadline was first adopted for absentee ballots.  *See* Section 22 of the Act of August 13, 1963,

P.L. 707 (effective January 1, 1964). The same deadline was adopted in Act 77 for mail-in ballots. *See* Section 1306-D(c) of the Election Code, 25 P.S. §3150.16(c).

2.  Petitioners' evidence did not prove that disruptions to USPS operations are likely to occur in November 2020 that will cause timely mailed ballots to go uncounted in the general election. Petitioners offered no evidence that a single mail-in ballot in the primary election was received by a county board of elections after the June 2, 2020, deadline because of a delay in delivery by the USPS. Petitioners offered no evidence upon which the Court can find, as fact, that the USPS will not be able to deliver absentee and mail-in ballots within 2 to 3 days of their being posted. The credible evidence shows just the opposite, *i.e.*, the USPS is unlikely to be overwhelmed in November.

3.  If the current deadlines remain in place for the November general election and significant delays develop in certain counties with the processing of ballot applications or in the USPS delivery of mail, the county courts of common pleas are empowered to provide targeted relief. Petitioners have not demonstrated that such county-specific relief will be inadequate and that an immediate statewide remedy is necessary.

4.  As Justice Wecht wrote in support of the Pennsylvania Supreme Court's recent decision dismissing a similar COVID-19-related challenge to the Commonwealth's administration of the 2020 primary election, "the instant request … is predicated upon mere speculation about what may or may not occur with delivery operations within the Commonwealth in several weeks' time. While circumstances may change, the possibility that votes may be suppressed due to late ballot delivery, as presently alleged, is too remote at

this time to constitute a cognizable injury." *Disability Rights Pennsylvania v. Boockvar*, (Pa., No. 83 MM 2020, filed May 15, 2020) (Wecht, J., Concurring Statement at 1-2).

5.  Petitioners' evidentiary case did not address the alleged injury occasioned by the prohibition against third-party assistance in casting and delivering absentee and mail-in ballots or the need for prepaid postage on all absentee and mail-in ballots.

6.  The Court concludes that it is not necessary to address the outstanding legal objections raised by Respondents, by Senate Intervenors or by House Intervenors.

7.  Petitioners have not made a "clear, palpable and plain demonstration" that the received-by deadline for absentee and mail-in ballots in Act 77 is unconstitutional for any election during the COVID-19 pandemic. *Yocum v. Commonwealth of Pennsylvania Gaming Control Board*, 161 A.3d 228, 238 (Pa. 2017). The received-by deadline for mail-in ballots is a valid election administration regulation, and the opportunity to vote by mail-in ballot accommodates those voters who do not wish to vote in person during the COVID-19 pandemic.

## V. Discussion

Constitutional challenges to any legislation, including election laws, are cognizable only where the injury is concrete. "There is a presumption that lawfully enacted legislation is constitutional. Should the constitutionality of legislation be challenged, the challenger must meet the burden of rebutting the presumption of constitutionality by a *clear, palpable and plain demonstration* that the statute violates a constitutional provision." *Yocum*, 161 A.3d at 238 (emphasis added).

Where a court determines that a law is unconstitutional, it is not the court's role to design an alternative scheme that passes constitutional muster; rather, the court must grant the legislature sufficient time to consider and enact remedial legislation. *See generally In re Fortieth Statewide Investigation Grand Jury*, 197 A.3d 712, 721 (Pa. 2018) (courts may not usurp the province of the legislature by rewriting legislation and adding hearing and evidentiary requirements that the participants must follow in grand jury proceedings); *League of Women Voters v. Commonwealth*, 178 A.3d 737, 821 (Pa. 2018) (providing timeframe for legislative and executive branches to enact remedial redistricting plan).

Moreover, "'[i]t is a mistake to suppose[] that a court of equity is amenable to no law, either common or statute, and assumes the rule of an arbitrary legislator in every particular case.' When the rights of a party are clearly established by defined principles of law, equity should not change or unsettle those rights. Equity follows the law." *Piper v. Tax Claim Bureau of Westmoreland County*, 910 A.2d 162, 165 (Pa. Cmwlth. 2006) (quoting *First Federal Savings and Loan Association v. Swift*, 321 A.2d 895, 897 (Pa. 1974)).

The United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators." U.S. CONST. art. I, §4, cl.1. Article I, Section 5 of the Pennsylvania Constitution further states: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, §5.

Each state's election code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- to least some degree -- the individual's right to vote …." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and the Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).

Although Petitioners seek to add new provisions to the existing Election Code, rather than expressly challenging the validity of a particular provision, the premise of *Yocum* applies with equal force. This Court has explained that "[a] statute is cloaked with a strong presumption of constitutionality and one who attacks it bears the burden of demonstrating that the legislation 'clearly, palpably and plainly violates the constitution.'" *Ketterer v. Department of Transportation*, 574 A.2d 735, 736 (Pa. Cmwlth. 1990) (quotation omitted).

Petitioners premise their claims on different provisions of the Pennsylvania Constitution, but the alleged injury in each instance is at bottom the same: if the legislative and executive branches do not implement the responsive measures to the ongoing COVID-19 pandemic favored by Petitioners, some voters will be burdened in the exercise of their vote. They believe this warrants declaratory and injunctive relief.

Petitioners allege that counties could (1) face shortages of poll workers and may have to contend with social-distancing guidelines in processing ballots, *see* Amended Petition ¶6; (2) fall behind on processing mail-in and absentee ballots applications, *id.*, *see also* ¶53; and (3) the USPS may not be able to deliver election ballots in a timely manner, *id.* ¶54. Petitioners allege that it is "anyone's guess whether voters who timely request mail ballots will receive them in time to complete the [ballots] and mail them back to county officials such that they arrive by 8:00 p.m. on Election Day." *Id.* ¶55.

Petitioners allege that without third-party assistance with delivery of mail-in and absentee ballots, "[v]oters … who have struggled with delayed mail delivery will be forced to deliver their ballots for the general election in-person this year to ensure their votes are counted[.]" *Id.* ¶63. Similarly, Petitioners assert that without prepaid postage on absentee and mail-in ballots, voters will have to shoulder the "unnecessary expense" of stamps, which "could be cost prohibitive," and will also risk a "trip to the post office or any other establishment that sells stamps, at a time when individuals have been instructed to maintain social distancing guidelines to stem the spread of COVID-19[.]" *Id.* ¶¶66-67. Some of the reforms for which Petitioners advocate are under consideration by the General Assembly. If they are not enacted, Petitioners believe these reforms must be ordered by the Supreme Court of Pennsylvania.

The Amended Petition states that in the days before the June primary election, some counties took targeted measures to address COVID-19-specific challenges. *See* Amended Petition ¶25 n.4, ¶57 (citing *In re Extension of Time for Absentee and Mail-In Ballots to be Received by Mail and Counted in the 2020 Primary Election*, (C.C.P. Del. Cty. No. 2020-003416)). However, Petitioners

34

believe these county-specific judicial orders (and executive orders) will not suffice in November 2020.

In her preliminary objections filed with the Supreme Court, the Secretary stated that "nothing in the Amended Petition gives any specifics on what exactly will go wrong, where it will go wrong, or, -- just as importantly -- why the statewide remedy Petitioners seek will be necessary to correct the problem.  Nor could the Amended Petition supply these specifics; in a fast-changing situation, and with the November general election months away, such predications are necessarily conjectural at best."  Secretary Preliminary Objections, at 16 ¶21.

Considering the above, Petitioners did not carry their burden of showing that the Election Code's deadline for returning absentee and mail-in ballots is plainly and palpably unconstitutional.  One year ago, the former Election Code required that all mail-in ballots, which were limited to absentee ballots, had to be returned to the county boards of elections by 5:00 p.m. on the Friday *before* Election Day in order to be counted.  *Former* Section 1306(a) of the Election Code, 25 P.S. §3146.69(a).  The General Assembly, which determines the time, place and manner of Pennsylvania's elections, extended the former received-by deadline by four days in Act 77.  It is for the General Assembly to decide what further changes should be made to all the statutory deadlines, which may include advancing the deadline for requesting an absentee or mail-in ballot.

Presently, voters in Pennsylvania have 50 days to request and cast a mail-in ballot.  Section 1302.1 – D of the Election Code, 25 P.S. §3150.12a.  Voters have the option to request a ballot early in the process and to return it early in the process. They also have the option to wait until one week before the election to request a ballot from the county board of elections, which has 48 hours to respond.

If the voter receives the ballot one day before Election Day, she can purchase overnight mailing from the USPS to ensure its timely receipt.  If the voter receives the ballot on Election Day, she can personally deliver the ballot to the county board of elections.  If the requested ballot is not received by Election Day, the voter can vote in person at her designated polling place, as did Ms. Laudenslager.  And, of course, voters have the option to appear at their polling place and vote in person before 8:00 p.m. on Election Day.

Section 1206 of the Election Code provides that where significant problems develop in a precinct or county, our courts of court of common pleas can order relief.  25 P.S. §3046.  This was done in several counties in the 2020 primary election, which extended the deadline for receipt of absentee and mail-in ballots.

As the Secretary noted, there must be deadlines in order for a free and equal election to take place. And every deadline will mean that some voters will not be able to participate in an election.  A voter may arrive at the polling place at 8:05 p.m. on Election Day, or a voter's mail-in ballot may arrive at the county board of elections at 8:05 p.m. on Election Day.  Neither vote will be counted.

In her original preliminary objections, the Secretary argued that Petitioners' pleading did not present a controversy ripe for judicial review.  Nor did Petitioners' evidence.  Whatever delays may be occasioned in the November 2020 general election with respect to the receipt of mail-in ballots by county boards of elections, they are not likely to be caused by the USPS.  The evidence demonstrated that USPS performance in Pennsylvania exceeds the national average.

There are an infinite number of considerations that go into setting the rules for a free and equal election.  It is the job of the legislature, not the judiciary, to make these policy choices.

36

The 8:00 p.m. Election Day deadline for returning absentee and mail-in ballots has been in existence since 1964.[12]  For a court to order a new statewide deadline may create widespread confusion among voters and the county boards of elections, the parties that actually conduct the election.  This militates against intervention by a court sitting in equity, assuming grounds for relief were demonstrated, and here they were not.

Even if that hurdle were crossed, an order enjoining enforcement of the received-by deadline would have to be issued to the county boards of elections.  They are the persons that process and qualify ballots.  Because they are not parties to this case, they cannot be enjoined from enforcing the received-by deadline in the Election Code.

In sum, the Election Code provides meaningful responses for conducting an election during the COVID-19 pandemic.   Voters may cast their vote by mail if they conclude their polling place will not meet their standards of safety.  That voters have the responsibility to obtain a ballot and return it by 8:00 p.m. Election Day does not impose an unlawful burden on the free exercise of the right to vote.  At the next level, county boards of elections may seek relief from their courts of common pleas should the circumstances require that step appropriate.  Finally, the General Assembly can enact appropriate measures should it determine that the COVID-19 pandemic requires a statewide response.

---

[12] Pennsylvania's received-by deadline is consistent with other state election laws.  *See* ARIZ. REV. STAT. ANN. §16-558.01 (West 2015) (requiring the return of a mail-in ballot by 7:00 p.m. on the day of the election); GA. CODE ANN. §21-2-386(a)(1)(f) (West 2019) (requiring the destruction of absentee ballots received after the polls close); ME. REV. STAT. ANN. tit. 21-a, §755 (1991) (requiring the return of an absentee ballot before the close of the polls on election day); MICH. COMP. LAWS ANN. §168.764a (West 2012) (requiring receipt of absentee ballot before the close of polls on election day);  WIS. STAT. ANN §7.52(1)(a) (West 2018) (requiring the canvas of all absentee ballots received by 8:00 p.m. on election day).

## VI. Conclusion

For these reasons, the Court recommends that the Supreme Court deny Petitioners' Prayer for Relief.

Respectfully submitted,

 s/Mary Hannah Leavitt
MARY HANNAH LEAVITT, President Judge

Filed:  September 4, 2020

38

**Exhibits Admitted into Evidence at Evidentiary Hearing**

| Exhibit No. | Description |
|---|---|
| **Petitioners** | |
| Petitioners' Ex. 4 | USPS Office of Inspector General Management Alert (July 7, 2020) |
| Petitioners' Ex. 6 | USPS General Counsel Thomas J. Marshall Letter to the Hon. Kathy Boockvar (July 29, 2020) |
| Petitioners' Ex. 7 | USPS General Counsel Thomas J. Marshall Letter to the Hon. Elaine Marshall (July 30, 2020) |
| Petitioners' Ex. 9 | USPS PMG Briefing, Service Performance Measurement (Aug. 12, 2020) |
| Petitioners' Ex. 28 | Eastern Areas Inspiring Mail Service Update |
| Petitioners' Ex. 30 | Preliminary Report of Joseph Eisenberg |
| Petitioners' Ex. 32 | Preliminary Report of Ronald Strohman |
| | |
| **Respondents** | |
| Respondents' Ex. 1 | Letter dated July 29, 2020, from Thomas J. Marshall, General Counsel and Executive Vice President of the United States Postal Service, to Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania |
| Respondents' Ex. 2 | Chart of County Absentee or Mail-in Ballots |
| Respondents' Ex. 4 | Postal Bulletin: Your 2020 Election and Political Mail Guide (Feb. 13, 2020) |
| **Senate Intervenors** | |
| Senate Intervenors' Ex. 1 | Mr. Plunkett's Declaration that as filed on May 18, 2020 as Ex. A to Legislative Intervenors' Opposition to the Petitioners' Application for Special Relief in the Nature of a Preliminary Injunction |
| Senate Intervenors' Ex. 2 | Attachment A from Plunkett's Report, *Quarterly Performance for First-Class Flats: Service Variance* |
| Senate Intervenors' Ex. 3 | Attachment B from Plunkett's Report, *Quarterly Performance Aggregation for First-Class Flats: Service Variance* |
| Senate Intervenors' Ex. 4 | Quarterly Performance for Presort First-Class Mail® Service Variance, USPS, FY 2020 Quarter III |
| Senate Intervenors' Ex. 6 | In the Matter of: Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District |
| Senate Intervenors' Ex. 7 | Final Report of the Miami-Dade County Grand Jury, Spring Term A.D. 2012, available |

| | |
|---|---|
| Senate Intervenors' Ex. 10 | USPS Service Alert, Aug. 28, 2020 |
| Senate Intervenors' Ex. 11 | Postmaster General Louis DeJoy Statement, USPS, Aug. 18, 2020 |
| Senate Intervenors' Ex. 16 | Dhaval M. Dave, *et al. Black Lives Matter Protests, Social Distancing, and COVID-19* |
| Senate Intervenors' Ex. 17 | U.S. Department of Health and Human Services and Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, *Notes from the Field*, July 31, 2020 |
| | |
| **House Intervenors** | |
| House Intervenors' Ex. 1 | Statement of Postmaster General and Chief Executive Office Louis DeJoy (Aug. 21, 2020) |