# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR PRESIDENT,           ) CIVIL ACTION
INC.; GLENN THOMPSON; MIKE KELLY;        )
JOHN JOYCE; GUY RESCHENTHALER;           )
REPUBLICAN NATIONAL COMMITTEE;           )
MELANIE STRINGHILL PATTERSON; and        )
CLAYTON DAVID SHOW,                      )
                                         )
              Plaintiffs,                )
                                         )
       v.                                ) No. 2:20-CV-966
                                         )
KATHY BOOCKVAR, in her capacity as       )
Secretary of the Commonwealth of         )
Pennsylvania; ADAMS COUNTY BOARD         )
OF ELECTIONS; ALLEGHENY COUNTY           )
BOARD OF ELECTIONS; ARMSTRONG            )
COUNTY BOARD OF ELECTIONS;               )
BEAVER COUNTY BOARD OF                   )
ELECTIONS; BEDFORD COUNTY BOARD          )
OF ELECTIONS; BERKS COUNTY BOARD         )
OF ELECTIONS; BLAIR COUNTY BOARD         )
OF ELECTIONS; BRADFORD COUNTY            )
BOARD OF ELECTIONS; BUCKS COUNTY         )
BOARD OF ELECTIONS; BUTLER               )
COUNTY BOARD OF ELECTIONS;               )
CAMBRIA COUNTY BOARD OF                  )
ELECTIONS; CAMERON COUNTY                )
BOARD OF ELECTIONS; CARBON               )
COUNTY BOARD OF ELECTIONS;               )
CENTRE COUNTY BOARD OF                   )
ELECTIONS; CHESTER COUNTY BOARD          )
OF ELECTIONS; CLARION COUNTY             )
BOARD OF ELECTIONS; CLEARFIELD           )
COUNTY BOARD OF ELECTIONS;               )
CLINTON COUNTY BOARD OF                  )
ELECTIONS; COLUMBIA COUNTY               )
BOARD OF ELECTIONS; CRAWFORD             )
COUNTY BOARD OF ELECTIONS;               )
CUMBERLAND COUNTY BOARD OF               )
ELECTIONS; DAUPHIN COUNTY BOARD          )
OF ELECTIONS; DELAWARE COUNTY            )
BOARD OF ELECTIONS; ELK COUNTY           )
BOARD OF ELECTIONS; ERIE COUNTY          )

BOARD OF ELECTIONS; FAYETTE              )
COUNTY BOARD OF ELECTIONS;               )
FOREST COUNTY BOARD OF                   )
ELECTIONS; FRANKLIN COUNTY               )
BOARD OF ELECTIONS; FULTON               )
COUNTY BOARD OF ELECTIONS;               )
GREENE COUNTY BOARD OF                   )
ELECTIONS; HUNTINGDON COUNTY             )
BOARD OF ELECTIONS; INDIANA              )
COUNTY BOARD OF ELECTIONS;               )
JEFFERSON COUNTY BOARD OF                )
ELECTIONS; JUNIATA COUNTY BOARD          )
OF ELECTIONS; LACKAWANNA                 )
COUNTY BOARD OF ELECTIONS;               )
LANCASTER COUNTY BOARD OF                )
ELECTIONS; LAWRENCE COUNTY               )
BOARD OF ELECTIONS; LEBANON              )
COUNTY BOARD OF ELECTIONS;               )
LEHIGH COUNTY BOARD OF                   )
ELECTIONS; LUZERNE COUNTY BOARD          )
OF ELECTIONS; LYCOMING COUNTY            )
BOARD OF ELECTIONS; MCKEAN               )
COUNTY BOARD OF ELECTIONS;               )
MERCER COUNTY BOARD OF                   )
ELECTIONS; MIFFLIN COUNTY BOARD          )
OF ELECTIONS; MONROE COUNTY              )
BOARD OF ELECTIONS; MONTGOMERY           )
COUNTY BOARD OF ELECTIONS;               )
MONTOUR COUNTY BOARD OF                  )
ELECTIONS; NORTHAMPTON COUNTY            )
BOARD OF ELECTIONS;                      )
NORTHUMBERLAND COUNTY BOARD              )
OF ELECTIONS; PERRY COUNTY BOARD         )
OF ELECTIONS; PHILADELPHIA               )
COUNTY BOARD OF ELECTIONS; PIKE          )
COUNTY BOARD OF ELECTIONS;               )
POTTER COUNTY BOARD OF                   )
ELECTIONS; SCHUYLKILL COUNTY             )
BOARD OF ELECTIONS; SNYDER               )
COUNTY BOARD OF ELECTIONS;               )
SOMERSET COUNTY BOARD OF                 )
ELECTIONS; SULLIVAN COUNTY               )
BOARD OF ELECTIONS; SUSQUEHANNA          )
COUNTY BOARD OF ELECTIONS; TIOGA         )
COUNTY BOARD OF ELECTIONS; UNION         )
COUNTY BOARD OF ELECTIONS;               )

VENANGO COUNTY BOARD OF         )
ELECTIONS; WARREN COUNTY BOARD  )
OF ELECTIONS; WASHINGTON COUNTY )
BOARD OF ELECTIONS; WAYNE       )
COUNTY BOARD OF ELECTIONS;      )
WESTMORELAND COUNTY BOARD OF    )
ELECTIONS; WYOMING COUNTY       )
BOARD OF ELECTIONS; and YORK    )
COUNTY BOARD OF ELECTIONS,      )
                                )
                  Defendants.   )

### VERIFIED SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned counsel, hereby complain of Defendants as follows:

### INTRODUCTION

1.     Free and fair elections are essential to the right of Americans to choose through their vote whom they elect to represent them.   Upending our entire election process and undermining ballot security through inconsistently-enforced regulations of by-mail voting, including through the use of unmonitored and/or unsecured drop-boxes and other polling locations, is the single greatest threat to free and fair elections.   To be free and fair, elections must be transparent, verifiable, and conducted uniformly in compliance with the rules and requirements set out by the legislature.   Yet, Defendants have inexplicably chosen a path that jeopardizes election security and will lead - and has already led - to the disenfranchisement of voters, questions about the accuracy of election results, and ultimately chaos heading into the upcoming November 3, 2020 General Election.   This is all a direct result of Defendants' hazardous, hurried, and illegal implementation of unmonitored mail-in voting which provides fraudsters an easy opportunity to engage in ballot harvesting, manipulate or destroy ballots, manufacture duplicitous votes, and sow chaos.   Contrary to the direction of Pennsylvania's General Assembly which has authorized only monitored and secured mail-in voting, Defendants have sacrificed the sanctity of in-person voting

at the altar of unmonitored and unsecured mail-in voting and have exponentially enhanced the threat that fraudulent or otherwise ineligible ballots will be cast and counted in the upcoming General Election.

2.     All of this was on full display in Pennsylvania's June 2, 2020 Primary Election. That election proved that Defendants are unwilling to properly administer the Pennsylvania General Assembly's new mail-in voting law, Act 77, that made significant changes to Pennsylvania's elections, and instead have opted to promote unlimited use of unmonitored mail-in voting.  Defendants' failure is the direct result of their election administration decisions, many of which exceed the legal power or authority of the decision makers.  For example, approximately twenty (20) counties in this Commonwealth, with the knowledge, consent, and/or approval of the Secretary of the Commonwealth, allowed absentee and mail-in[1] ballots to be returned to polling places and other locations, such as shopping centers, parking lots, fairgrounds, parks, retirement homes, college campuses, fire halls, municipal government buildings, and elected officials' offices.  Also, the Governor of the Commonwealth issued an Executive Order the *day before* the June 2, 2020 Primary Election changing the rules of mail-in balloting, but only for some counties and not all.  Further, Allegheny County not only issued duplicate mail-in and absentee ballots to

---

[1] Article VII, Section 14 of the Constitution of the Commonwealth of Pennsylvania provides that absentee voting shall be permitted for those "qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee[.]"  Pa. Const. art. VII, § 14.  Act 77 (as hereinafter defined, and codified, in part, at 25 P.S. § 2602) makes a distinction between a "qualified mail-in elector" and a "qualified absentee elector."  *See* 25 P.S. § 2602(w) & (z.6).  In general use, however, the terms "mail-in" and "absentee" are used interchangeably to discuss the use of the United States Postal Service to deliver ballots to and from electors.  For the purposes of this complaint, the terms "mail-in" and "absentee" refer to the general usage unless the specific is indicated.

voters because of a glitch in the state's Statewide Uniform Registry of Electors (SURE) system, but also instituted severe polling place consolidations that caused long lines and confusion among voters, candidates, and political parties.  Moreover, Philadelphia County could not sustain its vote counting process and, without warning, stopped counting ballots on June 4, 2020, and then, without formal notice, started counting again on June 9, 2020.

3.     Defendants, through their haphazard administration of Act 77, have burdened voters, candidates, and political committees with the arbitrary and illegal preclusion of poll watchers from being present in all locations where votes are being cast because (a) the locations where mail-in or absentee ballots are being returned do not constitute a "polling place" within the meaning of Sections 102(q) and 417(b) of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, as amended ("Election Code"), 25 P.S. §§ 2602(q) and 2687(b); and (b) the poll watchers may only serve in the county of their residence under Election Code Section 417(b), 25 P.S. § 2687(b).[2]  The result is that a significant portion of votes for elections in Pennsylvania are being cast in a fashion that denies any procedural visibility to candidates, political parties, and the public in general, thereby jeopardizing the free and fair public elections guaranteed by the United States and Pennsylvania Constitutions.  The most recent election conducted in this Commonwealth and the public reaction to it demonstrate the harm caused by Defendants' unconstitutional infringements of Plaintiffs' rights.  The continued enforcement of arbitrary and disparate policies and procedures regarding poll watcher access and ballot return and counting poses a severe threat to the credibility and integrity of, and public confidence in, Pennsylvania's elections.

---

[2] As noted below and in Plaintiffs' Notice of Remaining Viable Claims and Proposed Disposition Plan filed September 20, 2020 (ECF # 448 at p. 10), while Plaintiffs' facial challenge to the county residency requirement is no longer viable in light of the Pennsylvania Supreme Court's decision in *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872 (Pa., Sept. 17, 2020), Plaintiffs' as-applied challenge to the same, as stated in Count V, is still viable.

4.      The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast.  An individual's right to vote is infringed if his or her vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times.  The United States Supreme Court has made this clear in case after case.  *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

5.      Accordingly, along with equitable and other relief, Plaintiffs seek an order, declaration, and/or injunction that prohibits Defendants from permitting the return of absentee and mail-in ballots to unmanned mobile ballot collection centers and other inadequately noticed and unmanned ad hoc drop boxes and from commingling and counting such absentee and mail-in ballots with properly cast ballots.  Plaintiffs also seek an order, declaration, and/or injunction that bars county election boards from commingling and counting with properly cast ballots absentee and mail-in ballots that lack a secrecy envelope, contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, and/or are delivered in-person by third-parties for non-disabled voters.  Further, Plaintiffs seek an order, declaration, and/or injunction that requires county election boards to verify the identification and qualification for each applicant of an absentee or mail-in ballot, and to properly enforce which voters can and cannot vote on Election Day at the polling place after having applied for and either voted or not voted their absentee or mail-in ballots.  Additionally, Plaintiffs seek an order,

declaration and/or injunction that requires county election boards to (a) set aside, and not commingle, any absentee or mail-in ballot which may reasonably be subject to a challenge based upon a signature comparison under Election Code Section 3146.8(g)(3)-(7), 25 P.S. § 3146.8(g)(3)-(7), and (b) subject those absentee and/or mail-in ballots to the Election Code's stated challenge procedures in the same way that in-person voters are subject to signature comparison and challenge procedures under Election Code Section 3050(a.3), 25 P.S. § 3050(a.3). Finally, Plaintiffs seek an order, declaration, and/or injunction that permits poll watchers to be present in all locations where votes are cast or counted, including without limitation all locations where absentee or mail-in ballots are being returned, pre-canvassed, and/or canvased.

## JURISDICTION AND VENUE

6.      Under 28 U.S.C. §§ 1331 & 1343, this Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States and involves a federal election.  Also, this Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

7.      Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and several of the Defendants reside in this District and all of the Defendants are residents of the Commonwealth of Pennsylvania in which this District is located. 28 U.S.C. § 1391.

## PARTIES

8.      Plaintiff Donald J. Trump for President, Inc. (hereinafter, the "Trump Campaign"), is the principal committee for the reelection campaign of Donald J. Trump, the 45th President of the United States of America (hereinafter, "President Trump").   President Trump is the presumptive Republican nominee for the office of the President of the United States of America

in the upcoming November 3, 2020 General Election.  The Trump Campaign brings this action for itself and on behalf of its candidate, President Trump.  President Trump is a "candidate" as that term is defined in Election Code Section 102(a), 25 P.S. §§ 2602(a).  *See Rowland v. Smith,* 83 Pa. D. & C. 99, 101-2 (Pa. Ct. Com. Pl. Dauphin 1952) ("candidate" under the Election Code includes one who is a candidate for nomination for President of the United States).  As a political committee for a federal candidate, the Trump Campaign has Article III standing to bring this action.  *See, e.g., Orloski v. Davis,* 564 F. Supp. 526, 530-31 (M.D. Pa. 1983).  *See also Tex. Democratic Party v. Benkiser,* 459 F.3d 582, 587-588 (5th Cir. 2006) ("after the primary election, a candidate steps into the shoes of his party, and their interests are identical."); *In re General Election-1985,* 531 A.2d 836, 838 (Pa. Commw. Ct. 1987) (a candidate for office in the election at issue suffers a direct and substantial harm sufficient for standing to contest the manner in which an election will be conducted).

9.      Plaintiff Glenn Thompson (hereinafter, "Representative Thompson") is an adult individual who is a qualified registered elector residing in Centre County, a member of the Republican Party, and the United States Representative for the 15th Congressional District of Pennsylvania.   Representative Thompson is currently running for reelection in the 15th Congressional District which includes all of Warren, McKean, Forest, Venango, Elk, Cameron, Clarion, Jefferson, Armstrong, Clearfield, and Indiana counties, most of Cambria and Centre counties, and part of Butler County.  Representative Thompson constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Thompson brings this suit in his capacity as a candidate for federal office and a private citizen.  As a candidate and voter, Representative Thompson has Article III standing to bring this action.  *See Orloski,* 564 F. Supp. at 530; *Pierce v. Allegheny County Bd. of*

- 6 -

*Elections*, 324 F. Supp. 2d 684, 692-93 (W.D. Pa. 2003); *see also In re General Election-1985*, 531 A.2d at 838.

10.     Plaintiff Mike Kelly (hereinafter, "Representative Kelly") is an adult individual who is a qualified registered elector residing in Butler County, a member of the Republican Party, and the United States Representative for the 16th Congressional District of Pennsylvania. Representative Kelly is currently running for reelection in the 16th Congressional District which includes all of Erie, Crawford, Mercer, and Lawrence counties, as well as part of Butler County. Representative Kelly constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t). Representative Kelly brings this suit in his capacity as a candidate for federal office and a private citizen. As a candidate and voter, Representative Kelly has Article III standing to bring this action. *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93; *see also In re General Election-1985*, 531 A.2d at 838.

11.     Plaintiff John Joyce (hereinafter, "Representative Joyce") is an adult individual who is a qualified registered elector residing in Blair County, a member of the Republican Party, and the United States Representative for the 13th Congressional District of Pennsylvania. Representative Joyce is currently running for reelection in the 13th Congressional District which includes all of Blair, Huntingdon, Bedford, Fulton, Franklin, and Adams counties, most of Somerset County, and parts of Westmoreland, Cambria, and Cumberland counties. Representative Joyce constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t). Representative Joyce brings this suit in his capacity as a candidate for federal office and a private citizen. As a candidate and voter,

Representative Joyce has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93; *see also In re General Election-1985*, 531 A.2d at 838.

12.     Plaintiff Guy Reschenthaler (hereinafter, "Representative Reschenthaler") is an adult individual who is a qualified registered elector residing in Washington County, a member of the Republican Party, and the United States Representative for the 14th Congressional District of Pennsylvania.  Representative Reschenthaler is currently running for reelection in the 14th Congressional District which includes all of Fayette, Greene, and Washington counties, as well as the western part of Westmoreland County.  Representative Reschenthaler constitutes both a "candidate" and a "qualified elector" as those terms are defined in Election Code Section 102(a) and (t), 25 P.S. § 2602(a) & (t).  Representative Reschenthaler brings this suit in his capacity as a candidate for federal office and a private citizen.  As a candidate and voter, Representative Reschenthaler has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*,  324 F. Supp. at 692-93; *see also In re General Election-1985*, 531 A.2d at 838.

13.     Plaintiff Republican National Committee (hereinafter, the "RNC") is a national political committee that leads the Republican Party of the United States (hereinafter, the "Republican Party").  The RNC works to elect Republican candidates to state and federal offices throughout the United States, including in the Commonwealth of Pennsylvania, and it organizes and operates the Republican National Convention through which its members nominate their candidates for President and Vice President of the United States.  The Republican Party includes over thirty million (30,000,000) registered Republicans in all fifty (50) states, the District of Columbia, and the U.S. territories, and constitutes a "political party" as that term is defined in Election Code Section 801, 25 P.S. § 2831.  The RNC brings this action for itself, the Republican Party, all of its members, all registered Republican voters, and all nominated Republican

candidates in the November 3, 2020 General Election in the Commonwealth of Pennsylvania.  As a political committee, the RNC has Article III standing to bring this action.  *See, e.g., Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004); *Pa. Democratic Party v. Republican Party of Pa.*, 2016 U.S. Dist. LEXIS 153944, at *8-9 (E.D. Pa. Nov. 7, 2016); *Democratic Exec. Comm. v. Detzner,* 347 F. Supp. 3d 1017, 1025 (N.D. Fl. 2018); *Orloski*, 564 F. Supp. at 530-31.

14.     Plaintiff Melanie Stringhill Patterson (hereinafter, "Ms. Patterson") is an adult individual who is a qualified registered elector residing in Belle Vernon, Fayette County, Pennsylvania.  Ms. Patterson resides in the 14th Congressional District and desires to engage in poll watching for the re-election campaigns of both President Trump and Representative Reschenthaler in counties other than Fayette County.  Ms. Patterson constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t), and has always voted in-person on Election Day and plans to vote in-person at the November 3, 2020 General Election.  Ms. Patterson brings this suit in her capacity as a private citizen.  As a qualified elector and registered voter, Ms. Patterson has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93.

15.     Plaintiff Clayton David Show (hereinafter, "Mr. Show") is an adult individual who is a qualified registered elector residing in Hopwood, Fayette County, Pennsylvania.  Mr. Show resides in the 14th Congressional District and desires to engage in poll watching for the re-election campaigns of both President Trump and Representative Reschenthaler in counties other than Fayette County.  Mr. Show constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t).  Mr. Show brings this suit in his capacity as a private

citizen.  As a qualified elector and registered voter, Mr. Show has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93.

16.     Defendant Kathy Boockvar (hereinafter, "Secretary Boockvar") is the Secretary of the Commonwealth.  In this role, Secretary Boockvar leads the Pennsylvania Department of State. As Secretary, she is Pennsylvania's Chief Elections Officer and a member of the Governor's Executive Board.  The Pennsylvania Constitution vests no powers or duties in Secretary Boockvar. *Perzel v. Cortes,* 870 A.2d 759, 764 (Pa. 2005).  Instead, her general powers and duties concerning elections are set forth in Election Code Section 201, 25 P.S. § 2621.  Under the Election Code, Secretary Boockvar acts primarily in a ministerial capacity and has no power or authority to intrude upon the province of the Pennsylvania General Assembly.  *Perzel*, 870 A.2d at 764; *Hamilton v. Johnson*, 141 A. 846, 847 (Pa. 1928).  Secretary Boockvar is sued in her official capacity.

17.     Defendants Adams County Board of Elections, Allegheny County Board of Elections, Armstrong County Board of Elections, Beaver County Board of Elections, Bedford County Board of Elections, Berks County Board of Elections, Blair County Board of Elections, Bradford County Board of Elections, Bucks County Board of Elections, Butler County Board of Elections, Cambria County Board of Elections, Cameron County Board of Elections, Carbon County Board of Elections, Centre County Board of Elections, Chester County Board of Elections, Clarion County Board of Elections, Clearfield County Board of Elections, Clinton County Board of Elections, Columbia County Board of Elections, Crawford County Board of Elections, Cumberland County Board of Elections, Dauphin County Board of Elections, Delaware County Board of Elections, Elk County Board of Elections, Erie County Board of Elections, Fayette County Board of Elections, Forest County Board of Elections, Franklin County Board of Elections, Fulton County Board of Elections, Greene County Board of Elections, Huntingdon County Board

of Elections, Indiana County Board of Elections, Jefferson County Board of Elections, Juniata County Board of Elections, Lackawanna County Board of Elections, Lancaster County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Lehigh County Board of Elections, Luzerne County Board of Elections, Lycoming County Board of Elections, McKean County Board of Elections, Mercer County Board of Elections, Mifflin County Board of Elections, Monroe County Board of Elections, Montgomery County Board of Elections, Montour County Board of Elections, Northampton County Board of Elections, Northumberland County Board of Elections, Perry County Board of Elections, Philadelphia County Board of Elections, Pike County Board of Elections, Potter County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Somerset County Board of Elections, Sullivan County Board of Elections, Susquehanna County Board of Elections, Tioga County Board of Elections, Union County Board of Elections, Venango County Board of Elections, Warren County Board of Elections, Washington County Board of Elections, Wayne County Board of Elections, Westmoreland County Board of Elections, Wyoming County Board of Elections, and York County Board of Elections (collectively hereinafter, the "County Election Boards"), are the county boards of elections in and for each county of the Commonwealth of Pennsylvania as provided by Election Code Section 301, 25 P.S. § 2641.  The County Election Boards "have jurisdiction over the conduct of primaries and elections in such count[ies], in accordance with the provision of [the Election Code.]"  *Id.* at § 2641(a).  The County Election Boards' general powers and duties are set forth in Election Code Section 302, 25 P.S. § 2642.  The County Election Boards are executive agencies that carry out legislative mandates, and their duties concerning the conduct of elections are purely ministerial with no exercise of discretion.  *Shroyer v. Thomas*, 81 A.2d 435, 437 (Pa. 1951); *Perles v. Hoffman*, 213 A.2d 781, 786 (Pa. 1965) (Cohen, J., concurring).  *See also*

*Deer Creek Drainage Basin Authority v. County Bd. of Elections*, 381 A.2d 103, 109 (Pa. 1977) (Pomeroy, J., dissenting) ("A board of elections, it has been well said, "does not sit as a quasi-judicial body adjudicating contending forces as it wishes, but rather as an executive agency to carry out legislative mandates. Its duties are ministerial only."); *In re Municipal Reapportionment of Township of Haverford*, 873 A.2d 821, 833, n.18 (Pa. Commw. Ct. 2005) ("The duties of a board of elections under the Election Code are ministerial and allow for no exercise of discretion."), *appeal denied* 897 A.2d 462 (Pa. 2006).

## FACTUAL ALLEGATIONS

### I.    Federal Constitutional Protections for Free and Fair Public Elections.

18.    Free, fair, and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

19.    The most fundamental principle defining credible elections in a democracy is that they must reflect the free expression of the will of the people.

### A.    *The Right to Vote in Federal Elections*.

20.    The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution.  *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 665 (1966).  *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").  Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges and Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress.  *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (citing *Ex parte Yarbrough*, 110 U.S. 651, 663-64

(1884)).  *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

21.     The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.

22.     "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast.  *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

23.     "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

24.     Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote.  *See Anderson*, 417 U.S. at 227.

25.     "The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial.  The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

26.     Practices that promote fraud or the casting of illegal or unreliable ballots, or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots.  *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

**B.     *The Equal Protection Clause of the Fourteenth Amendment.***

27.     "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-5 (2000).  *See also Harper*, 383 U.S. at 665 ("Once the franchise is granted, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

28.     The Equal Protection Clause of the Fourteenth Amendment proscribes that "one person's vote must be counted equally with those of all other voters in a State."  *Reynolds*, 377 U.S. at 560.  In other words, "whenever a state or local government decides to select persons by popular election to perform governmental functions, [equal protection] requires that each qualified voter must be given an equal opportunity to participate in that election … ."  *Hadley, v. Junior College District*, 397 U.S. 50, 56 (1968).

29.     Accordingly, the Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'"  *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray*, 372 U.S. at 380 ("The idea that every

voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions.").

30.     "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

31.     The use of "standardless" procedures can violate the Equal Protection Clause. *Bush*, 531 U.S. at 103. "The problem inheres in the absence of specific standards to ensure … equal application" of even otherwise unobjectionable principles. *Id.* at 106. Any voting system that involves discretion by decision makers about how or where voters will vote must be "confined by specific rules designed to ensure uniform treatment." *Id.*

32.     Allowing a patchwork of different rules from county to county, and as between absentee and mail-in voters and in-person voters, in a statewide election involving federal and state candidates implicates equal protection concerns. *Pierce*, 324 F. Supp. 2d at 698-699. *See also Gray*, 372 U.S. at 379-381 (a county unit system which weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties violates the Equal Protection Clause and its one person, one vote jurisprudence).

## C.     *Constitutional Commitment of Federal Election Regulation to the State Legislature.*

33.     In statewide elections involving federal candidates, "a State's regulatory authority springs directly from the United States Constitution." *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing *Cook v. Gralike*, 531 U.S. 510, 522-523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995)).

34.     The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. Art. I, § 4, cl. 1 (emphasis added).  Likewise, the Electors Clause of the United States Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.  U.S. Const. Art. II, § 1, cl. 2 (emphasis added).

35.     The Legislature is "'the representative body which ma[kes] the laws of the people.'"  *Smiley v. Holm*, 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

36.     In Pennsylvania, the "legislature" is the General Assembly.  Pa. Const. Art. II, § 1. *See also Winston v. Moore,* 91 A. 520, 522 (Pa. 1914) ("The power to regulate elections is legislative, and has always been exercised by the lawmaking branch of the government."); *Patterson v. Barlow,* 60 Pa. 54, 75 (1869) ("It is admitted that the Constitution cannot execute itself, and that the power to regulate elections is a legislative one, which has always been exercised by the General Assembly since the foundation of the government.")

37.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Boockvar, have no authority to unilaterally exercise that power, much less flout existing legislation.

38.     Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine

its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections.   *Id.* at 2668.

39.     "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question."   *Bush*, 531 U.S. at 113 (Rehnquist, J., concurring); *Smiley*, 285 U.S. at 365.

## II.     Pennsylvania Constitutional Protections for Free and Fair Public Elections.

40.     The Pennsylvania Constitution also bestows the right to vote upon qualified citizens and guarantees them equal protection in the enjoyment of that right.  *See* Pa. Const. art. VII, § 1§ & art. I, § 28.

41.     Further, Article I, Section 5 of the Pennsylvania Constitution, entitled "Elections" and commonly referred to as the "Free and Equal Elections Clause," provides:

> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

Pa. Const. art. I, § 5.

42.     The Free and Equal Elections Clause "is contained within the Pennsylvania Constitution's 'Declaration of Rights,' which … is an enumeration of the fundamental individual human rights possessed by the people of the Commonwealth that are specifically exempted from the powers of the Commonwealth government to diminish."   *League of Women Voters v. Commonwealth*, 178 A.3d 737, 803 (Pa. 2018).

43.     "[E]lections are free and equal within the meaning of the [Pennsylvania] Constitution when they are public and open to all qualified electors alike; ***when every voter has the same right as every other voter; when each voter under the law has the right to cast his ballot and have it honestly counted***; when the regulation of the right to exercise the franchise does not

deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him." *Winston, 91 A. at 523* (emphasis added).

44.     *Winston*'s mandate set forth in the preceding paragraph represents "the minimum requirements for 'free and fair' elections" in this Commonwealth. *League of Women Voters, 178 A.3d at 810*.

45.     The rights protected by the Free and Equal Elections Clause of the Pennsylvania Constitution, including without limitation the right to free and fair public elections, may not be taken away by an act of the Commonwealth's legislative or executive branches, and both branches are prohibited by this clause from interfering with the exercise of those rights, even if the interference occurs by inadvertence. *League of Women Voters, 178 A.3d at 810*.

46.     The rights protected by the Free and Equal Elections Clause of the Pennsylvania Constitution, including without limitation the right to free and fair public elections, apply to the election of both federal and state candidates. *League of Women Voters, 178 A.3d at 811*.

## III.     Poll Watching Ensures Free and Fair Public Elections.

47.     The Pennsylvania Constitution gives the Commonwealth's General Assembly the authority to enact legislation governing the conduct of elections. *See* Pa. Const. art. VII, § 6; *Winston, 91 A. at 522*.

48.     "Pennsylvania's election laws apply equally to federal and state elections." *Project Vote, 805 F. Supp. 2d at 174* (citing *Kuznik v. Westmoreland County Board of Elections, 902 A.2d 476, 490-493 (Pa. 2006)*).

49.     Elections in Pennsylvania are governed and regulated by the Election Code.

50.     "Although the [Commonwealth] is ultimately responsible for the conduct and organization of elections, the statutory scheme [promulgated by the Election Code] delegates aspects of that responsibility to the political parties.  This delegation is a legislative recognition of

'the critical role played by political parties in the process of selecting and electing candidates for state and national office.'" *Tiryak v. Jordan*, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) (quoting *Marchioro v. Chaney*, 442 U.S. 191, 195 (1979)).

51.     Election Code Section 417, 25 P.S. § 2687, creates the position of poll watcher and entrusts to each candidate for nomination or election at any election, and each political party and each political body which has nominated candidates for such elections, the power to appoint poll watchers to serve in each election district in the Commonwealth.  *See* 25 P.S. § 2687(a).

52.     Under the Election Code, "poll watcher[s] perform[] a dual function on Election Day.  On the one hand, because [poll watchers] are designated and paid by [candidates, political parties, and/or political bodies], [their] job is to guard the interests of [their] candidates [or political parties or bodies].  On the other hand, because the exercise of [their] authority promotes a free and fair election, poll watcher[s] serve to guard the integrity of the vote.  Protecting the purity of the electoral process is a state responsibility and [poll watchers'] statutory role in providing that protection involves [them] in a public activity, regardless of [their] private political motives." *Tiryak*, 472 F. Supp. at 824.

53.     Election Code Section 417 dictates the number of poll watchers allowed, the qualifications and manner of their appointment, their provision of watchers' certificates from the County Election Boards, their location within the polling place[3], the activities permitted by poll watchers, and the maximum amount of compensation to be paid to poll watchers.  25 P.S. § 2687(a)-(c).

---

[3] "Polling place" is a defined term under the Election Code which means "the room provided in each election district for voting at a primary or election."  Election Code Section 102(q), 25 P.S. § 2602(q).

54.     Under Election Code Section 417(b), poll watchers may observe the election process from the time the first polling place official appears in the morning to open the polling place until the time the polls are closed and the election returns are counted and posted at the polling place entrance.  25 P.S. § 2687(b).  However, until the polls close, only one poll watcher representing each political party and its candidates at a general, municipal, or special election can be present in the polling place outside the enclosed space from the time that the election officers meet to open the polls and until the counting of the votes is complete.  *Id.*  *See also* Election Code Section 1220, 25 P.S. § 3060(a) & (d).  Once the polls close and while the ballots are being counted, then all the poll watchers for candidates and political parties or bodies are permitted to be in the polling place outside the enclosed space.  25 P.S. § 2687(b).

55.     Under Election Code Section 417(b), poll watchers are permitted to keep a list of voters, and during times when voters are not present or voting, watchers can ask the Judge of Elections to inspect the voting check list and either of the two numbered lists of voters, but cannot mark or alter those lists.  25 P.S. § 2687(b).

56.     In addition to the activities authorized by Election Code Section 417(b), poll watchers are among those who are authorized under Election Code Section 1210(d), 25 P.S. § 3050(d), to challenge any person who presents himself or herself to vote at a polling place on Election Day concerning the voter's identity, continued residence in the election district, or registration status.  *See* 25 P.S. § 3050(d) ("any person, although personally registered as an elector, may be challenged by any qualified elector, election officer, overseer, or **watcher** at any primary or election as to his identity, as to his continued residence in the election district or as to any alleged violation of the provisions of section 1210 of this act, …") (emphasis added).

57.     Also, prior to October 31, 2019, poll watchers were authorized under Election Code Section 1308(e), 25 P.S. § 3146.8(e) (repealed), to be present at the polling place on Election Day when absentee ballots, which were required to be delivered to the polling places, were examined by local election boards and to assert challenges to those absentee ballots' validity.

58.     Moreover, poll watchers' functions go beyond the activities authorized under Election Code Sections 417(b) and 1210(d) on Election Day.

59.     For example, under Election Code Section 310, 25 P.S. § 2650, poll watchers appointed by parties, political bodies, or bodies of citizens may appear "at any public session  or sessions of the county board of elections," and "at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines," in which case such poll watchers may exercise the same rights as watchers at polling places and may raise objections to any ballots or machines for subsequent resolution by the county board of elections and appeal to the courts.  25 P.S. § 2650(a) & (c).

60.     Without poll watchers, the integrity of the vote in elections is threatened and the constitutional right to free and fair public elections under the United States and Pennsylvania Constitutions is denied.

61.     Poll watchers serve as an important check to ensure transparency and guard against inconsistencies and other wrongdoing by election officials.  The need for poll watchers was demonstrated by the case of *United States v. DeMuro*, Criminal No. 20-112 (E.D. Pa. unsealed May 21, 2020).  In that case, a former Judge of Elections in South Philadelphia pled guilty to adding fraudulent votes to the voting machines during Election Day -- also known as "ringing up" votes -- and then falsely certifying that the voting machine results were accurate for specific federal, state, and local Democratic candidates in the 2014, 2015, and 2016 primary elections.  The

scheme involved a political consultant who purportedly solicited monetary payments from the candidates as "consulting fees," and then used portions of those funds to pay election board officials, including DeMuro, in return for ringing up votes. DeMuro was able to commit the fraud because there were no poll watchers at his precinct. *See United States v. DeMuro*, Criminal No. 20-112, Information ([Doc. #1](#)) (E.D. Pa Mar. 03, 2020); M. Cavacini, "U.S. Attorney William M. McSwain Announces Charges and Guilty Plea of Former Philadelphia Judge of Elections Who Committed Election Fraud," U.S. Attys. Office – Pa., Eastern (May 21, 2020) (available at *[https://www.justice.gov/usao-edpa/pr/us-attorney-william-m-mcswain-announces-charges-and-guilty-plea-former-philadelphia](https://www.justice.gov/usao-edpa/pr/us-attorney-william-m-mcswain-announces-charges-and-guilty-plea-former-philadelphia)*.

62.     Poll watchers also serve a "get out the vote" function. Traditionally, poll watchers have a list of all registered voters and keep track of those who voted to aid their respective candidates, campaign committees, and political parties in encouraging reliable supporters to vote on election day. If polling locations fail to open or are relocated and changed, then poll watchers serve to help redirect voters to proper locations in the absence of state guidance. Poll watchers also aid candidates, parties, and the state by quickly identifying issues with polling locations or rogue election officials, thus facilitating the rapid resolution of those issues before voters are disenfranchised.

## IV.     The Perils of Hastily Moving to an Unmonitored Mail-In Voting System.

63.     "States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *[Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 50 (1959)](#)*.

64.     However, failing to enact even basic transparency measures or safeguards against the casting of illegal or unreliable ballots creates an obvious opportunity for ineligible voters to cast ballots, invites fraud, and undermines the public's confidence in the integrity of elections —

all of which violate the fundamental right to vote, the guarantee of equal protection, and the right to participate in free, fair, and transparent elections as guaranteed by the United States and Pennsylvania Constitutions.

65.     If a state fails to enact even basic integrity and transparency measures it violates the right to free, fair, and transparent public elections because its elections are no longer meaningfully public and the state has functionally denied its voters a fair election.

66.     "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford, 553 U.S. at 195-96* (plurality op. of Stevens, J.).  As the Commission on Federal Election Reform - a bipartisan commission chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, and cited extensively by the United States Supreme Court - observed, "the 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'"  *Building Confidence in U.S. Election,* Report of the Commission on Federal Election Reform, p. 46 (Sept. 2005) (available at *https://bit.ly/3dXH7rU,* and referred to and incorporated herein by reference) (hereinafter, the "Carter-Baker Report").

67.     According to the Carter-Baker Report, mail-in voting is "the largest source of potential voter fraud."  Carter-Baker Report, p. 46.  Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots."   Michael T. Morley, *Election Emergency Redlines*, p. 2 (Mar. 31, 2020) (available at *https://ssrn.com/abstract=3564829* or *http://dx.doi.org/10.2139/ssrn.3564829,* and referred to and incorporated herein by reference) (hereinafter, "Morley, Redlines").  Such fraud is easier to commit and harder to detect.  As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one."  *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th

Cir. 2004). *See also id.* at 1130-31 (voting fraud is a "serious problem" and is "facilitated by absentee voting.").

68.    Courts have repeatedly found that mail-in ballots are particularly susceptible to fraud.  As Justice Stevens has noted, "flagrant examples of [voter] fraud ... have been documented throughout this Nation's history by respected historians and journalists," and "the risk of voter fraud" is "real" and "could affect the outcome of a close election."  *Crawford*, 553 U.S. at 195-196 (plurality op. of Stevens, J.) (collecting examples).  Similarly, Justice Souter observed that mail-in voting is "less reliable" than in-person voting.  *Crawford*, 553 U.S. at 212, n.4 (Souter, J., dissenting) ("'election officials routinely reject absentee ballots on suspicion of forgery'"); *id.* at 225 ("absentee-ballot fraud … is a documented problem in Indiana").  *See also Veasey v. Abbott,* 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc) ("mail-in ballot fraud is a significant threat" — so much so that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.")*. See also id.* at 263 ("[M]ail-in voting ... is far more vulnerable to fraud."); *id.* (recognizing "the far more prevalent issue of fraudulent absentee ballots").

69.    Pennsylvania is not immune from mail-in ballot fraud.  For example, in 1999, former Representative Austin J. Murphy was indicted by a Fayette County grand jury and then convicted of absentee ballot fraud for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge.  *See* B. Heltzel, "Six of seven charges against Austin Murphy dismissed," Pittsburgh Post-Gazette (June 22, 1999) (available at *http://old.post-gazette.com/regionstate/19990622murphy6.asp,* and referred to and incorporated herein by reference).  Similarly, in 2014, Richard Allen Toney, the former police chief of Harmar Township in Allegheny County pleaded guilty to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council.  *See* T. Ove, "Ex-

Harmar police chief pleads guilty to ballot tampering," Pittsburgh Post-Gazette (Sept. 26, 2014) (available at *https://www.post-gazette.com/local/north/2014/09/26/Ex-Harmar-police-chief-pleads-guilty-to-ballot-tampering-Toney/stories/201409260172,* and referred to and incorporated herein by reference).  Further, in 2015, Eugene Gallagher pled guilty to unlawfully persuading residents and non-residents of Taylor in Lackawanna County to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election.  *See* J. Kohut, "Gallagher resigns from Taylor council, pleads guilty to three charges," The Times-Tribune (Apr. 3, 2015) (available at *https://www.thetimes-tribune.com/news/gallagher-resigns-from-taylor-council-pleads-guilty-to-three-charges/article_e3d45edb-fe99-525c-b3f9-a0fc2d86c92f.html,* and referred to and incorporated herein by reference).  *See also Commonwealth v. Bailey*, 775 A.2d 881, 886 (Pa. Commw. Ct. 2001) (upholding defendant's conviction for absentee ballot violations, holding that a county district attorney has jurisdiction to prosecute such claims even in the absence of an investigation and referral by the Bucks County elections board); *In re Center Township Democratic Party Supervisor Primary Election*, 4 Pa . D. & C.4th 555, 557-563 (Pa. Ct. Com. Pl. Beaver 1989) (court ordered a run-off election after evidence proved that fifteen absentee ballots were applied for and cast by non-existent individuals whose applications and ballots were handled by a political ally of the purported winner).

70.     Mail-in voting is vulnerable to abuse in several ways.  For one, mail-in ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted."  Carter-Baker Report, p. 46.  For another, absentee or mail-in voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation."  *Id*.  And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail."  *Id*.  For example, "[i]ndividuals can sign and sell their absentee ballot," or

"[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently."
*Id.*

71.     This risk of abuse by absentee or mail-in voting is magnified by the fact that "many
states' voter registration databases are outdated or inaccurate."  Morley, Redlines, p. 2.  A 2012
study from the Pew Center on the States - which the U.S. Supreme Court cited in a recent case -
found that "[a]pproximately 24 million - one of every eight - voter registrations in the United States
are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals
are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one
state."  *See* Pew Center on the States*, Election Initiatives Issue Brief*, "Inaccurate, Costly, and
Inefficient: Evidence That America's Voter Registration System Needs an Upgrade," (Feb. 2012)
(available  at  *https://www.issuelab.org/resources/13005/13005.pdf,*  and  referred  to  and
incorporated herein by reference) (cited in *Husted v. A. Philip Randolph Inst*., 138 S. Ct. 1833,
1838 (U.S. 2018)*)*.

72.     Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that
roughly 9% of "listed registration records in the United States … are estimated to be invalid."  *See*
Ansolabehere, S., Hersh, E.*,* Report, Caltech/MIT Voting Technology Project, *The quality of voter
registration  records:  A  state-by-state  analysis*,  "Summary,"  (Jul  14,  2010)  (available  at
*https://elections.wi.gov/sites/default/files/publication/65/the_quality_of_voter_registration_recor
ds_harvard__10685.pdf,* and referred to and incorporated herein by reference).  On top of those
invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant
is listed multiple times."  *Id.*  The same study found that "[i]n the typical state, 1 in 40 counted
votes in the 2008 general election cannot be matched to a registrant listed as having voted" and
that "1 in 100 listed registrants is likely to be deceased."  *Id.*

73.     Crucially as it pertains to Pennsylvania's registered voters, as recently as December, 2019, the Auditor General of Pennsylvania, Eugene DePasquale, determined through an audit of Pennsylvania's Statewide Uniform Registry of Electors ("SURE"), administered by the Department of State, that there are more than 50,000 cases of potentially inaccurate voter records.  The Performance Audit Report noted that the audit "found too many instances of potentially bad data and sloppy recordkeeping."  *See* *https://www.paauditor.gov/press-releases/auditor-general-depasquale-issues-audit-of-voter-registration-system-calls-for-changes-at-pennsylvania-department-of-state* (last accessed September 21, 2020 , and referred to and incorporated herein by reference); *see also*   *https://www.paauditor.gov/Media/Default/Reports/Department%20of%20State_SURE%20Audit%20Report%2012-19-19.pdf* (last accessed September 21, 2020 , and referred to and incorporated herein by reference).   The Department of State was provided 50 recommendations to strengthen their policies and management controls, one of which was to work with counties to resolve records management issues such a duplicative voter records.  *See id.*  Mr. DePasquale criticized the Pennsylvania Department of State for its "lack of cooperation and a failure to provide the necessary information" during the audit, including the "denial of access to critical documents and excessive redaction of documentation."  As a result, the Auditor General was "unable to establish with any degrees of reasonable assurance that the SURE system is secure and that Pennsylvania voter registration records are complete, accurate and in compliance with applicable laws, regulations, and related guidelines."  *Id.*

74.     The risks of abuse by mail-in voting are compounded by the practice of ballot harvesting: *i.e.*, coordinated efforts to have third parties collect mail-in ballots from voters and drop them off at polling places or elections centers.

75.     Ballot harvesters are usually third parties (*i.e.,* campaign workers, union members, political activists, paid personnel, volunteers, or others).  They go door-to-door and offer to collect and turn in ballots for voters. "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."  S. Crabtree, "Amid Covid Mail-In Push, CA Officials Mum on Ballot Harvesting," RealClear Politics (Apr. 24, 2020) (available  at  *https://www.realclearpolitics.com/articles/2020/04/24/amid_covid_mail-in_push_ca_officials_mum_on_ballot_harvesting__143036.html,* and referred to and incorporated herein by reference).

76.     "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in a number of ways.  Morley, Redlines, p. 5.  For instance, "[h]arvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

77.     These forms of misconduct are incredibly difficult to detect, and that difficulty is compounded by the use of unmanned and unmonitored ballot drop locations.  The practice is "especially concerning when third parties who are not related to the voter -- and who may not even be known to the voter -- are permitted to harvest unlimited numbers of ballots, frequently without having to identify themselves to election officials or note their identity on the ballots' envelopes." Morley, Redlines, p. 4.

78.     Ballot harvesting can have a substantial negative impact on elections.  For example, in 1993, the Honorable Clarence C. Newcomer of the United States District Court for the Eastern District of Pennsylvania enjoined the Philadelphia County Board of Elections from counting over

a thousand voted absentee ballots that had been delivered by Democratic committee members and several campaign workers of William Stinson who was the Democratic candidate for the 2nd senatorial district for the Pennsylvania Senate.  *See Marks v. Stinson,* C.A. No. 93-6157, 1994 WL 1461135, 1994 U.S. Dist. LEXIS 5273, at *83 & *96-*99 (E.D. Pa. April 26, 1994).  Judge Newcomer found that approximately six hundred (600) of the illegally delivered ballots involved unregistered voters who could not have voted in person at the polls.  *Id.*, 1994 U.S. Dist. LEXIS 5273, at *44-*45.  Accordingly, because the ballot harvesting violated the Pennsylvania Election Code and the fundamental right to vote protected by the Fourteenth Amendment, Judge Newcomer declared Bruce Marks, the Republican candidate, the winner of that election.  *Id.* at *77-*92.

79.    To be sure, absentee or mail-in voting can be a legitimate feature of a state's election process when coupled with adequate procedural safeguards to deter fraud.  But given the many risks discussed above, in most states, it is an *alternative* implemented carefully and slowly and *only with* such safeguards in place.

80.    One procedural safeguard is prohibiting a third party's ability to collect and return another person's absentee or mail-in ballot.  As the Carter-Baker Report explains: "States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots."  Carter-Baker Report, p. 46.

81.    Another procedural safeguard is specifying the locations where absentee or mail-in ballots can be returned and providing for state officials or poll watchers to monitor the return or delivery of ballots to those locations.

82.     Federal law also recognizes the risks of unmonitored absentee or mail-in voting and thus requires certain first-time voters to present identification when voting in such a manner. *See* 52 U.S.C. § 21083(b).

**V.      Pennsylvania Enacts All-Voter Mail-in Voting.**

83.     The Pennsylvania General Assembly may enact laws governing the conduct of elections. *Winston*, 91 A. at 522.   However, "no legislative enactment may contravene the requirements of the Pennsylvania or United States Constitutions." *Shankey v. Staisey*, 257 A. 2d 897, 898 (Pa.), *cert. denied* 396 U.S. 1038 (1970).

84.     "Prior to the year 1957, the Pennsylvania Constitution permitted absentee voting only by individuals engaged in actual military service (Art. 8, § 6 of the Pennsylvania Constitution (1874)), and by bedridden or hospitalized veterans (Art. 8, § 18 added to the Pennsylvania Constitution (1949))." *Absentee Ballots Case*, 224 A.2d 197, 199 (Pa. 1966).

85.     In 1957, the Pennsylvania Constitution was further amended to permit absentee voting for those "qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee[.]" Pa. Const. art. VII, § 14.

86.     In 1960, the Election Code was amended to implement the 1957 amendment to the Pennsylvania Constitution. *Absentee Ballots Case*, 224 A.2d at 200. *See also* The Act of January 8, 1960, entitled "An Act amending the Act of June 3, 1937," P.L. 2135, 25 P.S. §§ 3149.1-3149.9 (Supp. 1960).

87.   "Absentee voting has consistently been regarded by the Pennsylvania courts as an extraordinary procedure in which the safeguards of the ordinary election process are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d 419, 420 (Pa. Ct. Com. Pl. Phila. 1964).

88.   Specifically, "in the casting of an absentee ballot, the ordinary safeguards of a confrontation of the voter by the election officials and watchers for the respective parties and candidates at the polling place are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420.

89.   Because "it is fraught with evils and frequently results in void votes," Pennsylvania's laws regarding absentee voting are "strictly construed and the rights created thereunder not extended beyond the plain and obvious intention of the act." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420-21 (citing *Decision of County Board of Elections*, 29 D.&C.2d 499, 506-7 (Pa. Ct. Com. Pl. 1962)). *See also Marks,* 1994 U.S. Dist. LEXIS 5273, at *78.

90.   Moreover, consistent with Pennsylvania's Statutory Construction Act, the Election Code's use of the word "shall" to identify the manner and other "technicalities" that an elector must follow to cast an absentee ballot are "substantive provisions" that are necessary to "safeguard against fraud" and preserve the "secrecy and the sanctity of the ballot and must therefore be observed," and ballots cast "in contravention of [such] mandatory provision[s] are void." *See In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d 1223, 1231-34 (Pa. 2004).

91.   On October 31, 2019, the Pennsylvania General Assembly enacted Act 77. *See* Act 2019-77 (S.B. 421), § 8, approved October 31, 2019, eff. October 31, 2019.

92.     Act 77 made significant changes to Pennsylvania's elections, including the adoption of no excuse mail-in voting for all qualified electors.  *See, e.g.,* 25 P.S. §§ 3150.11-3150.17.  However, presumably knowing of all the risks associated with mail-in voting, the General Assembly enacted no excuse mail-in voting with certain restrictions designed to ensure the ballot's secrecy and to prevent fraud.

93.     For example, for both absentee and mail-in voting, Act 77 retains the requirement that "the [non-disabled] elector shall send [his or her absentee or mail-in ballot] by mail, postage, except where franked, or deliver it in person to [the] county board of elections," in order for the ballot to be properly cast under Act 77.  *See* 25 P.S. §§ 3146.6(a) & 3150.16(a).  Accordingly, as it did prior to the enactment of Act 77, the Election Code bars ballot harvesting of absentee and mail-in ballots cast by non-disabled voters.  *See Crossey v. Boockvar,* No. 108 MM 2020, 2020 Pa. LEXIS 4868, at *4 (Pa., Sept. 17, 2020) ("It has long been the law of this Commonwealth, per 25 P.S. § 3146.6(a), that third-person delivery of absentee ballots is not permitted.  Act 77 adds a substantially identical provision for mail-in ballots, which we likewise conclude forbids third-party delivery of mail-in votes.") (citations omitted); *Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234 ("we hold that Section 3146.6(a)'s "in person" delivery requirement is mandatory, and that the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are void."); *Marks,* 1994 U.S. Dist. LEXIS 5273, at *83.

94.     Also, for both absentee and mail-in voting, Act 77 retains the requirement that an elector must comply with the following additional mandatory requirements in order for such ballot to be properly cast:

> [T]he [non-disabled] elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black

ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. …

*See* 25 P.S. §§ 3146.6(a) & 3150.16(a).

95.     Moreover, as it did prior to the enactment of Act 77, the Election Code bars the counting of an absentee or mail-in ballot that either lacks an "Official Election Ballot," or contains on that envelope "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference," or fails to contain a completed declaration that is signed and dated by the elector.  *See* Election Code Sections 1306.6(a) and 1308(g)(i)-(iv), 25 P.S. §§ 3146.6(a) & 3146.8(g)(4)(i)-(iv).

96.     These provisions in the Election Code, as amended by Act 77, that identify exactly what an elector "shall" do to properly cast and vote an absentee or mail-in ballot serve to ensure the secrecy of such ballots and to prevent fraud.  *See Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1232.  *See also id.* at 1234 (the Election Code's provisions of how to cast an absentee ballot are "substantive matters—how to cast a reliable vote—and not [] a mere procedural matter" that can be disregarded by a county board of elections); *Appeal of Yerger,* 333 A.2d 902, 907 (Pa. 1975) (the validity of a ballot must first be ascertained before any factual inquiry into the intention of the voter); *Appeal of James,* 105 A.2d 64, 66 (Pa. 1954) ("violations of substantive provisions of the [Election] Code cannot be overlooked on the pretext of pursuing a liberal construction.").

97.     However, in contrast to prior provisions of the Election Code, all absentee and mail-in ballots are no longer sent to polling places on Election Day and are no longer inspected by the

local election boards or subject to challenge by poll watchers at the polling places. Instead, Act 77 mandates that all properly cast absentee and mail-in ballots are to remain with the County Election Boards until they are to be canvassed by them. *See* Election Code Section 1308(a), 25 P.S. § 3146.8(a).

98.     Additionally, contrary to the prior provisions of the Election Code, Act 77 requires the County Election Boards to conduct a pre-canvass of all absentee and mail-in ballots received to that point before 7:00 a.m. on Election Day. During the pre-canvass, the election officials open the ballots and, in some instances, actually process the ballots through the ballot counting machines. Although Election Code Section 3146.8(b), 25 P.S. § 3146.8(b), provides that "[w]atchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded," poll watchers are not identified as being authorized to attend this pre-canvass meeting. Rather, only one "representative" for each candidate and political party can be present, and that "representative" is not bound by any county or state residency requirement. *See* Election Code Section 1308(g)(1.1), 25 P.S. § 3146.8(g)(1.1).

99.     Further, contrary to prior provisions of the Election Code, Act 77 mandates that the County Election Boards are to meet no earlier than the close of polls on Election Day and no later than the third day following the election to begin canvassing absentee and mail-in ballots. Like Act 77's pre-canvass meeting provision, although Election Code Section 3146.8(b), 25 P.S. § 3146.8(b), provides that "[w]atchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded," poll watchers are not identified as being authorized to attend the post-election canvass meeting. Rather, only one "representative" for each candidate and political party

- 34 -

can be present, and that "representative" is not bound by any county or state residency requirement.

*See* Election Code Section 1308(g)(2), 25 P.S. § 3146.8(g)(2) .

100.    Act 77 prohibits an elector from casting both a mail-in ballot and in-person ballot.

Specifically, Act 77 provides:

> Any elector who receives and votes a mail-in ballot under section 1301-D shall not be eligible to vote at a polling place on election day.  The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who voted a mail-in ballot to vote at the polling place.

25 P.S. § 3150.16(b)(1).

101.    Further, Act 77 provides that an elector who requests a mail-in or absentee ballot and who is not shown on the district register as having voted may vote only by provisional ballot at the polling place on Election Day, unless the elector remits the unvoted mail-in or absentee ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement under penalties of perjury that he or she has not voted the absentee or mail-in ballot.  25 P.S. § 3150.16(b)(2) & (3).

102.    These restrictions and requirements under Act 77 were put in place to reduce the possibility that illegally cast and/or fraudulent ballots would be counted.

**VI.    Defendants' Administration of Pennsylvania's 2020 Primary Election Resulted in Violations of the Election Code and Infringement of Constitutional Rights to Free, Fair and Transparent Public Elections.**

103.    Although the Secretary of the Commonwealth is considered the "chief election officer," the Pennsylvania Constitution vests no powers or duties in Secretary Boockvar. *Perzel, 870 A.2d at 764*.  Instead, her general powers and duties concerning the administration of elections are set forth in Election Code Section 201, 25 P.S. § 2621.

104.   Under Election Code Section 201, Secretary Boockvar has no ruling-making power or authority. *See* 25 P.S. § 2621(a)-(g). Instead, Secretary Boockvar acts primarily in a ministerial capacity and has no power or authority to intrude upon the province of the Pennsylvania General Assembly. *Perzel*, 870 A.2d at 764; *Hamilton*, 141 A. at 847.

105.   Under Election Code Section 301, 25 P.S. § 2641, the election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. In particular, Election Code Section 301 provides that each county "shall" have "a county board of elections" which "shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]." 25 P.S. § 2641(a).

106.   The general powers of the County Election Boards are set forth in Election Code Section 302, 25 P.S. § 2642. Under that section, the County Election Boards are empowered to "make and issue such rules, regulations and instructions, ***not inconsistent with law***, as they may deem necessary ***for the guidance of voting machine custodians, election officers and electors***." 25 P.S. § 2642(f) (emphasis added).

107.   However, because they are executive agencies that carry out legislative mandates, *see Shroyer*, 81 A.2d at 437; *Perles*, 213 A.2d at 786, the County Election Boards have no power to enact or adopt rules, policies, practices, and/or procedures that violate explicit directives of the Election Code, including those involving absentee and mail-in voting, on the pretext of pursuing a liberal construction. *See In re Canvass of Absentee Ballots of November 4, 2003,* 839 A.2d 451, 461 (Pa. Commw. Ct. 2003) (J. Leadbetter, dissenting), *rev'd in part,* 843 A.2d 1223 (Pa. 2004). *See also In re April 10, 1984 Election of East Whiteland Township, Chester County,* 483 A.2d 1033, 1036 (Pa. Commw. Ct. 1984) ("While it is true that a defect which is minor or technical in

nature will not void an otherwise valid ballot, violations of substantive provisions of the Code cannot be overlooked on the pretext of pursuing a liberal construction.").

108.    When County Election Boards, individually or collectively, exceed their limited rule-making powers, they "generate a far greater inequity: the uneven treatment of absentee votes throughout the Commonwealth." *In re Canvass of Absentee Ballots,* 843 A.2d at 1234. *See also Pierce*, 324 F. Supp. 2d at 698-699 (allowing a patchwork of different rules from county to county in a statewide election involving federal and state candidates implicates equal protection concerns).

109.    Under the Election Code, the Secretary of the Commonwealth has no role that allows her to oversee the County Election Boards' conduct of primaries and general elections, except the limited authority to order a recount or recanvass under Election Section 1404, 25 P.S. § 3154. *See* 25 P.S. § 2621(f.2).

110.    Accordingly, under the Election Code, the County Election Boards, rather than the Secretary of the Commonwealth, are responsible to mail out, receive, count, and verify absentee and mail-in ballots.  *See, e.g.*, 25 P.S. §§ 3146.5, 3146.6(a) & (c), 3146.8(g)(3), 3150.15, 3150.16(a) & (c).  Also, the County Election Boards are the entities to issue "certificates of appointment to watchers at primaries and elections." 25 P.S. § 2642(e).  Additionally, the County Election Boards are responsible for "instruct[ing] election officers in their duties … to the end that primaries and elections may be honestly, efficiently, and *uniformly* conducted." 25 P.S. § 2642(g) (emphasis added).

111.    On June 2, 2020, Pennsylvania held its Primary Election which was the first election that followed the enactment of Act 77 and its no-excuse, mail-in voting alternative.

112.    Prior to the Primary Election, Pennsylvania election officials estimated that as many as two million (2,000,000) voters would apply to vote by mail. *See Crossey v. Boockvar*,

No. 266 MD 2020 (Pa. Commw. Ct. May 18, 2020), "Decl. of Jonathan Marks, the Deputy Secretary for Elections and Commissions for Pennsylvania," ¶ 32  (hereinafter, "Marks Decl." and referred to and incorporated herein by reference).  "Ultimately, more than 1.8 million voters applied for a mail-in or absentee ballot."  *See "*Trump, Biden win Pennsylvania primary contests amid unrest, pandemic," TRIBLive–Associated Press (June 2, 2020) (available at *https://triblive.com/news/pennsylvania/pennsylvania-primary-begins-amid-unrest-pandemic/,* and referred to and incorporated herein by reference).

113.    According to Secretary Boockvar, "nearly 1.5 million voters cast their vote by mail-in or absentee ballot [in the June 2, 2020 Primary Election.]"  *See* K. Boockvar, "FixGov: Historic primary paves way for successful general election in Pennsylvania," The Brookings Institution (June 22, 2020) (available at *https://www.brookings.edu/blog/fixgov/2020/06/22/historic-primary-paves-way-for-successful-general-election-in-pennsylvania/,* and referred to and incorporated herein by reference).

114.    Despite the record number of requested and voted absentee or mail-in ballots, Defendants failed to take adequate measures to ensure that the provisions of the Election Code concerning absentee or mail-in ballots, including without limitation the newly enacted Act 77, were followed.

A.    *Failure to Perform Proper Verification of Applicant's Qualifications and Identity.*

115.    On or about January 10, 2020, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards a set of "guidelines" titled "Pennsylvania Applications and Balloting Guidance: Mail-in and Absentee Ballots and Voter Registration Changes."  A true and correct copy of the January 10, 2020 Guidelines are available at the Pennsylvania Department of State's

web site at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_Act%2077_Absentee%20and%20Mail-in%20Guidance.pdf.

116.    The January 10, 2020 Guidelines purportedly "define both what is required by Act 77 and what is permissible under Act 77 or some other portion of the Election Code." *See* January 10, 2020 Guidelines, p. 2.

117.    According to the January 10, 2020 Guidelines, for in-person applications of absentee or mail-in ballots, "[a] county board of elections **cannot decline** the voter's application for a mail-in or absentee ballet, unless there is a bona fide objection to the mail-in or absentee ballot application." *See* January 10, 2020 Guidelines, p. 4 (emphasis original).

118.    Yet, Act 77 states that a county election board, "upon receipt of any application of a qualified elector under section 1301-D, shall determine the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card," and determine for itself whether it is "satisfied that the applicant is qualified to receive an official mail-in ballot," at which point "the application shall be marked 'approved,'" which decision "shall be final and binding, except that challenges may be made only on the grounds that the applicant [i]s not a qualified elector." 25 P.S. § 3150.12b(a)(1)-(2). *See also* 25 P.S. § 3146.2b(a) – (c).

119.    The January 10, 2020 Guidelines make no mention of the County Election Boards' duty to verify an applicant's qualifications or identification by comparison to the applicant's permanent registration card.  Instead, the January 10, 2020 Guidelines suggest the County Election Boards should just approve all submitted applications unless someone raises a "bona fide objection," without any further explanation as to what constitutes a "bona fide objection." *See* January 10, 2020 Guidelines, p. 4.

120.    Upon information and belief, several counties followed the "guidance" provided in the January 10, 2020 Guidelines and approved in-person applications for absentee or mail-in ballots without performing the requisite verification of the applicant's qualifications or identification by comparison to the applicant's permanent registration card.

**B.    *Use of Unmanned Drop-Boxes and Other Ballot Collection Locations*.**

121.    Under the headings "Optional County Services" and "Collection of Mail-In and Absentee Ballots," the January 10, 2020 Guidelines state that "[a]s allowed under existing law, county election boards may provide for mail-in and absentee application processing and balloting at more than one [county elections office (CEO)] located within county borders," and advises that "[w]hen choosing a location for the CEO, counties should consider, at a minimum, … choos[ing] locations that serve heavily populated urban/suburban areas, as well as rural areas, [including] near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes." *See* January 10, 2020 Guidelines, pp. 4-6.

122.    Although the January 10, 2020 Guidelines note the importance of the County Election Boards to follow certain "best practices" concerning the use of drop boxes and other "ballot collection locations," the January 10, 2020 Guidelines themselves instruct the County Election Boards to "contact the Department [of State] for [further] guidance" on these issues. *Id.* at p. 6.

123.    Upon information and belief, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, disseminated such further "guidance" to some but not all the County Election Boards, and none of this further "guidance" set forth any requirement or "best practices" that the County Election Boards were to follow to ensure that third-party delivery or other ballot harvesting of absentee and mail-in ballots cast by non-disabled voters would not take place through the use of drop boxes and other ballot-collection sites.

124.    Approximately twenty (20) County Election Boards (namely, Allegheny, Bedford, Bucks, Chester, Cameron, Carbon, Centre, Chester, Clinton, Crawford, Dauphin, Delaware, Elk, Erie, Luzerne, Montgomery, Philadelphia, Venango, and York) followed the January 10, 2020 Guidelines and other "guidance" provided by Secretary Boockvar and/or the Pennsylvania Department of State, and allowed absentee and mail-in ballots to be returned to other unmonitored and unsecured locations, such as shopping centers, parking lots, fairgrounds, parks, retirement homes, college campuses, fire halls, municipal government buildings, and elected officials' offices. *See* "Voting by Absentee or Mail-In Ballot: County drop boxes and drop-off locations," Pa. Dept. of State (2020) (previously available at *https://www.votespa.com/Voting-in-PA/Documents/2020Primary-County-DropLocations.pdf*, and referred to and incorporated herein by reference). *See also* Joe Brandt and Deanna Durante, *"Can You Drop Off a Pa. Mail-In Ballot? It Depends Where You Live,"* Channel 10 Philadelphia (May 26, 2020) (available at *https://www.nbcphiladelphia.com/news/local/can-you-drop-off-a-pa-mail-in-ballot-it-depends-where-you-live/2408168/*, and referred to and incorporated herein by reference); Shaunice Ajiwe, "Here Are All the Places You Can Drop Off Your Mail-In Ballot," Philadelphia Magazine (May 29, 2020) (available at *https://www.phillymag.com/news/2020/05/29/drop-off-mail-in-ballot/*, and referred to and incorporated herein by reference).

125.    Additionally, the Philadelphia County Board of Elections partnered with the Committee of Seventy, a Philadelphia based, self-proclaimed non-partisan group, to implement a mobile mail-in ballot drop-off initiative to collect voted absentee and mail-in ballots from non-disabled voters.  The mobile collection occurred between May 30, 2020 and June 1, 2020 at certain schools and shopping centers within Philadelphia County, and was in addition to the Commissioner's "24/7 mail-in ballot drop-off locations" at "[Philadelphia] City Hall (south portal)

and [the Philadelphia County] Board of Elections Office at 520 N. Columbus Blvd (Spring Garden entrance)."  *See* Office of the Philadelphia City Commissioners, "Mobile Drop Off Location for Mail-In-Ballot"   (available   at   *https://www.philadelphiavotes.com/en/home/item/1814-mobile_drop_off_location-_for_mail_in_ballot,* and referred to and incorporated herein by reference).

126.    Moreover, the Delaware County Board of Elections announced the day before the June 2, 2020 Primary Election that it was permitting third-party delivery of absentee and mail-in ballots for non-disabled voters and that absentee and mail-in ballots could be returned to "ANY polling location on Election Day" via unmonitored drop boxes in which voters were "not be required to check in with the [poll] workers."  Further, the Delaware County Board of Elections allowed those who received and completed absentee or mail-in ballots but did not want to return them to the election board to appear at their respective polling location on Election Day and cast provisional ballots which will "likely be included in the initial results."  *See, e.g.,* Delaware County Press Release, June 1, 2020 (last accessed July 15, 2020) *https://www.delcopa.gov/publicrelations/releases/2020/primaryupdate_june1.html.*  All of these actions were inconsistent and/or contrary to the clear and unambiguous mandates of the Election Code and Act 77.  *See* 25 P.S. §§ 3146.6(a) & (b)(1)-(3), 3150.16(a) & (b)(1)-(3), and 3050(a.4).

127.    Most of the other locations that were used to collect mail-in or absentee ballots for the Primary Election involved the use of unmanned "drop-off boxes" and/or other similar means which resulted in third-party delivery or other ballot harvesting of absentee and mail-in ballots cast by non-disabled voters.  Moreover, such illegal delivery of absentee or mail-in ballots occurred, despite signage on some of the unmanned drop boxes which stated that third-party delivery and/or ballot harvesting was prohibited.

128.     Discovery in the case to date has also revealed that for the Primary Election, many counties either did not have their drop boxes under video surveillance, or if they did use cameras to capture the drop boxes, the video footage was either unusable, not preserved, or not within the possession, custody, or control of the County Election Boards, thereby making it difficult and/or useless even to attempt to identify illegal delivery or ballot harvesting of absentee and mail-in ballots.  This is particularly troublesome given that for the November 3, 2020 General Election, upon information and belief, Delaware County intends to utilize 50 drop boxes, Montgomery County plans to install 10 drop boxes, and Philadelphia County plans to install 30 drop boxes.  Yet, to date, none of the Counties have announced any plans or proposals to ensure that the drop boxes are properly monitored and secured during the times when ballots are placed inside them in order to prevent illegal third-party delivery or other ballot harvesting or illegal activity.

129.     Moreover, the amount of notice and the fashion in which notice was given concerning the existence, use, and location of the drop boxes and the mobile voting sites varied among the twenty counties that implemented such measures, and many of the notices failed to comply with the Election Code's notice publication requirements.  *See, e.g.,* Election Code Sections 106 and 526(c), 25 P.S. §§ 2606 & 2726(c).

130.     Under the Election Code, a "polling place" is defined as "the room provided in each election district for voting at a primary or election."  *See* Election Code Section 102(q), 25 P.S. § 2602(q).  Also, the Election Code provides that a county board of election, "in its discretion, may procure and provide portable or movable polling places of adequate size and facilities for any or all election districts."  *See* Election Code Section 527(c), 25 P.S. § 2727(c).

131.     Further, Election Code Sections 526 through 530, 25 P.S. §§ 2726-2729.1, set forth the requirements that must be met for a location to be selected and used as a "polling place."

Notably, Election Code Section 529.1, 25 P.S. § 2729.1, mandates that "[n]o election shall be held in any of the following: … (5) A vacant lot[; or] … (7) An office, building or private residence of an elected official. … ." Accordingly, many of the other locations that were used to collect mail-in or absentee ballots for the Primary Election violated Election Code Section 529.1, 25 P.S. § 2729.1.

132.    The other locations that were used to collect mail-in or absentee ballots for the Primary Election were used in violation of the Election Code's mandatory provisions, including without limitation the clear and unambiguous mandate that absentee and mail-in ballots were to be personally delivered by only the non-disabled electors, *see* Election Code Section 1306(a), 25 P.S. §§ 3146.6(a) & 3150.16(a), and that no election shall be held in a vacant lot or an office or building of an elected official, *see* Election Code Section 529.1, 25 P.S. § 2729.1.

133.    The use of inadequately noticed, unmanned drop boxes or mobile drop-off facilities eviscerates the procedural protections that currently accompany Pennsylvania's mail-in voting procedures by creating a gap in the ability of both the Commonwealth and political parties and candidates to observe the delivery process and ensure that Pennsylvania's election laws are being followed.

### C.    *Issues Involving Duplicate or Unmailed Absentee and Mail-In Ballots and Double Voting.*

134.    On May 14, 2020, Allegheny County reported that an issue with the State's SURE system was causing the printing and mailing of duplicate mail-in and absentee ballots to voters within its county. *See* A. Downs, "Elections Division Statement on State SURE System Issue Impacting County," Allegheny County Dept. of Adm. Servs. – Div. of Elections (May 14, 2020) (available at *file:///H:/Downloads/Elections%20Division%20Statement%20on%20State%*

*20SURE%20System%20Issue%20Impacting%20County%20(2).pdf*, and referred to and incorporated herein by reference).

135. Further, several Allegheny County residents reported that they never received their mail-in or absentee ballots, and of the more than 280,000 mail-in ballots requested, only 75% of the ballots were received back, as of June 4, 2020. *See* "Allegheny County voters identify 5 issues to address before November presidential election," PublicSource (Jun. 4, 2020) (available at *https://www.publicsource.org/allegheny-county-voters-identify-5-issues-to-address-before-november-presidential-election/*, and referred to and incorporated herein by reference).

136. The issue of duplicate ballots caused confusion with voters over which ballot to vote and whether their voted ballot was actually received.

137. Equally concerning is that, according to a recent report from the Philadelphia County Board of Elections, double voting (*i.e.*, voting by mail and in-person by the same elector) occurred in the Primary Election. *See* Jonathan Lai, "Philly elections officials caught 40 cases of double voting. It's not fraud, but it's still a problem," The Philadelphia Inquirer (June 16, 2020) (available at *https://www.inquirer.com/politics/election/pa-primary-election-mail-ballots-double-voting-20200616.html*).

138. The double-voting occurred in Philadelphia despite Act 77's clear and unambiguous mandate that an elector cannot vote both a mail-in or absentee ballot and an in-person or machine ballot. 25 P.S. § 3150.16(b)(1)-(3).

139. Defendants' misadministration of the Primary Election caused an uneven treatment of voters throughout the Commonwealth.

**D.**    *Uneven Treatment of Absentee and Mail-Ballots That Fail to Include a Secrecy Envelope or Otherwise Comply with the Mandates of the Election Code and Act 77.*

140.    On pages 10 through 13 of the January 30, 2020 Guidelines, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, provided "guidance" on the envelopes that an elector must use to vote an absentee or mail-in ballot, including without limitation the "secrecy envelope."  *See* January 30, 2020 Guidelines, pp. 10-12. Other than stating that "[t]he secrecy envelope shall contain no other marks other than the envelope title," the January 30, 2020 Guidelines do not note that the Election Code's mandatory requirement that the absentee and mail-in ballot be enclosed in a secrecy envelope in order for it to be counted.

141.    Attached as **Exhibit 1** is a directive issued by the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, on May 28, 2020.

142.    Titled "Important DOS Email re: Absentee/Mail-in Ballot Canvass," the May 28, 2020 Directive states:

> Thought the Election Code requires county boards of elections to set aside absentee or mail-in ballots enclosed in the official ballot envelopes that contain "any text, mark or symbol which reveals the identity of the elector," there is **no statutory requirement, nor is there any statutory authority,** for setting aside an absentee or mail-in ballot solely because the voter forgot to properly insert it into the official election ballot envelope.  See 25 P.S. § 3146.8(g)(4)(ii).
>
> To preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official election ballot envelopes or privacy sleeves until such time as they are ready to be tabulated.

*See* May 28, 2020 Directive.

143.    The May 28, 2020 Directive is contrary to the clear and unambiguous provisions of the Election Code and Act 77.  *See* Election Code Sections 1306.6(a) and 1308(g)(i)-(iv), 25 P.S.

§§ 3146.6(a) & 3146.8(g)(4)(i)-(iv).  *See also Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234 (the Election Code's provisions of how to cast an absentee ballot are "substantive matters—how to cast a reliable vote—and not [] a mere procedural matter" that can be disregarded by a county board of elections).

144.     Upon information and belief, many of the County Election Boards followed the May 28, 2020 Directive and counted in the 2020 Primary Election absentee and mail-in ballots that failed to comply with the Election Code's inner secrecy envelope mandate, but some County Election Boards did not.

145.     Also, upon information and belief, some but not all County Election Boards followed in the 2020 Primary Election the Election Code's mandate to not count absentee and mail-in ballots that contain on the inner secrecy envelope "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference," or fail to include on the outside envelope a completed declaration that is dated and signed by the elector, but some County Election Boards did not.  For example, upon information and belief, Philadelphia County Board of Elections' practice is to count such absentee and mail-in ballots, whereas the practice in other counties is to not count them.

146.     The statutory provisions in the Election Code and Act 77 involving absentee and mail-in ballots do not repose in either Secretary Boockvar or the County Election Boards the free-ranging power to attempt to ascertain voter intent or rule out fraud when a vote has been cast in violation of its explicit mandates.  While voter intention may be paramount in the realm of the fundamental right to vote, ascertaining that intent necessarily assumes a properly cast ballot.  Otherwise, a properly cast ballot will be diluted by one which has been improperly cast.

147.     By enacting the inner secrecy envelope proscription and the other mandates for the casting of a "reliable vote" via an absentee or mail-in ballot, the General Assembly weighed the factors bearing on that question, and it did not vest, and has not vested, any discretion or rule-making authority in Secretary Boockvar and/or the County Election Boards to reweigh those factors in determining whether or not to count a particular absentee or mail-in ballot should be counted.  *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, at *73 (Pa., Sept. 17, 2020).

148.     The May 28, 2020 Directive caused an uneven treatment of absentee and mail-in voters throughout the Commonwealth.

149.     Moreover, several County Election Boards who followed the May 28, 2020 Directive, including without limitation Philadelphia County Election Board, counted absentee and mail-in ballots that contained text, marks, or symbols on the inner secrecy envelope, lacked declarations on the outside envelope that were not completed, dated and/or signed by electors, and/or were delivered by third-persons for non-disabled voters.  Such County Election Boartds believed that they have the discretion to count such ballots even though they were cast in violation of the Election Code and Act 77.

**VII.     Defendants' Administration of the Upcoming 2020 General Election Will Result in Violations of the Election Code and Infringement of Constitutional Rights to Free, Fair and Transparent Public Elections.**

150.     With 43 days left until the November 3, 2020 General Election in which Pennsylvanian voters may still apply for an absentee or mail-in ballot, as of September 15, 2020, the County Election Boards had already received nearly 1.9 million applications for mail-in or absentee ballots.  *See* K. Boockvar's September 15, 2020 interview with ABC news (available at https://twitter.com/abcnewslive/status/1306023793643708417?s=27 (last accessed September 21 2020).

151.     Nevertheless, Secretary Boockvar and the Pennsylvania Department of State have not undertaken any meaningful effort to prevent the casting of illegal or unreliable absentee or mail-in ballots and/or to ensure the application of uniform standards amongst all 67 of the County Election Boards to prevent the casting of such illegal or unreliable ballots.  Rather, Secretary Boockvar has done the opposite, thereby sacrificing the right to vote by those who legally cast their ballots (whether in-person or through properly cast absentee or mail-ballots) through the unlawful dilution or debasement of the weight of their vote.

A.     *August 19, 2020 Guidance On Unmanned Drop Boxes And Other Similar Ballot-Collection Sites***.**

152.     For example, on August 19, 2020 the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards a set of a guidance titled "Absentee and Mail-In Ballot Return Guidance," in which the Secretary provides "guidance on how each county should establish a ballot return and collection plan for their county prior to the election."  A true and correct copy of the August 19, 2020 guidance is available at the Pennsylvania Department of State's web site at *https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_BallotReturn_Guidance_1.0.pdf* (last accessed September 21, 2020).

153.     As detailed in the August 19, 2020 guidance, although counties are encouraged to submit their proposed plans to the Pennsylvania Department of State on or before the 45th day before an election, there is no requirement or repercussion if a county does not make any such submission.  Instead, it remains entirely up to each of the 67 counties to decide the time, manner, and place for their use, if any, of such drop-boxes, and when and how notice of such drop boxes will be provided.  *Id.*

154.     Further, nowhere in the guidance dated August 19, 2020 does Secretary Boockvar or the Pennsylvania Department of State make any mention of the procedures the County Election Boards must follow to avoid the commingling and counting of non-disabled voters' absentee and mail-in ballots that are delivered in-person by someone other than the non-disabled electors. Indeed, the August 19, 2020 guidance is completely devoid of any such procedures or guidance.

155.     In the August 19, 2020 guidance, Secretary Boockvar has encouraged the County Election Boards to begin using drop boxes and other ballot-collection sites "not less than thirty (30) days before the day of the election, and on the day of the election."  Also, the "business hours for [the] sites do not have to be limited to weekdays or normal business hours," but instead should be made available outside of business hours, including weeknights or weekend hours.

156.     As a result of the Secretary's August 19, 2020 guidance, some but not all counties have announced plans to use unmanned drop boxes and other unmonitored and unsecured ballot-collections sites for the upcoming November 3, 2020, General Election.

157.     For example, Delaware County has announced plans to install by October 1, 2020, fifty (50) unmanned drop-boxes for the return and collection of absentee and mail-in ballots cast for the November 3, 2020 General Election.  *See* 01/17/20 Email message from K. Lehman (bate-stamped as PADOS000609.000001-5); *see also* http://www.delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html (last accessed September 21, 2020).  Upon information and belief, these drop boxes will be accessible on a 24 hour/7 days-a-week basis without any manned supervision, and their purchase has been funded through Delaware County's receipt of a $2.2 million grant from the Center for Tech and Civic Life (CTCL).  *See Philadelphia Inquirer*, "Philly is about to get $10 million for mail ballot drop boxes, early voting, and raises for poll workers," August 26, 2020, (available at *https://www.inquirer.com/politics/*

*election/philadelphia-2020-election-funding-20200826.html*.)  CTCL is a Chicago, Illinois-based election reform advocacy group that is  funded by organizations such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation, and by Facebook founder and CEO Mark Zuckerberg and his wife Priscilla Chan who, on September 1, 2020, announced they were donating $250 million to CTCL.  *See* https://www.influencewatch.org/non-profit/center-for-tech-and-civic-life/#note-16.

158.    Similarly, Philadelphia County, whose 2020 operating budget is $12.3 million, announced on August 21, 2020, the receipt of a $10 million grant from CTCL to fund "mail drop boxes,      early      voting,      and      raises      for      poll      workers."      *See* https://www.inquirer.com/politics/election/philadelphia-2020-election-funding-20200826.html (last accessed September 21, 2020).  The grant is intended to fund an additional 15 unmanned drop boxes  that would be accessible on a 24-hour/7-days-a-week, bringing the total unmanned drop boxes in Philadelphia to 30 for the upcoming November 3, 2020 General Election.

159.    However, not all counties plan to use unmanned drop boxes.  For example, Allegheny County has announced plans to use manned or staffed drop boxes as part of its satellite offices that will offer in-person/over-the-counter absentee and mail-in ballot application processing and voting, with their staff trained to prevent third-party delivery of non-disabled voters' absentee or mail-in ballots.

160.    Using manned or staffed drop boxes like Allegheny County has indicated it intends to employ rather than the unmanned drop boxes like Philadelphia and Delaware Counties are proposing to employ is the only reliable way to avoid ballot harvesting or other illegal casting of absentee or mail-in ballots.

161.     The August 19, 2020 guidance encourages the casting of illegal or unreliable absentee or mail-in ballots through the use of unmanned drop boxes and other ballot-collection sites that will not and cannot be monitored by the candidates and political parties, including Plaintiffs, to ensure that the November 3, 2020 General Election is free, fair, and transparent.

**B.     *August 19, 2020 Guidance On Inner Secrecy Envelopes*.**

162.     On the same day its guidance on the use of unmanned drop boxes and other ballot-collection sites was disseminated, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards another guidance titled "Pennsylvania Guidance for Missing Official Ballot Envelopes ('Naked Ballots')."   A true and correct copy of the August 19, 2020 Naked Ballots guidance was available at the Pennsylvania Department of State's web site at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_NakedBallot _Guidance_1.0.pdf.

163.     In her Naked Ballot Guidance, Secretary Boockvar espoused "the … position that naked ballots should be counted pursuant to the Pennsylvania Election Code, furthering the Right to Vote under the Pennsylvania and United States Constitutions[,]"that "[t]he failure to include the inner envelope ('Secrecy Envelope') does not undermine the integrity of the voting process[,]"and that "no voter should be disenfranchised for failing to place their ballot in the official election ballot envelope before returning it to the county board of election."  *Id.*

164.     On September 17, 2020, the Pennsylvania Supreme Court rejected the Secretary's position and ruled that "the secrecy provision language in Election Code Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid." *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, at *72 (Pa., Sept. 17, 2020).

165.     Following the Pennsylvania Supreme Court's September 17, 2020 decision, Secretary Boockvar has removed the August 19, 2020 Naked Ballot guidance from the and the Pennsylvania Department of State's web site.  However, she has not issued any guidance advising all 67 County Election Boards that they must not count non-compliant absentee or mail-in ballots, including without limitation those that lack an inner secrecy envelope, contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, and/or are delivered in-person by third-parties for non-disabled voters.

**C.     *Unfounded and Wrong Guidance on In-Peron Voting by Absentee or Mail-In Voters.***

166.     On January 30, 2020, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards a set of "guidelines" titled "Pennsylvania Balloting and Envelope Guidance."  A true and correct copy of the January 30, 2020 Guidelines are available at the Pennsylvania Department of State's web site at *https://www.dos.pa.gov/VotingElections/ OtherServicesEvents/Documents/PADOS_BallotingandEnvelope_CountyGuidance_v1.0.pdf*.

167.     Like the January 10, 2020 Guidelines, the January 30, 2020 Guidelines purportedly "define both what is required by Act 77 and what is permissible under Act 77 or some other portion of the Election Code."  *See* January 30, 2020 Guidelines, p. 2.

168.     According to the January 30, 2020 Guidelines, "[a]s soon as a voter requests a civilian absentee ballot or mail-in ballot, they are <u>only</u> entitled to vote by provisional ballot if they show up at their polling place, and the voter is not shown on the district register as having voted an absentee or mail-in ballot," citing Election Code Section 1210, 25 P.S. § 3050(a.4)(1).  Also, the January 30, 2020 Guidelines state: "Act 77 of 2019 establishes provisional balloting as the

only option for voters to cast their vote in the event their absentee or mail-in ballot is not returned to the county by 8:00 p.m. on election day."  Similar statements are made on page 3 of the January 10, 2020 Guidelines.

169.    Yet, under Act 77, as it has been amended for the upcoming November 3, 2020, General Election, an elector who requests an absentee or mail-in ballot and who is not shown on the district register as having voted that ballot may vote a regular ballot in-person at the polling place if the elector remits his or her unvoted absentee or mail-in ballot and the envelope containing the elector's declaration to the judge of elections to be spoiled and the elector signs the requisite statement declaring that he or she has not voted the absentee or mail-in ballot and has requested it to be spoiled.  *See* 25 P.S. §§ 3146.6(b)(3) & 3150.16(b)(3).

170.    The "guidance" provided in the January 30, 2020 Guidelines concerning whether an elector who has applied for but not voted an absentee or mail-in ballot is contrary to what Act 77 and the Election Code provides.

171.    The Secretary's January 10 and 30, 2020 Guidelines will lead to the disenfranchisement of voters at the November 3, 2020 General election.

D.    *September 11, 2020 Guidance On Approving Absentee and Mail-In Ballot Applications and Canvassing Absentee and Mail-In Ballots.*

172.    In the January 10, 2020 Guidelines, Secretary Boockvar makes no mention of the County Election Boards' duty to verify an in-person applicant's qualifications or identification by comparison to the applicant's permanent registration card.  Nor in the January 10 and 30, 2020 Guidelines did Secretary Boockvar provide any guidance on what procedures the County Election Boards should follow concerning the examination of declaration envelopes at or before the time of any pre-canvass or canvass of absentee and mail-in ballots.

- 54 -

173.     On September 11, 2020, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards a guidance titled "GUIDANCE CONCERNING EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES."  A true and correct copy of the September 11, 2020 Guidance is available at the Pennsylvania Department of State's web site at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

174.     Under the "Background" section of the September 11, 2020 Guidance, Secretary Boockvar states that "[b]efore sending [an absentee or mail-in] ballot to the applicant, the county board of elections confirms the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained in the voter record[,]" that "[i]f the county is satisfied that the applicant is qualified, the application must be approved[,]" and that "[t]his approval shall be final and binding, except that challenges may be made only on the grounds that the applicant was not a qualified voter, …"

175.     Yet, the Election Code mandates that for non-disabled and non-military voters, all applications for an absentee or mail-in ballot "shall be signed by the applicant."  25 P.S. §§ 3146.2(d) & 3150.12(c).

176.     Moreover, because of the importance of the applicant's signature and the use of the word "shall," Pennsylvania courts have consistently upheld challenges to absentee ballots that have been cast by voters who did not sign their absentee ballot applications.  *See, e.g., Opening of Ballot Box of the First Precinct of Bentleyville,* 598 A.2d 1341, 1343 (Pa. Commw. Ct. 1991).

177.     To the extent that it states or implies that challenges cannot be asserted to absentee or mail-in ballots that have been cast by non-disabled and non-military voters who have not signed

their applications, the September 11, 2020 guidance is contrary to the mandatory terms of the Election Code and Pennsylvania case law.

178.    Further, under the "Examination of Declaration on Ballot Return Envelopes" section of the September 11, 2020 guidance, Secretary Boockvar states that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections."

179.    However, except for first-time voters, the only basis under the Election Code for the identification of any voter, whether voting in-person or by absentee or mail-ballot, is an analysis of the voter's signature.

180.    Before one can cast a regular ballot at a polling place on Election Day, that voter is subject to the following signature comparison and challenge process:

> (1) All electors, including any elector that shows proof of identification pursuant to subsection (a), shall subsequently sign a voter's certificate in blue, black or blue-black ink with a fountain pen or ball point pen, and, unless he is a State or Federal employe [sic] who has registered under any registration act without declaring his residence by street and number, he shall insert his address therein, and hand the same to the election officer in charge of the district register.

> (2) Such election officer shall thereupon announce the elector's name so that it may be heard by all members of the election board and by all watchers present in the polling place and ***shall compare the elector's signature on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote:*** Provided, That if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to make the affidavit and produce the evidence as provided in subsection (d) of this section.

25 P.S. § 3050(a.3)(1) – (2)(2020) (emphasis added).

181.    Similarly, under Election Code Section 1308(g)(3)-(7), "[w]hen the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots…, the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and shall compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed." 25 P.S. § 3146.8(g)(3). Further, only those ballots "that have been verified under paragraph (3) shall be counted …" 25 P.S. § 3146.8(g)(4). If a ballot is not counted because of a lack of a genuine signature, it is considered "challenged" and subject to the notice and hearing provisions under Section 1308(g)(5)-(7). 25 P.S. § 3146.8(g)(5)-(7).

182.    Therefore, contrary to the September 11, 2020 Guidance, the Pennsylvania Election Code does authorize County Election Boards to set aside and challenge returned absentee or mail-in ballots that contain signatures which do not match the voters' signatures in their permanent voter registration records.

183.    To the extent that it states or implies that challenges cannot be asserted to absentee or mail-in ballots that lack genuine signatures, the September 11, 2020 Guidance is contrary to the mandatory terms of the Election Code and Pennsylvania case law.

184.    Moreover, to the extent that it states or implies that challenges cannot be asserted to absentee or mail-in ballots that lack genuine signatures, the September 11, 2020 Guidance

creates an arbitrary, disparate, and unequal treatment between those who vote in-person at the polling place versus those who vote by absentee or mail-in ballot.

185.    To the extent that it states or implies that challenges cannot be asserted to absentee or mail-in ballots that lack genuine signatures, the September 11, 2020 Guidance fosters an environment that encourages ballot fraud or tampering and prevents the Commonwealth and the County Election Boards from ensuring that the November 3, 2020 General Election is free, fair, and transparent.

186.    The September 11, 2020 Guidance promotes the unconstitutional dilution of validly cast ballots in the November 3, 2020 General Election through Defendants' arbitrary, disparate, and/or uneven approval of all absentee and mail-in ballots without performing the requisite verification of the voter's signature, resulting in the treatment of by-mail and in-person voters across the state in an unequal fashion in violation of state and federal constitutional standards.

187.    The Secretary's September 11, 2020 "guidance" is yet another instance of an attempt by Pennsylvania's Executive Branch to exceed its authority by seeking to undo the Election Code's signature and comparison challenge provisions for those who decide to cast their vote via an absentee or mail-in ballot.

E.    *Defendants' Inconsistent Administration and Uneven Treatment of Voters Represents an Unconstitutional Infringement of Plaintiffs' Fundamental Rights.*

188.    The casting of votes in violation of the Election Code's mandatory provisions renders them void. *Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234.

189.    Further, for statewide elections involving federal candidates, Defendants' allowance, by act or omission, of the collection and counting of in-person, provisional, and absentee and mail-in ballots in a manner and at locations that are contrary to the Election Code's mandatory provisions (as set forth more fully in Paragraphs 103 through 186 of this complaint)

constitutes legislative action by the Executive Branch in violation of the Elections and Electors Clauses of the United States Constitution.

190.   Finally, the lack of statewide standards governing the notice and location of unmanned drop boxes and the subsequent use of a patchwork of ad-hoc rules that vary from county to county in a statewide election involving federal and state-wide candidates (as set forth more fully in Paragraphs 103 through 186 of this complaint) violates the Equal Protection clause of the Fourteenth Amendment.  *Pierce*, 324 F. Supp. 2d at 698-699.

**VIII.   Pennsylvania's Poll Watching is Unconstitutionally Restrictive.**

191.   When initially enacted, Election Code Section 417 restricted a poll watcher's geographical territory to a single appointed election district within the county in which the person was a qualified registered elector.  *See* 25 P.S. § 2687 (1947).

192.   In 2004, Election Code Section 417 was amended to expand the poll watcher's geographical territory from a single election district to all election districts in the county in which the watcher is a qualified registered elector.  25 P.S. § 2687(b) (2004).

193.   In 2019, when Act 77 was enacted, no changes were made to Election Code Section 417 or the county residency and/or the Election Day polling place requirements of poll watchers.

194.   Consequently, as currently written, Election Code Section 417 does not permit a candidate or political party or any other body to appoint a poll watcher to serve in an election district in a county in which the watcher is not a qualified registered elector or at a polling place that is not operating on Election Day.  *See* Election Code Section 417, 25 P.S. § 2687(b).

195.   In this upcoming November 3, 2020 General Election, there are statewide and federal candidates, including President Trump and Representatives Thompson, Kelly, Joyce, and Reschenthaler, whose election will be impacted by the manner in which the voting in all sixty-seven (67) counties of the Commonwealth is conducted.

196.   Moreover, the Election Code sets forth the uniform standards that all sixty-seven (67) counties must follow in order to conduct any election in this Commonwealth and to cast and count votes, and the provisions of the Election Code do not create different standards for one or more classes of counties.  Rather, the standards apply equally to all 67 counties.

197.   The Equal Protection Clause mandates that the Commonwealth provide and use the same statewide uniform standards and regulations when conducting statewide or multi-county elections involving federal candidates, including without limitation the standards and regulations providing for the casting and counting of votes.  *Pierce*, 324 F. Supp. 2d at 698-699.  In other words, the Equal Protection Clause requires every county in the Commonwealth to enforce and apply the same standards and procedures for an election, and it does not allow a select few counties to either decline to enforce or employ those standards or develop their own contradicting standards that benefit their voters to the detriment of voters outside their counties.  *Id.*

198.   Accordingly, the manner in which the November 3, 2020 General Election is conducted and in which votes are cast and counted should be uniform across the counties of the Commonwealth.

199.   Because the standards in the conduct of statewide elections involving federal and state candidates, including without limitation the casting and counting of votes, are to be uniform, Plaintiffs have a vested interest in ensuring that the electoral process is properly administered in every election district.

200.   The Commonwealth has not, and cannot, articulate a constitutionally-recognized basis to restrict poll watchers from serving in counties other than their county of residence.

201.    The Commonwealth's arbitrary rule against voters serving as poll watchers in counties other than their county of residence has real, demonstrable impacts on all Plaintiffs to this action.

202.    In Pennsylvania, all Congressional electoral districts contain portions of multiple counties, and President Trump will appear on every ballot that will be cast in the November 3, 2020 General Election in all 67 counties of the Commonwealth.  Consequently, all Plaintiffs have an interest in having their poll watchers monitor the polls in multiple counties to ensure the integrity of the vote on behalf of themselves and the other federal and state electoral candidates and to protect the integrity of the vote on behalf of its registered electors who are voting for federal and statewide Republican candidates.

203.    According to statistics collected and disseminated by the Pennsylvania Department of State, there is a significant gap between the number of voters registered as Democrats and the number of registered Republicans in some Pennsylvania counties.  *See* "2019 Voter Registration Statistics – Official," Pa. Dept. of State (Nov. 5, 2019) (available at *https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Document s/2019%20Election%20VR%20Stats%20%20final.pdf*, and referred to and incorporated herein by reference) (hereinafter, the "2019 Voter Registration Statistics").

204.    For example, in Philadelphia County, there exist 66 voting wards which are divided into 1,686 divisions (hereinafter, the "Philadelphia Divisions").  *See* Political Maps, Office of the Phila. City Commissioners (2020) (available at *http://www.philadelphiavotes.com/en/resources-a-data/political-maps*, and referred to and incorporated herein by reference).  Republicans are not a majority of registered voters in any ward in Philadelphia County.  *See* Department Reports and Data, "Historical Citywide Voter Registration Data," Office of the Phila. City Commissioners (1940-

2019) (available at *https://files7.philadelphiavotes.com/department-reports/Historical_Registration_1940-2019G.pdf#_ga=2.206750996.604579856.1592778750-1031414694.1591725640*, and referred to and incorporated herein by reference). Accordingly, Republicans are at a disadvantage in staffing polling places in Philadelphia County with Republican poll watchers.

205.    In some contiguous geographic areas of the Commonwealth, such as in Fulton, Franklin, Bedford, Huntingdon and Perry counties, Republicans account for almost 70% of the voters, thereby placing Democrats at a disadvantage in staffing polling places with Democratic poll watchers. *See* 2019 Voter Registration Statistics.

206.    As a result of the Commonwealth's arbitrary restriction on poll watchers, candidates, political parties, and political bodies are unjustifiably burdened in their attempts to locate available, qualified registered electors who can serve as poll watchers.

207.    Additionally, Pennsylvania law does not speak to the ability of poll watchers to be present at the other locations that were used to collect mail-in and absentee ballots for the Primary Election to ensure that no third-party delivery or other ballot-harvesting has occurred. *See* Election Code Sections 417 & 102(q), 25 P.S. §§ 2687(b) & 2602(q).

208.    Nor are poll watchers identified as being authorized to be present during the pre-canvass meetings held on Election Day by the county boards of elections of the absentee and mail-in ballots. *See* Election Code Section 1308(g)(1.1), 25 P.S. § 3146.8(g)(1.1).

209.    This issue is even more relevant now given the authorization on the use of drop boxes for the upcoming General Election and that absentee and mail-in ballots submitted through such collection sites will be opened during the pre-canvassing meetings. In every instance where an absentee or mail-in ballot is opened and canvassed by a county election board, poll watchers should be permitted to be present. *See* Election Code Section 1308(b), 25 P.S. § 3146.8(b)

("Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.").

210.   In the June 2, 2020 Primary Election, approximately half of the cast votes were by absentee and mail-in ballots.

211.   For the upcoming November 3, 2020 General Election, the predictions are that the same or greater percentage of absentee and mail-in ballots will be cast.

212.   Indeed, as noted above, nearly 1.9 million Pennsylvania voters have already applied for an absentee or mail-in ballot for the November 3, 2020 General Election.

213.   Plaintiffs have a substantial interest to ensure that the upcoming November 3, 2020 General Election is conducted in a free, open, and honest manner and that the votes cast, whether in person or by mail, are legitimate.

214.   The Commonwealth has not articulated and cannot articulate a constitutionally-recognized basis to restrict poll watchers from being present at locations that are used to collect mail-in and absentee ballots prior to or on Election Day (including inadequately noticed and unmonitored ad hoc drop boxes and other collection sites), or the pre-canvass meeting of such voted absentee and mail-in ballots.

215.   The Commonwealth's arbitrary exclusion of poll watchers from being present at locations that are used to collect mail-in and absentee ballots prior to Election Day (including inadequately noticed and unmonitored ad hoc drop boxes and other collection sites), or the pre-canvass meeting of such ballets has real, demonstrable impacts on all of the Plaintiffs.

216.   Poll watchers serve the important purpose of assuring voters, candidates, political parties, and political bodies, who may question the fairness of the election process, that the same

is conducted in compliance with the law, and is done in a correct manner which protects the integrity and validity of the vote and ensures that all elections are free, open, fair, and honest.

217.    Arbitrarily restricting a registered voter from serving outside of the county of his or her residence and/or limiting his or her activities to only those which occur at a polling place on Election Day results in an unconstitutional infringement on the fundamental right to vote, the guarantee of equal protection, and the right to participate in free and fair public elections as guaranteed by the United States and Pennsylvania Constitutions.

## IX.    Need for Judicial Intervention.

218.    The current voting regime as employed by Defendants, including the January 10, 2020, January 30, 2020, August 19, 2020 and the September 11, 2020 Guidelines, remain in place and have needlessly resulted in the denial of free and fair elections and other fundamental rights during the Pennsylvania Primary Election.  Absent judicial intervention, there is no reason to believe things will be different during the November 3, 2020 General Election.

219.    This Court should act now to prevent a recurrence of the problems that manifested in the Pennsylvania Primary Election.  The November General Election is now only 43 days away; presenting these issues to the Court now allows this Court and the parties sufficient time to develop a record and adequately consider the legal merits of Plaintiffs' claims.

220.    Plaintiffs respectfully request that this Court prevent Defendants from making the same mistake twice.  In addition to any other affirmative relief that the Court may deem necessary and proper, Plaintiffs seek an order, declaration, and/or injunction that prohibits Defendants from permitting the return of absentee and mail-in ballots to unmanned and/or unmonitored mobile ballot collection centers and other inadequately noticed and unmonitored ad hoc drop boxes. Plaintiffs also seek an order, declaration, and/or injunction that bars county election boards from counting absentee and mail-in ballots that lack a secrecy envelope, contain on that envelope any

text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, and/or are delivered in-person by third-parties for non-disabled voters. Further, Plaintiffs seek an order, declaration, and/or injunction that requires county election boards to verify the identification and qualification for each applicant of an absentee or mail-in ballot, and to properly enforce which voters can and cannot vote on Election Day at the polling place after having applied for and either voted or not voted their absentee or mail-in ballots. Additionally, Plaintiffs seek an order, declaration and/or injunction that requires county election boards to (a) set aside, and not commingle, any absentee or mail-in ballot which may reasonably be subject to a challenge based upon a signature comparison under Section 3146.8(g)(3)-(7) of the Election Code and (b) subject those absentee and/or mail-in ballots to the Election Code's stated challenge procedures in the same way that in-person voters are subject to signature comparison and challenge procedures under Election Code Section 3050(a.3), 25 P.S. § 3050(a.3). Finally, Plaintiffs seek an order, declaration, and/or injunction that permits poll watchers to be present in all locations where votes are cast or counted, including without limitation all locations where absentee or mail-in ballots are being returned, pre-canvassed, and/or canvased.

## COUNT I

**First and Fourteenth Amendments**
**U.S. Const. Art. I § 4, cl. 1; Art. II, § 1, cl. 2; Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Invalid Enactment of Regulations Affecting the Time, Place and Manner of Election by Pennsylvania's Executive Branch**

221.     Plaintiffs refer to and incorporate Paragraphs 1 through 220 of this Complaint as though the same were repeated at length herein.

222.     Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution.

- 65 -

223.    The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process.  *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (lst Cir. 1978).

224.    The United States Constitution entrusts state legislatures to set the time, place, and manner of congressional elections and to determine how the state chooses electors for the presidency.  *See* U.S. Const. Art. I, § 4, cl. 1 & Art. II, § 1, cl. 2.

225.    In Pennsylvania, "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representative."  Pa. Const. Art. II, § 1.  *See also Winston*, 91 A. at 522; *Patterson*, 60 Pa. at 75.

226.    Defendants, as a member of the Governor's Executive Board and county executive agencies, are not part of the General Assembly and cannot exercise legislative power.  Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed."  Pa. Const. Art. IV, § 2.

227.    Although the Pennsylvania General Assembly may enact laws governing the conduct of elections, "no legislative enactment may contravene the requirements of the Pennsylvania or United States Constitutions."  *Shankey*, 257 A. 2d at 898.

228.    The Pennsylvania Election Code mandates that the County Election Boards shall determine the qualifications of all absentee and mail-ballot applicants by verifying their proof of identification and comparing the information provided on the applications with the information contained on the applicants' permanent registration cards, and for all absentee and mail-in ballots by approved non-disabled electors, the elector "shall" "enclose and securely seal" the voted ballot in the "Official Election Ballot" secrecy envelope with no text, mark, or symbol which reveals the elector's identity, political affiliation or candidate preference, "shall" place the secrecy envelope

in the second envelope and "shall ... fill-out, date and sign the declaration printed on such envelope," and then "shall" mail or personally delivered the voted ballot to only the county boards of elections to ensure that the ballots are properly cast, kept secret, and not subject to fraud. *See* 25 P.S. §§ 3146.6(a), 3150.16(a) & 3146.8(g)(4)(i)-(iv).

229.    Rather than heeding these mandates, Defendants have knowingly authorized, allowed, and/or permitted some, but not all, of the County Election Boards to not verify the identification and/or qualifications of absentee and mail ballot applicants, to not verify the signatures on all cast absentee and mail-in ballots, and/or to collect absentee and mail-in ballots at unmonitored and unmanned locations including without limitation mobile sites and locations that the Election Code has mandated shall not serve as polling places, and/or unmanned drop boxes and other unmonitored and/or unsecured means.  Also, some, but not all, of the County Election Boards count absentee and mail-in ballots that lack the "Official Election Ballot" secrecy envelope, contain a text, mark, or symbol thereon, do not include on the outside envelope a completed declaration that is dated and signed by the elector, and/or are delivered in-person by third-parties for non-disabled voters, despite the Election Code's contrary mandate.

230.    Permitting absentee and mail ballot applications to be approved without identification or confirmation of the applicant or his or her qualifications, permitting absentee and mail-in ballots which lack genuine signatures that match the voters' signatures in their voter registration records to be counted, and/or permitting absentee and mail-in ballots of non-disabled electors to be collected through unmanned drop boxes and other unmonitored and/or unmanned means and/or to be counted when not cast in the manner mandated by the Election Code allows illegal absent and mail-in voting, ballot harvesting, and other fraud to occur and/or go undetected, and will result in dilution of validly cast ballots.

231.    By permitting absentee and mail ballot applications to be approved without identification or confirmation of the applicant or his or her qualifications, by permitting absentee and mail-in ballots which lack genuine signatures that match the voters; signatures in their voter registration records to be counted, by utilizing unmanned and improperly noticed drop boxes and other ballot-collections sites at locations that are banned as polling places for the return of absentee and mail-in ballots, and by counting improperly cast absentee and mail-in ballots, all in contradiction of Pennsylvania's statutory law, Defendants have increased the potential for ballot fraud or tampering, thus infringing the right to vote as secured to Plaintiffs and their members by the First and Fourteenth Amendments to the United States Constitution, without any authority to do so.

232.    Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

233.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT II

**Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Equal Protection**
**Disparate Treatment of Nondisabled Absentee/Mail-In Voters Among Different Counties**

234.    Plaintiffs refer to and incorporate Paragraphs 1 through 233 of this Complaint as though the same were repeated at length herein.

235.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.

236.     The Equal Protection Clause prevents the government from treating similarly situated voters differently without a compelling justification for doing so.  *Bush*, 531 U.S. at 104-05 ("[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

237.     The requirement of equal treatment is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

238.     The Pennsylvania Election Code mandates that all absentee and mail-in ballots by non-disabled electors "shall" be enclosed in the "Official Election Ballot" secrecy envelope with no text, mark, or symbol which reveals the elector's identity, political affiliation or candidate preference, the secrecy envelope "shall" then be placed in the outside envelope and the elector "shall then fill out, date and sign the declaration printed on such envelope" and securely seal it, and then the elector "shall" mail or personally deliver it to only the county boards of elections, to ensure that the ballots are properly cast, kept secret, and not subject to fraud.  *See* 25 P.S. §§ 3146.6(a), 3150.16(a) & 3146.8(g)(4)(i)-(iv).

239.     Rather than heeding this mandate, Defendants have knowingly authorized, allowed, and/or permitted some, but not all, of the County Election Boards to collect absentee and mail-in ballots at locations other than their offices, including without limitations unmanned mobile sites and locations that the Election Code has mandated shall not serve as polling places, and/or to utilize unmanned drop boxes  Also, some, but not all, of the County Election Boards count absentee and mail-in ballots that lack the "Official Election Ballot" secrecy envelope, contain a text, mark, or symbol thereon, do not include on the outside envelope a completed declaration that is dated and signed by the elector,  are delivered in-person by third-parties for non-disabled voters, and/or

lack a genuine signature which match the voters' signatures in their registration records, despite the Election Code's contrary mandate.

240.    Permitting absentee and mail-in ballots of non-disabled electors to be collected through unmonitored and/or unsecured means, including unmanned and improperly noticed drop boxes and other ballot-collections sites at locations that are banned as polling places, and to be counted when lacking a genuine signature and/or not cast in the manner mandated by the Election Code allows illegal absent and mail-in voting, ballot harvesting, and other fraud to occur and/or go undetected, and will result in dilution of validly cast ballots and the unequal treatment of voters in the Commonwealth.

241.    Defendants, through their intentional, negligent, or reckless acts or omissions, have violated the Elections and Electors Clauses of the United States Constitution and infringed upon the equal protection rights of Plaintiffs, their members, and all qualified Pennsylvania voters.

242.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection Clause of the United States Constitution.

243.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

### COUNT III

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Invalid Enactment of Regulations**
**Affecting the Time, Place and Manner of Election by Pennsylvania's Executive Branch**
**and Denial of Equal Protection via Disparate Treatment of Absentee/Mail-In Voters**
**Amongst Different Counties**

244.    Plaintiffs refer to and incorporate Paragraphs 1 through 243 of this Complaint as though the same were repeated at length herein.

245.    The Pennsylvania Constitution also bestows the right to vote upon qualified citizens and to equal protection in the enjoyment of that right.   *See* Pa. Const. art. VII, § 1 & art. I, § 28.

246.    Further, the Free and Equal Elections Clause of the Pennsylvania Constitution, provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."   Pa. Const. art. I, § 5.

247.    A free and fair election requires ballot security.

248.    For the same reasons Defendants have violated the United States Constitution's Elections and Electors Clauses and its First and Fourteenth Amendments and Equal Protection Clause by their intentional, negligent, or reckless failure or refusal to enforce the Election Code's mandate concerning the collection and/or counting of absentee and mail-in ballots (as stated more fully in Paragraphs 221 through 243 of this Verified Amended and Supplemental Complaint), Defendants have violated the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and have infringed upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

249.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

250.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT IV

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Poll Watcher Residency Restriction &**
**Polling Place Restriction**

251.    Plaintiffs refer to and incorporate Paragraphs 1 through 250 of this Complaint as though the same were repeated at length herein.

252.    In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Plaintiffs and all qualified voters in the Commonwealth of Pennsylvania, regardless of their location or residence, have a vested interest in ensuring that the electoral process is properly administered in every election district.

253.    Defendants have a duty to establish basic minimum safeguards to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.

254.    In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Election Code Section 417, 25 P.S. § 2687, arbitrarily and unreasonably distinguishes between qualified voters within the Commonwealth of Pennsylvania by limiting their service as a poll watcher to only the county of their residence and by limiting their service as a poll watcher to monitoring only in-person voting at the polling place on Election Day.

255.    The Commonwealth has no legitimate interest in arbitrarily restricting the right of any of its qualified voters from serving as a poll watcher to monitor the drop off of absentee and mail-in ballots before Election Day, regardless in what county those ballots may be cast.

256.    By failing to allow Pennsylvania voters to serve as poll watchers in counties other than their county of residence or monitor the drop off of absentee and mail-in ballots, Election Code Section 417, 25 P.S. § 2687, makes it extremely difficult or functionally impracticable for candidates and parties to ensure that they have poll watchers at all locations where ballots are being cast in connection with the November 2020 General Election – including remote drop boxes and other satellite offices – thus fostering an environment that encourages ballot fraud or tampering, and preventing the Commonwealth, candidates, and political parties from ensuring that the General Election is free, fair, and transparent.

257.    By failing to take basic precautions to protect against ballot fraud or tampering, Defendants have infringed upon the right to vote as secured to Plaintiffs and their members by the First and Fourteenth Amendments to the United States Constitution without any compelling reason to do so.

258.    As applied to the 2020 General Election, Election Code Section 417's residency requirement and its "polling place" requirement deny qualified voters in the Commonwealth of Pennsylvania of their fundamental right to a free, fair, and transparent public election process.

259.    Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

260.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT V

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Poll Watcher Residency Restriction &**
**Polling Place Restriction**

261.    Plaintiffs refer to and incorporate Paragraphs 1 through 260 of this Complaint as though the same were repeated at length herein.

262.    For the same reasons Election Code Section 417's county residency requirement and polling place restriction violate the United States Constitution's First and Fourteenth Amendments and its Equal Protection Clause (as stated more fully in Paragraphs 251 through 260 of this Complaint), Election Code Section 417's county residency requirement and polling place restriction violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and infringe upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

263.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

264.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT VI

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against**
**Dilution of Vote by Fraud or Tampering: Failure to Notice Drop Box Location**

265.    Plaintiffs refer to and incorporate Paragraphs 1 through 264 of this Complaint as though the same were repeated at length herein.

- 74 -

266.     In statewide and federal elections conducted in the Commonwealth of Pennsylvania, including without limitation the upcoming November 3, 2020 General Election, Plaintiffs and all qualified voters in the Commonwealth of Pennsylvania, regardless of their location or residence, have a vested interest in ensuring that the electoral process is properly administered in every election district.

267.     In the June 2, 2020 Primary Election, some of the County Election Boards, with Secretary Boockvar's knowledge, approval, and/or consent, established drop box and mobile drop box drop off locations for absentee and mail-in ballots while providing insufficient public notice regarding the location of these drop boxes or mobile locations.

268.     The Election Code requires the County Election Boards to provide not less than twenty (20) days' public notice of the location of all polling places where an election is to be held, and not less than five (5) days' public notice before closing or opening a new polling place.  *See* Election Code Section 526(a) & (c), 25 P.S. § 2726(a) & (c); *see also* Election Code Section 106, 25 P.S. § 2606.

269.     Moreover, the Election Code provides certain criteria that govern the selectin of sites for polling places.  *See* Election Code Sections 527-529.1, 25 P.S. §§ 2727-2729.1.

270.     Defendants failed to comply with either the Election Code's notice requirements or these site selection requirements when establishing drop boxes and mobile drop boxes for absentee and mail-in ballots in connection with the June 2, 2020 Primary Election.

271.     In doing so, Defendants increased the likelihood that they would confuse voters and prevent candidates or political parties from notifying voters about the availability and location of the drop boxes or adequately monitoring the drop boxes, thus fostering an environment that encourages ballot fraud or tampering, and preventing the Commonwealth, candidates, and political parties from ensuring that the General Election is free, fair, and transparent.

272.     On information and belief, Plaintiffs believe that Defendants intend to repeat this practice in the upcoming November 3, 2020 General Election.

273.     Defendants have a duty to establish basic minimum safeguards to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.

274.     By failing to comply with Pennsylvania's statutory notice, Defendants have failed to enact minimal safeguards against dilution of the right to vote by fraudulent ballots or tampering and thus infringe the right of qualified voters in the Commonwealth of Pennsylvania to a free, fair, and transparent public election process.

275.     Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

276.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT VII

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Failure to Sufficiently Safeguard Against Dilution of Vote by Fraud or Tampering: Failure to Notice Drop Box Location**

277.     Plaintiffs refer to and incorporate Paragraphs 1 through 276 of this Complaint as though the same were repeated at length herein.

278.     For the same reasons Defendants' failure to provide the statutory or otherwise adequate notice of drop box locations violates the United States Constitution's First and Fourteenth Amendments and its Equal Protection Clause (as stated more fully in Paragraphs 265 through 276

of this Complaint), Defendants' failure to provide the statutory or otherwise adequate notice of drop box locations violates the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and infringes upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

279.    Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

280.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

<u>**COUNT VIII**</u>

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Infringement of the Right to Vote Through Improper Voting at Polling Places**

281.    Plaintiffs refer to and incorporate Paragraphs 1 through 280 of this Complaint as though the same were repeated at length herein.

282.    Under Act 77, an elector who requests an absentee or mail-in ballot and who is not shown on the district register as having voted that ballot may vote a regular ballot in-person at the polling place if the elector remits his or her unvoted absentee or mail-in ballot and the envelope containing the elector's declaration to the judge of elections to be spoiled and the elector signs the requisite statement declaring that he or she has not voted the absentee or mail-in ballot and has requested it to be spoiled.  *See* 25 P.S. §§ 3146.6(b)(3) & 3150.16(b)(3).

283.    According to the January 10, 2020 and January 30, 2020 Guidelines, Secretary Boockvar has instructed election officials to deny electors who had applied for but not voted their absentee or mail-in ballots the right to vote a regular ballot in person at the polling locations,

leaving these electors with their votes subject to the Election Code's provisional ballot challenges, in direct contravention of the Election Code's mandates.

284.    Moreover, during the Primary Election, some counties failed to follow the dictates of the Act 77 and the Election Code which bar electors who had voted an absentee and mail-in ballot from voting any ballot at the polling place, including without limitation a provisional ballot.  The result of the County Election Boards' refusal and/or failure to bar voters who had already voted an absentee and mail-in ballot from voting at their polling places was the existence of double votes being cast and counted.

285.    On information and belief, Plaintiffs believe that Defendants intend to repeat this practice in the upcoming November 3, 2020 General Election and to follow the Secretary's January 10 and 30, 2020 Guidelines concerning provisional voting.

286.    Defendants have a duty to follow basic minimum safeguards to guard against deprivation of the right to vote by allowing those who are entitled to vote cast regular ballots and by preventing the dilution of validly cast ballots by improperly cast and/or fraudulent ballots.

287.    By failing to comply with the Election Code and Act 77, Defendants have failed to enact minimal safeguards against deprivation of the right to vote and thus infringe the right of qualified voters in the Commonwealth of Pennsylvania to a free, fair, and transparent public election process.

288.    Defendants have acted and will continue to act under color of state law to violate the right to vote as secured by the First and Fourteenth Amendments to the United States Constitution.

289.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## COUNT VIX

**Pennsylvania Equal Protection and Free and Equal Elections**
**Pa. Const. art. VII, § 1, art. I, § 28, & art. I, § 5**
**Infringement of the Right to Vote Through Improper Voting at Polling Places**

290.     Plaintiffs refer to and incorporate Paragraphs 1 through 289 of this Complaint as though the same were repeated at length herein.

291.     For the same reasons Defendants' failure to follow basic minimum safeguards to guard against deprivation of the right to vote by allowing those who are entitled to vote cast regular ballots and by preventing the dilution of validly cast ballots by improperly cast and/or fraudulent ballots violates the United States Constitution's First and Fourteenth Amendments and its Equal Protection Clause (as stated more fully in Paragraphs 281 through 289 of this Complaint), Defendants' failure to comply with the Election Code and Act 77's provisions concerning who is entitled to vote regular and provisional ballots at the polling place violates the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution and infringes upon the rights of Plaintiffs and all qualified Pennsylvania voters protected thereby.

292.     Defendants have acted and will continue to act under color of state law to violate the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

293.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

WHEREFORE, Plaintiffs ask this Court to enter judgment in their favor and provide the following relief:

A.     An order or declaration that Defendants must comply with Pennsylvania laws governing notice of changes to polling locations and site criteria for polling locations when establishing locations other than their respective offices to which voters may return absentee and mail-in ballots, and ensure that all counties utilize that option;

B.     An order or declaration that the counting of absentee and mail-in ballots that lack an "Official Election Ballot" secrecy envelope, contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, lack genuine signatures which match the signatures in the voters' permanent registration records, and/or are delivered in-person by third-parties for non-disabled voters, violates the Pennsylvania Election Code and the United States and Pennsylvania Constitutions;

C.     An order or declaration enjoining the enforcement of Election Code Section 417's residency and "polling place" requirements for Plaintiffs' poll watchers as a violation of the rights secured by the United States and Pennsylvania Constitutions;

D.     An order or declaration mandating that County Election Boards verify the identification and qualification for each applicant of an absentee or mail-in ballot by comparing the application information to the information contained on the applicant's permanent registration card;

E.     An order or declaration mandating that County Election Boards verify the identification of the registered voter of an absentee or mail-in ballot by comparing the signature

information on the absentee or mail-in ballot to the information contained on the voter's permanent registration card;

F.      An order or declaration mandating that County Election Boards permit those electors who have applied but not voted their absentee and mail-in ballots to vote regular ballots upon having the electors' non-voted absentee and mail-in ballots returned and spoiled at their polling places, and that County Election Boards deny those electors who have voted their absentee and mail-in ballots from casting any ballot, regular or provisional.

G.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from collecting absentee and mail-in ballots through unmanned drop boxes and other similar unsecured and unmonitored means;

H.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from counting absentee and mail-in ballots that lack an "Official Election Ballot" secrecy envelope, contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, lack genuine signatures which match the signatures in the voters' permanent registration records, and/or are delivered in-person by third-parties for non-disabled voters;

I.      A preliminary and permanent injunction prohibiting Defendants, and all other persons acting in concert with them, from restricting Plaintiffs' poll watchers, regardless of their county of residence, to be present in all locations where votes are cast, including without limitation where absentee or mail-in ballots are being returned before and on Election Day and at any pre-canvass and canvass meetings;

J.     A preliminary and permanent injunction requiring the County Election Boards to verify the identification and qualification for each applicant of an absentee or mail-in ballot by comparing the application information to the information contained on the applicant's permanent registration card;

K.     A preliminary and permanent injunction requiring the County Election Boards to verify the identification of the registered voter of an absentee or mail-in ballot by comparing the signature information on the absentee or mail-in ballot to the information contained on the voter's permanent registration card;

L.     A preliminary and permanent injunction requiring the County Election Boards to permit those electors who have applied but not voted their absentee and mail-in ballots to vote regular ballots upon having the electors' non-voted absentee and mail-in ballots spoiled at their polling places, and that County Election Boards deny those electors who have voted their absentee and mail-in ballots from casting any ballot, regular or provisional.

M.     Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

N.     All other relief that Plaintiffs are entitled to and that the Court deems just and proper.

Date:  September ___, 2020                    Respectfully submitted,

                                             PORTER WRIGHT MORRIS & ARTHUR LLP

                                 By:   */s/ Ronald L. Hicks, Jr.*
                                       Ronald L. Hicks, Jr. (PA #49520)
                                       Jeremy  A. Mercer (PA #86480)
                                       Russell D. Giancola (PA #200058)
                                       Carolyn B. McGee (PA #208815)
                                       Six PPG Place, Third Floor
                                       Pittsburgh, PA 15222
                                       (412) 235-4500 (Telephone)
                                       (412) 235-4510 (Fax)
                                       rhicks@porterwright.com

jmercer@porterwright.com
rgiancola@porterwright.com
cmcgee@porterwright.com

and

Matthew E. Morgan (DC #989591)
(admitted pro hac vice – ECF #10)
Justin Clark (DC #499621)
(admitted pro hac vice – ECF #31)
Elections, LLC
1000 Maine Ave., SW, 4th Floor
Washington, DC 20224
(202) 844-3812 (Telephone)
matthew.morgan@electionlawllc.com
justin.clark@electionlawllc.com

*Counsel for Plaintiffs*

## **<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have reviewed the foregoing Complaint and that the factual allegations are true and correct.


Date: September ___, 2020

_____
James Fitzpatrick, PA EDO Director
Donald J. Trump for President, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing Second Amended and Supplemental Complaint to be filed this _____ day of September, 2020, via ECF, which system will serve notice of same on all parties registered to receive same via the ECF system.  For any party who has yet to enter an appearance, the undersigned certifies that a copy of the foregoing filing will be served on that party via U.S. Mail and a copy sent to the County Solicitor, if known, via email or fax.

Respectfully submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

By:   */s/ Ronald L. Hicks, Jr.*

Ronald L. Hicks, Jr. (PA #49520)
Jeremy  A. Mercer (PA #86480)
Russell D. Giancola (PA #200058)
Carolyn B. McGee (PA #208815)
Six PPG Place, Third Floor
Pittsburgh, PA 15222
(412) 235-4500 (Telephone)
(412) 235-4510 (Fax)
rhicks@porterwright.com
jmercer@porterwright.com
rgiancola@porterwright.com
cmcgee@porterwright.com

and

Matthew E. Morgan (DC #989591)
(admitted pro hac vice – ECF #10)
Justin Clark (DC #499621)
(admitted pro hac vice – ECF #31)
Elections, LLC
1000 Maine Ave., SW, 4th Floor
Washington, DC 20224
(202) 844-3812 (Telephone)
matthew.morgan@electionlawllc.com
justin.clark@electionlawllc.com

*Counsel for Plaintiffs*

13755015v1