# EXHIBIT 19

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

September 30, 2020

<u>**VIA EMAIL ONLY**</u>

Ronald L. Hicks, Jr., Esq.
Kathleen A. Gallagher, Esq.
Porter Wright Morris & Arthur LLP
6 PPG Place, Third Floor
Pittsburgh, Pennsylvania 15222

RE:      <u>**Expert report – Election administration issues**</u>

Dear Attys. Hicks and Gallagher:

I have been retained by Porter Wright Morris & Arthur LLP to provide an expert report for use in an election-related litigation matter it is handling on behalf of several clients, including the Republican National Committee and Donald J. Trump for President, Inc.  That report, which addresses election administration issues, follows.[1]

The opinions set out in this document are my own opinions and are based on my education, training, and experience; my review of relevant related literature in the field; and review of the materials mentioned throughout; and decades of observing and studying election issues.

### *Background*

Before providing my opinion, a brief description of my background is necessary.  Between 2011 and 2019, I served as the Director of Elections and General Registrar ("Director") for Stafford County, Virginia.  Stafford County, Virginia is a suburb of Washington, D.C., is one of the fastest growing counties in America, and is in the top 10% of Virginia counties or city/counties ranked by population.  As the Director, my primary goal was to ensure that voter registration and elections in Stafford County were conducted in accordance with the law.  To do that, I leveraged technology and best-practices to serve, assist, and communicate with voters and to ensure that the voting process was conducted legally and with as little opportunity for voter fraud as possible.

In addition to serving as the Director for Stafford County, Virginia, I also have served on the US Election Assistance Commission's Standards Board from 2015 to 2019.  The US Election Assistance Commissions "is an independent, bipartisan commission charged with

---

[1]      As required by the Federal Rules of Civil Procedure, I disclose that I am being compensated for my work on this matter at the rate of $170 per hour and my compensation is not dependent upon the outcome of the litigation matter at issue.  I also have attached as Exhibit A to this letter my current CV.  I have not authored any publications in the past 10 years, and I have not testified as an expert at trial or a deposition in the past 4 years.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration." *See* https://www.eac.gov/about-the-useac.  The Standards Board is a 110-member advisory board that assists the Election Assistance Commission in carrying out its mandates.  *See* https://www.eac.gov/about_the_eac/standards_board.

During my service with the US Election Assistance Commission, I served on the Standards Board Executive Committee from 2017 to 2019 and served as the Chair of the Standards Board and the Executive Committee in 2019.  I also served from 2015 to 2019 as a Member of the Technical Guidelines Development Committee, a 14-member board of experts and stakeholders who write technical specifications and requirements for certified election equipment.

### *Overview*

This report outlines my views as an experienced election administrator regarding the propensity for voter fraud in elections generally, my assessment of the rampant problems and associated fraud in Pennsylvania's 2020 primary election, and my opinions regarding a number of policies unilaterally adopted by Pennsylvania election officials that I believe will undermine the integrity of the 2020 general election in Pennsylvania.

### *Goal of Election Administration*

The guiding directive for any election official should be to ensure that the elections are conducted in accordance with all legal requirements, in order to minimize the possibility that voter fraud will occur.  "In the freest nation in the world, our system of government and our very liberty depend on free and fair elections. Whether they're selecting a mayor or the president of the United States, every American must be able to trust the process, or the democratic system itself breaks down." *See* https://www.heritage.org/election-integrity/heritage-explains/safeguarding-the-electoral-process.

The ways in which elections are administered, though, can help to reduce that fraud or create ways for voter fraud to be perpetuated.  It is my opinion that the recent guidance documents issued by the Pennsylvania Secretary of the Commonwealth, specifically the guidance about the use of ballot drop boxes and the September 2020 guidance prohibiting signature verification for absentee and mail-in voting (all of which are attached to this letter as Exhibit B), are administration methods that perpetuate voter fraud.

### *Voter Fraud Exists*

Unfortunately, voter fraud exists.  When I use the term voter fraud, I mean the casting and/or counting of ballots in violation of a state's election code.  Voting twice yourself—even if in multiple jurisdictions, voting someone else's ballot, ordering civilian absentee/vote-by-mail ballots for your whole family, and ballot harvesting are all against the law in Pennsylvania

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

and therefore fraudulent.  Election Officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons is also against the law and therefore fraudulent.

Too many arguments by stakeholders, academicians, and the media center around how few cases there are and therefore that election fraud is not really an issue.  But as the United Supreme Court has noted, voter fraud is successful because it is difficult to detect.  *Burson v. Freeman*, 504 U.S. 191, 208 (1992) ("Voter intimidation and election fraud are successful precisely because they are difficult to detect.").[2]  Beyond that, there is plenty of data—historical and recent—to the contrary.  For example, a court recently ordered a new election in New Jersey due to mail-in voter fraud.  *See* https://www.wsj.com/articles/a-mail-voting-redo-in-new-jersey-11598050780.  A recent article in the New York Post revealed that a Democratic operative engaged in, and taught others how to engage in, voter fraud in several states, including Pennsylvania, and noted that mail-in ballots were a particularly easy way to alter votes.  *See* Confessions of a voter fraud: I was a master at fixing mail-in ballots, https://nypost.com/2020/08/29/political-insider-explains-voter-fraud-with-mail-in-ballots/.  Recent examples of voter fraud are noted in the Secretary's Act 35 Report, including double voting in Philadelphia and ballot harvesting in several counties.  *See* Pennsylvania 2020    Primary    Election    Act    35    of    2020    Report, https://www.dos.pa.gov/VotingElections/Documents/2020-08-01-Act35Report.pdf;    *see also* https://www.inquirer.com/politics/election/pa-primary-election-mail-ballots-double-voting-20200616.html (Philadelphia officials admitted that the new mail-in voting regime led to at least forty people voting twice in the 2020 primary election); https://www.youtube.com/watch?v=ww888sfhNt8 (beginning around 15:20, Philadelphia election officials approved the counting of mail-in ballots that lacked the completed certification on the outside of the envelope); *Marks v. Stinson,* C.A. No. 93-6157, 1994 WL 1461135, 1994 U.S. Dist. LEXIS 5273, at *44-*45, *77-*92 & *96-*99 (E.D. Pa. April 26, 1994); Heritage Foundation's Election Fraud Database, printable version can be found at https://www.heritage.org/voterfraud-print/search.[3]

Ballot harvesting, another form of voter fraud, also persists in Pennsylvania.  At his deposition, Jonathan Marks, Pennsylvania's Deputy Secretary for Elections and Commissions, admitted that during the June 2020 Primary, several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law.  *See* 8/19/2020 Dep. Tr. of J. Marks, 55:9–72:9.  Deputy Secretary Marks and Secretary Kathy Boockvar also testified that several counties continued to allow third-

---

[2]    Anecdotally, fraud is almost never alleged by stakeholders when their candidate wins 58% or more of the vote.  Election officials' closing comment when speaking with another election professional often sign-off with, "May all races on the ballot today be won by landslides."

[3]    The Plaintiffs in this case include many more examples in their complaint and discovery responses served in this case, which I refer to as part of this report.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

party delivery of non-disabled voters' ballots.  *See* 8/21/2020 Dep. Tr. of K. Boockvar, 91:23–99:6; 8/19/2020 Dep. Tr. of J. Marks, 55:9–72:9.  Deputy Secretary Marks further testified regarding several instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes.  *See* 8/19/2020 Dep. Tr. of J. Marks, 162:17–165:16; J. Marks Dep. Exhs. 24, 25, & 26. Copies of these photographs are collectively attached as Exhibit D to this report.  Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day revealed additional instances of third-party delivery. *See also* Exhibit D to this report.

Documents produced by Montgomery County reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs.  *See* 05/24/2020 Email Message from L. Soltysiak (MONTGOMERY000285-286).   More importantly, these documents confirm that the only effective means to stop that from occurring was having the drop boxes staffed with security who "instruct[ed] voters they can only drop off their own ballot" and "turned people away … without incident who had ballots other than their own."

Since 2000 and the *Bush v Gore* decision, races (city/county/state/federal) seemingly are closer than ever before—margins of victory often miniscule.  Dozens of races around the country every election cycle lead to automatic state directed and paid recounts.

The closest election and recount I was involved in was the 2013 Attorney General race in Virginia, and the margin of victory for the Democratic candidate was 165 votes out of 2,212,281 votes cast.  The victory was verified during a statewide recount; close races are all the more reason for state and county election officials to follow all of the laws promulgated by the legislature because recounts are hard enough without the lawsuits that follow when the race was close AND there may have been some procedural defugalties at the county or state level.  Pennsylvania is not immune from close races.  For example, in 2004, only 28 votes decided a statewide judicial race.  *See* https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=12&ElectionType=G&IsActive=0.

Voter fraud also exists in the form of inaccurate voter registration rolls.  Whether the result of intentional fraud, neglect, or simple inadvertence, voter rolls across the country are woefully deficient.  It is common knowledge among election administrators that millions of registrants are actively registered in more than one state and no nationwide effort, to my knowledge, has ever been attempted to identify these possibly fraudulent Election Day activities.  Again, Pennsylvania is not immune from these challenges.  In 2019, Pennsylvania officials admitted that at least 11,000 illegal immigrants were registered to vote in the state.  *See*  https://www.washingtontimes.com/news/2019/jan/30/pennsylvania-11000-non-citizens-registered-vote/.  Moreover, a lawsuit is pending in Pennsylvania challenging the legitimacy of more than 800,000 names on the voter registration rolls in just three counties.  *See Judicial Watch, Inc. v. Commonwealth of Pennsylvania*, Middle District of Pennsylvania at 1:20-cv-00708-CCC.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

Also, as recently as December, 2019, the Auditor General of Pennsylvania, Eugene DePasquale, determined through an audit of Pennsylvania's Statewide Uniform Registry of Electors ("SURE"), administered by the Department of State, that there are more than 50,000 cases of potentially inaccurate voter records.  His Performance Audit Report noted that the audit "found too many instances of potentially bad data and sloppy recordkeeping."  *See* https://www.paauditor.gov/press-releases/auditor-general-depasquale-issues-audit-of-voter-registration-system-calls-for-changes-at-pennsylvania-department-of-state; *see also* Exhibit 2 to 08/21/2020 Dep. Trans. of Kathy Boockvar (the Performance Audit Report); and https://www.paauditor.gov/Media/Default/Reports/Department%20of%20State_SURE%20Audit%20Report%2012-19-19.pdf.   The Department of State was provided 50 recommendations to strengthen their policies and management controls, one of which was to work with counties to resolve records management issues such a duplicative voter records.  *See id.*

Mr. DePasquale criticized the Pennsylvania Department of State for its "lack of cooperation and a failure to provide the necessary information" during the audit, including the "denial of access to critical documents and excessive redaction of documentation."  Exhibit 2 to 08/21/2020 Dep. Trans. of Kathy Boockvar (the Performance Audit Report), p. 2.  As a result, the Auditor General was "unable to establish with any degrees of reasonable assurance that the SURE system is secure and that Pennsylvania voter registration records are complete, accurate and in compliance with applicable laws, regulations, and related guidelines."  *Id.*

"Americans ought to be far more concerned about domestic voter fraud and the integrity of state-managed election efforts. The Heritage Foundation maintains a database, a sampling of recent cases of voter fraud around the country. It shows that domestic voter fraud is all too real and all too common. Every vote cast illegally undermines the integrity of the system and the rights of legitimate voters. In close elections, fraud could undermine our democratic will. Those wishing to preserve the integrity of our elections should worry less about foreign interference and concentrate on pressing state and local election authorities to adopt practices and provide oversight to assure that every legitimate vote is counted, and every bogus vote gets spotted and tossed out."  Carafano, James:  VOTER FRAUD MORE LIKELY TO IMPACT ELECTION THAN FOREIGN MEDDLING, August 12, 2020, available at https://www.heritage.org/election-integrity/commentary/voter-fraud-more-likely-impact-election-foreign-meddling.

The conversation about voter fraud needs to change.  Instead of discussing how few reported cases there are - and even fewer prosecutions; the conversation ought to be "How many cases of voter fraud should we allow in this election?"  When viewed that way, the obvious answer—from election administrators, candidates, and electors—should be obvious:  zero. Since zero is the right answer, and integrity and uniformity among the counties in accordance with a state's election code greatly enables our acquisition of zero, it behooves election professionals to do their absolute best at all times; embracing the mantra of integrity in all they do and uniformity throughout the state.  In sum, voter fraud poses a legitimate threat to free and fair elections that all Americans should help address.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

### Voter Confidence Is a Must

One vote per properly registered adult citizen is the *sine qua non* of our Republic's electoral system, and voter confidence is its hallmark. Most people in the United States take confidence in the electoral process for granted. But to ensure that confidence, election administration officials must follow the law as enacted by the legislatures of their various states or Commonwealths—not only to ensure compliance with the procedures but to reduce, as much as possible, the possibility that voter fraud will occur. The United States Supreme Court has recognized that voter confidence is important and is a consideration that election officials must keep in mind in administering an election. *See Crawford v. Marion County Election Bd.*, 535 U.S. 181, 197 (2008) ("Finally, the State contends that it has an interest in protecting public confidence 'in the integrity and legitimacy of representative government.' Brief for State Respondents, 53. While that interest is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter-Baker Report observed, the '"electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."'").

The legislative assemblies of the various states and Commonwealths enact election-related laws. It is those laws that must be followed on Election Day and during early voting, whatever form that may take, such as absentee or mail-in balloting. And it is the legislatures that are empowered to make changes to the election codes. Last minute extracurricular policy and procedure changes and interim changes by county or state election officials are improper and should be avoided, even under the guise of "emergencies." Those changes, by entities not empowered to change the election code, invite lack of uniformity, sow confusion, and erode voter confidence. *See* http://www.delcopa.gov/electionsbureau/pdfs/2020/PublicComment09_03_2020.pdf.

An additional element of the election administration process that helps to ensure voter confidence is poll watchers. In my opinion, poll watchers serve an important audit-like function and ought to be allowed everywhere that voting is taking place. Stakeholders are allowed under certain circumstances, detailed in Pennsylvania's election code, to have poll watchers. Poll watchers have certain rights and responsibilities; and it is those poll watchers who help ensure that the entire electoral process is done in accordance with the applicable election code and that voter confidence is thereby maintained. While the poll workers are critical to the operations of an election, poll watchers can ensure that those operations are properly conducted and that issues are promptly reported and resolved.

As I explain below, while unstaffed ballot drop boxes are not a sound business practice in election operations, the presence of poll watchers at each and every ballot casting, collection, and/or return site is critical. Voting takes place during the entire early voting period and should be overseen by poll watchers if they choose to do so. Voting takes place in the precinct on Election Day, and voting takes place in the county office during the entire early

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

voting period and poll watchers ought to be present at all locations where voting is taking place even down to the ward level.  Poll watcher access ought to be uniform and not restricted in any arbitrary way.  Poll watchers should only have to be adults who are themselves eligible to vote in the state/Commonwealth; they should not be restricted to their precinct/ward/county.

The old rules of local observers were to make it likely that the observers knew the voters.  Precincts/wards have grown so large and neighborhoods so transient that the likelihood of poll workers or poll watchers actually knowing more than a handful of the voters is slim.  Alternate voting vehicles like absentee and vote-by-mail have decreased the Election Day precinct burden to some extent; but having enough workers and watchers is clearly essential to smooth Election Day operations.  Yet, "nearly 65 percent of jurisdictions reported that it was 'very difficult' or 'somewhat difficult' to obtain a sufficient number of poll workers [and I would add watchers] ... more populous jurisdictions faced greater challenges when recruiting poll workers, ... 56% are 61 or older."  U.S. Election Assistance Commission, "Data "Deep Dive" Shows Level of Difficulty in Recruiting Poll Workers, Decline in Physical Polling Places," Nov. 15, 2017 (available at https://www.eac.gov/news/2017/11/15/data-deep-dive-shows-level-difficulty-recruiting-poll-workers-decline-physical).

### *Election Code Changes Require Careful Attention and Strict Compliance by Administration Officials*

As changes are enacted by the various legislatures, the election administration officials have an obligation to change their administration methods to ensure ongoing compliance with the updated laws.  Part of that obligation includes being informed of court decisions as to the meaning of the words used by the legislatures and making sure that it is the legislature's intent, not that of the election official, that is carried out.  It is not the job of the election administration official to try to change the law as written or interpreted but to carry out the law as written or interpreted, even if the election administration official disagrees with the law or with any change thereto.

But election administration officials also need to remember that voter confidence must never take a back seat to the changes.  We must continue to insist and ensure that our elections are righteous.  Our Election Day operations in the precincts need to be righteous.  Our election day operations at the County elections offices need to be righteous and our early voting, regardless of the form that it may take, including absentee and vote-by-mail, need to be righteous.  And by righteous I mean legal, with rigorous integrity and uniformity.

Voter confidence in the entire system is not just local; trust is also regional and National.  Citizens of other cities, counties, and states crave confidence that elections held elsewhere are conducted lawfully.  Likewise, citizens not only of the state but throughout the country want to know that any changes to the electoral process are being made only by the legislatures.  While they may not like the changes being made by those legislatures, regardless of whether it's their state or another, they understand that the process for

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

changes to a previously adopted election code are to be done through legislation. Changes are debated and passed by elected legislators and signed into law by governors. Yet regardless of the changes that are enacted, it still remains the goal for proper election administration that only eligible voters may vote and no one gets to vote twice.

Unfortunately, state and county election officials are going far afield of well-established best practices, in every phase and facet of election operations. In the absence of a rollback of these ill-considered changes in the few days remaining before November 2020 election, we must take all necessary steps to salvage and reinforce election integrity to the best of our ability. Every portion of this, and every election, should be transparent, explainable, understandable, defendable, and auditable.

In my opinion, it is both improper and ill-advised that Secretary Boockvar can effectively usurp the province of the General Assembly and rewrite the Election Code via the issuance of guidance. Effectively, the Secretary has sewn chaos into the conduct of the election process by issuing guidance that, based on my experience, is likely to be ignored by some counties and followed by others. This lack of uniformity across the Commonwealth undermines voter confidence and defensibility of the election results. Code requirements for ballot casting, handling, validation, counting, or rejection must be followed consistently, in accordance with the Election Code.

### *Integrity Is Necessary and Requires Accountability at Each Stage of the Process*

With so many last-minute changes to well-known procedures and so many different forms of casting ballots now available, including – for the first time in a Pennsylvania general election – no-excuse vote-by-mail, it is imperative that rigorous stakeholder oversight of every facet be both allowed and encouraged. Observation must be allowed from start-to-finish in every process and sub-process (ballot casting to results posted) for each individual type of voting: early/absentee in-person; Election Day in-person; early/absentee vote-by-mail (USPS); early/absentee vote-by-mail (drop box); and provisional.

No type of voting, ballot casting, ballot delivery, pre-canvass, or canvass should fall outside of the overarching need for operational integrity, transparency, and auditability, all of which, again, works best with unfettered observation. It is not enough to ask those opposed to massive alterations to time-tested code-based election procedures to "prove the negative," when what we should be practicing in these very challenging times is the poignant Information Technology Security mantra of, "never trust … always verify." The Pennsylvania Election Code reflects this mantra by its inclusion of poll watchers in nearly every function of the election process and adds to it by allowing the additional presence of representatives during the pre-canvass and canvassing process. *See* 25 P.S. §§ 2650(a), 2687(b), & 3146,8(g)(1.1)-(2).

The American election construct is unique in the world and a hallmark of American life; but election participation is not without rules. Regardless of an individual's naiveté or large

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

stakeholder groups wishes to the contrary, the construct includes a fivefold "test" or attestation. This attestation is verbally offered/implied in some cases and required in writing in others – and must be consistently and uniformly applied and verified within each individual type of voting.

The test all American voters affirm, or the implied contract if you will, when they offer to vote is:

- I am who I say I am;

- I am living where I say I live;

- I am properly registered;

- I am offering to vote in the precinct/ward where I reside; and

- I am not voting more than once in this election.

These five "I am" statements or Voter Affirmations are necessary for the integrity of the process. Each must be separately established and all five should be uniformly subject to verification and challenge (even post-election audit, investigation, and prosecution if and when warranted) (The "Verify and Challenge Process"). The Verify and Challenge Process happens very quickly and is often transparent to the voter yet essential to the election process. The necessity and ability of county election officials, and the stakeholders who oversee them, to validate a ballot cast, regardless of the method used to cast it, is the primary function of county election officials.

Election preparation, conduct of the election and the canvasses, production of results, and audit preparation are all critical functions of our county electoral boards. There is no function more critical to the American hallmark and to ensuring and enshrining voter confidence than their sworn duty to only count valid ballots and to treat every voter the same, regardless of the method the voter chose to submit their ballot. Holding every voter to the fivefold test is the first step in election integrity and stewardship of voter confidence. Having taken and passed the fivefold test, I cast a righteous ballot and I have the right to know that you did too, and so do the other 160 million voters in America.

### *Best Practices in Election Day Line Management*

Voters may vote by any method authorized by the election code. But, in my opinion, the most secure way to vote, for both the voter and the various stakeholders, is in-person at the county board of elections. The second most secure way is in-person at the precinct/ward on Election Day. Both of these in-person voting methods involve election officials in direct contact with voters ensuring the integrity and uniformity of the process. There is confidence that the person voting is the person registered to vote and poll workers and watchers view

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

the process to minimize the risk of voter fraud and disenfranchisement.  Moreover, voters learn on-the-spot that their vote will be counted.

The main difference between these two methods is code familiarity.  The full-time county board employees, as sworn election officials, think about and deal with election and registration issues every-day-all-day.  Precinct and ward officials, also sworn, are occasional workers, trained by the county boards, overseen by poll watchers, valuable to the system certainly, but subject to stale knowledge/memories of how they did it last time and the need to incorporate new legal changes and policy guidance changes from the Pennsylvania legislature and Department of State, respectively.

Ballots submitted via any other method are less secure, because they are being handled by others - some sworn election officials, others not.

Considering all of the above, I would like to focus on three issues in this case.

### 1.      By-Mail Ballots and Applications Lacking Matching or Genuine Signatures

With its recent election code change, Pennsylvania now allows no-excuse vote-by-mail, in addition to retaining the absentee voting procedures.  Vote-by-mail, by definition, eliminates some of the Election Day load on precincts/wards.  But, to ensure voter confidence and to reduce the possibility of voter fraud, that vote-by-mail process must be administered in strict conformity with the Pennsylvania Election Code.  It is the legislature's job to determine the procedures that must be followed for valid voting to occur; it is not up to the election administration officials to fill-in perceived gaps or attempt to expand the ways for voters to return their ballots, regardless of how well-intentioned those efforts may be.

One such requirement that election administration officials rely upon as an indicator that the ballot being received is the ballot actually cast by the vote-by-mail voter is the signed declaration on the outside envelope.  Pennsylvania law requires that a voter complete and sign that declaration. *See* 25 P.S. §§ 3146.6(a) (cast absentee ballot) & 3150.16(a) (cast mail-in ballot).  It is the election administration official's job to ensure that requirement is met.  Not only does enforcing the election code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.  For example, Washington state is a complete vote-by-mail state.  Recently Lori Augino, Director of Elections for the State of Washington, noted "[t]he linchpin of our security is signature verification."  Orey, Rachel & Jones, Emma:  "Is Voting by Mail Safe and Reliable?  We Asked State and Local Elections Officials." June 12, 2020, available at  https://bipartisanpolicy.org/blog/is-voting-by-mail-safe-and-reliable-we-asked-state-and-local-elections-officials/.

If the required declaration is not completed and signed by the voter in whose name the ballot is cast, a crucial security aspect of vote-by-mail is missing and the ballot should not be counted.  To do otherwise would undermine voter confidence and would increase the

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

possibility of voter fraud.  Without the completed and genuinely signed declaration, how does an election administration official (or a candidate or another voter) know that the ballot actually was cast by an eligible voter who voted only once?  Yet, during the 2020 Primary Election, at least the Philadelphia County Board of Elections voted to count numerous mail-in ballots that lacked a completed declaration.  *See* https://www.youtube.com/watch?v=ww888sfhNt8 (beginning around 15:20, Philadelphia election officials approved the counting of mail-in ballots that lacked the completed certification on the outside of the envelope).  In my opinion, that was erroneous and allowed voter fraud to occur, undermining voter confidence in the election process and the election outcomes.

Moreover, the requirement of a genuine signature is not limited to the declaration on the outside envelope of an absentee or mail-in ballot.  Under the Pennsylvania Election Code, there is also a requirement that the application for an absentee or mail-in ballot be signed by the person requesting such ballot.  *See* 25 P.S. §§ 3146.2(d) (absentee ballot application), & 3150.12(c) (mail-in ballot application).[4]  These signature requirements for the declaration envelope and the absentee and mail-in ballot application are a fundamental part of the Pennsylvania Election Code, as all electors (whether voting in-person, provisionally, or by mail) are identified and verified to vote solely by their signatures.  *See id.;* 25 P.S. § 3050(a.3), (a.4)(1)-(12), & (b).  An exception to this statement exists for certain first-time voters who are required to produce acceptable identification as mandated by the Help America Vote Act.  But, since Pennsylvania's voter ID law was struck down, a voter's signature is the sole means by which election officials can verify one's eligibility to vote in Pennsylvania.

As Exhibit B confirms, on September 11 and 28, 2020, Secretary Boockvar issued to the Pennsylvania County Boards of Elections two sets of guidance which state that the Pennsylvania Election Code does not permit county election officials to reject absentee or mail-in ballot applications or voted absentee or mail-in ballots based solely on a comparison or analysis of one's signature to the voter's permanent voter registration record or other information available to the election officials.  *See* 09/11/2020 Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes, p. 3; 09/28/2020 Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures, p. 9.  Moreover, her September 28, 2020 guidance states that "[n]o challenges may be made to mail-in and absentee ballots at any time based on signature analysis."  *See* 09/28/2020 Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures, p. 9.

The Secretary's September 11 and 28, 2020 sets of guidance do not track the language of the Pennsylvania Election Code.  Moreover, they are not in compliance with the duties of an election administration official, which is to ensure that the elections are conducted in

---

[4]   The Election Code does include some exceptions to the application signature requirement: *i.e.*, those in the military and those who are unable to sign due to illness or physical injury.  25 P.S. §§ 3146.2(d) & 3150.12(d).

## GREG S. RIDDLEMOSER
### Stafford, Virginia
g.s.riddlemoser@earthlink.net

accordance with the laws as enacted by the legislature and as interpreted by the courts.  But more fundamentally, I disagree with the Secretary's September 11 and 28, 2020 sets of guidance because following they actually encourage, rather than prevent, voter fraud.

In jurisdictions like Pennsylvania which lack voter ID laws, signature verification is the most common method to verify that absentee and mail-in ballots are coming from the intended voter.  When a voter registers to vote in Pennsylvania, he or she is required to sign his or her name on their permanent voter registration record.[5]  That signature is then used to identify and verify the voter for several purposes, including the processing of an absentee or mail-in ballot application and the verification that a returned absentee or mail-in ballot has been properly cast by that voter.[6]  For those whose signature cannot be matched to their voter registration record or is otherwise determined to not be genuine, the Election Code provides

---

[5]     *See* 25 Pa.C.S.A. §§ 1322(a) ("The applicant shall provide the information required on the registration application and sign the registration declaration."), 1323(a)("An application under this subsection shall serve as an application to register to vote unless the applicant fails to sign the voter registration application."), & 1324(a) ("The applicant must complete the information required on the registration application and sign the registration declaration.").

[6]     *See* 25 P.S. §§ 3146.2b(c) ("The county board of elections, upon receipt of any application of a qualified elector required to be registered under the provisions of preceding section 1301, shall determine the qualifications of such applicant by verifying the proof of identification and comparing the information set forth on such application with the information contained on the applicant's permanent registration card."), 3150.12b(a) ("The county board of elections, upon receipt of any application of a qualified elector under section 1301-D, shall determine the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card."), & 3146.8(g)(3) ("When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his eligibility to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.").

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

that absentee or mail-in voter with notice and opportunity to resolve that issue so that the voted ballot can be counted.[7]

The provisions of the Pennsylvania Election Code providing for signature analysis and verification of absentee and mail-in ballot applications and voted ballots are substantially similar to the signature analysis and verification process that exists under the code for in-person and provisional voters. *See* 25 P.S. § 3050(a.3), (a.4)(1)-(12), & (b). Moreover, much like absentee or mail-in voters, in-person and provisional voters are given notice and opportunity to cure their signatures so that their ballots can be counted.

Pennsylvania's signature verification process ties into, confirms, and is an inherent element of the first step of the Verify and Challenge Process, which must apply to every type of voting method and must be uniform, both in the process itself as well as throughout each county of the Commonwealth. The first Voter Affirmation, "I am who I say I am", is the initial lynchpin in ensuring the integrity of the voting process and avoiding the potential for fraud. Accordingly, in Pennsylvania, the sole means of confirming the identity of any voter, other than for certain first time voters, is through signature verification.

The Secretary's September 11 and 28, 2020 sets of guidance run directly contrary not only to best practices in my opinion but also that of the Director of Elections for Washington state, which has had large scale vote-by-mail much longer than Pennsylvania. *See* Orey, Rachel & Jones, Emma: "Is Voting by Mail Safe and Reliable? We Asked State and Local Elections

---

[7]     *See* 25 P.S. §§ 3146.2b(d) ("In the event that any application for an official absentee ballot is not approved by the county board of elections, the elector shall be notified immediately to that effect with a statement by the county board of the reasons for the disapproval. For those applicants whose proof of identification was not provided with the application or could not be verified by the board, the board shall send notice to the elector with the absentee ballot requiring the elector to provide proof of identification with the absentee ballot or the ballot will not be counted."); 3150.12b(c) ("In the event that an application for an official mail-in ballot is not approved by the county board of elections, the elector shall be notified immediately with a statement by the county board of the reasons for the disapproval. For applicants whose proof of identification was not provided with the application or could not be verified by the board, the board shall send notice to the elector with the mail-in ballot requiring the elector to provide proof of identification with the mail-in ballot or the ballot will not be counted."); & 3146.8(h) ("For those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified: … (2) If the proof of identification is received and verified prior to the sixth calendar day following the election, then the county board of elections shall canvass the absentee ballots and mail-in ballots under this subsection in accordance with subsection (g)(2). (3) If an elector fails to provide proof of identification that can be verified by the county board of elections by the sixth calendar day following the election, then the absentee ballot or mail-in ballot shall not be counted.").

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

OFFICIALS." June 12, 2020 ("[t]he linchpin of our security is signature verification."), available at https://bipartisanpolicy.org/blog/is-voting-by-mail-safe-and-reliable-we-asked-state-and-local-elections-officials/.  It also runs counter to the opinion of the National Conference of State Legislators, which is a bipartisan non-governmental organization that, among other things, strives to improve the quality and effectiveness of state legislatures and promote policy innovation and communication among state legislatures.  According to NCSL, "[t]he most common method to verify that absentee/mailed ballots are coming from the intended voter is to conduct signature verification. When voters return an absentee/mailed ballot, they must sign an affidavit on the ballot envelope. When the ballot is returned to the election office, election officials have a process for examining each and every signature and comparing it to other documents in their files that contain the voter signature—usually the voter registration record."  VOTING OUTSIDE THE POLLING PLACE:  ABSENTEE, ALL-MAIL AND OTHER VOTING AT HOME OPTIONS – Processing, Verifying and Counting Absentee Ballots – How do officials verify voted absentee ballots?, September 24, 2020, available at https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx. NCSL then identifies Pennsylvania as being one of 36 jurisdictions that engages in signature comparison to verify the authenticity of absentee/mail-in ballots.

Not only does the Secretary's September 11 and 28, 2020 sets of guidance leave the absentee/mail-in ballots subject to the potential for unfettered fraud, she also subjects in-person voters to greater scrutiny, creating a multi-class preferential voting scheme based solely upon the manner in which one chooses to vote.  Such a scheme is untenable and imposes disparate treatment of voters based solely upon the method by which one chooses to vote.  When one method of voting is subject to a different or less stringent standard than another, improper disparate treatment of voters exists, effectively creating an improper multi-tiered preferential voting scheme the U.S. Supreme Court ruled to be unconstitutional in *Bush v. Gore*.  Yet, this is exactly what Secretary Boockvar has created by virtue of her September 11 and 28, 2020 guidance where she eliminates the signature verification requirement for absentee/mail-in ballot applications and voted ballots.  Last minute policy promulgations from Secretary Boockvar notwithstanding, I do not believe anyone has the authority to waive any portion of  the Voter Affirmation test for any voter or any voting method.  To do so, would create an election result not worthy of certification. Again, any attempt to remove any attestation from the absentee/mail-in voting process is dangerous and ripe for purposefully facilitating fraudulent casting and counting.  The only protocol for a uniformly administered election is for uniform compliance with one's election code.  That includes the transparent validation or rejection of each ballot type, following the rules passed by the legislature and maintaining a defensible audit trail that can be followed if necessary, and all done under the careful oversight of poll watchers.

From the discovery produced in the case, there are several counties who have documented procedures for signature analysis of absentee and mail-in ballot applications and voted ballots which comport with the processes mentioned previously.  *See* 06/03/2020 Email Message from Clinton County; Chester County Document Production, CHESTER55-66. Moreover, several counties have testified or indicated in discovery that they do not intend to

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

follow the Secretary's September 2020 sets of guidance as they pertain to her stated prohibition on signature verification. *See* Elk Cnty. Dep. Tr., pp. 32:25-34:7; 09/29/2020 Email Message from M. Kestermont, Cambria County Solicitor's Office ("Cambria County will allow poll watchers to be present at canvass and pre-canvass meetings, and signatures are compared for both absentee and mail-in ballots."); Luzerne Cnty. Dep. Tr., pp. 37:24-38:21, 42:1-13. Meanwhile, other counties have advised that they will follow the Secretary's guidance. *See* Allegheny Cnty. Dep. Tr., pp. 38:4-24, 44:1-20; Delaware Cnty. Dep. Tr., p. 50:15-24; and Montgomery Cnty. Dep. Tr., pp. 36:3-21, 39:10-25. *See also* County BOE Discovery Response Summary, attached as Exhibit E.  This is problematic as the Secretary has now created a situation where unequal treatment of voters in the upcoming November 3, 2020 General Election will exist both between those who vote in-person (whether a regular or provisional ballot) and those who vote via absentee or mail-in ballot, and between absentee and mail-in voters depending on whether the county in which they reside will or will not be following the Secretary's latest inappropriate guidance.

In my opinion, the Secretary's guidance on the prohibition of signature analysis for absentee and mail-in voting invites the dilution of legitimately cast votes by illegal or fraudulent ballots.  Moreover, the guidance creates an unwarranted and disparate treatment of voters and represents a complete disregard of an election official's duty to ensure that elections are conducted in accordance with all legal requirements, in order to minimize the possibility that voter fraud will occur.

## 2. *Unstaffed Drop Boxes*

Unstaffed drop boxes offer, in my opinion, the least amount of electoral security, integrity, and uniformity and lead to voter fraud and vote dilution.  Initially, I will note that people often quibble that with vote-by-mail, voters are using a "box" that is not controlled by the county elections board (i.e., postal mailboxes).  While true, the Pennsylvania General Assembly has determined that the use of those postal mailboxes are authorized.  The legislature weighed the pros and cons and determined that the use of postal mailboxes to transmit ballots was appropriate.  And as noted earlier, it is the job of the election administration official to follow that decision and not to attempt to expand upon it. Otherwise, voter confidence is impacted.

On August 19, 2020, the Secretary issued guidance to the Pennsylvania County Election Boards on "Ballot Return Sites" including drop boxes.  *See* 08/19/2020 Pennsylvania Absentee and Mail-In Ballot Return Guidance.  That guidance promotes the use of staffed and unstaffed drop boxes, leaving it up to each county to decide whether to use, or not use, such devices for the return and collection of absentee and mail-in ballots.  I am not a lawyer, but I understand that on September 17, 2020, the Pennsylvania Supreme Court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, at \*22 (Pa., Sept. 17, 2020).  However, in rendering its opinion, the Supreme Court did not discuss

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

the differences between staffed and unstaffed drop boxes and declined to opine whether the use of drop boxes is constitutional.  *Id.*

In my opinion, the use of unmanned drop boxes presents the easiest opportunity for voter fraud.  In order to guard against that fraud potential, and to ensure voter confidence is not diminished, certain steps must be taken to make drop boxes "secure" and "monitored."  Simply repurposing a postal service mailbox and emptying it on a schedule is not sufficient.

First, every drop box that is used must be "secure"—in all that that implies—at all times.  Therefore, they need to be attended (never left unattended at any time they are open for ballot drop-off) and must be attended by sworn election officials.  These officials, just like at the county election board's main office, must verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot.  *See, e.g.,* MONTGOMERY000285-286.  Relatedly, this process would allow the election official to ask the voter if they followed the instructions they were provided (such as placing the ballot in the inner secrecy envelope, without marking it, and completing the outside envelope declaration) and assist them in doing so to remediate any errors, where possible, before ballot submission.  That process, of course, would reduce the number of ballots that are challenged/rejected during the tabulation/canvass.

Second, at the end of the day (and every day during the drop box period), these boxes must be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, *etc*.  These sealed containers must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement[8]) back to the county board where they are properly receipted and safeguarded.  *See* 25 P.S. §3146.8(a).  The emptied drop boxes also must be secured such that they are not able to accept any additional ballots until they are "open" again, *e.g.*, the following day.  And before they are "open" again, the boxes must be examined to ensure no ballots are in the box, that nothing else is inside the ballot, and that the structural integrity and any security associated with the box remains intact.  These processes, from readying the drop box for the day's activity to the final receipt of the sealed container back at the county elections board, must be available for monitoring by poll watchers.  Employing even one, let alone dozens or hundreds, of these drop boxes should never be contemplated if stakeholder oversight is not allowed.  Additionally, the drop box itself must be tamperproof—in all that that implies—at all times; both when attended and when empty and unattended.

---

[8]     An example from the June 2020 Primary Election shows how transporting materials can result in the loss of those materials.  At least two poll books were not returned to the Philadelphia County Board of Elections and at least one was thought to have been in a car that was stolen.  *See* https://www.youtube.com/watch?v=doNl98vOURQ (Election Board addressed at least two missing poll books).  If that same car had been transporting ballots from one or more drop boxes, potentially hundreds or thousands of votes would have been lost.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

In my opinion, there are no substitutes for the above suggested drop box procedures; anything less would lack uniformity and integrity, while subjecting ballots and thereby voting to unacceptable insecurity. Tamperproof but unmonitored, tamperproof but monitored by video camera, and tamperproof but unmonitored and emptied only occasionally are examples of risky election administration practices. A cardboard box monitored at all times by a sworn election official is still unacceptable but far preferable to an unmonitored, tamperproof receptacle.

As recently pointed out by a Pennsylvania election administration official, the presence of video cameras, alone, to monitor drop boxes is insufficient to protect the sanctity and security of the ballots that are deposited therein or prevent ballot harvesting or other third-party delivery. *See* Elk Cnty. Dep. Tr., pp. 23:23-24:18 & 42:22-45:12. In my opinion, her concerns are valid and underscore the fact that any ballot drop box must be monitored by sworn election officials at all times that they are open to receive ballots. The video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself.[9] While the identity of the person responsible may be determined (which is questionable if all persons are wearing masks like during COVID-19 times), the ballots themselves would be destroyed—effectively disenfranchising numerous voters. Moreover, the use of video cameras would not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box, something both Secretary Boockvar and Deputy Secretary Marks admitted at their depositions. *See* 8/21/2020 Dep. Tr. of K. Boockvar 213:2-25; 8/19/2020 Dep. Tr. of J. Marks 151:12-14; 154:5-11; 162:17–165:16. The video recording provided by Elk County shows several people depositing more than one ballot into the drop box located in the hallway outside the County Elections Board's office during the 2020 Primary. *See* Elk Cnty. Dep. Exh. 8, also attached hereto in Exhibit D to my report. And while those ballots were returned illegally, and proof of that exists, there is no way to identify which ballots were returned illegally or separate those ballots from the count of those not returned illegally.

Some people may argue that the same activity could occur with a US postal service box. And while that is true, there is no way to know how many (if any at all) ballots are in a particular US postal service box. Moreover, the ability to destroy numerous (perhaps hundreds or more) ballots at one time can be directed at one particular party by way of this destructive behavior to a drop box which is not the case with a US postal mailbox. In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for

---

[9]     While at first blush this may seem absurd if the box is bolted or otherwise secured in place, recent footage of toppled statues and damage to government buildings shows that forcible removal of ballot drop boxes should be considered a distinct possibility.

that political party or that party's candidate(s) as possible.  Again, the same cannot be said for a US postal service box.

The use of unstaffed drop boxes also presents an additional problem from the perspective of the election administration official – uniformity.  As I noted above when discussing voter fraud, integrity and uniformity among the counties in accordance with a state's election code greatly enables election administration officials to do our best to reduce the potential for voter fraud.  Moreover, uniformity and integrity are part of what ensures voter confidence remains high.  Our mantra should be integrity in all we do and uniformity throughout the Commonwealth.

From the discovery I have reviewed to date, drop boxes are not being used uniformly across the Commonwealth.  Secretary Boockvar admitted in her deposition that it remains entirely up to each of the 67 counties to decide the time, manner, and place for their use, if any, of such drop-boxes.  *See* 8/21/2020 Dep. Tr. of K. Boockvar, 199:10–200:10; 201:6-203:18; 211:18–212:9.  One county—Delaware County—plans to install 50 drop boxes.  *See* http://www.delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html; *see also* 1/17/20 Email message from K. Lehman (bate-stamped as PADOS000609.000001-5).  But what about the other counties?  Are they also planning to install 50 drop boxes or whatever number of drop boxes would employ the same ratio of boxes to voters?  And, there is no uniformity regarding the locations of the drop boxes, particularly between more heavily Democratic areas or the more heavily Republican areas, between rural, suburban and urban areas, and between high income versus low income areas. Are the drop boxes to be staffed or unmanned? The Secretary's August 19, 2020 guidance offers no concrete answers to these questions or myriad of others.  Thus, there is no way for uniformity to be achieved using drop boxes.  But, the mandated return to the physical office of the county board of elections is uniform.

As a former election administration official whose job it was to ensure that the properly cast votes of eligible voters are counted and that voter confidence is maintained, it is my opinion that the use of unmanned or unstaffed ballot drop boxes is something to be avoided.  Although not addressing drop boxes specifically, but certainly including them, it must be reiterated that, "Something as critical as election integrity can't be left to a simple honor system. One of the most important roles of government is to safeguard the electoral process and ensure that every voter's right to cast a ballot is protected. That not only protects our right to vote; that's how we protect the future of our very republic." *See* https://www.heritage.org/election-integrity/heritage-explains/safeguarding-the-electoral-process.

### 3.    *Organization of Ballots*

As noted above, one aspect of election integrity is auditability or the ability to ensure the results are accurate and valid.  County boards of election must take no action that does not provide a consistent statewide avenue to challenge the validity before counting the ballot

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

and provide an audit trail afterward.  Checking and rechecking (post challenge) the validity of every ballot cast, regardless of how long it takes, is a necessary component of a righteous election process.  Voters want to know who <u>really</u> won and they want to know that <u>all</u> of the rules were followed in the process.

To ensure this aspect of election integrity is met, election administration officials must ensure that all five steps of the Verify and Challenge Process are met for each voter.  For absentee and mail-in voters, that includes ensuring the voter did not also vote by provisional ballot or on the machine.

It also means ensuring that commingling of the various ballots do not occur:  in-person ballots should be kept separate from the provisional ballots which should be kept separate from the absentee and mail-in ballots, and absentee and mail-in ballots should be segregated based on when and how they were cast.  The reasons to keep all products of the various types of voting separate are multi-faceted but center around the immutable responsibility of County Boards of Election to only count those votes which are properly cast by a qualified voter.  Comingling of early/absentee in-person, Election Day in-person, early/absentee vote-by-mail (USPS), early/absentee vote-by-mail (drop box), and provisional ballots make it quite literally impossible to audit any particular aspect of the election and verify that no invalid ballots were counted.  It also allows the election administration officials to have a defensible, explainable, and accurate accounting of each type of vote cast, validated, and counted or not validated and rejected.[10]  And the entire pre-canvass and canvass process must be overseen by poll watchers and authorized observers to insure both election integrity and uniformity.  Anything less will contribute to vote dilution and the illegal casting of potentially fraudulent ballots.

### *Conclusions*

With the Legislature having opened the aperture to no-excuse mail-in voting, Pennsylvania election officials must be purposefully rigorous in their concept validation and ballot counting paradigms.  Vote-by-mail is new and, by all accounts, will constitute as much as 50% or more of the ballots cast for the November 3rd election.  A new process is not an excuse to undercut election integrity.  It is not an excuse for not requiring every voter, regardless of voting method chosen, to live up to each step of the Voter Affirmation.  The approval of drop boxes is not approval to disregard election security.  While the means of casting one's ballot may have changed, the obligation to ensure that each ballot cast is lawful in all respects through a uniform process which ensures compliance with the Voter Affirmations and a rigorous as well as uniform Verify and Challenge Process remains immutable.  The American elector is entitled to no less.

---

[10]     To be clear, I would go one step further and say that absentee and mail-in ballots that are received via a drop box should not be commingled with those received either via mail or in-person delivery to a board of elections' office.

## GREG S. RIDDLEMOSER
Stafford, Virginia
g.s.riddlemoser@earthlink.net

In conclusion, it is my opinion, to a reasonable degree of certainty as a former election administration official, that election best practices do not countenance the use of unstaffed or unmanned ballot drop boxes to return vote-by-mail ballots. Using such drop boxes increases the possibility for voter fraud (and vote destruction) and decreases voter confidence. If drop boxes are to be used, they should be used only if done so uniformly across the Commonwealth and in conformity with the best practices I set out above.

It is my further opinion, to a reasonable degree of certainty as a former election administration official, that the aspects of the Secretary's September 11 and 28, 2020, sets of guidance concerning a prohibition on signature analysis or challenges to absentee and mail-in ballot applications or voted ballots are an improper attempt by an election administration official to usurp the role of the legislature. That late-issued guidance will remove guarantees of election integrity, treat voters differently solely based upon the manner in which they choose to vote, and open the door to the potential for massive voter fraud through a mechanism already susceptible to voter fraud. The Secretary, in issuing that guidance, has removed the "linchpin" of ballot security for absentee and mail-in ballots. That aspect of the September 11 and 28, 2020 sets of guidance should be removed immediately and a new guidance issued in its place that urges all county boards of elections to follow the election code and engage in the signature verification process for all voters – those who vote in-person, those who vote by provisional ballot, and those who vote by absentee/mail-in ballot.

In my experience, while Americans value their right to vote, some take for granted or don't fully understand normal election operations. Based upon the hundreds of thousands of phone calls pouring into county electoral boards across the country, the Nation is facing a low-voter-confidence election. Unsecure drop boxes and the Secretary's September 11 and 28, 2020 sets of guidance will, for the reasons set forth above, provide support for the lack of the public's trust in this year's election process. While true in every election, with the national elections at issue this November, there is no excuse for the Pennsylvania county election officials not operating in strict code compliance during every phase of this election and validating every voter, every voter's method, and every voter's ballot in conformity with the Pennsylvania Election Code.

I reserve the right to supplement or change this opinion and the conclusions should additional information or data be provided to me. Pursuant to 28 U.S.C. § 1746, I affirm, declare and certify under penalty of perjury that the foregoing statements, representations and affirmatives are true and correct to the best of my knowledge and belief.

Sincerely,

Greg S. Riddlemoser

Enclosures

**<u>Exhibit A</u>**

Curriculum Vitae of Greg S. Riddlemoser

# GREG S. RIDDLEMOSER

Stafford, Virginia

g.s.riddlemoser@earthlink.net

My name is Greg Riddlemoser. I am a citizen by birth of the United States and a resident by choice of the Commonwealth of Virginia. I'm a 62 year old male and I've been a registered voter since I was 18 years old. Although I've lived in at least five states, I can only remember voting in 3; and 2 of those was as an uniformed military member using the UOCAVA (absentee by mail) process. I am a college graduate; I hold a bachelor of arts, a master of arts and a master of science in resource strategy. My MS is from the Eisenhower School at National Defense University.

I am a retired US Air Force Colonel, a combat veteran, and a Legion of Merit recipient (in addition to my approximately 34 other awards/decorations). I spent 26 years (1983-2009) as an officer in the Air Force - 12 years as an aviator, 7 of those as a flight instructor in the F-4, a little over a year at First Air Force, and 12 years at the Pentagon in increasingly responsible positions, including on the staff and personal staff of 4 Chairman of the Joint Chiefs, several Secretaries of the Air Force and a Deputy Secretary for Reserve affairs. Whilst in the military and at the Pentagon, I served as the DOD liaison and senior federal government official to the state of Texas for two hurricanes Ike and Gustav (2008) and I served as the DOD liaison to NCORP (National Council on Readiness and Preparedness).

After college, but prior to going into the military, I served in various Boise City and/or Ada County appointed positions for three years; I've also held elected office (Meridian School Board - now called West Ada). After retiring from the military I took a job as a green space preservation consultant for a Fredericksburg Virginia company whose prime contract is with DOD. My role was with a contract supporting the USAF Civil Engineer.

Between 2011 and 2019, I served as an appointed General Registrar and Director of Elections for Stafford County Virginia. As a local election administrator I've been responsible for every facet of voter registration, election day operations and early voting which is absentee in-person or absentee with an excuse - in Virginia our version of vote-by-mail. I presided over more than 20 elections, local regional and statewide recounts, two presidential elections, servicing the needs of Stafford's nominal 160,000 citizens; 80% of which are of voting age - 80% of which are registered voters - the exact number of which changes, literally daily.

In the eight years I served as the Stafford County Director of Elections and General Registrar, I served as a subject matter expert in lobbying the two full Election Committees (and their various subcommittees) of the Virginia General Assembly on behalf of the Voter

Registrars Association. A couple of years after becoming a local election professional, I was appointed by the Secretary (state director) of the Department of Election to a seat on the US Election Assistance Commission Standards Board as Virginia's local representative.  The EAC Standards Board has 110 members, one from each state and territory (state election director) and one each from the state and territories local election officials. During my last three years on the Standards Board, I served as a member of the Executive Committee; and during my final year on the Standards Board, I served as the Chairman of both the Standards Board Executive Committee and the Standards Board.

In my second year on the Standards Board I was nominated by the executive committee and acclaimed by the entire membership to a seat on the joint Department of Commerce (NIST)/ EAC Technical Guidelines Development Committee (TGDC). I was the only local election official on the NIST/TGDC and our role was capturing the best practices of and writing standards for election equipment. Overarching guidelines and principles, test assumptions, and even test plans were part of our portfolio. We met a couple times of year under the federal meetings guidelines and took testimony from disparate advocacy groups and stakeholders in deliberation of our standards writing requirements. I have given numerous presentations and served on many panels as a subject matter expert on the conduct of elections, the standardization of processes and election related equipment, and the capturing and promulgation of best practices in the industry.

I am not a PhD or academician of any kind; nor am I an attorney. Nor am I a Statesman in the old-school sense. Or as President John F. Kennedy said it in PROFILES IN COURAGE: "... I have been interested in the problems of political courage in the face of constituent pressures, and the light shed on those problems by the lives of past Statesman. I am not a professional historian and ... the errors of fact and judgment are exclusively my own...". JOHN F. KENNEDY, PROFILES IN COURAGE, p. xix (1955 preface) (Giant Cardinal-Harper and Row, 24th ed. 1963). In my case, I'm just a man who has been fascinated since high school by the American form of government (City/County/state and federal), how we choose our elected officials (the proper conduct of elections) and how we hold them accountable by insisting that the rules - all of the rules - are followed in the interim between legislative sessions.

**<u>Exhibit B</u>**

August 19, 2020, September 11, 2020, and September 28, 2020, Guidance

**PENNSYLVANIA ABSENTEE AND MAIL-IN BALLOT RETURN GUIDANCE**

**TLP: WHITE**



# Pennsylvania
# Absentee and Mail-in Ballot Return Guidance

Date: August 19, 2020
Version: 1.0

## PENNSYLVANIA ABSENTEE AND MAIL-IN BALLOT RETURN GUIDANCE

**TLP: WHITE**

### BACKGROUND

Under Pennsylvania law, in addition to using the mail, voters may return their own voted absentee or mail-in ballot in-person. The ballot may be returned to each county election board's primary office as well as to other offices and locations designated by the board to receive ballots (hereinafter referred to as "Ballot Return Sites"), including secure ballot return receptacles (commonly referred to as "drop-boxes") that are easily identifiable.

This document provides guidance on how each county should establish a ballot return and collection plan for their county prior to each election.

**Guidance Contents**

1    Establishing a Ballot Return and Collection Plan .................................................................. 3

    1.1    Ballot Return Sites .................................................................................................. 3

    1.2    Location of Ballot Return Sites ............................................................................... 3

        1.2.1    Location of Ballot Return Sites ........................................................................ 3

        1.2.2    Hours of Operation ......................................................................................... 3

    1.3    Providing Notice of Location of County Election Offices and Ballot Return Sites .................... 4

    1.4    Confirmation of Plan Readiness .............................................................................. 4

2    Ballot Return Site Design and Requirements ........................................................................ 4

    2.1    Types of Ballot Return Sites .................................................................................... 4

    2.2    Secure Receptacles ("Drop-Boxes") ....................................................................... 5

    2.3    Signage ................................................................................................................... 5

    2.4    Accessibility of Ballot Return Sites .......................................................................... 6

    2.5    Security ................................................................................................................... 6

3    Ballot Collection and Chain of Custody Procedures .............................................................. 7

    3.1    Ballot Collection at Ballot Return Sites .................................................................... 7

    3.2    Transport and Receipt of Retrieved Ballots to the Board of Elections ...................... 7

    3.3    Election Day and Post-Election Procedures ............................................................. 8

4    Processing of Collected Ballots ........................................................................................... 8

**PENNSYLVANIA ABSENTEE AND MAIL-IN BALLOT RETURN GUIDANCE**

**TLP: WHITE**

# 1   ESTABLISHING A BALLOT RETURN AND COLLECTION PLAN

## 1.1   BALLOT RETURN SITES

For each election, county boards of elections should establish a plan and adopt procedures for how voters in their county may return their own voted absentee and mail-in ballots to the county board of elections. The initial plan should be submitted to the Department of State on or before 45 days prior to the election.

County boards of elections may establish multiple ballot return locations where voters may return their own voted ballot. At these sites, the county may provide voters with access to a secure ballot return receptacle for this purpose.

## 1.2   LOCATION OF BALLOT RETURN SITES

### 1.2.1   Location of Ballot Return Sites

Sites may include, but are not limited to, city and municipal facilities, public libraries, county facilities, or other locations designated by the board to receive ballots. When choosing a location, counties should consider, at a minimum, the following:

- locations that serve heavily populated urban/suburban areas, as well as rural areas.
- locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes.
- locations that are easily recognizable and accessible within the community.
- locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout.
- proximity to communities with historically low vote by mail usage.
- proximity to language minority communities.
- proximity to voters with disabilities.
- proximity to communities with low rates of household vehicle ownership.
- proximity to low-income communities.
- access to accessible and free parking.
- the distance and time a voter must travel by car or public transportation.

### 1.2.2   Hours of Operation

Business hours for sites do not have to be limited to weekdays or normal business hours. Counties are encouraged to offer business hours outside of these time frames, including weeknights or weekend hours to enable maximum flexibility and convenience to voters.

**TLP: WHITE**

## 1.3   PROVIDING NOTICE OF LOCATION OF COUNTY ELECTION OFFICES AND BALLOT RETURN SITES

A list of the ballot return sites and county election offices, including the dates and hours they are open, should be made public as early as possible. At least 7-10 days after submission of the plan to the Department of State, the county board of elections should provide notice of the county's ballot return plan by posting a notice in the county elections office and in a highly visible location on the county's website. The board may also post copies of the notice at such other locations it deems appropriate for the efficient notification of voters. The notification should also be included in absentee and mail-in voting materials sent to voters. At a minimum, the notice should include the following:

- ballot return deadline.
- list of county election offices and ballot return sites, including building names and street address.
- days and hours of operation, including election day hours.
- contact information for the county board of elections.
- accessibility information.

The list posted on the county's website should be in a format that is accessible for people with disabilities. In the event of any changes to site location operations, the county board of elections should post the updated information on the official election website within 24 hours.

## 1.4   CONFIRMATION OF PLAN READINESS

A county's initial absentee and mail-in ballot return plan should be submitted to the Department of State, Bureau of Election Security and Technology ("BEST") no later than 45 days before an election. If the Bureau of Election Security and Technology requests modifications to a plan, the county election office should submit a modified plan within 7 days of the request.  If the county board of elections determines that it is in the best interest of their voters to alter their plan or increase/decrease the number of ballot return sites they may submit a supplemental plan to BEST no later than 25 days before the election with notice to the public within 5 days of submission.

# 2   BALLOT RETURN SITE DESIGN AND REQUIREMENTS

## 2.1   TYPES OF BALLOT RETURN SITES

County boards of elections may establish sites where voters may return their own voted ballot. The site should provide voters access to a ballot return receptacle that is secure.

All return sites should be accessible at least during regular business hours beginning not less than 30 days before the day of the election, and on the day of the election. Return sites should have the same features, and be of substantially similar design, color scheme, and signage to facilitate identification by the public.

TLP: WHITE

## 2.2  SECURE RECEPTACLES ("DROP-BOXES")

Each ballot return site should have a secure receptacle that permits voters to return their own voted ballot. A postage stamp is not needed on the return envelope when depositing a ballot at a ballot return site. The receptacle should be designed to function as follows:

- hardware should be operable without any tight grasping, pinching, or twisting of the wrist.
- hardware should require no more than 5 lbs. of pressure for the voter to operate.
- receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair.

Other design requirements include:

- The drop-box should provide specific points identifying the slot where ballots are inserted. The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns).
- To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots.
- The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The county boards of election should determine receptacle size based on the use and needs of the location. The receptacle should be securely fastened to a stationary surface, to an immovable object, or placed behind a counter.

## 2.3  SIGNAGE

In determining the design and functions of ballot return sites, county boards of elections should design them in such a way that they are official and secure. To this end, the county board of elections must ensure each return site is marked with official signage ("Official Ballot Return Site" or "Official Ballot Return.") Counties should not display traditional "Vote Here" signs at designated ballot return sites. Signage should adhere to the following:

- Signage should be in all languages required under the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503).
- Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code (25 P.S. §§ 3516 and 3517).
- Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a declaration signed by the voter and the person rendering assistance.

**TLP: WHITE**

- Signage should provide a statement requesting that the designated county elections official should be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

## 2.4   ACCESSIBILITY OF BALLOT RETURN SITES

County boards of elections should ensure that ballot return sites are accessible to voters with disabilities, and should also ensure the following:

- If a site has only one ballot return receptacle, the design and placement of that site should meet the accessibility requirements.
- At a site with multiple drop-boxes, if not all drop-boxes meet the accessibility requirements outlined in this subdivision, then each inaccessible return site should have directional signage indicating the location of an accessible drop-box.

## 2.5   SECURITY

County boards of election must ensure the following when establishing ballot return sites:

- Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box.
- Drop-boxes should be secured in a manner to prevent their unauthorized removal.
- All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock.
- Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object.
- During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded.
- The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use.
- When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video.  A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election.
- To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

PENNSYLVANIA ABSENTEE AND MAIL-IN BALLOT RETURN GUIDANCE

TLP: WHITE

# 3   BALLOT COLLECTION AND CHAIN OF CUSTODY PROCEDURES

The county board of elections should develop ballot collection and chain of custody procedures for ballots returned to a county election office or a ballot return site. These procedures may not be inconsistent with Pennsylvania law or Department of State directives.

## 3.1   BALLOT COLLECTION AT BALLOT RETURN SITES

- Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays.
- The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site.  Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots.
- Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties.
- The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container.
- The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval.

## 3.2   TRANSPORT AND RECEIPT OF RETRIEVED BALLOTS TO THE BOARD OF ELECTIONS

- Ballots collected from any ballot return site should be immediately transported to the county board of elections.
- Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above.
- The seal number should be verified by a county election official or a designated representative.
- The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form.
- The completed collection form should be maintained in a manner prescribed by the board of elections to ensure that the form is traceable to its respective secure ballot container.
- The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

**TLP: WHITE**

### 3.3 ELECTION DAY AND POST-ELECTION PROCEDURES

- The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots.
- Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed.
- At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites, and drop-boxes must be closed and locked.
- Staff must ensure that no ballots are returned to ballot return site after the close of polls.
- After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election.

## 4   PROCESSING OF COLLECTED BALLOTS

Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

# # #

Version History:

| Version | Date | Description | Author |
|---------|------|-------------|--------|
| 1.0 | 8.19.2020 | Initial document release | Bureau of Election Security and Technology |

TLP: WHITE



# GUIDANCE CONCERNING EXAMINATION OF ABSENTEE AND

# MAIL-IN BALLOT RETURN ENVELOPES

**Date: September 11, 2020**

**Version: 1.0**

# EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES

## 1   BACKGROUND:

The Pennsylvania Election Code describes processes that a qualified voter follows to apply for, receive, complete and timely return an absentee or mail-in ballot to their county board of election. These processes include multiple secure methods used by the voter's county board of election to verify that the qualified voter's absentee or mail-in application is complete and that the statutory requirements are satisfied. These include voter identification verification confirmed by either a valid driver's license number, the last four digits of the voter's social security number or other valid photo identification, and unique information on the application including the voter's residence and date of birth. Before sending the ballot to the applicant, the county board of elections confirms the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained in the voter record. If the county is satisfied that the applicant is qualified, the application must be approved. This approval shall be final and binding, except that challenges may be made only on the grounds that the applicant was not a qualified voter, and those challenges must be made to the county prior to five o'clock p.m. on the Friday prior to the election.

Once the qualified voter's absentee or mail-in application is approved, the voter is mailed a ballot with instructions and two envelopes. The outer envelope includes both a unique correspondence ID barcode that links the envelope to the qualified voter's application and a pre-printed Voter's Declaration that the voter must sign representing that the voter is qualified to vote the enclosed ballot and has not already voted. This Guidance addresses the examination of the Voter's Declaration on the ballot return envelope. This Guidance assumes that the voter has satisfactorily completed the steps described above as to application for, receipt and return of an absentee or mail-in ballot.

## 2   RECORDING THE DATE, RETURN METHOD AND BALLOT STATUS FOR RETURNED BALLOTS:

County boards of elections should have processes in place to record the date, return method, and ballot status for all voted ballots received. County boards of elections must store and maintain returned ballots in a secure location until the ballots may be pre-canvassed or canvassed.

The county board of elections should stamp the date of receipt on the ballot-return. County boards of elections should record the receipt of absentee and mail ballots daily in the SURE system. To record a ballot as returned, the staff should scan the correspondence ID barcode on the outside of the envelope. The correspondence ID on the envelope is unique to each absentee or mail-in voter and each issuance of a ballot to a voter. Once a correspondence ID has been returned in the SURE system, it cannot be returned again. Further, if a ballot issuance record is cancelled by the county board of elections (e.g. voided to reissue a replacement ballot) in the SURE system, the correspondence ID on the cancelled ballot will become invalid. If the same barcode is subsequently scanned, the SURE system will not allow the returned ballot to be marked as being approved for counting.

The county boards of elections should record the date the ballot is received (not the date that the returned ballot is processed). In the event a county board of elections is entering the ballot on a date other than the date the ballot was received, the county personnel should ensure that the SURE record reflects the date of receipt, rather than the date of entry, since by default, SURE will automatically populate both the 'Date Received' and 'Vote Recorded' fields with the current date and time unless users manually correct the date to reflect the date received.

## 3   EXAMINATION OF DECLARATION ON BALLOT RETURN ENVELOPES:

The county board of elections is responsible for approving ballots to be counted during pre-canvassing.

To promote consistency across the 67 counties, the county boards of elections should follow the following steps when processing returned absentee and mail-in ballots.

After setting aside ballots of elector's who died prior to the opening of the polls, the county board of elections shall examine the Voter's Declaration on the outer envelope of each returned ballot and compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the "Registered Absentee and Mail-in Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File."

If the Voter's Declaration on the return envelope is blank, that ballot return envelope must be set aside and not counted. If the board determines that a ballot should not be counted, the final ballot disposition should be noted in SURE. The ballot return status (Resp Type) should be noted using the appropriate drop-down selection.

If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing unless challenged in accordance with the Pennsylvania Election Code.

The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

| Version | Date | Description | Author |
|---------|------|-------------|--------|
| 1.0 | 9.11.2020 | Initial document release | |

TLP: WHITE



# GUIDANCE CONCERNING CIVILIAN ABSENTEE AND MAIL-IN

# BALLOT PROCEDURES

**Date: September 28, 2020**

**Version: 1.0**

# GUIDANCE CONCERNING CIVILIAN ABSENTEE AND MAIL-IN BALLOT PROCEDURES

## 1   MAIL-IN AND CIVILIAN ABSENTEE BALLOTING – GENERAL PROVISIONS

Qualified voters may apply at any time on or before 5:00 p.m. on the Tuesday before any primary or election for a mail-in or civilian absentee ballot, and county boards of elections must begin processing applications at least fifty (50) days before the primary or election. County boards of elections may process applications earlier than fifty (50) days before the primary or election, if the county board of elections determines that it is better for its operational needs to do so.

### 1.1   WHO MAY REQUEST AN ABSENTEE OR MAIL-IN BALLOT?

All qualified voters in Pennsylvania are eligible to vote by mail-in ballot, and no excuse is required. For example, even if a voter will be present in their municipality on Election Day, but would simply prefer to vote from home, they may request a mail-in ballot.

Absentee ballots may be voted by domestic voters who will be absent from their municipality on Election Day due to work or vacation, voters who are celebrating a religious holiday, and voters such as college students who also may be away from the municipality on Election Day, if they don't choose to vote where they go to school.  Absentee ballots are also for those who are unable to attend their polling place due to illness or physical disability.

A voter may only qualify for and vote one ballot.

### 2.2   Permanent Voter Lists

Any qualified voter can request to be placed on the permanent **mail-in** voter list at any time.

For the permanent annual **absentee** ballot list, only voters with a permanent illness or disability are eligible; this section does not apply to voters expecting to be absent from the municipality.  Absentee voters who request to be placed on the permanent absentee list do not have to renew their physician's certification of continued disability every four (4) years or list it on each application.

If voters wish to request to become an annual permanent voter:

- For annual permanent **mail-in** list requests: these requests may be submitted when completing their online mail-in ballot request application.
- For annual permanent **absentee** list requests: this may be submitted by paper application only due to the physician's certification requirement.

Each year the county must send an application to any voter on the permanent absentee and mail-in voter lists by the first (1st) Monday in February.  The yearly application, once approved, serves as a standing request for a mail-in or absentee ballot to be mailed to that voter for every election that calendar year and for any special election until the third (3rd) Monday in February the next year.

If a permanent mail-in or permanent absentee voter no longer wishes to receive a ballot for the upcoming election or wishes to cancel her permanent status, the voter can submit a cancellation form to the county board of elections.  The cancellation form can be found at VotesPA.com.

## 2   REQUESTING AN ABSENTEE OR MAIL-IN BALLOT

There are three (3) ways by which voters can apply for mail-in or absentee ballots:

1.  By Mail
2.  In Person
3.  Online

### 2.1   MAIL REQUESTS
A voter may submit a paper application via mail to the county board of elections for absentee and mail-in ballot applications.

### 2.2   IN-PERSON (OVER THE COUNTER) REQUESTS
Act 77 of 2019 allows voters to request and cast an absentee or mail-in ballot over the counter in advance of Election Day. After ballots are finalized by a county, voters may apply at a County Election Office (CEO) during established business hours to receive and cast a mail-in or absentee ballot in person while the voter is in the office.

Once the voter is determined to be qualified and the application for an absentee or mail-in ballot is approved, the county board of elections **must promptly present** the voter with the voter's mail-in or absentee ballot.  Under Section 1305 of the Election Code, 25 P.S. § 3146.5, a county board of elections may not deny the eligible voter's request to have the ballot presented to the voter while the voter is at the office unless there is a bona fide objection to the absentee or mail-in ballot application.  Voters still need to provide proof of identification (as defined in the Election Code) to be verified by county boards of elections to vote an absentee or mail-in ballot.  Proof of identification for civilian absentee and mail-in voting include a valid driver's license number, the last four digits of the voter's social security number or other valid photo identification.

Voters who receive a mail-in or absentee ballot in person must be provided an opportunity to privately and secretly mark their ballot. *Note: The marking of the ballot in secret does not have to take place in the election offices. It can be provided in a nearby location.*

### 2.2.1   Satellite County Election Offices
County election boards may provide for mail-in and absentee application processing and balloting at more than one location within county borders.

Counties may establish additional business hours for CEOs; hours do not have to be limited to weekdays or to typical business hours. Counties are encouraged to offer business hours outside of these time frames, including weeknights or weekend hours to enable maximum flexibility and convenience for voters.

When a county decides to provide additional mail-in and absentee balloting by establishing additional CEOs, the county must account for all of the following:

- Each CEO must be staffed by appointed elections personnel in municipal or county-owned or leased locations selected by the county board of elections for processing applications and in-person voting of both mail-in and absentee ballots.
- Each CEO must have a secure county network connection that is capable of connecting to the Statewide Uniform Registry of Electors (SURE), and staff trained and approved to access SURE. NOTE: The Department will work with counties to establish secure connections; the county network extension must be approved by the Department.
- Each CEO must either have copies of all ballot styles available to be voted in the county, or an on-demand ballot printer capable of printing all ballot styles available to be voted in the county.
- Each CEO must have a secure ballot collection receptacle to store voted mail-in or absentee ballots submitted at the location.  County boards of election are required to keep voted ballots in a sealed or locked container until the time of pre-canvassing.
- Please see the Department of State's August 19, 2020 Absentee and Mail-In Ballot Return Guidance for more information and guidance on choosing a location for a CEO.

## 2.3   ONLINE REQUESTS
A voter may submit either an absentee or mail-in ballot request online via the Department's online portal at PA Voter Services.

Online applications must be processed according to the same statutory requirements as an application submitted by-mail or in person, including the proof of identification requirements defined in the Election Code.

## 3   DELIVERY OF MAIL-IN AND ABSENTEE BALLOTING MATERIALS

Counties must begin delivering mail-in or absentee ballots as soon they are certified and available. Counties may await the outcome of pending litigation that affects the contents of the ballots, but in any event the county must begin delivering mail-in or absentee ballots no later than the 2nd Tuesday prior to Election Day.

Once the counties begin delivering their ballots, as additional applications are received and approved, the county must deliver or mail ballots to such additional voters within forty-eight (48) hours of receipt of approved applications.

## 3.1   BALLOTING MATERIALS
The absentee and mail-in balloting materials must include the following:

1. The voter's proper ballot style based on the voter's registration address.
2. A white, inner (or "secrecy") envelope that indicates official ballot.

3. A pre-addressed outer ballot-return envelope that contains a declaration which the voter must sign and date.

The ballot must be returned within the inner envelope, which must be placed in the pre-addressed outer envelope.

With regard to the inner envelope:

- The Pennsylvania Supreme Court held on September 17, 2020, that any ballot that is not returned in the official ballot envelope (secrecy envelope) must be set aside and declared void. These ballots have been referred to as "naked ballots." In accordance with that ruling, all ballots that are not returned within the inner envelope must be set aside and may not be counted. ***Counties are strongly encouraged to include an instructional insert which describes how the voter should mark and return their ballot and to clearly warn that ballots must be returned in the secrecy envelopes or they will not be counted.*** The Department encourages county boards of election to publicize the requirement that ballots must be returned within the inner envelope, including on the county's website, in their offices, at ballot collection sites, and in other locations that may assist and educate voters.
- If any voted ballot's inner (or "secrecy") envelope contains any text, mark, or symbol which reveals the identity of the voter, the voter's political affiliation (party), or the voter's candidate preference, the envelopes and the ballots inside them must be set aside, declared void and may not be counted.

With regard to the outer ballot-return envelope:

- A ballot-return envelope with a declaration that is filled out, dated, and signed by an elector who was approved to receive an absentee or mail-in ballot is sufficient and counties should continue to pre-canvass and canvass these ballots.
- A ballot-return envelope with a declaration that is not filled out, dated, and signed is not sufficient and must be set aside, declared void and may not be counted. Ballot-return envelopes must be opened in such a manner as not to destroy the declarations executed thereon.
- All ballot-return envelopes containing executed declarations must be retained for a period of two years in accordance with the Election Code.

## 3.2   BALLOT DESIGN REQUIREMENTS

Act 12 of 2020 changed the law with respect to the surrender process for voters who request mail-in or absentee ballots.

Pursuant to Act 12 of 2020, a warning notice is required to be listed on both the absentee and mail-in ballots, which states:

> WARNING: If you receive an absentee or mail-in ballot and return your voted ballot by the deadline, you may not vote at your polling place on election day. If you are unable to return your voted absentee or mail-in ballot by the deadline, you may only vote a provisional ballot at your polling place on election day, unless you surrender your absentee or mail-in ballot and envelope to the judge of elections to be voided to vote by regular ballot.

## 4    RETURN OF BALLOTS BY VOTERS

### 4.1    VOTER MUST RETURN OWN BALLOT

A voter must return his or her own completed absentee or mail-in ballot by 8:00 pm on Election Day to the county board of elections or other county-designated drop-off location. Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability who have designated in writing an agent to deliver their ballot for them. Agency forms may be found at VotesPA.com. Emergency absentee ballots also may be delivered by a designated agent.

### 4.2    COLLECTION OF MAIL-IN AND ABSENTEE BALLOTS

In addition to the main CEO and satellite CEOs, counties may provide for other secure ballot collection locations that the county deems appropriate to accommodate in-person return of voted mail-in and absentee ballots. *Please refer to the Department's August 19, 2020 Absentee and Mail-In Ballot Return Guidance for more information and guidance regarding ballot collection locations and procedures.*

County boards of election are required to keep absentee and mail-in ballots in a sealed or locked container(s) until the time of pre-canvassing.

### 4.3    SURRENDER PROCESS FOR VOTERS WHO REQUEST MAIL-IN OR ABSENTEE BALLOTS

Once a voter requests a civilian absentee or mail-in ballot, they should vote and return that mail-in or absentee ballot by mail, or deliver it in person to a county elections office (CEO) or other designated drop-off location prior to 8:00 P.M. on Election Day.

However, if a voter has not voted their mail-in or absentee ballot, they may take it to their polling place on election day to surrender it. (NOTE: This is a different procedure than was in place for the June 2020 primary. Act 12 of 2020 changed the procedures for voters who request mail-in or absentee ballots, but later appear at their polling place. These changes take effect for the first time in the November 2020 General Election.)

Specifically, a voter who requests a mail-in or absentee ballot and who is not shown on the district register as having voted the ballot may vote at their polling place on Election Day if (1) the voter surrenders the original mail-in or absentee ballot and its outer envelope to the judge of elections to be spoiled, and (2) the voter signs a statement subject to the penalties under 18 Pa. C.S. § 4904 in substantially the following form:

> I hereby declare that I am a qualified registered elector who has obtained an absentee ballot or mail-in ballot. I further declare that I have not cast my absentee ballot or mail-in ballot, and that instead I remitted my absentee ballot or mail-in ballot and the envelope containing the declaration of the elector to the judge of elections at my polling place to be spoiled and therefore request that my absentee ballot or mail-in ballot be voided.

If the voter turns in (surrenders) his or her ballot and outer envelope and signs the statement, the voter is permitted to vote by regular ballot at the polling place.

If a voter whose record in the district poll book indicates that the voter requested a mail-in or absentee ballot but the voter does not surrender their ballot and declaration envelope and sign the required statement, the voter should be provided a provisional ballot.  Even if the voter asserts that they did not cast a mail-in or absentee ballot and is eligible to vote, the voter should only be provided a provisional ballot.

## 5   ABSENTEE AND MAIL-IN VOTING PROCESSES FOR COUNTY ELECTION OFFICIALS

### 5.1   POLL BOOK PROCESSES
The poll books will be divided into two sections.

The main section will include a) voters who have not requested a mail-in or absentee ballot for this election and b) voters who requested an absentee or mail-in ballot but who did not return their ballot by the date the pollbooks were printed. There will be a special watermark in the poll book indicating that voters who did not return their ballot by the date the pollbooks were printed must either surrender their ballot as described in Section 4.3 above or vote provisionally if they appear at the polling place on Election Day.

The secondary section of the pollbook will contain a list of voters who have both requested and returned their ballot (cast their vote) by the time the poll book was printed.

Voters who requested but have not returned their absentee or mail-in ballot may vote in person at their polling place on election day ONLY if they surrender their ballot and the declaration envelope that accompanies it, as described in Section 4.3 above.  The poll worker shall take the surrendered ballot and declaration envelope and mark them as "VOID." There is a location in the poll book where the poll worker must indicate that the items were surrendered. The voided ballot and declaration envelope, and the signed surrender declaration should be placed in a secure envelope or container and returned to the county election office with other polling place materials at the end of the voting day.  The surrendered ballot materials must be preserved.

As noted above, the poll book record for voters whose cast absentee or mail-in ballot has already been received will indicate that the voter's ballot was cast and they are not eligible to vote at the polling place. This will aid poll workers when checking in voters to easily determine that these voters are not eligible to vote on the voting equipment but may vote provisionally if the voter believes they are eligible to vote.

The watermarks in the poll books as listed above also apply to voters with a permanent flag on their voter record. In either case, the poll worker will be able to determine the appropriate course of action when reviewing the poll book on election day.

### 5.2   PRE-CANVASSING AND CANVASSING ABSENTEE AND MAIL-IN BALLOTS

The Act 12 of 2020 amendments provide for a pre-canvass period beginning on the morning of Election Day to canvass all ballots received prior to the pre-canvass meeting. The amendments further provide for a canvass meeting beginning no earlier than the close of polls to canvass all ballots not included in the pre-canvass meeting.

**Pre-canvass Meeting**

- The **pre-canvass** may begin no earlier than 7:00 AM on Election Day. County boards of election must provide notification of the time and location of a pre-canvass meeting at least 48 hours prior to the meeting by posting notice on its website.
- The county board of elections must provide a list of the names of the voters whose absentee or mail-in ballots are to be pre-canvassed.
- One authorized representative for each candidate and one authorized representative for each political party must be permitted to remain in the room where the pre-canvass meeting occurs.
- Persons observing, attending or participating in the pre-canvass meeting MAY NOT disclose the result of any portion of the pre-canvass prior to the close of polls on Election Day.
- The Department strongly urges all counties to begin pre-canvassing at the earliest time allowed to ensure that results can be tabulated promptly.

**Canvass Meeting**

- The **canvass** of mail-in and absentee ballots may begin no earlier than the close of polls and no later than the 3rd day following the election. County boards of election must provide notification of the time and location of the **canvass** meeting at least 48 hours prior to the meeting by posting notice on its website.
- The county board of elections must provide a list of the names of the voters whose absentee or mail-in ballots are to be canvassed.
- The canvass process must continue through the 8th day following the election to include valid military and overseas ballots received by 5:00 PM on the 7th day following the election.
- One authorized representative for each candidate and one authorized representative for each political party must be permitted to remain in the room where the canvass meeting occurs.
- The Department strongly urges all counties to begin canvassing at the earliest time allowed to ensure that results can be tabulated and reported promptly.

**Pre-canvass and Canvass Procedures**

At the pre-canvass or canvass, as the case may be, the county board of elections should:

- Segregate the unopened ballots of voters whose applications were challenged by the challenge deadline (5:00 PM on the Friday before the election).
  - o These ballots must be placed in a secure, sealed container until the board of elections holds a formal hearing on the challenged ballots.
  - o Ballot applications can only be challenged on the basis that the applicant is not qualified to vote.
- Set aside the ballot of any voter who was deceased before election day.

- Set aside any ballots without a filled out, dated and signed declaration envelope.
- Set aside any ballots without the secrecy envelope and any ballots in a secrecy envelope that include text, mark, or symbol which reveals the identity of the voter, the voter's political affiliation (party), or the voter's candidate preference.

The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis.

No challenges may be made to mail-in or absentee ballot applications after 5:00 pm on the Friday before the election.

No challenges may be made to mail-in and absentee ballots at any time based on signature analysis.

NOTE: For more information about the examination of return envelopes, please refer to the Department's September 11, 2020 *Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes*.

# # #

Version History:

| Version | Date | Description |
|---------|------|-------------|
| 1.0 | 9.28.2020 | Initial document release |

**<u>Exhibit C</u>**

Materials Reviewed

Materials Reviewed

In addition to the materials identified in the report itself, the following represents the materials I reviewed, consulted, and/or relied upon, in forming the opinions in this report:

1. Plaintiffs' pleadings and filings in this case;
2. Pennsylvania Department of State guidance and other documents published on its web site under "Election Administration Tools";
3. Heritage Foundation web site and posted cases and other materials;
4. Plaintiffs' written discovery responses served in this case;
5. Discovery responses and documents produced by the county election boards in this case and a summary thereof;
6. Transcripts of depositions taken in the case; and,
7. Various information obtained online regarding election administration best practices and procedures.

**Exhibit D**

Photographs and Video Stills

Case 2:20-cv-00966-NR   Document 504-19   Filed 10/01/20   Page 49 of 75

The Inquirer

Unlimited Access    Log In    ☰

# USPS says Pennsylvania mail ballots may not be delivered on time, and state warns of 'overwhelming' risk to voters

**EXHIBIT**
Marks 08/19/20 EX24

by **Jonathan Lai** and **Ellie Rushing**, Updated: August 16, 2020 - 10:51 AM



# The Inquirer

Unlimited Access | Log In ≡ 

YONG KIM / FILE PHOTOGRAPH

A voter prepares to drop off their ballot into a drop box at Philadelphia City Hall during May's primary election.

The U.S. Postal Service has warned Pennsylvania that some mail ballots might not be delivered on time because the state's deadlines are too tight for its "delivery standards," prompting election officials to ask the state Supreme Court to extend the deadlines to avoid disenfranchising voters.

The warning came in a July 29 letter from Thomas J. Marshall, general counsel and executive vice president of the Postal Service, to Pennsylvania Secretary of State Kathy Boockvar, whose department oversees elections. That letter was made public late Thursday in a filing her Department of State submitted to the Supreme Court, asking it to order that mail ballots be counted as long as they are received up to three days after the Nov. 3 election date.

## RELATED STORIES

- **Trump says he'll block extra funding for postal service to thwart mail-in voting**

- **Philly mail delays are raising alarms about the 2020 election: 'This is a huge problem'**

If the court agrees, that could increase the likelihood that the results of the presidential race between President Donald Trump and presumptive Democratic nominee Joe Biden won't be known for days after the election.

The Postal Service's letter came amid false attacks on mail voting by Trump, and as concerns mount nationally about how the coronavirus pandemic could disrupt the 2020 election. For Pennsylvania, a battleground state that was decided by less than 1% of the vote in 2016, the letter warned that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards."

# The Inquirer

Unlimited Access    Log In    ☰

## Organizational policy prohibits access to this content

"This mismatch creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them," Marshall wrote in the letter, which was first reported by PA Post.



## Conflicting Timetables for Voting by Mail in Pa.

Pennsylvania law allows voters to apply for a mail ballot up to a week before the Nov. 3 election, but the U.S. Postal Service recommends that voters should request mail ballots at least 15 days before the election, and "preferably long before that time." The Oct. 27 state deadline for **applying** for a mail ballot is the same day that the Postal Service recommends **mailing ballots back** to county governments.

**Oct. 19:**
Postal Service recommends voters **apply for mail ballots** at least 15 days before the election.

**Oct. 27:**
Postal Service recommends **mail ballots be sent** at least seven days before the election.

**Nov. 6:** Pa. Secretary of State Kathy Boockvar is requesting the state Supreme Court to allow mail ballots to be counted if they are received **three days after the election**, as long as there is no proof that the ballot was mailed after Election Day.

**19** 20 21 22 23 24 25 26 **27** 28 29 30 31 · 1 2 **3** 4 5 6

Pennsylvania wants to help voters track mail ballots online, state warns of overwhelming risk to voters

## The Inquirer

Unlimited Access   Log In ☰

**register** for the
November election.

**to apply for a
mail ballot.**

requires mail
ballots to be
**received by 8 p.m.**

SOURCES: Pa. Dept. of State; U.S. Postal Service

JOHN DUCHNESKIE / Staff Artist

# Conflicting Timetables for

Marshall's letter represented "a significant change to the outlook for voting by mail in the general election," the Department of State told the court in its filing. Before the July 29 warning, the department said, "the Postal Service had not indicated the likelihood of widespread, continuing, multiple-day mail-delivery delays presenting an overwhelming, statewide risk of disenfranchisement for significant numbers of voters utilizing mail-in ballots."

The department, which is part of Democratic Gov. Tom Wolf's administration, wants the court to order that mail ballots be counted if they are received by the Friday after Election Day as long as there is no proof (such as a postmark) that they were mailed after that day. State law currently requires that mail ballots be received by 8 p.m. on an election day.



Alliance for Retired Americans and supported by Priorities USA, a Democratic super PAC backing Biden. The lawsuit seeks to change the state's mail ballot deadlines, among other things. The state's reversal underscored the extent to which widespread mail delivery delays, along with Trump's acknowledgment that his refusal to increase Postal Service funding is tied to his belief that mail voting will hurt his reelection prospects, have alarmed Democrats across the state and the country.

Voters can request mail ballots as late as seven days before the election. But election officials urge voters to request and return their ballots weeks earlier, to ensure they arrive on time even with current mail delays.

Some counties set up drop boxes in the primary election so voters could hand-deliver their ballots without relying on the mail. But the Trump campaign and Republican National Committee have sued the state to block drop boxes from being used in November. Philadelphia and some of its suburban counties are hoping to set up election offices where voters can use mail ballots to vote in person weeks before the election.

The USPS did not immediately respond to a request for comment. The Department of State declined to comment beyond its filing.

USPS tells Pa. it can't deliver mail ballots on time, state warns of 'overwhelming' risk to voters

# The Inquirer

Unlimited Access    Log In    ☰



similar letter to Washington state.

The filing came on the same day that Trump openly admitted that by withholding funding for the Postal Service, the agency would not be able to handle an anticipated surge of mail voting in November.

» *READ MORE:* *The Postal Service needs money for mail-in voting. Trump is opposed to additional funding.*

"They need that money in order to have the post office work so it can take all of these millions and millions of ballots," Trump said Thursday morning on Fox Business Network.

Referring to negotiations over a new coronavirus economic relief package that have stalled in part because of disagreements over post office funding, Trump added: "If we don't make a deal, that means they don't get the money. That means they can't have universal mail-in voting. They just can't have it."

USPS delays mail carriers leave ballots on time, state warns, amid overwhelming number voters

## The Inquirer

Unlimited Access    Log In   ☰ 

Serious mail delivery delays have impacted residents across the Philadelphia region, largely due to policies implemented by the new postmaster general, who is also a major Trump campaign donor. Those policies eliminate overtime, order carriers to leave mail behind to speed up workdays, and slash office hours.

The changes, coupled with staffing shortages amid previous budget cuts and coronavirus absences, are forcing some Philadelphians to go upward of three weeks without mail, leaving them without medication, paychecks, and bills. Mail is piling up in offices, often unscanned, carriers have said, and routes are going undelivered for days when a carrier is absent.

In the primary, just over half of all votes were cast by mail, a huge jump from about 5% in past elections. And turnout in November's election will likely be more than double the primary, meaning there could be several million ballots sent through the mail.

But there have been significant logistical challenges to rapidly scaling up vote-by-mail this year. Election officials struggled in the primary to keep up with demand for ballots, and the pandemic meant every step of requesting and receiving a mail ballot took longer than normal.

County officials warned before the election that thousands of voters could be disenfranchised, and tens of thousands of ballots ultimately arrived after the deadline.

Those officials, as well as advocacy groups, have urged lawmakers in Harrisburg to change the law to widen the window between the deadlines for requesting and returning ballots. While many lawmakers agree that there is a problem, there has been no consensus around a solution. It's unclear whether there will be political momentum to change the law in time for the election.

Legislative leaders didn't immediately comment late Thursday.

*Staff writer Sean Collins Walsh contributed to this article.*

The Inquirer

Unlimited Access | Log In | ☰

# The Inquirer

Unlimited Access    Log In



TWITTER     FACEBOOK     INSTAGRAM

© 2020 The Philadelphia Inquirer, LLC    Terms of Use   /   Privacy Policy



EXHIBIT

**Marks 08/19/20 EX25**

P002068



 **Li Kramer Halpern**
Monday at 12:53 PM · One Montgomery Plaza · 🌐

**Cory** and I voted! I miss my sticker. If you're using the drop box in Norristown, walk through the construction the building is open. Closed at noon today but other days open 7am - 8pm through June 2nd. **https://www.montcopa.org/ArchiveCenter/ViewFile/Item/5177**

**EXHIBIT**

**Marks 08/19/20 EX26**





6/2/2020 1:13:19 PM



EXIT

6/2/2020 1:13:24 PM



6/2/2020 1:13:25 PM



EXIT

6/2/2020 1:20:09 PM



6/2/2020 1:20:11 PM

6/2/2020 1:43:51 PM



EXIT

6/2/2020 1:43:54 PM



6/2/2020 1:43:56 PM



6/2/2020 1:43:57 PM



6/2/2020 1:44:36 PM



6/2/2020 1:44:36 PM

**Exhibit E**

County BOE Discovery Response Summary Chart

**County BOE Discovery Response Summary Chart**

| County | Stationary Off-site Drop Box Collection[1] | | Mobile Collection | | Intends to Follow September Signature Verification Guidance |
|---|---|---|---|---|---|
| | Primary | General | Primary | General | |
| Adams | Yes | Yes | - | - | - |
| Allegheny | No | - | - | - | - |
| Armstrong | No | No | - | - | Yes |
| Beaver | - | - | - | - | |
| Bedford | No | Yes | - | - | Yes |
| Berks | No | Yes | - | - | Yes |
| Blair | No | No | - | No | Still evaluating |
| Bradford | No | No | - | - | - |
| Bucks | Yes | Yes[2] | - | - | - |
| Butler | No | No | - | - | Yes |
| Cambria | No | No | - | - | - |
| Cameron | Yes | Yes | - | - | - |
| Carbon | - | - | - | - | - |
| Centre | No | Yes | - | - | Yes |
| Chester | Yes | Yes[3] | - | - | - |
| Clarion | No | No | - | - | - |
| Clearfield | No | No | - | - | Yes |
| Clinton | No | Yes | - | - | - |
| Columbia | No | No | - | - | Yes |
| Crawford | No | No | - | - | Yes |
| Cumberland | No | No | - | - | - |
| Dauphin | No | No | - | - | Yes |

---

[1]    This Summary Chart is provided pursuant to Federal Rule of Evidence 1006. Except where otherwise noted, the information summarized herein is derived from each County's answer or supplemental answer to Plaintiffs' Interrogatory No. 5. The Counties' discovery responses, having been served in discovery in this case, are already available to all of the parties. *See* Fed. R. Evid. 1006. Several counties did not respond substantively (or at all) to Plaintiffs' Interrogatory No. 5, as indicated by a hyphen where appropriate.

[2]    https://2020-general-election-bucksgis.hub.arcgis.com/pages/drop-box-info

[3]    https://www.chesco.org/4758/Drop-Off-Locations

**County BOE Discovery Response Summary Chart**

| County | Stationary Off-site Drop Box Collection[1] | | Mobile Collection | | Intends to Follow September Signature Verification Guidance |
|---|---|---|---|---|---|
| | Primary | General | Primary | General | |
| Delaware | - | Yes[4] | Yes[5] | - | - |
| Elk | - | - | - | - | - |
| Erie | Yes | Yes | - | No | - |
| Fayette | No | No | - | - | - |
| Forest | - | - | - | - | - |
| Franklin | No | - | - | - | - |
| Fulton | Yes | Yes | - | - | - |
| Greene | No | No | - | - | Yes |
| Huntingdon | No | No | - | - | Yes |
| Indiana | No | Yes | - | - | Yes |
| Jefferson | No | Yes | - | - | Yes |
| Juniata | Yes | Yes | - | - | No |
| Lackawanna | No | Yes | - | - | Yes |
| Lancaster | Yes | Undetermined | - | - | - |
| Lawrence | - | - | - | - | - |
| Lebanon | No | No | - | - | Still Evaluating |
| Lehigh | No | Yes[6] | - | - | - |
| Luzerne | Yes | Yes | - | - | Yes |
| Lycoming | No | No | - | - | |
| McKean | No | No | - | - | - |
| Mercer | - | - | - | - | - |
| Mifflin | No | No | - | - | No |
| Monroe | Yes[7] | No[8] | - | - | - |

---

[4]   https://delcopa.gov/elections/ballotdropboxlocations.html
[5]   DELCO_WDPA_002063.
[6]
      https://www.lehighcounty.org/Portals/0/PDF/PublicInformation/Lettered_County%20Drop%20Boxes%20Announcement%20%20Press%20Release_table.pdf?ver=2020-09-24-144953-347
[7]   LAW-001556.
[8]   http://www.monroecountypa.gov/Dept/Voter/Documents/MailInAbsenteeInformation.pdf

**County BOE Discovery Response Summary Chart**

| County | Stationary Off-site Drop Box Collection[1] | | Mobile Collection | | Intends to Follow September Signature Verification Guidance |
|---|---|---|---|---|---|
| | Primary | General | Primary | General | |
| Montgomery | Yes | Yes[9] | - | - | - |
| Montour | No | No | - | - | Yes |
| Northampton | No | Yes | - | - | Yes |
| Northumberland | No | No | - | - | Yes |
| Perry | No | No | - | - | - |
| Philadelphia | Yes | - | Yes | - | - |
| Pike | - | - | - | - | - |
| Potter | - | No | - | - | - |
| Schuylkill | - | - | - | - | - |
| Snyder | - | - | - | - | - |
| Somerset | No | No | - | No | - |
| Sullivan | No | No | - | No | - |
| Susquehanna | No | - | - | - | - |
| Tioga | Yes | Yes | - | - | - |
| Union | - | - | - | - | - |
| Venango | No | No | - | - | - |
| Warren | - | - | - | - | - |
| Washington | No | - | - | - | - |
| Wayne | Yes[10] | Yes[11] | - | - | - |
| Westmoreland | - | - | - | - | - |
| Wyoming | No | No | - | - | No |
| York | No | Yes | - | - | Yes |

---

[9]  https://www.montcopa.org/3587/Secure-Ballot-Drop-Box-Locations
[10]  LAW-003260.
[11]  http://www.waynecountypa.gov/faq.aspx?qid=106