**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.;  *et al.*, | ) | *Electronically Filed* |
| | ) | |
| Plaintiffs, | ) | Civil Action |
| | ) | |
| v. | ) | No.: 2-20-CV-966 |
| | ) | |
| KATHY BOOCKVAR; *et al.*, | ) | |
| | ) | Judge J. Nicholas Ranjan |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

PORTER WRIGHT MORRIS & ARTHUR LLP
Ronald L. Hicks, Jr. (PA #49520)
Jeremy  A. Mercer (PA #86480)
Carolyn B. McGee (PA #208815)
Six PPG Place, Third Floor
Pittsburgh, PA 15222
(412) 235-4500 (Telephone)
(412) 235-4510 (Fax)
rhicks@porterwright.com
jmercer@porterwright.com
cmcgee@porterwright.com

and

Matthew E. Morgan (DC #989591)
(admitted pro hac vice – ECF #10)
Justin Clark (DC #499621)
(admitted pro hac vice – ECF #31)
Elections, LLC
1000 Maine Ave., SW, 4th Floor
Washington, DC 20224
(202) 844-3812 (Telephone)
matthew.morgan@electionlawllc.com
justin.clark@electionlawllc.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 7

   I.   THE PARTIES INCLUDE QUALIFIED ELECTORS AND REPRESENTATIVES ENFORCING THEIR RIGHT TO HAVE THE ELECTION DECIDED ON FUNDAMENTAL PRINCIPLES OF FAIRNESS. ........................................................... 7

      A.   The Plaintiffs Are a Presidential Candidate's Campaign Committee, a National Political Party, Congressional Candidates, and Qualified Electors............................ 7

      B.   The Defendants Are the Secretary of the Commonwealth and all 67 County Boards of Elections. ................................................................................................ 8

   II.   THE UNITED STATES CONSTITUTION AND PENNSYLVANIA CONSTITUTION GUARANTEE FREE AND FAIR ELECTIONS. ................................ 9

   III.   PENNSYLVANIA FAVORS IN-PERSON VOTING AND HAS ALWAYS HAD MANDATORY SAFEGUARDS FOR MAIL-IN BALLOTS. ........................................ 10

   IV.   PENNSYLVANIA REFORMS ITS ELECTION LAW THROUGH ACT 77, BUT STILL REQUIRES SAFEGUARDS AGAINST VOTE DILUTION AND TO PROTECT THE EQUAL TREATMENT OF VOTERS. ................................................... 11

   V.   THE SECRETARY'S SEPTEMBER 11 GUIDANCE IS CONTRARY TO THE ELECTION CODE AND WILL RESULT IN BALLOT FRAUD, VOTE DILUTION, AND UNEQUAL TREATMENT OF PENNSYLVANIA VOTERS. .............................. 15

   VI.   THE SEPTEMBER 28, 2020 GUIDANCE LIKEWISE IS CONTRARY TO THE ELECTION CODE AND WILL RESULT IN BALLOT FRAUD, VOTE DILUTION, AND UNEQUAL TREATMENT OF PENNSYLVANIA VOTERS. ............................... 15

   VII.   DEFENDANTS' UNCONSTITUTIONAL JANUARY 10, 2020 GUIDANCE ON BALLOT DROP BOXES RESULTS IN ILLEGAL BALLOT COLLECTION AND COUNTING DURING THE PRIMARY ELECTION. ..................................................... 19

   VIII.   THE SECRETARY'S AUGUST 19 GUIDANCE DOES NOT RESOLVE THE CONSTITUTIONAL VIOLATIONS CREATED BY THE UNSTAFFED AND UNSECURED DROP BOXES. ........................................................................................ 23

   IX.   POLL WATCHERS SERVE AS A CRUCIAL CROSS-CHECK ON ELECTION ADMINISTRATION. ................................................................................................... 29

   X.   THE COUNTY RESIDENCY RESTRICTION ON POLL WATCHERS WILL RESULT IN UNEQUAL ELECTION OBSERVANCE AND DIFFERENT "RULES" FOR VOTERS................................................................................................................ 30

   XI.   DROP BOXES ALREADY CONTAIN INELIGIBLE CO-MINGLED BALLOTS AND PENNSYLVANIA VOTERS ARE FACING IRREPARABLE HARM IN THE FORM OF VOTE DILUTION AND UNEQUAL TREATMENT.......................... 34

LEGAL STANDARD.......................................................................................................... 34

LAW AND ARGUMENT ................................................................................................... 35

I.   NO GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING PLAINTIFFS' CLAIMS. ................................................... 35

    A.   Under Both the United States and Pennsylvania Constitutions, the Right to Vote and to Free and Fair Elections Includes the Right to Have One's Vote Fully Counted Without Dilution or Debasement. ...................... 36

    B.   Regulations Which Dilute or Debase the Right to Vote and to Free and Fair Elections Present a Federal Question and Are Subject to Strict Scrutiny. ............... 38

    C.   Equal Protection Mandates that all Pennsylvania Voters Must Be Treated the Same or the Burden Is Severe. ................................................................. 40

    D.   Due Process also Demands that all Pennsylvania Voters Must Be Treated the Same or the Burden Is Severe. ................................................................. 43

II.  THE SECRETARY'S SEPTEMBER 2020 GUIDANCE VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO VOTE AND TO A FREE AND FAIR ELECTION. ...... 45

    A.   Prohibiting Signature Verification for Absentee and Mail-in Applications and Ballots Dilutes the Vote and Violates Equal Protection. ........................................... 45

    B.   The September Guidance Creates an Unconstitutional Distinction Between Absentee, Mail-In, In-Person, and Provisional Voters, Violating Both Equal Protection and Substantive Due Process. ................................................... 50

III. DEFENDANTS' HAPHAZARD AND INCONSISTENT USE OF DROP BOXES AND MOBILE COLLECTION SITES VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO VOTE AND TO A FREE AND FAIR ELECTION. ...... 53

    A.   Unstaffed Drop Boxes and Mobile Collection Sites Dilute the Vote and Violate Equal Protection. ........................................................................ 53

    B.   An Unfair Voting Scheme is Created by the Unequal Use of Drop Boxes and Mobile Collection Sites and Violates Due Process. ................................................. 57

V.   PLAINTIFFS ARE ENTITLED TO AN INJUNCTION TO PREVENT VOTE DILUTION AND FURTHER VIOLATIONS OF EQUAL PROTECTION AND DUE PROCESS. ............................................................................... 68

CONCLUSION ................................................................................ 70

# TABLE OF AUTHORITIES

Page(s)

**Cases**

12(b) *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*,
  373 F. Supp. 3d 567 (W.D. Pa. 2019) .................................................................48

*Absentee Ballots of November 4, 2003 Gen. Election*,
  843 A.2d at 1224 .................................................................................................13

*ACLU of N.M. v. Santillanes*,
  546 F.3d 1313 (10th Cir. 2008) ..........................................................................50

*Ali v. Woodbridge Twp. Sch. Dist.*,
  957 F.3d 174 (3d Cir. 2020)................................................................................34

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)................................................................................39, 58, 61

*Anderson v. United States*,
  417 U.S. 211 (1974)................................................................................36, 53, 64

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015)............................................................................................38

*Baker v. Carr*,
  369 U.S. 186 (1962)............................................................................................36

*Benezet Consulting, LLC v. Boockvar*,
  433 F. Supp. 3d 670 (M.D. Pa. 2020) .............................................................39, 49

*Black v. McGuffage*,
  209 F. Supp. 2d 889 (N.D. Ill. 2002) ......................................................... *passim*

*Burdick v. Takushi*,
  504 U.S. 428 (1992)................................................................................39, 53, 58

*Bush v. Gore*,
  531 U.S. 98 (2000)................................................................................... *passim*

*In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*,
  843 A.2d at 1223................................................................................10, 12, 54

*Canvass of Absentee Ballots of April 28, 1964 Primary Election*,
  34 Pa. D. & C.2d 419 (Pa. Com. Pl. Phila. 1964).................................................11

*Charfauros v. Bd. of Elections*,
    249 F.3d 941 (9th Cir. 2001) ............................................41

*City of Phila. v. Sessions*,
    309 F. Supp. 3d 289 ......................................................69

*Cook v. Gralike*,
    531 U.S. 510 (2001).......................................................9, 37

*Coverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
    298 F.3d 201 (3d Cir. 2002)............................................34

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)........................................................39, 63

*Crossey v. Boockvar*, 108 MM 2020,
    2020 Pa. LEXIS 4519 (Pa. Aug. 21, 2020).........................61

*Curry v. Baker*,
    802 F.2d 1302 (11th Cir.1986) ......................................43

*Democracy N.C. v. N.C. State Bd. of Elections*,
    Civ. A. No. 20-cv-457, Order ........................................51

*Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc,
    2020 U.S. Dist. LEXIS 172330 (W.D. Wis. Sep. 21, 2020) (enjoining
    Wisconsin requirement that election officials at polling places be "an elector
    of the county in which the municipality is located") ....................................... *passim*

*Duncan v. Poythress*,
    657 F.2d 691 (5th Cir. 1981) ........................................43, 44

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)......................................................41

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)......................................................34

*Exodus Refugee Immigration Inc. v. Pence*,
    165 F. Supp. 3d 718 (7th Cir. 2016) ..............................68

*Florida State Conference of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ......................................43

*Gallagher v. N.Y. State Bd. of Elections*,
    2020 U.S. Dist. LEXIS 138219 (S.D.N.Y. Aug. 3, 2020).....................57

*Gray v. Sanders,*
  372 U.S. 368 (1963).................................................................................41, 42, 51, 63

*Green Party v. Aichele,*
  89 F. Supp. 3d 723 (E.D. Pa. 2015) ......................................................................49

*Green v. City of Tucson,*
  340 F.3d 891 (9th Cir. 2003) ..........................................................................39, 41

*Griffin v. Burns,*
  570 F.2d 1065 (1st Cir. 1978) ("If the election process itself reaches the point
  of patent and fundamental unfairness, a violation of the due process clause
  may be indicated and relief under § 1983 therefore in order.").........................43, 50

*Hadley v. Junior College District,*
  397 U.S. 50 (1968).................................................................................................40

*Harper v. Virginia State Board of Elections,*
  383 U.S. 663 (1966).........................................................................................35, 40

*League of Women Voters v. Commonwealth,*
  178 A.3d 737 (Pa. 2018) ..................................................................................37, 64

*Lemons v. Bradbury,*
  538 F.3d 1098 (9th Cir. 2008) ..............................................................................39

*Marchioro v. Chaney,*
  442 U.S. 191 (1979)...............................................................................................59

*Marks v. Stinson,*
  19 F.3d 873 (3d Cir. 1994).....................................................................................43

*Meyer v. Grant,*
  486 U.S. 414 (1988)...............................................................................................35

*Miller v. City of Bradford,* No. 17-268 Erie,
  2019 U.S. Dist. LEXIS 134248 (W.D. Pa. Aug. 9, 2019) .....................................15

*Moore v. Ogilvie,*
  394 U.S. 814 (1969).........................................................................................40, 41

*Norman v. Reed,*
  502 U.S. 279 (1992)...............................................................................................39

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) .................................................................................39

*Oburn v. Shapp*,
   521 F.2d 142 (3rd Cir. 1975) .........................................................................................67

*Pa. Democratic Party v. Boockvar*, No. 133 MM 2020,
   2020 Pa. LEXIS 4872 (Pa., Sept. 17, 2020) ................................................. *passim*

*Pa. Voters Alliance, et al. v. Centre County, et al.*,
   Civ. A. No. 4:20-cv-1761 (M.D. Pa. 2020) .........................................................61

*Patino v. City of Pasadena*, No. H-14-3241,
   2017 U.S. Dist. LEXIS 229191 (S.D. Tx. Jan 16, 2017) .......................................68

*Patriot Party v. Allegheny Cty. Dep't of Elections*,
   95 F.3d 253 (3d Cir. 1996)........................................................................................58

*Pierce v. Allegheny County Bd. of Elections*,
   324 F. Supp. 2d 684 (W.D. Pa. 2003)..............................................42, 51, 53, 67

*Prichard v. United States*,
   181 F.2d 326 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)......................36

*Project Vote v. Kelly*,
   805 F. Supp. 2d 152 (W.D. Pa. 2011)........................................................9, 37, 46

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)........................................................................................................54

*Reynolds v. Sims*,
   377 U.S. 533 (1964)................................................................................... *passim*

*Roe v. Alabama*,
   43 F.3d 574 (11th Cir.1995) ....................................................................................43

*Roth v. United States*,
   354 U.S. 476 (1957)....................................................................................................35

*Scheidementle v. Slippery Rock Univ. State Sys. of Higher Educ.*,
   470 F.3d 535 (3d Cir. 2006).....................................................................................34

*Scutella v. Erie Cty. Prison*, No. 1:19-cv-245,
   2020 U.S. Dist. LEXIS 19318 (W.D. Pa. Feb. 5, 2020) .......................................69

*Smiley v. Holm*,
   285 U.S. 355 (1932).....................................................................................................38

*South v. Peters*,
   339 U.S. 276 (1950).....................................................................................................36

*Swartzwelder v. McNeilly,*
    297 F.3d 228 (3rd Cir. 2002) ...............................................................69

*TD Bank N.A. v. Hill,*
    928 F.3d 259 (3d Cir. 2019).................................................................34

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) .............................................................................38

*Tiryak v. Jordan,*
    472 F. Supp. 822 (E.D. Pa. 1979) ..................................................59, 63

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995)...........................................................................9, 37

*United States v. Classic,*
    313 U.S. 299 (1941) .............................................................................36

*United States v. Marcavage,*
    609 F.3d 264 (3d Cir. 2010)..................................................................58

*Williams v. Rhodes,*
    393 U.S. 23 (1968)................................................................................38

*Winston v. Moore,*
    91 A. 520 (Pa. 1914) ............................................................................37

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886)..............................................................................43

**Statutes**

25 P.S. § 2600 ...........................................................................................10

25 P.S. § 2601(t) ..........................................................................................8

25 P.S. § 2602(q) ........................................................................................62

25 P.S. § 2602(w) & .....................................................................................11

25 P.S. § 2641(a)...........................................................................................8

25 P.S. § 2642(f) ...........................................................................................9

25 P.S. § 2650(a) & (c) ...............................................................................29

25 P.S. § 2687 ................................................................................... *passim*

25 P.S. § 2687(b) ..........................................................................29, 66, 67

25 P.S. § 3050(a.3)................................................................15, 17, 29, 46, 49

25 P.S. § 3145(a)................................................................................10

25 P.S. § 3146.1............................................................................11, 12

25 P.S. § 3146.2................................................................................16

25 P.S. § 3146.2(a)-(c)........................................................................16

25 P.S. § 3146.2(d)............................................................................16

25 P.S. § 3146.2b...........................................................................45, 46

25 P.S. § 3146.2b(c)...........................................................................16

25 P.S. §§ 3146.2b(d).........................................................................49

25 P.S. § 3146.6(a)............................................................................54

25 P.S. §§ 3146.6(a)..........................................................................12

25 P.S. § 3146.8(b)............................................................................14

25 P.S. § 3146.8(g)............................................................................13

25 P.S. § 3146.8(g)(1.1)......................................................................29

25 P.S. § 3146.8(g)(1.1) & g(3)..............................................................14

25 P.S. 3146(g)(1.1) & (2)....................................................................32

25 P.S. § 3146.8(g)(3).....................................................................13, 18

25 P.S. § 3146.8(g)(3) & g(4)..............................................................13, 45

25 P.S. § 3146.8(g)(4)........................................................................18

25 P.S. § 3146.8(g)(5)-(7)...............................................................13, 18, 19

25 P.S. §§ 3149.1-3149.9 (Supp. 1960)........................................................10

25 P.S. §§ 3150.11–3150.12b..................................................................12

25 P.S. § 3150.12..............................................................................16

25 P.S. § 3150.12(b)...........................................................................16

25 P.S. § 3150.12b(a)..........................................................................16

25 P.S. § 3150.14(a)-(b) ................................................................................13

25 P.S. § 3150.16(b)(1) ................................................................................13

**Other Authorities**

Fed. R. Civ. P. 8(c) ................................................................................48

Pa. Const ................................................................................9

Pa. Const. art. II, § 1 ................................................................................9

PA Const. art. VII, § 1 & art. I, § 28 ................................................................................9, 36

Pa. Const. art. VII, § 14 ................................................................................10, 11

U.S. Const. amend. XIV, § 1 ................................................................................40

U.S. Const. art. I, § 4, cl.1 ................................................................................9, 38

U.S. Const. Art. II, § 1, cl. 2 ................................................................................38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; *et al.*, | ) Civil Action No.: 2-20-CV-966 |
| Plaintiffs, | ) |
| v. | ) Judge J. Nicholas Ranjan |
| KATHY BOOCKVAR; *et al.*, | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In 2017, Defendant Kathy Boockvar announced to the world her unfiltered opinion of President Donald J. Trump: "Using the title 'President' before the word 'Trump' really demeans the office of the presidency." (App. Ex. 52, Tweets by Secretary Boockvar at 3; App. ; Ex. 9, Boockvar Dep. 247:14–248:6.)[1] This open bias came from the person who currently serves as Pennsylvania's Secretary of the Commonwealth, head of the Department of State and someone who is supposed to "promote the integrity of the electoral process [and] encourage[ ] the highest standards of ethics and competence in elections … ." (App. Ex. 51, Secretary Boockvar's About Us Page at 1; App. Ex. 9, Boockvar Dep. 11:5-13.) Instead of respecting the President's position of public trust and living up to those non-partisan goals, Defendant Boockvar has spent her time in office issuing illegal election guidance memos that are contrary to Pennsylvania's Election Code

---

[1]    References to the Appendix in Support of Plaintiffs' Motion for Summary Judgment, filed contemporaneously herewith, shall be indicated as "App. Ex.," followed by a brief description and/or page reference.

and well-recognized election administration best practices, all in the hopes that come November 2020, she can help ensure the title of President is no longer used before the name Trump.

In a true effort to preserve and promote the integrity of the electoral process, to encourage the highest standards of ethics and competence in Pennsylvania's November General Election, and to minimize the possibility of election fraud, Plaintiffs sought intervention by this Court. Thus, they filed this action, a constitutional challenge to enjoin the unequal treatment of voters in Pennsylvania, enforce Pennsylvania's Election Code, and reduce the possibility of voter fraud. In this action, the Trump Campaign, the Republican National Committee, and other Plaintiffs—who range from elected representatives to private citizen poll watchers—ask this Court to uphold bedrock principles of democracy: all voters should be treated equally; all registered voters should be allowed to vote once; and all votes should be free from dilution by fraudulent votes.

The Defendants in this action are Pennsylvania Secretary of State Kathy Boockvar – in her official capacity – and the County Boards of Elections for each county in the Commonwealth of Pennsylvania. Unconstitutional guidance memos issued by Secretary Boockvar, and implemented inconsistently by the remaining Defendants, along with the unjustified residency restrictions for poll watchers, jeopardize the equal treatment of the electorate in Pennsylvania and undermine the protections of the First and Fourteenth Amendment of the United States Constitution, as well as the Pennsylvania Constitution.

Specifically, Defendants' guidance memos eschew the Election Code's critical signature verification requirements as such are the sole way to ensure that absentee or mail-in voters actually are the qualified voters they purport to be. Additionally, Secretary Boockvar's guidance memos impermissibly create different classes of voters based upon both the manner in which a registered voter exercises his/her franchise and upon the county in which that voter votes. The Election Code

requires signature verification for all voters.  But the guidance memos at issue require signature verification for in-person voters only (either those who vote a regular ballot or those who vote a provisional ballot), not for those who vote by mail (absentee or mail-in).  Moreover, some Defendant Boards of Elections have said they will follow the illegal guidance while others have said they will not but will enforce the Election Code's signature comparison requirement.  So, the upcoming November 3, 2020 General Election will see voters treated differently not only within a county but across the entire Commonwealth.  The Constitution does not permit treating voters, or votes, differently in either way.  The lack of signature verification will result in a violation of equal protection, vote dilution, and the promotion of fraudulent voting unless this Court enjoins the Defendants from implementing the illegal guidance.  (App. Ex. 19, Riddlemoser Rep. at pp. 14-15.)  The safeguards required by the Election Code and time-tested election administration best practices—which protect the sanctity of each citizen's vote and the integrity of the election process—cannot be ignored, yet that is exactly what Defendants intend to do.

Defendants also have implemented an unfair, haphazard, and uneven system for the collection of absentee or mail-in ballots via unstaffed and unsecured ballot drop boxes and/or via mobile collection sites.  The use of unstaffed drop boxes and mobile collection sites poses a direct threat to the security of unknown hundreds (if not thousands) of ballots, placing those ballots in jeopardy of theft or destruction and making them vulnerable to manipulation.  Defendants' experts acknowledge that the majority of drop boxes in Pennsylvania will be unstaffed and lack even video surveillance, despite simultaneously highlighting that the majority of states that use drop-boxes require at least one of the two methods for security reasons.  Relying on an excuse of the alleged burden of employee costs, the Secretary of State has made an unconstitutional decision: she has sacrificed election security and integrity.

The lack of security for these drop-boxes means that if anyone attempted to drop off multiple ballots or to tamper with a ballot drop-box, no one would know. The lack of security also *ensures* that it will be easy to commit voter fraud. Defendants' experts do not even discuss the threat of mobile collection sites, thus conceding the true and real threat that such insecure areas pose to election security. As a result, the use of these drop boxes and mobile collection sites unconstitutionally permits a new means of vote dilution through ballot harvesting; no one will be watching these boxes or sites—which are designed purely as receptacles for significant numbers of ballots—nor will any Defendant take affirmative action to prevent anyone from depositing more than one ballot into the boxes.

The Defendants also lack consistent parameters regarding the location or use of the drop boxes and collection sites, either within a particular county (where will the boxes or sites be located and how are those locations determined) or across different counties (some counties are using unstaffed drop boxes and mobile collection site, some are using multiple unstaffed drop boxes, some are using just one unstaffed drop box, some are using no drop boxes at all). The lack of uniform measures regarding the use of, location of, and administration of unstaffed and unsecured ballot drop boxes and mobile collection sites violates the constitutional rights of the Plaintiffs. But more than that, these plans threaten to undermine the very integrity and defensibility of the November 3, 2020 General Election process and results unless this Court intervenes.

Finally, Defendants also intend to unconstitutionally enforce the Pennsylvania Election Code's restriction that a poll watcher only observe polls, pre-canvassing, and canvassing in his or her own county. Poll watchers fill multiple critical roles in ensuring the integrity of an election. They flag irregular ballots, help identify malfunctioning voting machines, call out possible voter fraud, and communicate with voters to help ensure voter turnout to the correct locations. Plaintiff

candidates all appear on the ballot in multiple counties and the Election Code must be applied uniformly across all 67 of Pennsylvania's counties, yet Pennsylvania's residency restriction on poll watchers prevents someone from watching polls across county lines.  This needless and unjustified requirement poses considerable problems for Republicans, Democrats, and third-parties (such as the Libertarian Party, Constitution Party, and Communist Party), especially in counties or election districts where they are significantly outnumbered by the other party, even without the overlay of COVID-19's impact on poll watcher recruitment efforts.

The parties simply do not have enough registered voters in certain areas to send a poll watcher to observe elections at each polling location and are prevented from augmenting their numbers with poll watchers from another county.  This means the interests of all parties, Republican, Democrat, and third-party, will not be represented equally through election observance.  Critical oversight in some polling locations will be lost and pre-canvasses and/or canvasses will almost certainly go unobserved by one or more party.  And despite knowing residents of Pennsylvania could staff all desired locations, Plaintiffs are being deprived of their ability to do so—which effectively deprives them of the ability to ensure the integrity of the election process and the results from those locations—due to the unjustifiable county-based residency restrictions.  This is not equal treatment, especially for candidates who appear on the ballot in multiple counties.

Even if the parties did have enough in-county registered voters, there still will be unequal treatment because certain counties have testified that they will not allow poll watchers to participate in the pre-canvass and canvass of mail-in ballots.  Other counties, such as Delaware County, intend to deploy "mobile sites" where the polling location will change from "day-to-day." (App. Ex. 16, Hagan Dep. 26:19-27:8.)

Prompt action is needed.  Election Day is 32 days away and the clock is ticking.  Absentee and mail-in ballots have already been printed and sent out to voters and are being returned.  Poll watchers are being recruited and the locations where they are needed are being determined. Counties are preparing for the election – some are planning to use ballot drop boxes, some are not, some are planning to use mobile ballot collection efforts, some are not.  Among those counties using the boxes or mobile collection efforts, there is no uniform standard being applied.  Moreover, some counties have said they will follow the Secretary's guidance dispensing with the signature verification requirement of the Election Code, other counties have said they will ignore the guidance and follow the law.  This is shaping up to be multiple elections in 67 counties under many different Election Codes.   And the Secretary of the Commonwealth is fostering—if not championing—a divergent, incoherent, and inconsistent administration of the election process, all in hopes of defeating President Donald J. Trump.  Defendants' actions are untenable, indefensible, illegal, and unconstitutional.

To preserve the rights of millions of Pennsylvania registered voters, the constitutional rights of the Plaintiffs in this suit, and the integrity of this election, Plaintiffs seek three discrete remedies from this Court.  *First*, Plaintiffs seek a declaration that Defendant Boockvar's guidance memos dispensing with the signature verification of absentee and mail-in ballots are unconstitutional and ask this Court to enjoin enforcement thereof.   *Second*, Plaintiffs seek a declaration that drop boxes and/or mobile collection sites for the return of absentee and mail-in ballots should be staffed, secured, and employed consistently within and across all 67 of Pennsylvania's counties to prevent third-party delivery and the receipt of illegally cast ballots; use contrary thereto should be enjoined and any illegally cast ballots segregated and not counted. *Third*, Plaintiffs seek a declaration that the county residency restriction for watchers is

unconstitutional as applied to the upcoming General Election and an injunction preventing its application because of the burden on the Plaintiffs' constitutional rights will leave myriad locations unwatched and foster an environment ripe for voter fraud. Without the requested declaratory and injunctive relief, votes cast in the General Election in Pennsylvania will be illegal, unsecure, inaccurate, and indefensible and Pennsylvania voters will be treated unequally one from another. The undisputed facts show Plaintiffs are entitled to the requested relief as a matter of law.

STATEMENT OF FACTS

I.   **THE PARTIES INCLUDE QUALIFIED ELECTORS AND REPRESENTATIVES ENFORCING THEIR RIGHT TO HAVE THE ELECTION DECIDED ON FUNDAMENTAL PRINCIPLES OF FAIRNESS.**

   A.   **The Plaintiffs Are a Presidential Candidate's Campaign Committee, a National Political Party, Congressional Candidates, and Qualified Electors.**

Plaintiffs include national elected officials, political committees, and private citizens, each seeking to enforce their state and federal constitutional rights. The elected officials include the Trump Campaign, (Compl., ¶ 8),[2] together with Congressmen Glenn Thompson (*id.* at ¶ 9), Mike Kelly (*id.* at ¶ 10), John Joyce (*id.* at ¶ 11), and Guy Reschenthaler (*id.* at ¶ 12). Each of the Congressmen are United States Representatives for Congressional Districts in Pennsylvania (App. Ex. 4, Decl. of Glen Thompson, ¶ 4; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶ 4; App. Ex. 5, Decl. of George Joseph Kelly, Jr., ¶ 5; App. Ex. 7, Decl. of John Patrick Joyce, ¶ 4.) The political committees are Donald J. Trump for President, Inc., which is the principal campaign committee for President Donald J. Trump, and the Republican National Committee, which works to promote the Republican party and its candidates in elections on behalf of over 30 million registered Republicans in the United States. (*Id.* at ¶ 13.)

---

[2]   References to the Complaint are to the Verified Second Amended and Supplemental Complaint filed on September 23, 2020 at ECF Docket Number 461.

The private citizens are Ms. Melanie Patterson (*id.* at ¶ 14) and Mr. Clayton Show (*Id.* at ¶ 15).  Ms. Patterson and Mr. Show reside in Fayette County, Pennsylvania.  App. Ex. 3,  Aff. of Melanie Patterson ¶ 3.); (Compl. ¶¶ 14-15.)  Ms. Patterson has always voted in person and intends to vote in-person at the upcoming General Election.  (*Id.* at ¶ 4.)  She wants to engage in poll watching outside of her home district.  (*Id.* at ¶ 9.)  Ms. Patterson has continued to reside in her election district for more than one election cycles and is a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2601(t).  (*Id.* at ¶ 5.)  Ms. Patterson has been working for several months to recruit poll watchers on behalf of the Republican Party.  (*Id.* at ¶ 10.)

**B.      The Defendants Are the Secretary of the Commonwealth and all 67 County Boards of Elections.**

The Defendants include Kathy Boockvar, the current Pennsylvania Secretary of the Commonwealth, together with the County Board of Elections in each county in the Commonwealth.    (Compl., at ¶¶ 16-17); (App. Ex. 9, Boockvar Dep. at 11:22-12:3.) Ms. Boockvar served as acting Secretary of the Commonwealth from January 2019 until the Pennsylvania Senate confirmed her appointment to the position in November 2019.  (App. Ex. 9, Boockvar Dep. at 12:7-22.)  In that position, Secretary Boockvar heads the Department of State, which does not issue any election guidance document without Secretary Boockvar's knowledge and approval.  (*Id.* at 12:23-13:9.)

Although the Commonwealth's elections are governed by the Election Code, its elections are administered at the county level.  Pennsylvania has 67 counties and, as of the June 2, 2020 Primary, has 9,128 voting precincts.  (*See* App. Ex. 45,  Department of State, Official Statewide Returns for June 2, 2020, available at https://www.electionreturns.pa.gov/.)  Each of the counties has a County Board of Elections responsible for "exercising jurisdiction over the conduct of primaries and elections in such county."  25 P.S. § 2641(a).  The County Boards of Elections are

empowered to "make and issue such rules, regulations and instructions, **not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors**." 25 P.S. § 2642(f) (emphasis added).

## II. THE UNITED STATES CONSTITUTION AND PENNSYLVANIA CONSTITUTION GUARANTEE FREE AND FAIR ELECTIONS.

Both the Constitution of the United States and Pennsylvania's Constitution protect the right of qualified citizens to equal enjoyment in the right to vote. A state's authority to regulate elections flows from the Constitution of the United States to the states. *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing *Cook v. Gralike*, 531 U.S. 510, 522-23 (2001)); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995) (In statewide elections involving federal candidates, "a State's regulatory authority springs directly from the United States Constitution."). The Equal Protection Clause of the Fourteenth Amendment guarantees that "one person's vote must be counted equally with those of all other voters in a State[.]" *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). The Pennsylvania Constitution bestows the right to vote upon qualified citizens and guarantees them equal protection in the enjoyment of that right. *See* Pa Const. art. VII, § 1 & art. I, § 28.

The Elections Clause of the U.S. Constitution gives the power to state legislatures to determine "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl.1. In Pennsylvania, the legislature is the General Assembly. *See* Pa. Const. art. II, § 1. Nothing in either the U.S. or Pennsylvania Constitution grants the General Assembly the authority to delegate to an executive officer its power to set the time, place, and manner of holding elections for Congress and the President. *See generally* U.S. Const.; Pa. Const.

III.   **PENNSYLVANIA FAVORS IN-PERSON VOTING AND HAS ALWAYS HAD MANDATORY SAFEGUARDS FOR MAIL-IN BALLOTS.**

Before 1957, the Pennsylvania Constitution only allowed absentee voting by Pennsylvania residents engaged in actual military service (Art. 8, § 6 of the Pennsylvania constitution), and by bedridden or hospitalized veterans (Art 8 § 18 added to the Pennsylvania Constitution).  In 1957, the Pennsylvania Constitution was further amended to permit absentee voting for those "qualified electors who may . . . be absent from the municipality of their residence because their duties, occupation or business require them to be elsewhere" or who would not attend a polling place because of illness, physical disability, religious holiday, or election duties on behalf of the county. Pa. Const. art. VII, § 14.

The Pennsylvania General Assembly enacted the Election Code to govern and regulate "general, municipal and primary elections, the nomination of candidates . . . and election contests" in Pennsylvania.  25 P.S. § 2600. In 1960, the General Assembly amended the Election Code to implement the 1957 amendments to the Pennsylvania Constitution regarding absentee voting.  *See* The Act of January 8, 1960, entitled "An Act amending the Act of June 3, 1937," P.L. 2135, 25 P.S. §§ 3149.1-3149.9 (Supp. 1960).

The Election Code amendments allowing for absentee voting also included mandatory safeguards that a qualified elector had to follow to cast an absentee ballot, including the requirement that—unless the elector had a physical disability—the elector had to mark and send in his or her own ballot, foreclosing third-party deliveries of mail-in ballots.  *See In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.23d 1223, 1226 (Pa. 2004) ("the Election Code does not provide for third-party deliveries of absentee ballots . . ."); 25 P.S. § 3145(a) ("the elector shall, in secret, proceed to mark the [mail-in] ballot").  This requirement for an elector to cast his or her own vote in the absence of a disability or extraordinary circumstances has always

been the law in Pennsylvania.  Defendants agree the prohibition on ballot harvesting "is a long-time, well-established law in Pennsylvania."  (App. Ex. 9, Boockvar Dep. 88:20-89:15); *see also* (App. Ex. 10, Marks Dep. 70:1-3) ("If it is not the voter's own ballot, then yes, I would not instruct that individual to insert that in the mailbox.").

Pennsylvania courts have echoed the General Assembly's preference for in-person voting, finding that "in the casting of an absentee ballot, the ordinary safeguards of a confrontation of the voter by the election officials and watchers for the respective parties and candidates at the polling place are absent." *Canvass of Absentee Ballots on April 28, 1964 Primary Election*, 34 Pa. D. & C.2d 419, 420 (Pa. Com. Pl. Phila. 1964).  For this reason, vote-by-mail was consistently regarded as "an extraordinary procedure in which the safeguards of the ordinary election process are absent." *Id.*  Defendants concede that in-person voting "has more elements of a chain of custody" than voting by mail.  (App. Ex. 10, Marks Dep. at 42:5-18.)

## IV.  PENNSYLVANIA REFORMS ITS ELECTION LAW THROUGH ACT 77, BUT STILL REQUIRES SAFEGUARDS AGAINST VOTE DILUTION AND TO PROTECT THE EQUAL TREATMENT OF VOTERS.

Pennsylvania significantly expanded vote-by-mail[3] last year to implement "no excuse voting."  On October 31, 2019, the Pennsylvania General Assembly enacted Act 77, which expanded Pennsylvania's acceptance of ballots by mail.  Before Act 77, Pennsylvania law permitted only certain qualified absentee electors to vote by mail and required all other Pennsylvania voters to vote in-person.  25 P.S. § 3146.1.  Act 77 changed this by creating two categories of voters who are permitted to vote by means other than voting in-person at a polling

---

[3] Article VII, Section 14 of the Constitution of the Commonwealth of Pennsylvania makes a distinction between a "qualified mail-in elector" and a "qualified absentee elector."  *See* 25 P.S. § 2602(w) & (z.6). Following the passage of "no excuse" voting, however, the terms "mail-in" and "absentee" often are used interchangeably to discuss the use of the United States Postal Service to deliver ballots to and from electors.  For purposes of the remainder of this Memorandum, the terms "mail-in" and "absentee" are used interchangeably, unless otherwise noted.

location: absentee voters and mail-in voters. "Qualified absentee electors" include, among others, the traditional persons who would qualify for an absentee ballot under the 1957 amendments to the Pennsylvania Constitution—people who are unable to vote in person due to a physical disability or illness, people who expect to be absent from the municipality of their residence on Election Day due to work, and people who cannot vote in person because of observance of a religious holiday. 25 P.S. § 3146.1. Act 77 created a new category of "qualified mail-in electors," which included all other registered voters, who may apply to submit their ballots by mail-in voting, without providing a justification. This is referred to in Act 77 as "no-excuse voting." 25 P.S. §§ 3150.11–3150.12b.

Act 77 represented bipartisan reform. The Pennsylvania House of Representatives passed Act 77 on a bipartisan majority vote of 138-61, and the Act passed the Pennsylvania Senate on a bipartisan majority vote of 35-14. *See* Pennsylvania General Assembly, Senate Bill 421; Regular Session 2019-2020, https://www.legis.state.pa.us/cfdocs/billinfo/bill_history.cfm?syear= 2019&sind=0&body=S&type=B&bn=421.) Governor Wolf then signed Act 77 into law. (*Id.*)

Act 77's reforms were not made in a vacuum, however. Similar to earlier absentee voting, Act 77 included mandatory procedures and requirements for verifying mail-in ballots. Act 77 retains the requirement that "the [non-disabled] elector shall send [his or her ballot] by mail, postage, except where franked, or deliver it in person to [the] county board of elections" in order for the ballot to be properly cast under Act 77. *See* 25 P.S. §§ 3146.6(a) & 3150.16(a). In this way, Act 77 bars "ballot harvesting" because the qualified elector, him- or herself, must send in the ballots. *See also* 25 P.S. §§ 3146.6(a) & 3150.16(a); *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, *70 (Pa., Sept. 17, 2020). This prohibition on third-party voting is mandatory, and ballots cast illegally by non-disabled third parties are void. *See*

12

*Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1234 ("We hold that Section 3146.6(a)'s 'in person' delivery requirement is mandatory, and the absentee ballots . . . delivered in contravention of this mandatory provision are void.")

An elector who requests a mail-in ballot may only vote a provisional ballot at the polling place on Election Day, unless the elector remits the unvoted mail-in ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement under penalties of perjury that he or she has not voted the mail-in ballot. *See* 25 P.S. § 3150.16(b)(2) & (3). Act 77 expressly prohibits an elector from casting both a mail-in ballot and an in-person ballot, providing that "[a]ny elector who receives and votes a mail-in ballot . . . shall not be eligible to vote at a polling place on election day." 25 P.S. § 3150.16(b)(1).

Act 77 requires that all mail-in ballots have a completed verification on the external envelope that contains the inner secrecy envelope, which contains the ballot. 25 P.S. § 3150.14(a)-(b). If that certification, which includes a signature line for the voter, is not completed in full, the ballot is to be set aside and not counted. *See* 25 P.S. § 3146.8(g). Act 77 also provides that the sole method to verify a ballot has been submitted by the actual voter named on the external envelope is a comparison of the signature on the external envelope to the voter's permanent record on file. *See* 25 P.S. § 3146.8(g)(3). If the signature does not match, the voter is to be contacted and provided an opportunity to prove his or her identity. 25 P.S. § 3146.8(g)(5)-(7). If the county Board of Elections is "satisfied that the declaration is sufficient and the information contained in the 'Registered Absentee and Mail-In Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote," the ballot contained therein "shall be counted and included with the returns of the applicable election district[.]" 25 P.S. § 3146.8(g)(3) & g(4).

Mail-in ballots may be pre-canvassed beginning at 7 a.m. on Election Day, with the canvass beginning after polls close on Election Day. (Compl. ¶ 37, citing 25 P.S. § 3146.8(g)(1.1) & g(3)). It is at the pre-canvass or canvass where county Boards of Elections are required to undertake the aforementioned signature comparison. According to the Department of State, mailing envelopes containing the secrecy envelope and ballot can be opened and the secrecy envelope removed and separated from that outer envelope, which contains the signature. (App. Ex. 10, Marks Dep. Ex. 36 at 3.) Then, the Department of State allows for those secrecy envelopes to be opened and the ballots processed. *Id.* ("If the pre-canvass process is not complete prior to the time the polls close, the scanning process may continue until complete … ."). "The only distinction between a pre-canvass and a canvass meeting is that election results generated during a canvass meeting may be made public." *Id.* The Election Code permits poll watchers to be present whenever either (i) mail-in ballots are opened and (ii) when the ballots are counted and recorded. *See* 25 P.S. § 3146.8(b). Thus, poll watchers are permitted to attend both the pre-canvass and the canvass meetings to help ensure election integrity and to be able to challenge the signatures on any of the mail-in ballot envelopes before they are opened.

The 2020 Primary Elections proved to be the first significant test of Act 77. According to Secretary Boockvar, before the enactment of Act 77 in 2016, Pennsylvania "had a total of 84,000 absentee ballots statewide cast." (App. Ex. 9, Boockvar Dep. 189:4-16). In the 2020 Primary Election, the number ballooned to "nearly 1.5 million mail-in and absentee ballots." (*Id.* at 189:4-18.) Pennsylvania election officials knew that mail-in voting would expand following Act 77's passage. Before the Primary Election, Pennsylvania election officials estimated that as many as two million voters would apply to vote by mail. (App. Ex. 8, Marks Decl. ¶ 34.)

V.     **THE SECRETARY'S SEPTEMBER 11 GUIDANCE IS CONTRARY TO THE ELECTION CODE AND WILL RESULT IN BALLOT FRAUD, VOTE DILUTION, AND UNEQUAL TREATMENT OF PENNSYLVANIA VOTERS.**

The Pennsylvania Department of State issued a guidance document on September 11, 2020, entitled "GUIDANCE CONCERNING EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES." (App. Ex. 24.)  In the September 11 guidance, the Secretary states that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely upon signature analysis by the county board of elections." (*Id.* at 3.)  The Secretary does not explain how she arrived at that conclusion given the Election Code's requirement for signature verification of qualified electors.  Nor does the Secretary explain why an in-person voter can be challenged based solely upon his or her signature but a mail-in ballot voter cannot.  (*Compare* 25 P.S. §§ 3050-(a.3)(1)-(2)(2020); *with* App. Ex. 24, p.3.)

VI.    **THE SEPTEMBER 28, 2020 GUIDANCE LIKEWISE IS CONTRARY TO THE ELECTION CODE AND WILL RESULT IN BALLOT FRAUD, VOTE DILUTION, AND UNEQUAL TREATMENT OF PENNSYLVANIA VOTERS.**

The Department of State issued an additional deficient guidance related to the issue of signature verification on September 28, 2020 related to the issue of signature verification titled "GUIDANCE CONCERNING CIVILIAN ABSENTEE AND MAIL-IN BALLOT PROCEDURES." (App. Ex. 25.)[4]  This most recent guidance provides additional information

---

[4] Judicial notice of the Secretary's September 28, 2020 guidance memo is appropriate. *See Miller v. City of Bradford*, No. 17-268 Erie, 2019 U.S. Dist. LEXIS 134248, at *7 n.4 (W.D. Pa. Aug. 9, 2019) ("The Court takes judicial notice of these provisions, as they constitute matters of public record."). With her issuance of the September 28 guidance memo, the Secretary did remedy one claim that Plaintiffs and this Court identified as claims remaining after the Pennsylvania Supreme Court's decision. Specifically, Plaintiffs still were pursuing a claim related to the Secretary's guidance memo requiring mail-in voters to vote only by provisional ballot, even if they were to spoil their ballot at the polling location. *See, e.g.*, ECF # 459, p.3, #11. But, in the September 28 guidance memo, the Secretary corrected that earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs

about the acceptance and scrutiny of mail-in and absentee ballots for the upcoming General Election and not only fails to remedy but doubles down on the illegal September 11 guidance forbidding signature verification as a reason to set aside both mail-in ballots and ballot applications as well.  In this September 28 guidance memo, the Secretary proclaims that "[t]he Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis."  (*Id.*, at p. 9.)  She then goes even further and pronounces that "[n]o challenges may be made to mail-in and absentee ballots at any time based on signature analysis."  (*Id.*)

As to ballot applications, the Election Code requires that a person applying for both an absentee and a mail-in ballot complete a form with various information and sign the application. *See* 25 P.S. § 3146.2(a)-(c); 25 P.S. § 3146.2(d) (the absentee ballot application "shall be signed by the applicant"); 25 P.S. § 3150.12(b); 25 P.S. § 3146.2(d) (except has not relevant here, "the application [for a mail-in ballot] shall be signed by the applicant.").  Other than the signature requirement, there is no other proof of identification required to be submitted with the ballot applications.  *See generally* 25 P.S. § 3146.2; 25 P.S. § 3150.12. When those ballots are being reviewed for approval, the board of elections is required to both (i) compare the information provided on the application with the information contained on the voter's permanent card and (ii) verify the proof of identification.  *See* 25 P.S. § 3146.2b(c); 25 P.S. § 3150.12b(a).  The board of elections, then, is required to engage in signature verification as the only means available to it to verify the identity of the voter.  *See* (App. Ex. 19, Riddlemoser Rep. at pp. 10-15) (outlining importance of signature verification process in Pennsylvania).

---

a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot.  *See* (App. Ex. 25, §§ 4.3, 5.1.)  Therefore, Plaintiffs agree to withdraw that claim from those that still are being pursued.

As to signature analysis of the returned ballots, except for first-time voters, the ***only*** basis under the Election Code for the identification of any voter, whether voting in-person or by absentee or mail-ballot, is an analysis of the voter's signature.  Before one can cast a regular ballot at a polling place on Election Day, that voter is subject to the following signature comparison and challenge process:

> (1)   All electors, including any elector that shows proof of identification pursuant to subsection (a), shall subsequently sign a voter's certificate in blue, black or blue-black ink with a fountain pen or ball point pen, and, unless he is a State or Federal employe [*sic*] who has registered under any registration act without declaring his residence by street and number, he shall insert his address therein, and hand the same to the election officer in charge of the district register.
>
> (2) Such election officer shall thereupon announce the elector's name so that it may be heard by all members of the election board and by all watchers present in the polling place and **shall compare the elector's signature on his voter's certificate with his signature in the district register**. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That **if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to make the affidavit and produce the evidence as provided in subsection (d) of this section**.

25 P.S. § 3050(a.3)(1) – (2)(2020) (emphasis added). Mail-in voters face this same requirement under the Election Code.  Pursuant to Section 1308(g)(3)-(7):

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots…, the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and **shall compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable. If the county board has verified the proof of**

> **identification as required under this act** and is satisfied that the
> declaration is sufficient and the information contained in the
> 'Registered Absentee and Mail-in Voters File,' the absentee voters'
> list and/or the 'Military Veterans and Emergency Civilians Absentee
> Voters File' verifies his right to vote, the county board shall provide
> a list of the names of electors whose absentee ballots or mail-in
> ballots are to be pre-canvassed or canvassed.

25 P.S. § 3146.8(g)(3) (emphasis added).  Only those ballots "that have been verified under paragraph (3) shall be counted . . ." 25 P.S. § 3146.8(g)(4).  If a ballot is not counted because of a lack of a genuine signature, it is considered "challenged" and subject to the notice and hearing provisions under Section 1308(g)(5)-(7).  25 P.S. § 3146.8(g)(5)-(7).

Therefore, any county Board of Elections who follows the Secretary's September 28 guidance memo by ignoring the signature comparison on voter applications will violate the Election Code, treat in-person applicants differently than applicants who apply by mail, and will open the door to voter fraud.[5]  And any county Board of Elections who follows the Secretary's September 10 and 28 guidance memos by ignoring the signature comparison on returned ballots will violate the Election Code and treat in-person voters such as Plaintiff Patterson differently based solely upon the manner in which they choose to exercise their franchise.

---

[5]   This would not be the first time the Secretary has issued an election guidance memo that was contrary to the dictates of the Election Code, opened the door to fraud, and was not followed by all counties.  Prior to the Primary Election, the Secretary issued a guidance memo telling counties that they were to count, and not treat as void, mail-in ballots that were returned without an inner secrecy envelope.  (App. Ex 54, Marks Email to Counties; App. Ex. 10, Marks Dep. 231:1-5.)  Recently, the Pennsylvania Supreme Court determined that any mail-in ballots returned without the inner secrecy envelope were invalid ballots and should not be counted. *Pa. Democratic Party v. Boockvar*, 2020 Pa. LEXIS 4872, *73-74.  Fortunately, during the Primary Election, the Lawrence County Board of Elections declined to follow the Secretary's guidance on that issue and refused to count 400+ mail-in ballots that were returned without their inner secrecy envelope. (App. Ex. 9, Boockvar Dep. 141:22-142:6.)  Of the 17,862 ballots cast in Lawrence County during the primary, 8,003 were mail-in ballots.  (App. Ex. 53, Act 35 Report at 10–11; App. Ex. 9, Boockvar Dep. 227:23–228:10.)  The fact that 5.5% of mail-in ballots lacked an inner secrecy envelope raises the suspicion of voter fraud on a massive scale – fraud that would have been ignored had the Secretary's guidance memo been followed.

The Secretary's guidance also will result in the different treatment of voter applicants and mail-in voters across the Commonwealth as not all counties will be following the September 11 and 28 guidance memos.  (App. Ex. 1, Summary of County Interrogatory Responses.)  Therefore, those voters who apply by mail and those mail-in voters in certain counties will be given preferential treatment not only over in-person applicants and voters throughout the Commonwealth but other mail-in applicants and voters in other counties.  For example, numerous counties have responded to discovery in this case saying they **will follow** the Secretary's September 11 and 28 guidance memos and not engage in signature verification.  (*Id.*)  But, many counties have responded that they **will not follow** the Secretary's September 10 and 28 guidance memos, opting instead to follow the Election Code's signature verification requirement.  (*Id.*)  For example, in District 16, Representative Kelly's district, Bedford County has responded that it will follow the Secretary's guidance memos; Franklin County has responded that it will not; and Blair County has responded that it is still evaluating whether to follow the guidance.  (*Id.*)

When asked in a deposition why she issued the September guidance memos, the Secretary replied "Well, you've sued us and -- or I should say, your client sued us, and it raised this issue, as you may recall, and asked permission to file an amended complaint." (App. Ex. 12, Boockvar 30(b)(6) Depo. 106:1-4.)  Plainly, the Secretary's issuance of the September 10 and 28 guidance memos, which are contrary to the Election Code are not based on a compelling state interest and, will result in the violation of Plaintiffs' equal protection rights.

## VII.   DEFENDANTS' UNCONSTITUTIONAL JANUARY 10, 2020 GUIDANCE ON BALLOT DROP BOXES RESULTS IN ILLEGAL BALLOT COLLECTION AND COUNTING DURING THE PRIMARY ELECTION.

In advance of the 2020 Primary Election, on or about January 10, 2020, the Pennsylvania Department of State published and disseminated to every County Election Board an official guidance document entitled "Pennsylvania Applications and Balloting Guidance:   Mail-in

Absentee Ballots and Voter Registration Changes." (App. Ex. 9, Boockvar Dep. 154:1-18; App. Ex. 21, Boockvar Dep. Ex. 14, January 10, 2020 Pennsylvania Applications and Balloting Guidance: Mail-in and Absentee Ballots and Voter Registration Changes.) The January 10 guidance purported to "define both what is required by Act 77 and what is permissible under Act 77 or some other portions of the Election Code." (App. Ex. 14 at 2.)

The January 10 guidance suggested, for the first time, the use of drop boxes or other collection locations for collecting mail-in ballots. (App. Ex. 9, Boockvar Dep. 183:16-184:2.) Under the headings "Optional County Services" and "Collection of Mail-In and Absentee Ballots," the January 10 guidance stated that "[a]s allowed under existing law, county election boards may provide for mail-in and absentee application processing and balloting at more than one [county elections office (CEO)] located within county borders." (App. Ex. 21, January 10 Guidance at 4.) The January 10 guidance also advised that "[w]hen choosing a location for the CEO, counties should consider, at a minimum, . . . choos[ing] locations that serve heavily populated urban/suburban areas, as well as rural areas, [including] near heavy traffic areas such as commercial corridors, large residential areas, major employers, and public transportation routes." (*Id.* at 4–5.)

But nothing in the January 10 guidance indicated counties needed to make certain to prohibit third-party delivery of mail in ballots from someone other than a non-disabled qualified elector. (App. Ex. 9, Boockvar Dep. 189:4-13.) And although the guidance notes the importance of the County Election Boards to follow undefined "best practices" concerning the use of a "secure ballot collection receptacle," it did not provide any explanation for what would qualify as those best practices. (App. Ex. 21, January 10 Guidance at 5.) Instead, it directed County Election

Boards to "contact the Department for guidance on factors, best practices, and examples of these receptacles." (*Id.* at 6.)

Some, but not all, counties did contact the Department of State regarding best practices for drop boxes. Ms. Christine Ruther of Delaware County notes the Department of State informed her there were a list of "conditions" to the placement of drop boxes, including "the boxes had to be locked and under supervision at all times, this means they have to be at the polling places under the eyes of the Election Board." (App. Ex. 27, May 18, 2020 Email from M. William.) But this list of conditions appears nowhere in the January 10 guidance (or any other guidance, to-date, issued by the Pennsylvania Department of State; nor was it produced in this litigation) and there is no evidence suggesting that these "conditions" were provided to all 67 County Boards of Elections.

Communications between counties and the state following the January 10 guidance confirm that the guidance was confusing. In one April 9 email exchange in Bedford County, the representative notes "I don't have any information on Drop Boxes that are used for ballots. I have never heard of anything like that before." (App. Ex. 26, April 9 Emails Between Adam Yake and Debra Brown.) The recipient agreed, noting they were "just not sure if it is feasible or if we are setting ourselves up for lots of problems." (*Id.*)

Defendant Boockvar made no efforts to ensure that all 67 of Pennsylvania's counties actually followed the January 10 guidance. Nor did she work to ensure that those counties that did follow the guidance did so consistently. Instead of helping to ensure voter integrity, as explained by Mr. Greg S. Riddlemoser, the Director of Elections and General Registrar in Stafford County, Virginia, changes like the ones made by Secretary Boockvar "invite lack of uniformity, sow confusion, and erode voter confidence." (App. Ex. 19, Riddlemoser Rep. at p. 6.)

On June 2, 2020, Pennsylvania held its Primary Election, which was the first election that followed the enactment of Act 77 and its no-excuse mail-in ballot alternative. Secretary Boockvar's January Guidance resulted in actual harm to election process on several levels.

First, only certain counties followed the guidance and employed drop boxes. Mr. Johnathan Marks, Deputy Secretary for Elections and Commissions at the Pennsylvania Department of State, testified that approximately twenty County Election Boards followed the January 10 guidelines to use drop boxes. (App. Ex. 10, Marks Dep. 210:11-18; App. Ex. 29, Marks Dep. Ex. 31.) Deputy Secretary Marks confirmed that the January 10 guidance resulted in different interpretations among the counties concerning the use of drop boxes. (App. Ex. 10, Marks Dep. 184:2-7) ("Yes. That is my understanding that different counties had different interpretations of that."). Yet, the Secretary did nothing to prevent the unequal distribution of ballot drop boxes within or among the various counties and allowed voters to return mail-in ballots to unstaffed, unmonitored, and unsecured locations, such as shopping centers (App. Ex. 10, Marks Dep. 206:20-25; App. Ex. 29), parking lots (App. Ex. 10, Marks Dep. 201:24-202:25; App. Ex. 29), fairgrounds, parks (App. Ex. 10, Marks Dep. 205:21-24), retirement homes, college campuses (App. Ex. 29), fire halls (App. Ex. 10, Marks Dep. 205:17-19, App. Ex. 29), municipal government buildings (App. Ex. 10, Marks Dep. 203:23-205:6; App. Ex. 29), and elected officials' offices (App. Ex. 10, Marks Dep. 208:18-20; App. Ex. 31). The drop boxes were accessible during differing and irregular times, and some were accessible "24/7." (App. Ex. 31.)[6]

---

[6]    In addition to the unstaffed and unsecured nature of the drop boxes, the placement of many of them also likely was illegal. Deputy Secretary Marks confirmed his understanding that elected officials' offices could not serve as a polling place. (App. Ex. 10, Marks Dep. 208:21-209:8.) Secretary Boockvar likewise disapproved of this approach to drop box placement: "I would prefer not to have drop boxes in elected officials' facilities or union halls, preferably, that is my opinion." (App. Ex. 9, Boockvar Dep. 204:20-25.)

These were not the only issues with Defendants' implementation of mail-in voting during the 2020 Primary Election. The use of unmonitored and unsecured drop boxes led to incidences of illegal voting, specifically ballot harvesting.[7] (*See, e.g.* App. Ex. 19; Ex. D to Mr. Riddlemoser's Expert Report (containing copies of photographs and video stills demonstrating ballot harvesting in Philadelphia and Elk Counties during the Primary); App. Ex. 28, Email from Lee Soltysiak ("Security was instructed before the boxes were in use on Saturday to instruct voters they can only drop off their own ballot. They have turned people away yesterday and today without incident who had ballots other than their own.").)

In sum, the January 10 guidance did not provide equal treatment for mail-in voters during Pennsylvania's 2020 Primary Election. Deputy Secretary Marks conceded that there were "learned lessons from the primary," they received "concerns expressed . . . by county elected directors" and the Department of State would be "updating our guidance accordingly." (App. Ex. 10, Marks Dep. 188:6-22.)

## VIII. THE SECRETARY'S AUGUST 19 GUIDANCE DOES NOT RESOLVE THE CONSTITUTIONAL VIOLATIONS CREATED BY THE UNSTAFFED AND UNSECURED DROP BOXES.

The Pennsylvania Department of State published its promised updated guidance on August 19, 2020. (App. Ex. 23, August 19, 2020, Pennsylvania Absentee and Mail-in Ballot Return Guidance.) In the interim, though, the Elections Reform Committee of the County Commissioners

---

[7]     Discovery revealed that ballot harvesting occurred in other respects during the Primary Election as well. For example, in Mercer County, a care home administrator delivered nine ballots on Election Day because the electors "had failed to timely mail the ballots." (App. Ex. 53, Act 35 Report. at 39.) Additionally, "[t]here were several, at least one or two counties who said that they realized some of their staff had wrongly accepted ballots from spouses of voters." (App. Ex. 9, Boockvar Dep. 92:4-10.) Additionally, Montour County confirmed in its discovery responses that it "allowed a nursing home representative to both pick up applications and deliver voted ballots." (App. Ex. 10, Marks Dep. 60:3-61:10; App. Ex. 49, Excerpt of Responses by Montour County.) Montour County also allowed spouses to cast mail-in and/or absentee votes, contrary to the provisions of the Election Code. (*Id.*)

Association of Pennsylvania held a virtual meeting, in which various concerns were raised

regarding the security of ballot drop boxes, including how to locate and secure those drop boxes.

(App. Ex. 10, Marks Dep. 186:9-188:5; App. Ex. 55, Marks Dep. Ex. 28.)  During that July 14,

2020, meeting, Forrest Lehman, the Director of Elections for Lycoming County, raised specific

concerns regarding the lack of security at ballot drop boxes.

> How is a county to [*sic*] supposed to keep a drop box secure but also
> accessible by voters?  A ballot drop box could be a target for
> political sabotage or mean-spirited vandalism.  What if someone
> pours water into a drop box and ruins the ballots inside?  Bodily
> fluids?  Gasoline and a lit match?  Hardly matters if the box is
> monitored by a camera – even if you catch the crime on tape and
> prosecute the perpetrator, those ballots are gone.  What about the
> problem of where to locate them, geographical/political/racial
> representation, urban vs. rural, etc.

(App. Ex. 55, Marks Dep. Ex. 28; App. Ex. 10, Marks Dep. 181:6-21; App. Ex. 19, Riddlemoser

Report.)  The August 19 guidance purports to answer the last question raised by Mr. Lehman but

punts on the issue of ballot security.

On the issue of security, the August 19 guidance, entitled "Absentee and Mail-In Ballot

Return Guidance," provides a few considerations but fails to require the ballot drop boxes to be

staffed.[8]  Instead, the August 19 Guidance states that "[w]hen feasible, ballot return sites should

be monitored by a video security surveillance system or an internal camera that can capture digital

images and/or video."  (App. Ex. 23, August 19 Guidance at 6.)  But the guidance provides no

alternatives or guidance for when such video surveillance is not "feasible" at the drop box location.

(*Id.*)  And the guidance recognizes that Mr. Lehman's concern about water or other liquid is a valid

---

[8]    This failure is even more perplexing given the Secretary's "conditions" before the 2020
Primary Election that the boxes be "under supervision," that is "under the eyes of" election
watchers at all times.  (App. Ex. 27, May 18, 2020 Email from M. William.)

concern when it states the boxes should be designed to "minimize the ability for liquid to be poured into the drop-box." (*Id.* at 5.) Yet the guidance does not mandate that the box be staffed, which would prevent, not simply minimize, the ability for liquid to be poured into the box.[9]

Another benefit of having staffed drop boxes, which the August 19 guidance ignores, is the deterrent to ballot harvesting. As succinctly put by Ms. Kimberly Frey, the Elk County Director of Elections, without having a staffed drop box, there is no way to determine if a qualified elector delivers only his or her own ballot to the drop box:

> **Q: What would your county election workers do if it is determined a ballot was improperly delivered by a third-party?**
> **A:** I don't know how we would know that.
> **Q: So would you agree with me there is no way to prevent that with this drop box?**
> **A:** That's correct.

(App. Ex. 11, Frey Dep. 24:12-18; *see also* Riddlemoser Report App. Ex. 19.) Similarly, Philadelphia County's Rule 30(b)(6) deponent Seth Bluestein, when asked if there "a way to prevent commingling of those illegal ballots with actually legally dropped ballots," responded "[o]nce the egg is cracked, it can't be unscrambled." (App. Ex. 13, Bluestein Dep. 50:1-7.) Deputy Secretary Marks agreed that despite signage advising against it, "there is nothing that physically prevents someone from dropping off more than one" ballot. (App. Ex. 10, Marks Dep. 164:14-19.)

---

[9]      Defendants likely will attempt to discredit these concerns by arguing that no such ballot box destruction has occurred in the past. But, Pennsylvania has used these in only limited situations one time before. And, there is a first time for everything. Before July 20, 1969, no one had walked on the moon. Before the Primary Election earlier this year, Pennsylvania did not have no-excuse mail-in balloting. Before January 28, 1986, no space shuttle had ever exploded. And the Department of State must believe ballot destruction is possible as it specifically has recommended that the boxes be designed to "minimize" the ability to pour liquids into them. And waiting for the first time to happen means disenfranchising all of the voters whose ballots were in the damaged, vandalized, or stolen box.

Moreover, Defendant's experts acknowledge that the majority of drop boxes in Pennsylvania will be unstaffed and lack even video surveillance, despite simultaneously highlighting that the majority of states that use drop-boxes require at least one of the two methods for security reasons. *See* Defendant's Expert Report of Robert M. Stein, Ph.D., 19, No. 2:20-CV-966; Defendant's Expert Report of Paul Gronke, Ph.D., No. 2:20-CV-966, 15. Defendant's experts' justification for lacking such security is that "manning in-person polling locations is a significant cost of conducting elections . . . " but they conveniently avoid discussing the costs of placing a video camera in front of a drop-box. Stein, 9 ("[i]n Oregon, New Mexico and Colorado, drop boxes must be monitored by an election official or video surveillance. Drop boxes in Montana must be staffed with election officials . . .."). Relying on an excuse of the alleged burden of employee costs, the Secretary of State has unconstitutionally decided election security is unimportant.

As to the issue of location, the August 19 guidance devotes just one-half page to the question of where to locate ballot drop boxes. (App. Ex. 23, August 19 Guidance at 3.) But the sum and substance of that advice/guidance is a list of 11 bullet-point items a county "should consider" in determining where to locate the ballot drop boxes. (*Id.*) Yet there is no direction that counties must consider any of those items, direct that a county ensure consistency in its selection criteria within a particular county, or encourage or require consistency among the counties. (*Id.*) And despite her testimony that she "would prefer not to have drop boxes in elected officials' facilities or union halls," Defendant Boockvar's August 19 Guidance does not state as much. (App. Ex. 9, Boockvar Dep. 204:20-25; App. Ex. 23, Boockvar Dep. Ex. 17, August 19 Guidance.) In fact, the August 19 guidance appears to do the exact opposite, encouraging counties to consider

"city and municipal facilities [and] county facilities" as locations for the drop boxes.  (App. Ex. 23, August 19 Guidance at 3.)

Nor does the guidance require that voters have equal access to drop box locations, leaving this determination up to each county.  (App. Ex. 9, Boockvar Dep. 201:6-203:18.)[10]  As a result, Pennsylvania's counties have announced that they will have different numbers of drop boxes.  For example, York County will only have one drop box that will be available at the York County Administrative Center and offers different times of availability during the week and weekends, but is under video surveillance.  (App. Ex. 37, https://yorkcountypa.gov/voting-elections/mail-in-voting-faq.html ("the only secured drop-box is in the lobby of the Elections Department.").) Adams County has indicated it will use a single drop box in front of its Courthouse.  (App. Ex. 48, Adams Cty. Resp. To Interrogatory #5 ("Adams County Board of Elections will use a single secure 'drop box' inside the lobby of the Adams County Courthouse.").)  Elk County will also have one drop box.  (App. Ex. 11, Frey Dep. 18:6-8) ("Q:  So you will only have that one drop box for the general election?  A:  That's correct.")

Delaware County indicated it will have 50 drop boxes throughout the county.  (*See* App. Ex. 38, http://www.delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html (last accessed September 4, 2020); *see also*, App. Ex. 35. 1/17/20 Email message from K. Lehman (bate-stamped as PADOS000609.000001-5); App. Ex. 16, Hagan Dep. 28:11-25.)  Whereas, Montgomery County announced it will have 11 drop boxes at unsecured locations, including a

---

[10]    While the August 19 guidance encouraged counties to submit a plan to the Department of State 45 days or more before the General Election, it does not *require* counties to submit this plan, and a county's failure to submit a plan would not preclude it from using drop boxes.  (App. Ex. 9, Boockvar 197:23-200:10; Ex. 23, August 19 Guidance.)  Based on Plaintiffs' review of the discovery responses in this case, no such plans were produced by any of the Defendants, despite being responsive to discovery requests.

public park and parking lots, and one location that is "To Be Determined."   (App. Ex. 39, https://www.montcopa.org/Faq.aspx?TID=40.; App. Ex. 14, Soltysiak Dep. 21:21-24.)  Lehigh County will have five drop boxes available for use "during normal municipal business hour[s]." (App. Ex. 40,  https://www.lehighcounty.org/Portals/0/PDF/PublicInformation/Lettered_County %20Drop%20Boxes%20Announcement%20%20Press%20Release_table.pdf?ver=2020-09-24- 144953-347).  Some counties, like Delaware County, have announced the intention to implement "mobile voting locations" wherein a "voting mobile service center" will be used to collect ballots. *See* (App. Ex. 41, https://delcopa.gov/elections/mobilevsa.html), 9/27/20, 12:03pm; App. Ex. 16, Hagan Dep. 26:7-27:8.)

Other counties, like Allegheny County, indicated it will not use any unstaffed drop boxes, instead providing eight manned and secure return ballot locations. (*See* App. Ex. 58, https://www.alleghenycounty.us/elections/frequently-asked-questions.aspx; App. Ex. 17, Voye Dep. 23:24-25:25.)  Some counties, like Philadelphia County, as of September 29, 2020, are not yet decided on whether it will use drop boxes, whether those drop boxes would be manned and secure, or generally how it would use drop boxes.  (App. Ex. 13, Bluestein Dep. 37:2-53:3.)

Still other counties, like Cambria, Monroe, Wyoming, and Lawrence will have no drop boxes at all.  *See, e.g.,* (App. Ex. 42, https://www.cambriacountypa.gov/election-and-voter- registration.aspx, accessed 9/25/2020, 1:22am) ("CAMBRIA COUNTY WILL NOT HAVE DROP OFF BOXES") (emphasis in original.); App. Ex. 43, Monroe County Mail-In and Absentee Ballot  Information  available  from  http://www.monroecountypa.gov/Dept/Voter/Documents/ MailInAbsenteeInformation.pdf, accessed 9/27/2020, 9:45am ("5.  Will Drop Boxes be used?  a. NO"); (App. Ex. 50, Wyoming Cty. Resp. To Interrogatory #5) ("Wyoming County will NOT

utilize drop boxes or drop off locations other than the County Office."); App. Ex. 15, Allison Dep. 24:21-25.)

As Mr. Riddlemoser notes, the counties have no guidance if they should install the same number of drop boxes as other counties or where they should be placed; should they place drop boxes in more heavily Democrat or Republican areas. (App. Ex. 19, Riddlemoser Rep. at p. 13.) Mr. Riddlemoser concludes that the "Secretary's August 19, 2020, guidance offers no concrete answer to these questions or a myriad of others." (App. Ex. 19, Riddlemoser Rep. at p. 18.) That failure by Defendant Boockvar could be disastrous for the process and results given that "upwards of three million" mail-in votes are expected to be cast in Pennsylvania during the General Election, twice as many as in the primary election. (App. Ex. 10, Marks Dep. 268:20–269:5.)

## IX. POLL WATCHERS SERVE AS A CRUCIAL CROSS-CHECK ON ELECTION ADMINISTRATION.

In addition to observing the pre-canvass and canvass events, poll watchers, such as Plaintiff Ms. Patterson, serve a crucial role in the administration of elections. *See* 25 P.S. § 2687 (creating the position of poll watcher and giving every candidate from every political party the power to appoint poll watchers to serve in each election district in the Commonwealth). The Election Code also dictates the quality and manner of poll watcher appointments. *See* 25 P.S. § 2687. Without providing any statutory justification for it, the Election Code also limits a poll watcher to watching only those polls, pre-canvass, or canvass of the county in which he or she resides. *See id.*[11] The poll watcher may accept only a maximum of $120 for his or her service. *Id.*

---

[11] The poll watcher residency requirement creates an arbitrary distinction between representative – which can challenge at pre-canvassing and canvassing but need not be a county resident – and actual poll watchers. *Compare* 25 P.S. § 2687; 25 P.S. § 3146.8(g)(1.1). The poll watcher residency requirement also deters open elections. (App. Ex. 4, Thompson Decl., ¶ 21.) If anything, allowing nonresident to be poll watchers encourages free and fair elections. For example, in a small community, knowing the personal identity of the poll watcher could influence the vote. (*Id.* at 103:18-104:18.)

Poll watchers may observe the election from the time the first polling place official appears in the morning to open the polling until the time the polls are closed and the election returns are counted and posted at the polling place entrance.  *See* 25 P.S. § 2687(b).  Poll watchers may raise objections to "challenge any person making application to vote." 25 P.S. § 2650(a) & (c).  Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status.  *See* 25 P.S. § 3050(d) ("any person . . . may be challenged by any qualified elector, election officer, overseer, or *watcher* at any primary or election as to his identity, as to his continued residence in the election district or as to any alleged violation of the provisions of section 1210 of this act, . . .") (emphasis added.)  The only way to ensure or challenge the "identity" of a mail-in voter is by use of the signature comparison process.

## X.   THE COUNTY RESIDENCY RESTRICTION ON POLL WATCHERS WILL RESULT IN UNEQUAL ELECTION OBSERVANCE AND DIFFERENT "RULES" FOR VOTERS.

As noted above, poll watchers serve an important function in ensuring the transparency, defensibility, and integrity of the election process.  (App. Ex. 19, Riddlemoser Rep. at pp. 6 & 19; App. Ex. 20, Lockerbie Rep. at ¶ 14.)  Despite the important function of poll watchers, the Election Code restricts poll watchers to observing "polling place" only within the county of their residence. 25 P.S. § 2687.  This restriction will hamper poll watching during the 2020 General Election, which will reduce the integrity and voter confidence in the process and the outcomes from that election.  (App. Ex. 19, Riddlemoser Rep. at pp. 6 & 19; App. Ex. 20, Lockerbie Rep. at ¶ 17.)

It is important to note that in Pennsylvania, all but three Congressional electoral districts contain portions of multiple counties (District 2 and 3 lie solely in Philadelphia County and District 18 lies solely in Allegheny County), and President Trump will appear on every ballot that will be cast in the General Election.  (*See* App. Ex. 47, 2018 Remedial Congressional Districts by County, https://www.dos.pa.gov/VotingElections/CandidatesCommittees/RunningforOffice/Pages/2018-

Remedial-Congressional-Districts.aspx.)   But according to statistics collected and disseminated by the Pennsylvania Department of State, there is a significant gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties.  (*See* App. Ex. 34, 2019 Voter Registration Statistics – Official," Pa. Dept. of State (Nov. 5, 2019) (available at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/2019%20Election%20VR%20Stats%20%20final.pdf.)   For example, Philadelphia County divides its 66 voting wards into 1,686 divisions.  (App. Ex. 44, *See* Political Maps, Office of the Phila. City Commissioners (2020) (available at https://www.philadelphiavotes.com/en/resources-a-data/political-maps).)   Republicans do not comprise a majority of voters in any ward in Philadelphia County.  (*See* App. Ex. 46, Department Reports and Data, "Historical Citywide Voter Registration Data," Office of Phila. City Commissioners (1940-2019) (available at https://files7.philadelphiavotes.com/department-reports/Historical_Registration_1940-2019G.pdf#_ga=2.50450285.594957769.1601506841-1102870046.1601506841).)   Accordingly, Republicans face a disadvantage in Philadelphia County in recruiting qualified poll watchers.  But Democrats face a similar hurdle in other counties in the Commonwealth.  For example, Republicans account for almost 70% of the voters in Fulton, Franklin, Bedford, Huntingdon, and Perry Counties, thereby placing Democrats in a similar disadvantage in recruiting poll watchers in those counties.  (*See* App. Ex. 34, 2019 Voter Registration Statistics – Official," Pa. Dept. of State (Nov.                5,                2019)                 (available                at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/2019%20Election%20VR%20Stats%20%20final.pdf).)

Recruiting qualified poll watchers is difficult on a good day.  (App. Ex. 19, Riddlemoser Rep. p. 7.)  As election expert and political scientist Professor Brad Lockerbie explains, in order

to become a certified poll worker, a candidate "must meet numerous criteria." (App. Ex. 20, Lockerbie Rep. at ¶ 10.) For example, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law[.]" (*Id.*) And a poll watcher must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours. (*Id.*; *see also* App. Ex. 3, Patterson Aff. at ¶ 10; ("others have told me that they would like to poll watch but cannot commit to spend 14+ hours to poll watch on Election Day.")) As Ms. Patterson explains, the long day often necessitates poll watchers taking shifts, which, as Ms. Patterson testifies, means a party or candidate would need "at least 3 people to cover each precinct on Election Day[.]" (*Id.*)

These criteria alone limit the number of persons who will qualify as a poll watcher, but "Pennsylvania's requirement that poll watchers be a resident of the relevant county greatly limits further the pool of potential candidates for this position." (App. Ex. 20, Lockerbie Rep., ¶ 12.) This is especially true in heavily Democrat and heavily Republican areas, where "it is not at all clear" that the minority party would be able to identify sufficient candidates to qualify as poll watchers from the residents of that county. (*Id.* at ¶ 15.)

Even if the Democrat and Republican parties could rely on their minority number of registrants in heavily partisan counties, the county residency requirement all but forecloses poll watcher participation from third-parties. As Professor Lockerbie explains, even if one were to assume that *all* third-party voters were members of the same minor party, which of course they are not, then in Philadelphia County, it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct. (*Id.* at ¶ 16.)

But the application of the county residency requirement is uniquely problematic in the 2020 General Election. As Professor Lockerbie explains, the 2020 General Election is unique because

of the unprecedented restrictions on public gatherings resulting from COVID-19. These restrictions have "magnified" the difficulties in securing poll watchers. (*Id.* at ¶ 11.) According to Professor Lockerbie, based upon the data that he reviewed, "the quality and quantity of poll watchers subject to the residency requirements will lead to inconsistent appearance of such individuals." (*Id.* at ¶ 17.) But "[i]n contrast, relief from the residency requirement will ameliorate these obvious problems." (*Id.* at ¶ 18.)

Further complicating the situation, Pennsylvania law does not even speak to the ability of poll watchers to be present at locations used to collect mail-in and absentee ballots to ensure that no third-party delivery or other ballot harvesting occurred. Instead, any person in Pennsylvania, including a non-resident of Pennsylvania, can serve as a "representative" and attend the pre-canvass and canvass activities related to absentee and mail in ballots. 25 P.S. § 3146(g)(1.1) & (2); (App. Ex. 20, Lockerbie Rep. at ¶ 19.) But representatives are not poll watchers. (App. Ex. 9, Boockvar Dep. 238:17-19.) And the Department of State takes the position that the county residency restriction in the Election Code would bar a poll watcher from traveling between counties to watch the pre-canvass of mail in ballots. (*Id.* at 239:4-8.)

The need for and strain on the resources of poll watchers is even greater now that myriad counties have stated they will be using (and are using) drop boxes to collect mail-in ballots. Moreover, the expected surge in mail-in ballots during the General Election means there will be more mail-in ballots to be pre-canvassed and canvassed, which will require more poll watchers. Especially in light of the COVID-19 impacts and fears, as Professor Lockerbie's Report and Ms. Patterson's testimony demonstrate, the county residence restriction on poll watchers will preclude poll watchers from being present in all locations where votes are being cast. This means that a

significant portion of ballots will be cast in darkness, without the transparency provided by poll watchers.

## XI. DROP BOXES ALREADY CONTAIN INELIGIBLE CO-MINGLED BALLOTS AND PENNSYLVANIA VOTERS ARE FACING IRREPARABLE HARM IN THE FORM OF VOTE DILUTION AND UNEQUAL TREATMENT.

Plaintiff's harm is real, imminent, and, if Defendants are not enjoined, irreperable. As explained by the Congressmen, their election will be affected if illegal absentee and mail-in votes are permitted to be cast, resulting from counties who, following Secretary Boockvar's guidance, have decided not to enforce the mandatory terms of the Election Code on mail-in ballots. (App. Ex. 4, Decl. of Glen Thompson, ¶¶ 6-8; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶¶ 5-10; App. Ex. 5, Decl. of George Joseph Kelly, Jr., ¶¶ 9-14; App. Ex. 7, Decl. of John Patrick Joyce, ¶¶ 9-11.) As Ms. Patterson testifies, she faces imminent harm of vote dilution resulting from Secreaty Boockvar's guidance. (App. Ex. 3, Patterson Aff. at ¶¶ 6–8.)

The unconstitutional guidance issued by the Department of State means that mail-in ballots already have been cast in violation of the Election Code, either through third-party voting – whether fraudulent or not – and through the inability to perform a signature challenge for the application of an absentee or mail-in ballot. *See* (App. Ex. 25 September 28 Guidance.) The counties have confirmed that there is no way to disentangle improperly cast mail-in ballots from properly cast mail in ballots. (App. Ex. 13, Bluestein Dep. 50:1-7.)

### LEGAL STANDARD

"Summary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 179 (3d Cir. 2020). "[A] court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor." *Scheidementle v.*

34

*Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  But, the evidence presented by the non-moving party "must be more than a scintilla."  *Id.*

The summary judgment standard does not change if a party seeks declaratory or injunctive relief.  *Coverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 n.12 (3d Cir. 2002) ("The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief.").  However, to award injunctive relief at summary judgment requires a district court to engage in a two-step analysis, first applying the summary judgment standard to determine whether the moving party is entitled to relief as a matter of law, and then applying its discretion as to whether to grant a permanent injunction.  *See TD Bank N.A. v. Hill*, 928 F.3d 259, 269 (3d Cir. 2019).

To be awarded a permanent injunction, a moving party must demonstrate: "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank*, 928 F.3d at 278 (citing *eBay Inc. v. MercExchange, L.LC.*, 547 U.S. 388, 391 (2006)).

## LAW AND ARGUMENT

## I.   NO GENUINE DISPUTE OF MATERIAL FACT EXISTS REGARDING PLAINTIFFS' CLAIMS.

After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.  Defendants have confirmed the unequal application of Pennsylvania election law regarding signature matching and drop boxes, and there is no dispute that those requirements along with the county poll watcher requirement, will dilute votes in violation of the

United States Constitution.  Thus, summary judgement is appropriate in Plaintiffs' favor on all of

their claims.

> **A.     Under Both the United States and Pennsylvania Constitutions, the Right to Vote and to Free and Fair Elections Includes the Right to Have One's Vote Fully Counted Without Dilution or Debasement.**

The most fundamental principle defining credible elections in a democracy is that they

must reflect the free expression of the people's will.  Accordingly, the rights to vote and to free,

fair, and transparent elections are fundamental to our constitutional democracy and protected by

the First and Fourteenth Amendments of the United States Constitution.  *Harper v. Virginia State*

*Board of Elections*, 383 U.S. 663, 665 (1966).  *See also Reynolds*, 377 U.S. at 554 (The Fourteenth

Amendment protects the "right of all qualified citizens to vote, in state as well as in federal

elections."); *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (citing *Roth v. United States*, 354 U.S. 476,

484 (1957)) ("The First Amendment 'was fashioned to assure unfettered interchange of ideas for

the bringing about of political and social changes desired by the people.'").  Once a state endows

its citizens with voting rights, "the right to vote as the legislature has prescribed is fundamental."

*Bush v. Gore*, 531 U.S. 98, 104 (2000).

"Obviously included within the right to [vote], secured by the Constitution, is the right of

qualified voters within a state to cast their ballots and have them counted" if they are validly cast.

*United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means

counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (quoting

*South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).  Invalid or fraudulent votes

"debase[]" and "dilute" the weight of each validly cast vote.  *Anderson v. United States*, 417 U.S.

211, 227 (1974).  "The deposit of forged ballots in the ballot boxes, no matter how small or great

their number, dilutes the influence of honest votes in an election, and whether in greater or less

degree is immaterial.  The right to an honest [count] is a right possessed by each voting elector,

and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).  Accordingly, "every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson*, 417 U.S. at 227; *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

The Pennsylvania Constitution also bestows the right to vote upon qualified citizens and guarantees them equal protection in the enjoyment of that right.  *See* Pa. Const. art. VII, § 1 & art. I, § 28.  Further, Article I, Section 5 of the Pennsylvania Constitution, entitled "Elections" and commonly referred to as the "Free and Equal Elections Clause," provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. I, § 5.

The Free and Equal Elections Clause "is contained within the Pennsylvania Constitution's 'Declaration of Rights,' which … is an enumeration of the fundamental individual human rights possessed by the people of the Commonwealth that are specifically exempted from the powers of the Commonwealth government to diminish." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 803 (Pa. 2018).  Under that clause, "elections are free and equal within the meaning of the [Pennsylvania] Constitution when they are public and open to all qualified electors alike; *when every voter has the same right as every other voter; when each voter under the law has the right to cast his ballot and have it honestly counted*; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and

when no constitutional right of the qualified elector is subverted or denied him." *Winston v. Moore,* 91 A. 520, 523 (Pa. 1914) (emphasis added).

The rights protected by the Pennsylvania Free and Equal Elections Clause may not be taken away by an act of the Commonwealth's legislative or executive branches, and both branches are prohibited by this clause from interfering with the exercise of those rights, even if the interference occurs by inadvertence. *See League of Women Voters,* 178 A.3d at 810. Moreover, the rights protected by the Free and Equal Elections Clause, including without limitation the right to free and fair public elections, apply to the election of both federal and state candidates. *See id.* at 811.

### B. Regulations Which Dilute or Debase the Right to Vote and to Free and Fair Elections Present a Federal Question and Are Subject to Strict Scrutiny.

In statewide elections involving federal candidates, "a State's regulatory authority springs directly from the United States Constitution." *Project Vote v. Kelly,* 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing *Cook v. Gralike,* 531 U.S. 510, 522-523 (2001); *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 805 (1995)). Specifically, the Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. Art. I, § 4, cl. 1 (emphasis added). Likewise, the Electors Clause of the United States Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President. U.S. Const. Art. II, § 1, cl. 2 (emphasis added).

The Legislature is "the representative body which ma[kes] the laws of the people." *Smiley v. Holm,* 285 U.S. 355, 365 (1932). Consequently, regulations of congressional and presidential elections "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,* 576 U.S. 787, 807 (2015).

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation. While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 576 U.S. at 824, it does hold states accountable to their chosen processes when it comes to regulating federal elections. *See id.* at 820. Accordingly, "[a] significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush*, 531 U.S. at 113 (Rehnquist, J., concurring); *see also Smiley*, 285 U.S. at 365. Although states are afforded the power to regulate their elections, their authority to do so is not unrestricted. To the contrary, election-related legislation must conform to the limits imposed by the Constitution. *See Williams v. Rhodes*, 393 U.S. 23, 29 (1968).

In reviewing a First Amendment challenge to a state's election law, the Supreme Court emphasized that "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Instead, under what has come to be known as the *Anderson-Burdick* balancing test, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens" the First Amendment right. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). *See also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* ... ."); *Obama for Am. v. Husted,* 697 F.3d 423, 429 (6th Cir. 2012) ("when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies").

The *Anderson-Burdick* balancing test requires a "weighing" of several factors, including: (1) the "character and magnitude" of the alleged constitutional injury; (2) "the precise interests put forward by the State as justifications for the burden imposed by its rule[;]" and (3) "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). If, upon review of these factors, the challenged regulation imposes "severe restrictions" on the First Amendment rights, then the law is constitutional only if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). In other words, strict scrutiny applies. *See id.*; *see also Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 688 (M.D. Pa. 2020) (applying strict scrutiny on in-state witness requirement law because severe burden on constitutional rights).

"'[R]egulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit' … are subject to strict scrutiny." *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (quoting *Green v. City of Tucson*, 340 F.3d 891, 900 (9th Cir. 2003)). As our Supreme Court explained: "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Moore v. Ogilvie*, 394 U.S. 814, 818-19 (1969).

## C.  Equal Protection Mandates that all Pennsylvania Voters Must Be Treated the Same or the Burden Is Severe.

The character and magnitude of the injury to the fundamental right to vote is severe when the burden on a qualified elector's vote dilutes the weight of that vote and fails to afford it equal protection. The Fourteenth Amendment states that "no State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Because the fundamental right to vote "can be denied by a debasement or dilution of the weight of a citizen's

vote just as effectively as by wholly prohibiting the free exercise of the franchise," *Reynolds*, 377 U.S. at 555, the Supreme Court declared in *Bush*: "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush*, 531 U.S. at 104-5; *see also Harper*, 383 U.S. at 665 ("Once the franchise is granted, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

The Equal Protection Clause of the Fourteenth Amendment proscribes that "one person's vote must be counted equally with those of all other voters in a State." *Reynolds*, 377 U.S. at 560. In other words, "whenever a state or local government decides to select persons by popular election to perform governmental functions, [equal protection] requires that each qualified voter must be given an equal opportunity to participate in that election … ." *Hadley v. Junior College District*, 397 U.S. 50, 56 (1968).

Accordingly, the Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions."). "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes." *Charfauros*, 249 F.3d at 954.  Indeed, a

"minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

Additionally, the use of "standardless" procedures can violate the Equal Protection Clause. *Bush*, 531 U.S. at 103. "The problem inheres in the absence of specific standards to ensure … equal application" of even otherwise unobjectionable principles. *Id.* at 106. Any voting system that involves discretion by decision makers about how or where voters will vote must be "confined by specific rules designed to ensure uniform treatment." *Id.*

Finally, when evaluating a voter dilution claim under the equal protection clause, it is critical to correctly identify the "relevant electoral unit." *Green*, 340 F.3d at 900. As the Supreme Court in *Gray* states: "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote – whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." *Gray*, 372 U.S. at 379; *see also Moore*, 394 U.S. at 819 (law that "discriminates against the residents of the populous counties of the State in favor of rural sections ... lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment"); *Reynolds*, 377 U.S. at 555 ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); *Pierce v. Allegheny County Bd. of Elections*, 324 F. Supp. 2d 684, 697 (W.D. Pa. 2003) ("A state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment.").

The "geographical unit" in this election is the entire Commonwealth of Pennsylvania. Along with the presidential election, Pennsylvania voters are casting ballots for the offices of attorney general, auditor general, and state treasurer – all state-wide elections.  Accordingly, *all* Pennsylvanians "who participate in the election are to have an <u>equal</u> vote" as "required by the Equal Protection Clause." *Gray*, 372 U.S. at 379 (emphasis added).  *See also Pierce*, 324 F. Supp. 2d 699 (different interpretations of election code could lead to differing "*statewide* standards," diluting the vote in certain counties and "afford[ing] greater voting strength than similarly-situated voters" in others); *Black v. McGuffage*, 209 F. Supp. 2d 889, 900 (N.D. Ill. 2002) ("That people in different counties have significantly different probabilities of having their votes counted, solely because of the nature of the system used in their jurisdiction is the heart of the problem."). Accordingly, all qualified Pennsylvania voters – "whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be (in any county)" – must be afforded the same protections and equal treatment of their vote.  *Gray*, 372 U.S. at 379.

**D.    Due Process also Demands that all Pennsylvania Voters Must Be Treated the Same or the Burden Is Severe.**

Separate from the equal protection clause, courts have found that the fundamental right to vote is protected by the Fourteenth Amendment's due process clause which protects against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (citing *Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir.1986))). *See also Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under

order."); _Marks v. Stinson,_ 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

Part of the courts' justification for such ruling is the Supreme Court's recognition that the right to vote and to free and fair elections is one that is preservative of other basic civil and political rights.  _See Black,_ 209 F.Supp.2d at 900 (quoting _Reynolds,_ 377 U.S. at 561-62 ("since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.")); _see also Yick Wo v. Hopkins_, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is regarded as a fundamental political right, because [_sic_] preservative of all rights.").  Thus, courts have found that "the right to vote, the right to have one's vote counted, and the right to have ones vote given equal weight are basic and fundamental constitutional rights incorporated in the due process clause of the Fourteenth Amendment to the Constitution of the United States."  _Black,_ 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process).

"Just as the equal protection clause of the Fourteenth Amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the Fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right."  _Duncan,_ 657 F.2d at 704.  It is well established that when a state accords arbitrary and disparate treatment to voters, those voters are deprived of their constitutional rights to due process and equal protection.  _Bush,_ 531 U.S. at 107.

Accordingly, in addition to equal protection, the Fourteenth Amendment's due process clause protects the fundamental right of vote against voter dilution.

## II.    THE SECRETARY'S SEPTEMBER 2020 GUIDANCE VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO VOTE AND TO A FREE AND FAIR ELECTION.

Secretary Boockvar's unfair, haphazard, and uneven system of Election guidance is causing an immediate and direct injury to Plaintiffs.  Secretary Boockvar's guidance memos instruct counties—contrary to Pennsylvania's Election Code passed with bipartisan support—that signatures cannot be used to verify absentee or mail-in applications or ballots. (App. Ex. 24, Sept. 11 Guidance; App. Ex. 25, Sept. 28 Guidance.)  If these guidance memos continue to stand, the integrity of the electoral process in Pennsylvania will be severely burdened and whether a free and fair election in Pennsylvania occurred in Pennsylvania questioned.

Plaintiffs' injuries, caused by the Secretary's guidance, involve their fundamental right to have their votes and the votes of those similarly situated counted and not subject to being debased or diluted by illegally cast votes through absentee or mail-in voters whose signatures on applications or ballots do not match their voter registration records or are otherwise not verified. Plaintiffs are also burdened because Secretary Boockvar's guidance creates an unequal voting scheme across the Commonwealth's counties, invoking an improper distinction between absentee/mail-in voters and in-person/provisional voters.  The Commonwealth's perceived justification, if any, for imposing such a burden upon Plaintiffs is not sufficient to justify so burdening Plaintiffs' fundamental rights.  Any such justification fails to outweigh Plaintiffs' fundamental right to have their votes counted at full value without dilution or discount.  Therefore, under an *Anderson-Burdick* analysis, strict scrutiny applies to Plaintiffs' voter dilution claims.

### A.    Prohibiting Signature Verification for Absentee and Mail-in Applications and Ballots Dilutes the Vote and Violates Equal Protection.

The Pennsylvania Legislature promotes free and fair elections by protecting qualified voters through signature verification for voting applications and absentee, mail-in, *and* in-person ballots. By instructing counties to not verify absentee and mail-in electors by signature analysis, the Secretary is placing a severe burden on the fundamental right to vote for which there is no compelling interest.

The Election Code is clear that, when applying for an absentee or mail-in ballot, the qualified election must be verified and approved before the absentee or mail-in ballot is provided. *See* 25 P.S. § 3146.2b (absentee application approval); 3150.12b(a) (mail-in application approval). When the ballot is returned, the qualified elector must be verified again. *See* 25 P.S. § 3146.8(g)(3) and (g)(4) ("only those ballots that have been verified under paragraph (3) shall be counted . . ."). The qualified elector's signature is the sole method for verifying absentee and mail-in ballots, ensuring that only qualified electors' ballots are counted and votes are not diluted by fraudulent ballots. *See* (App. Ex. 19, Riddlemoser Rep. at p. 11) ("Pennsylvania's signature verification process . . . is the initial lynchpin in ensuring the integrity of the voting process and avoiding the potential for fraud."). Signature verification is similarly required for verifying in-person voters. *See* 25 P.S. § 3050(a.3)(1) – (2); *see also Applewhite v. Commonwealth*, 2014 Pa. Commw. Unpub. LEXIS 756 (Jan. 17, 2014) (finding voter photo-ID law unconstitutional).

Yet, Secretary Boockvar, contrary to the Election Code, is promoting an election procedure that prohibits verifying absentee and mail-in ballots through signature comparison, impermissibly creating different classes of voters based on the manner the voter chooses to vote. (App. Ex. 24, Sept. 11 Guidance at 3) ("The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of election"); (App. Ex. 25, Sept. 28 Guidance at 9) ("The Election Code does not

permit county election officials to reject applications or voted ballots based solely on signature analysis.").)  In similar contradiction to the Election Code, Secretary Boockvar further stated that signature verification is not permitted *at all* under the Election Code for absentee and mail-in ballots.  (Ex. 12, Boockvar (30(b)(6)) Dep. 54:2 – 56:19.)  But, without signature verification, it is difficult, if not impossible, to envision how an absentee or mail-in ballot would be deemed valid, presenting a ripe opportunity for illegal and fraudulent votes to be case.

The Secretary's Guidance is further troubling based on long-standing precedent that applications for an absentee or mail-in ballot and voted absentee and mail-in ballots require the voter's signature.  *See* 25 P.S. §§ 3146.2b (absentee application approval); 3150.12b(a) (mail-in application approval); 3146.6(a) (voted absentee ballot); & 3150.16(a) (voted mail-in ballot).  Moreover, Pennsylvania Courts have held that applications and absentee/mail-in ballots cast without signatures are void, and those failing signature comparisons may be challenged.  *See, e.g., Project Vote*, 805 F. Supp. 2d at 152; *Opening of Ballot Box of the First Precinct of Bentleyville, 598 A.2d 1341 (Pa. Commw. 1991); Wilkes-Barre Election Appeals*, 44 Pa. D. & C.2d 535 (Luzerne C.P. 1967); *Canvass of Absentee Ballots of November 2, l965, Gen. Election*, 39 Pa. D. & C.2d 429 (Montgomery C.P. 1965); *Fogleman Appeal*, 36 Pa. D. & C.2d 426 (Juniata C.P. 1964).  Yet, Secretary Boockvar suggests that this is not the case.  She suggests that no county election board could set aside an application or ballot when the signatures do not match and cannot be verified because such "consequence" is not expressly spelled-out in the Election Code.  (Ex. 12, Boockvar (30(b)(6) Dep. 104:2–105:18.)  Coincidentally, the Secretary advanced that same faulty argument before the Pennsylvania Supreme Court when she sided with the Pennsylvania Democratic Party to assert that county election boards could not set aside and void absentee or mail-in ballots because they lacked inner secrecy envelopes, and the Supreme Court unanimously

rejected that position.  *See Pa. Democratic Party v. Boockvar*, 2020 Pa. LEXIS 4872, at *72 ("The clear thrust of *Appeal of Pierce*, however, is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism. What we learn from that decision is that violations of the mandatory statutory provisions that pertain to integral aspects of the election process should not be invalidated *sub silentio* for want of a detailed enumeration of consequences.").

At its essence, the Secretary's September 2020 guidance memos promote voter fraud. Take, for example, a college-aged, out-of-state son or daughter who fails to timely submit an absentee or mail-in application.  Under the Secretary's guidance memos, that child's parent could fill out the application in the child's name, sign the child's signature to it, and mail it to the election board, and upon noting the mismatched signature, the election board could not reject it solely on that basis.  Moreover, under the Secretary's guidance memos, the child's parent could go one step further, by filling out the declaration, signing the child's name, and mailing back the voted ballot. Because the ballot is signed, the county election board again cannot reject it for a non-genuine signature, according to the Secretary's guidance memos, even though it is clear that the child did not sign the ballot.  Instead, under the Secretary's guidance memos, the election board must accept the ballot and no one, not even a candidate or other qualified voter (or the child herself), is entitled to challenge that ballot based solely on the non-genuine signature.  A vote cast in this manner is a clear violation of the Election Code and a fraudulent vote.

Moreover, the voter fraud would not stop there, but would continue to snowball, with spouses, neighbors, acquaintances, strangers, and others, illegally submitting applications for mail-in ballots and returning them as voted ballots for choices made, not by the stated applicant but

instead the person who signed the voter's name to the application and ballot. Thus, these guidance memos, like her now-struck guidance memos during the Primary Election allowing naked ballots to be counted, are a violation of the Election Code, and a severe burden on the fundamental right to vote. *See* (App. Ex. 9, Boockvar Dep. 141:22-142:6 ("I was aware that Lawrence County had a lot of ballots returned without secrecy envelopes. I was also aware Lawrence County did not count those ballots. I disagree with that decision by them.").) Strict scrutiny applies.

Applying strict scrutiny, the Secretary's guidance unconstitutional, violate equal protection, and must be enjoined. First, the Secretary provided no interest, let alone a compelling interest, for her arbitrary, disparate, and unequal voting scheme. A compelling government interest is an affirmative defense to an equal protection claim requiring a strict scrutiny review. *See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429, 126 S. Ct. 1211, 1219 (2006) (the government "bear[s] the burden of demonstrating a compelling interest as part of its affirmative defense"). By failing to plead and or otherwise assert any compelling state interest as an affirmative defense, the Secretary waived this as an affirmative defense to her unconstitutional burden on the fundamental right to vote. *See* Fed. R. Civ. P. 8(c) and 12(b) *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.,* 373 F. Supp. 3d 567, 593 (W.D. Pa. 2019) ("affirmative defenses are waived if they are not specifically raised by responsive pleading or by appropriate motion."). Without a compelling state interest, her guidance memos fail under strict scrutiny and the Secretary must be enjoined from prohibiting signature verification for absentee and mail-in applications and ballots.[12]

---

[12]     Secretary Boockvar and Courts interpreting Pennsylvania Election Code have recognized that "ensuring integrity and preventing fraud in the electoral process" is a compelling state interest. *Benezet Consulting,* 433 F. Supp. 3d at 689. *See also Green Party v. Aichele,* 89 F. Supp. 3d 723, 745 (E.D. Pa. 2015) ("the Commonwealth has a compelling interest in preventing voter fraud in the signature gathering process"). Yet, the Secretary is not promoting this interest. When asked

But, *even if* there was a compelling government interest, which there is not, her guidance memos are not narrowly tailored.  The Election Code already provides a workable voting scheme for signature verification that comports with equal protection and due process.  Should an absentee or mail-in ballot or application be challenged for any reason, including signature verification, the Election Code requires a notice and opportunity to be heard.  *See, e.g.,* 25 P.S. §§ 3146.2b(d) (requiring notice and opportunity to cure for rejected absentee ballet application); 3150.12b(c) (same for rejected mail-in ballot application); & 3146.8(h) (allowing voter six days following the election to provide verifiable proof of identification).  This is substantially similar to the notice and opportunity to be heard provided to in-person and provisional voters, thus providing all voters with the opportunity to cure their signatures or any other ballot deficiencies so their ballots can be counted.  *See* 25 P.S. § 3050(a.4)(4)(i).  The Election Code as written—allowing signature verification and providing an opportunity to cure a signature deficiency—already protects free and fair elections and the fundamental right to vote.  (*See* App. Ex. 19, Riddlemoser Rep. at pp. 2-13.)  The Secretary's guidance memos are unconstitutional and unnecessary, and must be declared as such.

> **B.   The September Guidance Creates an Unconstitutional Distinction Between Absentee, Mail-In, In-Person, and Provisional Voters, Violating Both Equal Protection and Substantive Due Process.**

The Secretary's September 2020 guidance memos also place an unconstitutional burden on due process.  *See Black,* 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process).  *First,* Secretary Boockvar's September guidance memos result in the unequal

---

*why* she issued the September Guidance, she stated:  "Well, you've sued us and -- or I should say, your client sued us, and it raised this issue, as you may recall, and asked permission to file an amended complaint."  (App. Ex. 12, Boockvar 30(b)(5) Depo. 106:1-4.)  This is not a compelling interest, and the Secretary cannot provide one.

treatment of absentee/mail-in voters and in-person/provisional ballot voters.  Although "[a]bsentee

voting is a fundamentally different process from in-person voting, and is governed by procedures

entirely distinct from in-person voting procedures," "such different treatment" cannot be "without

justification."  *ACLU of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) (requiring in-person

voters to present photo-id but not absentee voters was a proper distinction between the classes of

voters because of "the unique procedures for absentee voting allow for a separate process

confirming the identification of a voter").  There is no justification in this instance to create such

an arbitrary and disparate rule between absentee/mail-in voters and in-person voters.  Signature

verification, for absentee, mail-in, *and* in-person voters, is Pennsylvania's only procedure for

confirming the identification of all voters.  To suggest that absentee and mail-in voters do not need

to comply with the signature verification process at the time they vote, but that in-person (whether

voting a regular or provisional ballot) votes must be subject to such verification flies in the face of

due process.  *See, e.g., Griffin*, 570 F.2d at 1077 (the due process clause warrants federal relief

"where broad-gauged unfairness permeates an election, even if derived from apparently neutral

action").  It also flies in the face of unquestioned best practices for election administration.  *See*

(Riddlemoser Rep. at p. 11) ("Pennsylvania's signature verification process . . . is the initial

lynchpin in ensuring the integrity of the voting process and avoiding the potential for fraud.")

 *Second*, Secretary Boockvar's guidance memos are not being implemented equally across

the state.  Some counties are following her guidance memos, while others, knowing the guidance

memos violate Pennsylvania's Election Code and the Constitution, have indicated that they will

continue signature analysis.  (App. Ex. 1, Summary of County Interrogatory Responses.)  Allowing

this type of a patchwork of different rules from county to county, and as between absentee and

mail-in voters and in-person voters, in a statewide election involving federal and state candidates,

51

is exactly the type of equal protection concerns which this Court addressed over 15 years ago. *See Pierce*, 324 F. Supp. 2d at 698-699. *See also Gray*, 372 U.S. at 379-381 (a county unit system which weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties violates the Equal Protection Clause and its one person, one vote jurisprudence).

*Third*, at least one other federal district court has recently rejected a similar attempt by its state election board to rewrite the requirements for absentee and mail-in voting without legislative action shortly before the upcoming November 3, 2020 General Election. Specifically, on September 30, 2020, the District Court for the Middle District of North Carolina ordered a status conference to address the North Carolina State Board of Elections' attempt to eliminate the legislative requirement under North Carolina law that voters have a witness sign their absentee ballots in order for them to be properly cast and counted. *See Democracy N.C. v. N.C. State Bd. of Elections*, Civ. A. No. 20-cv-457, Order dated 09/30/2020 (ECF # 145) (M.D. N.C. 2020) (Olsteen, W., D.J.). There, the North Carolina State Board of Elections gave notice to the federal district court that it had issued "Memo 2020-19" which the court found "may be reasonably interpreted to eliminate the one-witness requirement under the guise of compliance with this court's order." *See id.* at ECF # 145, p. 3.

Judge William Olsteen found "such an interpretation unacceptable," noting that "permitting a voter to cast an unwitnessed absentee by mail ballot … undermines and in effect eliminates the Legislature's interest in preventing ballot fraud[.]" *See id.* at ECF # 145, p. 10. Also, Judge Olsteen noted that the State Election Boards' memorandum ignores that the court had "upheld the one-witness requirement and in so doing found that it was a reasonable measure to deter fraud." *See id.* at pp. 7-8. Additionally, Judge Olsteen raised concern about the timing of

the memorandum given that it was issued fewer than 60 days before the election.  *See id.* at p. 11. Accordingly, the North Carolina court scheduled a status conference to determine whether the court's interpretation of the Memo 2020-19 is correct and whether other action or relief was necessary.  *See id.* at p. 12; *see also id.* at ECF # 124, p. 102, 159-160.

Thus, the Secretary's guidance memos on signature analysis create unequal, unfair, and different voting schemes between in-person and absentee voters and across the Commonwealth's counties.  This is a clear violation of both equal protection and due process among the Pennsylvania electorate, and those aspects of her September 11 and 28, 2020 guidance memos should be declared unconstitutional.

## III. DEFENDANTS' HAPHAZARD AND INCONSISTENT USE OF DROP BOXES AND MOBILE COLLECTION SITES VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO VOTE AND TO A FREE AND FAIR ELECTION.

Secretary Boockvar also fails to protect free and fair elections by permitting the use of unstaffed, unmonitored drop boxes and mobile collection sites.  The Secretary's August 19, 2020 guidance memo permits counties, at their sole discretion, to implement drop boxes—unstaffed and unmonitored, and, in some cases, mobile and unmonitored.  (App. Ex. 23, August 19 guidance.) Like the signature verification, Plaintiffs' injuries, caused by the Secretary's guidance memo, involve their fundamental right to have their votes and the votes of those similarly situated counted and not subject to being debased or diluted by illegally cast or delivered votes at unstaffed drop boxes.  The Secretary's arbitrary guidance also creates a varying voting scheme across the Commonwealth, raising serious concerns as to the validity of the votes cast. Therefore, under an *Anderson-Burdick* analysis, strict scrutiny applies to Plaintiffs' voter dilution claims.

### A. Unstaffed Drop Boxes and Mobile Collection Sites Dilute the Vote and Violate Equal Protection.

Mobile collection sites and unstaffed drop boxes fail to provide secure, free, and fair elections, risking vote dilution through illegal third-party harvesting and fraudulently cast ballots. The Secretary's guidance memo instructs counties to use, at their discretion, drop boxes.  (App. Ex. 23, August 19 Guidance at 4-5.)  Her Guidance also permits counties to use, at their own discretion, mobile collection sites  (*Id*.)  But, the Secretary fails to provide consistent parameters or uniform standards when implementing drop boxes and mobile units, leading to unmanned, unmonitored drop boxes and unsecure mobile collection sites.  This vague guidance memo places a severe burden on the fundamental right to vote to which the Secretary provided no compelling interest.  *See Burdick*, 504 U.S. at 434 (strict scrutiny applies when burden severe).  *See also Anderson*, 417 U.S. at 226 ("The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election . . . to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States.") (internal quotation omitted).

Unstaffed drop boxes and mobile collection sites promote the casting of illegal, unreliable, and fraudulent ballots, and fail to contain basic minimum guarantees against such conduct that violate the Constitution by leading to the dilution of validly cast ballots.  *See Pierce*, 324 F. Supp. at 695 ("the principle that vote dilution unconstitutionally violates equal protection extends to matters beyond malapportioned legislative districts"); *see* also Statement of the Facts, II.G; App. Ex. 9, Boockvar Dep. 154:1-18, 183:16-184:2, 189:4-13, App. Ex. 21, Boockvar Dep. Ex. 14, January 10 Guidance.).  The risk of illegal and fraudulently cast ballots is not remote.  A similar version of the guidance memo, which was in place during the Primary Election, allowed for the creation of these unstaffed and unmonitored drop boxes, as well as mobile service centers, and the

acceptance and counting of illegally returned ballots.  (App. Ex. 9, Boockvar Dep. 92:4-10, Boockvar Dep. Ex. 18; App. Ex. 53, Act 35 Report); (App. Ex. 10, Marks Dep. 60:3-61:10, Marks Dep. Ex. 7, App. Ex. 49, Montour County Interrogatory No. 5.)  Despite knowing of this flawed system, the Secretary did not remediate the situation; instead she continued the practice and allowed for the use of these illegal ballot dropping locations in the upcoming General Election. (App. Ex. 9, Boockvar Dep. 92:4-10.)

Unmonitored, unstaffed drop boxes and mobile units "present[] the easiest opportunity for voter fraud" through ballot destruction and illegal third-party ballot harvesting.  (App. Ex. 19, Riddlemoser Rep. at 16.)    The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation.  (App. Ex. 19, Riddlemoser Rep. at Ex. D.)  This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the election process is essential to the functioning of our participatory democracy.").    *See generally*, App. Ex. 4, 5, 6, and 7, Decl. of Congressman Thompson, Reschenthaler, Kelly and Joyce.  As held by the Pennsylvania Supreme Court and recognized by Secretary Boockvar, third-party ballot harvesting is illegal in Pennsylvania.  *See, e.g.,* 25 P.S. § 3146.6(a); *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1226 ("the Election Code does not provide for third-party deliveries of absentee ballots . . .."); Sept. 28 Guidance, Sec. 4.1, p. 6 ("A voter must return his or her own completed absentee or mail-in ballot . . . Third-person delivery of absentee or mail-in ballots are not permitted, and any ballots delivered by someone other than the voter are required to be set aside.").  Although Secretary Boockvar and her experts *know* that unstaffed drop boxes leads to illegal third-party ballot harvesting, App. Ex.

19, Riddlemoser Rep., she refuses to change her tune, promoting the use of this unconstitutional voting scheme and placing a severe burden on the fundamental right to vote.

What is further troubling about the Secretary's interpretation of the August guidance memo is that it is contrary to the understanding and election expertise of the guidance memo's principal author, Veronica Degraffenreid, special advisor on election modernization for the Commonwealth. (App. Ex. 18, Degranffenreid Dep. 8:16-25, 35:2-8). Prior to her role with the Commonwealth, Ms. Degraffenreid served as director of election operations for North Carolina for six years, administering North Carolina's election code. (*Id.*) Under Ms. Degraffenreid, North Carolina provided no-excuse absentee voting and over-the-counter ballot options. (*Id.* at 13:5-16:17.) North Carolina also required two witness signatures on ballot return envelopes to verify voters. (*Id.*) Even with these systems of voting, under Ms. Degraffenreid's guidance, North Carolina did <u>not</u> use unstaffed drop boxes. More telling, according to Ms. Degraffenreid, the principal author of the guidance memo and experienced election official, Pennsylvania also does not permit the use of unstaffed and unmonitored drop boxes. See App. Ex. 18, Degranffenreid Depo 17:9-18:15; 36:1-25. Thus, there is no compelling reason for the use of unstaffed drop boxes.

This severe burden on the fundamental right to vote cannot stand unless Secretary Boockvar's guidance memo on drop boxes is narrowly tailored to serve a compelling government interest. Defendants have offered no interest – let alone a compelling interest – for the use of unmonitored mobile collection sites and unstaffed drop boxes. This alone proves this type of ballot delivery fails strict scrutiny and their use must be enjoined. But, *even if* there is a compelling interest, the Secretary's guidance memo is not narrowly tailored. A narrowly tailored drop box policy requires the drop boxes to be secure and attended to at all times by a sworn election official. *See* (Riddlemoser Rep. 15-16.) The election official can verify the identity of the ballot dropper,

preventing any illegal third-party ballot delivery, and safeguard that all ballots collected are secured from tampering at the end of each day.  (*Id.*)  A narrow-tailoring such as this would serve the Commonwealth's best interest when remediating ballot errors, like signatures, before ballot submission and ensuring the qualified elector's ballot is cast.  (*Id.*)  In this scenario, qualified electors are still afforded the opportunity to drop off their ballots, but the election scheme is narrowly tailored to that interest while protecting the qualified elector's right to an equal vote.  As it stands, Secretary Boockvar's guidance memo on drop boxes and mobile collection sites is not narrowly tailored, is unconstitutional, and the use of such systems should be enjoined.

### B. An Unfair Voting Scheme is Created by the Unequal Use of Drop Boxes and Mobile Collection Sites and Violates Due Process.

The various use of mobile collection and drop boxes across counties also violates due process.  *Black,* 209 F. Supp. 2d at 900 (a state law that allows local election officials to impose different voting schemes upon some portions of the electorate and not others violates due process). The Secretary's guidance memo on these drop boxes creates different voting schemes across the Commonwealth.  It is entirely up to each county when deciding whether to allow for the use of drop boxes, whether staffed or unstaffed, located inside or outside a municipal building, a park, garage, or elected officials' office or building, or targeting a particular demographic or group.  (*See* App. Ex. 9, Boockvar Dep. 199:10–200:10; 201:6-203:18; 211:18–212:9; Statement of Facts, *supra*, II.G.).  For example, Delaware County will have 50 drop boxes throughout the county and implement mobile collection sites, yet Monroe County will have neither.  *Compare* Delaware County Warded $2.2 Million Grant for Save Elections; http://www.delcopa.gov/publicrelations/releases/2020/safeelectionsgrant.html (accessed September 4, 2020); *with* (Monroe County Mail-In and Absentee Ballot Information available

from   http://www.monroecountypa.gov/Dept/Voter/Documents/MailInAbsenteeInformation.pdf,

accessed Sept. 27, 2020, 9:45am.)

With the risks associated with mobile collection units and drop boxes, the use of these voting schemes by some counties but not others further dilutes the votes and creates an unconstitutional burden on due process.  "That people in different counties have significantly different probabilities of having their votes [weighed the same as others], solely because of the nature of the system used in their jurisdiction is the heart of the problem."  *Black,* 209 F. Supp. 2d at 899; *see also* *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, *64 (S.D.N.Y. Aug. 3, 2020)* ("That burden is exceptionally severe. A large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control.").   Accordingly, the Defendants' inconsistent use of drop boxes and other mobile collection sites, in accordance with the Secretary's August 19, 2020 guidance, violates equal protection and due process, and must be enjoined.

## IV.    THE COUNTY RESIDENCY RESTRICTION ON WATCHERS WILL RESULT IN UNEVEN ELECTION OBSERVATION AND UNEQUAL VOTING CHALLENGES, VIOLATING EQUAL PROTECTION AS APPLIED IN THE 2020 GENERAL ELECTION.

As applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection.    Under Election Code Section 417(b), a party may only utilize county residents as watchers.  *See* 25 P.S. § 2687. Although the Pennsylvania Supreme Court recently affirmed that such requirements are *facially* acceptable as a "reasonable" limitation, the court did not consider, in light of the limitations presented by COVID-19, whether a county residency restriction *as applied* causes parties to be unable to staff watchers and violates equal protection.  *See* *Pa. Democratic Party v. Boockvar*, 2020 Pa. LEXIS 4872 at *86-88.

A. **As Applied, Pennsylvania's County Residency Requirement Constitutes an Unconstitutional Burden on the First and Fourteenth Amendment Rights of Candidates and Political Parties to Free and Fair Elections and Equal Protection.**

A state regulation that imposes reasonable, nondiscriminatory burdens on the election process will be subject to an intermediate form of scrutiny, and the Court must determine if the state's interests outweigh the burdens on Fourteenth Amendment rights. *See Burdick*, 504 U.S. at 428, 434 (quoting *Anderson*, 460 U.S. at 788); s*ee also Democratic Nat'l Comm. v. Bostelmann, No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 172330, at \*84 (W.D. Wis. Sep. 21, 2020)* (enjoining Wisconsin requirement that election officials at polling places be "an elector of the county in which the municipality is located"). Although a law may facially pass muster under equal protection, if the law, as applied, calls into question the ability to meet the requirements of the law and provide equal protection, no matter how "reasonable" the law may be on its face, the burden on the right to free and fair elections is unconstitutional. *See, e.g., United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."). When determining if an election law violates equal protection as applied, the Court must consider the circumstances surrounding application of the law in the current climate. *See Patriot Party v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 270 (3d Cir. 1996) ("the challenged Pennsylvania election laws, as applied in this case, constitute an unconstitutional burden on the Patriot Party's First and Fourteenth Amendment rights to free association and equal protection").

Watchers are essential to the electoral process, playing a critical role when ensuring the integrity of an election by flagging irregular ballots, malfunctioning voting machines, and possible voter fraud, while also communicating with voters to help ensure voter turnout to the correct

locations. *Tiryak v. Jordan,* 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) (quoting *Marchioro v. Chaney,* 442 U.S. 191, 195 (1979)); *see also* (App. Ex. 19, Riddlemoser Rep. at pp. 6 & 19; App. Ex. 20, Lockerbie Rep. at ¶ 14.). Pennsylvania's Election Code requires for a general election that: (1) each party is entitled to appoint three poll watchers per location; (2) each candidate for nomination is entitled to appoint two watchers per election district; and (3) each watcher be a resident of the county for which the watcher is appointed. *See* 25 P.S. § 2687; *see also* (App. Ex. 20, Lockerbie Rep. at ¶¶ 6-10) (additional qualifications for poll watchers include that the individual must be sufficiently educated on election law and procedure to perform the duties of a poll watcher and must be willing to serve for what amounts to less than minimum wage).)

In a "normal" election, the residency requirement limits the pool of potential watchers per party and candidate in each county. It is questionable whether the residency requirement even is justifiable in "normal" elections. (App. Ex. 4, Thompson Decl. at ¶ 21.) However, the current pandemic severely challenges the ability of parties to staff watchers, violating equal protection as applied to the 2020 General Election. *See Bostelmann,* 2020 U.S. Dist. LEXIS 172330 at *84 ("eliminating the residence requirement [for poll workers] would provide greater flexibility across the state to meeting unanticipated last-minute demands for staffing due to COVID-19 outbreaks or fear"). "[T]he United States has suffered through an unprecedented period of pandemic and curtailment of public activity." App. Ex. 20, Lockerbie Report ¶ 11. The pandemic's impact on elections is and has been so severe that numerous states cancelled in-person voting for the primaries, and the Commonwealth repeatedly referred to the pandemic as a basis to expand mail-in voting due to the fact that voters may be unwilling or unable to come to polling places in November. *Id.* The impact expands further, to the number of residents who are willing to appear at a mass gathering, like a polling place, for twelve or more hours to observe election activities.

Although watchers play a critical role in the electoral process and the integrity of an election, watchers, for all parties and candidates, are difficult to find.  In a "normal" election, the Republican Party and its candidates have "struggled to recruit and retain sufficient poll [watchers]."  *See* (App. Ex. 2, Decl. of James Fitzpatrick, ¶¶ 20-22 & 25); *see also Bostelmann,* *2020 U.S. Dist. LEXIS 172330 at \*85.*  For the 2020 General Election, the Trump Campaign, the RNC, and the Congressmen Plaintiffs do not believe that they will be able to obtain a full roster of qualified and willing watchers for the General Election if the residency requirement is in place. (App. Ex. 2, Decl. of James Fitzpatrick, ¶ 25; App. Ex. 4, Decl. of Glenn Thompson, ¶¶ 19-20; App. Ex. 5ecl. of Mike Kelly, ¶ 16; App. Ex. 7, Decl. of John Joyce, ¶¶ 11-13; App. Ex. 6, Decl. of Guy Reschenthaler, ¶¶ 11-13; App. Ex. 3, Aff. of Melanie Patterson, ¶ 5.)

For minor parties, the difficulty of staffing watchers is even worse.  Unlike the major parties, which at least have a roster of members to canvas for possible service, minor parties simply do not have the ability to staff the polling places with the residency requirements in place.  *See* App. Ex. 20, Lockerbie Report, at ¶ 17 (utilizing 2016 election data for Philadelphia, all "other" parties combined would have to compete for one in every seven voters to serve as their appointed poll watcher).  Given that there are dozens of smaller parties who have nominees for President that are eligible to receive votes in Pennsylvania, the residency requirement amounts to a wide-scale denial of the ability to observe the election where candidates will be evaluated.  *Id.* at ¶ 16; *see also Anderson,* 460 U.S. at 780 (recognizing third or minor political parties still afforded protections under First and Fourteenth Amendments).

Additionally, the upcoming November 3, 2020 General Election involves the first time that the Commonwealth electorate will be voting at a general election under its newly enacted no-excuse by-mail voting.  At the Secretary's encouragement, several county boards of elections have

61

established temporary satellite offices to allow voters to apply in-person for an absentee or mail-in ballot and upon approval, vote and return that ballot to the county election officials staffing such satellite offices. (App. Ex. 17, Voye Dep. at 16: 4-20; App. Ex. 13, Bluestein Dep. at 30: 2-10; App. Ex. 14, Soltysiak Dep. at 16:22 – 17:8, 43:11-16; and App. Ex. 16, Hagan Dep. at 18:11-22.) At least three of these counties (*i.e.*, Philadelphia, Delaware, and Centre) are ones in which Democratic registered voters out-number than their Republican counterparts. *See* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Pages/VotingElectionStatistics.aspx (last accessed October 1, 2020). Also, these same three counties have received funding for the establishment of such multiple satellite offices – Philadelphia, alone, has approved 15 satellite offices to operate from September 28, 2020 until Election Day – and other absentee and mail-in ballot efforts from a private group that favors the Democratic Party and their platform. *See Pa. Voters Alliance, et al. v. Centre County, et al.*, Civ. A. No. 4:20-cv-1761 (M.D. Pa. 2020), Complaint filed 09/25/2020 (ECF # 1), p. 1-2, 17-18; *see also Crossey v. Boockvar*, 108 MM 2020, 2020 Pa. LEXIS 4519, at *2-*3 (Pa. Aug. 21, 2020) (Saylor, C.J.) (concurring and dissenting) (noting that "[t]his litigation represents one of many high-stakes disputes between political organizations with differing constituencies unfolding across the country. I respectfully dissent to the associational interests of one side (Democratic parties) being represented to the exclusion of the other [Republican parties]". . The Secretary has stated that she anticipates approximately 2 million votes (approximately 25% of the total registered electorate) will be cast in the November 3, 2020 General Election via absentee and mail-in ballots, and that the vast majority of them will be cast through these early voting satellite offices. Under the Election Code, a "polling place" is defined as the "room provided in each election district for voting at a primary or election." 25 P.S. § 2602(q). Therefore, seeking to staff these county satellite offices in addition

to the polls on Election Day is making it impossible for parties and candidates, including the Plaintiffs in this case, to recruit and staff watchers for the November 3, 2020 General Election. (App. Ex. 2, Decl. of James Fitzpatrick, ¶¶ 22, 24-25 & 28.)[13]

Thus, Election Code Section 2687's county residency requirement, as applied in these unprecedented times, is not rationally connected or reasonably related to any interest presented by the Commonwealth.  Removing the county residency restriction is reasonable and promotes a compelling state interest of free and fair elections.  Removing the residency restriction ameliorates challenges faced by the parties when staffing watchers, allowing citizens outside of the county, who are ready, willing, and able but would otherwise be prohibited, to serve as a poll watchers for major and minor political parties alike.  Removing the residency barrier also provides "greater flexibility across the state to meet unanticipated last-minute demands for staffing due to COVID-19 outbreaks of fear." *Bostelmann*, 2020 U.S. Dist. LEXIS 172330 at *85.  And, removing the residency requirement affirms the sanctity of the election process and public confidence that, whatever the outcome in the upcoming November 3, 2020 General Election, it has been the result of a full and fair process.  Thus, removing the residency requirement is reasonable as applied in these circumstances, satisfying equal protection and the fundamental right to free and fair elections. *See, e.g., Bostelmann*, 2020 U.S. Dist. LEXIS 172330 at *86.

**B.**     **The Decisions in *Republican Party of Pa. v. Cortes* and *Pennsylvania Democratic Party v. Boockvar* Do Not Preclude Plaintiffs' As-Applied Challenge.**

In Answers to the Complaint and earlier Motions to Dismiss, Secretary Boockvar and several County Election Boards have argued that Plaintiffs' challenge to the county residency

---

[13]     Equally concerning is that not all counties have advised whether watchers will be permitted to observe the activities at any of Defendants' satellite offices or any of the drop boxes or other mobile collection sites that they may use. (*See, e.g.,* App. Exh. 56, Montgomery County Guidance for Watchers at Drop Box Locations.)

requirement is barred by the Pennsylvania Supreme Court's September 17, 2020, decision in *Pennsylvania Democratic Party v. Boockvar*, and its adoption of the Pennsylvania Eastern District Court's decision in *Republican Party of Pa. v. Cortes.* *See, e.g.,* Secretary's Answer and Affirmative Defenses (ECF # 492), p. 49-50, 52.  However, this argument is without merit.

The United States Supreme Court has long held that the right to vote includes, *inter alia*, the ability to do so free from state-imposed burdens or dilution by fraud.  *See, e.g., Gray*, 372 U.S. at 380 (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford,* 553 U.S. at 196 (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds*, 377 U.S. at 554-55 & n.29.  Indisputably, Pennsylvania's poll watcher statute seeks to preserve an orderly and accurate canvass of the electorate by permitting candidates to appoint qualified registered electors to observe, report, and, on occasion, challenge the process by which the vote occurs. *Tiryak*, 472 F. Supp. at 823-24.  Any limitation on people who can perform these functions necessarily will impact the extent to which these functions will be carried out.

Despite these indisputable facts, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court held that the poll watcher qualification requirements, including those related to residency, "impose[] no burden on one's constitutional right to vote and, accordingly, requires only a showing that rational basis exists to be upheld."  *Pennsylvania Democratic Party v. Boockvar*, 2020 Pa. LEXIS 4872, at *86.  Other than by relying primarily on the *Cortes* decision from the United States District Court for the Eastern District of Pennsylvania, the Pennsylvania Supreme Court provided no analysis as to how it reached the conclusion that a statute enacted to preserve a transparent voting process and to identify and regulate irregularities that would impact voting was, in fact, disassociated from the "right to vote."  *Id.*  If poll watchers are not there to

preserve the right to vote free from irregularities, and the associated right of candidates to have their candidacy fairly adjudicated by the electorate, one wonders why they are there at all.  Indeed, the Pennsylvania Supreme Court in *Pennsylvania Democratic Party v. Boockvar* simply changed the question by noting that *Cortes* held that "serving as a poll watcher does not implicate a fundamental constitutional right, like the right to vote, but rather, is a right conferred by statute." *Id.* at *79.  To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election.

In *Pennsylvania Democratic Party v. Boockvar*, the Republican challengers did, in fact, raise the constitutional right to participate in a free election untainted by fraud: "every voter in a federal election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Id.* at *82 (*quoting* Respondents' Brief at 45 and *citing Anderson*, 417 U.S. at 227).  And, while not disputing that poll watchers serve an important function in securing that guarantee, the Pennsylvania Supreme Court summarily decided that concerns about fraud "are unsubstantiated and are specifically belied by the Act 35 report issued by the Secretary on August 1, 2020 concerning mail in voting in the Primary Election." *Id.* at *87. The Pennsylvania Supreme Court appeared to conclude, as a factual matter, that notwithstanding the U.S. Constitution's guarantee of a fair and untainted electoral process, fraud is not a concern in Pennsylvania simply because the Secretary says so.  But the U.S. Constitution guarantees are not so makeweight that a public official may sweep them away with the assurance "don't worry, it's not a problem."  Moreover, the authority cited by the Pennsylvania Supreme Court, the Secretary's the Act 35 report, dealt with the security of mail-in balloting and did not conclude that

observation and challenge was no longer needed at polling places.  *See* App. Ex. 53, Act 35 Report, p. 39 ("The data provided by the counties reinforces numerous independent studies that conclude that mail ballot fraud is exceedingly rare, …").[14]   Indeed, the Pennsylvania Supreme Court apparently took on the mantle of a super-legislature and concluded that watchers really are not needed after all.  That is a bridge too far.

In fact, it is not the burden of a candidate or political party to prove fraud exists before procedural safeguards related to a free and accurate election are acknowledged to be of a constitutional dimension.  App. Ex. 19, Riddlemoser Rep.  The court in *Pennsylvania Democratic Party v. Boockvar* never grappled with the core question of the purpose of the Pennsylvania poll watcher statute.  It is not the existence of fraud that infuses poll watching with constitutional protections – it is the possibility of something less than a full and free election that connects their presence with constitutional guarantees.

Moreover, to the extent proof of fraud is required before a court is willing to infuse poll watching with constitutional protections, this Court need only review the recent criminal convictions in the case of *United States v. DeMuro*, Criminal No. 20-112 (E.D. Pa. unsealed May 21, 2020).  In that case, a former Judge of Elections in South Philadelphia pled guilty to adding fraudulent votes to the voting machines during Election Day – also known as "ringing up" votes – and then falsely certifying that the voting machine results were accurate for specific federal, state,

---

[14] As both Secretary Boockvar and Deputy Secretary Marks confirmed, the Act 35 report did not disclose all the data provided by the counties to the Secretary.  (App. Ex. 9, Boockvar Dep. 231:25 – 232:8; App. Ex. 10, Marks Dep. 242:11–244:18, 245:1-7, 246:18 – 247:12, 254: 1-17.)  Specifically, the Act 35 Report makes no mention that of the 8,003 absentee and mail-in ballots cast in Lawrence County, which represented 45% of the total votes cast in the 2020 Primary Election, 440 of them were returned without inner secrecy envelopes as mandated by the Election Code.  (App. Ex. 10, Marks Dep. 242:11 – 244:18, 245:1-7.)  Deputy Secretary Marks testified he was unable to exclude the possibility of fraud on this issue.  (*Id.* at 240:15–241:7.)

and local Democratic candidates in the 2014, 2015, and 2016 primary elections.  The scheme involved a political consultant who purportedly solicited monetary payments from the candidates as "consulting fees," and then used portions of those funds to pay election board officials, including DeMuro, in return for ringing up votes.  DeMuro was able to commit the fraud because there were no poll watchers at his precinct.  *See United States v. DeMuro*, Criminal No. 20-112, Information (ECF # 1) (E.D. Pa Mar. 03, 2020); M. Cavacini, "U.S. Attorney William M. McSwain Announces Charges and Guilty Plea of Former Philadelphia Judge of Elections Who Committed Election Fraud," U.S. Attys. Office – Pa., Eastern (May 21, 2020) (available at *https://www.justice.gov/usao-edpa/pr/us-attorney-william-m-mcswain-announces-charges-and-guilty-plea-former-philadelphia*.

The Eastern District of Pennsylvania's decision in *Cortes* fares no better in undermining the claims made there.  There, the court focused on, and rejected, claims of the poll watchers themselves.  *Cortes*, 218 F. Supp.3d at 414 (rejecting a First Amendment right of poll watchers under the right of free association); *id.* (rejecting the claim that poll watching involved political speech).  When considering the claims that the party would be unable to staff polling places due to the residency requirement, the district court rejected these claims due to a lack of evidence.  For example, the court determined that the claim that poll watchers would deter fraud as "speculation" on the record presented to the court.  *Id.* at 406.  Moreover, the court relied on its factual conclusion that the party "points to no polling place that Section 2687(b) prevents it from staffing with poll watchers."  *Id.* at 408.  Finally, the court noted that Section 2687(b) does not "bar[ ]" parties from staffing particular polling places.  *Id.* at 411.

But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's

choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents. As the evidence presented in this matter establishes, the residency requirement necessarily limits the abilities of the parties to staff these positions and, as such, puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote.

Accordingly, as applied, the county residency requirement for watchers in Election Code Section 2687 is unconstitutional.

## V. PLAINTIFFS ARE ENTITLED TO AN INJUNCTION TO PREVENT VOTE DILUTION AND FURTHER VIOLATIONS OF EQUAL PROTECTION AND DUE PROCESS.

There is no question that Plaintiffs have demonstrated irreparable injury because Defendants have infringed, and will continue to infringe, Plaintiffs' federal and state constitutional rights leading up to the 2020 General Election. "Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation." *Pierce*, 324 F. Supp. 2d at 706 (citing *Oburn v. Shapp*, 521 F.2d 142, 151 (3rd Cir. 1975)).

Free, fair, and credible elections are fundamental principles defining our democracy. Secretary Boockvar, through her unconstitutional rule-making, is severely risking the integrity of the 2020 General Election. (App. Ex. 5, Decl. of Mike Kelly.) The President's and the Congressmen's fundamental right of free and fair elections will suffer irreparable harm if Secretary Boockvar is not enjoined from continuing her unconstitutional policies and the Counties enjoined from following those policies. There will be no protection of one-person, one-vote in Pennsylvania, because her policies prohibiting signature verification and allowing inconsistently located/used unstaffed drop boxes will result in illegal ballots being cast and counted with

legitimate votes.  The Republican National Committee faces the same irreparable harm, on behalf of its candidates and members, who will respectively have their elections disparaged and their votes diluted should the Secretary's practices continue.  *See, e.g., Patino v. City of Pasadena, No. H-14-3241, 2017 U.S. Dist. LEXIS 229191, *2 (S.D. Tx. Jan 16, 2017)* (when vote dilution occurs, "[r]emedies like monetary damages, or more limited injunction provisions, are inadequate to redress the injury and to prevent future harm").

Individual in-person voters face even further irreparable harm, as their in-person votes will be disparately impacted through the Secretary's arbitrary guidance allowing in-person votes to be treated more strictly than mail-in votes.  For example, Ms. Patterson and Mr. Show, who both intend to vote in person, will be treated differently than absentee or mail-in voters. (App. Ex. 3, Aff. of Melanie Patterson, ¶ 5.)  Under Secretary Boockvar's guidance memo, their votes face a rigid screening process and signature comparison, which could lead to the rejection of their ballots. But, under Secretary Boockvar's September guidance memos, a fraudulent voter, casting an illegal ballot via absentee or mail-in, can succeed in casting an illegal ballot.  (App. Ex. 19, Riddlemoser Rep. at Rep. Ex. D.)  The irreparable harm faced by all Plaintiffs and the Pennsylvania electorate is clear; Defendants must be enjoined.

Weighing the balance of harms also tips sharply in Plaintiffs' favor.  Where, as here, a plaintiff shows a violation of equal protection, "the balance of harms need not strongly weigh in [the moving party's favor] for this factor to be met."  *Exodus Refugee Immigration Inc. v. Pence, 165 F. Supp. 3d 718, 739 (7th Cir. 2016).*  Plaintiffs have shown that, unless enjoined, Defendants' conduct during the 2020 General Election will illegally effect the results of elections throughout Pennsylvania and the nation.

Plaintiffs likewise have met their burden to show their claims advance the public interest. The Third Circuit instructed that "the public interest is best served by eliminating constitutional violations." *Scutella v. Erie Cty. Prison*, No. 1:19-cv-245, 2020 U.S. Dist. LEXIS 19318, *17 (W.D. Pa. Feb. 5, 2020) (citing *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3rd Cir. 2002)) (internal quotations omitted); *see also City of Phila. v. Sessions*, 309 F. Supp. 3d 289, 342 (E.D. Pa. 2018 ("Enjoining constitutional violations also furthers the public interest.").  Accordingly, because Plaintiffs will suffer irreparable harm, a balancing of harms favors Plaintiffs, and the public interest is best suited by a free, fair, and equal 2020 General Election, the injunctive relief Plaintiffs seek is warranted and should be granted.

## CONCLUSION

The undisputed facts show Plaintiffs are entitled to the three distinct remedies from this Court as a matter of law.  *First*, Plaintiffs are entitled to: (a) a declaration that Secretary Boockvar's guidance memos dispensing with the signature verification of absentee and mail-in applications and ballots are unconstitutional; and (b) an injunction enjoining all defendant county boards of election from following that guidance memo.  *Second*, Plaintiffs are entitled to: (a) a declaration that all drop boxes and/or mobile collection sites for the return of absentee and mail-in ballots must be staffed, secured, and employed consistently within and across all 67 of Pennsylvania's counties to prevent third-party delivery and other improperly cast absentee or mail-in ballots; and (b) an injunction enjoining any contrary use and segregating any improperly cast ballots.  *Third*, Plaintiffs are entitled to: (a) a declaration that the county residency restriction for watchers is unconstitutional as applied to the upcoming General Election; and (b) an injunction preventing its application, because of the burden on the fundamental right to vote and to a free and fair election will leave myriad locations unwatched and foster an environment ripe for voter fraud.

As the clock continues to tick away to November 3, 2020, Plaintiffs and Pennsylvania's millions of voters are speeding toward a General Election that will undoubtedly be a divisive and incoherent administrative nightmare.  This is all while Secretary Boockvar continues to issue illegal guidance memos to all 67 Pennsylvania County Boards of Elections promoting defiance of Pennsylvania's Election Code – all in order to oust a President she does not favor.  The undisputed facts and the Election Code, as interpreted by long-standing jurisprudence, leave no doubt that Plaintiffs are entitled to the remedies they seek from this Court.  For these reasons, as fully set forth above, Plaintiffs respectfully request the Court to grant their Motion for Summary Judgment in its entirety and enter the relief set forth in their proposed order.

Respectfully submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

Date:  October 1, 2020          By:  */s/ Ronald L. Hicks, Jr.*
Ronald L. Hicks, Jr. (PA #49520)
Jeremy A. Mercer (PA #86480)
Carolyn B. McGee (PA #208815)
Six PPG Place, Third Floor
Pittsburgh, PA 15222
(412) 235-4500 (Telephone)
(412) 235-4510 (Fax)
rhicks@porterwright.com
jmercer@porterwright.com
cmcgee@porterwright.com

and

Matthew E. Morgan (DC #989591)
(admitted pro hac vice – ECF #10)
Justin Clark (DC #499621)
(admitted pro hac vice – ECF #31)
Elections, LLC
1000 Maine Ave., SW, 4th Floor
Washington, DC 20224
(202) 844-3812 (Telephone)
matthew.morgan@electionlawllc.com

justin.clark@electionlawllc.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing *Plaintiffs'*
*Memorandum of Law in Support of Motion for Summary Judgment* to be filed on October 1,
2020, via ECF, which system will serve notice of same on all parties registered to receive same via
the ECF system.  For any party who has yet to enter an appearance, the undersigned certifies that
a copy of the foregoing filing will be served on that party via First Class Mail and a copy sent to
the County Solicitor, if known, via email or fax.

Respectfully submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

By:   */s/ Ronald L. Hicks, Jr.*
        Ronald L. Hicks, Jr. (PA #49520)
        Jeremy  A. Mercer (PA #86480)
        Carolyn B. McGee (PA #208815)
        Six PPG Place, Third Floor
        Pittsburgh, PA 15222
        (412) 235-4500 (Telephone)
        (412) 235-4510 (Fax)
        rhicks@porterwright.com
        jmercer@porterwright.com
        cmcgee@porterwright.com

        and

        Matthew E. Morgan (DC #989591)
        (admitted pro hac vice – ECF #10)
        Justin Clark (DC #499621)
        (admitted pro hac vice – ECF #31)
        Elections, LLC
        1000 Maine Ave., SW, 4th Floor
        Washington, DC 20224
        (202) 844-3812 (Telephone)
        matthew.morgan@electionlawllc.com
        justin.clark@electionlawllc.com

        *Counsel for Plaintiffs*