**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DONALD J. TRUMP FOR PRESIDENT,
INC., et al.

               Plaintiffs,

    v.

KATHY BOOCKVAR, in her capacity as
Secretary of the Commonwealth of
Pennsylvania, et al.,

               Defendants.

Civil Action No. 2:20-CV-966

Judge J. Nicholas Ranjan

**ALLIANCE INTERVENORS' MEMORANDUM OF LAW
(1) IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
(2) IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................1

BACKGROUND ..............................................................................................................2

   I.   Scope of Remaining Claims ................................................................................2

   II.   The Poll Watching Claims..................................................................................3

      A.   Pennsylvania's poll watching law .................................................................3

      B.   A troubling history of poll watching ..............................................................5

   III.   The Plaintiffs' Signature Match Claims. ...........................................................9

      A.   The statute Plaintiffs rely on does not require or even mention signature matching ......9

      B.   The Secretary's Guidance Memoranda reasonably interpret the statute ......................10

LEGAL STANDARD ......................................................................................................11

ARGUMENT ..................................................................................................................12

   I.   Summary judgment should enter against Plaintiffs on Counts I, II, and III because they do not have standing. ..............................................................12

      A.   Plaintiffs lack representational standing..........................................................14

      B.   Plaintiffs lack direct organizational standing. ..................................................15

      C.   Plaintiffs do not have prudential standing to raise the rights and interests of others. ...17

   II.   This Court should abstain on all questions of state law. ...................................19

   III.   Plaintiffs' poll watching claims fail as a matter of law and of proof. ............................22

      A.   This Court should enter summary judgment against Plaintiffs on Counts IV and V. ...23

      B.   Plaintiffs are not entitled to summary judgment on their poll watching claims.............31

   IV.   Plaintiffs' signature match claims fail as a matter of law...............................................34

## TABLE OF AUTHORITIES

**CASES**

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
  938 F.3d 1147 (9th Cir. 2019) ............................................................................... 15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................... 11, 12

*Anderson v. United States*,
  417 U.S. 211 (1974) ............................................................................................... 28

*Ariz. Democratic Party v. Hobbs*,
  No. CV-20-01143-PHX-DLR, 2020 U.S. Dist. LEXIS 165959 (D. Ariz. Sep.
  10, 2020) ................................................................................................................. 37

*Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*,
  835 F.3d 388 (3d Cir. 2016) .................................................................................. 12

*Balsam v. Secretary of N.J.*,
  607 F. App'x 177 (3d Cir. 2015) ..................................................................... 23, 24

*Banfield v. Cortés*,
  110 A.3d 155 (Pa. 2015) ....................................................................................... 24

*Benezet Consulting, LLC v. Boockvar*,
  433 F. Supp. 3d 670 (M.D. Pa. 2020) .................................................................. 12

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) .................................................................................. 12

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014) .................................................................................. 15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................... 11, 12

*Citizens for Fair Representation v. Padilla*,
  815 F. App'x 120 (9th Cir. 2020) ......................................................................... 15

*Clark v. Martinez*,
  543 U.S. 371 (2005) ............................................................................................... 35

*Common Cause Rhode Island v. Gorbea*,
  970 F.3d 11 (1st Cir. 2020) ................................................................................... 27

*Cook Cnty. Rep. Party v. Pritzker*,
  No. 20-cv-4676, 2020 WL 5573059 (N.D. Ill. Sept. 17, 2020) ...........................................27

*Corman v. Torres*,
  287 F. Supp. 3d 558 (M.D. Pa. 2018) (per curiam) ...............................................................18

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) ...............................................................................................................28

*Daschle v. Thune*,
  No. 04-4177 (D.S.D. Nov. 2, 2004), Dkt. 1, 6 .........................................................................6

*Dem. Exec. Comm. of Fl. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ..............................................................................................37

*Dem. Nat'l Comm. v. Rep. Nat'l Comm.*,
  671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012) ...........................6, 29

*Democracy N.C., et.al. v. N.C. State Bd. of Elections*,
  No. 1:20-cv-457, 2020 WL 4484063 (M.D.N.C. May 22, 2020) ............................................36

*Doe v. Nat'l Bd. of Medical Examiners*,
  199 F.3d 146 (3d Cir. 1999) ...................................................................................................12

*Donald J. Trump for President, Inc. v. Cegavske*,
  No. 2:20-cv-1445 JCM (VCF), 2020 WL 5626974 (D. Nev. Sept 18, 2020) .......13, 15, 16, 17

*Fair Elections Ohio v. Husted*,
  770 F.3d 456 (6th Cir. 2014) ..................................................................................................14

*Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*,
  141 F.3d 71 (3d Cir. 1998) .....................................................................................................16

*Frederick v. Lawson*,
  No. 1:19-cv-0959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995 (S.D. Ind. Aug.
  20, 2020) ................................................................................................................................37

*Gray v. Sanders*,
  372 U.S. 368 (1963) ...............................................................................................................28

*Green Party of Ark. v. Martin*,
  649 F.3d 675 (8th Cir. 2011) ..................................................................................................19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...............................................................................................................15

*Hughes v. City of Cedar Rapids*,
  840 F.3d 987 (8th Cir. 2016) ..................................................................................................18

*Jutrowski v. Twp. of Riverdale*,
  904 F.3d 280 (3d Cir. 2018) ............................................................. 12

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ................................................................... 17, 18

*League of Women Voters of N.J. et al. v. Tahesha Way*,
  No. 20-cv-05990, Dkt. 34 (E.D.N.J. June 17, 2020) ........................... 37

*League of Women Voters of Penn. v. Commonwealth*,
  178 A.3d 737 (Pa. 2018).......................................................24, 27, 28

*League of Women Voters of the U.S. v. Kosinski*,
  No. 1:20-cv-05238, Dkt. 37 (S.D.N.Y. Sept. 17, 2020) ....................... 38

*Libertarian Party of Conn. v. Merrill*,
  No. 3:20-CV-0467 (JCH), 2020 WL 3526922 (D. Conn. June 27, 2020) ............ 19

*Libertarian Party of Ill. v. Pritzker*,
  No. 20-CV-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), *aff'd sub nom.*
  *Libertarian Party of Ill. v. Cadigan*, No. 20-1961, 2020 WL 5104251 (7th Cir.
  Aug. 20, 2020)......................................................................... 19

*Libertarian Party of Ohio v. Blackwell*,
  462 F.3d 579 (6th Cir. 2006) ............................................................. 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................... 13, 17

*Martel v. Condos*,
  No. 5:20-cv-131, 2020 WL 5755289 (D. Vt., Sept. 16, 2020).................. 14, 15

*Martin v. Kemp*,
  341 F. Supp. 3d 1326 (N.D. Ga. 2018)............................................ 36, 38

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ............................................................. 30

*Minn. Voters Alliance v. Ritchie*,
  720 F.3d 1029 (8th Cir. 2013) ................................................... 1, 26, 27

*N.C. All. for Retired Americans et al. v. N.C. State Bd. of Elections*,
  No. 20-CVS-8881 (N.C. Sup. Ct. Sept. 22, 2020) ............................... 38

*Ohio State Conference of NAACP v. Husted*,
  768 F.3d 524 (6th Cir. 2014), *vacated as moot*, 2014 WL 10384647 (Oct. 1,
  2014)..................................................................................... 23

*Paher v. Cegavske*,
 No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) .............. 14, 15

*Partido Nuevo Progresista v. Perez*,
 639 F.2d 825 (1st Cir. 1980) ........................................................................................... 1, 27

*Penn. Dem. Party v. Boockvar*,
 No. 133 MM 2020, 2020 WL 5554644 (Pa. Sept. 17, 2020) ...........................................passim

*Railroad Commission of Texas v. Pullman Company*,
 312 U.S. 496 (1941) ............................................................................................................ 2, 20

*Rep. Party of Penn. v. Cortés*,
 218 F. Supp. 3d 396 (E.D. Pa. 2016) ...................................................................................passim

*Reynolds v. Sims*,
 377 U.S. 533 (1964) ........................................................................................................ 26, 28

*Rogers v. Corbett*,
 468 F.3d 188 (3d Cir. 2006) ................................................................................................. 23

*Rust v. Sullivan*,
 500 U.S. 173 (1991) ............................................................................................................. 35

*Saucedo v. Gardner*,
 335 F. Supp. 3d 202 (D. N.H. 2018) .................................................................................... 38

*Scott v. Harris*,
 550 U.S. 372 (2007) ............................................................................................................. 12

*Self Advocacy Sols. N.D. v. Jaeger*,
 No. 3:20-CV-00071, 2020 U.S. Dist. LEXIS 108854 (D.N.D. June 5, 2020) ....................... 37

*Short v. Brown*,
 893 F.3d 671 (9th Cir. 2018) .......................................................................................... 23, 27

*Sierra Club v. Trump*,
 963 F.3d 874 (9th Cir. 2020), *petition for cert. filed*, No. 20-138 (U.S. Aug. 7,
 2020) ..................................................................................................................................... 14

*Snider v. Shapp*,
 405 A.2d 602 (Pa. Cmwlth. Ct. 1979) .................................................................................. 24

*Socialist Workers Party v. March Fong Eu*,
 591 F.2d 1252 (9th Cir. 1978) .............................................................................................. 30

*Spencer v. Blackwell*,
 347 F. Supp. 2d 528 (S.D. Ohio 2004) ................................................................................... 6

*Strayer v. Bare*,
No. 3:06-cv-2068, 2010 WL 95123 (M.D. Penn. Jan. 6, 2010) .................................................. 3

*Trump for President, Inc. v. Boockvar*,
No. 2:20-CV-966, 2020 WL 4920952 (W.D. Pa. Aug. 23, 2020) ....................... 19, 20, 21, 22

*United States v. Florida*,
No. 4:12cv285-RH/CAS, 2012 WL 13034013 (N.D. Fla. Nov. 6, 2012) ....................... 14, 15

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ..................................................................................................... 17, 18

*Warth v. Sedlin*,
422 U.S. 490 (1975) .............................................................................................................. 14

*Winston v. Moore*,
91 A. 520 (Pa. 1914) ................................................................................................. 24, 25, 26

*Zessar v. Helander*,
No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ................................................ 37

## STATUTES

25 P.S. § 2375 ......................................................................................................................... 33

25 P.S. §§ 2642(e), 2687(a)–(c) ................................................................................................ 4

25 P.S. § 2642(i) ................................................................................................................ 32, 33

25 P.S. § 2650 ........................................................................................................................... 4

25 P.S. § 2671 ..................................................................................................................... 4, 32

25 P.S. § 2676 ........................................................................................................................... 4

25 P.S. § 2685 ..................................................................................................................... 4, 32

25 P.S. § 2687 ......................................................................................................................... 33

25 P.S. § 2687(a) ....................................................................................................................... 4

25 P.S. § 2687(b) ............................................................................................................... 3, 4, 22

25 P.S. § 3050(d) ...................................................................................................................... 4

25 P.S. § 3067 ........................................................................................................................... 4

25 P.S. § 3146.8 ....................................................................................................................... 20

25 P.S. § 3146.8(b) ..................................................................................................... 4

25 P.S. § 3146.8(f) .................................................................................................... 35

25 P.S. § 3146.8(g) ............................................................................................... 9, 35

25 P.S. § 3146.8(g)(3) ........................................................................................ 10, 35

25 P.S. § 3146.8(g)(5)–(7) ....................................................................................... 35

25 P.S. § 3150.11(b) ................................................................................................ 36

25 P.S.  §§ 3501–3553 ............................................................................................. 33

52 U.S.C. § 20511 ................................................................................................... 33

Pa. Laws, 1937 vol. 1 1333, 1351 ............................................................................. 3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ............................................................................................... 11

Fed. R. Civ. P. 56(e) ............................................................................................... 13

Pa. Const. art. I, § 5 ................................................................................................ 24

Reg. Sess. (Pa. 2002) ................................................................................................ 3

U.S. Constitution First and Fourteenth Amendments ................................................ 4

U.S. Constitution Fourteenth Amendments ............................................................. 25

## INTRODUCTION

Plaintiffs' claims are multiplying in quantity but not quality. Each small grievance they add to the grab-bag of claims they have asked this Court to resolve draws it into a task that federal courts are ill-equipped for: the detailed oversight of the state administration of election laws to stamp out the specter of voter fraud. On what basis? Plaintiffs' claims are not rooted in any constitutional injury; Plaintiffs have not been prevented from voting or unfairly singled out by the state for disadvantage. Their foundation is quicksand. Plaintiffs envision a dramatic expansion of federal judicial oversight of election administration in an effort to combat voter fraud. But there is no basis in law or in fact for this Court to take on that role. "The Constitution is not an election fraud statute," *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and it is not an appropriate institutional role for federal courts to make policy on the best way to prevent voter fraud in administering elections, *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827–28 (1st Cir. 1980).

At bottom, Plaintiffs' claims share a fatal flaw—Plaintiffs are unable to show that the laws they challenge make it harder to vote. This flaw undermines their case for standing, and the merits of their claims, which are governed by *Anderson-Burdick*. For this reason, Intervenor-Defendants the Pennsylvania Alliance for Retired Americans, Michael Crossey, Dwayne Thomas, Irvin Weinreich, and Brenda Weinreich (the "Alliance Intervenors" collectively) move for summary judgment against Plaintiffs on all claims and oppose Plaintiffs' motion for the same.

To avoid duplication, the Alliance Intervenors have narrowed the scope of this brief. This brief covers four issues: (1) standing, (2) abstention, (3) Plaintiffs' poll watching claims, and (4) the federal constitutional principles that inform Plaintiffs' signature match claims. The Alliance Intervenors otherwise join Defendants' and other Intervenors' briefs.

**BACKGROUND**

**I.     Scope of Remaining Claims**

Rather than narrowing the claims in this case, at each successive stage of litigation Plaintiffs have sought to add more. Their motion for summary judgment is no exception. Plaintiffs' motion requests relief based on four categories of claims: (1) challenges to the Secretary's guidance that applications for absentee and mail-in ballots, as well as voted ballots, should not be rejected based solely on a signature analysis; Proposed Order ¶ 1, Dkt. 503-1; (2) challenges to the Secretary's guidance allowing unstaffed drop boxes, Proposed Order ¶ 2; (3) an as-applied challenge to the county residency restrictions for poll watchers, Proposed Order ¶ 3; and (4) a request that poll watchers have access to all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including satellite and early voting sites, *id.*

The only live issue of those raised by Plaintiffs, however, is their as-applied challenge to the poll watcher residency requirements. This Court clarified in its September 24th order that it was abstaining under *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496 (1941), on "claims regarding Secretary Boockvar's guidance that in-person mail-in ballots shall be accepted absent a 'bona fide objection'" as being an "unsettled question of state law," and that it would also abstain from deciding claims regarding "verification of in-person, mail-in ballot applications" for the same reason. Dkt. 460 at 1. Thus, Plaintiffs' first category of claims are out of the case. This Court also stated in its September 23rd order that it was abstaining on "Drop-Box Notice and Other 'Polling Place' Requirement Claims," specifically because these issues "involve[] unsettled issues of state law" and "Plaintiffs had several avenues to pursue a prompt interpretation of state law after this Court abstained."  Dkt. 459 at 5–6. Therefore, Plaintiffs' second category of claims also are no longer in contention here. Finally, the claims in Plaintiffs'

fourth category, which relate to the extent to which various aspects of absentee voting should be treated like polling places (*i.e.*, whether poll watchers should be allowed), are either covered by the text of the Court's abstention order (as it relates to ballot dropboxes), Dkt. 459 at 5, or are not fairly encompassed by the Second Amended Complaint and are not in the case, *Strayer v. Bare*, No. 3:06-cv-2068, 2010 WL 95123, at *17 (M.D. Penn. Jan. 6, 2010) (citations omitted).

Out of an abundance of caution, however, the Alliance Intervenors address all of Plaintiffs' purported claims in the discussion that follows.

## II.    The Poll Watching Claims

Acknowledging that their facial challenges to Pennsylvania's poll watching laws cannot succeed, Plaintiffs raise an as-applied challenge to the law. The exact nature of their as-applied challenge is murky, but the claims appear to rest on the assertion that the COVID-19 pandemic makes it too difficult to procure poll watchers in each polling location if poll watching is limited to county residents.

### A.    Pennsylvania's poll watching law

At least since 1937, Pennsylvania has required poll watchers to be drawn from the local community. *See* Pa. Laws, 1937 vol. 1 1333, 1351. While Pennsylvania law originally confined poll watchers to the district where they were registered to vote, in 2002 the General Assembly amended the law to better accord with the Commonwealth's county-based system of election administration. S.B. 1240, Gen. Assemb., Reg. Sess. (Pa. 2002). The Election Code now requires that each poll watcher "must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located." 25 P.S. § 2687(b). This residency requirement is the basis of Plaintiffs' poll watching claims.

Reflecting their dual nature as county and party agents, poll watchers are appointed and compensated by a candidate or political party and receive certification from the county board of

elections. *Id.* §§ 2642(e), 2687(a)–(c). A candidate may appoint two poll watchers per district, and a political party may appoint three. *Id.* § 2687(a). Only one watcher per party is allowed inside a polling location at a time. *Id.* § 2687(b).

Upon receiving their certificate of appointment, poll watchers are granted a number of privileges. They may inspect the voting check list at their polling place to help their appointing candidate or party determine which supporters have cast a ballot. *Id.* § 2687(b). They may challenge any voter on the basis of identity or residency. *Id.*; *id.* § 3050(d). And they may monitor various proceedings from the swearing in of other election officials, *id.* § 2676, to the opening and counting of absentee and mail ballots, *id.* § 3146.8(b), to the tabulation of votes, *id.* § 3067, and any recounting of ballots, *id.* § 2650. Election procedures are also monitored by a district election board consisting of a judge of election, a majority inspector of election, and a minority inspector of election. *Id.* § 2671. The board may also be assisted by clerks and machine inspectors. *Id*. In addition, "five or more duly registered electors of any election district" may petition the court of common pleas of that county to appoint overseers to "secure the purity and fairness" of any election. *Id.* § 2685. Overseers have authority similar to but more extensive than poll watchers; for example, they may "challenge any person offering to vote and interrogate him and his witnesses under oath in regard to his right of suffrage at said primary or election, and to examine his papers produced." *Id.*

Federal and state courts have repeatedly upheld the constitutionality of Pennsylvania's county residency requirement for poll watchers. In 2016, the U.S. District Court for the Eastern District of Pennsylvania rejected a challenge to the requirement under the First and Fourteenth Amendments of the U.S. Constitution. *See Rep. Party of Penn. v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016). The Court held that the county residency requirement did not burden the

fundamental right to vote or "in any way" limit the range of choices in the voting booth. *Id.* at 408. Applying rational basis review, the Court determined that the county residency requirement is "rationally related to the state's interest in maintaining its county-run election system." *Id.* at 409. The Supreme Court of Pennsylvania recently reached the same conclusion, affirming that the county residency requirement does not violate state or federal constitutional rights. *See Penn. Dem. Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *30 (Pa. Sept. 17, 2020). The Court rejected claims that poll watchers are needed to protect against election fraud involving mail-in voting, and it reached the same conclusion as *Cortés*: the county residency requirement does not burden constitutional voting rights, and it is justified by Pennsylvania's rational choice to adopt a county-based scheme for conducting elections. *Id.* "[E]ven if" it is difficult for parties to fill poll watcher positions in every precinct, the Court concluded, that claim "is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

## B.    A troubling history of poll watching

As Dr. Matthew Barreto, a Professor of Political Science and Chicana/o studies at University of California, Los Angeles and expert in election administration, explains, "there is a long history of voter intimidation targeted at Black and Latino communities in this country, which carries through to the modern day." [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 4-16, 28); Ex. 2 Equal Justice Initiative, Lynching in America: Confronting the Legacy of Racial Terror (3d ed. Sept. 15, 2020) at 9, 12, 14, 16, 21, 58).] "Many of these instances involve harassment at the polling place, including by targeted challenges to the qualification of minority voters to vote." [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶ 28).] His expert report, included in the appendix to this brief, catalogues this history and concludes that "[p]oll-watching will generate a chilling effect on political participation among minority groups." [*Id.* ¶ 41.]

Many of these instances of voter intimidation have been perpetrated by the very Plaintiffs in this case, and by other Republican and conservative organizations.[1] Indeed, the Republican National Committee has been prohibited from engaging in poll watching since the 1980s because of egregious misconduct in its poll monitoring activities that resulted in a consent decree. [*Id.* ¶¶ 30–32.] Among other things, Republicans "created a list of persons to be challenged at the polls by mailing sample ballots to individuals living in precincts where the majority of the registered voters were members of ethnic minorities." *Dem. Nat'l Comm. v. Rep. Nat'l Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012); [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 30–32)]. Republicans also sent off-duty law enforcement officers wearing "armbands emblazoned with a seemingly-official title: 'National Ballot Security Task Force'" to polling locations to intimidate voters. *Dem. Nat'l Comm.*, 671 F. Supp. 2d at 579; [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 30–32)]. That consent decree was vacated in 2017, making the upcoming presidential election the first in nearly four decades where the RNC will be allowed to run a poll watching operation. [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶ 32).]

In the 2016 election, a federal court in the neighboring state of Ohio granted a temporary restraining order against Donald J. Trump for President and the Ohio Republican Party under the Ku Klux Klan Act for voter intimidation tactics. *Ohio Dem. Party v. Ohio Rep. Party*, No. 16-2645 (N.D. Ohio Nov. 4, 2016), Dkt. 1, 27. Indeed, Donald J. Trump for President was charged with

---

[1] *See also Spencer v. Blackwell*, 347 F. Supp. 2d 528 (S.D. Ohio 2004); *Daschle v. Thune*, No. 04-4177 (D.S.D. Nov. 2, 2004), Dkt. 1, 6 (entering a temporary restraining order against a Republican Senate candidate after his supporters harassed Native American voters at the polls); [Ex. 3 (John Ritter, *The Ballot Cops*, The Atlantic (Sept. 19, 2012) (documenting abusive use of Ohio's poll watching statute against minority voters); Ex. 4 (Sherwood Guernsey, Lee Harrison, Johanna Dombrowski, *Why Can't I Vote: The Republican Party's 50-Year Assault on Voting Rights* (Aug. 2015).]

harassing and intimidating voters at the polls across the country in 2016. [Ex. 5 (*Report: Trump 2016 Campaign Sought to Dissuade Blacks from Voting, Listed Millions for 'Deterrence,'* Forbes (Sept. 28, 2020)).]   By stoking fears of a "rigged election," the Trump campaign energized supporters, including heavily armed militia movement groups, to plan poll watching activities in "full force." [Ex. 6 (Ben Schreckinger, *White Nationalists Plot Election Day Show of Force*, Politico (Nov. 2, 2016)).] As one election law expert put it, the Trump campaign's incendiary focus on the specter of a rigged election "seem[ed] to be an invitation to go and make trouble." [Ex. 7 (David Weigel, *Trump Fires Up Recruitment of Poll Watchers as He Warns of Election "Cheating,"* Wash. Post (Aug. 13, 2016)).]

Pennsylvania is unfortunately all-too-familiar with these tactics. In 2012, a Pennsylvania judge ordered Republicans to stop harassing voters outside a polling location in Allegheny County by asking for identification. [Ex. 8 (Adam Brandolph, *Voters Report Problems with Long Lines, Confusion Over Voter ID Law*, TribLive (Nov. 6, 2012)).] And in 2016, one of Pennsylvania's U.S. Senators requested assistance from the Department of Justice after reports that elements of the Ku Klux Klan and other white nationalists intended to intimidate voters through poll watching and other efforts. [Ex. 9 (Brent Griffiths, *Sen. Casey Calls for DOJ to Intervene After White Nationalists Vow to Poll Watch*, Politico (Nov. 3, 2016)).]

The rhetoric and iconography Plaintiffs have deployed in this very election has primed the pump for their supporters to engage in voter intimidation. Like in 2016 where Trump repeatedly stoked fears about voter fraud in Philadelphia and told his supporters to go "watch other communities," [Ex. 10 (Aug. 12, 2016 Donald J. Trump for President Rally in Altoona, PA at 3:45-5:30); Ex. 9 (David Weigel, *Trump fires up recruitment of poll watchers as he warns of election 'cheating,'* The Washington Post (Aug. 13, 2016) (describing Altoona rally); Ex. 11 (Oct.

1, 2016 Donald J. Trump for President Rally in Manheim, PA at 15:30–16:30); Ex. 12 (Oct. 10, 2016 Donald J. Trump for President Rally in Ambridge, PA at 46:00–46:35); Ex. 13 (Philip Bump, *Donald Trump warns that 'other communities' are poised to steal the election*, The Washington Post (Oct. 11, 2016); Ex. 14 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic (Oct. 13, 2016) (describing Ambridge and Manheim rallies)], Trump is up to the same old tactics.

Once again, Trump and his campaign are warning supporters that Democrats in Pennsylvania are trying to steal the election, and using aggressive and quasi-military iconography and rhetoric to set a tone ripe for intimidation. [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 42–51); Ex. A (Sept. 30, 2020 Unredacted Expert Report of Dr. M. Barreto ¶¶ 44–45); Ex. 16 (Griffin Connolly, *Trump recruiting 50,000 polling site monitors in thinly veiled attempt to harass and intimidate voters, activists warn*, The Independent (May 18, 2020); Ex. B (Plaintiffs' Discovery Responses Bates No. P001555) (recruiting email from Trump Campaign); Ex. 17 (Plaintiffs' Discovery Responses Bates No. P001537–38) (poll watcher recruitment email from Trump Campaign that says "We need to ensure that these votes are PROTECTED. . . . The Democrats are trying to ruin Election Day with fraud and lies. Join our Election Day Operation and ensure a fair election."); Ex. C (Plaintiffs' Discovery Responses Bates No. 1550–51) (email between Trump Campaign official and Pennsylvania Republican Party official); Ex. D (Plaintiffs' Discovery Responses Bates No. 1565); Ex. 18 (Plaintiffs' Discovery Responses Bates No. P002042–45) (website describing poll watchers as part of the Army for Trump); Ex. 19 (Plaintiffs' Discovery Responses Bates No. P001632–33) (email from Lehigh County Republican Party Chair to Trump Election Day Director stating "We know the Democrats will have a full court press this November to try to steal the election from Trump. We need to put the fear of God in them and put

them on notice that we will not tolerate any attempts at fraud."); Ex. E (Aug. 20, 2020 Deposition of James Fitzpatrick for Trump for President, Inc. and RNC at 498–503)]. His supporters have already caused disruption during voting. Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶ 51; Ex. 15 (Nick Corasanti, *Trump Supporters Disrupt Early Voting in Virginia*, The New York Times (Sept. 20, 2020)]. And at the first presidential debate just days ago, President Trump stated, "I am urging my supporters to go into the polls and watch very carefully, because that's what has to happen," and he then specifically referenced Philadelphia "because bad things happen in Philadelphia." [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶ 52); Ex. 20 (Sept. 29, 2020 Presidential Debate at 1:32:00–1:33:00)].

### III.   The Plaintiffs' Signature Match Claims.

Plaintiffs' signature match claims center on their allegation that two Guidance Memoranda issued by the Secretary "eschew the [Pennsylvania] Election Code's critical signature verification requirements," which they characterize as "illegal guidance." Plaintiffs' Motion for Summary Judgment ("Pls. Mot."), Dkt. 505 at 12–13. As support, Plaintiffs cite a single provision in the Pennsylvania Election Code, 25 P.S. § 3146.8(g). They claim that this provision requires election officials to verify the identity of the voter by conducting "a comparison of the signature on the external envelope to the voter's permanent record on file" to ensure the signatures "match." Pls. Mot. at 23.

### A.   The statute Plaintiffs rely on does not require or even mention signature matching

The statute Plaintiffs cite, however, does not require or even mention "signature matching." Instead, it requires county election officials to "compare the information" contained in the voter's declaration on the envelope to the information in the applicable file:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the

declaration on the envelope of each ballot not set aside under subsection (d) [covering deceased voters] and ***shall compare the information thereon*** with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

25 P.S. § 3146.8(g)(3) (emphasis added).

It is unclear why Plaintiffs think the statute they cite requires signature matching.

**B.    The Secretary's Guidance Memoranda reasonably interpret the statute**

Based on their interpretation of the statute, Plaintiffs challenge two Guidance Memoranda issued by the Secretary. *See* Pls. Mot. at 25.

The first, titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes," was issued on September 11, 2020 (the "September 11 Guidance"). [Ex. 21 (Pennsylvania Department of State, Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes, Version 1.0 (Sept. 11, 2020))]. The September 11 Guidance "assumes that the voter has satisfactorily completed the steps described above [*i.e.*, Pennsylvania's rigorous procedures for approving a voter's application for absentee or mail-in ballot] as to application for, receipt and return of an absentee or mail-in ballot." [*Id.* at 2.] It then instructs county election officials to follow the procedures set out in the Pennsylvania Election Code by:

[E]xamin[ing] the Voter's Declaration on the outer envelope of each returned ballot and compar[ing] the information on the outer envelope, i.e., the voter's name and address, with the information contained in the "Registered Absentee and Mail-in Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File."

. . .

10

> If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing unless challenged in accordance with the Pennsylvania Election Code.
>
> The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

[*Id.* at 3.]

The second, titled "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures," was issued on September 28, 2020 (the "September 28 Guidance"). [Ex. 22 (Pennsylvania Department of State, Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures, Version 1.0 (Sept. 28, 2020))]. The September 28 Guidance reaffirmed that the Pennsylvania Election Code "does not permit county election officials to reject applications or voted ballots based solely on signature analysis." [*Id.* at 9.] And it clarified that, under the Election Code, "[n]o challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.*]

## LEGAL STANDARD

Summary judgment should be entered when "the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[T]he burden on the moving party may be discharged by 'showing'—that

11

is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party has carried its burden under Rule 56, the non-moving party must "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). The non-moving party has not carried its burden if the evidence offered in response "is merely colorable, conclusory, or speculative." *Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 680 (M.D. Pa. 2020); *see Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) ("Bare assertions, conclusory allegations, or suspicions will not suffice.") (citations omitted); *see also Anderson*, 477 U.S. at 249–50. Summary judgment is appropriate where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where cross-motions for summary judgment are filed, the court reviews each motion separately to determine whether either side carried its respective burden. *See Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

### I.    Summary judgment should enter against Plaintiffs on Counts I, II, and III because they do not have standing.

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of litigation." *Doe v. Nat'l Bd. of Medical Examiners*, 199 F.3d 146, 152–

53 (3d Cir. 1999) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). At the summary judgment stage, that means that Plaintiffs cannot rest on "'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561. "Standing is not 'an ingenious academic exercise in the conceivable,' but . . . requires, at the summary judgment stage, a factual showing of perceptible harm." *Id.* at 566 (quoting *United States v. SCRAP*, 412 U.S. 669, 688 (1973)).

In order to establish standing, therefore, Plaintiffs must put forward evidence of specific facts that they have: (1) suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *id.* at 560 (internal quotation marks); (2) that there is "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court,'" *id.* (alterations in the original); and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,'" *id.* at 561.

In this case, summary judgment is appropriate because Plaintiffs lack standing to assert Counts I, II, and III. They have not established that any of these policies make it harder for their supporters to vote or have their vote counted, nor have they sought relief that would address this injury if they had asserted it. Instead, all they assert is a general interest in preventing voter fraud that is shared by the entire population of Pennsylvania. Indeed, courts across this country, facing arguments from Plaintiffs and similar parties, have rejected the desire to prevent voter fraud as a basis for standing. *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-1445

JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept 18, 2020); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *3–*5 (D. Vt., Sept. 16, 2020); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *4–*5 (D. Nev. Apr. 30, 2020); *cf. United States v. Florida*, No. 4:12cv285-RH/CAS, 2012 WL 13034013, at *1 (N.D. Fla. Nov. 6, 2012) (rejecting motion to intervene).

### A. Plaintiffs lack representational standing.

Plaintiffs do not have representational standing to promote the interests of their voters or supporters because their voters and supporters would not have standing to sue. "The possibility of [] representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Sedlin*, 422 U.S. 490, 511 (1975). Plaintiffs must prove that their supporters "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the [supporters] themselves brought suit." *Id.*; *see also Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020) ("An organization has standing to sue on behalf of its members when 'its members would otherwise have standing to sue in their own right.'" (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996))), *petition for cert. filed*, No. 20-138 (U.S. Aug. 7, 2020); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Unlike in [other cases], there is simply no indication that any of [the plaintiff's] members will be a voter affected by the challenged law.").

Here, there is no genuine dispute over whether the challenged laws make it harder for Plaintiffs' voters to vote. Plaintiffs have presented no such evidence. Nor could they. The voting laws they purport to challenge in their summary judgment motion—the use of unstaffed dropboxes and the Secretary's signature match guidance—make it easier, not harder, to vote and to have that vote counted.

The only purported injury they have presented on behalf of their voters—vote dilution by fraud—is not a cognizable injury for standing purposes. As one court recently explained, when confronted by a similarly unsupported theory of vote-dilution-by-illegal-votes:

> The theory of Plaintiffs' case . . . is that the [challenged election plan] will lead to an increase in illegal votes thereby harming them as rightful voters by diluting their vote. But Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury. This is not a pioneering finding. Other courts have similarly found the absence of an injury-in-fact based on claimed vote dilution.

*Paher*, 2020 WL 2089813, at *5 (citations omitted); *see also, e.g., Trump for President, Inc.*, 2020 WL 5626974, at *4 ("The alleged [vote dilution] injuries are speculative as well, but their key defect is generality." (citation omitted)); *Martel*, 2020 WL 5755289, at *4 ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Florida*, 2012 WL 13034013, at *1 (holding vote dilution not basis for intervention because proposed intervenors' "asserted interests are the same . . . as for every other registered voter in the state"); *see also Citizens for Fair Representation v. Padilla*, 815 F. App'x 120, 123 (9th Cir. 2020) (no standing where "the growing size of California's electoral districts values—or in Plaintiffs' view, devalues—every vote equally").

## B. Plaintiffs lack direct organizational standing.

Plaintiffs do not have direct organizational standing either because they lack evidence of specific facts that could support a finding that the challenged laws threaten their organizational mission or their supporters. An organization has standing to sue if it can demonstrate that a challenged law or policy causes a direct organizational injury, either by harming the organization's mission or requiring the organization to divert resources to prevent said harm. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285–86 (3d Cir. 2014); *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019).

"An organization cannot 'simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem.'" *Trump for President, Inc.*, 2020 WL 5626974, at *5 (quoting *Valle de Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013)); *see also Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 79–80 (3d Cir. 1998).

Thus, to prove direct organizational standing on a diversion of resource theory, an organization must show two things: (1) that the challenged law threatens an injury to its mission, its members, or its supporters; and (2) that it has diverted resources to prevent that injury. In the election context, courts routinely recognize that laws that make it harder to vote threaten the mission of political parties and candidates either by illegally harming their electoral prospects or by injuring their supporters. The common thread of these cases is that "the challenged law has a direct and specific impact on a voter's ability to vote." *Trump for President*, 2020 WL 5626974, at *6 (collecting cases).

Plaintiffs do not have direct organizational standing because the laws that they challenge do not threaten an injury to their mission or their supporters. The challenged laws do not reduce the opportunities and avenues for voters to vote. Throughout this litigation, in pleadings and in depositions, Plaintiffs have asserted that the challenged laws may cause voters to lose faith in the electoral process. *E.g.*, [Ex. 23 (Sept. 28, 2020 Deposition of Plaintiff M. Kelly at 29–30)]. But they have not introduced proof that voters have lost faith in the electoral process besides their own say so, and they certainly have not introduced proof that traces that loss of confidence back to the laws they actually challenge. Indeed, when pressed on what has caused voters to lose confidence in the electoral process, Plaintiffs pointed to many different policies, including the passage of Act

77 and the adoption of no-excuse absentee voting, neither of which are at issue in this case. [*Id.* at 65–66)]. This failure of proof dooms their case for standing. *See Trump for President*, 2020 WL 5626974, at *5 (rejecting plaintiffs' organizational standing argument because "[o]utside of stating 'confus[ion]' and 'discourage[ment]' in a conclusory manner, plaintiffs make no indication of how [the challenged law] will discourage their member voters from voting." (second and third alterations in original)); *see also Lujan*, 504 U.S. at 560 (explaining that standing requires "a causal connection between the injury and the conduct complained of").

### C. Plaintiffs do not have prudential standing to raise the rights and interests of others.

To the extent that Plaintiffs continue to raise claims under the Elections Clause, *see* Pls. Mot. at 19, 48–50, and assert the rights of third-party political organizations, they lack prudential standing to do so. Even where a plaintiff has Article III standing, "the usual rule is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). These claims, however, "rest . . . on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth*, 422 U.S. at 499). In order to assert the legal rights and interests of third parties, Plaintiffs must prove (1) a close relationship between them and the third party; and (2) a hinderance to the third party's ability to protect its own rights. *Id.* at 130.

### 1. Plaintiffs lack prudential standing to assert claims under the Elections or Electors Clauses on behalf of the General Assembly.

Despite this Court's efforts to cull questions of unsettled state law from this litigation, Plaintiffs' motion for summary judgment raises several new arguments under the Elections and Electors Clauses that Defendants are not acting in conformity with Pennsylvania law. Their motion is replete with references to Pennsylvania's Legislature—the General Assembly—and the alleged usurpation of that body's authority. Pls. Mot. at 19, 48–50. That is naturally so because the

Elections and Electors Clauses vest rights in those entities involved in the lawmaking processes of a state, namely the General Assembly and whatever other entities Pennsylvania has delegated lawmaking authority to. *See Corman v. Torres*, 287 F. Supp. 3d 558, 571–73 (M.D. Pa. 2018) (per curiam) (rejecting Article III and prudential standing in Elections Clause challenge by two state legislators to Pennsylvania Supreme Court decision).

"Plaintiffs are neither the Pennsylvania General Assembly nor a group to which Pennsylvania has delegated the Commonwealth's lawmaking power." *Id.* at 573. As such, they do not have any rights under the Elections and Electors Clauses. *Id.* Thus, they must meet the requirements of prudential standing in order to pursue claims under the Elections and Electors Clauses. Plaintiffs do not. They have identified no "'hindrance' to the [Legislature's] ability to protect [its] own interests." *Kowalski,* 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *see also Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016) (third-party standing requires "'a close relationship with the person who possesses the right' and 'a hindrance to the possessor's ability to protect [her] own interests'" (alteration in original) (quoting *Kowalski*, 543 U.S. at 130)). "Absent a 'hindrance' to the third-party's ability to defend its own rights, this prudential limitation on standing cannot be excused." *Corman*, 287 F. Supp. 3d at 572 (quoting *Kowalski*, 543 U.S. at 130). Accordingly, applying the "usual rule" of prudential standing, *Am. Booksellers*, 484 U.S. at 392, Plaintiffs "do[] not have third-party standing" to assert claims on the Legislature's behalf, which is fully capable of representing its own interests. *Hughes*, 840 F.3d at 992; *see also Corman*, 287 F. Supp. 3d at 571–73.

### 2. Plaintiffs lack prudential standing to assert the interests of minor political parties.

Plaintiffs also appear to assert the interests of minor political parties in challenging Pennsylvania's poll watching scheme. Plaintiffs, who are direct adversaries of minor political

parties, can hardly be said to have a close relationship with those organizations. And one need look no further than the pages of the federal reporter to see that minor political parties are perfectly capable of raising their own challenges to election laws. *See, e.g.*, *Libertarian Party of Conn. v. Merrill*, No. 3:20-CV-0467 (JCH), 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party candidates to petition their way onto the ballot); *Libertarian Party of Ill. v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *1 (N.D. Ill. Apr. 23, 2020) (addressing state's ballot access rules related to signature collection), *aff'd sub nom. Libertarian Party of Ill. v. Cadigan*, No. 20-1961, 2020 WL 5104251 (7th Cir. Aug. 20, 2020); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 581 (6th Cir. 2006) (holding that Ohio's system for minor party qualification violated the First Amendment).

## II.    This Court should abstain on all questions of state law.

Plaintiffs' motion for summary judgment continues to raise questions of Pennsylvania law: (1) whether Pennsylvania's election laws require signature matching on absentee ballots and absentee ballot applications; (2) whether early voting and satellite offices as well as ballot dropboxes should be treated like polling locations, including whether poll watchers should be allowed at each location; and (3) whether poll watchers should be permitted to attend pre-canvasses. To the extent this Court considers these claims fairly raised in the Second Amended Complaint and still alive after the ruling on abstention, the Court should abstain.[2] Each of these claims requires the Court to address "uncertain questions of state law, arising under a recently enacted state statute, that challenge Defendants' purported exercise of their core constitutional authority to administer elections." *Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020

---

[2] To the extent it is procedurally required, Alliance Intervenors' move for judgment on the pleadings on abstention grounds.

WL 4920952, at *8 (W.D. Pa. Aug. 23, 2020). The Court should not wade into these murky waters and should instead invoke the *Pullman* abstention doctrine, as it has already done several times in this case. *See Trump for President*, 2020 WL 4920952 (abstaining from Plaintiffs' claims under *Pullman* doctrine); Dkt. 459 (same); Dkt. 460 (same); *see also Pullman*, 312 U.S. at 496.

Under *Pullman* abstention, "federal courts decline to decide federal-constitutional claims if (1) doing so requires interpretation of 'unsettled questions of state law,'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important states policies[.]'" *Trump for President*, 2020 WL 4920952, at *1 (quoting *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991)). When these three factors are met, courts have discretion to stay federal proceedings by weighing other factors like "the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Id.* at *8 (quoting *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996)). As this Court has recognized, the *Pullman* doctrine is "rooted in basic principles of federalism," *id.* at *16 (quoting *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir. 2001)), and counsels strongly against "needless federal intervention into local affairs," *id.* at *7 (quoting *Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 53 (1st Cir. 1994)). *Pullman* abstention on Plaintiffs' federal constitutional challenges is unquestionably warranted here.

First, addressing these claims would require the Court to interpret "unsettled questions of state law." *Id.* at *1 (citation omitted). For example, Plaintiffs argue that the Pennsylvania Election Code—specifically, 25 P.S. § 3146.8—requires "signature verification of qualified electors." Pls. Mot. at 23, 25. Based on that premise, they argue that the Secretary's guidance that county boards

of elections cannot set aside "returned absentee or mail-in ballots based solely upon signature analysis by the county board of elections" is unconstitutional. *Id.* (quoting Ex. 21 (Sept. 11, 2020 Guidance)); *id.* at 25–26 (quoting Ex. 22 (Sept. 28, 2020 Guidance)). The Secretary has interpreted the statute differently. Thus, there is an unsettled question of Pennsylvania law. *See Trump for President*, 2020 WL 4920952, at *9 (noting that Plaintiffs' claims would require the Court "to first decide (1) how to interpret the relevant election-code provisions; and (2) whether Secretary Boockvar's guidance violated each provision as the Court has interpreted it."). To the extent that counties do not read the relevant statutes to permit poll watchers at satellite voting locations and pre-canvass meetings, the same is true for those claims as well.

Second, allowing a Pennsylvania court to resolve unsettled questions about Pennsylvania's Election Code "would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims.'" *Id.* at *1 (citation omitted). If a Pennsylvania court were to agree with Plaintiffs' interpretation of the statutes, then Plaintiffs' federal constitutional claims in this Court would be "mooted entirely." *Id.* at *8; *see id.* at *15–*16 (collecting cases).

Third, an "erroneous construction" of Pennsylvania's Election Code would "clearly" be disruptive to important state policies. *Id.* at *1, *16. As this Court has recognized, "important state policies will be implicated if this Court intervenes in Pennsylvania's election on federal-constitutional grounds" because "under the Constitution, the critical responsibility of administering elections is reserved for the states." *Id.* at *16. "'[C]ommon sense, as well as constitutional law, compels the conclusion' that states must be free to engage in 'substantial regulation of elections' if 'some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id.* at *17 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). "In practice, this

means that '[f]ederal law . . . generally defers to the states' authority to regulate the right to vote.'"
*Id.* (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016)).

Finally, discretionary considerations weigh in favor of abstaining from Plaintiffs' newly introduced signature match, satellite office, and pre-canvass claims, which have been pending in this Court for only a short time. Specifically, Plaintiffs can quickly and definitively resolve their claims by seeking relief directly from the state courts, and they have an "adequate state remedy." *Id.* at *8, *17–*18 (omissions).

## III.    Plaintiffs' poll watching claims fail as a matter of law and of proof.

Plaintiffs challenge the Pennsylvania election law that requires poll watchers to be residents of the county in which they serve (the "residency requirement"). 25 P.S. § 2687(b). While Plaintiffs acknowledge that their facial challenge is not a viable claim in light of the Pennsylvania Supreme Court's recent decision in *Pennsylvania Democratic Party*, they contend that they have also mounted an as-applied challenge to the residency requirement as an undue burden on the right to vote under the U.S. Constitution (Claim IV) and the Pennsylvania Constitution (Claim V). Dkt. 448 at 10. The theory of their as-applied challenge is, in a nutshell, that it is just too hard to recruit poll watchers for the November election. Dkt. 461 at ¶ 204. They hypothesize, then, that a lack of Republican poll watchers could result in election fraud, which could then result in the dilution of honest votes.

The problems with Plaintiffs' claims are many, but they all boil down to this: there is not an iota of legal, factual, or even logical support for their claim that the residency requirement burdens the right to vote. To the contrary, the facts and the law make clear that the residency requirement is an important part of Pennsylvania's county-based election administration and it serves to hinder voter intimidation so that more eligible voters access the franchise. With this in

mind, the Court should grant Defendants-Intervenors' motion for summary judgment on Counts IV and V, and deny Plaintiffs' motion for summary judgment on the same.

### A.   This Court should enter summary judgment against Plaintiffs on Counts IV and V.

As Plaintiffs concede, there is no right to poll watch under the U.S. or Pennsylvania Constitutions. *See Penn. Dem. Party*, 2020 WL 5554644, at *30 ("[A]s the District Court aptly noted, there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute."). Thus, in order to succeed on the merits of their poll watching claim, Plaintiffs are required to prove that the residency requirement unduly burdens the First and Fourteenth Amendment right to vote under the *Anderson-Burdick* framework. *See Short v. Brown*, 893 F.3d 671, 676–77 (9th Cir. 2018) (applying *Anderson-Burdick* to vote dilution challenge to vote by mail law); *see also Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 538 (6th Cir. 2014), *vacated as moot*, 2014 WL 10384647 (Oct. 1, 2014) (applying *Anderson-Burdick* to equal protection challenge to Secretary of State directive); *Cortés*, 218 F. Supp. 3d at 408 (applying *Anderson-Burdick* to vote dilution challenge to Pennsylvania's poll watching law); *Penn. Dem. Party*, 2020 WL 5554644, at *26–27 (same); *cf. Rogers v. Corbett*, 468 F.3d 188, 193 (3d Cir. 2006) (applying *Anderson-Burdick* to an equal protection challenge to ballot access laws). Under *Anderson-Burdick*, a court "must first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Short*, 893 F.3d at 676 (alteration in original) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see Balsam v. Secretary of N.J.*, 607 F. App'x 177, 181 (3d Cir. 2015). Then the court must weigh those interests against the state's justification for the challenged policy. *Short*, 893 F.3d at 676. Those interests must be "sufficiently weighty to justify the limitation." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). Laws that only modestly burden the right to vote are subject to rational basis review. *Id.* at 676–

77; *Balsam*, 607 F. App'x at 181 ("If a statute imposes only modest burdens, however, then 'the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." (quoting *Anderson*, 460 U.S. at 788)).

The Free and Equal Elections Clause of the Pennsylvania Constitution protects voters' right of suffrage by requiring elections to be "free and equal." Pa. Const. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). To ensure that elections are "free and equal," voters are protected from "regulation[s] of the right to exercise the franchise [that] deny the franchise itself, or make it so difficult as to amount to a denial." *League of Women Voters of Penn. v. Commonwealth*, 178 A.3d 737, 810 (Pa. 2018) ("*LOWV*"); Pa. Const. art. I, § 5. The Clause does not, however, prevent the Commonwealth from enacting "reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Banfield v. Cortés*, 110 A.3d 155, 176–77 (Pa. 2015).

While the Clause applies with equal force where the interference with voting rights occurs "by inadvertence," *LOWV*, 178 A.3d at 810, it is not violated where the "rights of the voter are only incidentally involved," *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914); *see also Snider v. Shapp*, 405 A.2d 602, 612–13 (Pa. Cmwlth. Ct. 1979) (holding that statutes that establish qualifications for elective office and hence limit the field of candidates do not interfere with the Free and Equal Elections Clause).

The Supreme Court of Pennsylvania has identified a variety of tests to determine whether election regulations comport with the Constitution:

> [E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise

does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Winston*, 91 A. at 523. Like the federal constitution, the Free and Equal Elections Clause is also not an election fraud statute.

### 1. The residency requirement does not burden the right to vote.

The residency requirement imposes no burden whatsoever on the right to vote. As the Pennsylvania Supreme Court and the Eastern District of Pennsylvania before it explained, and as Plaintiffs themselves concede, there is simply no basis—in evidence or in logic—to believe that the residency requirement makes it harder to vote. *See Penn. Dem. Party*, 2020 WL 5554644, at *30 ("In examining the constitutionality of the poll watcher residency provision at issue here, we conclude, as the District Court in *Cortés* concluded, that it imposes no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld."); *Cortés*, 218 F. Supp. 3d at 408; *see also* [Ex. 24 (Sept. 28, 2020 Deposition of Plaintiff J. Joyce at 67) ("Q. Are you aware of anyone who has been unable to cast their ballot because of the residency requirement that a poll watcher reside in the county that they are poll watching in? A. Someone was not able to cast their ballot because a poll watcher -- no, I'm not."); Ex. 25 (Sept. 28, 2020 Deposition of Plaintiff G. Thompson at 107–10) (describing safeguarding confidence in the election as the only way poll watching safeguards the right to vote).]

The Court in *Cortés* explained that the residency restriction does not violate the First or Fourteenth Amendments to the U.S. Constitution because it does not burden the fundamental right to vote or in any way "limit[] the range of choices in the voting booth." 218 F. Supp. 3d at 408. In *Pennsylvania Democratic Party*, the Court reached the same conclusion as *Cortés* in analyzing the federal constitution, and, treating rights afforded under the state constitution as co-extensive with the federal constitution, it held that the restriction also does not violate Pennsylvania's constitution.

2020 WL 5554644, at *31 & n.35. To the extent Plaintiffs suggest that the Pennsylvania Constitution's Free and Equal Elections Clause protects the right to vote differently than the federal constitution, they fare no better. The residency restriction cannot violate the Free and Equal Elections Clause because the restriction does not burden the franchise in a way the Pennsylvania Supreme Court recognizes as actionable: It denies no qualified elector the right to vote. It treats all voters alike. It does not prevent the casting or counting of votes. The residency requirement imposes no inconvenience on the process of voting. And it does not touch on any other constitutional right. *See Winston*, 91 A. at 523.

Because the residency requirement does not prevent anyone from voting, Plaintiffs grasp at a theory of burden based on vote dilution by fraud. The premise of this claim is that (1) because of the pandemic, the residency requirement prevents them from recruiting poll workers effectively, (2) the absence of Republican poll watchers in these counties will lead to increased fraud, and (3) the increase in fraud will dilute the value of honest votes. The evidentiary basis for this claim aside—there is none, *see infra* at Argument, III.A.2—Plaintiffs' theory does not give rise to a cognizable claim for relief. That is, even if they are correct at steps (1) and (2), there is simply no precedent for holding that the right to vote protected by the U.S. and Pennsylvania Constitutions encompasses the right of individual voters to prevent fraud in any manner of their liking.

While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, *see, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 563–64 (1964), it is also true that "[t]he Constitution is not an election fraud statute." *Minn. Voters Alliance*, 720 F.3d at 1031 (quoting *Bodine*, 788 F.2d at 1271). There is simply no authority for transmogrifying the vote dilution line of cases into a weapon that voters may use to enlist the federal judiciary to micromanage the

administration of elections, or to make it harder for other citizens to vote. *Partido Nuevo Progresista*, 639 F.2d at 827–28; *see Short*, 893 F.3d at 677–78 ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution."). To the contrary, courts have routinely—and appropriately—rejected such efforts. *See Minn. Voters Alliance*, 720 F.3d at 1031–32 (rejecting challenge grounded in vote dilution theory to decision by election administrators to allow same-day registrants to vote before verifying their voting eligibility to the satisfaction of plaintiffs); *Cook Cnty. Rep. Party v. Pritzker*, No. 20-cv-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes); *Cortés*, 218 F. Supp. 3d at 406–07 (rejecting a claim that rested on premise that voter fraud would dilute weight of the plaintiffs' votes); *see also Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (rejecting a claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Short*, 893 F.3d at 679; *Partido Nuevo Progresista*, 639 F.2d at 827–28 (rejecting challenge to purportedly invalid ballots because the "case does not involve a state court order that dis enfranchises voters; rather it involves a Commonwealth decision that en franchises them. [sic] [P]laintiffs claim that votes were 'diluted' by the votes of others, not that they themselves were prevented from voting.").

Similarly, cases where the Pennsylvania Supreme Court has recognized the Free and Equal Elections Clause to be violated because of vote dilution are not like this one. In *LOWV*, the Court held that partisan gerrymandering violated the Clause because the very act of gerrymandering subverts democracy. 178 A.3d at 814. Specifically, the official act of configuring districts in a manner intended to maximize one party's hold on power requires the state to distribute voters who

supported the out-of-power party in a way that effectively wastes their votes. *Id.* No such gamesmanship is at play with the poll watcher residency restriction. A vote dilution claim in the partisan gerrymandering context recognizes that the state has drawn districts in a way that ensures disfavored voters will have no impact on election outcomes. *See id.* Plaintiffs' strained vote-dilution-by-fraud theory is fundamentally different. Under Plaintiffs' theory, the "diluting" act is performed not by the state, but by a private citizen who violates the state's rules and casts an unlawful ballot impacting all voters equally. By permitting poll watchers to observe election proceedings and assist candidates in their home counties, the Commonwealth has not made it any less worthwhile for every Pennsylvanian to cast a vote. Elections remain free and equal for all.

Failing to identify any cases that support their vote-dilution-by-fraud theory, Plaintiffs cite cases from other contexts. *Anderson v. United States*, 417 U.S. 211 (1974), affirmed a criminal conviction for voter fraud. *Gray v. Sanders*, 372 U.S. 368 (1963), and *Reynolds v. Sims*, 377 U.S. 533 (1964), prohibited states from counting votes or drawing districts in a manner that systematically favored rural voters over urban voters. *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), upheld a state law intended to reduce fraud against a challenge that it burdened the right to vote. Plaintiffs have cited no cases where a court has struck down a state statute for reducing election fraud *insufficiently*. It is simply not a cognizable theory under any source of law.

### 2. The residency requirement serves a legitimate, compelling state interest.

Because Plaintiffs have not produced any evidence to support the conclusion that the residency requirement burdens the right to vote, the requirement passes constitutional muster if it is rationally related to a legitimate state interest. The residency requirement serves several legitimate—and compelling—interests.

First, and as explained by the Pennsylvania Supreme Court, "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth." *Penn. Dem. Party*, 2020 WL 5554644, at *30. Given this county-based scheme, "it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*; *see also Cortés*, 218 F. Supp. 3d at 409.

Second, and as conceded by Plaintiffs, voters are more likely to be comfortable with poll watchers "they know and they recognize from their area." [Ex. 23 (Sept. 28, 2020 Deposition of Plaintiff M. Kelly at 112); *see also* Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 39–40) ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.")]. This is especially true in the communities with significant minority populations that Plaintiffs seek access to with this lawsuit. Pls. Mot. at 71–72; [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 25, 39) ("There is a long history of people from outside the community using vigilantism and lynch mob tactics against African American and Latino communities." Given this history, "[p]eople from outside the community are often seen with suspicion and their outsider status may result in voters becoming nervous or afraid, based on the historical record of violence and intimidation against minority communities"); Ex. 26 (U.S. Census Bureau, *Quick Facts Pennsylvania*)]. Poll watchers are also more likely to be effective in their roles when they are from the community. [Ex. 27 (Aug. 21, 2020 Deposition of Secretary K. Boockvar at 239–40)].

Third, the relationship between poll watching and voter intimidation justifies significant restrictions on poll watching. *Dem. Nat'l Comm.*, 671 F. Supp. 2d at 578–79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud

the RNC is prevented from addressing by the Decree."); *see generally* [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 25–52); Ex. A (Sept. 30, 2020 Unredacted Expert Report of Dr. M. Barreto ¶¶ 44–45.] Plaintiffs have filed this lawsuit to seek access to communities with significant minority populations such as Philadelphia County. Pls. Mot. at 71–72. [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶ 26]. But there is a very real history and future threat of voter intimidation at the polls, especially in majority minority areas. *See supra* at Background, II.B. Poll watching gives an individual privileged access to the polling location, enabling those with ill-intent to exact maximum damage. [Ex. 1 (Sept. 30, 2020 Expert Report of Dr. M. Barreto ¶¶ 25, 52)].

For this reason alone, but especially coupled with Pennsylvania's interests in maintaining a poll watching system consistent with its county system of election administration, it cannot be disputed that the residency requirement serves legitimate government interests. Because there is no genuine factual dispute over whether these legitimate state interests are served by the residency requirement, summary judgment is appropriate. *See Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020); *Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252 (9th Cir. 1978).

### 3. Plaintiffs' "as-applied" challenge does not save their poll watching claims.

Plaintiffs' new "as-applied" challenge is a barely disguised attempt to relitigate the facial challenge they have already lost, but it cannot save their poll watching claims. Even if the conditions they point to as part of this as-applied challenge make it harder to recruit poll watchers, a point they have failed to prove, *see infra* at Argument, III.B, their poll watching claims still fail. Their "as-applied" arguments do not address the impediments to their success on these claims: there is still no constitutional right to be or have poll watchers, the residency requirement still does not affect the ability of voters to vote, and vote dilution by fraud still is not a cognizable theory of burden. Accordingly, summary judgment is appropriate.

**B.**     **Plaintiffs are not entitled to summary judgment on their poll watching claims.**

Plaintiffs' motion for summary judgment does not address the critical flaws in their poll watching claims just discussed and can be denied on that basis alone. Plaintiffs' motion focuses largely on their difficulty recruiting poll watchers. Even if this were a material fact capable of resurrecting their poll watching claims, there is a genuine dispute over whether and to what extent the residency requirement burdens their ability to recruit poll watchers, and whether every precinct must be staffed by poll watchers representing every eligible candidate and party in order for an election to be free and equal.

The record reveals that the chief determinant of whether a party is able to field its full allotment of poll watchers is the party's own initiative and investment in recruiting participants. Republican Representative Glenn Thompson testified that whether a county party organization is good at recruiting poll watchers "really comes down to the leader" of the organization, and some leaders are better than others at motivating and recruiting supporters. [Ex. 25 (Sept. 28, 2020 Deposition of Representative G. Thompson at 104–05)]. Consistent with that analysis, Republican Representative Michael Kelly testified that despite Democrats' registration advantage in Erie County, which he represents, he has not been prevented from attracting volunteers and contributors and building a base of support in the County. [Ex. 23 (Sept. 28, 2020 Deposition of Representative M. Kelly at 114–15)]. But in some parts of the state, lackluster party leadership can result in the failure to staff poll watchers, even where party supporters are willing and available. [Ex. 28 (social media post).] Pandemic or no pandemic, some county organizations place a higher value on—and demonstrate a greater talent for—mobilizing supporters and recruiting volunteers.[3]

---

[3] Plaintiffs argue that the residency requirement burdens the interest of minor political parties, but they do not have prudential standing to assert those interests. *See supra* at Argument, I.C.2.

Nor does the record support Plaintiffs' assertion that poll watchers are necessary to prevent fraud. Plaintiffs do not even believe that. At his deposition, Representative Thompson testified that he did not doubt the integrity of election results in elections where he was unable to recruit poll watchers. [Ex. 25 (Sept. 28, 2020 Deposition of Plaintiff G. Thompson at 104–05).] Representative Kelly testified that he did not "even think about" poll watchers until this election despite having run in 11 primary or general elections for Congress. [Ex. 23 (Sept. 28, 2020 Deposition of Plaintiff M. Kelly at 114–15)]. Republican Representative John Joyce, in turn, testified that he has never used poll watchers as part of his campaigns for Congress. [Ex. 24 (Sept. 28, 2020 Deposition of Plaintiff J. Joyce at 65–66).] In none of these elections did the absence of poll watchers lead to any reports of significant fraud, which in any event is not a problem in Pennsylvania's elections. *See* [Ex. 29 (Sept. 30, 2020 Expert Report of Dr. L. Minnite at 1–35); *see also* Ex. 27 (Aug. 21, 2020 Deposition of Secretary K. Boockvar at 222, 237–38); Ex. 30 (Sept. 29, 2020 Deposition of L. Allison for Lawrence County at 49–50)].

As a sister federal court has already recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." *Cortés*, 218 F. Supp. 3d at 404. For example, each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minority inspector. *Id.* § 2671. Each district may also use two "overseers of election," who are appointed from different political parties by the Pennsylvania Courts of Common Pleas. *Id.* § 2685. To help ensure the integrity of the election, overseers of election may be present within an enclosed space with election officers at the polling place, and they may "challenge any person offering to vote and interrogate him and his witnesses under oath in regard

to his right of suffrage.'' *Id.* Poll watchers, in contrast, must remain "outside the enclosed space," and have no authority to question voters under oath. *Id.* § 2687.

Plaintiffs also fail to account for the presence of poll watchers from other parties. Even if a party's registration disadvantage in some counties results in it sponsoring fewer poll watchers, Plaintiffs have made no assertion that the county residency requirement will preclude every candidate and party from recruiting poll watchers in a given precinct. And crucially, Plaintiffs have offered no evidence that poll watchers will neglect their duties and permit fraud in counties where their appointing party holds a registration advantage. That is, Plaintiffs assume—with no evidence—that poll watchers appointed by Democrats in majority-Democratic counties and poll watchers appointed by Republicans in majority-Republican counties will fail to report any unlawful activity in their precinct.

Secretary Boockvar also testified that Pennsylvania has adopted new voting systems that will provide an additional level of security. [Ex. 27 (Sept. 28, 2020 Deposition of Secretary K. Boockvar at 237–38)]. Notably, Pennsylvania will now ensure a paper trail so that voters can confirm their choice, and the Commonwealth recently piloted a new program, supported by the Trump administration, that will help ensure that votes can be properly verified. [*Id.*] This is all on top of the regular procedures for verifying voter eligibility. [*Id.* at 163–64.] And as an extra layer of deterrence on top of all the prophylactic monitoring and verification, any person who violates the election laws faces stiff state and federal criminal penalties. *See, e.g.*, 52 U.S.C. § 20511; 25 P.S. § 2375; *id*. §§ 3501–3553. Plaintiffs' claim that elections are not secure because lawful votes are diluted if any precinct is not staffed with Republican poll watchers is belied not only by the record, but also by common sense.

Because Plaintiffs' position that the county residency requirement is unconstitutional has now been rejected twice in state and federal court, *see Penn. Dem. Party*, 2020 WL 5554644; *Cortés*, 218 F. Supp. 3d at 408, they now try to suggest that the COVID-19 pandemic somehow changes the analysis. *See* Pls. Mot. at 70. It is time for this zombie claim to be put down for good. Plaintiffs' only support for the assertion that COVID-19 has "magnified" the difficulties in securing poll watchers is statements in an expert report by a political scientist with no apparent background in public health. Pls. Mot. at 43. Indeed, Plaintiffs offer no citation at all for the crux of their argument, that the pandemic will critically reduce "the number of residents who are willing to appear at a mass gathering, like a polling place, for twelve or more hours to observe election activities." Pls. Mot. at 70. There is no dispute that the pandemic will affect the upcoming election, or even that public health restrictions may make it more difficult to recruit poll watchers. But Plaintiffs have not supplied competent evidence to establish that the integrity of the 2020 election will not be secure because the residency restriction prevents candidates and parties from recruiting the full allotment of poll watchers that may have been available to them but for the pandemic.

## IV. Plaintiffs' signature match claims fail as a matter of law.

Finally, Plaintiffs cannot succeed on the signature match claims in Counts I and II of the Second Amended Complaint, and the Alliance Intervenors are entitled to judgment on this basis.

While the Alliance Intervenors maintain that abstention is appropriate here, if the Court is inclined to rule on the merits of Plaintiffs' signature match claims, it should reject them under the doctrine of constitutional avoidance. The crux of Plaintiffs' claims is that, under the Pennsylvania Election Code, county election boards must perform a signature match on absentee ballots and reject them if the signature on the ballot envelope does not match the signature on file. But this interpretation is not compelled by the text of the statute Plaintiffs cite, which does not even mention signature matching. And if Plaintiffs' interpretation were credited, it would run head-first into

federal due process issues, because the Pennsylvania Supreme Court has held that state's Election Code does not provide a "notice and opportunity to cure" procedure for issues identified by county election officials under these circumstances. *See Penn. Dem. Party*, 2020 WL 5554644, at *20 (holding that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner").[4] The Court should reject Plaintiffs' interpretation of the Election Code to avoid raising serious constitutional questions.

The canon of constitutional avoidance is a well-established tool that courts use to interpret statutory texts. Under the doctrine, when a statute has two "competing plausible interpretations," a court will presume that the legislature "did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The "canon is followed out of respect" for the legislature. *See Rust v. Sullivan*, 500 U.S. 173, 191 (1991).

The constitutional avoidance canon applies with full force to Plaintiffs' signature match claims. Those claims rest on Plaintiffs' interpretation of the Pennsylvania Election Code, 25 P.S. § 3146.8(g), which they claim contains "signature verification requirements." Pls. Mot. at 12; *id.* at 23. As a starting point, it is exceedingly unlikely that Plaintiffs have a "plausible interpretation" of the statute, since the provision does not even mention signature matching (much less require it). But even if Plaintiffs *were* raising a plausible interpretation, the Secretary's interpretation that ballots cannot be rejected solely on the basis of a signature match issue would be at least equally plausible.

---

[4] Plaintiffs suggest that, "[i]f a ballot is not counted because of a lack of a genuine signature, it is considered 'challenged' and subject to the notice and hearing provisions under Section 1308(g)(5)-(7). 25 P.S. § 3146.8(g)(5)–(7)." Pls. Mot. at 29. But that is not how the Election Code is written. The notice and hearing provisions in Section 3146.8(g)(5)–(7) only apply in the event of a "challenge," which is *not* the comparison and verification process that county election officials must conduct under 25 P.S. § 3146.8(g)(3). Instead, a "challenge" is made by an individual *to* the county board of elections. *Id.* § 3146.8(f).

Plaintiffs' interpretation would raise serious constitutional questions, because the Pennsylvania Election Code does not give absentee voters an opportunity to "cure" deficiencies with their ballots. *See Penn. Dem. Party*, 2020 WL 5554644, at *20; [Ex. 31 (Sept. 28, 2020 Deposition of D. Parsnik for Luzerne County at 43-44).] Under Plaintiffs' interpretation of the statute, county election boards could reject ballots based solely on signature matching, which is an inherently subjective and arbitrary process that is riddled with errors. *See* [Ex. 32 (Sept. 30, 2020 Expert Report of A. McReynolds ¶ 64); Ex. 33 (Sept. 29, 2020 Deposition of D. Voye for Allegheny County at 38) ("As we all know, signatures change."); Ex. 30 (Sept. 29, 2020 Deposition of L. Allison for Lawrence County at 35) ("We certainly are cognizant of the fact that one's handwriting changes with time as much my own has. We, also, understand that elderly individuals suffer from any number of different maladies that would change their signatures."); Ex. 34 (Sept. 29, 2020 Deposition of L. Hagan for Delaware County at 49) ("It is my experience that signatures can change year to year, day to day.")]. And the voters whose ballots are rejected would not be given notice or an opportunity to cure the problem.

That outcome would implicate significant constitutional concerns. Absentee voters in Pennsylvania unquestionably have a protected liberty interest in voting and having their ballots count, and ballot rejection rules such as signature matching implicate the fundamental right to vote. Pennsylvania law gives all registered voters the right to request and cast a mail-in ballot that will be processed and counted. 25 P.S. § 3150.11(b). And courts across the country have found protected liberty interests in analogous circumstances. *See, e.g.*, *Democracy N.C., et.al. v. N.C. State Bd. of Elections*, No. 1:20-cv-457, 2020 WL 4484063, at *53  (M.D.N.C. May 22, 2020) (holding that "...North Carolina, having 'authorized the use of absentee ballots,' must afford appropriate due process protections to the use of the absentee ballots"); *Martin v. Kemp*, 341 F.

Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Courts around the country have recognized that '[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.'") (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd*., 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at \*5 (N.D. Ill. Mar. 13, 2006) ("The right to vote by absentee ballot is not, in and of itself, a fundamental right. But once the State permits voters to vote absentee, it must afford appropriate due process protections, including notice and a hearing, before rejecting an absentee ballot.").

Thus, courts have held—time and again—that absentee ballot rejection rules such as signature match must be accompanied by a cure process. *See, e.g.*, *Dem. Exec. Comm. of Fl. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) (affirming preliminary injunction of signature match law without a cure process); *Ariz. Democratic Party v. Hobbs*, No. CV-20-01143-PHX-DLR, 2020 U.S. Dist. LEXIS 165959, at \*41 (D. Ariz. Sep. 10, 2020) (granting preliminary injunction and ordering Arizona election officials to provide voters with seven days after Election Day to cure absentee ballots with missing signatures); *Frederick v. Lawson*, No. 1:19-cv-0959-SEB-MJD, 2020 U.S. Dist. LEXIS 150995, (S.D. Ind. Aug. 20, 2020) (permanently enjoining Indiana election officials from rejecting any absentee ballot because of perceived signature mismatch absent adequate notice and cure procedures to the affected voter); *League of Women Voters of N.J. et al. v. Tahesha Way*, No. 20-cv-05990, Dkt. 34 (E.D.N.J. June 17, 2020) (granting preliminary injunction and ordering New Jersey election officials to allow voters to cure absentee ballots with missing or mismatched signatures for sixteen days after Election Day); *Self Advocacy Sols. N.D. v. Jaeger*, No. 3:20-CV-00071, 2020 U.S. Dist. LEXIS 108854 (D.N.D. June 5, 2020) (holding North Dakota's cure procedures for absentee ballots violated due process and ordering North

Dakota's election officials to allow voters six days after Election Day to cure their absentee ballot); *Martin*, 341 F. Supp. 3d at 1342 (granting preliminary injunction directing Georgia election officials to implement cure process for signature matching); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D. N.H. 2018) (declaring signature match law unconstitutional because it did not include a cure process); *N.C. All. for Retired Americans et al. v. N.C. State Bd. of Elections*, No. 20-CVS-8881 (N.C. Sup. Ct. Sept. 22, 2020) (consent decree requiring North Carolina election officials to provide nine days after Election Day for voters to cure absentee ballots); *see also League of Women Voters of the United States et al. v. Kosinski*, et al., No. 1:20-cv-05238, Dkt. 37 (S.D.N.Y. Sept. 17, 2020) (consent decree requiring New York election officials to provide five days for voters to cure absentee ballot after voter is notified of the need to cure the ballot).

The Secretary's guidance should be read against this backdrop. Plaintiffs' signature matching claim, which rests on a shaky statutory foundation, should be rejected because it would draw the state into problematic constitutional territory.

## IV.   CONCLUSION

Because Plaintiffs' claims fail as a matter of comity, of law, and of evidence, Intervenor-Defendants' motion for summary judgment should be granted, and Plaintiffs' motion for summary judgment should be denied.

Dated:  October 3, 2020

Justin T. Romano
PA ID No. 307879
justin@arlawpitt.com
Marco S. Attisano
PA ID No. 316736
marco@arlawpitt.com
429 Fourth Avenue, Suite 1705
Pittsburgh, PA 15219
Phone: (412) 336-8622
Fax: (412) 336-8629

Adam C. Bonin, PA Bar No. 80929 *(WD PA admission pending)*
The Law Office of Adam C. Bonin
121 S. Broad St., Suite 400
Philadelphia, PA 19107
Phone: (267) 242-5014
Facsimile: (215) 827-5300
Email: adam@boninlaw.com

By: */s/ Marc E. Elias*
Marc E. Elias
Uzoma N. Nkwonta
Courtney A. Elgart
Jacob D. Shelly
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
celgart@perkinscoie.com
jshelly@perkinscoie.com

Elise Edlin
Torryn Taylor Rodgers
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050
eedlin@perkinscoie.com
trodgers@perkinscoie.com

Laura Hill
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
lhill@perkinscoie.com

Gillian Kuhlmann
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399
gkuhlmann@perkinscoie.com

*Attorneys for the Alliance Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing ALLIANCE INTERVENORS' MEMORANDUM OF LAW (1) IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND (2) IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT to be filed on October 3, 2020, via ECF, which system will serve notice of same on all parties registered to receive same via the ECF system.

<u>/s/ Justin T. Romano</u>
Justin T. Romano
PA ID No. 307879
justin@arlawpitt.com
429 Fourth Avenue, Suite 1705
Pittsburgh, PA 15219
Phone: (412) 336-8622
Fax: (412) 336-8629
