**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; *et al.*, | ) | CIVIL ACTION |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2-20-cv-966 |
| | ) | |
| | ) | |
| KATHY BOOCKVAR; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEMOCRATIC INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 3

      A.   The Pennsylvania Election Code Grants Counties Authority to Administer
           Statewide Elections .................................................................................... 3
      B.   The Secretary Has Authority to Issue Guidance Related to Statewide
           Elections and Has Done So .......................................................................... 5

           1.   The Secretary's Authority ................................................................. 5
           2.   The Secretary's August 19, 2020 Guidance ..................................... 6
           3.   The Secretary's September 11 and September 28 Guidance ............ 7

      C.   County Boards Possess Lawful Discretion to Establish Drop-Boxes and
           Other Ballot Collection Sites ...................................................................... 8
      D.   The Election Code's Requirements for Verifying the Identity of In-Person
           Voters and Voters Who Vote Mail-In and Absentee Ballots ....................... 9
      E.   The Election Code's Poll Watcher Residency Requirement and Plaintiffs'
           Efforts to Recruit Poll Watchers ............................................................... 11

III.  ARGUMENT ...................................................................................................... 13

      A.   The Undisputed Material Facts Fail to Establish Boards' Use of Drop-
           Boxes or Ballot Collection Sites Violates the Equal Protection Clause ...... 13
      B.   The Undisputed Record Evidence Shows that Plaintiffs' Equal Protection
           Claim Regarding the Poll Watcher Residency Requirement Fails .............. 16

           1.   Plaintiffs are Precluded from Relitigating the Poll Watcher Claim .......... 16
           2.   The Undisputed Material Facts Show Plaintiffs' As-Applied
                Challenge to the Poll Watcher Residency Requirement Fails ................. 18

      C.   Democratic Intervenors are Entitled to Summary Judgment on Plaintiffs'
           Voter Dilution and Equal Protection Claims Related to the Secretary's
           September Guidance Regarding Signature Matching Analysis ................... 21

           1.   Pullman Abstention is Warranted. .......................................... 21
           2.   Plaintiffs' Lack Standing to Assert That the Secretary's September
                2020 Guidance Lead to Vote Dilution ...................................... 23

      D.   Plaintiffs' Equal Protection Claim Regarding the Secretary's September
           2020 Guidance Also Fails ......................................................................... 25

IV.   CONCLUSION ................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*England v. Louisiana State Bd. of Med. Examiners*,
    375 U.S. 411 (1964)................................................................................16, 17

*Engquist v. Oregon Dep't of Agr.*,
    553 U.S. 591 (2008)........................................................................................15

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)........................................................................................20

*Harris v. United States*,
    536 U.S. 545 (2002)........................................................................................25

*Lance v. Coffman*,
    549 U.S. 437 (2007)........................................................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................24

*McCleskey v. Kemp*,
    481 U.S. 279 (1987)........................................................................................14

*Montana v. United States*,
    440 U.S. 147 (1979)........................................................................................18

*Railroad Commission of Texas v. Pullman Co.*,
    312 U.S. 496 (1941)........................................................................................16

*Vance v. Bradley*,
    440 U.S. 93 (1979)..........................................................................................20

*Bradley v. Pittsburgh Bd. of Educ.*,
    913 F.2d 1064 (3d Cir. 1990)........................................................................17

*Donald J. Trump for President, Inc. v. Cegavske*,
    --- F. Supp. 3d ---, 2020 WL 562674 (D. Nev. Sept. 18, 2020)................24

*Fender v. Wash. Cnty.*,
    No. 14-0142, 2014 WL 1491138 (W.D. Pa. Apr. 15, 2014)......................22

*Gelb v. Bd. of Elections of City of New York*,
    224 F.3d 149 (2d Cir. 2000)..........................................................................14

*Ins. Fed'n of Pennsylvania, Inc. v. Supreme Court of Pennsylvania,*
  669 F.2d 112 (3d Cir. 1982)...........................................................................16

*Minnesota Voters All. v. Ritchie,*
  720 F.3d 1029 (8th Cir. 2013) ........................................................................14

*Partido Nuevo Progresista v. Perez,*
  639 F.2d 825 (1st Cir. 1980) ..........................................................................15

*Powell v. Powell,*
  436 F.2d 84 (2d Cir. 1970)..............................................................................15

*Republican Party of Pennsylvania v. Cortes,*
  218 F. Supp. 3d 396 (E.D.Pa. 2016) .......................................................3, 19, 20

*Ross v. Alaska,*
  189 F.3d 1107 (9th Cir. 1999) ...................................................................17, 18

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ..........................................................................15

*Smolow v. Hafer,*
  353 F. Supp. 2d 561 (E.D. Pa. 2005) ..............................................................16

*Startzell v. City of Philadelphia,*
  533 F.3d 183 (3d Cir. 2008).............................................................................25

*Trump for President, Inc. v. Boockvar,*
  No. 20-966, 2020 WL 4920952 (W.D. Pa. Aug. 23, 2020)...........................22, 23

**State Cases**

*Maryland Cas. Co. v. Odyssey Contracting Corp.,*
  894 A.2d 750 (Pa. 2006) .................................................................................25

*Pennsylvania Democratic Party, et al v. Boockvar et al,*
  --- A.3d ---, 2020 WL 5554644 (Pa. Sept. 17, 2020)................3, 10, 12, 15, 16, 17, 19, 20, 25

*West Mifflin Area School District v. Zahorchak,*
  4 A.3d 1042 (2010) .........................................................................................16

**State Statutes**

25 Pa. C.S. § 2621(e)-(e.1) ................................................................................5

25 Pa. C.S. § 3150.16(a) .................................................................................10

25 Pa. C.S. § 2621....................................................................................................5

25 Pa. C.S. § 2641......................................................................................................15

25 Pa. C.S. § 2641(a)....................................................................................................3

25 Pa. C.S. § 2642(o)..................................................................................................15

25 Pa. C.S. § 2687 (2003)...........................................................................................11

25 Pa. C.S. § 2687(b) (2004).......................................................................................11

25 Pa. C.S. § 3050(a.3)(1).............................................................................................9

25 Pa. C.S. § 3050(a.3)(2)........................................................................................9, 25

25 Pa. C.S. § 3146.2...................................................................................................10

25 Pa. C.S. § 3146.8(1.1)............................................................................................26

25 Pa. C.S. § 3146.8(g)(3)...........................................................................10, 11, 22, 26

25 Pa. C.S. § 3146.8(g)(4)...........................................................................................11

25 Pa. C.S. § 3150.12(a)...............................................................................................9

25 Pa. C.S. §§ 3150.12(b)(1)(i)-(v).................................................................................9

25 Pa. C.S. § 3150.12(b)(2)...........................................................................................9

25 Pa. C.S. § 3150.12(c)..............................................................................................10

25 Pa. C.S. § 3150.12b(a)............................................................................................10

25 Pa. C.S. §§ 3150.12b(a)(1)-(2)................................................................................10

25 Pa. C.S. § 3150.16(a)..............................................................................................10

25 Pa. C.S. § 3150.16(c)..............................................................................................10

Act 77 § 1306-D..........................................................................................................10

Act 77 § 1306-D(a)......................................................................................................10

**Constitutional Provisions**

U.S. Const. amend. I...................................................................................................19

## I.  **INTRODUCTION**

A three-year old tweet has absolutely no relevance to the resolution of Plaintiffs' remaining claims. The fact that Plaintiffs chose to lead off their 71-page brief with a demonstrably immaterial social media post, posted by a then private citizen, presage the abject weaknesses in their arguments, and in their entire case. Taken together, Plaintiffs brief–and 87-page Second Amended Complaint–offer no legal or evidentiary support entitling them to the extraordinary relief requested from this Court.

More fundamental, Plaintiffs' requests for relief turn the principle of federalism on its ear by inviting federal courts to intrude on the sovereign power and authority of the Commonwealth of Pennsylvania to administer even the most mundane and procedural elements of its elections. Without any evidence of either state action or causal fraud, Plaintiffs ask this Court to find that routine and election administrative decisions are preemptively and presumptively unconstitutional if not applied precisely and uniformly by all 67 Boards of Elections ("Boards") across the Commonwealth to standards not required by federal or state law.  They seek to convert these policy choices into federal court imposition of unmanageable constitutional standards on the Defendants. Neither the United States nor Pennsylvania Constitutions demand such exactitude or permit the imposition of such an unprecedented remedy.

As disturbing, Plaintiffs are asking this Court to step-in and judicially micromanage and second-guess on the ground administrative decision-making by Boards which are best-suited and empowered to conduct elections commensurate with the widely disparate and varying needs of their local electorates; *i.e.*, whether to use ballot drop-boxes, the number of ballot-drop-boxes needed, the locations to place them and the mode of security required. Consistent with prior rulings, this Court should decline the invitation to dip its toe into this murky water.

Plaintiffs' claims are now whittled down to three–and only three–requests for relief[1]: (1) a declaration that the alleged uneven use of drop-boxes, including the use of unmanned drop-boxes or ballot collection sites, violates the Equal Protection Clause of the United States Constitution and that if Boards use drop-boxes, they must be staffed and secured uniformly across the Commonwealth, and an injunction enjoining any contrary use and segregation of ballots; (2) a declaration that the poll watcher residency requirement is unconstitutional as-applied to the General Election, and an injunction preventing its application; and (3) a declaration that the Secretary of the Commonwealth's ("Secretary") September 11 and 28 memoranda directing Boards to not perform a signature verification of absentee and mail-in ballots is unconstitutional, and an injunction enjoining all Boards from following the Secretary's guidance.

Plaintiffs contend that the relief requested is necessary, not because they can prove the actual existence of voter fraud through Defendants' actions or inactions, but merely to prevent some hypothetical or speculative voter fraud that might occur if fraudsters arrive in the night and are not deterred by applicable criminal and civil penalties. In other words, it is not enough that in-person voting fraud and ballot harvesting are illegal under Pennsylvania law. Plaintiffs urge this Court to take a gargantuan step further and impose obligations on the Defendants to implement ill-defined and unworkable election security measures that "guarantee" with unachievable perfection and precision that a hypothetical person can never vote illegally. In short, isolated and routine

---

[1] This Court has dismissed Plaintiffs' vote dilution, Equal Protection, and state constitution violation claims in **Counts I, II, and III**. *See* Dkt. 459. This Court also abstained regarding the following questions of state law: (1) whether the "polling place" requirements under the Election Code apply to drop-box locations (**portions of Counts I, II, and III**); (2) whether Boards have provided adequate notice of the location of drop-boxes (**Counts VI and VII**); and (3) whether the Secretary's guidance that in-person mail-in ballots shall be accepted absent a "bona fide objection" contravenes the Election Code (**portions of Counts I, II, and III**). Dkt. 459-460. Finally, Plaintiffs correctly withdrew **Counts VII and IX**. *See* Dkt. 505 at pg. 15, n.4.

incidents of election administration do not equal constitutional infirmity, nor do any of the remaining three rise to a constitutional dimension requiring federal court intervention.

This baseless case and litigation chaos must be put to rest. Voters are already casting their ballots and election officials need to focus all their time and energies on administering and ensuring a transparent, fair and orderly election. For these reasons and those below, Democratic Intervenors Motion for Summary Judgment should be granted and Plaintiffs' Second Amended Complaint dismissed with prejudice.

## II.  <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Democratic Intervenors incorporate by reference the statement of undisputed material facts in the motions for summary judgment filed by the Defendants and Intervenor-Defendants, and state the following additional undisputed material facts.

### A.  The Pennsylvania Election Code Grants Counties Authority to Administer Statewide Elections

"[I]n 1937, the Pennsylvania General Assembly enacted a county-based scheme to manage elections within the state, and consistent with that scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process." *Pennsylvania Democratic Party, et al v. Boockvar et al*, --- A.3d ---, 2020 WL 5554644 at *28 (Pa. Sept. 17, 2020) (quoting *Republican Party of Pennsylvania v. Cortes*, 218 F. Supp. 3d 396, 409 (E.D.Pa. 2016)). The General Assembly delegated to the 67 county Boards broad powers and "jurisdiction over the conduct of primaries and elections in such counties." 25 Pa. C.S. § 2641(a). This system was a decision to "'draw the lines[] at the county level [which is] something entirely rational in fashioning a scheme for a state as large as Pennsylvania." *Cortes*, 218 F. Supp. 3d at 409.

Boards are tasked with election administration within their counties because Pennsylvania is not only a large state, its 67 counties are widely diverse in population as well as diverse geographically, demographically and culturally. For instance, as of November 2019, the total voter registration in each county range from 2,986 in Cameron County to 1,062,606 in Philadelphia. Dkt. 504-34, App. Ex. 34 to Plaintiffs' Motion for Summary Judgment. In some counties, Republicans enjoy a large voter registration advantage over Democrats, and in other counties the opposite is true. *See id.* Pennsylvania has large densely populated counties, with expanded public transportation systems and counties of rural farmland with more widely dispersed populations, each of which call for their own, county-specific approaches to the administration of elections.

Pennsylvania's county-run election regime is similar to how other states administer elections. App. Ex. A, Election Administration at State and Local Levels, https://www.ncsl.org/research/elections-and-campaigns/election-administration-at-state-and-local-levels.aspx (last accessed Oct. 3, 2020). "The [United States] is characterized by a highly decentralized election system." *Id.* That said, "[e]lections are usually administered at the county level" and are generally run by an individual or a board or commissions of elections." *Id.* Currently, 10 states, including the Commonwealth, use boards of elections to perform election administration at the county level and another 18 states divide election administration duties between a single and a board or commission who administer elections within each local county. *Id.* The county-based election administration scheme "allows individual jurisdictions to experiment and innovate – to see how election might best be run for the state and the locality's particular circumstances." *Id.*

This decentralized and county-based approach to election administration also applies to voting by mail. *Id.* Although all states allow at least some of their voters to cast their ballots by mail, states offer different options to do so. *Id.* Most states, 34 out of 50, permit no-excuse mail-

4

in voting and nine states conduct universal mail-in voting "in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' having to request them." App. Ex. B, Expert Report of Dr. Robert Stein at pg. 5-6. Unsurprisingly, the use of drop-boxes and ballot collection sites and the procedures and requirements related to them also varies by state. *Id.* at pg. 8. For example, Arizona requires only that drop-boxes be "secure" but does not define the specific steps needed to secure the drop-box. *Id.* at pg. 9. By contrast, in Oregon, New Mexico, and Colorado, "drop boxes must be monitored by an election official or video surveillance." *Id.* Moreover, in numerous states, including California, Colorado, Hawaii, and Oregon, county election officials determine the location and number of drop-boxes. *Id.* The discretion afforded to local county election officials makes sense because "the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots)." *Id.*

## B. The Secretary Has Authority to Issue Guidance Related to Statewide Elections and Has Done So

### 1. The Secretary's Authority

The Secretary of Pennsylvania's Department of State ("Secretary") is the chief election official of Pennsylvania. 25 Pa. C.S. § 2621. The Election Code confers upon her statewide election oversight authority and the power to "receive such reports from county boards of elections as are required by this act, and to demand such additional reports on special matters as he[/she] may deem necessary [and] [t]o receive from county boards of elections information on voting system errors or difficulties or other election data pursuant to regulation." 25 P.S. § 2621(e)-(e.1). In carrying out her duties, the Secretary often issues advisory guidance to the Boards on various election topics. App. Ex. C, Aug. 20, 2020 Dep. Tr. Secretary Boockvar at 60:4-15. Because the

Election Code empowers Boards to administer elections, the Secretary has no legal authority to force Boards to follow her guidance or to impose penalties on Boards which choose not to follow her guidance. *Id.* at 197:23-198:3 ("Q. And what happens, if a county board of elections doesn't submit a plan either at all or on or before the 45 days? A. There is – I do not believe I have enforcement penalty authority, if they do not. This is guidance.").

### 2. The Secretary's August 19, 2020 Guidance

On August 19, 2020 the Secretary issued guidance titled "Pennsylvania Absentee and Mail-In Ballot Return Guidance" ("August Guidance") to "provide guidance on how each [Board] should establish a ballot return and collection plan prior to each election."  App. Ex. D at pg. 1. The August Guidance creates parameters by which Boards may, at their discretion, establish "Ballot Return Sites" which are "other offices and locations designated by the board to receive ballots" and "secure ballot return receptacles" which are drop boxes.  *Id.* at 1-2.[2]  The August Guidance creates security, chain of custody and processing requirements for Boards to implement. *Id.* at 6-8.  It also recommends security procedures for Boards who choose to use manned and/or unmanned drop boxes in their county, including adequate lighting and where feasible video surveillance. *Id.* The August Guidance was issued as a resource for Boards to determine first whether the use of drop-boxes or other ballot collection sites during the General Election are necessary to accommodate the voting needs of their local electorate, and if they so deem them necessary, describes some of the best practices and procedures to provide for safe, secure, and ease of use. *Id.*

---

[2] For all relevant provisions for the purpose of this litigation, the rules and requirements are identical for mail-in and absentee ballots and, for that reason, the terms will be used interchangeably throughout.

### 3. The Secretary's September 11 and September 28 Guidance

On September 11, 2020, the Secretary issued guidance titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes" ("September 2020 Guidance"). App. Ex. E, PADOS000755-01-03. The September 2020 Guidance explains that "[t]o promote consistency across the 67 counties" Boards should do the following when processing returned absentee and mail-in ballots:

> [T]he county board of elections shall examine the Voter's Declaration on the outer envelope of each returned ballot and compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the Registered Absentee and Mail-in Voters File, the absentee voter's list and/or the Military Veterans' Emergency Civilians Absentee Voters File.
>
> ***
>
> If the Voter's Declaration on the return envelope is signed and the county board is satisfied that the declaration is sufficient, the mail-in or absentee ballot should be approved for canvassing unless challenged in accordance with the Pennsylvania Election Code.
>
> The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections.

*Id.*

On September 28, 2020, the Secretary issued "Guidance Concerning Civilian Absentee and Mail-in Ballot Procedures" ("September 28 Guidance"). App. Ex. F, PADOS000762-01-09. The September 28 Guidance reiterates the September 2020 Guidance and explains "[t]he Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis" and "[n]o challenges may be made to mail-in and absentee ballots at any time based on signature analysis." *Id.* at 09.

### C.  County Boards Possess Lawful Discretion to Establish Drop-Boxes and Other Ballot Collection Sites

Consistent with authority and discretion granted by the General Assembly, many Boards plan to employ the use of ballot return sites and drop-boxes. These decisions were based on various factors, including the county's population, geography, density, and varying modes of public transportation.[3] Boards that plan not to use drop-boxes tend to have fewer registered voters than more populous counties. For example, Lawrence County has about 55,000 registered voters and determined that drop boxes were not necessary[4]; while Delaware County, with more than 400,000 registered voters, intends to use 50.[5] However, the number of registered voters in a county does not correlate directly with the number of ballot drop-boxes employed by the Boards. Allegheny County has nearly one million registered voters but plans, after weighing the local variables, that 8 drop-boxes are needed to serve its administrative needs during the General Election.[6]

Although Plaintiffs have adduced no material evidence of fraud or illegal voting from the use of drop-boxes or any evidence of actual threat to the security of ballots, the evidence of record shows that Boards will provide varying security measures to protect drop boxes when open for use. For instance, Delaware County plans to employ an unmanned drop-box in each of its 49 municipalities and one other at the county courthouse, and each drop-box will weigh over 200

---

[3] *Compare* App. Ex. G, Fayette Board of Elections' Supplemental Responses and App. Ex.  H, Crawford County Board of Elections' Supplemental Responses (choosing not to utilize drop boxes) *with* App. Ex. I, Berks County Board of Elections' Supplemental Responses (choosing to use two drop box locations).

[4] App. Ex. J, Sept. 28, 2020 Dep. Tr. of Lawrence County Board of Elections' Corporate Designee at 15:22-25; 17:16-20.

[5] App. Ex. K, Sept. 29, 2020 Dep. Tr. of Delaware County Board of Elections' Corporate Designee, at 16:20-23; 28:6-29:6.

[6] App. Ex. L, Sept. 29, 2020 Dep. Tr. of Allegheny County Board of Elections Corporate Designee at 15:11-14; 24:8-24.

pounds, be secured into a cement block into the ground and under 24-hour surveillance.[7] Montgomery County plans to use 11 drop boxes county-wide that will be staffed the entire time by county personnel during normal business hours and removed each night.[8]

### D. The Election Code's Requirements for Verifying the Identity of In-Person Voters and Voters Who Vote Mail-In and Absentee Ballots

The General Assembly established different voting regimes for in-person voting and mail-in voting. When a qualified elector votes at a polling place, the registered voter is required to show "proof of identification" and sign a "voter's certificate in blue, black, or blue-black ink." 25 Pa. C.S. § 3050(a.3)(1). The election officer is required to "compare the elector's signature on his [or her] voter's certificate with his [or her] signature in the district register." *Id.* at § 3050(a.3)(2). "[I]f the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to make the affidavit and produce the evidence as provided in subsection (d) of this section." *Id.*

The Election Code contemplates a different scheme for mail-in voters. First, the voter must complete an application to receive a mail-in ballot. *Id.* at § 3150.12(a). The application must include the voter's (1) date of birth; (2) length of time a resident of voting district; (3) voting district, if known; (4) party choice in case of primary; and (5) the voter's name. *Id.* at § 3150.12(b)(1)(i)-(v). In addition, the mail-in voter applicant must specify the address to which the ballot should be sent. *Id.* at § 3150.12(b)(2). The mail-in ballot application must be signed by the

---

[7] App. Ex. K, Sept. 29, 2020 Dep. Tr. of Delaware County Board of Elections' Corporate Designee at 28:16-25; 32:6-25.
[8] App. Ex. M, Sept. 29, 2020 Dep. Tr. of Montgomery County Board of Elections' Corporate Designee at 23:11-22.

voter applicant. *Id.* at § 3150.12(c). After receipt of an application, the Board shall determine the applicant's qualifications by "verifying the proof of identification and comparing the information provided on the application with the information contained in the applicant's permanent registration card." *Id.* at § 3150.12b(a). **A signature comparison is not required**. "If the [Board] is satisfied that the applicant is qualified to receive an official mail-in ballot, the application shall be marked 'approved.'" That decision is "final and binding" and "challenges may only be made on the grounds that the applicant was not a qualified elector." *Id.* at § 3150.12b(a)(1)-(2).[9]

A voter who chooses to vote by mail-in ballot must "mark the ballot . . . enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot'" (the "Privacy Envelope"). 25 P.S. § 3150.16(a). The voter must then place the Official Election Ballot into a second envelope, which contains, among other things, the declaration of the elector and the address of the elector's county board. *Id.* The elector must complete, sign and date the declaration printed on the envelope. *Id.*

After a voter completes their mail-in ballot, the voter is required to return his or her ballot to their "county board of election." Act 77 § 1306-D(a); 25 Pa. C.S. § 3150.16(a), (c). The language the General Assembly adopted in section 1306-D allows each county board to collect ballots by whatever means, and at whatever location(s) that it controls, and chooses. 25 Pa. C.S. § 3150.16(a); *Boockvar*, 2020 WL 5554644, at *9.

When Boards meet to canvass the mail-in ballots, the staff, among other things, examines "the **declaration** on the envelope . . . . and shall compare the **information thereon** with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable." 25

---

[9] The same process is generally applicable for absentee ballots. *See* 25 Pa. C.S. § 3146.2

Pa. C.S. § 3146.8(g)(3) (emphasis added). If the voter's right to vote is verified and the Board determines the voter's declaration is sufficient and consistent with the information in the voter's file, the ballot may only be challenged if the voter is not qualified. *Id.* The Board then opens the envelope of unchallenged mail-in ballots and checks to confirm that the Privacy Envelope does not have "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference[.]" *Id.* at § 3146.8(g)(4).

The General Assembly determined that this process is sufficient to ensure qualified electors who vote by mail are who they say they declare to be. Dkt. 504-12, App. Ex. 12 to Plaintiffs' Motion for Summary Judgment, Sept. 29, 2020 Dep. Tr. of Secretary at 56:8-10 (explaining signature matching is not required for mail-in and absentee ballots because "there's a lot of verification and identification that happens before you even get a ballot"). Contrary to Plaintiffs' repeated assertions, nowhere in the Election Code does it state that Boards are required to perform a matching signature analysis on the outer envelope with the signature in the voter's file or not count the ballot if, in the election officials' view, the signatures do not "match." *See id.* at 3146.8(g)(3)-(7); Dkt. 504-12, App. Ex. 12 at 104:7-13.

### E. The Election Code's Poll Watcher Residency Requirement and Plaintiffs' Efforts to Recruit Poll Watchers

Until 2004, the Commonwealth's Election Code limited "a poll watcher's geographical territory" to the election district where the elector lived. *See* 25 Pa. C.S. § 2687 (2003). The 2004 amendments to the Election Code "expand[ed] the poll watcher's geographical territory from a single election district to all election districts in the county in which the watcher is a qualified registered elector." *See* Second Amended Complaint, ¶ 192; *see also* 25 Pa. C.S. § 2687(b) (2004).

The General Assembly decided "to allow county election officials to credential only poll watchers from their own county . . . . [and] each county election official is tasked with managing

credentials for a discrete part of the state's population." *Boockvar*, 2020 WL 5554644, at *28. Indeed, Plaintiff Congressman Michael Kelly testified that restricting poll watchers to county residents helped with administration because county residents were familiar with the voters. App. Ex. P, Dep. Tr. Representative Michael Kelly at 111:15-112:14.

Pennsylvania counties have no shortage of registered Republicans voters qualified to serve as poll watchers. Indeed, in some of the Commonwealth's largest counties, 100,000-200,000 voters are registered as Republicans. *See* Dkt. 504-34, App. Ex. 34 to Plaintiffs' Motion for Summary Judgment. In addition, tens of thousands of registered independent voters reside in many of these counties, including close to 100,000 such voters in Philadelphia County. *Id.*

| County Name | # of Registered Republican Voters | # of Registered Independent Voters ("No Affiliation") |
| --- | --- | --- |
| Philadelphia | 125,710 | 99,342 |
| Allegheny | 259,541 | 84,705 |
| Montgomery | 206,468 | 55,912 |
| Delaware | 157,557 | 33,038 |
| Bucks | 192,294 | 51,766 |
| Chester | 151,457 | 40,589 |

*See id.* Moreover, a party or candidate is not restricted to recruiting registered voters of their own parties to serve as poll watchers and, in fact, the Trump Campaign utilized at least one Democrat among the handful of poll watchers it registered in the Primary. App. Ex. N, Aug. 20, 2020 Dep. Tr. of Trump Campaign and RNC Corporate Designee at 267:23-268:1; App. Ex. O, Poll Watcher Certificate Request, P001647-1648.

The record evidence shows that the Plaintiffs have made minimal efforts to recruit poll watchers. The RNC and Trump Campaign's corporate designee James Fitzpatrick testified that the Trump Campaign intended to recruit poll watchers for every county in Pennsylvania **but they do not know how many poll watchers they need for the General Election.** *Id.* at 326:1-7; 510:4-

21 (emphasis added). The RNC has initiated poll watcher recruitment efforts for the General Election by using a website called DefendYourBallot.com. *Id.* at 261:21-262:3; 263:8-19. The website permits qualified electors to volunteer to be a poll watcher. *Id.* In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activities to identify potential poll watchers. *Id.* at 326:14-329:7.

Plaintiffs are not focused on doing enhanced poll watcher recruitment efforts in any particular county, rather, they are making calls to potential volunteers across the entire state. *Id.* at 329:22-331:3. Plaintiffs cannot even identify the counties to prioritize for their poll watcher recruitment efforts. *Id.* at 519:5-20; 524:20-525:7. Indeed, Plaintiffs admit that it cannot identify one county where they are unable to obtain "full coverage" of poll watchers or any county where they have problems recruiting poll watchers for the General Election. *Id.* at 261:21-262:3; 263:8-19; 265:2-266:3.

Again, to the extent relevant, Plaintiffs have produced no evidence of their inability to recruit poll watchers in counties where registered Democrats outnumber registered Republicans. *See id.* at 329:22-331:3; 519:5-20; 519:22-25; 524:20-525:7.

### III. <u>ARGUMENT</u>

Democratic Intervenors incorporate by reference the arguments in the motions for summary judgment or motions to dismiss filed by the Defendants and Intervenor-Defendants, and set forth the following additional arguments.

### A. The Undisputed Material Facts Fail to Establish Boards' Use of Drop-Boxes or Ballot Collection Sites Violates the Equal Protection Clause

Plaintiffs' Equal Protection theory regarding the uneven use of drop-boxes and ballot collection sites plainly and authoritatively does not come close to a constitutional violation. More

to the point, the notion that all counties must employ the same voting delivery options for their local electorate, according to some exacting one size fits all standard, has no support in the law.

To successfully bring an Equal Protection challenge, Plaintiffs must allege that Defendants *intentionally* sought to deprive voters of a fundamental right by providing drop boxes unequally. *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) ("[d]iscriminatory purpose . . . . implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (internal quotation marks omitted)). Plaintiffs made no such allegation. In fact, they do not allege any illicit state action whatsoever.

The General Assembly had ample reason to afford Boards administrative discretion to establish ballot drop-boxes, or not to do so, to account for the differing geography and population, and thus the divergent voting needs of their respective electorate. Regardless of this clear justification, without an intent to discriminate, even willful errors leading to disenfranchisement would not be cognizable as a constitutional violation. *See, e.g.*, *Minnesota Voters All. v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (limiting federal oversight over state election procedures to carefully delineated categories, including "willful and illegal conduct"); *Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 154 (2d Cir. 2000) (finding "intentional or purposeful discrimination" is necessary on the part of election administrators to create an Equal Protection claim); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 828 (1st Cir. 1980) (finding no Equal Protection violation where "plaintiffs claim that votes were 'diluted' by the votes of others, not that they themselves were prevented from voting.").

The Boards' establishment of drop-boxes (*Boockvar*, 2020 WL 5554644, at *9) is consistent with the authority and discretion granted by the General Assembly to carry out each

county's election administrative functions. *See* 25 Pa. C.S. §§ 2641, 2642(o). Boards have, based on their assessment of their county's needs (*i.e.*, geography and population), determined whether to use drop-boxes, their location, and the appropriate safety and security measures needed.

The Supreme Court has rejected the view that an exercise of discretion, standing alone, supports an Equal Protection claim. The Court is clear that when discretion is granted to government decision-makers, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603 (2008); *see also Powell v. Powell*, 436 F.2d 84, 88 (2d Cir. 1970) ("Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'internal or purposeful discrimination.'"). A Board's decision regarding whether to utilize drop-box sites is no more violative of the Equal Protection clause than a Board's decision regarding the establishment of locations for in-person polling places. The disparate number and kinds of drop-boxes any particular county Board utilizes "does not burden anyone's right to vote . . . . it makes it easier for some voters to cast their [mail-in or absentee] ballots . . . .". *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

As the Pennsylvania Supreme Court has recognized, a "provision is a legislative enactment which enjoys the presumption that the General Assembly did not intend to violate constitutional norms." *Boockvar*, 2020 WL 5554644, at *29. A statute is presumed valid and should be declared unconstitutional only if it is shown to be "clearly, palpably, and plainly [violative of] the Constitution." *Id.* (quoting *West Mifflin Area School District v. Zahorchak*, 4 A.3d 1042, 1048 (2010)). Plaintiffs cannot make such a showing and have not here.

Plaintiffs' requested remedy is another an ill-advised attempt to have this Court wade into the administrative minutiae of locally run elections and micromanage state election affairs. The law flatly precludes such a remedy, and if granted, would fundamentally intrude on the Commonwealth's sovereign right to operate a "county-based scheme for conducting elections." *Boockvar*, 2020 WL 5554644, at *30.

### B. The Undisputed Record Evidence Shows that Plaintiffs' Equal Protection Claim Regarding the Poll Watcher Residency Requirement Fails

#### 1. *Plaintiffs are Precluded from Relitigating the Poll Watcher Claim*

Plaintiffs are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers based on the *England* doctrine. *See, e.g.*, *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411 (1964). When the *Pullman* abstention doctrine is invoked, the abstaining federal court may retain jurisdiction passively while the litigation proceeds in the state court. *See, e.g.*, *Ins. Fed'n of Pennsylvania, Inc. v. Supreme Court of Pennsylvania*, 669 F.2d 112, 113 (3d Cir. 1982) (citing *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941)).

After a federal court abstains under *Pullman*, a plaintiff may preserve his right to have his federal claims adjudicated before a federal court by first raising only his state law issues before the state court, and then returning for adjudication of his remaining federal claims.  *See Smolow v. Hafer*, 353 F. Supp. 2d 561, 575 (E.D. Pa. 2005) (citing *England*, 375 U.S. at 421–22). However, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." *England*, 375 U.S. at 419.  Further, "even a litigant who has made a valid reservation may not relitigate an issue s/he fully and unreservedly litigated in state court." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990).

Here, two of the plaintiffs in this case filed applications to intervene in the state court litigation, *Boockvar*. The Pennsylvania Supreme Court granted the Pennsylvania Republican Party's application to intervene and permitted the Trump Campaign and the RNC to file briefs as *amici curiae*. Although represented by the same counsel, the Trump Campaign and RNC simply re-filed their August 20, 2020 brief in support of preliminary objections with the Pennsylvania Supreme Court, and none of the three parties reserved the right to relitigate this claim in federal court. The Republican Party presented this issue for determination by the Pennsylvania Supreme Court, which ultimately held that the "the poll watcher residency requirement does not violate state or federal constitutions." *Boockvar*, 2020 WL 5554644 at *31. Accordingly, pursuant to *England*, Plaintiffs are now precluded from relitigating the constitutionality of the poll watcher residency requirement in federal court.

This case is similar to a Ninth Circuit decision involving the Republican Party of Alaska's challenge to Alaska's primary system. In *Ross v. Alaska*, the Republican Party of Alaska brought an action in federal court challenging Alaska's "blanket primary" system for determining the nominees of political parties. *Ross v. Alaska*, 189 F.3d 1107, 1109 (9th Cir. 1999). The federal district court in Alaska granted summary judgment against the Republican Party, holding that the doctrine of issue preclusion barred relitigating certain issues decided by the Alaska Supreme Court. *Id.* The United States Court of Appeals for the Ninth Circuit affirmed. *Id.* at 1112–13. (emphasis added).

Further, the United States Supreme Court has held that where a nonparty carries the "laboring oar" with respect to the state court proceedings, the doctrine of estoppel can be invoked in a subsequent federal action. *Montana v. United States*, 440 U.S. 147, 155 (1979) ("That the United States exercised control over the *Kiewit I* litigation is not in dispute . . . [A]lthough not a

17

party, the United States plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel."). Pursuant to the *England* doctrine, the United States, a nonparty to the original state court action, was estopped from bringing its similar claims in federal court. *Montana*, 440 U.S. at 163 ("[H]ere, as in *England*, a party has "freely and without reservation submit[ted] his federal claims for decision by the state courts . . . and ha[d] them decided there . . . Considerations of comity as well as repose militate against redetermination of issues in a federal forum at the behest of a plaintiff who has chosen to litigate them in state court.").

Here, like in *Ross*, the Pennsylvania Supreme Court granted the intervention application of the Republican Party. Although the Trump Campaign and the RNC did not participate as intervenors in the state court litigation, they re-filed their brief in support of preliminary objections as an amicus brief before the Supreme Court, and the Republican Party made arguments on behalf of the Trump Campaign and the RNC. Further, the fact that the Trump Campaign, the RNC, and the Republican Party were represented, and continue to be represented, by the same law firm, Porter, Wright, Morris and Arthur, LLP, indicates that all three parties had a full and fair opportunity to litigate their federal claims in the state court proceeding. Accordingly, like the United States in *Montana*, the key federal plaintiffs fully participated, along with the Republican Party, in the state court litigation. Pursuant to the *England* doctrine, none of those parties preserved their right to return to federal court to relitigate any of their federal claims decided by the Pennsylvania Supreme Court and therefore, Plaintiffs' federal claims with respect to the constitutionality of the poll watcher residency requirement fails as a matter of law.

  2. *The Undisputed Material Facts Show Plaintiffs' As-Applied Challenge to the Poll Watcher Residency Requirement Fails*

Plaintiffs' as-applied challenge to the Commonwealth's poll watcher residency requirement is yet another meritless charge. Plaintiffs contend that restricting voters to serve as

poll watchers in counties other than their county of residence makes it "extremely difficult or functionally impracticable . . . . to have poll watchers at all locations where ballots are being cast in connection with the November 2020 General Election . . . . thus fostering an environment that encourages ballot fraud or tampering." Second Amended Complaint, ¶ 256. This contention fails on at least three fronts: (1) poll watching does not implicate a constitutionally protected right; (2) there is no factual evidence of fraud; and (3) there is no factual evidence that recruitment efforts have been burdened.

As an initial matter, this issue was resolved by both the Pennsylvania Supreme Court and a federal district court, which both ruled that that the poll watcher residency requirement does not violate the Due Process or Equal Protection clause because it "does not implicate a fundamental constitutional right, like the right to vote" and does not violate the First Amendment. *Boockvar*, 2020 WL 5554644, at *28 ("Respondent does not claim that poll watching involves a fundamental constitutional right."); *Republican Party of Pennsylvania v. Cortes*, 218 F. Supp. 3d 396 (E.D. Pa. 2016).[10] Plaintiffs simply have no constitutional right to insert non-resident poll watchers at polling places or ballot drop-boxes. Because the Commonwealth's poll watcher residency requirement "places no burden on Plaintiffs' constitutional rights, [the residency requirement] must only withstand rational-basis review." *Cortes*, 218 F. Supp. 3d at 409. The Pennsylvania Supreme Court–as well as the *Cortes* Court–concluded there "is a clear rational basis for the county poll watcher residency requirement." *Boockvar*, 2020 WL 5554644, at *30.

It is well-settled that when a statute does not infringe on a fundamental constitutional right, which is the case here, the statute "must be upheld against equal protection challenge if there is

---

[10] Plaintiffs' cavalier attempt to dismiss these rulings must be rejected. The "right to participate" in an election has no greater constitutional protection than "a right to vote."

any reasonably conceivable state of facts that could provide a rational basis for the classification."

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (internal citations omitted); *Vance v. Bradley,* 440 U.S. 93, 97 (1979) (explaining that rational basis review is the paradigm of judicial restraint and that "judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."). The Pennsylvania Supreme Court in *Boockvar* identified a rational basis for the residency requirement: "General Assembly chose a county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers . . . . to be residents of the counties in which they serve." *Boockvar*, 2020 WL 5554644, at *30.

Second, aside from the constitutional analysis, the evidence of record contradicts Plaintiffs' principal claim that eliminating the residency requirement is necessary to protect against voter fraud. Plaintiffs have failed to produce one shred of evidence of pervasive voter fraud let alone material evidence that non-resident poll watchers protect against hypothetical voter fraud. As the Pennsylvania Supreme Court explained in *Boockvar*, "these claims are ***unsubstantiated*** and are specifically belied by the Act 35 report the Secretary issued concerning mail in voting in the Primary." *Boockvar*, 2020 WL 5554644, at *30 (emphasis added).

Finally, as an additional and separate reason to grant summary judgment, Plaintiffs have produced no evidence that the residency requirement makes it functionally impossible for Plaintiffs to retain county resident poll watchers. Plaintiffs admit to actively recruiting poll watchers in all counties in the Commonwealth through a variety of means but have not prioritized or focused any additional recruitment efforts in any specific county. Plaintiffs admit that their recruiting efforts have not been deterred in any county. Plaintiffs further admit their poll watcher needs in any county have yet to be determined. As an empirical matter, the undisputed evidence shows that the political registration disparities in any county have not burdened, and should not

burden, Plaintiffs' ability to recruit poll watchers. For example, even accepting Plaintiffs' alleged desire to retain non-Democratic party poll watchers, in Philadelphia County, there is a pool of more than 120,000 registered Republicans and 95,000 unaffiliated voters. Plaintiffs admit that a voter does not need to be a registered Republican to serve as a poll watcher for the Trump Campaign or RNC.[11] Such speculative claims are insufficient as a matter of law. Accordingly, Democratic Intervenors are entitled to summary judgment on Counts IV and V.

### C. Democratic Intervenors are Entitled to Summary Judgment on Plaintiffs' Voter Dilution and Equal Protection Claims Related to the Secretary's September Guidance Regarding Signature Matching Analysis

#### 1. Pullman Abstention is Warranted.

This Court must abstain from Plaintiffs' recast claim that the Secretary's September 2020 Guidance regarding signature matching for absentee and mail-in voting violates the United States and Pennsylvania Constitution.

As this Court explained in its August 23, 2020 opinion, *Pullman* abstention is appropriate if the following special circumstances are met: (1) "uncertain issues of state law underlie the federal constitutional claims brought in the district court; (2) that the state law issues are amenable to state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claim; and (3) that important state policies would be disrupted through a federal court's erroneous construction of state law." *Trump for President, Inc. v. Boockvar*, No. 20-966, 2020 WL 4920952, at *8 (W.D. Pa. Aug. 23, 2020) (*DJT I*) (internal citations omitted). If these elements are met, this Court must determine "whether abstention is appropriate by weighing such

---

[11] Plaintiffs argue that they are entitled to have poll watchers at temporary satellite offices because some voters may choose to vote there or return their ballot to a temporary satellite office. This argument puts the cart before the horse. This Court has already decided to abstain from deciding whether the Election Code's "polling place" requirements apply to drop-box location and likewise should abstain from resolving whether a temporary satellite office constitutes a "polling place" under the Election Code. Dkt. 459 at pg. 5.

factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Id.* (internal citations omitted). Each *Pullman* element is satisfied here.

*First*, at the core of this recast claim are two questions of unsettled state law: (1) whether the Election Code requires Boards to compare the form of the signature on the outer envelope of a mail-in ballot with the signature in the voter's registration or application file; and (2) whether Boards must reject ballots if the signatures–in their subjective estimation–do not match. Democratic Intervenors contend that Plaintiffs' position is wrong because section 3146.8(g)(3) of the Election Code merely instructs Boards to compare the *information* in the declaration and signature on the outer envelope *with information* contained in the voter's file. The plain language of section 3146.8(g)(3) supports this interpretation. Before counting a mail-in ballot, the Board must "verif[y] the proof of identification" provided by the voter, satisfy itself that the declaration on the ballot return envelope is "sufficient," and satisfy itself that information contained in the application records verifies the voter's "right to vote." *Id.* The section is devoid of any signature-matching requirement. Regardless of the parties' respective positions, the interpretation of section 3146.8(g)(3) is "best addressed at the state, not federal level." *Fender v. Wash. Cnty.*, No. 14-0142, 2014 WL 1491138, at *3 (W.D. Pa. Apr. 15, 2014).

*Second*, state-court resolution of this section would obviate the need for or substantially narrow the scope of Plaintiffs' federal constitutional claim. For example, if a state-court agreed with Plaintiffs' interpretation, they could obtain a state court declaration that the Election Code requires a signature comparison and challenge procedure for mail-in ballots, obviating the need for relief from this Court. Towards that end, Plaintiffs' could be "hoist[ed] on their own petard." *DJT I*, 2020 WL 4920952, at *15 (internal quotations omitted).

*Third*, this Court rightly concluded in its August 23, 2020 opinion that an erroneous interpretation of the Election Code would threaten to "disrupt Pennsylvania's exercise of [its] core, constitutional power" to regulate its elections. *Id.* at *17. As this Court explained, "[a] federal-court constitutional decision, premised on an erroneous interpretation of ambiguous state law, coming less than three months before a contentious national election, amid a global pandemic, would risk electoral chaos and undermine the integrity of the democratic process in the minds of voters." *Id.* This principle is even more true today, less than 32 days from a national election and as voters have already begun casting ballots.

Finally, equitable considerations require abstention. On multiple occasions this Court has given Plaintiffs a road map on how to obtain speedy and substantial relief regarding unsettled state law questions. *See id.* at *18; Dkt. 459 ("Plaintiffs had several avenues to pursue a prompt interpretation of state law . . ."). Plaintiffs have repeatedly chosen to ignore the Court's guidance, and have done so again here. "That [Plaintiffs] chose not to [follow this Court's instruction] does not mean this Court now must, or even should, deny state courts the opportunity to resolve this unsettled state-law issue first." Dkt. 459 at pg. 6. Accordingly, this Court must abstain from resolving this issue.

### 2. *Plaintiffs' Lack Standing to Assert That the Secretary's September 2020 Guidance Lead to Vote Dilution*

Further, Plaintiffs lack standing to challenge the Secretary's September 2020 Guidance. Plaintiffs allege that Boards' failure to analyze a mail-in voters' signatures on their outer envelope and set aside cast ballots containing non-matching signatures "fosters an environment and encourages ballot fraud or tampering." Second Amended Complaint, ¶ 185.

In their Second Amended Complaint, Plaintiffs have not alleged an actual injury to support this claim. Plaintiffs do not allege that any invalid or fraudulent votes have been cast because of

Boards' failure to perform signature matching analyses. Plaintiffs do not allege that any of Defendants intend to count fraudulently cast ballots or present evidence that voting fraud is substantially likely to occur because of the Secretary's September 2020 Guidance. This vote dilution theory–based on hype and speculation–is nothing more than a generalized grievance which is insufficient to confer standing. *Donald J. Trump for President, Inc. v. Cegavske*, --- F. Supp. 3d ---, 2020 WL 562674, at *4 (D. Nev. Sept. 18, 2020) (dismissing vote dilution claim because allegations are "'precisely the kind of undifferentiated, generalized grievance about the conduct of government' that fail to confer Article III standing'") (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)). Likewise, Plaintiffs' vote dilution claim is impermissibly speculative. *Cegavske*, 2020 WL 562674, at *4.

Plaintiffs also cannot establish the causation or redressability elements to establish standing. The causation prong requires a party to establish a connection between the injury and the alleged misconduct (*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) and the redressability prong requires that the injury will be "redressed by a favorable decision." *Id.* (internal quotations omitted). In this case, hypothetical ballot fraud or tampering is not caused by the Secretary's September 2020 Guidance or Boards' mail-in ballot tabulation practices (i.e., whether they perform a signature matching analysis or not), it is caused by hypothetical third-parties' illegal conduct. Plaintiffs' requested remedy would not redress the injury they allege–voter fraud–because such remedy provides no guarantee that a signature matching analysis of signatures on the outer envelope of mail-in ballots will reveal even one instance of voter fraud. Accordingly, Plaintiffs do not have standing to assert this recast voter dilution claim.[12]

---

[12] Ironically, construing the Election Code to require Boards to conduct a signature matching analysis would raise significant other constitutional concerns. *Boockvar*, 2020 WL 5554644, at *34 (Wecht, J. concurring). "Signature comparison is a process fraught with the risk of error and

### D.  Plaintiffs' Equal Protection Claim Regarding the Secretary's September 2020 Guidance Also Fails

To sustain an Equal Protection claim, the Plaintiffs must show the affected individuals are similarly situated. "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008). Here, mail-in ballot voters are not similarly situated to in-person voters. The procedures for each form of voting are inherently and demonstrably different; for instance, although a mail-in ballot will be invalidated for failure to include a privacy envelope, no such comparable requirement exists for in-person voters. Under Plaintiffs' theory, each such difference would represent an Equal Protection violation.

Further, the Secretary's guidance reflects the explicit text of the Election Code, which requires that poll workers, for in-person voters, "compare the elector's signature on his voter's certificate with his signature in the district register." 25 Pa. C.S. § 3050(a.3)(2).  By contrast, mail-in ballots are not subject to an explicit signature requirement: "the board shall examine the declaration on the envelope of each ballot . . . and shall compare the information thereon" with the voter registration file. 25 Pa. C.S. § 3146.8(g)(3).  In its wisdom, the General Assembly rationally differentiated between these forms of voting: at any given polling place location, the signature of perhaps several hundred voters during Election Day is compared and verified, whereas county ballot canvassers are expected to count hundreds of thousands of ballots beginning at 7 a.m. on Election Day. *See* 25 Pa. C.S. § 3146.8(1.1). That is just one reason the General Assembly may

---

inconsistent application, especially when conducted by lay people." *Id.* The canon of constitutional avoidance weighs against Plaintiffs' interpretation of the Election Code. *Maryland Cas. Co. v. Odyssey Contracting Corp.*, 894 A.2d 750, 757 (Pa. 2006) (the canon explains that when a "statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter") (quoting *Harris v. United States*, 536 U.S. 545, 555 (2002)).

have determined that the differing modes of voting required different voter verification methods. Again, Plaintiffs have presented not on iota of real evidence that the General Assembly's clearly prescribed different method of voter verification for mail-in ballots produces voter fraud.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Democratic Intervenors respectfully request that this Court grant their Motion for Summary Judgment, deny Plaintiffs' Motion for Summary Judgment, and dismiss Plaintiffs' Second Amended Complaint with prejudice.

Respectfully submitted,

*/s/ A. Michael Pratt*

A. Michael Pratt
Kevin Greenberg
Adam R. Roseman
George Farrell
**GREENBERG TRAURIG, LLP**
1717 Arch Street, Suite 400
Philadelphia, PA  19103
(t) 215.972.5916
(f) 215.988.7801
prattam@gtlaw.com
greenbergk@gtlaw.com

Clifford B. Levine
Alex Lacey
**DENTONS COHEN & GRIGSBY P.C.**
625 Liberty Avenue
Pittsburgh, PA  15222-3152
(t) 412.297.4998/4642
clifford.levine@dentons.com
alex.lacey@dentons.com

Lazar M. Palnick
1216 Heberton St.
Pittsburgh, PA 15206
(t) 412.661.3633
lazarpalnick@gmail.com

Dated: October 3, 2020

## CERTIFICATE OF SERVICE

I, A. Michael Pratt, hereby certify that on October 3, 2020, I caused a true and correct copy of the foregoing Democratic Intervenors' Memorandum of Law in Support of Their Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment to be served on the following counsel of record for Plaintiffs, Defendants and other Intervenors listed on the docket via the Court's ECF system.

*/s/ A. Michael Pratt*_____
A. Michael Pratt