Matthew J. Carmody
Regina M. Blewitt
Lawrence J. Moran, Jr.
**JOYCE, CARMODY & MORAN, P.C.**
9 N. Main Street, Suite 4
Pittston, PA 18640
Ph: (570) 602-3560                                        Attorneys for Defendant
Fax: (570) 602-3561                                        Luzerne County Board of Elections

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC., et al.,** | |
| **Plaintiffs,** | **Civil Action No. 2:20-cv-966-NR** |
| **v.** | |
| **KATHY BOOCKVAR, et al.,** | **JUDGE J. NICHOLAS RANJAN** |
| **Defendants.** | |

### DEFENDANT LUZERNE COUNTY BOARD OF ELECTIONS' APPENDIX OF EXHIBITS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Exhibit 1 – Deposition of David Parsnik

Respectfully submitted:

*s/ Regina M. Blewitt*
Lawrence J. Moran, Jr. (PA ID No. 316253)
Regina M. Blewitt (PA ID No. 205644)
Matthew J. Carmody (PA ID No. 206781)
**JOYCE, CARMODY & MORAN, P.C.**
9 N. Main Street, Suite 4
Pittston, PA 18640
Phone:  570-602-3560
Fax:  570-602-3561
E-mail:  rmb@joycecarmody.com

Attorneys for Defendant
Luzerne County Board of Elections

DATED:   October 3, 2020

Matthew J. Carmody
Regina M. Blewitt
Lawrence J. Moran, Jr.
**JOYCE, CARMODY & MORAN, P.C.**
9 N. Main Street, Suite 4
Pittston, PA 18640
Ph: (570) 602-3560                                        Attorneys for Defendant
Fax: (570) 602-3561                                       Luzerne County Board of Elections

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC., et al.,** | |
| **Plaintiffs,** | **Civil Action No. 2:20-cv-966-NR** |
| **v.** | |
| **KATHY BOOCKVAR, et al.,** | **JUDGE J. NICHOLAS RANJAN** |
| **Defendants.** | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date a true and correct copy of the foregoing Appendix of Exhibit(s) in Support of its Motion for Summary Judgment was filed electronically and served via the Court's CM/ECF system, pursuant to the Federal Rules of Civil Procedure.

*s/ Regina M. Blewitt*
Regina M. Blewitt

DATED:   October 3, 2020

# EXHIBIT 1

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4     DONALD J. TRUMP FOR          )
       PRESIDENT, INC., et al.,     )
 5                                  )
                     Plaintiffs,    )
 6                                  )
            vs.                     )No.
 7                                  )2:20-cv-966-RN
       KATHY BOOCKVAR, et al.,      )
 8                                  )
                     Defendants.    )
 9

10                      - - -

        Videotape Video Conference 30(b)(6) Deposition of
11           LUZERNE COUNTY BOARD OF ELECTIONS
             DAVID PARSNIK, Designated Deponent
12
                 Monday, September 28, 2020
13
                        - - -
14
            The videotape video conference deposition of
15     DAVID PARSNIK, called as a witness by the plaintiffs,
       pursuant to notice and the Federal Rules of Civil
16     Procedure pertaining to the taking of depositions,
       taken before me, the undersigned, Lance E. Hannaford,
17     Notary Public in and for the Commonwealth of
       Pennsylvania, at 2568 Aldon Drive, Sewickley,
18     Pennsylvania  15143, commencing at 11:03 o'clock a.m.,
       the day and date above set forth.
19
                        - - -
20
                NETWORK DEPOSITION SERVICES
21                SUITE 1101, GULF TOWER
                PITTSBURGH, PENNSYLVANIA
22                   866-565-1929
23                      - - -
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 2

```
 1     APPEARANCES VIA VIDEO CONFERENCE:
 2        On behalf of the Plaintiffs:
 3        Porter Wright:
          Carolyn McGee, Esquire
 4        Six PPG Place, Third Floor
          Pittsburgh, Pennsylvania 15222
 5        cmcgee@porterwright.com
 6
 7
 8        On behalf of Bucks, Chester, Montgomery, and
          Philadelphia County Boards of Elections:
 9
          Hangley Aronchick Segal Pudlin & Schiller:
10        Michele Hangley, Esquire
          Robert Wiygul, Esquire
11        One Logan Square, 27th Floor
          Philadelphia, Pennsylvania 19103
12        mhangley@hangley.com
13
14
15        On behalf of Luzerne County Board of Elections:
16
          Joyce, Carmody & Moran:
17        Larry Moran, Esquire
          Regina M. Blewitt, Esquire
18        9 N. Main Street, Suite 4
          Pittston, Pennsylvania 18640
19        ljm@joycecarmody.com
          rmb@joycecarmody.com
20
21                     - - -
22
23
24
25
```

Page 3

```
 1     APPEARANCES VIA VIDEO CONFERENCE CONTINUED:
 2        On behalf of Secretary of State Boockvar:
 3        Pennsylvania Office of Attorney General:
          Nicole Boland, Esquire
 4        Deputy Attorney General
          Civil Litigation Section
 5        Strawberry Square, 15th Floor
          Harrisburg, Pennsylvania 17120
 6        nboland@attorneygeneral.gov
 7
 8        On behalf of Kathy Boockvar:
 9        Kirkland & Ellis:
          Kristen Bokhan, Esquire
10        1301 Pennsylvania Avenue, N.W.
          Washington, D.C.  20004
11        kristen.bokhan@kirkland.com
12
13
14        On behalf of Secretary of State Boockvar:
15        Myers Brier & Kelly:
          Daniel T. Brier, Esquire
16        John Dempsey, Esquire
          Suite 200, 425 Spruce Street
17        Scranton, Pennsylvania 18503
          dbrier@mbklaw.com
18        jdempsey@mbklaw.com
19
20        On behalf of Washington County Board of
          Elections:
21
          Swartz Campbell:
22        Ryan Joyce, Esquire
          436 7th Avenue, Floors 7 and 8
23        Pittsburgh, Pennsylvania 15219
          rjoyce@swartzcampbell.com
24
25                     - - -
```

Page 4

```
 1     APPEARANCES VIA VIDEO CONFERENCE CONTINUED:
 2        On behalf of Intervenor-Defendants NAACP
          Pennsylvania State Conference, Common Cause of
 3        Pennsylvania, the League of Women Voters,
          Patricia M. DeMarco, Danielle Graham Robinson,
 4        and Kathleen Wise:
 5        WilmerHale:
          Samantha Picans, Esquire
 6        1225 Seventeenth Street, Suite 2600
          Denver, Colorado  80202
 7        sam.picans@wilmerhale.com
 8
 9
10        On behalf of Intervenors Pennsylvania Democratic
          Party, Nilofer Nina Ahmad, Danilo Burgos, Austin
11        Davis, Dwight Evans, Isabella Fitzgerald, Edward
          Gainey, Manuel V. Guzman, Jr., Jordan A. Harris,
12        Arthur Haywood, Malcolm Kenyatta, Patty H. Kim,
          Stephen Kinsey, Peter Schweyer, Sharif Street,
13        and Anthony H. Williams:
14        Greenberg Traurig:
          George Farrell, Esquire
15        1717 Arch Street, Suite 400
          Philadelphia, Pennsylvania 19103
16        farrellg@gtlaw.com
17
18
19        On behalf of Intervenors Michael Crossey, Dwayne
          Thomas, Irvin Weinreich, Brenda Weinreich, and
20        the Pennsylvania Alliance for Retired Americans:
21        Perkins Coie:
          Jacob Shelly, Esquire
22        700 13th Street, N.W., Suite 800
          Washington, D.C.  20005
23        jshelly@perkinscoie.com
24
25                     - - -
```

Page 5

```
 1     APPEARANCES VIA VIDEO CONFERENCE CONTINUED:
 2        On behalf of Intervenors Citizens for
          Pennsylvania's Future and the Sierra Club:
 3
          Quinn Emanuel:
 4        John Chun, Esquire
          Jonathan Oblak, Esquire
 5        51 Madison Avenue, 22nd Floor
          New York, New York  10010
 6        johnchun@quinnemanuel.com
          jonoblak@quinnemanuel.com
 7
 8
 9        On behalf of Allegheny County Board of
          Elections:
10
          Opsitnick & Associates:
11        Allan Opsitnick, Esquire
          564 Forbes Avenue, Suite 1301
12        Pittsburgh, Pennsylvania 15219
          aopsitnick@opsitnickslaw.com
13
14
15        On behalf of the Election Boards of Armstrong,
          Bedford, Blair, Centre, Columbia, Dauphin,
16        Fayette, Huntingdon, Indiana, Lackawanna,
          Lawrence, Lebanon, Montour, Northumberland,
17        Venango, and York Counties:
18        Babst Calland:
          Sean R. Keegan, Esquire
19        Two Gateway Center
          Pittsburgh, Pennsylvania 15222
20        skeegan@babstcalland.com
21
22
23                     - - -
24
25
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 6

1    APPEARANCES VIA VIDEO CONFERENCE CONTINUED:
2       On behalf of Delaware County Board of Elections:
3          Ballard Spahr:
            Elizabeth Wingfield, Esquire
4          1735 Market Street, 51st Floor  19103
            Philadelphia, Pennsylvania
5          wingfielde@ballardspahr.com
6
7
8    ALSO PRESENT:
9       Raymond Urbash, Videographer
10                     - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                   I-N-D-E-X
2    EXAMINATION BY:                    PAGE:
3    Ms. McGee                      9, 69
4    Mr. Moran                         58
5    Mr. Oblak                         58
6
7    EXHIBIT:                       MARKED:
8    Exhibit 1 - Notice of Deposition      11
     Exhibit 2 - 5-1-20 letter             20
9    Exhibit 3 - 8-19-20 guidance          34
     Exhibit 4 - 9-11-20 guidance          35
10   Exhibit 5 - 9-28-20 guidance          45
     Exhibit 6 - 9-24-20 statement         52
11
12                     - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          VIDEOGRAPHER:  We are now on the record.
2    Good morning.
3          The date today is September 28th, 2020.
4          And the time is, approximately, 11:03 a.m.
5          This is the videotape deposition of David
6    Parsnik taken in the matter of Donald J. Trump
7    for President, Incorporated, et al. versus Kathy
8    Boockvar, et al., filed in the United States
9    District Court for the Western District of
10   Pennsylvania.
11         Civil action No. 2:20-CV-966-RN.
12         My name is Raymond Urbash.  I will be the
13   videographer.
14         Our court reporter today is Lance
15   Hannaford.
16         The appearances will appear on the
17   stenographic record.
18         So if our court reporter will swear in the
19   witness, we can proceed.
20                     - - -
21
22
23
24
25

Page 9

1          DAVID PARSNIK
2    Called as a witness by the plaintiffs, having been
3    first duly sworn, as hereinafter certified, was
4    deposed and said as follows:
5          EXAMINATION
6    BY MS. McGEE:
7          Q    Good morning, Mr. Parsnik.
8          My name is Carolyn McGee.  I am in my
9    office in Pittsburgh.  I'm with the law firm of Porter
10   Wright.
11         I'm one of the lawyers who represent the
12   plaintiffs in the case we are here for today.  And we
13   are here today to take the rule 30(b)(6) deposition of
14   the Luzerne County board of elections.
15         Aside from yourself, Mr. Parsnik, and
16   Mr. Moran, is there anybody else in the room with you
17   today?
18         MS. BLEWITT:  Yes.  Regina Blewitt of Joyce
19   Carmody Moran.
20         Q    Thank you.
21         Is there anybody else, or is that it?
22         MS. BLEWITT:  That's it.
23         Q    Mr. Parsnik, please state your full name
24   for the record?
25         A    David Richard Parsnik.

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

4  (Pages 10 to 13)

Page 10

1    Q    And how are you currently employed, sir?
2    A    I am employed by Luzerne County as director
3    of administrative services.
4    Q    How long have you held the position of
5    director of administrative services?
6    A    Since 2014.
7    Q    How did you come to hold that position?
8    A    I was originally hired in the county as
9    director of security.  I then received a position of
10   director of 911.  And I applied for the open position
11   in 2014 for director of administrative services.  And
12   I was hired into that position.
13   Q    And as director of administrative services,
14   what are your job duties?  What are you responsible
15   for?
16   A    So I have the daily operational and fiscal
17   responsibilities for eight departments.  It involves
18   about 40 employees.  And about 30 million dollars in
19   budget.
20   Q    And what are the eight departments you
21   oversee?
22   A    I oversee elections, HR, IT, purchasing,
23   licensing, mapping, development, and convention and
24   visitor center.
25        Is that eight or nine?

Page 11

1    Q    Is there anybody above you in the chain of
2    command, if you will, as it pertains to elections?  Or
3    is it fair to say that you are the top election
4    official for Luzerne County?
5    A    So I report to the county manager.  I am
6    not the top election official in Luzerne County.
7    Q    Who would that person be?
8    A    I would have to say --
9        MR. MORAN:  Object to the form.  Go ahead.
10   A    Since we are a home rule charter, I report
11   to the county manager.  That is who I report to.  So I
12   would take direction from the county manager.
13   Q    Have you been designated today to testify
14   as your county's representative for the purposes of
15   the rule 30(b)(6) notice?
16   A    Yes.
17   Q    Ray, if you would pull up what I had put in
18   my shared folder as C1.  We will mark this as Exhibit
19   1.
20        (Thereupon, Exhibit No. 1 was marked for
21   identification.)
22   Q    If you would just --
23       MR. MORAN:  Carolyn, have you circulated
24   that folder?  Do we have access to it?
25       MS. McGEE:  No.  It is my shared folder.

Page 12

1        MR. MORAN:  Okay.
2        VIDEOGRAPHER:  I can give everyone access
3    to exhibits shared in a shared folder, like we
4    did for the last depositions, if that is what
5    everyone wants.
6        MR. MORAN:  That is what I would like,
7    please.
8        VIDEOGRAPHER:  I will need about 30
9    seconds, once the exhibit is put down, to put
10   everything into that folder that we are going to
11   use and give you guys.
12       If you look in the chat, a link has been
13   shared.  Exhibit 1 has been uploaded into that
14   folder.
15       MR. MORAN:  Has that been emailed to us?
16       VIDEOGRAPHER:  I put a link to the folder
17   in the chat.  If you just click on that link, it
18   will take you right to the folder.
19       MS. McGEE:  Ray, you are not sharing my
20   shared folder, are you?
21       VIDEOGRAPHER:  No.  I made a separate
22   folder.  I am moving in the exhibits that you
23   call up.
24       (Discussion off the record.)
25   Q    Mr. Parsnik, have you seen -- and Ray, if

Page 13

1    you could scroll through a little bit.
2        Have you seen this document before that we
3    marked Exhibit 1?  This is the notice of deposition
4    directed to Luzerne County board of elections pursuant
5    to rule 30(b)(6).
6    A    Yes.
7        I also believe this has been amended.
8    Q    Yes.  There have been certain narrowing
9    and/or withdrawing of topics.  But my question to you
10   is have you seen and reviewed this notice before
11   today?
12   A    Yes.
13   Q    As director of administrative services,
14   which includes the election department for your
15   county, are you in charge of all of the activities
16   surrounding your county's administration of elections?
17   A    I have an elections director that performs
18   that task for me.
19   Q    Who is your election director?
20   A    Shelly Watchilla.
21   Q    How do you spell her last name?
22   A    W-A-T-C-H-I-L-L-A.
23   Q    Are you her supervisor?
24   A    I am.
25   Q    Okay.

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 14

1      As part of your responsibilities, are you
2  required to know how elections are to be conducted
3  within your county?
4      A   Yes.
5      Q   So is it fair to say, when legislation is
6  passed concerning Pennsylvania's election code, do you
7  make yourself familiar with that legislation?
8      MR. MORAN:  Object to the form.  Go ahead.
9      Q   You can answer the question, Mr. Parsnik.
10     A   I do make myself familiar as much as I can
11  to the legislation, yes.
12     Q   Would you agree with me your county board
13  of elections is charged with jurisdiction over the
14  conduct of the primary and general elections conducted
15  in your county?
16     A   Yes.
17     Q   Would you also agree with me in conducting
18  the elections in your county, you are required to
19  follow the election code?
20     A   Yes.
21     Q   In that vein, is it true the Department of
22  State often times issues guidances or instructions to
23  counties, including your county, with regard to the
24  administration of elections?
25     MR. MORAN:  Object to the form.

Page 15

1      A   They issue guidelines.  Yes.
2      MS. McGEE:  Ray, you can take down that
3  exhibit.
4      Q   Mr. Parsnik, how many voting precincts or
5  district election boards are in your county?
6      A   There are 144 precincts.
7      Q   As of the primary election on June 2nd,
8  2020, I believe that you had 211,276 registered voters
9  in your county.
10     Does that sound correct?
11     A   Yes.  Pretty much.
12     Q   Sitting here today, do you know if that
13  number has changed at all since the primary election?
14     A   Yes.  I believe it went to 214,000.
15     Q   How many polling locations for in-person
16  voting do you plan to have open in your county for the
17  general election?
18     MR. MORAN:  Object to the form.
19     Want to repeat the question again?
20     Q   How many polling locations for in-person
21  voting does Luzerne County plan to have open for the
22  general election?
23     A   We will have about 186 of them.
24     Q   And for those polling locations, how many
25  poll workers will your county require for the general

Page 16

1  election?
2      A   It depends on the size of the polling
3  location.
4      Q   Are you able to give me a general number, a
5  top number of poll workers your county is going to
6  need?
7      A   We will probably have close to 1,000.
8      Q   Now, you say you will probably have close
9  to 1,000.  Is that a sufficient number?  I guess my
10  question will be for prior general elections has that
11  number been more than that?
12     A   No.  That is a sufficient number to conduct
13  an election.
14     Q   Have you secured 1,000 poll workers, have
15  you signed up that many poll workers so far?
16     A   Not at this point.
17     Q   How many have you signed up at this point?
18     A   I am not sure of that.
19     Q   You don't know that number sitting here
20  today?
21     A   I do not.
22     Q   Do you know who would know that number?
23     A   We can get that from my elections director.
24     Q   Do you expect to fulfill the total number
25  of 1,000 poll workers?

Page 17

1      A   I expect to fulfill the amount of poll
2  workers needed to complete the election.  Yes.
3      Q   You expect to fulfill 1,000 poll workers,
4  correct?
5      MR. MORAN:  Object to the form.  He doesn't
6  know if they are going to need 1,000.  That has
7  been the uppermost needed in past elections.
8  They are going to do their best --
9      MS. McGEE:  Your objection is noted.  He
10  answered they need 1,000 poll workers for this
11  election.
12     My question is does he expect to have 1,000
13  workers?
14     MR. MORAN:  He estimated that number.
15     MS. McGEE:  I'm sorry.  You spoke over me.
16  So I didn't hear that.
17     MR. MORAN:  He estimated 1,000.
18     MS. McGEE:  He didn't say he estimated.  I
19  would please ask that you stop coaching the
20  witness by this.  He said they need 1,000
21  workers.
22     My question is do they expect to have 1,000
23  workers signed up by November 3rd.
24     A   I do not need 1,000.  I have had upwards of
25  1,000 people during elections to work as poll workers.

Page 18

1  We get as many poll workers as we can to conduct the
2  election.  We don't specify a complete number.
3      Q    So is it fair to say your county may not
4  have 1,000 workers by November 3rd?
5      A    If 1,000 workers are not required or
6  needed, yes.
7      Q    When does your county intend to start
8  sending out mail-in or absentee ballots, or have they
9  already started sending out those ballots?
10     A    We intend to start sending out those
11  ballots October 5th is our goal right now.
12     Q    So you have not started sending them out
13  yet.
14          Correct?
15     A    That's correct.
16     Q    Okay.
17          When you mail out your absentee and mail-in
18  ballots are you providing any instructions with those
19  ballots on how to return them?
20          MR. MORAN:  Object to the form.
21     Q    You can answer the question.
22     A    So the instructions provided on the mail-in
23  ballots and the absentee ballots are provided to the
24  voter as in how to complete the ballot and how to send
25  the ballot back.

Page 19

1      Q    And how are you instructing them to send
2  the ballot back?
3      A    There is a communication on three envelopes
4  that are contained.  You have the outer envelope.
5  Then you have the envelope with the declaration.  Then
6  you have the secrecy envelope.
7          And they are instructed to place the
8  ballots into the secrecy envelope.  And then place the
9  completed secrecy envelope into the ballot, fill out
10  the declaration, and return it to us.
11     Q    And what specific method of return are you
12  instructing them on how to get their ballot back to
13  the county board of election?
14          MR. MORAN:  Object to form.
15     Q    Are you telling them where they can drop it
16  off?
17     A    So they can put it in the mail, or they can
18  drop it off at the election bureau.
19     Q    How many applications has your county
20  received for absentee and mail-in ballots for the
21  general election?
22     A    I am not sure of the total amount.  I know
23  at the primary amount we had about 54,000 on record.
24     Q    For the primary election isn't it true you
25  sent an application to every registered voter in your

Page 20

1  county?
2          MR. MORAN:  Object to the form.  Relevance.
3      A    So the county manager sent a correspondence
4  out pertaining to that in the primary election.
5          MS. McGEE:  Ray, would you pull up what I
6  have in the shared folder as C2, please?  This
7  will be Exhibit 2.
8          (Thereupon, Exhibit No. 2 was marked for
9  identification.)
10     Q    Mr. Parsnik, is this the correspondence
11  that you -- take a moment, first, to take a look at
12  this document.
13          Ray, if you could scroll to the second and
14  third pages.
15          Is this the correspondence that you just
16  referenced as your county manager having sent out for
17  the primary election?
18          MR. MORAN:  Object to the form.
19     A    So the letter from the county manager is
20  the correspondence that went out.
21     Q    Like the primary, for the general election,
22  did your county manager or anyone else in your
23  county -- did the county send out applications to
24  every registered voter?
25     A    We did not.

Page 21

1      Q    Sitting here today, do you know how many
2  applications the county has received for absentee and
3  mail-in voting for the November 3rd election?
4      A    I do not.
5      Q    Do you know who would know that
6  information?
7      A    That would be my elections director.
8      Q    So given that, is it fair to say you don't
9  know how many applications have been processed or
10  approved?
11     A    I can only tell you what I previously
12  testified to in the primary, there were 54,000 that we
13  had.
14     Q    So my question is for the general election
15  in November, do you know how many applications have
16  been processed and/or approved?
17     A    I do not at this point.
18          MS. McGEE:  Ray, if you could go to page 2
19  of Exhibit 2.
20     Q    Mr. Parsnik, on this page, there are three,
21  quote, "dropoff locations" listed that I believe your
22  county utilized for the primary election.
23          My question to you is taking a look at
24  these three locations, the Hazleton post office, the
25  Wilkes-Barre post office, and Penn Place, a drop box

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 22

1  ballot at lockbox location.
2      Q    My question is will these be the same three
3  locations where ballots can be delivered for the
4  general election?  Or will it be different?
5          MR. MORAN:  Objection to the form.
6      A    They will be the same three locations.
7      Q    The Penn Place location, is that a ballot
8  drop box?
9      A    In place is a physical location of our
10  election office.
11     Q    At your election office is there a ballot
12  drop box for the return of absentee and mail-in
13  ballots?
14     A    There is.
15     Q    So is it fair to say your county will only
16  have one drop box for the general election?
17         MR. MORAN:  Objection to the form.  He
18  didn't call it a drop box.
19     A    I don't know what you are defining as a
20  drop box.  But a physical location that we have for
21  elections to drop off ballots would be at the 20 North
22  Pennsylvania Avenue address.
23     Q    And that is the address where voters take
24  their ballot and drop it off over the counter, or do
25  they put it in a box, a receptacle themselves?

Page 23

1      A    They put it in a receptacle themselves.
2      Q    Would you agree with me that that is a drop
3  box or a box that a person could drop their ballots?
4      A    Yes.
5      Q    So given that testimony, will you only have
6  one drop box for the general election?
7      A    The other two locations are post offices
8  where the postal service receives ballots from
9  residents, that walk in, over the counter.
10         And then they do whatever they need to do
11  to process those through the mail system.  And they
12  would hold those for us in mail bins until we pick
13  them up.
14     Q    So the locations, the ballots dropped at
15  those locations, they are not actually placed into the
16  U.S. mail.  They are given to the postal service to
17  hold until you pick them up.
18         Is that fair?
19         MR. MORAN:  Object.  If you know.
20     Q    I'm just trying to understand what you are
21  telling me.  That is all.
22     A    So at the postal service a resident comes
23  in, and they have it at the counter.  And they take it
24  across the counter, if it needs postage on it.
25         The postal service goes through their

Page 24

1  process to bar code or postmark, whatever postage is
2  on it.  Instead of sending it to the sorter racks to
3  be distributed to the postal carriers, they leave it
4  in a plastic mail bin for us to pick up.
5      Q    This dropoff ballot box at the Penn Place,
6  20 North Pennsylvania Avenue, you said that that is at
7  your election office?
8      A    Yes.
9      Q    Where is that box in a physical location to
10  the counter of your election office?  Is it in sight
11  of the counter, or is it around the corner?  That is
12  what I am trying to get at.
13     A    No.  It is directly in front of the
14  counter.
15         So let me clarify as well.  So we have --
16  when we had the COVID issue, and we were not letting
17  any traffic into the office, the drop box is down at
18  the security sheriff's counter at Penn Place.  I
19  believe the plan for the general is going to move it
20  back up to the elections office counter.
21     Q    I'm sorry, why was it moved down to where
22  the sheriffs are?
23     A    Because of COVID.  We were not letting the
24  public into our buildings.
25     Q    Okay.

Page 25

1          Is that where it was for the primary
2  election?
3      A    Correct.
4      Q    Has it been moved yet to the counter in the
5  elections office?
6      A    It has not.
7      Q    What are the hours of operation for that
8  drop box?
9      A    I believe it is 8:00 to 5:00 p.m.
10     Q    Is there any signage on that box?
11     A    Other than it says "ballot box," no.
12     Q    So there is no signage on it regarding the
13  prohibition of third party delivery of voter ballots?
14         MR. MORAN:  Objection to the form.
15     A    There is not.
16     Q    Can you describe the physical design of the
17  look of the drop box?
18     A    The design of the drop box itself?
19     Q    Yes.
20     A    A metal box.  It has an opening at the top.
21  It is locked.  Probably 18 by 18 or maybe bigger, 24
22  by 24 box.  It sits on top of the counter.  It has a
23  general mail slot to drop ballots in, and it is
24  locked.
25     Q    Do you have a date on which that box is

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 26

1    going to be moved to the counter in the election
2    office?
3        A    I do not.
4        Q    Will it be before you anticipate sending
5    out mail-in ballots on October 5th?
6        MR. MORAN:  Objection to the form.
7        A    At this point I don't know the date it will
8    be moved.
9        Q    Will that box be supervised or staffed by
10   elections staff?
11       A    The box is in plain view of elections
12   personnel as you walk into the counter.
13       Q    My question is a little bit different.  I
14   will ask it again a different way.  When a voter goes
15   to place their ballot in the box, will there be an
16   election worker there to verify that the voter casting
17   the ballot is the voter that is on that ballot, I
18   should say?
19       MR. MORAN:  Objection to form.
20       A    The box is in the plain view of the
21   counter.  The counter sits right there as you walk
22   into the elections office.  If your question is will
23   we have somebody there right next to the ballot box?
24   Probably not.
25       Q    Is it under video surveillance, or will it

Page 27

1    be under video surveillance when ballots are able to
2    be returned?
3        A    It is under video surveillance in that part
4    of the office, yes.
5        Q    Do you know what retention policies are for
6    that video?
7        A    I want -- I don't know for sure.  I would
8    say the general policy is 30 days.
9        Q    Was it under video surveillance for the
10   primary election?
11       A    Yes.  It was.
12       Q    Do you know if that video footage still
13   exists?
14       A    I do not.
15       Q    Do you know who would know?
16       A    The sheriff of Luzerne County.
17       Q    What notice has been published by Luzerne
18   County regarding the location, hours and availability
19   of that drop box?
20       MR. MORAN:  Objection to the form.  That is
21   not an issue in this case.
22       A    Since we haven't done anything yet with it,
23   and we haven't sent the ballots out yet, we haven't
24   sent any communication.
25       Q    Is the county implementing any measures to

Page 28

1    assure ballots are not able to be placed inside of
2    that drop box after 8:00 p.m. on election night?
3        A    The ballot box will be removed from the
4    counter immediately after 8:00 p.m. on election night.
5        Q    And what will happen to the drop box when
6    it is removed from the counter at 8:00 o'clock on
7    election night?
8        A    Contents will be emptied and placed into
9    the election director's office.
10       Q    Is the election director's office -- does
11   it have a lock and key to his door?
12       A    It does.
13       Q    How long will those ballots stay in that
14   office until they are canvassed?
15       A    They will stay in there until we can have
16   elections personnel scan it into the SURE system.
17       Q    Does your county permit poll watchers to be
18   present at the drop box during its hours of operation?
19       A    I never had a request for that.
20       Q    What efforts or measures is your county
21   implementing to prevent against third party delivery
22   of non-disabled voters or absentee --
23       MR. MORAN:  Objection to form.  Not at
24   issue in this case.
25       Q    What is your county doing -- go ahead,

Page 29

1    Mr. Parsnik.
2        A    Our policy is to make sure we follow the
3    election code.  The person that filled out the ballot
4    is the person that puts the ballot into the ballot
5    box.
6        Q    Is your county implementing any measures to
7    prevent the commingling of illegally delivered ballots
8    or illegally delivered ballots into that drop box?
9        MR. MORAN:  Objection to the form.  Use of
10   the term "illegal."
11       A    So my answer is the same as the previous.
12   We follow the election code.  We make sure that the
13   person that delivers the ballot is the person that
14   filled out the ballot.
15       Q    How do you make sure of that?
16       A    If someone walks into the office, and since
17   it is in direct view of election personnel, we can
18   look at it that way.  If need be, the video, we can go
19   back and look at video, if there is an issue.
20       Q    What process will your county follow to
21   collect mail-in ballots from that drop box?
22       A    As far as which part?
23       Q    How often will it be collected?
24       A    So usually the mailbox in elections, if we
25   feel it is getting full, we will go and empty the

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 30

1    contents in that.  Depending on the traffic at the
2    postal service we usually have our mail personnel pick
3    those up the end of the day or the next morning.
4         Q    So let's break that up a little bit.  The
5    drop box, you said if it is full.  How do you
6    determine if it is full?
7         A    We can see in our drop box, in the
8    elections box, once there are so many ballots placed
9    into there, we can see where the slot is to place the
10   ballots, if it is approaching that full and there is
11   difficulty putting them in.
12        Q    Like you said earlier, if that is the case,
13   then that box is emptied, and those ballots are placed
14   in your director of elections office?
15        A    That's correct.
16        Q    And what kind of receptacle do they go into
17   that is placed in the office?
18        A    We have plastic bins.
19        Q    So they are just in a plastic bin; they are
20   not in an enclosed container of any kind?
21        A    They are in a plastic bin.
22        Q    And the same questions for the ballots
23   picked up from the post office.  What kind of
24   receptacle are they transported in from the post
25   office to the elections office?

Page 31

1         MR. MORAN:  Objection to form.  The
2    handling and transportation and security of any
3    non-drop box ballot is not at issue in this case.
4         A    So the mail service provides us with the
5    general plastic mail bins that say "U.S. postal" on
6    them.  And they put all of our mail into those bins.
7    And we then bring it back to the mail room.
8         Q    Are those ballots also placed in the
9    director of elections office?
10        A    They are -- when the mail room brings up
11   the mail, we place the ballots in the director's office
12   and lock them up.
13        Q    And do they stay there locked up until they
14   are canvassed?
15        A    That's correct.
16        Q    Is your county creating any record of when
17   the ballots are delivered to the office and locked up?
18        MR. MORAN:  Objection to the form.
19        A    So you have to explain what type of record
20   you are talking about.
21        Q    Well, for example, when your workers empty
22   the drop box, is there a log or diary or something
23   that they are keeping a record of when that box is
24   emptied?
25        A    I am not sure if there is a log.  I

Page 32

1    believe they record when it is emptied.  But I don't
2    know how much of a log is there.
3         Q    Is there a certain period of time that
4    passes, hours or days, between the box is emptied and
5    the ballots are placed in the office until they are
6    scanned into the SURE system?
7         Or I guess the better question, are they
8    scanned into the SURE system as soon as they are taken
9    out of that box?
10        A    They are scanned into the SURE system
11   daily.
12        Q    Is the box emptied daily?
13        A    The box could be emptied more than once
14   daily.
15        Q    Once the box is emptied and placed into the
16   bins in the director's office, are those ballots also
17   commingled with the ballots retrieved from the postal
18   service?
19        MR. MORAN:  Objection to the form.
20        A    So the ballots, whether they are received
21   from the elections box or from the postal service, are
22   all in the same bins.  And we scan them all in to SURE
23   at the same time.
24        Q    Will you have any tracking measures to
25   record which ballots were delivered via drop box, U.S.

Page 33

1    mail, or in-person?
2         A    I don't believe so.
3         Let me take that back.  Let me take that
4    back.  All of the mail that we get in every day in the
5    elections office is time stamped.  So that is a report
6    of when they are received back.  They then go into the
7    election director's office to be locked up.
8         Q    On that time stamp, does it say if they are
9    received from the postal service, or is it just a time
10   stamp of the date?
11        A    Just a time stamp of the date and the time.
12        Q    Aside from the drop boxes, is your county
13   implementing other types of mobile collection sites or
14   satellite office for the collection of mail letter
15   absentee ballots?
16        A    We are not.
17        Q    In those instances where a voter delivers
18   their absentee or mail-in ballot in person to your
19   election office, will those voters be asked by a
20   county election worker is it their own ballot which
21   they are casting?
22        MR. MORAN:  Objection to the form.
23        A    I don't believe so.
24        Q    Why not?  Why aren't they asking that
25   question?

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 34

1    MR. MORAN: Objection to the form.
2    A    When a voter has that declaration, they
3  sign that declaration, that they filled this out, and
4  it is their ballot, and everything else is correct.
5  If that voter wants to commit some type of fraud or
6  criminal act, it is the voter's -- I don't know what
7  else to say.  It is the voter's purview.
8    MS. McGEE: Ray, would you pull up C3?  We
9  will mark this Exhibit 3.
10    (Thereupon, Exhibit No. 3 was marked for
11  identification.)
12    Q    If you could scroll to the second page,
13  please, Ray.
14    Mr. Parsnik, what we marked Exhibit 3 is an
15  August 19, 2020 document from the Pennsylvania
16  Department of State regarding absentee and mail-in
17  ballot return guidance.
18    Are you familiar with this document?
19    A    I have read it.
20    MS. McGEE: Ray, would you scroll through
21  it slowly?
22    Q    Let me know when you are ready,
23  Mr. Parsnik.
24    Have you seen this document before,
25  Mr. Parsnik?

Page 35

1    A    Yes.
2    Q    Have you ever reviewed it in total before
3  today?
4    A    Yes.
5    Q    This guidance from the Department of State
6  concerns ballot return and collection.
7    Correct?
8    MR. MORAN: Objection to the form.
9    A    It appears to, yes.
10    Q    And this guidance discusses a ballot return
11  and collection plan.  My question to you is has
12  Luzerne County submitted a collection plan to the
13  Department of State?
14    A    I believe a ballot and collection plan
15  needed to be submitted, if they were off site other
16  than their election office.
17    Q    Okay.
18    So is it fair to say you did not submit a
19  plan, because yours are not off site?
20    A    Correct.
21    MS. McGEE: Ray, you can take this down.
22  If you would pull up C4.
23    (Thereupon, Exhibit No. 4 was marked for
24  identification.)
25    Q    Mr. Parsnik, this is a September 11, 2020

Page 36

1  guidance from the Department of State concerning
2  examination of absentee and mail-in return envelopes.
3  Have you seen this document before?
4    A    Yes.
5    Q    If you would look at the first page, second
6  paragraph.
7    A    You need to blow that up.
8    Q    The second paragraph.  It says, "Once the
9  qualified voter's absentee or mail-in application is
10  approved, the voter is mailed a ballot with
11  instructions and two envelopes."
12    It goes on to say at the bottom, "This
13  guidance addresses the examination of the voter's
14  declaration on the ballot return envelope.  This
15  guidance assumes that the voter has satisfactorily
16  completed the steps described above as to the
17  application for receipt and return of an absentee or
18  mail-in ballot."
19    My question is would you agree with me this
20  paragraph tracks Pennsylvania's election laws for the
21  process by which a voter must complete their absentee
22  or mail-in ballot with regard to the completion of the
23  declaration envelope?
24    MR. MORAN: Objection to the form.  He is a
25  lay witnesses.

Page 37

1    A    Say it again, what your question --
2    Q    Would you agree with me this paragraph that
3  we are on, the second paragraph on page 2 of this --
4    A    Okay.
5    So unless you --
6    Q    Describe the process by which a voter must
7  complete their absentee or mail-in ballot with regard
8  to the declaration envelope?
9    A    So that is the state process --
10    MR. MORAN: Carolyn, can you blow up that
11  paragraph?
12    MS. McGEE: The second paragraph, Ray.
13  Right above that.
14    It starts with "once."  There you go.
15    MR. MORAN: Can you see that better?
16    THE WITNESS: Yes.
17    MR. MORAN: Would you mind asking the
18  question again now that he can see the text?
19    Q    Would you agree with me that this paragraph
20  describes how a voter must complete their absentee or
21  mail-in ballot with regard to the declaration
22  envelope?
23    A    Yes.
24    Q    Would you also agree with me that the
25  signature requirement for the declaration envelope is

Page 38

1   an important component of a voter voting their mail-in
2   or absentee ballot?
3       A   It is one component of importance, yes.
4       Q   And that is partly because in Pennsylvania,
5   unless you are a first time voter, you do not have to
6   show ID in order to vote?  Your identification is
7   verified by signature, isn't that true?
8       MR. MORAN:  Objection to the form.
9       A   So it is true.  But also on that
10  declaration is the correct name that you would use,
11  and your correct address.
12      Q   Correct.
13      So by those component, their name, their
14  address, and their signature, that is that voter
15  establishing their right to vote.
16      Correct?
17  A   Yes.
18      MR. MORAN:  Objection to form.
19      MS. McGEE:  Ray, if you would blow up the
20  first paragraph under section 2 on that same
21  page.
22      Q   That paragraph states, "County boards of
23  elections should have processes in place to record the
24  dated return method and ballot status for all voted
25  ballots received.  County boards of elections must

Page 39

1   store and maintain returned ballots in a secure
2   location until the ballots may be precanvassed or
3   canvassed."
4       And my question to you is what process does
5   your county have in place for the general election to
6   record the date, return method, and ballot status for
7   all voted absentee or mail-in ballots?
8       MR. MORAN:  Objection to the form.
9       A   So we record the date through the time
10  stamp.  And the return method is into bins by either
11  the postal service or through the ballot box.
12      So we don't have the mail bins -- do we
13  separate the ones from the ballot box to the ones
14  received from the post office?  The answer is no,
15  because all those are recorded into SURE as being
16  either absentee or mail-in ballot that gets returned
17  to the office.
18      The way that they return them, and we put
19  them into SURE to record them, doesn't mean it would
20  have a bearing on it.  The date is recorded into SURE,
21  when you scan them in.
22      Q   What will you be doing to maintain those
23  records, once the ballots are scanned into SURE?
24      MR. MORAN:  Objection to form.
25      A   Once the ballots are scanned into SURE, you

Page 40

1   need -- what records do you need at that point?
2       Q   What happens with the ballots after they
3   are scanned in?
4       A   What happens to the ballots after they are
5   scanned in?  They are locked in our data room.
6       Q   Until they are canvassed, correct?
7       A   That's correct.
8       MS. McGEE:  Ray, if you go to the third
9   page of that exhibit.  We are looking at section
10  3.  Examination of declaration on ballot return
11  envelopes.  If you would blow up the second to
12  last paragraph.
13      Q   It states, "If the voter's declaration on
14  the return envelope is signed, and the county board is
15  satisfied that the declaration is sufficient, the
16  mail-in or absentee ballot should be approved for
17  canvassing unless challenged in accordance with the
18  Pennsylvania election code."
19      My question to you is what do you
20  understand the word "sufficient" to mean?
21      A   Sufficient?
22      The declaration would be considered
23  sufficient, if the envelope is signed.  And the
24  correct address is on the declaration as well as the
25  correct spelling of the elector's name.

Page 41

1       Q   What will your county election workers do
2   to determine whether the signature on the declaration
3   is sufficient?
4       MR. MORAN:  Objection to the form.
5       A   So the county workers will look at every
6   one of those declarations on the envelope as they are
7   placing them into the SURE system to verify and put
8   into the system that we received the ballot.
9       And if there is a reason for them to
10  believe it is not sufficient based on their experience
11  working in the office for many years, they would then
12  place it on the side to be adjudicated.  And it would
13  not be sent through SURE.
14      Q   At that point in time are they comparing
15  the signatures on the declaration envelopes to any
16  voter registration records to verify the signature?
17      A   So they verify the signature with what
18  appears on the SURE system, when they scan the bar
19  code in.
20      Q   Okay.
21      This guidance goes on to state in the last
22  paragraph -- if you blow that up, Ray.
23      "The Pennsylvania election code does not
24  authorize the county board of elections to set aside
25  returned absentee or mail-in ballots based solely on

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 42

1   signature analysis by the county board of elections."
2       My question is, given this instruction from
3   the Department of State, what will your election
4   workers do, if they are unable to verify signature on
5   a declaration envelope of a voter mail-in or absentee
6   ballot?
7       MR. MORAN:  Objection to the form.
8       A    If they are unable to look at the signature
9   and say whether it is sufficient or not?  Is that your
10  question?
11      Q    Yes.
12      A    Based on what we have today, we would put
13  it in our bin for adjudication.
14      Q    I'm sorry, you broke up.  Your bin for
15  what?
16      A    Adjudication.
17      Q    So you would set it aside.  Is that
18  correct?
19      A    That's correct.
20      Q    What other basis would justify about being
21  set aside an absentee or mail-in ballot?
22      MR. MORAN:  Objection to the form.  Let's
23  clarify what we mean by set aside.
24      The witness is actually talking about
25  setting aside into a pile for later adjudication

Page 43

1   by the board of elections.
2       Are you asking him in terms of set aside as
3   meaning disregard entirely for some deficiency?
4   Can we clarify what we mean by that term "set
5   aside"?
6       Q    I am meaning when they scan in the ballots
7   to SURE, before they scan them in, if they determine
8   there is something that needs to be further reviewed,
9   what other basis would they put a ballot aside and not
10  count it at that point?  Or not scan it in.
11      A    If the signature is not sufficient in their
12  estimation, or if there was another article in there,
13  they failed to put their correct address in there, we
14  would put that to the side.  Things like that.
15      Q    Okay.
16      What procedure would your county follow to
17  provide notice to a voter that their ballot had been
18  set aside?
19      MR. MORAN:  Objection to the form.
20      A    At this point, their ballot in the end,
21  whether it is received or not, gets reported into SURE
22  with an explanation of a code in SURE to either put
23  in, and that would become part of the voter's record.
24      Q    How would the voter be notified there is
25  something wrong with their ballot?

Page 44

1       A    They are not notified.  It is put into an
2   adjudication.  They would be notified --
3       Q    I'm sorry.  Go ahead.
4       A    Go ahead.
5       Q    Are you aware under Pennsylvania's election
6   code, when a ballot is set aside for missing
7   information, or an issue with signature verification
8   on a declaration envelope, that that voter is to be
9   provided a notice and opportunity to address that?
10      MR. MORAN:  Objection to the form.  If you
11  know.
12      A    I do not know.
13      MS. McGEE:  Ray, could you pull up C9,
14  please?
15      Q    Mr. Parsnik 20 minutes before your
16  deposition we received from counsel for Secretary
17  Boockvar a guidance dated September 28, 2020, that Ray
18  is going to pull up for me.
19      And I realize you may not have seen this
20  document that was put out minutes before your
21  deposition.  But I would like you to take a look at it
22  nonetheless.  Okay?
23      A    Sure.
24      MS. McGEE:  Ray, can you pull up C9?
25      VIDEOGRAPHER:  I'm getting it ready right

Page 45

1   now.  It is taking a little longer to load.
2   Stand by.
3       (Thereupon, Exhibit No. 5 was marked for
4   identification.)
5       Q    Mr. Parsnik, is it fair to say you haven't
6   seen this document before, since it was just issued?
7       A    I have not.
8       MS. McGEE:  Ray, if you could go to the
9   very last page.  Page 9.
10      MR. MORAN:  I have a copy I am going to
11  hand him.  Turn to the last page.
12      MS. McGEE:  he has a printed copy in front
13  of him?
14      MR. MORAN:  Yes.  I had my office bring it
15  to me.  I have a printed copy.  It's the first
16  time he is seeing it now.
17      Q    I'm looking at the last few lines of this,
18  Mr. Parsnik.  And the first sentence under the
19  bullets.  It says, "The election code does not permit
20  county election officials to reject applications or
21  voted ballots based solely on signature analysis."
22      And as the one in charge of elections for
23  your county, do you agree with that statement?
24      MR. MORAN:  Objection to the form.
25      A    Let me read it first.  This is the first

# NETWORK DEPOSITION SERVICES
## Transcript of David Parsnik 30 (b) (6)

### Page 46

1  time I'm reading it.
2  Q   Sure.
3       Take your time.
4  A   What was your question?
5  Q   The statement, "The election code does not
6  permit county election officials to reject
7  applications or voted ballots based solely on
8  signature analysis," do you agree with that statement?
9  A   I would agree with that statement.
10  Q   So if there is an issue with signature
11  analysis on a voted absentee or mail-in ballot, will
12  that ballot be counted nonetheless?
13       MR. MORAN:  Objection to the form.  He is
14  just seeing this guidance.  They haven't
15  developed any process.
16  A   I don't really have an answer for you on
17  that.  I have just seen this today.  I can't really
18  say what we are going to do with it yet.
19  Q   Okay.
20       Prior to the issuance of the September 11
21  and now the September 28 guidance, how did your county
22  board of elections address a signature on a
23  declaration envelope that could not be verified
24  against a voter's registration during any precanvass
25  or canvass?

### Page 47

1       MR. MORAN:  Objection to the form.
2  Objection as asked and answered as well.
3  Q   That ballot would be set aside for
4  challenge?
5  A   Please ask me that one more time.
6  Q   Prior to the issuance of the September 11
7  and September 28 guidance, how did your county board
8  of elections address the signature on a declaration
9  envelope that could not be verified against a voter
10  registration during a precanvass or canvass?  Would
11  that ballot be set aside for challenge, or would it be
12  counted?
13       MR. MORAN:  Objection to the form.  He said
14  set aside for adjudication in his previous
15  testimony, not challenge.
16  A   Correct.  It would be set aside for
17  adjudication.
18  Q   And when an absentee ballot was set aside
19  for challenge or adjudication, as you say, would the
20  county board of elections hold a hearing on that
21  challenge?
22  A   The challenges and adjudications to me are
23  two different things.
24  Q   What is your distinction between the two?
25  A   Well, if somebody wants to challenge it, I

### Page 48

1  believe they would have to approach the election
2  board, fill out the paperwork for the challenge, and
3  go through that process.
4       The adjudication process by the board is
5  just the ballot is set aside, not put into the SURE
6  system.  And once we got through everything else we
7  needed to do for the election, and we got to the
8  adjudication part for the board, they would determine
9  whether that is to be counted or not.
10  Q   Prior to the issuance of these two
11  guidances, how did your board of elections address the
12  signature by an in-person voter that could not be
13  verified against their voter registration?
14       MR. MORAN:  Object to the form "in-person
15  voting" is not an issue in this litigation.
16       MS. McGEE:  It is an issue in this
17  litigation, because these guidances are treating
18  absentee and mail-in voters different than
19  in-person voters.  It is absolutely at issue.  I
20  would ask that he answer the question.
21       MR. MORAN:  I didn't instruct him not to
22  answer.  I am preserving the objection.  Go
23  ahead.
24  A   Ask me it one more time.
25  Q   Prior to the issuance of these two

### Page 49

1  guidances, how did your county board of elections
2  address the signature by an in-person voter that could
3  not be verified against their voter registration
4  record?
5  A   It would be the same process.  We would put
6  it aside, it would not go through SURE, for
7  adjudication.
8  Q   Will poll watchers be permitted to be
9  present during canvassing events in your county
10  including precanvass?
11  A   Poll watchers can be in the room for
12  precanvassing from 7:00 a.m. on Election Day.
13  Q   Does that include when the review of
14  signatures on declaration envelopes is performed?
15       MR. MORAN:  Objection to the form.
16  A   Poll watchers can object, do whatever they
17  need, if they are observing our procedure.
18  Q   During precanvass and canvassing of
19  absentee and mail-in ballots, what process will your
20  county follow to set aside any unopen ballots which
21  are received after the deadline?
22  A   So ballots that are received after the
23  deadline on Election Day at 8:00 p.m., is that what
24  you are getting at?
25  Q   Yes.  That's correct.

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 50

1    A    So we hold those ballots.  We keep them
2  locked in the director's office.  We have to go in the
3  SURE system and put them in as being received after
4  the deadline.
5    Q    What happens from there?  Are they counted,
6  or not counted?
7    A    If they are received after the deadline,
8  they are not counted.
9    Q    Okay.
10      I know I asked these questions before.  I
11  will just ask just to confirm a different way.  Aside
12  from the drop box located in the county election
13  office, is your county conducting any over the counter
14  absentee or mail-in voting in locations other than the
15  main office?
16      MR. MORAN:  Objection.  Asked and answered.
17    A    Say it one more time.  Are we doing what?
18    Q    Any over the counter voting for mail-in
19  ballots aside from the main office, is there any other
20  office location that that can take place at?
21    A    No.  That is the only one is North
22  Pennsylvania Avenue.
23    Q    Okay.
24      What is your county's procedures regarding
25  spoliation of any absentee or mail-in ballots for

Page 51

1  voters who applied for, but did not vote their
2  absentee or mail-in vote, and seek to vote in-person
3  on Election Day?
4    A    So if it comes to the polling place, and
5  they have their ballot in their hand, and they come in
6  and say, "I don't want to fill out my ballot, I want
7  to vote in person," the director of election would
8  then spoil that ballot, sign the proper paperwork, and
9  that voter would then be told to go vote at the
10  machine.
11    Q    At the November 3rd general election will
12  poll watchers be permitted to monitor the absentee and
13  mail-in ballot voting activities that occur at your
14  county election office, prior to and on Election Day?
15    A    I guess I don't know what you mean by
16  monitoring.
17    Q    Are poll watchers going to be permitted at
18  the main office, and I guess the two postal offices
19  you identified, where mail-in and absentee ballots can
20  be returned prior to and on Election Day?
21      MR. MORAN:  Objection.
22    A    We have no control over what the post
23  office does.  Poll watchers are admitted to our
24  precanvassing at that point.  Other than that, they
25  are at the polling locations to do what they need to

Page 52

1  do.  I can't answer what the poll watchers -- if they
2  would be allowed at the county elections office for
3  monitoring.
4    Q    During the primary election, did you have
5  any instances of voters who applied for and voted
6  absentee or mail-in ballots, and also voted in person
7  during the primary election?
8    A    We had none.
9    Q    Ray, could you pull up C5, please?
10      (Thereupon, Exhibit No. 6 was marked for
11  identification.)
12    Q    If you could blow up the middle part of
13  that with the heading.
14      Take a moment to read this, Mr. Parsnik.
15  This is a September 24, 2020 statement from the
16  Department of Justice, entitled "Statement of U.S.
17  Attorney Freed on inquiry into reports of potential
18  issues with mail-in ballots."
19      MR. MORAN:  I will object at this time and
20  instruct him not to answer any questions
21  pertaining to this ongoing investigation by the
22  United States Middle District Attorney.  Also, as
23  being way outside the scope of testimony as
24  noticed in the 30(b)(6) notice, subsequently
25  negotiated and agreed to by counsel.  He is not

Page 53

1  going to answer any questions pertaining to this
2  issue.
3      MS. McGEE:  Is this witness under
4  investigation such that he is invoking his Fifth
5  Amendment rights?
6      MR. MORAN:  No.
7      MS. McGEE:  I don't know the basis to
8  instruct him -- not to.  I'm still talking.
9  Because if he is not, you don't have a basis to
10  tell him not to answer.
11      If he is not subject to the investigation,
12  there is no reason he can't answer questions
13  about this incident.
14      MR. MORAN:  The reasons are it is outside
15  the scope of the 30(b)(6) notice.  It is not
16  particularly relevant to this litigation.
17      This is about UMOVA ballots.  It has
18  nothing to do with drop box ballots.  And as I
19  previously objected, any non-drop box ballot
20  activity, handling, storage, or security is not
21  at issue in this litigation.  He is not here to
22  testify --
23      MS. McGEE:  This statement and the news
24  articles that are out there doesn't make any
25  reference to whether or not these ballots that

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 54

1    were discarded were delivered by drop box.
2         And the issue over the security of mail-in
3    and absentee ballots is at issue in this
4    litigation.  So I am entitled to ask him
5    questions about this.
6         I only have a few.  If he doesn't know
7    anything about it, that will end it right there.
8    But I am entitled to ask him questions about it.
9         I really don't want to get into it.  We
10   already learned today the Judge is not available
11   for discovery disputes.  I would hate to have to
12   bring this witness back for any reason.  I would
13   ask please to be able to ask him a few questions
14   about this incident and what he knows.
15        MR. MORAN:  That is fair.  Ask your
16   questions.
17        MR. OBLAK:  On behalf of intervenors we do
18   not have any objection to this being outside the
19   scope of 30(b)(6) notice.
20        MS. McGEE:  The objection is noted.
21   Q    Mr. Parsnik, do you have any knowledge of
22   the incident that is identified in the statement
23   regarding military ballots that were found to be
24   discarded at the Luzerne County board of elections?
25        MR. MORAN:  Objection.

Page 55

1         Again, you just identified them as military
2    ballots.  There is nothing at all in this
3    litigation pertaining to military ballots.
4    Q    I'm sorry, I misspoke.  I'm sorry.  The
5    statement actually says potential issues with a small
6    number of mail-in ballots at Luzerne County board of
7    elections.
8    A    This is an ongoing investigation.  It is
9    not closed yet.  I am not comfortable answering any
10   questions on it regarding Luzerne County or personnel.
11   Q    Is it fair to say that you do have
12   knowledge regarding this incident of ballots being
13   discarded, and you are now refusing to answer?
14   A    I am not refusing to answer.  It is an open
15   investigation.
16   Q    Are you being investigated, sir?
17        MR. MORAN:  Objection.  Knowledge.  He
18   doesn't know who they are investigating.
19   A    At this point it is an open investigation.
20   I don't know who the targets are.
21   Q    Do you know why these ballots were
22   discarded?
23        MR. MORAN:  Objection.  I am instructing
24   you not to answer.
25   Q    Off the record for a few minutes, please.

Page 56

1         VIDEOGRAPHER:  We are now off the record.
2    The time is 12:13 p.m.
3         (Recess taken.)
4         VIDEOGRAPHER:  We are now back on the
5    record.  The time is 12:18 p.m.
6    Q    Mr. Parsnik, the ballots at issue in the
7    investigation, have they been counted, or will they be
8    counted for the general election?
9         MR. MORAN:  Objection.  Instruct not to
10   answer.
11        MS. McGEE:  On what basis?
12        MR. MORAN:  Same basis.  Outside the scope
13   of the 30(b)(6) notice, and the agreement
14   governing his testimony today.
15        MS. McGEE:  It is not beyond the scope of
16   the topics and issues.  I'm asking if those
17   ballots will be counted.
18        MR. BRIER:  This is Dan Brier for the
19   Secretary.  We are joining in the objection as
20   outside the scope.  Thank you.
21        MS. McGEE:  Are you instructing him not to
22   answer.
23        MR. MORAN:  I am instructing him not to
24   answer.
25        MS. McGEE:  For purposes of the record, I

Page 57

1    will put my objection to your objection, I guess.
2         But I am going to ask my questions to put
3    them on the record to preserve this for the
4    court.
5    Q    What is the current status of those
6    ballots, are they in possession of the county
7    election board?
8         MR. MORAN:  Objection.  Outside the scope
9    of the 30(b)(6) notice.  It also implicates
10   ongoing criminal or personnel investigation.
11   Q    Have those voters at issue with those
12   ballots been notified?
13        MR. MORAN:  Objection.  Outside the scope
14   of the 30(b)(6) notice.  Also particularly
15   implicates ongoing criminal and personnel
16   investigation.
17   Q    Have the voters at issue with those ballots
18   been notified they need to cast new ballots?
19        MR. MORAN:  Objection.  Outside the scope
20   of the 30(b)(6) notice.  Implicates ongoing
21   criminal and personnel investigation.  Instruct
22   him not to answer.
23   Q    That is all the questions I have for you,
24   Mr. Parsnik.  Thank you.
25   A    Thank you.

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

Page 58

1    MR. OBLAK: Sorry. John Oblak on behalf of
2  the Sierra Club and PennFuture intervenors. I
3  have a few questions.
4    MR. MORAN: So does counsel for the witness
5  as well.
6    MR. OBLAK: Why don't you go first. We
7  will follow.
8    EXAMINATION
9  BY MR. MORAN:
10   Q   I have just a few.
11    Mr. Parsnik, is there any requirement under
12  the law you are aware of for election staff to
13  interrogate voters when they are dropping off their
14  absentee or mail-in ballot?
15   A   Not to my knowledge.
16    MS. McGEE: Object to form.
17   Q   That is all I have.
18    MS. McGEE: Object to the form. But he can
19  answer.
20   Q   Did you answer?
21   A   Not to my knowledge.
22   Q   That is all I have.
23    EXAMINATION
24  BY MR. OBLAK:
25   Q   Good morning, Mr. Parsnik. Again, my name

Page 59

1  is Jonathan Oblak. I'm an attorney representing
2  intervenors PennFuture and Sierra Club. I have just a
3  few questions for you.
4    I want to ask a couple about the topic that
5  plaintiff's counsel finished with on the issue with
6  the ballots for which the U.S. Attorney's Office
7  issued for release, is it correct as a preballot
8  issuer of military ballots?
9    MR. MORAN: Objection. He is not answering
10  questions on this line.
11   Q   Mr. Parsnik, do you recall that the
12  Department of Justice issued a revised statement
13  following the one that counsel for plaintiff has
14  marked Exhibit C5?
15    MR. MORAN: Objection. Instruct not to
16  answer.
17   Q   Mr. Parsnik, are you familiar with a
18  statement issued by David Pedri, county manager,
19  regarding this issue?
20   A   Yes.
21   Q   Is that something you have read previously?
22   A   Yes.
23   Q   And so Mr. Pedri states in that issuance
24  that the contractor incorrectly discarded in the
25  office trash UMOVA ballots. Is that a true statement,

Page 60

1  to your knowledge?
2    MR. MORAN: I am instructing him not to
3  answer. You don't have any basis of what he
4  knows in terms of Mr. Pedri's knowledge.
5   Q   Understood.
6    Mr. Parsnik, switching gears a little bit.
7  With respect to Luzerne County's intentions in the
8  2020 general election, does it plan to follow guidance
9  issues by the Secretary of State with respect to how
10  that election should be conducted?
11   A   Yes.
12   Q   Does it intend to follow the guidance that
13  counsel for plaintiffs marked here today, or any
14  future guidance issued by the Secretary of State on
15  election issues?
16   A   Yes.
17   Q   To your knowledge, did Luzerne County
18  follow Secretary of State Boockvar's guidance during
19  the 2020 Pennsylvania primary?
20   A   Yes.
21   Q   Did it follow Pennsylvania election laws
22  during the 2020 primary, to your knowledge?
23   A   Yes.
24   Q   With respect to plans for the 2020 general
25  election, does Luzerne County again intend to

Page 61

1  encourage voters to drop off their ballots as it did
2  in the primary?
3   A   I don't know what you mean by encourage.
4   Q   Sure.
5    If we could look at Exhibit C2. Get that
6  pulled up. That is the correspondence, do you see
7  that in front of you, from May 1st, 2020?
8   A   Yes.
9   Q   Do you see point 2 on that letter reads,
10  "Vote in person as usual. Due to the pandemic, you
11  may experience larger crowds and wait times, as we
12  strive to enforce social distancing guidelines at a
13  consolidated number of polling places."
14    Do you see that?
15   A   Yes.
16   Q   And below that it reads, "I am strongly
17  encouraging all registered voters in Luzerne County to
18  take advantage of the vote by mail option in light of
19  the coronavirus pandemic."
20    Do you see that?
21   A   I see that.
22   Q   So do you know if Luzerne County is
23  encouraging voters to use the vote by mail option?
24   A   We will not be sending that type of
25  communication out in Luzerne.

Page 62

1      Q    With respect to Luzerne County's decision
2   to use the drop off at the post offices, and drop box
3   at the board election office, was there contemplation
4   of utilizing other drop box locations?
5      A    We do not.
6      Q    Was there any discussion about doing so?
7      A    There was not.
8      Q    Was there a demand in your county from
9   voters, to your knowledge, to add additional drop box
10  locations?
11     A    We are adding no additional drop box
12  location.
13     Q    Understood.
14        So my question is was there demand in your
15  county to add additional drop box locations?
16     MR. MORAN:  Object to form.
17     A    Not to my knowledge.
18     Q    Was that something that was taken into
19  consideration in determining not to use additional
20  drop box locations in the 2020 general election?
21     A    No.  Our original plan for the drop box
22  locations or collection sites, whatever you want to
23  call them, worked well.  And that is what we are doing
24  in November.
25     Q    Could you repeat that answer?  I didn't

Page 63

1   quite catch it.
2      A    Our drop box locations, election sites,
3   whatever you want to call them, for the primary,
4   worked well.  And we are going to be utilizing the
5   same processes for November.
6      Q    Has your office come up with any sort of
7   prediction or estimate as to how many applications it
8   expects to receive for mail-in ballots?
9      A    I do not know the number that we have
10  received currently.  I think I testified before, in
11  the primary, in June we received 54,000.
12     Q    I understand.
13        I am just wondering if your office came up
14  with any estimate as to how many it expects to receive
15  for the general election?
16     A    Estimate, I don't know that we came up with
17  an estimate.  I know that we have a count in SURE how
18  many we processed.  I just don't have that information
19  in front of me today.
20     Q    I understand.
21        Do you agree, sir, that if Luzerne County
22  wanted to add additional drop box locations, it could
23  do so under recent ruling from the Pennsylvania
24  Supreme Court?
25     MR. MORAN:  Objection.

Page 64

1      A    I guess I have to look at everything in
2   that ruling to see if there would be additional ones.
3   I don't -- that is as far as I could go with that.
4      Q    To the extent that your office has any
5   questions regarding how to interpret any guidance from
6   the Secretary of State, will it contact the Department
7   to resolve those questions?
8      MS. McGEE:  Object to form.
9      A    Again, the county has the liaison that if
10  you have questions or issues, you contact for
11  guidance.
12     Q    Is that something your office has taken
13  advantage of in the past?
14     A    Yes.
15     Q    With respect to the 2020 primary, are you
16  aware of any votes being double counted?
17     A    We had no reports of that.
18     Q    Are you aware of any attempts by anyone to
19  vote by mail by impersonating someone else?
20     A    We had no reports of that.
21     Q    Any reports of anyone attempting
22  counterfeit mail-in ballots for the 2020 primary?
23     A    None.
24     Q    Are you confident Luzerne County has
25  procedures in place to prevent double voting?

Page 65

1      MS. McGEE:  Object to form.
2      Q    I didn't get an answer.
3      A    I have the utmost confidence.
4      Q    Do you have confidence Luzerne County has
5   procedures in place to ensure security of ballots
6   submitted by mail through either the U.S. Postal
7   Service or delivered to the post office counters or
8   the lockbox you described?
9      MS. McGEE:  Object to form.
10     A    Yes.
11     Q    Are you aware of any group or organization
12  attempting to collect mail-in or absentee ballots from
13  voters in their 2020 Pennsylvania primary?
14     A    I am not.
15     Q    Are you aware of any group or organization
16  planning to collect mail-in or absentee ballots from
17  voters in the upcoming general election?
18     MS. McGEE:  Object to form.
19     A    I am not.
20     Q    With respect to poll watching, is it the
21  intent of Luzerne County board of elections to follow
22  any guidance from the Secretary of State regarding how
23  to authorize poll watching during the 2020 general
24  election?
25     A    Yes.

Page 66

1      Q    And is it the county's intention to follow
2    any guidance from the Secretary of State or the
3    election laws with respect to ballot finish
4    requirements?
5      A    Yes.
6      Q    In response to questions from counsel, you
7    were -- you testified about the requirements that
8    voters sign the declaration.  I believe you referenced
9    there being potential liability for doing so, for
10   doing so falsely?
11         MR. MORAN:  Object to the form.
12     A    Yes.
13     Q    Let me withdraw and ask a better question.
14         To your knowledge, is there a potential
15   liability to a voter who falsely signs a declaration
16   as part of a ballot in Pennsylvania?
17     A    Absolutely.
18     Q    And when you referenced the voter --
19   withdrawn.
20         What is the significance of that with
21   respect to your confidence in -- withdrawn.
22         One more time.  In your testimony earlier,
23   you referenced voter's purview.  I want to make sure I
24   understood what you meant by that.
25         Were you referring to the risk that a voter

Page 67

1    runs with respect to criminal liability, if they
2    submit a false declaration with their ballot?
3      A    Absolutely.
4      Q    Do you understand, generally, or can you
5    describe generally what the implications of doing so
6    are?
7      A    Implications of submitting a fraudulent
8    ballot or application, or any part of the election
9    process?
10     Q    Yes.
11     A    That will be investigated.  If it is proven
12   to be correct, you will be arrested.
13     Q    And during your tenure, has the county
14   identified any voter attempting to fraudulently submit
15   mail-in ballots?
16     A    Not to my knowledge since 2014, as far as I
17   have been responsible for it.
18     Q    I think this might be my last question.
19   You were describing the process for ballots received
20   after 8:00 p.m. on Election Day.  Do you recall
21   testifying about that?
22     A    Yes.
23     Q    Does the county have a process in place for
24   dealing with mail-in ballots that are postmarked by
25   Election Day, but are received between Election Day

Page 68

1    and November 6?
2      A    Yes.
3          So what we would do with that, we would get
4    them in that day, and we would look for the postmarks
5    on that.  And then they would be put into the file, if
6    they meet the requirements.  And then they would be
7    scanned in the system as well.
8      Q    Fair to say they would be treated the same
9    way as other mail-in ballots received by your office?
10     A    That's correct.  And adjudicated in the
11   same manner.
12     Q    With respect to poll watchers, when your
13   office -- when the county receives application for
14   individuals who want to serve as poll watchers, does
15   it verify their residence in the county?
16     A    We do.
17     Q    And has the county been receiving poll
18   watcher requests for the 2020 general election?
19     A    I do not know.  I don't have knowledge of
20   that yet.  I am sure we have.
21     Q    And do you know whether your office
22   received requests from individuals who were to serve
23   as poll watchers outside the county?
24     A    I do not know.
25     Q    With respect to the 2020 primary, do you

Page 69

1    know if the county declined to issue poll watcher
2    certifications for any poll watchers that requested
3    for that service?
4      A    I know that the poll watchers fill out a
5    form before they are issued the certificate.  And if
6    there is an issue, we bring it forward.  But I do not
7    know the answer to that.
8      Q    Thank you, Mr. Parsnik.  I have nothing
9    further.  I appreciate your time.
10         EXAMINATION
11   BY MS. McGEE:
12     Q    I have one followup question, Mr. Parsnik.
13   You identified there is a county liaison
14   individual that you can contact.  My question is
15   to who is that person?
16     A    It is not a county liaison.  It is a state
17   liaison from the Department of State.
18     Q    For the counties to contact.  Correct?
19     A    Correct.
20     Q    Who was that person?
21     A    Stephen Latanishen.
22     Q    That is all I have.
23         Thank you.
24         VIDEOGRAPHER:  Hearing nothing further, we
25   will now conclude the deposition.

**NETWORK DEPOSITION SERVICES**
**Transcript of David Parsnik 30 (b) (6)**

---

Page 70

```
 1              The time is 12:35 p.m.
 2              (Thereupon, the deposition was concluded at
 3         12:35 p.m.)
 4                    - - -
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 72

```
 1              CERTIFICATE
 2   COMMONWEALTH OF PENNSYLVANIA, )
                                   ) SS:
 3   COUNTY OF ALLEGHENY.          )
 4        I, Lance E. Hannaford, do hereby certify that
     before me, a Notary Public in and for the Commonwealth
 5   aforesaid, personally appeared DAVID PARSNIK, who then
     was by me first duly cautioned and sworn to testify
 6   the truth, the whole truth, and nothing but the truth
     in the taking of his oral deposition in the cause
 7   aforesaid; that the testimony then given by him as
     above set forth was by me reduced to stenotypy in the
 8   presence of said witness, and afterwards transcribed
     by means of computer-aided transcription.
 9
          I do further certify that this deposition was
10   taken at the time and place in the foregoing caption
     specified, and was completed without adjournment.
11
          I do further certify that I am not a relative,
12   counsel or attorney of either party, or otherwise
     interested in the event of this action.
13
          IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this _____ day of _____,
15   2020.
16
17   _____
18   Lance E. Hannaford, Notary Public
     My commission expires October 19, 2022
19
                    - - -
20
21
22
23
24
25
```

---

Page 71

```
 1              ERRATA SHEET
 2        I, David Parsnik, have read the foregoing 70
     pages of my deposition given on September 28, 2020,
 3   and wish to make the following, if any amendments,
     additions, deletions or corrections:
 4
     Page/Line    Should Read    Reason for Change
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18        In all other respects, the transcript is true and
     correct.
19
20   _____
          David Parsnik
21   Subscribed and sworn to before me this _____ day of
22   _____, 2020.
23
24   Notary Public
25                  - - -
```

---

Page 73

```
 1   NETWORK DEPOSITION SERVICES
          The Gulf Tower
 2        707 Grant Street, Suite 1101
          Pittsburgh, Pennsylvania 15219
 3        412-281-7908
 4   September 29, 2020
 5   TO: Larry Moran, Esquire
          Joyce Carmody Moran:
 6        9 N. Main Street, Suite 4
          Pittston, Pennsylvania 18640
 7
 8        RE: DEPOSITION OF DAVID PARSNIK
 9        NOTICE OF NON-WAIVER OF SIGNATURE
10        Please have the deponent read his deposition
     transcript. All corrections are to be noted on the
11   preceding Errata Sheet.
12        Upon completion of the above, the deponent must
     affix his signature on the Errata Sheet, and it is to
13   then be notarized.
14        Please forward the signed original of the Errata
     Sheet to Ms. Carolyn McGee, Esquire, for attachment to
15   the original transcript, which is in her possession.
     Send a copy of same to me.
16        Please return the completed Errata Sheet within
     thirty (30) days of receipt hereof.
17
18
19   Lance Hannaford,
     Court Reporter
20                  - - -
21
22
23
24
25
```

---

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**