**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:20-cv-00966-NR |
| | ) | |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania, *et al.*, | ) | Judge J. Nicholas Ranjan |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT-INTERVENORS CITIZENS
FOR PENNSYLVANIA'S FUTURE AND SIERRA CLUB**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND .....................................................................................................3

LEGAL STANDARD ..............................................................................................6

ARGUMENT ...........................................................................................................6

I.      PLAINTIFFS FAIL TO PROVIDE ANY EVIDENCE CONNECTING THEIR ALLEGED INJURY TO THEIR REQUESTED RELIEF ..................................6

      A.     There Is No Evidence That Additional Ballot Drop-Off Locations Increase Voting Fraud .........................................................................9

      B.     There Is No Evidence That Pennsylvania's Long-Standing Requirement That Electors Watch Polls In Their Own County Increases Voting Fraud............13

      C.     There Is No Evidence That Secretary Boockvar's  Guidance Will Increase Voting Fraud ............................................................................16

II.     PLAINTIFFS HAVE NOT ESTABLISHED ANY CONSTITUTIONAL RIGHT THAT COULD HAVE BEEN INFRINGED ..................................................17

      A.     Plaintiffs Have No Cognizable Claim Based On So Called Vote Dilution ..........17

      B.     Plaintiffs' Equal Protection "Uniformity" Claim Fails On The Merits ................22

      C.     Plaintiffs Have No Cognizable Claim To Challenge Secretary's Boockvar's Guidance ...........................................................................29

      D.     There Is No Evidence The Elections Clause Has Been Violated .........................29

CONCLUSION.......................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Cases

*Abbot v. Perez*,
  137 S. Ct. 2305 (2018) ................................................................................ 2, 18

*Acosta v. Dem. City Comm.*,
  288 F. Supp. 3d 597 (E.D. Pa. 2018) .......................................................... 2, 18

*Ali v. Woodbridge Township Sch. Dist.*,
  957 F.3d 174 (3d Cir. 2020)............................................................................. 6

*Am. Civil Rights Union v. Martinez-Rivera*,
  166 F. Supp. 3d 779 (W.D. Tex. 2015).......................................................... 19

*Anderson v. United States*,
  417 U.S. 211 (1974)................................................................................... 19-20

*Ariz. St. Legislature v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015).............................................................................. 29-30

*Baldwin v. Cortés*,
  378 F. App'x 135 (3d Cir. 2010) ................................................................... 30

*Bennett v. Yoshina*,
  140 F.3d 1218 (9th Cir. 1998) ...................................................................... 18

*Burdick v. Takushi*,
  504 U.S. 428 (1992)....................................................................................... 20

*Bush v. Gore*,
  531 U.S. 98 (2000)............................................................................... 21, 25-26

*Charfauros v. Bd. of Elections*,
  249 F.3d 941 (9th Cir. 2001) ........................................................................ 20

*In re Contest of Gen. Election Held on Nov. 4, 2008 for Purpose of Electing a U.S.
  Senator From the State of Minn.*,
  767 N.W.2d 453 (Minn. 2009)................................................................... 27-28

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ...................................................................................... 20

*Democratic Nat'l Comm. v. Bostelmann*,
  No. 20-CV-249-WMC, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020)................. 15

*Democracy N.C. v. N.C. State Bd. of Elections*,
  Civ. A. No. 20-cv-457, ECF # 145 (M.D.N.C. 2020) ............................................................. 17

*Donald J. Trump for President v. Hertz*,
  2020 WL 5810556 (D. Mont. September 30, 2020) ............................................................. 30

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ............................................................................................................. 20

*Gamza v. Aguirre*,
  619 F.2d 449 (5th Cir. 1980) ........................................................................................... 2, 18

*Gray v. Sanders*,
  372 U.S. 368 (1963) ............................................................................................................. 20

*Haakenson v. Parkhouse*,
  312 F. Supp. 929  (E.D. Pa. 1970) ...................................................................................... 18

*Lemons v. Bradbury*,
  538 F.3d 1098 (9th Cir. 2008) ............................................................................................ 27

*Mobile v. Bolden*,
  446 U.S. 55 (1980) ....................................................................................................... 2, 18-19

*Ne. Ohio Coal. for the Homeless v. Husted*,
  837 F.3d 612 (6th Cir. 2016) ............................................................................................. 24

*N.J. Peace Action v. Obama*,
  379 F. App'x 217 (3d Cir. 2010) ..................................................................................... 9-10

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ............................................................................................. 20

*Paher v. Cegavske*,
  --- F. Supp. 3d ---, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) .................................. 19, 24

*Pennsylvania Democratic Party v. Boockvar*,
  — A.3d —, 2020 WL 5554644 (Pa. Sept. 17, 2020) .......................................... 1, 8, 14, 17, 22

*Pierce v. Allegheny County Bd. Of Elections*,
  324 F. Supp. 2d 684 (W.D. Pa. 2003) ..................................................................... 10, 21, 24, 25

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
  913 F.2d 64 (3d Cir. 1990) ........................................................................................... 9, 13

*Rep. Party of Penn. v. Cortés,*
  218 F. Supp. 3d 396  (E.D. Pa. 2016) ..................................................... 14

*Shannon v. Jacobowitz,*
  394 F.3d 90 (2d Cir. 2005).......................................................................... 18

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ............................................................... 19, 24

*Ex parte Siebold,*
  100 U.S. 371 (1879)..................................................................................... 20

*Smiley v. Holm,*
  285 U.S. 355, 365 (1932)........................................................................29-30

*Tex. Democratic Party v. Williams,*
  2007 WL 9710211 (W.D. Tex. Aug. 16, 2007) ...................................... 24

*United States v. Classic,*
  313 U.S. 299 (1941)...................................................................................... 1

*United States v. Saylor,*
  322 U.S. 385 (1944)..................................................................................... 20

*United States v. Starzecpyzel,*
  880 F. Supp. 1027 (S.D.N.Y. 1995)......................................................... 17

*Wexler v. Anderson,*
  452 F.3d 1226 (11th Cir. 2006) ............................................................... 24

## Statutory And Constitutional Provisions

U.S. Const. art. I, sec. 4. ............................................................................ 9

52 U.S.C. § 10503 ......................................................................................... 23

25 P.S. § 2641 ................................................................................................ 30

25 P.S. § 2642 ................................................................................................ 28

25 P.S. §§ 2701, 2702, 2726 ......................................................................... 23

25 P.S. § 3146.1(k) ........................................................................................ 12

2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421) ("Act 77")............................ 9

## Additional Authorities

Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place*, Tbl. 9 (Apr. 27, 2020), *available at* https://www.ncsl.org/research/elections-and-campaigns/vopp-table-9-ballot-drop-box-definitions-design-features-location-and-number.aspx ...................... 12

Max Martin, *Philly: Vote now by dropping your ballot into a special box at City Hall*, Billy Penn (May 26, 2020), *available at* https://billypenn.com/2020/05/26/philly-vote-now-by-dropping-your-ballot-into-a-special-box-at-city-hall/ ................................................ 12

Mensah M. Dean & Julie Shaw, *South Philly judge of elections admits he took bribes to stuff the ballot box for Democratic candidates*, Phila. Inquirer (May 21, 2020), https://www.inquirer.com/news/voter-fraud-philadelphia-ward-leader-judge-of-elections-domenick-demuro-guilty-plea-20200521.html ........................................................ 16

Votes PA, *Voters With Disabilities*, Penn. Dep't of State (Apr. 2020), *available at* https://www.votespa.com/Resources/Poll-Worker-Training/Pages/Voters-With-Disabilities.aspx ................................................................................................................... 23

# INTRODUCTION

The simple, inescapable flaw with Plaintiffs' claims is that Plaintiffs have utterly failed to plead, much less prove, any actual voter fraud. Nor have they alleged or proved that any such fraud is connected to their claims or would be remedied by their requested relief. Despite the extensive discovery afforded to them by this Court over the last two months, it is telling that Plaintiffs continue to support their claims with nothing more than rank speculation and overheated rhetoric. Plaintiffs have adduced no evidence—none—of any voter fraud in the Pennsylvania primary, or a single voter's intention to engage in fraudulent voting in the upcoming general election in connection with the use of the drop boxes that were expressly permitted by the Pennsylvania legislature, and now approved by the Pennsylvania Supreme Court. *See Pennsylvania Democratic Party v. Boockvar*, — A.3d —, 2020 WL 5554644 at *10 (Pa. Sept. 17, 2020). Nor have Plaintiffs adduced any evidence that a single ballot was cast with a fraudulent intent in the primary election or that the County Election Boards will disobey the Secretary of State's guidance on the use of drop boxes and the Pennsylvania Supreme Court's unequivocal rulings as to the invalidity of ballots lacking inner secrecy envelopes. ECF 448 at 12.[1]

Plaintiffs' legal arguments are equally meritless. As Plaintiffs recognize (ECF 509 at 36): "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). Thus, the State of Pennsylvania is acting well within

---

[1] Defendant-Intervenors do not here rehash why Plaintiffs' claims are not justiciable (*see* ECF 219, 297, 346, 441, 458), and instead focus on the meritless nature of Plaintiff's federal claims. Defendants have repeatedly detailed the fatal deficiencies in Plaintiffs' claims. *See, e.g.*, ECF 185, 264, 297, 346, 441, 458. While Defendant-Intervenors briefly address Plaintiffs meritless claims concerning poll watching in Section I.B, *infra*, they refer the Court to the brief filed by the Pennsylvania Alliance for Retired Americans for a more thorough discussion of the meritless nature of Plaintiffs' claims concerning poll watchers.

its discretion under the U.S. Constitution by ensuring that legitimate voters can vote and that their votes are counted rather than prioritizing restraints against non-existent voter fraud.  It is also acting well within its discretion to allow for rational and benign differences among county drop box voting procedures, as there is no constitutional requirement that every county's election procedure be identical, no matter the differences in those counties.  Indeed, Plaintiffs' theory would amount to a radical and unprecedented change in the law, whereby courts—not state legislatures and election officials—would oversee every detail of the election process.

Nor can Plaintiffs concoct a colorable federal "vote dilution" equal protection challenge by speculatively forecasting unintentional, administrative, or otherwise accidental deviations from their view of what voting procedures require—deviations that lack any fraudulent intent, purpose, or result.  Defendant-Intervenors and the other Defendants have already exposed the legal deficiency of these claims in extensive briefing and do so again here.  *See* ECF 441 at 7-9. Plaintiffs' constitutional theory has already been repeatedly considered and rejected.  *See Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute . . ."); *see also Abbot v. Perez*, 137 S. Ct. 2305, 2314 (2018) (defining "vote dilution" as "'invidiously minimizing or canceling out the voting potential of racial or ethnic minorities'") (quoting *Mobile v. Bolden*, 446 U.S. 55, 66-67 (1980) (plurality opinion)); *Acosta v. Dem. City Comm.*, 288 F. Supp. 3d 597, 643 (E.D. Pa. 2018) ("'[G]arden variety election irregularities' are not actionable under § 1983.").  In contrast, virtually all of the cases Plaintiffs cite concern claims *against* restraints on the right to vote, and there is no legal basis to convert these cases into a free-standing claim to *impose* restraints under the rubric of vote dilution.

The time has come to separate the rhetoric from the law.  It is now time to dismiss Plaintiffs'

meritless "vote dilution" equal protection challenges.

## <u>BACKGROUND</u>

Plaintiffs have failed to adduce a scintilla of evidence establishing that a single voter acted with fraudulent intent to coerce, or purchase, a single ballot or intentionally sought to vote twice. Plaintiffs' designated witness pursuant to Rule 30(b)(6)—a trusted Trump and RNC "political operative," Ex. D (Fitzpatrick Dep. Tr. Part I) 24:17-21, indeed confirmed at his deposition, among other things, that Plaintiffs are not aware of *any* circumstance "where somebody pressured somebody else to vote in a certain way in the [June] primary," or asked another person "to give them their – that ballot or took the ballot from them and then submitted it," and in fact clarified "[w]e don't make that claim." *Id.* at 370:10-371:8.  This Trump campaign operative—designated to speak under oath on behalf of the RNC and the Trump campaign—confirmed that he is not aware of any instance of a voting drop-box or its contents being destroyed, or of anyone threatening to do the same, anywhere in Pennsylvania. *Id.* at 405:2-16, 411:2-20.  He was, indeed, not aware of a single report of improperly cast ballots from Plaintiffs' own volunteers who observed ballot drop boxes and ballot collection sites. *Id.* at 163:15-165:25.  And while Plaintiffs refer to photographs "obtained … from newspapers and social media posts" that they claim "confirm several instances of non-disabled voters placing [two ballots] into the drop-boxes," ECF 414 ¶ 21, the relevant disability status is of the elector whose vote is delivered, not the voter who does the delivering. *See* 25 P.S. § 3146.1(k).  On this point, despite having *months*, Plaintiffs have no more supporting evidence than a small handful of photos and a video in which a voter may have dropped just *two* ballots into a ballot box and to this day "have not talked to any of the people in those pictures who are dropping the ballot" and do not "know anything that's not in the picture about any of the circumstances to do with why the person is voting the second ballot or where this person

– the second person is" including if they are in the proximity.  Ex. D (Fitzpatrick Dep. Tr. Part I) 362:2-364:3.

The bottom line is nothing in the record casts any doubt on Secretary Boockvar's uncontradicted testimony that she has "seen no evidence that voter fraud is a problem" and that, to the contrary, out of nearly 2.9 million votes cast in the 2020 primaries, only *three* were identified as having been cast by someone other than the voter, "[a]nd in each case, the county election officials were confident that there was no intent.  It was a mistake.  And they voided the ballots." Ex. C (Boockvar Dep. Tr.) 252:10-253:18; *see also id.* at 253:19-254:1 ("Q: Are you aware of any ballots being cast in the 2020 primary, where there was willful or attempted fraud?  A: No. Q: Does that include with respect to mail-in or absentee ballot?  A: Yes.  With respect to all kind of voting, I'm not aware of any intentional fraud.").

Despite taking depositions of numerous county representatives, Secretary Boockvar, and Jonathan Marks and Veronica Degraffenreid of her staff, receiving voluminous responses to interrogatories, and having had months to thoroughly investigate their allegations of fraudulent voting and ballot harvesting (including through the introduction of so-called expert testimony (*see* ECF 504-19 (Report of Greg S. Riddlemoser); ECF 504-20, (Report of Brad Lockerbie), Plaintiffs have failed to establish that **one** single vote was cast fraudulently in the primary election or that there is any non-speculative basis to conclude that there will be a single vote cast fraudulently in the general election.  This unsurprising record is amply supported by a raft of expert reports submitted by Defendant-Intervenors.  These qualified scholars and experienced practitioners underscore in report after report that actual voter fraud is virtually nonexistent and that drop boxes are an entirely safe, protected, and appropriate means of permitting citizens to safely exercise their constitutional right to vote, and are particularly prudent and necessary given the dangers posed to

all by COVID-19.  *See* Ex. P (Report of Lorraine C. Minnite) (concluding that the incidence of voter fraud is miniscule, including in Pennsylvania, based on her original research; analysis of academic, state, and federal research; prosecutions for voter fraud; statements by the FBI director; and review of Plaintiffs' purported evidence of fraud); Ex. N (Report of Paul Gronke) (finding, inter alia, that drop boxes offer a secure method for returning ballots that decreases the burden on the voter, are widely used across the country and are considered a best practice by the federal Cybersecurity and Infrastructure Security Agency, and there is no evidence that drop boxes are a source for voter fraud); ECF O (Report of Amber McReynolds) (drop boxes do not create an increased opportunity for fraud, and reduce the risk of third party delivery of ballots); ECF M (Report of Donald S. Burke) (returning ballots by drop box will reduce the transmission of the novel coronavirus, particularly for minority communities with high rates of poverty where  polling places tend to have longer lines).

Nor is Plaintiffs' corrosive game of schematics—recasting any deviation from Plaintiffs' warped view of required voting procedures, no matter how benign, accidental, administrative or unintentional, as "voter fraud"—availing.  *See* Ex. D (Fitzpatrick Dep. Tr. Part I) 279:09-11 ("[V]oter fraud is any vote that's cast or attempted to be cast or counted that's not in compliance with the statute."); ECF 504-19, (Riddlemoser Report) at 2 ("When I use the term voter fraud, I mean the casting and/or counting of ballots in violation of a state's election code.").  As is obvious, and underscored by Defendant-Intervenors' experts, fraudulent voting is not the accidental or unintentional deviation from a voting procedure.  Fraudulent voting is the intentional registration and delivery of a ballot that is not your own.  *See* Ex. P, (Minnite Report) at 6-9.  Plaintiffs' sleight of hand in defining "fraudulent" voting broadly to include any and all possible deviations from

what Plaintiffs insist voting procedures should, in their view, require, in and of itself underscores the speciousness of their claims of *actual* fraudulent voting.

Both as a matter of pleadings and now as a matter of record evidence, there is no connection between Plaintiffs' lawsuit and voter fraud. Plaintiffs' meritless claims seek the extraordinary goal of invalidating *non-fraudulent* ballots, cast by registered Pennsylvania voters, that identifiably and reliably indicate those citizens' valid electoral preferences. Because Plaintiffs cannot establish any likelihood that their requested relief somehow combats voter fraud—or that there is even any tangible voter fraud to combat—the Court should now dismiss their claims.

## LEGAL STANDARD

"[S]ummary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. A fact is only material if it might affect the outcome of the suit under the governing law." *Ali v. Woodbridge Township Sch. Dist.*, 957 F.3d 174, 179-80 (3d Cir. 2020) (citations omitted).

## ARGUMENT

I.   **PLAINTIFFS FAIL TO PROVIDE ANY EVIDENCE CONNECTING THEIR ALLEGED INJURY TO THEIR REQUESTED RELIEF**

The only injury Plaintiffs allege and assert in their motion for summary judgment is that supposed voter fraud will dilute votes and make the election unfair. But that harm assumes— without any factual support—that the conduct they challenge will increase such voter fraud and that the remedies they seek will reduce it. There is no evidence supporting Plaintiffs' speculative claim of invalid or fraudulent votes, no evidence linking supposed voter fraud to the particular election processes at issue, and no evidence that the remedies sought will reduce the supposed voter fraud.

After expressly abandoning any basis for their claims of supposed voter fraud in opposition to the motion to dismiss their First Amended Complaint, *see* ECF 320 at 24; *see also id*. at 2, 25, 44, 47-48; ECF 346 at 1-2, Plaintiffs renew conclusory allegations of fraud in their Second Amended Complaint.  But they continue to ignore the fundamental problem: that they have failed to adduce any evidence establishing even a possible inference that actual voter fraud had or might imminently occur.

Despite being allowed wide ranging discovery, Plaintiffs' motion for summary judgment reveals how paltry that evidence is:  a few anecdotal cases, most of which concern simple unintentional or administrative mistakes in a handful of votes, rather than any facts that support any colorable inference of actual fraud.  None of the county election officials that Plaintiffs deposed could identify specific instances of fraud.  *See, e.g.*, Ex. E (Frey Dep. Tr.) 52:9-53:10 (no knowledge of any fraud, double voting, voter impersonation, forged signatures, pressure or payment to vote a certain way, or manipulation or destruction of ballots); Ex. I (Parsnik Dep. Tr.) 67:13-17 ("Q: And during your tenure, has the county identified any voter attempting to fraudulently submit mail-in ballots?  A: Not to my knowledge since 2014, as far as I have been responsible for it."); Ex. A (Allison Dep. Tr.) 49:19-50:2 (no knowledge of any fraud or instances of third parties delivering ballots for non-disabled electors).  Nor could the named Plaintiffs or their representatives identify actual instances of voter fraud (beyond regurgitating the third-hand, unsupported, assertions in the complaint) or ballot harvesting that were animating their claims. Ex. G (Kelly Dep. Tr.) 70:17-72:7 (no knowledge of any instances of double voting, voter impersonation, counterfeit ballots, other voter fraud); Ex. K (Thompson Dep. Tr.) 24:10-25:24; *see also id.* at 28:24-29:5 (same); Ex. J (Reschenthaler Dep. Tr.) 40:8-12 ("Q: And just [] to be super clear.  You're not aware of any ballot harvesting that's occurred in Pennsylvania; is that

7

correct? … A: Not personally."); Ex. K (Thompson Dep. Tr.) 18:9-12 ("Q: Do you have any reason to believe any fraudulent votes were cast in that election or in the recent 2020 primary when you were a candidate?  A: I do not."); Ex. D (Fitzpatrick Dep. Tr. Part I) 370:10-371:8.

Nor does anything in the record cast any doubt on Secretary Boockvar's uncontradicted testimony that she has "seen no evidence that voter fraud is a problem" and that, to the contrary, out of nearly 2.9 million votes cast in the 2020 primaries, only *three* were identified as having been cast by someone other than the voter, "[a]nd in each case, the county election officials were confident that there was no intent.  It was a mistake.  And they voided the ballots."  Ex. C (Boockvar Dep. Tr.) 252:10-253:18; *see also id.* at 253:19-254:1 ("Q: Are you aware of any ballots being cast in the 2020 primary, where there was willful or attempted fraud?  A: No.  Q: Does that include with respect to mail-in or absentee ballot?  A: Yes.  With respect to all kind of voting, I'm not aware of any intentional fraud.").  Indeed, the Pennsylvania Supreme Court found that concerns about fraud "are unsubstantiated and are specifically belied by the Act 35 report issued by the Secretary on August 1, 2020 concerning mail in voting in the Primary Election."  *Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644 at *30.  Plaintiffs' only response to this finding is that the "assurance" of the Secretary of State does not suffice.  ECF 509 at 65.  But the Pennsylvania Supreme Court did not simply rely on assurances, but on the evidence—specifically, the lack of evidence to substantiate fraud and the overwhelming evidence in the report that fraud was vanishingly rare.

Nor is there any evidence connecting Plaintiffs' assertions of supposed fraud to the claims and the relief sought.  In particular, there is no evidence of a connection between supposed voter fraud and where County Election Boards allow voters to return their ballots, where Pennsylvania

poll watchers are permitted to serve, or whether signatures are examined.[2]   Where, as here, Plaintiffs fail to allege any "connection between [their alleged] injury and the judicial relief sought," their claims should be dismissed.   *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 73 (3d Cir. 1990); *see also* Ex. H (Kelly Dep. Tr.) 105:15-23 ("Q: [I]s there anything specific actually sought by this lawsuit that you think would address your constituents' concerns?  A: No, I think for some people, no matter what would happen, they'd still have grave concerns.").

### A.   There Is No Evidence That Additional Ballot Drop-Off Locations Increase Voting Fraud

Plaintiffs' claim of injury from voter fraud based on additional ballot drop-off locations— and requested remedy to disallow such drop-boxes—has no evidentiary support.  As Plaintiffs recognize in their summary judgment brief (ECF 509 at 53-54), their claim regarding drop boxes depends entirely on the theory that their votes will be diluted by "illegally cast or delivered votes at unstaffed drop boxes" or "fraudulently cast ballots."   However, Plaintiffs do not dispute that Pennsylvania citizens who vote absentee or by mail may properly return their ballots using any of the thousands of publicly accessible, unmonitored mailboxes in the Commonwealth or across the country.  *See* Second Am. Compl. ECF 461 ¶ 93 (quoting 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421) ("Act 77")); *id.* ¶ 93 (acknowledging that absentee and mail-in ballots may be mailed).   The Second Amended Complaint's pages of unfounded and hyperbolic attacks on the legitimacy and security of voting by mail itself, *see id.* ¶¶ 64-81, repeated in Plaintiffs' motion for summary judgment, ECF 509 at 10-14, are thus irrelevant to Plaintiffs' ability to prove a claim here, as they

---

[2]   Notably, while Plaintiffs criticize Defendants' administration of the 2020 Primary Election, they do not allege that *any* of the implemented voting processes caused or even contributed to a single case of voting fraud.  *See* Second Am. Compl. ECF 461 ¶¶ 111-190.

do not ask the Court to prohibit that practice.  *See, e.g.*, *N.J. Peace Action v. Obama*, 379 F. App'x 217, 222 (3d Cir. 2010) (Table) (affirming dismissal of claim because the requested relief "would not redress their alleged injuries").

Instead, Plaintiffs must provide evidence that Defendants' choices to permit citizens to vote not just at any mailbox of their choosing but also at additional drop-off locations somehow increases the likelihood of voting fraud in the form of invalid votes.[3]  Plaintiffs have failed to do so.  Plaintiffs provide no reason (let alone evidence) to believe drop boxes are more likely to lead to voter fraud than mailboxes.  Without such evidence, there is no proof of a connection between Plaintiffs' alleged injury and their requested relief, which is fatal to Plaintiffs' claims.[4]  Defendants' bald assertions are, moreover, belied by the considerable expert testimony set forth in Defendant-Intervenors' expert reports. *See, e.g.*, Ex. N (Gronke Report) ¶¶ 2-3, 8 (concluding, as the founder and director of a nonpartisan center that studies non-precinct place voting and an author of numerous peer-reviewed articles on mail voting, that "[d]rop boxes have been in use for years all over the country and are secure" and that he is "not aware of any reports that drop boxes are a source for voter fraud"); Ex. P (Minnite Report) at 29-34 (reviewing all available evidence of voter fraud in Pennsylvania over more than 20 years and finding "absentee ballot fraud in Pennsylvania [to be historically] . . . extremely rare"); ECF O (McReynolds Report) ¶¶ 2, 9, 45 ("unaware of any incident of tampering with ballot boxes" in 13 years of direct experience in administering elections in which drop boxes were used and two additional years of advising state and local

---

[3]  As set forth in Part II, *infra*, credibly alleging an increased likelihood of voting fraud would not suffice to state a constitutional claim against the Defendants; the point, for present purposes, is that Plaintiffs fail to do even that.

[4]  Indeed, for this reason, *Pierce v. Allegheny County Bd. Of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2003), offers no help to Plaintiffs to support the viability of the claims in the Amended Complaint, because *Pierce* concerned actual votes already cast and therefore did not rely on the type of speculation and unsupported hyperbolic innuendo on which Plaintiffs rely here.

election officials); ECF Q (Stein Report) (concluding based on considerable experience that "[t]he security recommended by the Secretary's guidance for drop boxes coupled with the various other checks on the mail-in ballot application and verification process are appropriate to deter and prevent tampering with deposited mail-in ballots or any other voter fraud without deterring accessibility to drop boxes.").

Furthermore, even putting aside that Plaintiffs' requested relief would have no effect on supposed voter fraud given that dropping ballots at mailboxes would still be permitted, Plaintiffs have no evidence of illegal third party-ballot delivery in Pennsylvania. That Plaintiffs continue to cling to *de minimis*, unsubstantiated, anecdotes to anchor their wildly speculative assertions concerning how drop boxes increase the risk of voting fraud or unlawful third-party ballot delivery underscores their lack of proof. Plaintiffs' designated witness pursuant to Rule 30(b)(6) confirmed, among other things, that Plaintiffs are not aware of *any* circumstance "where somebody pressured somebody else to vote in a certain way in the [June] primary," or asked another person "to give them their – that ballot or took the ballot from them and then submitted it," and in fact clarified, "[w]e don't make that claim." Ex. D (Fitzpatrick Dep. Tr. Part I) 370:10-371:8. The same witness, who holds a position in the Trump campaign, *id.* 24:17-21, confirmed that he is not aware of any instance of a voting drop-box or its contents being destroyed, or of anyone threatening to do the same, anywhere in Pennsylvania. *Id.* at 405:2-16, 411:2-20. Plaintiffs' representative, indeed, was not aware of a single report of improperly cast ballots from Plaintiffs' own volunteers who observed ballot drop boxes and ballot collection sites. *Id.* at 163:15-165:25. And while Plaintiffs refer to photographs "obtained … from newspapers and social media posts" that they claim "confirm several instances of non-disabled voters placing [two ballots] into the drop-boxes," ECF 414 ¶ 21, the relevant disability status is of the elector whose vote is delivered, not the voter

who does the delivering.  *See* 25 P.S. § 3146.1(k).   On this point, Plaintiffs moreover admitted that they have no more supporting evidence than a small handful of photos and a video in which a voter dropped just *two* ballots into a ballot box and they "have not talked to any of the people in those pictures who are dropping the ballot" and do not "know anything that's not in the picture about any of the circumstances to do with why the person is voting the second ballot or where this person – the second person is" including if they are in the proximity.  Ex. D (Fitzpatrick Dep. Tr. Part I) 362:2-364:3.  Nor, tellingly, have Plaintiffs done anything over the course of months to further investigate these purported incidents of improper voting.

Plaintiffs' inability to provide evidence that making additional drop-off locations available to voters casting absentee or mail-in votes increases the rate of fraud is not surprising.  Ballot drop boxes are widely utilized in states with no-excuse absentee voting.  Indeed, Colorado, Oregon, and Washington *require* drop boxes be established for mail ballot return, and several other states (including Arizona, California, Kansas, Montana, Nebraska, New Mexico, and Utah) have long permitted drop boxes in some or all of their counties.[5]  And in Pennsylvania, counties implement appropriate measures to ensure the safety of Pennsylvania voters' absentee and mail-in ballots.[6]

---

[5]   Nat'l Conf. of State Legislatures, *Voting Outside the Polling Place*, Tbl. 9 (Apr. 27, 2020), *available at* https://www.ncsl.org/research/elections-and-campaigns/vopp-table-9-ballot-drop-box-definitions-design-features-location-and-number.aspx.

[6]   *See, e.g.*, Max Martin, *Philly: Vote now by dropping your ballot into a special box at City Hall*, Billy Penn (May 26, 2020), *available at* https://billypenn.com/2020/05/26/philly-vote-now-by-dropping-your-ballot-into-a-special-box-at-city-hall/ (noting that City Commissioners hold the only keys to the "red-white-and-blue emblazoned postal box" that serves as a ballot drop-off box and is "bolted to the sidewalk" outside City Hall).  Plaintiffs' assertions that drop boxes will not have adequate security is entirely speculative and lacks any evidentiary support.  *See, e.g.*, Ex. B (Bluestein Dep. Tr.) 45:10-13 ("The county of Philadelphia is planning to fulfill its responsibilities by following the Department of State guidance on security related to drop boxes.").  Indeed, the named Plaintiffs were not aware of the security guidance issued by the Secretary of State covering drop box security in detail, and could not point to any reason why that guidance would not be adequate to address their concerns.  *See* Ex. H (Kelly Dep. Ex. 1) at 5 (detailing drop

*See* Ex. N, Gronke Report ¶ 30 ("Drop boxes are a safe and secure direct extension of the county or local jurisdiction elections office. Once the voter deposits the ballot into the drop box, the ballot is for all intents and purposes in the custody of the elections office. With respect to chain of custody, drop boxes eliminate one link in the chain (i.e., further handling by the Postal Service), and by implication provide a more secure method of returning mail ballots than by using the mail."); ECF O, McReynolds Report ¶ 46 (Plaintiffs allegations of the potential for fraud related to drop boxes are "not consistent with [McReynolds'] experience with drop box security, particularly given the strong voter verification procedures that are followed by election officials throughout the country and in Pennsylvania"); *id.* ¶ 49 ("Accessible drop boxes also reduce the risk of mass collection of ballots or ballot harvesting. When voters are given more options to return their ballots directly to elections officials such as via drop boxes, they are less likely to seek or accept an intermediary's assistance with returning their ballots."); Ex. P, Minnite Report at 23 (None of [the documents produced by Plaintiffs] provided evidence of misuse of ballot drop-boxes or that ballot box drop-off boxes raised the risk of fraud.").  But the Court need not evaluate the improbability of any claim that adding a few dozen drop-off boxes on top of the indisputably permitted public mailboxes and County Election Board facilities could increase the incidence of voting fraud because Plaintiffs' Complaint contains no such allegations.  As such, all of Plaintiffs' claims related to drop-off boxes should be dismissed.  *See Pub. Interest Research Grp.*, 913 F.2d at 73.

### B.      There Is No Evidence That Pennsylvania's Long-Standing Requirement That Electors Watch Polls In Their Own County Increases Voting Fraud

---

box requirements), 6 (detailing security requirements); *see also, e.g.*, Ex. G (Kelly Dep Tr.) 22:25-23:8 ("Q: Do you know what security measures the Secretary of State has recommended for drop boxes?  A: I—no.  Q: Do you have a view as to whether the guidance is adequate for the upcoming election?  A: No.").

Plaintiffs also have no evidence to establish any injury from supposed voter fraud based on the requirement that poll watchers must watch polls in their own county. Second Am. Compl. ¶¶ 51, 192; *see id*. at 80-81 §§ D, I. The meritless nature of Plaintiffs' claims with respect to poll watchers has already been judicially established, as set forth in the Motions to Dismiss. *See* ECF No. 264 at 8-9, 15-17; ECF No. 209 at 17-19; *see also, e.g.*, *Rep. Party of Penn. v. Cortés*, 218 F. Supp. 3d 396, 406-09 (E.D. Pa. 2016). And it was further reaffirmed by the Pennsylvania Supreme Court. *See Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644 at *30. Plaintiffs assert that the Pennsylvania Supreme Court only rejected a facial rather than an as-applied challenge to the residency requirement for poll watchers. ECF 509 at 58. The Pennsylvania Supreme Court made no such distinction. To the contrary, the Pennsylvania Supreme Court expressly held that even as applied to the particular supposed facts that Plaintiffs assert here, there was no valid claim both because fraud was "unsubstantiated" and because "Respondent's speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.* Even "as applied," Plaintiffs' claim has already been rejected.

Plaintiffs' claim also should be dismissed on summary judgment because, as with their attempts to enjoin drop-off locations, they have failed to allege or provide any evidence of a connection between the residency requirement they ask the Court to abolish and the purported voting fraud injury they claim to fear. Although certain Plaintiffs purport to desire to serve as poll watchers, the only "injury" the Second Amended Complaint identifies with respect to its attack on Pennsylvania's residency requirements for poll watchers is connected to an alleged "vested interest in ensuring that the electoral process is properly administered in every election district." Second

14

Am. Compl. ¶ 252.  Regardless of whether poll watchers are important to detect the type of voter fraud that Plaintiffs have altogether failed to establish (*see supra* at I.A), Plaintiffs fail to establish that there is any logical connection between the county residency requirement and Plaintiffs' purported inability to prevent fraud.   Nor is this a surprising failure, as there is none.

While Plaintiffs cite to their extensive allegations regarding the *role* of poll watchers generally, they offer no evidence showing that requiring poll watchers to serve in their own county of residence will make poll watching impossible or more difficult.  *See id.* ¶¶ 47-62, 165-89.  All Plaintiffs note is that, in some Pennsylvania counties, registered Democrats outnumber registered Republicans, while in other counties the reverse is true.  *See* ECF 509 at 5, 31-32.  This observation does not, however, imply that any party will be unable to provide poll watchers to any polling place.  To the contrary, it in fact establishes that each party *will* have access to sufficient electors in every county to be able to provide resident poll watchers to every polling place.  *See Cortés*, 218 F. Supp. 3d at 410 (observing that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county").[7]

Moreover, Plaintiffs' self-serving declarations asserting that it would be difficult to obtain a full roster of poll watchers that satisfy the residency requirement, *see* ECF 509 at 60, are woefully insufficient support for their claim, let alone on summary judgment.  These declarations fail to show anything more than that Plaintiffs believe it will be difficult to find sufficient poll watchers,

---

[7]  Plaintiffs rely (ECF 509 at 59) on *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), but *Bostelmann* concerned a requirement that *election officials*, not *poll watchers*, be an elector of the county in which the municipality is located, and there was significant evidence in *Bostelmann* (not present here) that the requirement could prevent people from voting due to an absence of sufficient election officials. *Id.* at *25-26.

but without any evidence showing that—given the large number of people to choose from— Plaintiffs could not do so or that it amounts to an injury to put in this effort. *See* Ex. D (Fitzpatrick Tr. I) 325:06-326:07 (conceding that he did not know whether the RNC would be unable to achieve "full coverage" at polling places, or even how many watchers would be needed for such coverage). Indeed, Plaintiffs do not even claim that "Plaintiffs cannot staff a particular polling place," and instead argue that it is enough that some unobserved polling places might exist. ECF 509 at 67-68. However, there is no evidence to suggest that some small number of unobserved polling places (even assuming that Plaintiffs cannot find poll watchers that satisfy the residency requirement) would give rise to supposed voter fraud.[8] Plaintiffs' claim regarding the residency requirement should, thus, be dismissed.

### C.    There Is No Evidence That Secretary Boockvar's  Guidance Will Increase Voting Fraud

Plaintiffs' challenge to Secretary Boockvar's  guidance rests on the perverse assertion that it dilutes votes by encouraging so-called voter fraud. *See* ECF 509 at 45.[9] Plaintiffs, however, have not provided any evidence of a connection between the guidance and any fraud or increased

---

[8]    Plaintiffs point to a single example of fraud, notably committed on (not by) voters, involving ballot-stuffing in 2014 and 2016. *See* ECF 509 at 66-67. But this one example does not remotely suggest a likelihood of fraud in the upcoming election, let alone that a residency requirement for poll watchers would enable such fraud.

Moreover, poll watchers appear to have had no role in identifying this conduct, which was nonetheless detected and prosecuted. *See* Mensah M. Dean & Julie Shaw, *South Philly judge of elections admits he took bribes to stuff the ballot box for Democratic candidates*, Phila. Inquirer (May 21, 2020), *available at* https://www.inquirer.com/news/voter-fraud-philadelphia-ward-leader-judge-of-elections-domenick-demuro-guilty-plea-20200521.html ("[T]he Office of Philadelphia City Commissioners . . . found that DeMuro's 36th Division had a history of more votes being cast on machines than the number of voters who signed poll books and . . . referred the division's troubling vote numbers from 2014 and 2015 to the Philadelphia District Attorney's Office.").

[9]    To the extent that Plaintiffs assert that the guidance conflicts with state law, there is no reason for this Court to address that issue, given this Court's abstention rulings.

risk of fraud.   Indeed, when deposed, many of the individual Plaintiffs seemed unaware the guidance existed at all.   *See* Ex. G (Kelly Dep. Tr.) 22:15-22; Ex. J (Reschenthaler Dep. Tr.) 19:3-13.   Again exposing the extreme degree to which Plaintiffs appear to conflate idle speculation and fiction with facts, Plaintiffs provide two pages of wildly hypothetical possibilities of how fraud could occur, without citing any actual fraud.   *See* ECF 509 at 48-49.   There is no cognizable claim or injury that can rest on such rampant speculation, let alone at summary judgment.

Plaintiffs similarly provide no evidence that having election officials examine signatures would prevent fraud.   To the contrary, courts have recognized that the examination of signatures more often leads to the unwarranted failure to count valid votes.   *E.g.*, *Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644, at *34 (Wecht, J., concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.") (citing *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1046 (S.D.N.Y. 1995)). There is nothing irrational, let alone unlawful, in refusing to have many valid votes improperly discarded in a misguided attempt to stop nonexistent voter fraud.   While Plaintiffs cite one single case supposedly to the contrary, *see* ECF 509 at 52, that case merely concerned whether state election officials were violating state law in an attempt to comply with a court order intended to ensure that absentee votes were properly counted.   *See Democracy N.C. v. N.C. State Bd. of Elections*, Civ. A. No. 20-cv-457, Order dated 09/30/2020 (ECF # 145) (M.D.N.C. 2020) (Olsteen, W., D.J.).

## II.   PLAINTIFFS HAVE NOT ESTABLISHED ANY CONSTITUTIONAL RIGHT THAT COULD HAVE BEEN INFRINGED

### A.   Plaintiffs Have No Cognizable Claim Based On So Called Vote Dilution

For the reasons Defendant-Intervenors detail here and in their prior briefing, Plaintiffs have not stated any cognizable claim that they have a right under the U.S. Constitution to limit ballot

drop boxes, to poll watch outside of their own counties, or to dictate how Pennsylvania examines signatures on ballots.  *See* ECF 219, 297, 346, 441, 458.

As explained above, Plaintiffs' claims rest on a theory of vote dilution, but Plaintiffs' vote-dilution theory has been repeatedly considered and rejected.  As the Fifth Circuit summarized, federal courts

> must … recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. … If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss.

*Gamza*, 619 F.2d at 453. [10]   Indeed, the consequences of adopting Plaintiffs' theory that "improperly cast" ballots inflict a constitutional injury are hard to overstate; by such logic, every voter could bring a § 1983 suit seeking to require every state official charged with any responsibility for elections to adopt that voter's interpretation of state election law.  *See Acosta v. Dem. City Comm.*, 288 F. Supp. 3d at 643 (E.D. Pa. 2018) (dismissing § 1983 claims despite alleged wrongful conduct by Election Board workers because "'garden variety election irregularities' are not actionable under § 1983").

While Plaintiffs assert that redistricting decisions establish a personal, constitutional right to dictate the terms of state election law, what the Equal Protection Clause "prohibits [is]

---

[10]   *See also, e.g.*, *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) (reversing grant of summary judgment for plaintiff whose claim did not rise to the level of "purposeful state conduct directed at disenfranchising a class or group of citizens"); *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (requiring, *inter alia*, "significant disenfranchisement" for a constitutional claim, and expressly holding that "[m]ere fraud or mistake" will not suffice); *Haakenson v. Parkhouse*, 312 F. Supp. 929, 932 (E.D. Pa. 1970) (complaint that does not allege election procedures are "so porous that the number of unqualified electors whose votes will slip into the ballot box will amount to 'ballot stuffing,' and that such 'ballot stuffing' will harm any particular class of qualified voters … utterly fails to state a claim of a denial of Equal Protection").

intentional 'vote dilution'—'invidiously minimizing or canceling out the voting potential of racial or ethnic minorities.'" *Abbot v. Perez*, 137 S. Ct. 2305, 2314 (2018) (quoting *Mobile v. Bolden*, 446 U.S. 55, 66-67 (1980) (plurality opinion)).  And Plaintiffs likewise err in relying (ECF 509 at 36, 40-41) on the "one person, one vote" cases that ensure that some votes are not literally counted for less than others.  Fundamentally, Plaintiffs' "dilution" theory seeks to repurpose cases that ensure that citizens' right to vote is not improperly burdened in service of Plaintiffs' contorted claim that the state has not *burdened citizens' right to vote enough*.  Like the vote-by-mail procedures that varied by county in California and that the Ninth Circuit upheld against similar challenges, each of the policies Plaintiffs challenge "does not burden anyone's right to vote. Instead, it makes it easier for some voters to cast their ballots," which does not implicate the Equal Protection concerns that animate the voting rights cases brought by voters whose franchise is burdened.  *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).[11]  Indeed, even describing the nature of the rights asserted shows their absurdity:  a right to not have drop boxes; a right to act as a poll watcher in a foreign county; a right to have other voters' signatures examined in a particular way. In short, upholding Plaintiffs' unsupported and illusory claims would create a new constitutional cause of action from whole cloth.

---

[11]   Moreover, to the extent that Plaintiffs argue that there is a violation of state election law, such a violation (even if established) does not inherently cause vote dilution.  *Paher v. Cegavske*, --- F. Supp. 3d ---, 2020 WL 2089813, *5 n.7 (D. Nev. Apr. 30, 2020) ("Even if the Court had concluded . . . there was a violation of Nevada law in the implementation of the all-mail provisions . . . , the Court finds that Plaintiffs have not established a nexus between such alleged violations and the alleged injury of vote dilution."); *see also, e.g.*, *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").  And to the extent that Plaintiffs rely on the Pennsylvania Constitution (Dkt. 505 at 37-38), this Court should abstain from addressing this issue based on the reasoning in its prior abstention rulings, and regardless, Plaintiffs make no argument that the Pennsylvania Constitution provides any greater right of action than the U.S. Constitution with respect to their claims.

Plaintiffs' discussion of precedent confuses what states are *permitted* to do under the U.S. Constitution with what they are *required* to do.  For example, Plaintiffs cite *Anderson v. United States*, 417 U.S. 211, 226-27 (1974), for the proposition that voters have the "right under the Constitution to have [their] vote fairly counted, without its being distorted by fraudulently cast votes."  ECF 509 at 37.  But *Anderson* simply upheld the conviction of state and county officials—who had convinced three election officials to cast fake ballots, in an effort to rig both local and federal elections—against the argument that a federal statute could not reach the election officials' efforts to rig a local election.  47 U.S. at 214-15, 226-27.  *Anderson*'s recognition that the federal government *may* prosecute voter fraud in no way *mandates* that Pennsylvania adopt Plaintiffs' preferred voting procedures.  Regardless, Plaintiffs' failure to provide any evidence of a connection between their claims and supposed voter fraud forecloses their reliance on *Anderson*, which in relevant and quoted part referred only to dilution from "[t]he deposit of *forged* ballots." *Id.* at 226 (emphasis added).  More generally, the cases Plaintiffs cite (ECF 509 at 39-41) requiring equal treatment of voters and application of the *Anderson-Burdick* balancing test concern the evaluation of *impairments* on the ability to vote, not measures to *increase access* for voters.[12]

Likewise, Plaintiffs' misleading citation to *Gray v. Sanders*, 372 U.S. 368 (1963), is telling:

---

[12]    For instance, Plaintiffs cite (ECF 509 at 39) Justice Scalia's concurring opinion in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), but that opinion makes clear that the *Anderson-Burdick* test applies only to *restrictions* on the right to vote.  *See id.* at 204 (Scalia, J., concurring in the judgment) ("This [test] calls for application of a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.").  And the other cases Plaintiffs cite likewise concern actions that prohibited certain groups from voting, *see Charfauros v. Bd. of Elections*, 249 F.3d 941, 944 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105); *see also Dunn v. Blumstein*, 405 U.S. 330, 331 (1972), or placed a "burden" on the right to vote, *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Obama for Am. v. Husted,* 697 F.3d 423, 429 (6th Cir. 2012)—not laws that aided the right to vote where other voters claimed so-called vote dilution.  The same is true of all of the cases Plaintiffs cite (ECF 509 at 43-44) on due process.

They claim that *Gray* held that "every vote *must be* 'protected from the diluting effect of illegal ballots.'" ECF 509 at 64 (quoting *Gray*, 372 U.S. at 380) (emphasis added). But all the Court said in that case is that the right to have one's vote counted "*can be* protected from the diluting effect of illegal ballots." 372 U.S. at 380 (citing *Ex parte Siebold*, 100 U.S. 371 (1879), and *United States v. Saylor*, 322 U.S. 385 (1944)) (emphasis added). Plaintiffs' continued attempt to rely on *Pierce v. Allegheny County Board of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2003) is equally misplaced. *Pierce* dismissed all claims by candidate-plaintiffs on the pleadings, *see id.* at 694, and only granted a preliminary injunction against "commingling" identified, already-contested ballots so as to "provide an opportunity for [them] to be challenged *in the state courts*," *id.* at 691 (emphasis added). In sharp contrast to Plaintiffs' idle speculation in this case about ballots that have not been cast, the plaintiffs in *Pierce* alleged *actual* violations of the Election Code. And even then, the Court in *Pierce* expressly refused to direct that such votes not be counted, the relief Plaintiffs seek here. *Compare id.* at 706 (ruling that the challenged votes "should not be voided"), *with* Second Am. Compl. at 80-82 (requesting a permanent injunction against counting certain ballots). No part of the *Pierce* court's post-election preservation of a state-court challenge process supports Plaintiffs' extraordinary request that this Court dictate how every Defendant must run an election process that has not yet even occurred.[13]

To understand why Plaintiffs' effort is so illogical, consider the analogy of the tax system: some taxpayers cheat on their taxes, and without such fraud, tax rates would surely be lower for honest taxpayers. In this way, individuals who cheat on their taxes harm honest taxpayers who do

---

[13] Moreover, to the extent *Pierce* suggests a broad "vote dilution" theory, 324 F. Supp. 2d at 695-97, it rests solely on *Bush v. Gore*, 531 U.S. 98 (2000), which concerned arbitrary counting methods, not (as Plaintiffs allege) violation of state law due to supposed vote dilution. *Id.* at 105-06.

not.  This is in part why the U.S. government audits, investigates, and prosecutes individuals who engage in tax fraud.  But it is absurd to think that an honest taxpayer could sue to invalidate the entire tax system on the basis that another taxpayer is cheating—there is no constitutional right to a tax system free of fraud.  And if—similar to this case—the IRS took some action to make filing taxes more convenient (such as simplifying tax forms), it is equally absurd to think that an individual taxpayer would have a legal claim to challenge that change as facilitating further tax fraud.

Moreover, Plaintiffs' novel constitutional cause of action would embroil courts in a political debate over virtually every election rule.  Assuming a constitutional obligation to protect against the specter of purported voter fraud exists that candidates and private citizens could assert in federal court against state government officials, the question would remain what measures a state must take to provide sufficient protection.  Plaintiffs' position seems to be that the U.S. Constitution dictates the particular rules regarding drop boxes, poll watchers, and signature evaluation that Plaintiffs think best.  But there is no plausible support, under the U.S. Constitution or any precedent, for the extraordinary position that the federal courts should become the arbiters of the efficacy of every state election rule to determine whether it sufficiently addresses the supposed risk of voter fraud.  Indeed, such a reading of the Constitution ignores the roles that states play in setting in setting elections practices.  *See* U.S. Const. art. I, sec. 4.

### B.    Plaintiffs' Equal Protection "Uniformity" Claim Fails On The Merits

Plaintiffs similarly fail in an equally misguided effort to concoct a cognizable claim that the Fourteenth Amendment requires every county in Pennsylvania to adopt some formalistic and unrealistic identicalness.  At the threshold such a claim is premature.  As the Pennsylvania Supreme Court explained, given the uncertainty regarding the extent of any differences in county procedures:  "[T]he exact manner in which each county board of election will accept these votes

is entirely unknown at this point thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time." (*Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644 at *9).  *See also, e.g.*, Ex. B (Bluestein Dep. Tr.) 29:8-11, 40:19-22 ("Q: Is the plan for Philadelphia County to have these drop boxes manned in some way?  A: We haven't finalized our plans for the drop boxes."), 59:11-17 ("Q: How about with respect to the general election, will the county of Philadelphia be performing a signature comparison with the declaration envelope?  A: We are still reviewing the guidance from the Department of State, and those plans have not been finalized."), 62:2-4; Ex. F (Hagan Dep. Tr.) 26:13-17, 29:1-6  ("Q: So ... it's going to be one drop box in each of the 49 municipalities [in Delaware county].  Is that right?  A: That is the expectation, yes.  There is still ongoing [work] with the municipalities to establish where and who will host them.").

Even if the claim could be brought now, it is legally baseless.  Voters must have equal access to the fundamental right to vote and counties must honor that right.  But communities are diverse:  they face different barriers and have different needs.  Plaintiffs altogether ignore that the law not only accepts, but encourages, meeting those needs through specific practices and procedures.  That is why, for example, Section 203 of the Voting Rights Act requires the provision of registration forms, other materials, and voter assistance in languages other than English in jurisdictions—including counties—where more than five percent of voting age citizens are members of a single language minority group with limited English proficiency.  *See* 52 U.S.C. § 10503.  It is also why Pennsylvania counties can have different numbers of election districts— with each borough, township, and ward of every city serving as a district, along with possible additional districts comprised of 100 to 1,200 registered electors—and, in turn, different numbers of polling places.  *See* 25 P.S. §§ 2701, 2702, 2726.  And it is why voters with disabilities can

bring their own assistive devices to help them vote.  Votes PA, *Voters With Disabilities*, Penn. Dep't of State (Apr. 2020), *available at* https://www.votespa.com/Resources/Poll-Worker-Training/Pages/Voters-With-Disabilities.aspx.

Courts have repeatedly rejected the extreme and untenable position that, unless a state mandates the exact same procedures in every county, "it creates 'unconstitutional vote-dilution' in counties that [adopt different procedures].  Nothing in the Constitution, the Supreme Court's controlling precedent, or [federal appellate] case law suggests that [federal courts] can micromanage a state's election process to this degree."  *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018); *see also, e.g.*, *Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006) (holding that "manual recount procedures, which vary by county according to voting system," did not violate equal protection); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016) (rejecting Equal Protection challenge even where "plaintiffs presented uncontested evidence that, in determining whether to reject a given ballot, the practices of boards of elections can vary, and sometimes considerably"); *Paher v. Cegavske*, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) (rejecting Equal Protection challenge at preliminary injunction stage where a county's "Plan may make it easier or more convenient to vote in [that] County, but does not have any adverse effects on the ability of other voters in other counties to vote"); *Tex. Democratic Party v. Williams*, 2007 WL 9710211, *4 & n.4 (W.D. Tex. Aug. 16, 2007) (rejecting Equal Protection challenge because one county's choice to use particular "eSlate machines do[es] not treat voters arbitrarily or disparately compared to Texas voters using other voting technologies").  Plaintiffs' unprecedented interpretation of uniformity would, as they are no doubt aware, create a race to the bottom, where counties can only provide the bare minimum to voters, and cannot meet the particular needs of

their communities.  But that is not what Equal Protection requires.  Ensuring an equal right to vote often requires counties and localities to adopt *differing* practices.

While Plaintiffs again continue to misguidedly cling to *Pierce*, 324 F. Supp. 2d at 706 (W.D. Pa. 2003), *see* ECF 509 at 42-43, Plaintiffs ignore that the *Pierce* court erroneously made ***no*** determination of likelihood of success on the merits.  Instead, the *Pierce* court held only that there was "a reasonable probability that plaintiffs' claims could succeed on the merits *depending upon how the state court interprets the provision of the election code at issue*."  *Pierce*, 324 F. Supp. 2d at 705 (emphasis added).  The Court then specifically opined that "[t]his court finds it inappropriate, based upon the doctrines of comity and federalism, to speculate as to how the Pennsylvania courts would interpret this provision."  *Id.*  The *Pierce* court thus made no determination that the plaintiffs there had established a likelihood of success on the merits, and the preliminary injunction should not have issued.  It is thus no surprise that the *Pierce* decision was appealed and that the plaintiffs there elected to settle and dismiss the case prior to the Third Circuit's consideration of the erroneous preliminary injunction ruling.  *See Pierce v. Allegheny Cnty. Bd. of Elections*, No. 2:03-cv-01677-JFC, (W.D. Pa.), ECF 12 (Dec. 4, 2003), ECF 13 (Feb. 2, 2004), ECF 14 (Feb. 27, 2004).

Plaintiffs also err in relying on *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam).  The *per curiam* decision for the majority in *Bush v. Gore* expressly held that it was not addressing "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."  531 U.S. at 109.  Instead, it limited its Equal Protection analysis to circumstances like the one before it: "where a state court with the power to assure uniformity has ordered a statewide recount," and where, because that recount only considered the interpretation of inanimate, already-cast ballots, "[t]he formulation of uniform rules to determine intent based on … recurring

circumstances is practicable." *Id.* at 106, 109.  In such a situation, the Court held, there must be "at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Id.* at 109.  Florida's 2000 recount failed to provide those assurances because, *inter alia*, counties changed their evaluative standards in the middle of the counting process, failed to ensure consistent practices within each county, and alternatively included partial and full recounts, and because the Florida Supreme Court failed even to specify who would perform the recount in each county, much less provide uniform guidance for the interpretive questions that were bound to recur.  *See id.* at 106-09.  No similar lack of even "rudimentary" equal treatment is alleged or established here or, indeed, in the large majority of cases in which plaintiffs present similar arguments to federal courts, which largely follow the *Bush v. Gore* Court's express admonition that its "consideration [was] limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." *Id.* at 109.

Even assuming that *Bush v. Gore* imposed the kind of state uniformity standard that Plaintiffs assert (it does not), Plaintiffs would still have no reasonable probability of success.  As Plaintiffs have acknowledged, Secretary Boockvar has published "the Pennsylvania Department of State's official guidance on how a county election board can use drop-boxes for the return and collection of absentee and mail-in ballots . . . ."  ECF 414 ¶ 15.  As the Secretary's materials state on their face, they "provide guidance on how each county should establish a ballot return and collection plan," ECF 504-23 (Penn. Dep't of St., *Pennsylvania Absentee an Mail-in Ballot Return Guidance*, Aug. 19, 2020, at 2, *available at* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS_BallotReturn_Guidance_1.0.pdf), and direct counties not to count ballots that lack an inner secrecy envelope, consistent with the Pennsylvania Supreme

Court's ruling. ECF 504-25, (Penn. Dep't of St., *Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures*, Sept. 28, 2020 at 4-5, *available at* https://www.dos.pa.gov/ VotingElections/OtherServicesEvents/Documents/DOS%20Guidance%20Civilian%20Absentee %20and%20Mail-In%20Ballot%20Procedures.pdf).

Plaintiffs provide no argument, and certainly no evidence, that any of the defendant County Board of Elections will refuse to follow Secretary Boockvar's guidance or any decision from Pennsylvania state courts on the same topics. *See, e.g.*, Ex. E (Frey Dep. Tr.) 11:10-17, 55:2-5 ("Q: When the Department of State issues guidances or instructions to the county regarding elections, do you make yourself familiar with those materials?  A: Yes.  Q: Do you follow the guidances that the Department of State issues for the counties?  A: Yes."); Ex. I (Parsknik Dep. Tr.) 60: 12-16 ("Q: Does [Luzerne County] intend to follow the guidance counsel for plaintiffs marked here today, or any future guidance issued by the Secretary of State on election issues?  A: Yes."); Ex. A (Allison Dep. Tr.) 42:17-42:22 ("Q: Does Lawrence County intend to follow the guidance that has been issued by the Pennsylvania Department of State … ?  A: As long as those guidance[s] are in accord with the Pennsylvania election code, we have no problem with them."); Ex. B (Bluestein Dep. Tr.) 45:10-13 ("The county of Philadelphia is planning to fulfill its responsibilities by following the Department of State guidance on security related to drop boxes."); Ex. L (Voye Dep. Tr.) 44:9-20 ("I believe we are following the state guidance. . . Unless there is some other type objective that will come out, I believe we would follow those guidances.").

Courts have long held that the type of statewide guidance on the interpretation and application of state election law that Plaintiffs concede is now in place contribute to curing Equal Protection concerns like the ones Plaintiffs raise, even assuming they are cognizable.  For example, in *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), the Ninth Circuit held that "[e]ven were

*Bush* applicable to more than the one election to which the Court appears to have limited it," a Secretary of State's guidance to county election boards "would be sufficiently uniform and specific to ensure equal treatment of voters."  *Id*. at 1106.  Similarly, in *In re Contest of Gen. Election Held on Nov. 4, 2008 for Purpose of Electing a U.S. Senator From the State of Minn.*, 767 N.W.2d 453 (Minn. 2009), the Minnesota Supreme Court rejected an Equal Protection challenge to counties' admittedly divergent procedures for counting ballots because "there were clear statutory standards for acceptance or rejection of absentee ballots, about which all election officials received common training" from the Secretary of State.  *Id.* at 466.

Although not styled as such, Plaintiffs' request that this Court "ensure the application of uniform standards amongst all 67 of the County Election Boards," Second Am. Compl. ¶ 151, is a facial attack on 25 P.S. § 2642, by which Pennsylvania's legislature has authorized each county board of elections to select their polling places, choose between different forms of election equipment, and generally "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary."  Indeed, virtually every state has extensive variations in election methods in different locations.  If Plaintiffs' argument were accepted, it could not be limited to the particular differences Plaintiffs disfavor.  Election law across the country would need to be radically changed and conformed to ensure a "perfect"—and thereby equal—voting method.

Finally, even assuming *arguendo* Plaintiffs had a valid Equal Protection claim, the injunctive remedy they seek in their motion is totally disconnected from that claim.  As discussed above, Plaintiffs have no valid claims based on fraud or vote dilution.  Thus, if there was disparate treatment between counties, the proper remedy would not be to restrict ballot access but to require greater access uniformly.  In particular, because drop boxes are legal, and designed to protect the

franchise, any equal protection violation would require this Court to order counties to use more drop boxes, not fewer, to cure disparate treatment.

### C.   Plaintiffs Have No Cognizable Claim To Challenge Secretary's Boockvar's Guidance

Plaintiffs' challenges to Secretary's Boockvar's guidance on signature verification are also unavailing.  That claim—which alleges vote dilution and equal protection clause violations arising from the Secretary's guidance that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of election" (ECF 504-24 at 3)—should in the first instance be decided by the Pennsylvania courts, as this Court has already held with respect to Plaintiffs' other  ballot "verification" and "counting" claims, under the *Pullman* abstention doctrine.  *See* ECF 409 at 16 (abstaining in respect of Plaintiffs' claim challenging Defendants' "procedures for verifying the qualification of voters applying in person for mail-in or absentee ballots" and "rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contain stray marks on the envelope)").  Moreover, nothing about Plaintiffs' challenge to the Secretary's guidance in respect of signature verification remotely presents a violation of the Equal Protection or Due Process Clauses.  Rather, for the reasons stated above, it simply represents yet another attempt by Plaintiffs to dictate the terms of state election law and embroil this Court in micro-managing how the state of Pennsylvania and the local county board of elections verify mail-in and absentee ballots.

### D.   There Is No Evidence The Elections Clause Has Been Violated

It is unclear precisely what, if any, conduct Plaintiffs claim to be a violation of the Elections Clause or what remedy is supposed to address such a violation.  Regardless, any claim that executive or administrative action violates the Elections Clause has no legal basis.  Giving

29

Plaintiffs the benefit of the doubt, their theory appears to be based on a cramped definition of "the Legislature" in the Elections Clause. *See* Second Am. Compl. ¶ 35 ("The Legislature is 'the representative body which ma[kes] the laws of the people.'") (quoting *Smiley v. Holm*, 285 U.S. 355, 365 (1932); *see also id.* ¶¶ 36-37, 197-98. However, the Supreme Court has already rejected the argument that, "by specifying 'the Legislature thereof,' the Elections Clause renders the State's representative body the sole 'component of state government authorized to prescribe . . . regulations . . . for congressional redistricting.'" *Ariz. St. Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015). Indeed, as the Court has long held, what matters is not the name of the body exercising lawmaking authority, but whether the entity is engaged in "the function contemplated by article 1, s 4 . . . that of making laws." *Smiley*, 285 U.S. at 366. With that in mind, the Court concluded that state governors could make election law through the exercise of their veto power. *Id.* at 372-73. Accordingly, Plaintiffs' narrow and myopic reading of the Election Clause is contrary to settled understanding of who may enact election regulations. *See Donald J. Trump for President v. Bullock*, 6:20-cv-00066-DLC, 2020 WL 5810556, at *10 (D. Mont. September 30, 2020) ("A survey of the relevant case law makes clear that the term 'Legislature' as used in the Elections Clause is not confined to a state's legislative body.")

In any event, there is no plausible argument that executive and administrative officials cannot issue rules and regulations to enforce and implement the laws enacted by Pennsylvania's General Assembly. And that is precisely what Defendants are doing here, as all of their conduct is pursuant to and based on the power granted by the Commonwealth legislature. Pennsylvania's General Assembly has "delegate[ed] authority to the Secretary of the Commonwealth to administer the state election scheme." *Baldwin v. Cortés*, 378 F. App'x 135, 138-39 (3d Cir. 2010). The legislature has also given each county election board "jurisdiction over the conduct of

primaries and elections in such county." 25 P.S. § 2641(a). Even the dissenters in *Arizona State Legislature* recognized that the constitutional concern was "permanently and totally displac[ing] the legislature" with an independent commission. *Ariz. St. Legislature*, 135 S. Ct. at 2691 (Roberts, C.J., dissenting). There is no such concern here, and no basis to conclude that Defendants are undermining rather than enforcing Commonwealth law.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Second Amended Complaint, grant summary judgment in favor of Defendants, deny Plaintiffs' motion for summary judgment, and deny Plaintiffs' request for injunctive relief.

Dated: October 3, 2020

Respectfully submitted,

*/s/ Eliza Sweren-Becker*

Myrna Pérez
Eliza Sweren-Becker
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: 646.292.8310
myrna.perez@nyu.edu
eliza.sweren-becker@nyu.edu

Sascha N. Rand*
Jonathan Oblak*
Ellison Merkel*
David Cooper (*pro hac vice forthcoming*)
John Chun*
Owen Roberts*

QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: 212.849.7175
sascharand@quinnemanuel.com
jonathonoblak@quinnemanuel.com

31

ellisonmerkel@quinnemanuel.com
davidcooper@quinnemanuel.com
johnchun@quinnemanuel.com
owenroberts@quinnemanuel.com

*Counsel for Defendant-Intervenors Citizens for
Pennsylvania's Future and Sierra Club*

*Admitted Pro Hac Vice

**<u>CERTIFICATE OF SERVICE</u>**

I, Eliza Sweren-Becker, certify that I served the foregoing Memorandum of Law in Support of Motion for Summary Judgment of Defendant-Intervenors Citizens for Pennsylvania's Future and Sierra Club on the following counsel who are registered as CM/ECF filing users who have consented to accepting electronic service through CM/ECF:

*All counsel of record*

Dated: October 3, 2020                    Respectfully submitted,
                                          */s/ Eliza Sweren-Becker*

                                          *Counsel for Defendant-Intervenors Citizens for Pennsylvania's Future and Sierra Club*