## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR | ) | Civil Action |
| PRESIDENT, INC.; *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.: 2-20-CV-966 |
| v. | ) | |
| | ) | |
| KATHY BOOCKVAR; *et al.*, | ) | |
| | ) | Judge J. Nicholas Ranjan |
| Defendants. | ) | |

## RESPONSE TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PORTER WRIGHT MORRIS & ARTHUR LLP

By:    */s/ Ronald L. Hicks, Jr.*
       Ronald L. Hicks, Jr. (PA #49520)
       Jeremy A. Mercer (PA #86480)
       Carolyn B. McGee (PA #208815)
       Six PPG Place, Third Floor
       Pittsburgh, PA 15222
       (412) 235-4500 (Telephone)
       (412) 235-4510 (Fax)
       rhicks@porterwright.com
       jmercer@porterwright.com
       cmgee@porterwright.com

       and

       Matthew E. Morgan (DC #989591)
       (admitted pro hac vice – ECF #10)
       Justin Clark (DC #499621)
       (admitted pro hac vice – ECF #31)
       Elections, LLC
       1000 Maine Ave., SW, 4th Floor
       Washington, DC 20224
       (202) 844-3812 (Telephone)
       matthew.morgan@electionlawllc.com
       justin.clark@electionlawllc.com

       *Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

RESPONSE TO FACTUAL AVERMENTS ................................................................... 3

    I.    UNDISPUTED MATERIAL FACTS ........................................................... 3

    II.   PURPORTED DISPUTED FACTS .............................................................. 4

    III.  PLAINTIFFS' SUPPLEMENTAL FACTS ................................................. 6

REPLY/RESPONSE ARGUMENT ................................................................................ 7

    I.    THE UNDISPUTED FACTS SHOW PLAINTIFFS WILL SUFFER
        PARTICULARIZED INJURY AND HAVE STANDING TO BRING THEIR
        CLAIMS ........................................................................................................ 7

        A.    In Cases Seeking Declaratory or Injunctive Relief, Article III Standing Exists
             When at Least One Plaintiff Has Any Redressable Injury Caused By The
             Defendants' Actions. ............................................................................ 8

        B.    As Qualified Electors in the Upcoming General Election, the
             Congressional and Individual Voter Plaintiffs Have Suffered a Redressable
             Injury Caused by Defendants Sufficient to Confer Standing to Challenge the
             Secretary's Absentee and Mail-In Voting Guidance Memos and the County
             Elections Boards' Haphazard Implementation of Them. .................... 11

        C.    As A Political Party, The RNC Has Associational Standing To Challenge
             The Secretary's Guidance Memos And The County Elections Boards'
             Haphazard Implementation Of Them As They Relate To Absentee And
             Mail-In Voting ................................................................................. 15

        D.    As Candidates, the Congressional Plaintiffs and the Trump Campaign Have
             Article III Standing to Challenge the Secretary's Guidance Memos and the
             County Elections Boards' Haphazard Implementation of Them as They
             Relate to Absentee and Mail-In Voting ............................................ 18

        E.    All Plaintiffs Have Article III Standing To Assert Their As-Applied
             Challenge To The Pennsylvania Election Code's County Residency
             Requirement for Poll Watchers. ........................................................ 20

        F.    Defendants' Arguments Concerning Generalized Grievance, Justiciability,
             Mootness, and Third-Party Standing Are Not Supported By The Undisputed
             Facts Submitted by Plaintiffs. .......................................................... 21

             1.   Plaintiffs' Evidence Establishes Particularized, Concrete, and
                    Imminent Injury Sufficient To Confer Article III Standing Over
                    Their Constitutional Claims. ................................................ 30

             2.   Plaintiffs' Claims Are Ripe and Justiciable. .......................... 372

             3.   Plaintiffs Have Third Party Standing to Assert Their As-Applied
                    Challenge to the Watcher's County Residency Requirement. ........... 377

II.  *PULLMAN* ABSTENTION AS TO PLAINTIFFS' POLL WATCHING AND
SIGNATURE VERIFICATION CLAIMS IS NOT WARRANTED.............................. 30

    A.  State Law Issues Are Clear and Unmistakable. .................................................. 32

        1.  Plaintiffs' Signature Comparison Verification Claims. ............................ 35

        2.  Plaintiffs' Poll Watching Claims. ............................................................ 37

    B.  Plaintiffs' Federal Constitutional Claims Are Unlikely to Be Narrowed. .......... 37

        3.  Plaintiffs' Signature Comparison Verification Claims. ............................ 45

        4.  Plaintiffs' Poll Watching Claims. ............................................................ 46

    C.  Because The Relevant State Law Issues Are Not Unsettled, There Is No
Risk Of Disruption To Pennsylvania's Election Process. .................................... 38

    D.  Additional Equitable Factors Call For A Rejection Of *Pullman* Abstention
At This Late Stage. .............................................................................................. 40

III.  SECRETARY BOOCKVAR AND THE COUNTY DEFENDANTS ARE PROPER
PARTIES TO THIS SUIT BECAUSE ELEVENTH AMENDMENT IMMUNITY
DOES NOT SHIELD THEM FROM PLAINTIFFS' CONSTITUTIONAL CLAIMS
AND THEY ARE INDISPENSABLE PARTIES. .......................................................... 41

    A.  Secretary Boockvar And The County Boards Of Elections Violate The First
And Fourteenth Amendment On An On-Going Basis. ........................................ 42

    B.  The County Election Boards Are "Arms Of The State." ..................................... 47

    C.  Each Defendant County Election Board Is An Indispensable Party To The
Action. ................................................................................................................. 50

IV.  STRICT SCRUTINY APPLIES WHEN THE FUNDAMENTAL RIGHT TO
VOTE IS SEVERELY BURDENED.......................................................................... 54

V.  DEFENDANTS RAISE NO GENUINE ISSUE OF MATERIAL FACT OR
VIABLE LEGAL BASIS TO DENY PLAINTIFFS' REQUESTED RELIEF
CONCERNING THE SECRETARY'S SEPTEMBER 2020 GUIDANCE. ............... 57

VI.  PLAINTIFFS HAVE PROVED THE INCONSISTENT USE OF UNMANNED
DROP BOXES VIOLATES THEIR CONSTITUTIONAL RIGHTS......................... 61

    A.  PLAINTIFFS HAVE ESTABLISHED AN EQUAL PROTECTION
CLAIM. ............................................................................................................... 62

    B.  Strict Scrutiny Applies To Plaintiffs' Equal Protection Claim Related To
Drop Boxes Because Defendants Place A Severe Burden On The Right
To Vote................................................................................................................. 63

    C.  Pennsylvania's Implementation Of Drop Boxes Has Reached The Point
Of Patent And Fundamental Unfairness Due To The Choices Defendants
Made. .................................................................................................................. 65

    D.  The Use Of Unstaffed Drop Boxes Encourages Fraud And Invites Ballot
Destruction. ......................................................................................................... 67

1.  Plaintiffs Produced Evidence That The Use Of Drop Boxes
    Encourages Fraud.................................................................................. 656

2.  Drop Boxes – Past Is Not Prologue Here................................................ 679

VII. POLL WATCHING, AS-APPLIED AND PROVED BY PLAINTIFFS IN THIS
     CASE, IMPLICATES CONSTITUTIONALLY-PROTECTED RIGHTS. ................ 74

A.  Although Defendants Claim That Poll Watchers Have No First Amendment
    Right To Watch Polls, Defendants Do Not Dispute That Candidates And
    Voters Have A Constitutionally-Guaranteed Right To A Free And Untainted
    Election....................................................................................................... 74

B.  Defendants Do Not Deny That The Residency Requirement In The Poll
    Watching Statute Significantly Limits The Supply Of Individuals Qualified
    To Serve In That Roll. ................................................................................. 76

CONCLUSION ...................................................................................................................79

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC v. Blackwell*,
    479 F. Supp. 2d 719 (S.D. Ohio 2006) ..................................................40

*ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009) ............................................................9

*ACLU of N.M. v. Santillanes*,
    546 F.3d 1313 (10th Cir. 2008) ....................................................22, 56

*Acosta v. Democratic City Comm.*,
    288 F. Supp. 3d 597 (E.D. Pa. 2018) ...............................42, 43, 46, 64

*Adamietz v. Smith*,
    273 F.2d 385 (3d. Cir. 1960)..............................................................51

*Alden v. Me.*,
    527 U.S. 706 (1999).............................................................................46

*Amato v. Wilentz*,
    952 F.2d 742 (3d Cir. 1991)................................................................28

*Andrade v. NAACP of Austin*,
    345 S.W.3d 1 (Tx. 2011) ....................................................................21

*Andrade v. NAACP of Austin*,
    345 S.W.3d 1 (Tx. 2011) ....................................................................27

*Babbitt v. UFW Nat'l Union*,
    442 U.S. 289 (1979)............................................................................10

*Baggett v. Bullitt*,
    377 U.S. 360 (1964).....................................................................36, 63

*Baker v. Carr*,
    369 U.S. 186 (1962).....................................................................12, 13

*Balsam v. Sec'y of N.J.*,
    607 F. App'x 177 (3d Cir. 2015) ........................................................46

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................10

*Better Gov't Bureau v. McGraw,*
    904 F. Supp. 540 (S. D. W.Va., Oct. 16, 1995) .......................................................42

*Black v. McGuffage,*
    209 F. Supp. 2d 889 (N.D. Ill. 2002) ..............................................................53, 63

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ........................................................................................11

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ........................................................................................13

*Cano v. Davis,*
    191 F. Supp. 2d 1140 (C.D. Cal. 2002) ............................................................40

*Casey v. Clayton County,* No. 1:04-CV-00871-RWs,
    2007 U.S. Dist. LEXIS 17598 (N.D. Ga., Mar. 14, 2007)..................................48

*Cavert Acquisition Co. v. National Labor Relations Board,*
    83 F.3d 598 (3d Cir. 1996)................................................................................6

*Chez Sez III Corp. v. Union,*
    945 F.2d 628 (3d Cir. 1991)........................................................................30, 31

*City of Canton v. Harris,*
    489 U.S. 378 (1989)....................................................................................44, 65

*Colegrove v. Green,*
    328 U.S. 549 (1946) (Black, J., dissenting) ......................................................54

*Combs v. Homer-Center Sch. Dist.,*
    540 F.3d 231 (3d Cir. 2008)............................................................................55

*Common Cause v. Bolger,*
    512 F. Supp. 26 (D.D.C. 1980) .......................................................................19

*Constitution Party v. Aichele,*
    757 F.3d 347 (3d Cir. 2014)...................................................................8, 18, 27

*Crawford v. Marion Cnty. Election Bd.,*
    472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008) ......................9, 15, 16, 22

*Curry v. Baker,*
    802 F.2d 1302 (11th Cir. 1986) ......................................................................62

*Davis v. FEC,*
    554 U.S. 724 (2008).........................................................................................8

*De La Fuente v. Cortes*,
  261 F. Supp. 3d 543 (M.D. Pa. 2017) ............................................................ *passim*

*Democratic Exec. Comm. v. Detzner*,
  347 F. Supp. 3d 1017 (N.D. Fl. 2018) .....................................................................16

*Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc,
  2020 U.S. Dist. LEXIS 172330 (W.D. Wis., Sep. 21, 2020) ............................52, 77

*Donald J. Trump for President, Inc. v. Boockvar*,
  2020 U.S. Dist. LEXIS 152599 (W.D. Pa., Aug. 23, 2020) ............................ *passim*

*Donald J. Trump for President v. Cegavske*, No. 2:20-CV-1445 JCM (VCF),
  2020 U.S. Dist. LEXIS 172052 (D. Nev., Sep. 18, 2020) ......................................22

*Drake v. Obama*,
  664 F.3d 774 (9th Cir. 2011), *cert. denied*, 567 U.S. 906 (2012)...........................16

*Dunn v. Blumstein*,
  405 U.S. 330 (1972)...........................................................................................13, 23

*FEC v. Akins*,
  524 U.S. 11 (1998)...................................................................................................10

*Fla. State Conf. of The NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ................................................................................9

*Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*,
  373 F. Supp. 3d 567 (W.D. Pa. 2019).....................................................................55

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)...........................................................................................10, 15

*Fulani v. Hogsett*,
  917 F.2d 1028 (7th Cir. 1990) .................................................................................18

*Fulani v. League of Women Voters Educ. Fund*,
  882 F.2d 621 (2d Cir. 1989).....................................................................................19

*Ga. State Conf. of the NAACP v. Dekalb County Bd. of Registration & Elections*,
  No. 1:20-CV-00879-ELR,
  2020 U.S. Dist. LEXIS 162683 (N.D. Ga., Sept. 2, 2020) .....................................48

*Gray v. Sanders*,
  372 U.S. 368 (1963).................................................................................13, 21, 63, 64

*Green Party of Pennsylvania v. Aichele*,
  103 F. Supp. 3d 681 (E.D. Pa. 2015) ......................................................................27

*Greenwood v. Singel*,
   823 F. Supp. 1207 (E.D. Pa. 1993) ....................................................53

*Griffin v. Burns*,
   570 F.2d 1065 (1st Cir. 1978) ...........................................................44

*Grode v. Mutual Fire, Marine & Inland Ins. Co.*,
   8 F.3d 953 (3d Cir. 1993)...................................................................30

*Harper v. Va. State Bd. of Elections*,
   383 U.S. 663 (1966)....................................................................13, 54

*Hennings v. Grafton*,
   523 F.2d 861 (7th Cir. 1975) .............................................................64

*Holland v. Rosen*,
   895 F.3d 272 (3d Cir. 2018)...............................................................28

*Hughes v. Lipscher*,
   906 F.2d 961 (3d Cir. 1990)...............................................................31

*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977)..........................................................................15

*Hunter v. Hamilton County Bd. of Elections*,
   850 F. Supp. 2d 795 (S.D. Ohio 2012) ..............................................48

*Hunter v. Hamilton Cty. Bd. of Elections*,
   635 F.3d 219 (6th Cir. 2011) ......................................................61, 62

*Ind. Democratic Party v. Rokita*,
   458 F. Supp. 2d 775 (S.D. Ind. 2006) ...............................................28

*In re General Election-1985*,
   531 A.2d 836 (Pa. Commw. Ct. 1987) ..............................................19

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*,
   11 F.3d 399 (3d Cir. 1993)................................................................50

*Krislov v. Rednour*,
   226 F.3d 851 (7th Cir. 2000) ............................................................18

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*,
   440 U.S. 391 (1979)..........................................................................47

*Lemons v. Bradbury*,
   538 F.3d 1098 (9th Cir. 2008) .....................................................53, 54

*Levy v. Med. Servs. Ass'n*, No. 91-6028,
  1992 U.S. Dist. LEXIS 4958 (E.D. Pa., Mar. 31, 1992) ........................................................50

*Local 3 v. Ridge*,
  1997 U.S. Dist. LEXIS 8893 (E.D. Pa., June 19, 1997) ........................................................42

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................................9

*Martel v. Condos*, Case No. 5:20-cv-131,
  2020 WL 5755289, 2020 U.S. Dist. LEXIS 182693 (D. Vt., Sept. 16, 2020) .......................22

*MCI Telecomm. Corp. v. Bell Atl. Pa.*,
  271 F.3d 491 (3d Circ. 2000) ...............................................................................................42

*Merle v. U.S.*,
  351 F.3d 92 (3d Cir. 2003) ..................................................................................23, 24, 25

*Monell v. Dept't of Soc. Servs.*,
  436 U.S. 658 (1978) ...........................................................................................................44

*Moore v. Ogilvie*,
  394 U.S. 814 (1969) ...........................................................................................................64

*Morse v. Republican Party*,
  517 U.S. 186 (1996) .....................................................................................................25, 26

*N. Ins. Co. v. Chatham Cnty.*,
  547 U.S. 189 (2006) ...........................................................................................................46

*NCAA v. Corbett*,
  25 F. Supp. 3d 557 (M.D. Pa. 2014) ...................................................................................31

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*,
  508 U.S. 656 (1993) ...........................................................................................................22

*O'Donnell v. Pa. Dep't of Corr.*, No. 4:08-CV-00136,
  2009 U.S. Dist. LEXIS 124420 (M.D. Pa., Dec. 31, 2009) ..................................................50

*Orloski v. Davis*,
  564 F. Supp. 526 (M.D. Pa. 1983) ......................................................................................16

*Pa. Democratic Party v. Republican Party of Pa.*,
  2016 U.S. Dist. LEXIS 153944 (E.D. Pa. Nov. 7, 2016) ......................................................15

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*,
  297 F.3c 310, 323 (3d Cir. 2002) .......................................................................................42

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002)................................................................................28

*Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC,
2020 U.S. Dist. LEXIS 76597 (D. Nev., Apr. 30, 2020).........................................22

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)................................................................................43

*Pettengill v. Putnam Cty. R-1 Sch Dist.*,
472 F.2d 121 (8th Cir. 1973)................................................................................61

*PG Publ. Co. v. Aichele*,
902 F. Supp. 2d 724 (W.D. Pa. 2012)..................................................5, 27, 42

*Pierce v. Allegheny County Bd. of Elections*,
324 F. Supp. 2d 684 (W.D. Pa. 2003)..........................................................*passim*

*Planned Parenthood v. Farmer*,
220 F.3d 127 (3d Cir. 2000)................................................................................39

*Pleasant v. Erie Ins. Exch.*,
348 A.2d 477 (Pa. Commw. Ct. 1975) ................................................................52

*Powell v. McCormack*,
395 U.S. 486 (1969)................................................................................23

*Powers v. Ohio*,
499 U.S. 400 (1991)................................................................................28

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952)................................................................................23

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996)................................................................................30

*Railroad Commission of Texas v. Pullman Co.*,
312 U.S. 496 (1941)................................................................*passim*

*Ray v. Atlantic Richfield Co.*,
435 U.S. 151 (1978)................................................................................42

*RFF Family P'ship, LP v. Link Dev., LLC*,
849 F. Supp. 2d 131 (D. Mass. 2012) ................................................................49

*Rosario v. Rockefeller*,
410 U.S. 752 (1973)................................................................................23

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ........................................................................................................11

*Sandusky County Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ....................................................................................13, 15

*Schulz v. Williams*,
    44 F.3d 48 (2d Cir. 1994) ..............................................................................................17

*Selkridge v. United of Omaha Life Insurance Co.*,
    360 F.3d 155 (3d Cir. 2004) ...........................................................................................5

*Shannon v. Jacobowitz*,
    394 F.3d 90 (2d Cir. 2005) ............................................................................................64

*Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel*,
    895 F.2d 116 (3d Cir. 1990) ..........................................................................................50

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ......................................................................................................28

*Smith v. Boyle*,
    144 F.3d 1060 (7th Cir. 1998) .......................................................................................17

*South v. Peters*,
    339 U.S. 276 (1950) ......................................................................................................54

*Spencer v. Kemna*,
    523 U.S. 1 (1998) ..........................................................................................................25

*State Farm Mut. Auto. Ins. v. Mid-Continent Cas. Co.*,
    518 F.2d 292 (10th Cir. 1975) .......................................................................................49

*Stevenson v. State Board of Elections*,
    638 F. Supp. 547 (N.D. Ill. 1986) .................................................................................42

*Stewart v. Blackwell*,
    444 F.3d 843 (6th Cir. 2006) ....................................................................................54, 63

*Storer v. Brown*,
    415 U.S. 724 (1974) ...........................................................................................23, 24, 25

*Sugartown Worldwide LLC v. Shanks*, No. 14-5063,
    2015 U.S. Dist. LEXIS 36495 (E.D. Pa., Mar. 24, 2015) .............................................50

*Summit Med. Assocs., P.C. v. Pryor*,
    180 F.3d 1326 (11th Cir. 1999) .....................................................................................44

*Texas Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ................................................................16, 18

*Trinsey v. Montgomery County Bd. of Elections*, No. 87-6975
    1988 U.S. Dist. LEXIS 8704 (E.D. Pa., Aug. 4, 1988)............................48

*United Food & Commer. Workers Union Local 751 v. Brown Group*,
    517 U.S. 544 (1996)..................................................................................15

*United States v. Classic*,
    313 U.S. 299 (1941)..................................................................................54

*United States v. Hays*,
    515 U.S. 737 (1995)..................................................................................13

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
    412 U.S. 669 (1973)................................................................................9, 10

*Va. Office for Protection & Advocacy v. Stewart*,
    563 U.S. 247 (2011)..................................................................................42

*Valley Forge Christian College v. Americans United for Separation of Church
    and State, Inc.*,
    454 U.S. 464 (1982)................................................................................10, 11

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)..................................................................................11

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................9, 15

*Welker v. Clarke*,
    239 F.3d 596 (3d Cir. 2001)......................................................................61

*Whitemore v. Arkansas*,
    495 U.S. 149 (1990)................................................................................9, 10

*Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*,
    385 F.3d 801 (3d Cir. 2004)......................................................................23

*Ex parte Young*,
    209 U.S. 123 (1908)..................................................................................42

*Zambelli Fireworks Mfg. Co. v. Wood*,
    592 F.3d 412 (3d Cir. 2010)......................................................................49

**Statutes**

25 P.S. § 2645 ..........................................................................................47

25 P.S. § 2502 ...........................................................................................................35

25 P.S. § 2561 ...........................................................................................................47

25 P.S. § 2621 .............................................................................................................3

25 P.S. § 2641 ..............................................................................................47, 50, 51

25 P.S. § 2642 ....................................................................................................47, 50

25 P.S. § 2687 ....................................................................................................20, 35

25 P.S. § 3050 ..............................................................................................37, 38, 60

25 P.S. § 3146.2 ...................................................................................................57, 67

25 P.S. § 3146.2a .......................................................................................................34

25 P.S. § 3146.2b ...........................................................................31, 32, 33, 38, 59

25 P.S. § 3146.8 ..........................................................................................31, 33, 35

25 P.S. § 3150.12a .....................................................................................................34

25 P.S. § 3150.12b ...............................................................................................32, 33

42 U.S.C. § 1973i ........................................................................................................6

42 U.S.C. § 1983 ............................................................................15, 44, 64, 65

**Other Authorities**

Fed. R. Civ. P. 8 .......................................................................................................55

Fed. R. Civ. P. 12 .....................................................................................................55

Fed. R. Civ. P. 19 ...............................................................................................49, 50

Pa. Const. art. IV, §1 ...............................................................................................47

Pa. Const. art. IX, §4 ...............................................................................................47

Pa. Const. art. IX, §14 .............................................................................................47

U.S. Const. art. I ................................................................................................46, 73

U.S. Const. art. XI ...........................................................................................*passim*

U.S. Const. art. XIV .........................................................................................*passim*

## **INTRODUCTION**

Defendant Kathy Boockvar admits:  "free, fair, and transparent public elections are crucial to democracy" (*See* Secretary's Answer and Affirmative Defenses (ECF # 492), ¶ 18); "democratic elections should reflect the free expression of the will of the people" (*Id*. at ¶ 19); and, "[a] free and fair election requires ballot security." (*Id*. at ¶ 247).  The Secretary also admits "the right of qualified citizens to vote is recognized as a fundamental right under the First and Fourteenth Amendments of the United States Constitution" and the Pennsylvania Constitution (*Id*. at ¶¶ 21, 222, 245), and "the right to cast a ballot and have it counted is included within the fundamental right to vote" (*Id*. at ¶ 22).  Additionally, "the Secretary admits that the Equal Protection Clause prevents the government from treating similarly situated voters differently without a compelling reason for doing so" (*Id*. at ¶ 236), and "the equal enforcement of election laws is necessary to preserve fundamental voting rights" (*Id*. at ¶¶ 235, 237 (emphases added)).

Yet, her actions and guidance memos—illegal and contrary to the safeguards required by Pennsylvania's Election Code—fail to adhere to these basic principles.  In the 2020 Primary Election, for example, the Secretary admits that her own January guidance (*id*. at ¶ 115) prohibited, prompted "certain counties" but not all counties to "authorize[] the return of absentee ballots" in unstaffed locations.  (*Id*. at ¶ 124.)  The Secretary admits "that some counties have announced plans to use drop boxes to collect absentee and mail-in ballots for the November 3, 2020 General Election," just as they did in the Primary Election.  (*Id*. at ¶ 156.)  Her recent guidance memos on August 19 (*id*. at ¶ 152), September 11 (*id*. at ¶ 173), and September 28 do nothing to change this unequal system of voting.

By her own admissions, the Secretary has implemented and is implementing an unequal, unfair, and haphazard system of voting across the Commonwealth's 67 counties, burdening the

fundamental right to vote, treating similarly situated voters differently across the Commonwealth, diluting the vote, and violating the First and Fourteenth Amendments of the United States Constitution. Under the Secretary's guidance memos, the use of unstaffed, unmonitored, staffed, and/or monitored drop boxes is inconsistent throughout the Commonwealth. (App. Ex. 23, August 19, 2020, Pennsylvania Absentee and Mail-in Ballot Return Guidance; *see, e.g.,* App. Ex. 39 (Montgomery County, 11 unstaffed drop boxes in public parks and parking lots); App. Ex. 37 (York County, one drop box monitored under video surveillance); App Ex. 58 (Allegheny County, no unstaffed or unmonitored drop boxes); App Ex. 43 (Monroe, no drop boxes of any kind).) The failure to promote and equal voting scheme is reason enough to find the Secretary's guidance unconstitutional. Even worse, unstaffed and unmonitored drop boxes create a severe risk of illegal ballot casting, through unlawful third-party ballot harvesting and fraudulent votes. Taking it one step further, the Secretary's guidance memos then prohibit counties from verifying *any* absentee or mail-in votes dropped at these locations. (App. Ex. 24, Sept. 11 Guidance; App. Ex. 25, Sept. 28 Guidance.) This ensures no ballot security, illegal ballots are cast, and qualified elector's ballots are diluted through this haphazard system of voting.

Thus, by her own admission, the Secretary is failing to provide a free and fair November 3, 2020 General Election. Plaintiffs have proven the elements of their case, and Defendants' various responses have not created any genuine issue of material fact or demonstrated that Plaintiffs are not entitled to judgement as a matter of law. The Secretary's guidance memos and Defendants' inconsistent and haphazard implementation of them places a severe burden on Plaintiffs' fundamental rights by (a) diluting the votes in Pennsylvania through the allowance of illegal ballots to be cast, (b) otherwise treating in-person and by-mail voters differently across the entire state and (c) treating mail in voters differently depending on their county of residence. Defendants' actions violate equal protection and substantive due process, for which no compelling

2

government interest exists and/or has been achieved via means that are narrowly tailored. Plaintiffs' requested relief is warranted and necessary to ensure a free and fair 2020 General Election, and Defendants offer nothing to countenance against that conclusion.

Accordingly, Plaintiffs ask this Court to deny Defendants' cross-motions for summary judgment and grant Plaintiffs' summary judgment motion in its entirety.

## RESPONSE TO FACTUAL AVERMENTS

### I.   UNDISPUTED MATERIAL FACTS.

A comprehensive review of the Defendants' 15 separate Motions for Summary Judgment, Briefs in Support and Appendices (*see* ECF ## 506 – 508, 512 – 549) reveals that, as a general matter, Defendants do not dispute the factual record as set forth in Plaintiffs' Memorandum (ECF # 509, at p. 7-34) regarding the following categories of facts:

a)   Plaintiffs include qualified electors and U.S. Representatives;

b)   the protections afforded under the United States and the Pennsylvania Constitutions guarantee qualified electors and citizens the equal enjoyment of the right to vote;

c)   Pennsylvania's history of in-person voting and the advent of no excuse mail-in voting with the passage of Act 77, which enacted procedures that mirror the procedures for absentee voting as to verification of mail-in applications and ballots;

d)   the Secretary's oversight authority (and not rule-making authority) under 25 P.S. § 2621(a)-(g);

e)   the terms of Secretary Boockvar's August 19, and September 11 and 28, 2020 guidance memos regarding ballot collection plans, signature verification of qualified electors on absentee and mail-in applications and ballots and their impact on the County Boards of Elections' processes for the General Election;

f)   certain Counties intend to ignore the Election Code and follow the September guidance memos as to signature verification and challenge procedures for absentee and mail-in applications and ballots;

g)   the terms of Secretary Boockvar's January 10, 2020 guidance memo on the use of drop boxes for the Primary Election;

h) the unequal use and administration (*i.e.*, location, hours of operation, signage, security, staffing, etc.) of drop boxes during the Primary Election;

i) the planned unequal use and administration of drop boxes by the counties for the November General Election;

j) there is no way to prevent third-party delivery of ballots to drop boxes, even with security and/or surveillance measures in place;

k) there is no way to prevent the commingling of ballots returns via a drop box with ballots returned via the U.S. Postal Service or in person to a county elections office;

l) in-person voters will be treated differently from absentee and mail-in voters as a result of the September guidance memos with regard to signature comparison verification and challenges to the same;

m) the function of poll watchers and the Election Code's requirements surrounding the permissible activities of poll watchers; and

n) the County Boards of Election will not permit poll watchers to be present to observe the application process and return of voted absentee and mail-in ballots at drop boxes, satellite elections offices and/or collection centers, and mobile collection centers.

(*See generally*, Defendants' Briefs in Support of their cross-motions, ECF ## 507, 513, 516, 518, 520, 522, 525, 529, 531, 534, 540, 542, 543, 547 & 548); (*See also* Supp. Ex. 64, Summary Chart of Defendants' Answers and Admissions.)[1]

## II.     PURPORTED DISPUTED FACTS.

Defendants attempt to create genuine issues of fact regarding whether:

a) the unequal use and administration of drop boxes results in intentional voter fraud and/or illegal voting;

b) the use of unmanned drop boxes causes constitutional harm to the Plaintiffs;

c) the use of unmanned drop boxes poses a threat to the security of ballots;

---

[1]     It also is undisputed that Sierra Club's Appendix (ECF# 546), Boockvar's Brief in Support of Summary Judgment (ECF # 547), NAACP's Brief in Support of Summary Judgment (ECF # 548), and Boockvar's Appendix (ECF # 549) were filed after this Court's deadline. Therefore, those filing should be stricken and/or ignored.

    d)  the Election Code directs that signatures be compared between an absentee and mail-in application, the voted ballot and the elector's voter registration record;

    e)  Plaintiffs have any made meaningful effort to recruit poll watchers in counties where registered Democrats outnumber registered Republicans; and

    f)  poll watching has a "troubling history" of voter intimidation.

(ECF ## 525, at p. 5-8, 529, at p. 13, 17-18; 542, at p. 3-5; 547, at p. 22-28, 41-41; & 548, at p. 12-17.)   As to these alleged disputes of fact, Plaintiffs rely on and incorporate the Statement of Facts as set forth in their moving Memorandum including the submission of their expert reports which address (a) – (e), above. (ECF # 509, at p. 7-34; *see also* App. Ex. 19, Riddlemoser Rep.; App. Ex. 20, Lockerbie Rep.). In the interests of brevity and given the parties' already voluminous briefing, Plaintiffs will not repeat those facts herein.  Plaintiffs address in their Argument section below each of the Defendants' arguments based those disputes.

    The disputed facts identified in (f) above are solely raised by the Alliance Intervenor Defendants in a section titled "[a] troubling history of poll watching" in their moving brief. (*See* ECF # 525, at p. 5-9). As an initial matter, the Alliance Intervenor Defendants' salacious, unsubstantiated, false and inflammatory accusations that the Plaintiffs in this matter "have … perpetrated" "these instances of voter intimidation" should be outright rejected as wholly improper.  (*See id.* at p. 6)  Furthermore, the Court should reject and decline to consider, in any fashion, these Alliance Intervenor Defendants' statements as being completely irrelevant to the disposition of Plaintiffs' as-applied constitutional challenges to the county residency restriction for poll watchers.[2] *See PG Publ. Co. v. Aichele*, 902 F. Supp. 2d 724, 735 (W.D. Pa. 2012)

---

[2]    While Federal Rule of Evidence 201 permits a federal court to judicially notice a newspaper article's existence, the Alliance Intervenors go further than that in asking the Court to consider as fact the *statements* made in the articles they reference.  *See Selkridge v. United of Omaha Life Insurance Co.*, 360 F.3d 155, 162, n. 5, 45 V.I. 712 (3d Cir. 2004); (*see* ECF # 525, at p. 5-9).  As stated by Judge Fischer, "[t]here is an obvious difference between accepting the *fact* of an article's existence and accepting the *truth* of the statements contained therein." *PG Publ. Co.*, 902 F. Supp.

(declining to consider statements derived from a news conference as being irrelevant to the case.)

(citing *Cavert Acquisition Co. v. National Labor Relations Board*, 83 F.3d 598, 609-610 (3d Cir. 1996)).  In contrast to the incendiary fiction of alleged Republican-driven voter suppression authored by the Alliance Intervenor Defendants, Plaintiffs' claims for relief in this matter based on the county residency requirement center on the entirely legal activity of poll watching allowed under Pennsylvania law.  There is absolutely no support for the notion that because Plaintiffs are Republicans, their poll watcher claims are designed to promote voter intimidation.[3]

The Court should not countenance the Alliance Intervenor Defendants' improper attempt to poison the well against the Plaintiffs by reference to such accusatory statements. Similarly lacking support is the Secretary's bald assertion of a "long" history of safe, free and fair elections. A review of just the post 20 years reveals myriad instances of voter fraud and other voting irregularities. (*See* Supp. Ex. 65, Pictures of Destroyed Statutes, Riot Damage and Stolen Mailbox; Supp. Ex. 66, Ballot Harvesting; Supp. Ex. 67, Listing of Voting Irregularities of Pennsylvania).

## III.   PLAINTIFFS' SUPPLEMENTAL FACTS.

In further support of Plaintiffs' Motion for Summary Judgment and to oppose certain of the Moving Defendants' cross arguments, Plaintiffs respectfully submit their Supplemental

---

2d at 735. Here, the Court should decline to consider as "fact" the hearsay statements in the articles referenced by the Alliance Intervenors. The same holds true for the Secretary's reliance on statements in news articles regarding the Donald J. Trump Campaign. (ECF # 547, at p. 31, 66).

[3]     In fact, there are no reported filed actions against any member of the Republican party related to poll watching activities in Pennsylvania, and the Alliance Intervenors have cited none. In contrast, the only reported filed case involving poll watching activities that has been known to be filed involved the New Blank Panther Party as a result of its activities during the 2008 General Election in Philadelphia.  *See United States of America v. New Black Panther Party for Self Defense et al.*, Civ. A. No. 09-cv-00065 (E.D. Pa. Jan. 1, 2009) (*see* ECF # 1).  That case resolved with a default judgment entered against the leader Minister King Samir Shabazz enjoining him from displaying a weapon within 100 feet of any open polling location on any election day in the City of Philadelphia, or from otherwise violation 42 U.S.C. § 1973i(b).  (*See id.* at ECF # 22.)

Appendix with the Supplemental Declarations of James J. Fitpatrick, Representative Glenn Thompson, Representative Mike Kelly, Representative Guy Reschenthaler and Representative John Joyce. (*See* Supp. App. Ex. 59, Supp. App. Ex. 60, Supp. App. Ex. 61, Supp. App. Ex. 62, and Supp. App. Ex. 63).   The facts as set forth in these Supplemental Declarations are addressed below with regard to the issues of standing and the poll watcher as-applied challenges.

## REPLY/RESPONSE ARGUMENT

In their responses to Plaintiffs' motion and their cross-motions for summary judgment, the Secretary, the Defendant County Boards of Elections, and the Defendant Intervenors raise several unavailing reasons why Plaintiffs are not entitled to summary judgment on their claims while Defendants purportedly are entitled to such judgment.  In making their arguments, Defendants do not argue that genuine issues of any material fact preclude the entry of judgment in Plaintiffs' favor.  Instead, Defendants argue certain legal defenses and/or doctrines that purportedly bar the relief Plaintiffs seek.  Defendants' arguments are without merit.

**I.     THE UNDISPUTED FACTS SHOW PLAINTIFFS WILL SUFFER PARTICULARIZED INJURY AND HAVE STANDING TO BRING THEIR CLAIMS.**

Plaintiffs have provided undisputed facts showing they suffered and will continue to suffer concrete injury.  The Congressional and Individual Voter Plaintiffs will suffer harm as voters whose votes will be diluted, and/or as political candidates whose elections will be affected. (Compl.,[4] ¶¶ 9-12 & 14-15; App. Ex. 3,[5] Aff. of Melanie Patterson, ¶¶ 3-10; App. Ex. 4, Decl. of Glenn Thompson, ¶¶ 22; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶¶ 4-14; App. Ex. 5, Decl.

---

[4]     References to the Complaint are to the Verified Second Amended and Supplemental Complaint filed on September 23, 2020, at ECF # 461.

[5]     References to the Appendix in Support of Plaintiffs' Motion for Summary Judgment, filed on October 1, 2020, shall be indicated as "App. Ex.," followed by a brief description and/or page reference.

of George Joseph Kelly, Jr., ¶¶ 5-17; App. Ex. 7, Decl. of John Patrick Joyce, ¶¶ 4-13; Supp. App. Ex.[6] 59, Supp. Decl. of Glenn Thompson, ¶¶ 4-11; Supp. App. Ex. 60, Supp. Decl. of Guy Lorin Reschenthaler, ¶¶ 4-14; Supp. App. Ex. 61, Supp. Decl. of George Joseph Kelly, Jr., ¶¶ 4-11; Supp. App. Ex. 62, Supp. Decl. of John Patrick Joyce, ¶¶ 4-13.)   Also, the Republican National Committee has Article III standing to assert its own injury and the rights of its members s created by the Secretary's unconstitutional guidance memos and the Defendant County Boards of Elections' haphazard administration of such guidance, which favors absentee and mail-in voting over in-person voting, which most Republicans plan to do in the upcoming General Election. (Supp. App. Ex. 63, Supp. Decl. of James Fitzpatrick, ¶¶ 11-2.)   Finally, like the Congressional Plaintiffs and the RNC, President Trump's campaign committee has standing as the committee representative of the RNC and as a committee representing the candidate whose election will be impacted by the Defendants' proposed election processes and/or their arbitrary and disparate treatment of voters.  (App. Ex. 2, Decl. of James Fitzpatrick, ¶¶ 4-30; Supp. App. Ex. 63, Supp. Decl. of James Fitzpatrick, ¶¶ 10.)  Accordingly, Defendants' argument that Plaintiffs lack Article III standing fails because the harm Plaintiffs face is concrete, particularized, immediate, and redressable by this Court.

A.   **In Cases Seeking Declaratory or Injunctive Relief, Article III Standing Exists When at Least One Plaintiff Has Any Redressable Injury Caused By The Defendants' Actions.**

"The standing inquiry [under Article III of the U.S. Constitution] ... focuse[s] on whether the party invoking jurisdiction ha[s] the requisite stake in the outcome when the suit [i]s filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008).  "To establish that stake, a plaintiff must show three

---

[6]     References to the Supplemental Appendix in Response to Defendants' Cross-Motions for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment, filed contemporaneously herewith, shall be indicated as "Supp. App. Ex.," followed by a brief description and/or page reference.

elements: injury-in-fact, causation, and redressability." *Constitution Party v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014). "A plaintiff has standing in federal court if the party can allege an injury in fact caused by the defendant that can be redressed by the courts." *Pierce v. Allegheny County Bd. of Elections*, 324 F. Supp. 2d 684, 692-93 (W.D. Pa. 2003). Moreover, whether standing exists "in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal." *Whitemore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

For Article III standing to exist, the injury must be concrete and particularized, as well as "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted). "Immediacy, in this context, means reasonably fixed and specific in time and not too far off." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1193 (11th Cir. 2009). As the Eleventh Circuit explained in the context of an election: "[i]mmediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conf. of The NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (finding immediacy requirement met in challenge to election laws made several months before the 2008 General Election).

Standing "requires only a minimum showing of injury." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008). And that injury is not confined to economic harm. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686 (1973). As our Supreme Court explained:

> "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation -- even though small -- from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs

> with no more at stake in the outcome of an action than a fraction of
> a vote, … a $5 fine and costs, … and a $1.50 poll tax …. "The basic
> idea that comes out in numerous cases is that an identifiable trifle is
> enough for standing to fight out a question of principle; the trifle is
> the basis for standing and the principle supplies the motivation."

*SCRAP*, 412 U.S. at 689, n.14 (citations omitted)

Standing does not require literal certainty that the anticipated injury will materialize. Rather, it means only that the plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result" of the challenged action.   *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue and that the 'threatened injury [is] certainly pending'") (quoting *Whitemore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Further, injury-in-fact is not based on the number of people affected.  As the Supreme Court has noted, "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."  *SCRAP*, 412 U.S. at 686-88.  Thus, "where a harm is concrete, though widely shared, the Court has found injury in fact."  *FEC v. Akins,* 524 U.S. 11, 24 (1998) (citation omitted).

The causation prong requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  However, "that does not exclude injury produced by determinative or coercive effect upon the action of someone else."  *Bennet, 520 U.S. at 169*. Accordingly, causation is proven when an executive agency's advisory opinions lead to the injury inflicted by those who follow that advice.  *Id.* at 169-71.

The third component of standing (*i.e.*, redressability) examines whether the relief sought, if granted by the court, will likely alleviate the particularized injury alleged by the plaintiff. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982).  In other words, standing exists when "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge,* 454 U.S. at 472.

In multiple-plaintiff cases where only declaratory and injunctive relief is sought, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 52 n.2 (2006).  And if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 264 & n.9 (1977); *see also Bowsher v. Synar,* 478 U.S. 714, 721 (1986) (because union members had standing to challenge statute's constitutionality, court "need not consider the standing issue as to the Union or Members of Congress").

> **B.**  **As Qualified Electors in the Upcoming General Election, the Congressional and Individual Voter Plaintiffs Have Suffered a Redressable Injury Caused by Defendants Sufficient to Confer Standing to Challenge the Secretary's Absentee and Mail-In Voting Guidance Memos and the County Elections Boards' Haphazard Implementation of Them.**

Both the Congressional and Individual Voter Plaintiffs are qualified electors who are registered to vote in the upcoming November 3, 2020 General Election.  (Compl., ¶¶ 9-12 & 14-15); Supp. App. Ex. 59, Supp. Decl. of Glenn Thompson, ¶¶ 6-7; Supp. App. Ex. 60, Supp. Decl. of Guy Lorin Reschenthaler, ¶¶ 6-7; Supp. App. Ex. 61, Supp. Decl. of George Joseph Kelly, Jr., ¶¶ 7-8; Supp. App. Ex. 62, Supp. Decl. of John Patrick Joyce, ¶¶ 6-7; App. Ex. 3, Aff. of Melanie

Patterson, ¶ 3.)  Moreover, four of these Plaintiffs, Congressmen Kelly, Joyce and Reschenthaler and Melanie Patterson Stringhill, votes only in-person at the polls on Election Day.  (Compl., ¶ 14; Supp. App. Ex. 60, Supp. Decl of Guy Lorin Reschenthaler, ¶ 7; Supp. App. Ex. 61, Supp. Decl. of George Joseph Kelly, ¶ 8; Supp. App. Ex. 62, Supp. Decl. of John Patrick Joyce, ¶ 7; App. Ex. 3, Aff. of Melanie Patterson, ¶ 4.)  As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately cast votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are differently from those offered or being used in their counties of residence.  (Compl., ¶¶ 221-250; App. Ex. 3, Aff. of Melanie Patterson, ¶¶ 3-8; App. Ex. 4, Decl. of Glenn Thompson, ¶¶ 4-15 & 22; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶¶ 4-9; App. Ex. 5, Decl. of George Joseph Kelly, Jr., ¶¶ 5-13; App. Ex. 7, Decl. of John Patrick Joyce, ¶¶ 4-10; Supp. App. Ex. 59, Decl. of Glenn Thompson, ¶¶ 5-11; Supp. App. Ex. 60, Decl. of Guy Lorin Reschenthaler, ¶¶ 5-11; Supp. App. Ex. 61, Decl. of George Joseph Kelly, Jr., ¶¶ 5-12; Supp. App. Ex. 62, Decl. of John Patrick Joyce, ¶¶ 4-11.)  Thus, as this Court noted years ago, voters like the Congressmen and the Individual Voter Plaintiffs here have Article III standing to challenge the election process in which will be voting and/or participating as voters.  *Pierce*, 324 F. Supp. 2d at 692-93.

Although the Secretary and the other Defendants argue Article III standing requires actual evidence of voter fraud and/or the dilution of Plaintiffs' votes by their actions, the Supreme Court has never recognized standing on the basis of the results – as opposed to the process – of an election, particularly when voters claim a denial of equal protection or due process based on the dilution or debasement of their votes.  For example, in *Baker v. Carr*, 369 U.S. 186 (1962), the

12

Supreme Court upheld the standing of voters who brought an equal protection challenge to a Tennessee statute apportioning its legislative members among the state's 95 counties in such a manner that disfavored the plaintiff voters in the counties in which they resided, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties. *Baker*, 369 U.S. at 206. After noting voters have standing to bring equal protection challenges to complain of vote dilution and observing that "[m]any of the cases have assumed rather articulated the premise in deciding the merits of similar claims," the Supreme Court in *Baker* explained that voters have standing to assert their equal protection claim because:

> [t]hey are asserting a "*plain, direct and adequate interest in maintaining the effectiveness of their votes*," not merely a claim of "the right, possessed by every citizen, to require that the Government be administered according to law ... ." They are entitled to a hearing and to the District Court's decision on their claims. The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.

*Id.* at 208 (emphasis added).

Following *Baker*, the Supreme Court has consistently upheld the standing of voters to challenge the constitutionality of election processes which cause dilution or debasement of their votes without first proving that their particular votes have been actually miscounted, diluted, or debased. *See, e.g., Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 666 (1966) (Virginia residents have standing to seek a declaration that Virginia's poll tax violated the equal protection clause); *Burdick v. Takushi,* 504 U.S. 428, 430 (1992) (Hawaii voter has standing to challenge as unconstitutional the state's ban on write-in candidates); *Dunn v. Blumstein,* 405 U.S. 330, 333, n.2 (1972) (voter has standing to challenge Tennessee's durational residence requirement); *United States v. Hays,* 515 U.S. 737, 744-45 (1995) (voters residing in racially gerrymandered districts have standing to sue); *Gray v. Sanders,* 372 U.S. 368, 375 (1963) (a voter in Georgia may sue to

enjoin that state's allegedly unconstitutional county unit system as a basis for counting votes, holding that "appellee, like any person whose right to vote is impaired, has standing to sue" (citations omitted)).  *See also Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (upholding the district court's determination of standing even though no specific voter had been identified as having been wronged, finding "by their nature, [such wrongs] cannot be specifically identified in advance" but rather are "inevitable," "real and imminent"); Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 71, 91, 97 (3D ED. 2006) (stating that "[i]n general, a person who claims discrimination or a violation of an individual liberty ... will be accorded standing"); Charles Alan Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE § 3531.10 n.62 (3d ed. 2008) (noting  that "[o]rdinarily, courts do not even pause to confirm standing in cases of this sort").

The Congressional and Individual Voter Plaintiffs here are qualified registered electors who will be voting in the upcoming November 3, 2020 General Election and,  have pled a sufficient injury by alleging that, if this Court does not act, there will be no mechanism by which absentee and mail-in ballots could be challenged for alleged violations of the Pennsylvania Election Code and the United States Constitution.  (Compl. ¶¶ 188-90, 218-220.)  Causation is also readily met. It is undisputed that Plaintiffs' challenges are traceable to Defendants' inconsistent or haphazard implementation of Secretary's August 19, September 11, and September 28, 2020 guidance memos which are contrary to Pennsylvania's Election Code and the policies and/or practices of several counties, both before and after their issuance.  (App. Ex. 1, Summary of County Interrogatory Responses; *compare* Franklin County Brief Support Summ. J. (ECF # 520, p. 5) (intending to conduct signature analysis); Perry County Brief Support Summ. J. (ECF # 522, p. 6) (seeking relief if signature guidance deemed to be unconstitutional because they are following it in good faith.) With regard to the redressability prong, the declaratory and injunctive relief that Plaintiffs request

would alleviate their injuries and provide an opportunity to challenge any ballots that may have been improperly cast before the entry of any order by this Court.  (Plaintiffs' Motion for Summary Judgment (ECF # 503-1, Proposed Order).)  Therefore, the Congressional and Individual Voter Plaintiffs here have Article III standing to challenge the election process in which they will be participating as voters.  *Pierce*, 324 F. Supp. 2d at 692-93.

> **C.    As A Political Party, The RNC Has Associational Standing To Challenge The Secretary's Guidance Memos And The County Elections Boards' Haphazard Implementation Of Them As They Relate To Absentee And Mail-In Voting.**

An organization can have Article III standing to sue either on behalf of its members or its own behalf.  *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (noting that associations may have standing on their own right, or standing solely as the representative of its members).  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  The individual participation of an organization's members is "not normally necessary when an association seeks prospective or injunctive relief for its members."  *United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 546 (1996) (citing *Hunt*, 432 U.S. at 343).

In election matters involving voter dilution claims, the courts have consistently found that political parties have Article III standing to bring equal protection and other constitutional challenges to election processes injurious to their members who will vote in an upcoming election.  *See, e.g., Crawford*, 472 F.3d at 951 (7th Cir. 2007) (the state Democratic Party has standing on behalf of its members to challenge the constitutionality of Indiana's voter identification law); *Sandusky County Democratic Party*, 387 F.3d at 573-74 (6th Cir. 2004) (state and county

Democratic committees have standing to assert on behalf of their members a Section 1983 claim challenging whether the Ohio Secretary of State's directive on provisional voting conflicted with the Help America Vote Act); *Pa. Democratic Party v. Republican Party of Pa.*, 2016 U.S. Dist. LEXIS 153944, at *8-9 (E.D. Pa. Nov. 7, 2016) (the Pennsylvania Democratic Party has standing to assert claims of voter interference "to protect the interest of both Democratic candidates running for office and Democratic voters"); *Orloski v. Davis*, 564 F. Supp. 526, 530-31 (M.D. Pa. 1983) (the Pennsylvania Democratic State Committee has standing to assert on behalf of its judicial candidates and member electors an equal protection challenge to the constitutionality of 42 Pa.C.S. § 3133 and cross-filing in statewide judicial races); *Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1025 (N.D. Fl. 2018) (the Florida Democratic state committee has standing to assert on behalf of its candidates and electors a constitutional challenge to the signature analysis provisions of Florida's absentee and provisional voting laws).

Additionally, when a political party devotes its time, money, efforts, and/or other resources "to getting to the polls those of its supporters who would otherwise be discouraged by the [challenged] law from bothering to vote," then the political party has Article III standing on its own.  *Crawford,* 472 F.3d at 951.  "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  *Id.*

The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.  Several circuits have recognized what has come to be known as an Article III "competitive standing" theory whereby a candidate or his political party can show direct injury if the defendant's actions hurt the candidate's or party's chances of prevailing in an election.  *See, e.g., Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (upholding "competitive standing" theory that "potential loss of election" was injury-in-fact sufficient to give

16

local candidate and party officials supporting that candidate standing), *cert. denied*, 567 U.S. 906 (2012); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006) (finding persuasive the argument that a political party has suffered injury-in-fact when "its congressional candidate's chances of victory would be reduced" by defendant's actions because "a political party's interest in a candidate's success is not merely an ideological interest"); *Smith v. Boyle*, 144 F.3d 1060, 1062-63 (7th Cir. 1998) (holding Illinois Republican Party and its chairman had standing to challenge Illinois Constitution's method for selecting state supreme court justices that "denie[d] [its] members ... a fair opportunity to elect candidates of their choice"); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (noting the "well-established concept of competitors' standing" gave representative of Conservative Party sufficient Article III standing because party "stood to suffer a concrete, particularized, actual injury—competition on the ballot from candidates that ... were able to 'avoid complying with the Election Laws' and a resulting loss of votes").

In polls conducted about this year's primary and general elections, many more Republicans than Democrats have said they plan to vote in-person at the polls on Election Day, with 57% of Republicans reporting they plan to vote in person in comparison to 88% of Democrats who say they will vote by mail. *See* Prof. Spencer Kimball, "Montana 2020: Trump Holds Strong as Biden Coalesces Support," EMERSON COLLEGE POLLING, (2020), available at *https://emersonpolling.reportablenews.com/pr/montana-2020-trump-holds-strong-as-biden-coalesces-support.* Moreover, in Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election (Secretary Boockvar's Answer and Affirmative Defenses (ECF # 492), ¶ 212), "nearly 1.5 million Democrats have requested a mail-in ballot — nearly three times the requests from Republicans." *See* L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30,

2020), available at https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html.  For these precise reasons, the RNC has devoted its resources to ensure that its Pennsylvania supporters, who might otherwise be disenfranchised by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day.  (Supp. App. Ex. 63, Supp. Decl. of James Fitzpatrick, ¶ 15.) Further, it has incurred resources to combat the Secretary's directives which seek to favor absentee and mail-in voting over in-person voting, which in-turn favors the election of Democratic candidates over Republican candidates.  (Supp. App. Ex. 63, Supp. Decl. of James Fitzpatrick, ¶¶ 14-15.)  Thus, like the myriad of other courts have ruled, the RNC has suffered a sufficient, redressable injury-in-fact caused by Defendants to itself and its members and candidates, including the Congressional and Individual Voter Plaintiffs and the Donald J. Trump Campaign, to have Article III standing to challenge the constitutionality of the Secretary's August 19, September 11, and September 28, 2020 guidance memos and the Defendant County Boards of Elections' unequal and inconsistent implementation thereof.

> **D.    As Candidates, the Congressional Plaintiffs and the Trump Campaign Have Article III Standing to Challenge the Secretary's Guidance Memos and the County Elections Boards' Haphazard Implementation of Them as They Relate to Absentee and Mail-In Voting.**

Like political parties, a candidate has Article III standing when a challenged election process "threaten[s] his election prospects and campaign coffers."  *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006).  Moreover, "after the primary election, a candidate steps into the shoes of his party, and their interests are identical."  *Benkiser*, 459 F.3d at 586-87. Accordingly, courts have regularly recognized that candidates have Article III standing to challenge election processes that affect the chances of winning an election.  *See, e.g., Aichele*, 757 F.3d at 360-68 (independent candidates had standing to challenge the constitutionality of the

18

Election Code's cost assessment provisions for nomination challenges); *Krislov v. Rednour,* 226 F.3d 851, 857 (7th Cir. 2000) (by incurring the expense of using registered and resident circulators, candidates had Article III standing to challenge state's signature requirement even though they acquired enough signatures to be placed on ballot); *Fulani v. Hogsett,* 917 F.2d 1028, 1030 (7th Cir. 1990) (the additional expense of campaigning against candidates who should not be on the ballot provides candidate with Article III standing); *Fulani v. League of Women Voters Educ. Fund,* 882 F.2d 621, 626-27 (2d Cir. 1989) (independent presidential candidate had standing to challenge League of Women Voter's decision to deny her the right to participate in the Democratic and Republican primary debates); *Common Cause v. Bolger,* 512 F. Supp. 26, 30-31 (D.D.C. 1980) (candidates and campaign participants had standing to challenge franking statute which allegedly conferred unlawful benefit on incumbents seeking reelection, on grounds that granting subsidy to incumbents taints the political process and renders it unfair). *See also In re General Election-1985,* 531 A.2d 836, 838 (Pa. Commw. Ct. 1987) (a candidate for office in the election at issue suffers a direct and substantial harm sufficient for standing to contest the manner in which an election will be conducted).

Here, for the same reasons that the RNC has associational standing, the Congressional Plaintiffs and the Donald J. Trump Campaign have Article III standing. Akin to the RNC, the Congressional Plaintiffs and the Campaign have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day. (App. Ex. 4, Decl. of Glenn Thompson, ¶¶ 4-15 & 22; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶¶ 4-9; App. Ex. 5, Decl. of George Joseph Kelly, Jr., ¶¶ 5-13; App. Ex. 7, Decl. of John Patrick Joyce, ¶¶ 4-10; Supp. App. Ex. 63, Supp. Decl. of James Fitzpatrick, ¶ 12; Supp. App. Ex. 59, Decl. of Glenn Thompson, ¶

12; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶ 12; Supp. App. Ex. 60, Decl. of George Joseph Kelly, Jr., ¶ 13; Supp. App. Ex. 61, Decl. of John Patrick Joyce, ¶ 12.)   Accordingly, the Congressional Plaintiffs and the Donald J. Trump Campaign have sufficient Article II standing to represent themselves and their supporters, like the Individual Voter Plaintiffs, to pursue the constitutionality challenges they have asserted against Defendants as they relate to the Secretary's guidance memos and Defendants' haphazard and inconsistent administration of them and for which this Court has the authority to redress through the declaratory and injunctive relief to which Plaintiffs submit they are entitled.

>    **E.**    **All Plaintiffs Have Article III Standing To Assert Their As-Applied Challenge To The Pennsylvania Election Code's County Residency Requirement for Poll Watchers.**

As for Plaintiffs' as-applied challenge to the Pennsylvania Election Code's county residency requirement for watchers, all Plaintiffs have Article III standing to assert this claim. Under the Election Code, both candidates and political parties are empowered to appoint watchers. 25 P.S. § 2687.  Moreover, any "qualified elector" may serve as a watcher.  *Id.*  However, Section 2687 restricts all watchers and the power of appointment for such watchers to the county of the watcher's residence.  *Id.*   Consequently, as a result of Section 2687's county residency requirement, the Congressional Plaintiffs, the RNC, and the Campaign have sustained a redressable injury-in-fact in that they lack sufficient watchers to place in all areas within their election districts where voting (whether in-person or by mail) is occurring for the upcoming November 3, 2020 General Election, which injury can be alleviated by the declaratory or injunctive relief Plaintiffs seek from this Court.  (App. Ex. 2, Decl. of James Fitzpatrick, ¶ 2; App. Ex. 4, Decl. of Glenn Thompson, ¶¶ 16-22; App. Ex. 6, Decl. of Guy Lorin Reschenthaler, ¶¶ 10-14; App. Ex. 5, Decl. of George Joseph Kelly, Jr., ¶¶ 4-17; App. Ex. 7, Decl. of John Patrick Joyce, ¶¶ 11-13; App. Ex. 2, Decl. Of James Fitzpatrick, ¶¶ 20-30.)

Additionally, as to the Individual Voter Plaintiffs, they desire to engage in poll watching in any county that the Congressional Plaintiffs, the RNC, and/or the Donald J. Trump Campaign may need their services.   (Compl., ¶¶ 14-15; App. Ex. 3, Melanie Patterson Aff., ¶¶ 9-10.) However, because of the Election Code's county residency restriction, their ability to fully support their political party and candidates of choice is restricted.  *Id.*  Thus, the Individual Voter Plaintiffs have suffered an injury-in-fact which this Court can address by the declaratory or injunctive relief Plaintiffs seek.

Accordingly, as for Plaintiffs' as-applied challenge to the Election Code's county residency requirement, all Plaintiffs have Article III standing.

**F.    Defendants' Arguments Concerning Generalized Grievance, Justiciability. Mootness, and Third-Party Standing Are Not Supported By The Undisputed Facts Submitted by Plaintiffs.**

**1.    *Plaintiffs' Evidence Establishes Particularized, Concrete, and Imminent Injury Sufficient To Confer Article III Standing Over Their Constitutional Claims.***

Defendants' argument that Plaintiffs' claims are nothing more than "generalized objections to state election laws" overlook three important facts.  [*First*], all of Plaintiffs' claims are premised upon a denial of equal protection and substantive due process.  The Texas Supreme Court noted years ago, "voters [who] assert a denial of equal protection … often have standing to bring [that claim]."  *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 8 (Tx. 2011) (citations omitted).  *See also supra*. pp. 7-15.

*Second*, this case involves four votes who either vote only in-person and/or intend to vote in-person in the upcoming election.  (Supp. App. Ex. 60, Supp. Decl of Guy Lorin Reschenthaler, ¶ 7; Supp. App. Ex. 61, Supp. Decl. of George Joseph Kelly, ¶ 8; Supp. App. Ex. 62, Supp. Decl. of John Patrick Joyce, ¶ 7; App. Ex. 3, App. Ex. 3, Melanie Patterson Aff., ¶ 4.)  Also, three of the Congressional Plaintiffs and both of the Individual Voter Plaintiffs live in counties where drop

boxes are not being used.  (Supp. App. 62, Supp. Decl. of Mike Kelly, ¶ 5; Supp. App. 61, Supp. Decl. of Guy Reschenthaler, ¶ 4; Supp. App. 59, Supp. Decl. of John Joyce, ¶ 4; App. Ex. 1, Summary of County BOE Discovery Responses, Fayette County.)  Thus, these Plaintiffs have the particularized, concrete, and imminent injury necessary to confer Article III standing.  *See Gray, 372 U.S. at 375* (holding that "appellee, like any person whose right to vote is impaired, has standing to sue" (citations omitted)); *ACLU of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)* ("Though many of the burdens identified by the Plaintiffs now have a different legal significance given the Supreme Court's decision in *Crawford*, we are satisfied that, at the outset of this litigation, the evidence supporting the Plaintiffs' claim of unequal treatment of in-person voters vis-à-vis absentee voters is sufficient injury to confer standing, and the relief requested would solve the perceived problem.  The injury in fact is the denial of equal treatment.")

Third, Plaintiffs have offered undisputed material evidence from the June 2020 Primary Election where vote dilution occurred through the counting of illegally cast votes.  (*See, e.g.* App. Ex. 19; Ex. D to Mr. Riddlemoser's Expert Report (containing copies of photographs and video stills demonstrating ballot harvesting in Philadelphia and Elk Counties); App. Ex. 28, Email from Lee Soltysiak ("Security was instructed before the boxes were in use on Saturday to instruct voters they can only drop off their own ballot.  They have turned people away yesterday and today without incident who had ballots other than their own.").).  Indeed, in the Act 35 Report, the Secretary admits that despite Pennsylvania's long-standing law against third-party delivery and ballot harvesting, absentee and mail-in ballots were delivered in that manner—many to unmanned and unstaffed drop boxes in the southeastern counties.  (App. Ex. 9, Boockvar Dep. 92:4-10, Boockvar Dep. Ex. 18; App. Ex. 53, Act 35 Report.)

These three undisputed facts render the cases cited by the Secretary and the other Defendants inapposite. *See, e.g., Martel v. Condos, Case No. 5:20-cv-131, 2020 WL 5755289, 2020 U.S. Dist. LEXIS 182693 (D. Vt., Sept. 16, 2020)* (no equal protection claims asserted); *Donald J. Trump for President v. Cegavske, No. 2:20-CV-1445 JCM (VCF), 2020 U.S. Dist. LEXIS 172052 (D. Nev., Sep. 18, 2020)* (no individual voter joined as a plaintiff); *Paher v. Cegavske, No. 3:20-cv-00243-MMD-WGC, 2020 U.S. Dist. LEXIS 76597 (D. Nev., Apr. 30, 2020)* (no evidence of illegally casted ballots). Accordingly, these cases do not control the question of Plaintiffs' standing.

Defendants' position would create a blanket rule ensuring no one could ever had standing to challenge an unconstitutional election processes. Our Supreme Court has rejected that position on several occasions. *See* Argument *supra.*, pp. 7-11. This Court should do the same.

### 2.    Plaintiffs' Claims Are Ripe and Justiciable.

Defendants' arguments over justiciability and the ripeness and/or mootness of Plaintiffs' claims are incorrect. Ripeness requires that a conflict "'have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.'" *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands, 385 F.3d 801, 806 (3d Cir. 2004)* (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 244 (1952)*). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Wyatt, 385 F.3d at 806.* Mootness is based on the same principle but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Merle v. U.S., 351 F.3d 92, 94 (3d Cir. 2003)* (quoting *Powell v. McCormack, 395 U.S. 486, 496 (1969)*).

"Justiciability in [election] cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election." *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 737 n. 8 (1974); *Rosario v. Rockefeller*, 410 U.S. 752, 756 n. 5 (1973); *Dunn*, 405 U.S. at 333 n. 2).  "There is value in adjudicating election challenges … because 'construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated *before* an election is held.'" *Id.* (citing *Storer*, 415 U.S. at 737 n. 8).  Although waiting to decide an election challenge until after the election procedure is in practice "would remove any doubt about the existence of concrete injury resulting from application of the election provision, little could be done to remedy the injury incurred in the particular election." *Id.*  Here, if the instant action is not decided now, before the November General Election, Plaintiffs would suffer an irreparable injury—an unfair, unequal election—to which there would be no remedy.  Accordingly, the Court should not delay its decision but promptly evaluate now whether the Secretary's guidance memos and the Commonwealth's poll watcher residency requirement as applied are unconstitutional.

Moreover, Plaintiffs' injury is anything but hypothetical.  Defendants' drop box policies caused the same injuries to occur in the June 2020 Primary Election, and those policies remain in effect today, just 30 days from the General Election.  (*See* Plaintiffs Verified Amend. Compl. (ECF # 234), ¶190 ("The current voting regime as employed by Defendants, including the January 10, 2020, January 30, 2020, and the March 5, 2020 Guidelines, and the May 28, 2020 Directive, remain in place ….").)  Considering the Secretary has issued three guidance memos since the initiation of this lawsuit, and failed to remedy her illegal regulations, it is not speculative to assume that these policies will remain unchanged for the November election and cause the same, or worse, injury.  Indeed, it would be speculative to assume that the policies *will* be modified in a manner that does not violate the Election

Code.  Plaintiffs' claims are, therefore, not purely hypothetical but are based on events that are likely to repeat themselves in a matter of weeks.

Likewise, the end of the June Primary Election does not render Plaintiffs' claims moot.  "Cases in which apparently moot claims are likely to arise again have long been gathered under the 'capable of repetition yet evading review' exception to the mootness doctrine."  *De La Fuente v. Cortes*, 261 F. Supp. 3d 543, 549 (M.D. Pa. 2017) (citing *Merle*, 351 F.3d at 94), *aff'd*, 2018 U.S. App. LEXIS 21904 (3d Cir. Aug. 7, 2018).  Under this exception, "a court may exercise its jurisdiction and consider the merits of a case that would otherwise be deemed moot when '(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'"  *Merle*, 351 F.3d at 95 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

As Defendants fail to acknowledge, "the ['capable of repetition yet evading review'] exception readily applies to most election cases."  *De La Fuente*, 261 F. Supp. 3d at 549; *see also Merle*, 351 F.3d at 94 ("This controversy, like most election cases, fits squarely within the 'capable of repetition yet evading review' exception to the mootness doctrine."); *Morse v. Republican Party*, 517 U.S. 186, 235 n. 48 (1996) ("Like other cases challenging electoral practices, therefore, this controversy is not moot because it is 'capable of repetition, yet evading review.'").  This exception, "in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks."  *Storer*, 415 U.S. at 737 n.8 (1974).  "The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held."  *Id.*

The case of *De La Fuente* is instructive here.  There, a presidential candidate who unsuccessfully sought the Democratic nomination and was then blocked from running as an

independent candidate in the 2016 presidential election sued to challenge the Pennsylvania statute that blocked his bid to run as an independent, claiming the same law threatened his plans to run in the 2020 presidential election. *De La Fuente*, 261 F. Supp. 3d at 547. The defendant election officials, similar to Moving Defendants here, argued that any claims arising out of the 2016 election were moot because the election was over and any claims related to the 2020 election were hypothetical and thus not ripe. *Id.* at 549. Later affirmed by the Third Circuit, the Middle District of Pennsylvania rejected that argument, finding that the plaintiff's claims were "not purely hypothetical but are grounded in factual occurrences that are susceptible to repetition." *Id.* Likewise, the court found that the plaintiff's claim fell within the "capable of repetition yet evading review" exception to the mootness doctrine because the plaintiff had expressed his intention to run in the 2020 election, "where he is likely to face the same obstacles and raise the same claims again." *Id.* In so holding, the court pointed out the catch-22 the plaintiff would find himself in if the defendants' arguments were accepted: "Plaintiff's grievances arise when Pennsylvania's election laws impede his campaign efforts, which is most likely to occur mere months before the election cycle ends." *Id.* "Plaintiff could not fully litigate his claim in a matter of months and, therefore, will always bump against a jurisdictional bar." *Id.*

Defendants' arguments should be rejected for the same reason. As in *De La Fuente*, Plaintiffs' claims in this case credibly allege that history is likely to repeat itself given that the challenged policies implemented by Defendants and utilized during the June primary remain in place as the parties hurtle toward the November election. *See also Morse*, 517 U.S. at 235 n.48 (action challenging delegate registration fee for Republican Party's nominating convention was not mooted by end of the 1994 convention because "the Party has not disavowed the practice of imposing a delegate filing fee for its nominating convention," making the dispute capable of repetition); *see also Arcia v. Sec'y of Florida,* 772 F.3d 1335, 1343 (11th Cir. 2014) (action alleging Florida was scrubbing its voter rolls of suspected non-citizens within 90 days of a federal election in violation of the National Voter Registration Act was

not mooted by the passage of the election because the Florida Secretary of State had "not offered to refrain from similar programs within the 90-day window in the future" and "[t]hus, there is a reasonable expectation that the plaintiffs will be subject to the same action again").

Further, if Plaintiffs' claims are deemed moot or unripe, Plaintiffs would find themselves in the same catch-22 as the plaintiff in *De La Fuente*, being forced to wait until the eve of the election to sue when, at that time, it will be too late for Plaintiffs to fully litigate their claims and obtain relief. *See Arcia*, 772 F.3d at 1343 (holding that actions taken within 90 days prior to an election "were in their duration too short to be fully litigated prior to their cessation or expiration"). Indeed, Defendants' argument that Plaintiffs' claims are unripe unless and until Defendants finish issuing all the guidance memos the Secretary has planned for the November election would place this Court's jurisdiction entirely under Defendants' control and would permit Defendants to insulate their illegal conduct from judicial scrutiny simply by withholding such new guidance until it is too late to be challenged or by failing to issue such new guidance altogether.

Once again, the cases cited by Defendants are readily distinguishable. In *Constitution Party, 712 F. Supp. 2d at 400*, the court found a lack of ripeness in the plaintiffs' challenge to provisions of the Pennsylvania Election Code allowing taxing of litigation costs and attorneys' fees against minor party candidates defending challenges to their nomination papers because there was "no present controversy, no pending challenge to a nomination paper, and the opinion would not provide specific relief to anyone." None of those defects are present here. Plaintiffs' constitutional claims challenge in-force policies implemented by Defendants that have resulted in unconstitutional vote dilution in the June primary and, unless enjoined by this Court, will cause Plaintiffs the same injury in November.

Nor does the case of *Green Party of Pennsylvania v. Aichele*, 103 F. Supp. 3d 681 (E.D. Pa. 2015), support Defendants' argument. In *Aichele*, the court held that the Commonwealth's decision to alter its nomination paper forms for minor parties rendered moot the plaintiffs' claims concerning the

requirements of those forms where the challenged requirements had been abandoned in the altered forms.  *Green Party*, 103 F. Supp. 3d at 693-94.  Here, as Plaintiffs' evidence demonstrates, the unlawful policies instituted by Defendants have not been altered or abandoned.  Those policies remain in effect today, and there is no reason to believe Defendants intend to alter or abandon them for the November election.  (Plaintiffs Verified Amend. Compl. (ECF # 234), ¶190.)

### 3. Plaintiffs Have Third Party Standing to Assert Their As-Applied Challenge to the Watcher's County Residency Requirement.

Finally, Plaintiffs have third party standing to assert to assert an an-applied equal protection challenge on behalf of minor parties regarding the poll watcher residency requirement. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). However, the Supreme Court has "recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 410-11 (quoting *Singleton v. Wulff*, 428 U.S. 106, 115-16 (1976)); *see also Holland v. Rosen*, 895 F.3d 272 (3d Cir. 2018). These three factors are balanced with one another to determine third party standing. *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 289 (3d Cir. 2002) (stating that "candidates for public office may be able to assert the rights of voters") (citing *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) ("balancing approach has the virtue of incorporating the *strength* of the showings on each factor") (emphasis in original). *See also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 812 (S.D. Ind. 2006) (third party standing of Democratic Party present on behalf of "voters who have secured or could secure the necessary photo identification but, for some reason, will be unable to present [it] at the polls at the time of voting").

Plaintiffs have suffered an injury in fact since its right to a fair election will be impaired by lack of minor party poll watchers in many Pennsylvania counties. (App. Ex. 5, Decl. George Joseph Kelly, Jr. ¶ 14; App. Ex. 4, Decl. Glenn Thompson ¶¶ 17, 18; App. Ex. 2, Decl. James J. Fitzpatrick ¶¶ 26-27, 30; App. Ex. 6, Decl. Guy Lorin Reschenthaler ¶ 10-11; App. Ex. 7, Decl.

John Patrick Joyce ¶¶ 9, 11-12.)  Plaintiffs also have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties. Lastly, minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors.  Accordingly, Plaintiffs are best suited to assert the rights of these third-parties and have standing to do as such.

## II.  *PULLMAN* ABSTENTION AS TO PLAINTIFFS' POLL WATCHING AND SIGNATURE VERIFICATION CLAIMS IS NOT WARRANTED.

In its September 23, 2020 Memorandum Order and clarifying Order addressing Plaintiffs' Notice of Remaining Viable Claims (ECF # 448), this Court addressed abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), regarding Plaintiffs' claims which remained after the Pennsylvania Supreme Court September 17, 2020, decisions. (*See* Memorandum Order (ECF # 459), p. 5; Clarifying Order (ECF # 460), p. 1).  The Court has already determined that abstention is warranted on Plaintiffs' claims as to: (1) whether drop boxes must comply with the notice and site requirements applicable to other polling places, and (2) regarding Secretary Boockvar's guidance memo addressing verification of in-person, mail-in ballot applications. (*Id.*).  However, the Court did not abstain from the Plaintiffs' Constitutional claims regarding the Secretary's September 2020 guidance memos and the as-applied challenge to the Watcher's county residency requirement – both of which remain viable after the state court decisions.  Certain Defendants now seek to expand the Court's prior abstention determination by arguing that Plaintiffs' claims regarding the Secretary's September signature verification guidance memos and poll watchers raise questions of unsettled Pennsylvania law that should first be decided by the Pennsylvania courts.[7]

---

[7] The Defendants who have raised *Pullman* abstention include: Boockvar Brief Support Summ. J. (ECF # 547), pp. 68-71, 75-77) (as to the poll watcher and signature verification related claims); Bucks, Chester, Montgomery and Philadelphia County Boards Brief Support Summ. J. (ECF # 543), pp. 24-28) (signature verification only); Pa. Dems. Brief Support Summ. J. (ECF # 529) pp. 21-23) (signature verification only); Sierra Club Brief Support Summ. J. (ECF # 542), pp. 29)

Any further abstention by the Court is not warranted. Plaintiffs' signature verification and poll watching claims allege constitutional violations and interpretation of the related straightforward statutory provisions is ancillary to those claims. And resolution of these claims now, by this Court, would provide the urgent and timely direction on important issues for an election that is only a month away, with ballots already being delivered to voters. "[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citations omitted). "[O]nly in 'exceptional circumstances' may federal courts decline to exercise jurisdiction." *Pierce*, 324 F. Supp. 2d at 702 (quoting *Quackenbush*, 517 U.S. at 716). "'The presence of federal-law issues must always be a major consideration weighing against surrender' of jurisdiction." *Grode v. Mutual Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 960 (3d Cir. 1993) (quoting *Moses H. Cone Hosp.*, 460 U.S. 1, 26 (1983)).

Abstention under *Pullman,* is inappropriate because the requisite "special circumstances" are lacking and additional considerations should compel the Court to decline to exercise its discretion to abstain. *Pullman Co.*, 312 U.S. 496. The *Pullman* doctrine requires courts to engage in a two-step process. *First*, the Court must determine whether three "special circumstances" exist:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;

(2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims;

(3) A federal court's erroneous construction of state law would be disruptive of important state policies.

*Chez Sez III Corp. v. Union*, 945 F.2d 628, 631 (3d Cir. 1991). *Second*, only if all three of the "special circumstances" are found to be present, then the Court must "make a *discretionary* determination as to

---

(signature verification only); and Alliance Brief Support Summ. J. (ECF # 525), pp. 19-22) (poll watcher and signature verification claims).

whether abstention is in fact appropriate under the circumstances of the particular case, based on the weight of these criteria and other relevant factors." *Id.* (emphasis added).  Both steps of the *Pullman* analysis warrant the forward progress and resolution in this Court of Plaintiffs' federal law claims.

### A.      State Law Issues Are Clear and Unmistakable.

#### 1.      Plaintiffs' Signature Comparison Verification Claims.

Contrary to the Defendants' assertions seeking to mischaracterize Plaintiffs' signature comparison claims as involving "two plausible, competing interpretations of the state statute," the relevant portions of the Election Code are not "uncertain."  (Boockvar Brief Support Summ. J. (ECF # 547), p. 75.)  Before a court may exercise its discretion to abstain under *Pullman*, it must first determine whether the language of the underlying state law is "clear and unmistakable."  *Hughes v. Lipscher*, 906 F.2d 961, 965 (3d Cir. 1990).  If the language is "clear and unmistakable," the first of the three "special circumstances" is lacking, and *Pullman* abstention cannot be applied.  *Chez Sez III, 945 F.2d at 632*.  If an otherwise ambiguous statute has been authoritatively construed by the state courts, abstention would not be appropriate.  *Id.*  Courts may look to statutory definitions to determine whether the relevant language is "clear and unmistakable."  *NCAA v. Corbett*, 25 F. Supp. 3d 557, 568-69 (M.D. Pa. 2014).

*Pullman* abstention is inappropriate here because the provisions of the Election Code at issue are "clear and unmistakable." The provisions for casting absentee and mail-in ballots provide that the county boards "***shall compare*** the information" on the declaration envelopes with the voter's registration file and "[i]f the county board has verified the proof of identification as required under this act and is satisfied the declaration is sufficient," those absentee and mail ballots are to be canvassed. *See* 25 P.S. § 3146.8(g)(3) (canvassing of absentee and mail-in ballots). The language is similar for the application process for absentee and mail-in ballots. *See* 25 P.S. § 3146.2b(c) (absentee application approval, stating county boards "***shall*** determine the qualifications of such applicant by ***verifying***

***proof of identification and comparing the information set forth in the application with the information contained on the applicant's permanent registration card***") (emphasis added); 25 P.S. § 3150.12b(a) (mail-in application approval with same "shall," "verifying," and "comparing" language as 25 P.S. § 3146.2b(c)). Defendants' arguments that Plaintiffs seek an unsupported interpretation of the Election Code by instilling a non-existent comparison requirement blatantly ignore the clear terms written into the statutes by the General Assembly that signatures shall be compared to the corresponding voter registration records to verify the qualifications of the elector.

Furthermore, the very language which appears in the Election Code and Act 77 in terms of how to properly apply for and cast absentee and mail-in ballots, including the completion, dating, and signing of the declaration on the outside envelope, is identical to the language which the Supreme Court declared in 2004 and reaffirmed in 2017 to be clear, unambiguous, and unequivocally "mandatory" and "substantive provisions of the Election Code" which cannot be ignored or set aside based on a liberal construction in favor of the right to vote. *See Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231 ("The word 'shall' carries an imperative or mandatory meaning."). Hence, as the provisions of the Election Code make clear, county boards of elections are required to compare signatures on applications and voted absentee and mail-in ballots against voter registration records to determine if they are sufficient to approve the application and count those ballots. To hold otherwise would render the statutory language at issue meaningless. The mandatory language of these provisions makes clear that the consequence of a failure to verify a voter's qualification through signature comparison is the denial of that application and the setting aside of that elector's voted ballot. No interpretation by the state courts is necessary.

The Secretary complains that Plaintiffs should be required to litigate their "interpretation" of the signature verification issue in state court, and apparently, Secretary Boockvar "is preparing to petition the Pennsylvania Supreme Court to exercise its extraordinary (or 'King's Bench')

33

jurisdiction" over this issue. (Boockvar Brief Support Summ. J., (ECF # 547, p. 75). The Court should not countenance the Secretary's litigation gamesmanship. It is the Secretary who has created and perpetrated the dispute over signature verification with the issuance of her September guidance memos with now only 36 days until the election. The Secretary already presented her case before the Pennsylvania Supreme Court and did not any time during the pendency of those matters raise the signature verification of mail-in ballot applications and voted ballots. Even if the Pennsylvania Supreme Court were to grant another King's Bench petition and agree with the Secretary's re-writing of the statute, such a decision would still not resolve Plaintiffs' federal equal protection and due process claims. Thus, if the state court decides to take up the issue, Plaintiffs would yet again be required to sit and wait for the Pennsylvania Supreme Court to issue a decision to only then return to this Court to pursue the relief they are seeking now. Plaintiffs submit that repeating such a procedure would unduly waste more time and resources with the election less than 30 days away. Plaintiffs have expended a great amount of resources in this action already to complete discovery and file their Motion for Summary Judgment. In light of the procedural history and the clear and express language of the settled state laws at issue, Plaintiffs request that this Court decline to abstain from their federal law claims even if the Secretary pursues a King's Bench application with the Pennsylvania Supreme Court.

Additionally, the Secretary provides zero justification, let alone a compelling interest (other than being sued by Plaintiffs herein (App. Ex. 12, Boockvar 30(b)(5) Depo. 106:1-4)) for failing to issue September guidance memos earlier this year after the enactment of Act 77. It must be noted that the language of 25 P.S. § 3146.8(g)(3) and 25 P.S. § 3146.2b, as applicable to absentee applications and ballots, has been the law of Pennsylvania for decades and was replicated for mail-in ballots in 25 P.S. § 3146.8(g)(3) and 25 P.S. § 3150.12b(a) in Act 77. In other words, Act 77 did not alter the signature verification procedures. County boards of elections in many prior

elections followed and will continue to following these mandated procedures for voter identification in the November election. (*See* App. Ex. 1, Summary of County Interrogatory Responses identifying Elk, Franklin, Juniata, Mifflin and Wyoming Counties as intending to not follow the September guidance memos; *see also* Adams County Brief Support Summ. J. (ECF # 516, p. 9 (intending to continue verifying identification and qualifications of voters "in precisely the manner Plaintiffs request"); Berks County Brief Support Summ J. (ECF # 531, p. 2 (will perform signature comparison analysis on applications and ballots).

The Secretary's first guidance issued after the passage of Act 77 arrived January 10, 2020 and another guidance shortly thereafter on January 30, 2020. (App. Ex. 21, Boockvar Dep. Ex. 14, January 10, 2020 Pennsylvania Applications and Balloting Guidance: Mail-in and Absentee Ballots and Voter Registration Changes; App. Ex. 22, Pennsylvania Balloting and Envelope Guidance). While those guidance memos addressed the procedures for processing mail-in applications and ballots, they failed to raise the Secretary's new interpretation of the signature verification requirement. Instead, the Secretary waited 8 more months until September 11 and 28, 2020 when the application process for absentee and mail-in ballots had already commenced. *See* 25 P.S. § 3146.2a ("applications for absentee ballots shall be received in the office of the county board of elections not earlier than fifty (50) days before the primary or election"); and 25 P.S. § 3150.12a ("Applications for mail-in ballots shall be received in the office of the county board of elections not earlier than 50 days before the primary or election."). The timing of the September guidance memos renders the Secretary's position on abstention meritless.

### 2.    *Plaintiffs' Poll Watching Claims.*

The Court has already held that Plaintiffs' as-applied challenges to the poll watcher residency requirement do not "directly ask the Court to construe an ambiguous state statute." *Boockvar*, 2020 U.S. Dist. LEXIS 15299, at *54. The Court further explained that the constitutional harm alleged by

Plaintiffs "turns on their inability to recruit enough resident poll-watchers, or distribute them to all key locations within each county, to protect against fraudulent or 'invalid' voting that Plaintiffs say is associated with the use of 'unmonitored' drop-box sites, the counting of ballots without secrecy envelopes, and the other supposed ill-effects of Defendants' policies." *Id.* (citing Plaintiffs' Verified Amended Compl. (ECF # 234) ¶ 228).  Because the Pennsylvania Supreme Court found that drop boxes are permitted under Pennsylvania law, Plaintiffs' need for "expansive poll watching", which is severely hindered by the county residency restriction, has not been eliminated but rather exacerbated. *See id.* at * 55.

Plaintiffs' as-applied challenges are even more critical now given the admitted evidence that 53.5% of the votes cast in the Primary were by absentee and/or mail-in ballots (1.5 million votes cast were by mail-in or absentee ballots, while 1.3 million were in person). (App. Ex. 53, Pennsylvania 2020 Primary Election Act 35 of 2020 Report at 4). This was 7 times the number that voted absentee in the 2016 Primary, when only 84,000 absentee ballots were cast.  (*Id.*).  This restriction of limiting poll watchers to observing a "polling place" only within the county of their residence will greatly hamper poll watching during the 2020 General Election given the expansion of a "polling place" to drop-boxes and other satellite or mobile collection centers where millions of Pennsylvania will now be cast.  *See* 25 P.S. § 2687; and  25 P.S. § 2502(q) (defining a "polling place" as "the room provided in each election district for voting a primary or election.")  Additionally, as more fully argued in Plaintiffs' Memorandum and below, the poll watcher residency requirement creates an arbitrary distinction between representative – which can challenge at pre-canvassing and canvassing but need not be a county resident – and actual poll watchers.  *Compare* 25 P.S. § 2687; 25 P.S. § 3146.8(g)(1.1).

The second *Pullman* factors weighs against abstention; Plaintiffs' poll watching claims should proceed on their merits in this Court.

**B.      Plaintiffs' Federal Constitutional Claims Are Unlikely to Be Narrowed.**

*1.      Plaintiffs' Signature Comparison Verification Claims.*

The second, requisite "special circumstance" for *Pullman* to apply—i.e., that a state court interpretation might narrow or obviate the need for the adjudication of constitutional claims—is also lacking. *Pullman* abstention is usually triggered where "the unsettled issue of state law principally concerns the applicability of the challenged statute to a certain person or a defined course of conduct, whose resolution in a particular matter would eliminate the constitutional issue and terminate the litigation." *Baggett v. Bullitt*, 377 U.S. 360, 376-77 (1964).

Indeed, some of the issues have already been narrowed by past decisions of the Pennsylvania Supreme Court. In *Pierce,* this Court held that the *Pullman* doctrine applied, in large part, because guidance was needed from the state courts on whether the "in-person" requirement for the return of absentee ballots was mandatory or directory. *Pierce,* 324 F. Supp. at 703-04. The Pennsylvania Supreme Court then provided that guidance, holding that the "in-person" requirement and the other requirements in the language of Section 3146.6(a) were mandatory and substantive, such that an absentee ballot cast in violation of such provisions is "void. *Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d at 1231 ("The word 'shall' carries an imperative or mandatory meaning."); *id.* at 1234 ("we hold that Section 3146.6(a)'s 'in person' delivery requirement is mandatory, and that the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are void.").

No further narrowing is possible or necessary here. As noted above, the applicable provisions of the Election Code (which contain the same mandatory provisions of the language interpreted by the Pennsylvania Supreme Court in 2003 and replicated in Act 77 for both absentee and mail-in voting) are clear and unmistakable. And critically, the applicable provisions of the Election Code regarding voter identification through signature verification of electors who vote in person and for provisional

balloting are not disputed by the Defendant. *See* 25 P.S. § 3050(a.3)(1) – (2); *see also Applewhite v. Commonwealth*, 330 M.D. 2012, 2014 Pa. Commw. Unpub. LEXIS 756 (Pa. Commw. Ct., Jan. 17, 2014) (finding voter photo-ID law unconstitutional). Even if a state court were to definitely resolve the purported differing interpretations of the Election Code in the Secretary's favor, that would not in any way alter or moot Plaintiffs' equal protection and due process clams. Indeed, Secretary Boockvar has stated that signature verification is not permitted *at all* under the Election Code for absentee and mail-in ballots. (Ex. 12, Boockvar (30(b)(6)) Dep. 54:2 – 56:19.). By promoting the lack of this procedure for absentee and mail-in voters, Secretary Boockvar is impermissibly creating different classes of voters based on the manner the voter chooses to vote. According to her proffered procedure, absentee and mail-in voters will not be subject to the same verification requirements as in-person voters – the basis for Plaintiffs' federal constitutional claims. Accordingly, these claims cannot be narrowed or avoided. Therefore, abstention under *Pullman* is inappropriate

### 2.      *Plaintiffs' Poll Watching Claims.*

Because the Court has already ruled that Plaintiffs' challenges to the poll watcher residency requirement do not ask the Court to interpret the Election Code, *Boockvar*, 2020 U.S. Dist. LEXIS 15299, at *54, the second *Pullman* factor that an interpretation might narrow or obviate the need for the adjudication of Plaintiffs' as-applied constitutional poll watching claims is entirely lacking.

### C.      **Because The Relevant State Law Issues Are Not Unsettled, There Is No Risk Of Disruption To Pennsylvania's Election Process.**

As argued above and in more detail below as to the substantive merit Plaintiffs' claims based on the September signature verification guidance memos and the rules regarding poll watchers' activities at satellite voting locations, drop boxes, and pre-canvas meetings, there are no unsettled state law issues before this Court requiring interpretation. Consequently, there is no risk

of an "erroneous construction" of Pennsylvania's Election Code that would be disruptive to the Commonwealth's election process. *See De la Fuente*, 207 F. Supp. 2d at 450 (citations omitted).   A decision ordering Pennsylvania counties to follow the Election Code's mandatory signature verification process for absentee and mail-in ballots and applications would maintain the status quo of how the counties have conducted their elections for years prior to the September guidance memos.   There is nothing about Plaintiffs' claims that would require the counties to implement any new systems, training or quality control. (*See* Bucks, Chester, Montgomery, and Philadelphia Boards Briefs Support Summ. J. (ECF # 543) p. 27).   And contrary to Defendants' assertions (*see id.* at p. 28), the Election Code expressly provides a notice and cure period for mail-in electors whose signature could not be verified on either their application or their ballot during the pre-canvass and canvass.   *See* 25 P.S. §§ 3146.2b(d) (requiring notice and opportunity to cure for rejected absentee ballot application); 3150.12b(c) (same for rejected mail-in ballot application); & 3146.8(h) (allowing voter six days following the election to provide verifiable proof of identification). This is substantially similar to the notice and opportunity to be heard provided to in-person and provisional voters, thus providing all voters with the opportunity to cure their signatures or any other ballot deficiencies so their ballots can be counted.   *See* 25 P.S. § 3050(a.4)(4)(i).

An exercise in abstention now, with 30 days from the General Election, would only promote the electoral chaos, confusion and confiscation of the integrity of our state's democratic process caused by the Secretary's illegal guidance memos.  This is readily demonstrated by the undisputed, unequal adherence to those guidance memos by the counties.  Abstention is not only unwarranted, but improper at this stage.  The Court's adjudication of Plaintiffs' claims is crucial to the preservation of how Pennsylvania has conducted its elections for decades.

**D.    Additional Equitable Factors Call For A Rejection Of *Pullman* Abstention At This Late Stage.**

Even if all three of the "special circumstances" were present, the Court should not exercise its discretion to abstain from hearing this matter based on the weight of the discretionary factors, "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Fuente*, 207 F. Supp. 2d at 450 (citing *Planned Parenthood v. Farmer*, 220 F.3d 127, 150 (3d Cir. 2000)).

The Court previously recognized, over 5 weeks ago on August 23, 2020, that the "imminence of the general election weighs in favor of this Court acting as quickly as possible". *Donald J. Trump for President, Inc. v. Boockvar*, 2020 U.S. Dist. LEXIS 152599, at *65 (W.D. Pa. Ag. 23, 2020). That imminence is even greater with the General Election now only 30 days away.  When the Court determined abstention was warranted on August 23rd based on Plaintiffs' then-pending claims, there was litigation pending in the Pennsylvania state courts involving some, but not all, of the issues Plaintiffs have raised in this case. *See Boockvar*, 2020 U.S. Dist. LEXIS 152599, at *65. With specific regard to Plaintiffs' claims based on the signature comparison verification on absentee and mail-in applications and ballots, the facts prompting these claims (the Secretary issuance of the September 11 and 28 guidance memos) did not occur until *after* briefing had concluded in the matters before the Pennsylvania Supreme Court.  And as to the September 28 guidance memo, which expanded the Secretary's defiance of the Election Code from not only absentee and mail-in ballots but also to voters' applications for the same, it was issued 11 days after the Supreme Court's September 17, 2020 decisions.  For these reasons, Plaintiffs did not have an opportunity to pursue these claims in state court and are not, contrary to Defendants' argument, choosing "not to [follow this Court's instruction]". (ECF # 529, at p. 23).  Plaintiffs could not have raised their signature verification claims in the state

court matters because they did not yet exist.  The timing of the dispute regarding the signature verification process lies solely with the Secretary of the Commonwealth.

The need for a decision is urgent. If Plaintiffs' claims are not permitted to proceed, there is a significant likelihood – if not complete certainty – that the issues raised in the Complaint (ECF # 461) will go unaddressed before the General Election. *See ABC v. Blackwell*, 479 F. Supp. 2d 719, 731-732 (S.D. Ohio 2006) (abstention not warranted when state law is not challenged for facial vagueness and plaintiffs are entitled to a final decision before the upcoming mid-term election); *Cano v. Davis*, 191 F. Supp. 2d 1140, 1145 (C.D. Cal. 2002) (abstention should be denied where it "would foreclose any possibility that the fundamental voting rights violation that plaintiffs allege could be remedied prior to the next statewide election.").  Especially insofar as abstention is discretionary, these circumstances strongly support the continued litigation and ultimate resolution of this action before this Court even if all of the requisite "special circumstances" for the *Pullman* doctrine apply.

## III.   SECRETARY BOOCKVAR AND THE COUNTY DEFENDANTS ARE PROPER PARTIES TO THIS SUIT BECAUSE ELEVENTH AMENDMENT IMMUNITY DOES NOT SHIELD THEM FROM PLAINTIFFS' CONSTITUTIONAL CLAIMS AND THEY ARE INDISPENSABLE PARTIES.

Defendants are desperate to avoid a decision on the merits of Plaintiffs' First and Fourteenth Amendment claims. Certain[8] But desperation cannot absolve Defendants and their culpability. Defendants' attempts at an Eleventh Amendment immunity defense are just one of the several ways they seek to shield their unconstitutional actions from scrutiny.  Some[9] also seeks to shield their actions

---

[8]      The following Defendants argue that Eleventh Amendment immunity shields them from Plaintiffs claims: Boockvar Brief Support Summ. J. (ECF # 549); Adams County Brief Support Summ. J. (ECF # 516); Allegheny County Brief Support Summ. J. (ECF # 513);  Berks County Brief Support Summ. J. (ECF # 531); Bucks, Chester, Montgomery, and Philadelphia Boards Brief Support Summ. J. (ECF # 543); Northhampton County Brief Support Summ. J. (ECF # 534); Washington County Brief Support Summ. J. (ECF # 507).

by the excuse that they are simply following the law.  Fortunately, state officials and County election boards have no Eleventh Amendment immunity when plaintiffs, like those here, plead (and prove) that the defendants' ongoing actions, under the color of law, violate the United States Constitution, and plaintiffs' seek to stop those continuing violations.

First, Eleventh Amendment immunity does not apply to Plaintiffs' claims against these Defendants, which arise from the Fourteenth Amendment, either directly or coextensively.  Plaintiffs have brought no claims under the Election Code. Second, contrary to the Moving Defendants' assertions, the Eleventh Amendment does not immunize the county Defendants at all:  They are not state agencies, and Plaintiffs' did not state claims "against the Commonwealth."  Third, the county Defendants that argue they should receive judgment in their favor because there is no evidence that they violated the Election Code with respect to any of the matter Plaintiffs complain about miss the point of this lawsuit:  Plaintiffs seek an evenly administered state-wide election in Pennsylvania, and the county Defendants are indispensable parties if the Plaintiffs are going to attain that relief.

Accordingly, the Moving Defendants cannot cloak themselves with immunity or their compliance with the Election Code, and shield their unconstitutional, uneven, and unsecure administration of upcoming General Election.   Nothing bars Plaintiffs' Constitutional claims against Secretary Boockvar and the county Defendants.

### A. Secretary Boockvar And The County Boards Of Elections Violate The First And Fourteenth Amendment On An On-Going Basis.

Defendants violate the First and Fourteenth Amendment on an on-going basis under the color of law.  Secretary Boockvar and the County Boards of Elections have adopted and intend to implement an unconstitutional election, rife with disparate treatment of Pennsylvania's voters.  Plaintiffs' claims seek to redress those constitutional violations, not to force the Defendants to comply with the Election Code, per se.

Secretary Boockvar's actions primarily triggered the constitutional violations in this case, but the Secretary claims Eleventh Amendment immunity for those violations.  Eleventh Amendment immunity is subject to three exceptions: "(1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an on-going violation of federal law."  *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3c 310, 323 (3d Cir. 2002) (quoting *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Circ. 2000)).  Plaintiffs proceed against Secretary Boockvar in this case under the third exception.

If a state action or law, as written or as applied, violates the United States Constitution, an injured party may sue the implementing state officials for those violations in Federal court seeking to enjoin those violations. *Ex parte Young*, 209 U.S. 123, 159-160 (1908) ("If the act which the [state official] seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.") *Philadelphia Fed'n, Am. Fed.'n Local 3 v. Ridge*, 1997 U.S. Dist. LEXIS 8893 (E.D. Pa. June 19, 1997); *Stevenson v. State Board of Elections*, 638 F. Supp. 547, 549 (N.D. Ill. 1986) (citing *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)); *Better Gov't Bureau v. McGraw*, 904 F. Supp. 540, 547-48 (S. D. W.Va. Oct. 16, 1995).  *See also PG Publ.*, 902 F. Supp. 2d at 745 ("when a federal court commands a state official to do nothing more than refrain from violating federal law, [the official] is not the State for sovereign-immunity purposes.") (citing *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011)).

Where otherwise applicable, Pennsylvania's Secretary of State is the sort of state official that can be sued and enjoined under the *Ex parte Young* exception. *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) (citing *MCI Telecomm. Corp.*, 271 F.3d at, 506) ("Secretary Cortés as an officer of the Pennsylvania Department of State, may be sued in his individual and official

capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.'").

Certain Defendants, including Secretary Boockvar, want this Court to misread Plaintiffs' claims as "Election Code" claims, and then misapply *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) to this case.  (*See, e.g.*,  Boockvar Brief Support Summ. J. (ECF # 549), pp.  67-68 ("Plaintiffs cannot, consistent with the Eleventh Amendment, assert claims based on alleged violation of the state Election Code here in federal court . . . .");  NAACP Brief Support Summ. J. (ECF # 548), p. 44 ("Federal courts lack jurisdiction to hear claims for declaratory or injunctive relief arising from allegations that 'state officials violated state law in carrying out their official responsibilities.'");  Bucks, Chester, Montgomery, and Philadelphia Boards Brief Support Summ. J. (ECF # 543), p. 28, n.10 ("[T]his Court lacks jurisdiction to adjudicate Plaintiffs' Election Code claims.").)  Unlike *Pennhurst*, though, Plaintiffs have brought no separate action for a violation of the state law, *i.e.* the Election Code.  *Pennhurst*, 465 U.S. at 106.  And *Pennhurst* does not bar this Court from issuing the relief that Plaintiffs seek pursuant to the First and Fourteenth Amendments.  *See, e.g.*, *Acosta*, 288 F. Supp. 3d at 627-628.

Instead, Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on the manner in which they choose to vote or the location where they happen to live: in some counties, a mail-in vote will not be counted if the signature on the ballot is a mismatch with the signature on record, but in other counties, the same vote would be counted;  in some counties, voters will have around-the-clock access to "satellite election offices" at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering; in some counties, the Plaintiffs will be able to

deploy poll watchers in every precinct, but in other counties, because of the way the poll watcher residency requirement is applied, Plaintiffs will not be able to deploy any poll watchers at all.  (App. Ex. 1; App. Ex. 4, Thompson Decl., ¶¶ 16-21.)

The point is not that Defendants have violated the Election Code—it is that they have created an election process in Pennsylvania that is so uneven, so unsecured, and so mal-administered that it violates the First and Fourteenth Amendment.  Plaintiffs cite the Election Code and its provisions because, under Section 1983, that is the "color of state law" under which the Defendants have deployed their unconstitutional actions.  42 U.S.C. § 1983 (2020).  For purposes of Section 1983, "local governing bodies . . . can be sued directly . . . for . . . injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dept't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

The Secretary has issued numerous guidance memos, among other actions, that have led to an election process so uneven, arbitrary, and mal-administered that the process itself has reached the point of "patent and fundamental unfairness" to voters and candidates alike, in violation of the First and Fourteenth Amendment.  *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (Section 1983 applies where "the election process itself reach the point of patent and fundamental unfairness").  The County Boards of Elections, in exercising their discretion to follow the Secretary's guidance (or not) in the upcoming election have created an election system that will treat Pennsylvania citizens disparately in the exercise of their fundamental right to have their vote counted the same as their fellow citizens.  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) ("[W]here there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied."); *see City of Canton v. Harris*, 489 U.S. 378 (1989) (Political subdivision "liability under § 1983 attaches where – and only where – a deliberate choice to follow a

course of action is made among various alternatives by city policymakers." (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 783-784 (1986))).

Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district.  For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional vote counting and ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written. (*See, e.g.*, Ex. 1, Summary of County Responses (Franklin County and Mifflin County are not implementing drop boxes and signature verification guidance, but Luzerne and Northampton are implementing drop boxes and signature verification guidance); Ex. 34 (showing Franklin and Mifflin are Republican-heavy and Luzerne and Northampton are Democrat-heavy).)  The Plaintiffs who are voters in this state will have their properly cast votes diluted by improperly cast votes and the uneven state-wide deployment of drop boxes.  Moreover, the Secretary continues to issue new guidance to County Boards of Election that contradict the Election Code even while this lawsuit is pending, as evidenced by the September 28 guidance (App. Ex. 25), creating an atmosphere of patent and fundamental unfairness, as counties choose to follow the Secretary's guidance—or not.  (App. Ex. 1.)

As to the claims tied to the Pennsylvania Constitution, the Third Circuit interprets the Eleventh Amendment to foreclose only causes of action based on state law, not all state constitutional claims that are coextensive with viable federal claims, as the Moving Defendants argues.  Plaintiffs have not brought claims to require the Defendants' to follow Pennsylvania laws and have not brought claims for violations of the Election Code.  Rather, Defendants bring claims because the Defendants' administration of election processes violates the United States Constitution, directly, and coextensively by violating the Pennsylvania Constitution.

The cases Moving Defendants cite illustrate the importance of this distinction, finding the Eleventh Amendment immunity shields state law claims only *after* determining that no viable federal claims existed.   *Balsam v. Sec'y of N.J.*, 607 F. App'x 177, 183-84 (3d Cir. 2015) (finding that appellants' First Amendment and Fourteenth Amendment theories did not support any federal claim and as for what was left "it is state law that provides the causes of action, if any, and the attendant relief they seek");[10] *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597 (E.D. Pa. 2018) ("[B]ecause the Court has dismissed the First and Fourteenth Amendment claims over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over the state law claims under the Pennsylvania Election Code.").

Because the Moving Defendants' violations of the Pennsylvania Constitution coextensively violate the United States Constitution, and the Defendants have pled well and proven violations of the United States Constitution, both direct and coextensive, the state law exception to the *Younger* doctrine does not apply to the Plaintiffs' Pennsylvania Constitution claims.   Additionally, the *Younger* doctrine specifically applies in this case to enjoin the Secretary of State's action in direct violation of the United States Constitution.   As explained below, the county Defendants are not covered at all by Eleventh Amendment immunity.

**B.      The County Election Boards Are "Arms Of The State."**

The County Election Boards are political subdivisions that do not enjoy Eleventh Amendment immunity.   Political subdivisions are not "arms of the State." *N. Ins. Co. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006) ("Accordingly, this Court has repeatedly refused to extend sovereign immunity to counties."); *Alden v. Me.*, 527 U.S. 706, 756 (1999) ("The second important limit to the principle of

---

[10] Under the Third Circuit's Operating Rule 5.7, the decision in *Balsam* is not precedential or otherwise binding beyond the parties to that case.

sovereign immunity is that it bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State."); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'").

The Pennsylvania Constitution drives this point home even further:  County Election Boards are political subdivisions, not "arms of the State."  *See, e.g.,* Pa. Const. art. IV, §1 ("The Executive Department of this Commonwealth shall consist of a Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer, and Superintendent of Public Instruction and such other officers as the General Assembly may from time to time prescribe."); Pa. Const. art. IX, §4 (noting that "County government" is part of the "Local Government" in Pennsylvania); Pa. Const. art. IX, §14 (defining "Municipality" to mean "county, city, borough, incorporated town, township or any similar general purpose unit of government which shall hereafter be created by the General Assembly.").

Instead, County Board of Elections are an arm of the county, not the state.  Each County Board of Elections has "jurisdiction over the conduct of primaries and elections in such county."  25 P.S. § 2641(a).  Members of the County Board of Elections are members of the county commissioners or as otherwise provided in the county charter or option plan.  25 P.S. § 2561(b).  Moreover, the county appropriates the funds necessary for the county's Election Board's operations, and the counties, not the State, provide the county Election Board with offices in the county seat to conduct the board's operations. 25. P.S. § 2645(a) & (b).  The counties have the power and duties to conduct the functions relevant to this litigation, including investigate frauds, irregularities and violations of Act 77, issue poll watcher certifications, and instruct poll workers in their duties "to the end that primaries and elections may be honestly, efficiently, and uniformly conducted."  25 P.S. § 2642.

The Defendants cite a paucity of cases to the contrary, and the cases Defendants do cite offer this Court little guidance about Pennsylvania's County Elections Boards. For instance *Trinsey v. Montgomery County Bd. of Elections*, No. 87-6975 1988 U.S. Dist. LEXIS 8704 (E.D. Pa., Aug. 4, 1988), is two paragraph order on an uncontested summary judgment motion that found the complaint failed to state a claim against the Board of Elections and dismissed the case on that ground. *Id.* at *2. Thus, the remaining one paragraph dealing with the Eleventh Amendment is *dicta*. In *Casey v. Clayton County*, No. 1:04-CV-00871-RWs, 2007 U.S. Dist. LEXIS 17598 (N.D. Ga., Mar. 14, 2007), the court reserved the question of whether the Board of Elections was acting as an arm of the state for trial, and the remaining language is dicta. *Id.* at *25-30. The Northern District of Georgia resolved the question recently in another case, finding that Georgia county boards of elections are not "arms of the state," even when determining voter eligibility. *Ga. State Conf. of the NAACP v. Dekalb County Bd. of Registration & Elections*, No. 1:20-CV-00879-ELR, 2020 U.S. Dist. LEXIS 162683, *17-18 (N.D. Ga., Sept. 2, 2020). Finally, *Hunter v. Hamilton County Bd. of Elections*, 850 F. Supp. 2d 795 (S.D. Ohio 2012), is inapposite because Ohio's Board of Elections structure is top down, with members of the Board being appointed by the Secretary of State rather than by the counties themselves, as the case is in Pennsylvania. *Id.* at 801.

This Court should honor the distinction enshrined in the Pennsylvania Constitution and the Pennsylvania code.[11]

---

[11] If Plaintiffs are incorrect, and the Court determines that the County Board of Elections Defendants are "an arm of the State," Plaintiffs are willing to amend their Complaint to name each and every member of County Board of Election in Pennsylvania. But as outlined above, that is not necessary because the County Board of Elections Defendants are political subdivisions in Pennsylvania.

### C.   Each Defendant County Election Board Is An Indispensable Party To The Action.

Certain county boards of elections are improperly seeking dismissal for failure to assert specific factual allegations against the counties and/or their "lack of personal involvement" because they are not using drop boxes and/or are verifying signatures.[12]   In short, all counties must be part of and joined in this action – regardless of their "personal involvement" or specific claims against them. *See* Fed. R. Civ. P. 19(a)(1)(A) (a party must be joined if "in that person's absence, the court cannot accord complete relief among existing parties."); Fed. R. Civ. P. 19(a)(1)(B)(ii) (a party must be joined if "in the person's absence," another party may be "subject to a substantial risk of … otherwise inconsistent obligations").  Dismissal of any of the county boards of election, even without specific claims asserted against them, would be improper.

A party is indispensable if they are needed to resolve the matter.  *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 421 (3d Cir. 2010) ("parties are indispensable if 'in the circumstances of the case [they] must be before the court.'") (citation omitted).   Indispensable parties are those "'[p]ersons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.'"  *Id.* at 421; *see also RFF Family P'ship, LP v. Link Dev., LLC*, 849 F. Supp. 2d 131, 137 (D. Mass. 2012) (citing *State Farm Mut. Auto. Ins. v. Mid-Continent Cas. Co.*, 518 F.2d 292, 296 (10th Cir. 1975)) (denying 12(b)(6) motion because moving party's interest "may be directly affected by the Court's

---

[12] *See* Adams County Brief Support Summ. J. (ECF # 516), pp. 18-21; Berks County Brief Support Summ. J. (ECF # 531), p. 8; Franklin County Brief Support Summ. J. (ECF # 520), pp. 4-5; Northhampton Brief Support Summ. J. (ECF # 534). pp. 7-11; Perry County Brief Support Summ. J. (ECF # 522), pp. 4-5;Washington County Brief Support Summ. J. (ECF # 507), pp. 8-11.

resolution of the declaratory judgment claim" and "all interested parties should be joined in a declaratory judgment action whenever possible").

A party is necessary and joinder is required when "complete relief" cannot be "accorded to the parties to the action in the absence of the unjoined party." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993). "Complete relief . . . refers to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought.  Mere theoretical considerations of disposing of the whole controversy do not warrant compulsory joinder when it appears unlikely that the absent persons could be affected." *Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel*, 895 F.2d 116, 121 (3d Cir. 1990) (quoting 3A Moore's Federal Practice P 19.07-1[1], at 93-98 (2d ed. 1989).  "A court may not award injunctive relief against a non-party to the action." *Sugartown Worldwide LLC v. Shanks*, No. 14-5063, 2015 U.S. Dist. LEXIS 36495, at *32 (E.D. Pa., Mar. 24, 2015).  *See also O'Donnell v. Pa. Dep't of Corr.*, No. 4:08-CV-00136, 2009 U.S. Dist. LEXIS 124420, at *7-8 (M.D. Pa., Dec. 31, 2009) (although no factual allegations asserted, Secretary of the Pennsylvania Department of Corrections proper party in Eight Amendment prison condition action because "an appropriate or necessary party to implement injunctive relief if such relief were ordered in this case"); *Levy v. Med. Servs. Ass'n*, No. 91-6028, 1992 U.S. Dist. LEXIS 4958, at *6 (E.D. Pa., Mar. 31, 1992) ("Should this Court determine that the class certified in this action is entitled to some type of meaningful injunctive relief…Capital Blue Cross is a necessary party to this action pursuant to F.R.C.P. 19.")

As discussed in Plaintiffs' Motion for Summary Judgment, a uniform election across the Commonwealth is necessary and constitutionally required to ensure the fundamental right to vote is protected.  (*See* Plaintiffs' Brief Support Summ. J. (ECF # 509), pp. 45-58.)  The General Assembly tasked county boards of elections with "exercising jurisdiction over the conduct of primaries and elections in such county."  25 P.S. § 2641(a); *see also* 25 P.S. § 2642(f) ("The County Boards of

Elections are empowered to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors.")  Thus, all county boards of elections are required to enforce the election laws at issue in this litigation.  *See* 25 P.S. §§2641(a); 2642; 2642(e); 2642(g); 3146.5, 3146.6(a) & (c), 3146.8(g)(3), 3150.15, 3150.16(a) & (c).  Any order or judgment entered by this Court regarding the administration of the upcoming General Election would need to be directed at the Secretary and each county board of elections in order for the General Election to run in accordance with that order.  *See, e.g., Adamietz v. Smith*, 273 F.2d 385, 387 (3d. Cir. 1960) ("[T]he question of indispensability of parties is dependent not on the nature of the decision attacked but on the ability and authority of the defendant before the court to effectuate the relief which the party seeks.").

Dismissing any single county board of election would augment the very patchwork in rules and practices that led to this action in the first place.  All county boards of elections, whether ancillary or not, must remain named defendants because the election outcome is determined by a vote tally from all counties, in the aggregate, and only those county boards of elections that have been made parties will be bound by a judgment.  Failure to join all county boards of elections deprives the Court's judgment from any binding effect as to the county boards of elections not joined and could in the future lead to needless litigation if the rights declared in this Court's order were attempted to be enforced against them.  Under the status quo, each county board of elections—including each one seeking dismissal for failure to state a claim or lack of "personal involvement"—has been "doing its own thing" so to say, without due regard for adherence to guaranteed rights under the U.S. and Pennsylvania Constitutions.  Hence, notwithstanding a lack of county-specific allegations, every county board of elections must be bound by the Court's decision.

Every county board of elections also has a direct interest which will be affected by the judgment sought by Plaintiffs because only the county boards of elections are the effective administrators of

Pennsylvania's election laws, and thus have all duties in connection therewith.  *See Pleasant v. Erie Ins. Exch.*, 348 A.2d 477 (Pa. Commw. Ct. 1975) (holding that agencies were indispensable parties because they had an interest which would be affected by the declaration).  *See also Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 172330, at *42 (W.D. Wis., Sep. 21, 2020) ("intention to enforce Wisconsin's current elections laws demonstrates the WEC is an indispensable party for plaintiffs to achieve the remedies they seek")

The scheme for holding elections applies to (and must be followed by) all county boards of elections.  Whether or not every county boards of elections engaged (or may engage) in the unlawful activities is irrelevant to the issue of whether county boards of elections are indispensable parties due to the direct interest that every county boards of elections has in administering the scheme for holding elections.  Had Plaintiffs' claims related to administration of a county ordinance rather than a state statute mandating uniform application, then a lack of direct allegations against a specific county boards of elections might be dispositive on the question of whether Plaintiffs may maintain a claim that county boards of elections.  But that is not the case.

Moreover, the judgment Plaintiffs are seeking from this Court is not tied to a finding that every County has in fact suffered election-related misconduct, nor that every county board of elections has violated the U.S. Constitution and/or the Pennsylvania Constitution.  This Court's decision about the parameters for constitutional administration of the election must be uniformly adopted by all county boards of elections—giving any county boards of elections "pledge" to not follow the Secretary's improper guidance force of law.  (*See, e.g.,* Washington County Brief Support Summ. J. (ECF # 507), p. 9 (pledging to adhering to the rulings of the Pennsylvania Supreme Court and this Court after admitting to having counted ballots not in secrecy envelopes based on the Secretary's unlawful guidance).)  Joining all county boards of elections in this action is the only way ensure that all county

boards of elections implement rules and practices for administering the election in accordance with the U.S. and Pennsylvania Constitutions.

For the foregoing reasons, the Defendants are indispensable parties to this suit and Eleventh Amendment immunity does not shield them.

## IV.    STRICT SCRUTINY APPLIES WHEN THE FUNDAMENTAL RIGHT TO VOTE IS SEVERELY BURDENED.

Defendants fail to recognize that the Secretary's guidance memos, allowing the use of unmanned drop boxes and prohibiting signature verification for absentee and mail-in ballots, place a severe burden on the fundamental right to vote.    Instead, Defendants focus on how the Secretary's guidance memos do not have discriminatory intent or classification, and, because they are purportedly rational, are constitutional.[13]    This is incorrect.    Strict scrutiny is the proper standard for Plaintiffs' signature verification and drop box claims.    Although strict scrutiny applies when an election law is discriminatory, strict scrutiny also applies to "regulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit' [] are subject to strict scrutiny."    *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).    *See also Black v. McGuffage*, 209 F. Supp. 2d 889, 898 (N.D. Ill. 2002) ("the Supreme Court has not strictly adhered to the suspect classification doctrine when addressing cases of voting rights with respect to States") (citing *Bush*, 531 U.S. at 98); *cf. Greenwood v. Singel*, 823 F. Supp. 1207, 1212 (E.D. Pa. 1993) (applying rational basis because "*all* qualified voters in the Commonwealth of Pennsylvania have an *equal opportunity* to select representatives and senators").    There is no equal opportunity to vote in this instance because the Secretary's guidance memos illegally dilute the weight of the vote.

---

[13] *See, e.g.,* Boockvar Brief Support Summ. J. (ECF # 549), pp 50-58, 80-82; Pa. Dems. Brief Support Summ. J. (ECF # 529), pp. 17 at n.6, 19-22, 30-31.

The electoral unit in this election is the entire Commonwealth of Pennsylvania.  *See also Harper*, 383 U.S. at 665 ("Once the franchise is granted, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.")  Thus, to align with equal protection and the fundamental right to vote, "[a] state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote.  Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." *Pierce*, 324 F. Supp. 2d at 697.  The Secretary's guidance memos – contrary to the Election Code – do not provide for a uniform statewide standard and "contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters." *Lemons*, 538 F.3d at 1104; *see also* Sec. III, IV, *infra*; Plaintiff's Motion for Summary Judgment (ECF # 509), pp. 45-57.

Accordingly, this Court can "easily conclude that the right to have one's vote counted on equal terms is part of the right to vote.  No other conclusion is possible from the case law and thus, strict scrutiny applies." *Stewart v. Blackwell*, 444 F.3d 843, 868 (6th Cir. 2006) (vacated as moot when Ohio stopped using deficient voting system that infringed on the right to vote).  *See also South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting) ("There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth.  The right includes the right to have the ballot counted. It also includes the right to have the vote counted at full value without dilution or discount.") (citations omitted); *Colegrove v. Green*, 328 U.S. 549, 570 (1946) (Black, J., dissenting) ("The Constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give approximately equal weight to each vote cast."); *United States v. Classic*, 313 U.S. 299, 315 (1941) ("Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted.")

Defendants' fail to recognize that the Secretary's guidance memos place a severe burden on the fundamental right to vote, and to have one's vote count *equally*.  Instead, the Secretary promotes an unequal voting scheme, with severe risks of illegal votes being cast and counted.  Strict scrutiny is the appropriate standard.  As Plaintiffs proved, Defendants substantially burdened the fundamental right to vote.  Thus, it is required by the Defendants "to justify the burden with a compelling state interest and with proof that the least restricts means [were] employed." *Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 260 (3d Cir. 2008); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429 (2006) (the government "bear[s] the burden of demonstrating a compelling interest as part of its affirmative defense").  No Defendant asserts a compelling interest.  (*See, e.g.,* App. Ex. 12, Boockvar 30(b)(5) Depo. 106:1-4 (When asked *why* she issued the September Guidance, the Secretary stated:  "Well, you've sued us and -- or I should say, your client sued us, and it raised this issue, as you may recall, and asked permission to file an amended complaint."); Boockvar Brief Support Summ. J. (ECF # 549), p. 52 ("rational—interests in the use of drop boxes because they facilitate voting and enhance voter confidence"); *id*. at 81 ("it is entirely rational to restrict signature comparisons").[14]

What's more, by failing to plead and/or otherwise assert any compelling state interest as an affirmative defense, the Secretary and all other Defendants waived this affirmative defense.  *See* Fed. R. Civ. P. 8(c) and 12(b); *see also Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*, 373 F. Supp. 3d 567, 593 (W.D. Pa. 2019) ("affirmative defenses are waived if they are not specifically raised by responsive pleading or by appropriate motion.").  The Secretary and other Defendants

---

[14] Notably, the Pennsylvania Democratic Party Intervenors assert no state interest, compelling or otherwise, and only refers to the General Assembly "rationally" creating laws.  (Pa. Dems. Brief Support Summ. J. (ECF # 529), p. 25.)

have failed to prove or provide any compelling state interest. Without a compelling state interest, the guidance memos fail under strict scrutiny and the Secretary must be enjoined from prohibiting signature verification for absentee and mail-in applications and ballots, and prompting the uneven use of drop boxes, both staffed and unstaffed throughout the Commonwealth.[15]

## V.   DEFENDANTS RAISE NO GENUINE ISSUE OF MATERIAL FACT OR VIABLE LEGAL BASIS TO DENY PLAINTIFFS' REQUESTED RELIEF CONCERNING THE SECRETARY'S SEPTEMBER 2020 GUIDANCE.

In her response, Secretary Boockvar offers no compelling government interest for her September 11 and 28, 2020 guidance to the effect that county boards of elections are barred from doing what they had been for years under the Election Code's absentee ballot law in terms of approving by-mail applications and voted ballots by comparing the mandatory signatures on those documents to the voters' permanent registration records. Nor does she or any Defendant refute that her guidance is not narrowly tailored to promote any such interest. Finally, Secretary Boockvar does not counter Plaintiffs' argument that she waived any argument regarding the compelling government interest by failing to assert it as an affirmative defense in her September 28, 3030 answer (ECF # 492). Hence, given this record, Plaintiffs are entitled to summary judgment in their favor on this claim.

In addition to her abstention and general grievance arguments, Secretary Boockvar, along with several other Defendants, argue that her September 2020 guidance memos do not violate the United States Constitution. Yet, Defendants ignore three important undisputed facts. First, unlike the cases relied on by Defendants involving voter identification laws for in-person voters but not

---

[15] Because Defendants fail to provide compelling state interests, it is unnecessary to reach whether the Secretary's guidance memos are narrowly tailored (and whether the Defendants have proved as much). However, as discussed previously, there are more narrow means to implement drop boxes and signature verification, which would pass constitutional scrutiny. (*See* Plaintiff's Motion for Summary Judgment (ECF # 509), pp. 50, 56-57.)

absentee voters, s*ee, e.g., Santillanes*, 546 F.3d at1313 (different treatment between in-person and absentee voters was justified because there existed a separate, equally effective process in place to confirm the absentee voter's identity), the Secretary in this case has not articulated a compelling government interest or justification for the difference in treatment.[16]   The reason the Secretary cannot articulate any such justification is because it has been recognized by the Pennsylvania courts for years that the sole process that exists for verification of all voters (whether voting in-person or by-mail) is one's signature.[17]   *See Fogleman Appeal*, 36 Pa. D. & C.2d 426 (Pa. Com.

---

[16] The Secretary and several Defendants argue that a person's social security or driver's license numbers provide confirmation of the absentee or mail-in voters, such that the comparison of an absentee or mail-in voter's signature is not necessary.  However, the Election Code is clear that for both applications and voted ballots, the signature is the identifying factor, not one's social security or driver's license numbers. *See* 25 P.S. §§ 3146.2(d) ("The application of any qualified elector, as defined in preceding section 1301, subsections (a) to (h), inclusive, for an official absentee ballot in any primary or election shall be signed by the applicant, …"); 3150.12(c) ("**Signature required**. Except as provided in subsection (d), the application of a qualified elector under section 1301-D for an official mail-in ballot in any primary or election shall be signed by the applicant.") (emphasis original); 3146.6(a) ("The elector shall then fill out, date and sign the declaration printed on such envelope."); & 3150.16(a) ("The elector shall then fill out, date and sign the declaration printed on such envelope.").  Given the ease in which one's social security and driver's license numbers can be acquired by others, with or without the owner's knowledge, it is not unreasonable for the General Assembly to mandate that one's signature is the identifying factor upon which county boards of elections are to rely in determining whether to approve an absentee or mail-in ballot or to count or set aside and challenge a voted absentee or mail-in ballot. In any case, it is not the Secretary's prerogative to substitute her judgment for that of the General Assembly, which is what her September 2020 guidance seeks to do, not unlike what she attempted to do regarding secrecy envelopes.

Further, it is undisputed that a declaration on a voted absentee or mail-in ballot lacks the disclosure of the voter's driver's license or social security number.  Therefore, there is no way for a county board of elections to verify that information on the return ballot.  Accordingly, the Secretary's insistence that verification of identification means verifying that information, and *only* that information, as opposed to signature comparison, leaves that language meaningless as it relates to returned ballots.

[17] As Greg Riddlemoser explains in his expert report, which opinion no one disputes: "When a voter registers to vote in Pennsylvania, he or she is required to sign his or her name on their permanent voter registration record.  That signature is then used to identify and verify the voter for several purposes, including the processing of an absentee or mail-in ballot application and the verification that a returned absentee or mail-in ballot has been properly cast by that voter."  (App. Ex. 19, Expert Report of Greg Riddlemoser, p. 12 (footnotes omitted).)

Pl. Juniata 1964) (explaining that the in-person signature requirement at the polls had been "incorporated into the absentee elector's declaration" requirement).  Thus, the cases relied upon by the Secretary and the other Defendants are inapposite.

Second, prior to her September 2020 guidance, the county boards of elections have historically compared the signatures presented on both the applications for absentee ballots and the declaration envelopes of voted absentee ballots with the voters' permanent registration record and disregarded ballots that voters fail to verify as having been applied for or cast by them.  (App. Ex. 1, Summary of County Interrogatory Responses.)  Moreover, the county elections boards' signature comparison analysis is supported by case law.  *See, e.g., Fogleman Appeal*, 36 Pa. D. & C.2d at 428 (the court held that signatures that fail to match the voters' signatures on file render the absentee ballots void because " such elector has not completed the declaration *as required by law of all voters*"); *Canvass of Absentee Ballots of November 2, l965, Gen. Election*, 39 Pa. D. & C.2d 429, 441 (Montgomery C.P. 1965) ("There were several challenges made to incomplete applications and errors in the execution of the ballot or identity of the voter. We have already stated that we interpret the act strictly, and feel that all those who seek the special privilege of casting an absentee ballot must follow all the procedures which are required. Therefore, where ballots were signed in a different fashion from the registration cards, where certain portions of the ballot were incorrectly filled in or left blank, and where applications were not totally completed by the applicant, but obviously filled in by another, in all these cases, challenges to these ballots should have been sustained.").  The Pennsylvania state courts have reached this conclusion because "[i]n the casting of an absentee ballot, the ordinary safeguards of a confrontation of a voter by election officials and watchers for the respective parties and candidates at the polling place are absent." *Canvass of Absentee Ballots of November 2, l965, Gen. Election*, 39 Pa. D. & C.2d at 431-32 (quoting *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 D. & C. 2d 419,

420-21 (Pa. Com. Pl. Phila. 1964)).  Thus, the Secretary's September 2020 guidance does not comport with the law or practice that existed before their issuance approximately six weeks before the upcoming November 3, 2020 general election.

Third, several counties have already stated in discovery that they do not intend to follow the September 2020 guidance memos as they concern their prohibition on signature comparison for absentee and mail-in ballot applications and voted ballots.  As a result, the uneven treatment of voters goes beyond the distinction of those who vote in-person versus absentee or mail-in and now involves those who apply for or vote absentee or mail-in ballots and may or may not be subject to a signature comparison analysis depending on where they reside.  There is no compelling government interest served to justify this difference in treatment, and none of the Defendants have offered any such justification.  On the record before this Court, Plaintiffs have proven their entitlement to the requested relief on their constitutional challenges to the September 2020 guidance memos.

Finally, several Defendants (but not the Secretary) suggest that Plaintiffs' requested relief is unwarranted because the Election Code fails to provide those whose signatures do not match with notice and opportunity to cure.  However, Defendants' argument is wrong.  The Election Code provides both notice and opportunity to cure provisions for both absentee and mail-in ballots applications and voted absentee and mail-in ballots that a county board of election determines lacks a genuine signature.  *See* 25 P.S. §§ 3146.2b(d) ("In the event that any application for an official absentee ballot is not approved by the county board of elections, the elector shall be notified immediately to that effect with a statement by the county board of the reasons for the disapproval. For those applicants whose proof of identification was not provided with the application or could not be verified by the board, the board shall send notice to the elector with the absentee ballot requiring the elector to provide proof of identification with the absentee ballot or

the ballot will not be counted."); 3150.12b(c) ("**Notice.** In the event that an application for an official mail-in ballot is not approved by the county board of elections, the elector shall be notified immediately with a statement by the county board of the reasons for the disapproval. For applicants whose proof of identification was not provided with the application or could not be verified by the board, the board shall send notice to the elector with the mail-in ballot requiring the elector to provide proof of identification with the mail-in ballot or the ballot will not be counted.") (emphasis original); & 3146.8(h) ("For those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified: … (2) If the proof of identification is received and verified prior to the sixth calendar day following the election, then the county board of elections shall canvass the absentee ballots and mail-in ballots under this subsection in accordance with subsection (g)(2). (3) If an elector fails to provide proof of identification that can be verified by the county board of elections by the sixth calendar day following the election, then the absentee ballot or mail-in ballot shall not be counted.")  These notice and opportunity to cure provisions are substantially similar to the notice and opportunity to cure provisions that exist for in-person voters, whether casting a regular or provisional ballot.  *See* 25 P.S. §§ 3050(a.3) & (a.4)(4)-(5).

Accordingly, Plaintiffs are entitled to summary judgment in their favor concerning the September 2020 guidance memos, and Defendants' cross-motions for summary judgment should be denied.

## VI.   PLAINTIFFS HAVE PROVED THE INCONSISTENT USE OF UNMANNED DROP BOXES VIOLATES THEIR CONSTITUTIONAL RIGHTS.

It is beyond dispute that ballot harvesting occurred at drop boxes in the Primary Election and can occur at the drop boxes in the General Election.  It is beyond dispute that not all counties are going to use drop boxes in the General Election.  It is beyond dispute that even those counties

who are going to use drop boxes are not planning to use them in a consistent manner.  It also is beyond dispute there are no binding guidelines on the County Boards of Election as it relates to whether to use drop boxes, how to use them, when to use them, or where to use them.  It is beyond dispute that drop boxes are not immune from tampering, theft, or destruction, even if the Secretary's non-binding guidance is followed.  It should, and does, follow that Plaintiffs have established a constitutional violation from the Secretary's and Counties' actions related to the use of unmanned drop boxes in the upcoming General Election.

> **A.    Plaintiffs Have Established An Equal Protection Claim.**

To begin, Plaintiffs do not have to establish intentional discrimination on the part of Defendants to establish an equal protection violation.  *See, e.g.*, *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011) ("The Supreme Court has held in cases since *Snowden* that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination. … Consequently, we reject ORP's argument that there can be no violation of the Equal Protection Clause here without evidence of intentional discrimination.").  The cases cited by the Defendants for the contrary proposition are inapposite.

For example, Defendants cite *Welker v. Clarke*, from the Third Circuit as support for their claim that equal protection cannot be used to challenge non-intentional discrimination.  Yet, *Welker* dealt with solely a municipal or local election (not a statewide and national election like November's General Election:  "If Welker's claims were *only* that officials negligently maladministered the election by not properly enforcing the Pennsylvania residency requirements as interpreted by Welker, we would hesitate to intervene.  Under similar circumstances, other circuits have determined that such disputes do not state a constitutional violation and therefore do not rise to the level appropriate to support federal court interference in a local election." *Welker v. Clarke*, 239 F.3d 596, 597 (3d Cir. 2001) (emphasis added).  One cannot divorce the second

sentence from the first; yet that is what Defendants ask this Court to do.  Defendants' other cases

fare no better.  *See, e.g.*, *Pettengill v. Putnam Cty. R-1 Sch Dist.*, 472 F.2d 121, 122 (8th Cir. 1973)

("In essence, the appellants' complaint asks the federal court to oversee the administrative details

of a local election.") (emphasis added); *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986)

("Although federal courts closely scrutinize state laws whose very design infringes on the rights

of voters, federal courts will not intervene to examine the validity of individual ballots or supervise

the administrative details of a local election.") (emphasis added).  The November General Election

is a statewide and nationwide election, and thus Defendants' cases are inapposite.

## B.    Strict Scrutiny Applies To Plaintiffs' Equal Protection Claim Related To Drop Boxes Because Defendants Place A Severe Burden On The Right To Vote.

Strict scrutiny applies to Plaintiffs' unmanned drop box claims.  See Sec. IV, *supra*.

Defendants claim for rational basis is incorrect.  (*See, e.g.*, Boockvar Brief Support Summ. J. (ECF

# 549), pp 51-52 ("use of drop boxes—whether 'manned' or 'unmanned'—does not infringe

anyone's right to vote at all" because "undisputed" that it makes it easier for people to vote and

raise voter confidence);[18] Bucks, Chester, Montgomery, and Philadelphia Boards Brief Support

Summ. J. (ECF # 543), p. 17 n. 6 ("Heightened scrutiny applies only to regulations that burden the

right to vote, not those, like drop boxes that facilitate it.").

A counties' administration of an election can, and has, burdened the right vote.

Defendants' position that heightened scrutiny cannot apply to the manner in which an election is

administered is incorrect.  *Hunter*, 635 F.3d at 235 ("the cause for constitutional concern is much

greater when the Board is exercising its discretion in areas relevant to the casting and counting of

ballots").  The haphazard use of drop boxes changes the manner ballots are cast and counted, and

---

[18]    The Secretary's statement related to "undisputed" voter confidence in drop boxes is
incorrect.  (*See* App. Ex. 55, Marks Dep. Ex. 28; App. Ex. 10, Marks Dep. 181:6-21; App. Ex. 19,
Riddlemoser Report; App. Ex. 3, Patterson Aff. at ¶¶ 6–8.)

the risks associated with unstaffed drop boxes lead to constitution concern.  Defendants ignore that a burden on the fundamental right to vote can support an equal protection violation claim.  Case law is clear that "the right to have one's vote counted on equal terms is part of the right to vote…thus, strict scrutiny applies."  *Stewart*, 444 F.3d at 868 (citing cases).  This can come from the facilitation of unequal voting schemes across the geographical unit of the election.  *See, e.g.*, *Reynolds*, 377 U.S. at 555 ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); *Gray*, 372 U.S. at 380 (every vote must be "protected from the diluting effect of illegal ballots."); *Black*, 209 F. Supp. 2d at 900 (different voting systems used across counties improper).

The haphazard use of unmanned drop boxes across the Commonwealth places a severe burden on a qualified elector's right to vote and have their vote counted equally.  Counties have considered and stated their intention to use all varieties of drop boxes – manned and unmanned, monitored and unmonitored.  (App. Ex. 1, Summary Chart.)  There is no dispute that this haphazard use of drop boxes in the June 2020 Primary Election led to illegal votes being cast – diluting a qualified elector's vote and burdening their the fundamental principle of "one person, one vote" – yet counties are still intending on using this same system.  (*See, e.g.* App. Ex. 19; Ex. D to Mr. Riddlemoser's Expert Report (containing copies of photographs and video stills demonstrating ballot harvesting in Philadelphia and Elk Counties during the Primary); App. Ex. 28, Email from Lee Soltysiak ("Security was instructed before the boxes were in use on Saturday to instruct voters they can only drop off their own ballot.  They have turned people away yesterday and today without incident who had ballots other than their own.").)

More concerning, there was zero guidance from the Secretary on the equal implementation or equal access to drop box locations during the Primary Election, and there continues to be zero guidance on the equal treatment of such boxes for the General Election. (App. Ex. 9, Boockvar

Dep. 201:6-203:18; App. Ex. 10, Marks Dep. 184:2-7) ("Yes.  That is my understanding that different counties had different interpretations of [the drop box guidance].").) Yet, certain counties have confirmed that there is no way to disentangle improperly cast mail-in ballots from properly cast mail in ballots.  (App. Ex. 13, Bluestein Dep. 50:1-7).  This is a severe burden on the right to vote and the constitutional need to ensure all votes are counted and weighted equally.  Strict scrutiny applies, and Plaintiffs' unmanned drop box claim prevails as a matter of law.

### C.   Pennsylvania's Implementation Of Drop Boxes Has Reached The Point Of Patent And Fundamental Unfairness Due To The Choices Defendants Made.

Defendants' discretionary choices to deploy drop boxes (or not), when to make them available (if at all), and whether to staff them (or not) have resulted in an election system that treats voters disparately based on the county in which they reside alone.  The result is an election system that "undermines the organic process by which candidates are elected" and results in a "systematic discrimination against voters of a certain . . . geographic area."  *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975).  The Bucks, Chester, Montgomery, and Philadelphia Counties are right to point out that "garden variety election irregularities are not actionable under § 1983, (Bucks, Chester, Montgomery, and Philadelphia Boards Brief Support Summ. J. (ECF # 543), p. 13).  The systematic discrimination against voters based on their county of residence alone, though, is not a "garden variety" irregularity, and it is actionable as a Fourteenth Amendment violation under § 1983.  *Moore v. Ogilvie*, 394 U.S. 814, 817 (1969) ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote – whatever their race . . . and wherever their home may be in that geographical unit.  This is required by the Equal Protection Clause of the Fourteenth Amendment." (quoting *Gray v. Sanders*, 372 U.S. 368, 379 (1963))).

The differences in the Defendants' drop box implementation are not a species of garden variety differences, such as malfunctioning voting machines, human error, or technical deficiencies in printing ballots. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 643-644 (E.D. Pa. 2018) (quoting *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005), and listing each of those issues as "garden variety differences" that do not implicate § 1983). Rather, counties differ on whether a mail-in voter can return their ballot in-person outside normal business hours to a drop box; and if so, whether anyone will be monitoring the drop box to ensure a chain-of-custody free from tampering. These differences in access create an uneven playing field based on geography alone.

The Democratic Intervenors argue that "an exercise of discretion, standing alone" cannot support an Equal Protection claim, (Pa. Dems. Brief Support Summ. J. (ECF # 529), p. 15.), but that argument is a straw man.[19] Section 1983 liability attaches to a political subdivision, such as the County Board of Elections, only if the political subdivision has made a deliberative choice among competing alternatives. *City of Canton v. Harris*, 489 U.S. 378 (1989) (Political subdivision "liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made among various alternatives by city policymakers." (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 783-784 (1986))). Of course, more than a choice is necessary, but where the aggregated result of the Defendants' deliberative choices is the unequal access to the ballot box and the unequal integrity of their votes, those decision-makers, operating under the color of law, must be enjoined for the Equal Protection violation under Section 1983.

---

[19] Several Defendants also argue that the Election Code builds in discretion for County Boards of Elections on other topics and, therefore, the Boards should have the same as it relates to the use of drop boxes. But, the very citations by those Defendants show the errors of that argument as they point to guidelines built into the Election Code by the Legislature that cabin that discretion. No such guidelines exist here under Defendants' argument. It is those guidelines the Plaintiffs believe must be established to protect their constitutional rights.

**D.    The Use Of Unstaffed Drop Boxes Encourages Fraud And Invites Ballot Destruction.**

It is undisputed that the use of unstaffed drop boxes encourages fraud and invites ballot destruction.   Aiming to distract, Defendants set up a strawman argument that Plaintiffs are challenging the use of drop boxes at all.  Then, they downplay the evidence Plaintiffs have of ballot harvesting from the primary election and pivot to oddly point out that they are unaware of any ballot drop box being destroyed (or the ballots therein damaged).  Yet at no point do Defendants address head-on the thrust of Plaintiffs' claim:  unstaffed drop boxes encourage fraud and/or invite ballot destruction and the use of such boxes staffed or unstaffed, is inconsistent across the Commonwealth.

Plaintiffs do not challenge that a divided Pennsylvania Supreme Court recently ruled that the Election Code allows the return of ballots to locations other than the county boards of elections' offices.  *Boockvar*, 2020 Pa. LEXIS 4872 at *22-24).  But, the Pennsylvania Supreme Court did not address whether those drop boxes should be staffed and expressly declined to address the issue of whether the varied use of drop boxes by the Counties constituted a valid equal protection violation.  *Id.* at *23-24.  It is those issues that are being addressed here.

**1.    *Plaintiffs Produced Evidence That The Use Of Drop Boxes Encourages Fraud.***

Despite protestations by Defendants to the contrary, Plaintiffs produced and uncovered evidence that the use of drop boxes encourages fraud.  Lee Soltysiak, the Chief Operating Officer/Chief Clerk for Montgomery County, sent an email May 20, 2020, noting that security at the drop boxes in Montgomery County had to turn people away who were intending to drop more than one ballot in the drop boxes.  (App. Ex. 28, Email from Lee Soltysiak regarding secure drop box locations.)  This is positive evidence that the use of staff at the drop boxes eliminates ballot harvesting.

In Philadelphia, though, ballot drop boxes were not staffed. And just like in Montgomery County, people attempted to drop more than one ballot into the drop boxes – but as there was no staff present to stop this from happening, the ballot harvesters were successful. *See* App. Ex. 19, Ex. D. And this is despite the fact that Philadelphia had signage on its drop boxes telling voters, in English and Spanish, that "NO U.S. MAIL. BALLOT DROP OFF ONLY. VOTERS MUST DROP OFF THEIR OWN BALLOT. DROP OFF DEADLINE IS ELECTION DAY JUNE 2ND AT 8PM." *Id.* (excerpt from Philadelphia County Interrogatory Responses). Secretary Boockvar even retweeted a picture of a person dropping two ballots into a Philadelphia drop box, evidently as an example of how voters should "drop it off". *Id,* (tweet referenced in Boockvar Deposition at 217:20-218:4).[20]

A similar experience occurred in Elk County, where the County provided its security camera footage in discovery. In that video, one can see the entire hallway leading up to the drop box, which was outside the office of the County Board of Elections. In that video footage, at least three people can be seen depositing multiple ballots into the box – in violation of Pennsylvania's ballot harvesting law. *See* Doc. 504-19, pp.61-71. (App. Ex. 19, Expert Report of Greg Riddlemoser, pp. 61-71.)

In response, Defendants claim there is no proof that the person dropping the ballots off was not dropping off a ballot for a disabled individual. But, that process requires the submission to the county board of elections of a declaration signed by the disabled voter and the person turning in the ballot. *See, e.g.* 25 P.S. 3146.2. None of the pictures show that documentation being deposited

---

[20] This example undermines the Secretary's argument in her brief that the issue of ballot harvesting has been addressed because her guidance suggests signage advising voters that they cannot return a ballot other than their own. (Boockvar Brief Support Summ. J. (ECF #547), pp. 46-50.) Setting aside the Secretary's guidance is just that and not enforceable (Supp. App. Ex. 68, Boockvar Dep. 197:23-198:3, Philadelphia had similar signage during the primary election and still saw instances of ballot harvesting.

in addition to the ballots. Furthermore, to the extent there is a question (and neither Philadelphia nor Elk County produced information in discovery that disabled voter ballots were collected in their drop boxes), the presence of a staff person at the box would prevent the question from arising in the first place.

Defendants also respond that the evidence Plaintiffs cite is a paltry amount when compared to the number of mail-in votes actually voted in the primary. That begs two questions. First, just how many instances of ballot harvesting must be caught before it is sufficient. (App. Ex. 19, Expert Report of Riddlemoser, p. 6 of 75 ("… the question out to be 'How many cases of voter fraud should we allow in this election?' When viewed that way, the obvious answer—from election administrators, candidates, and electors—should be obvious: zero."))[21] Second, no information was produced in discovery that identifies how many of the mail-in ballots were returned via drop boxes. Moreover, the evidence of this type of ballot harvesting was uniquely in the possession of the Defendants, most of whom did not preserve the video surveillance footage, even assuming they had video footage to begin with (which goes to highlight the need for staff or poll watchers at the drop box locations).

Defendants further respond that ballot harvesting at the drop boxes is not a concern or surprise because it occurs with regularity at U.S. postal mailboxes, which are permitted ways to return ballots. (Bookavar Brief Support Summ. J. (ECF # 547), ¶ 74.) And their expert likewise admits, with apparent indifference to the consequences, that drop boxes pose the same risk as USPS boxes "in which a would-be ballot harvester could just as easily deposit the multiple ballots he or she has 'harvested' through any of the thousands of unmonitored USPS mailboxes (or other

---

[21] The NAACP intervenor group incredibly claims that "Mr. Riddlemoser's report does not even discuss drop boxes." (NAACP Brief Support Summ. J. (ECF # 548), p. 23.). (*But see* App. Ex. 19, Expert Report of Greg Riddlemoser, pp. 16-19.)

places mail can be received without detection)." (Boockvar App. (ECF # 549), Stein Report, Ex. 11, p. 19.) Defendant's concession amplifies Plaintiff's point. It is axiomatic that each new drop box creates yet another opportunity for third party abuse of the mail-in ballot process and magnifies the regularity with which such fraud is likely to occur. Just because ballot harvesting exists does not mean Defendants should provide myriad additional opportunities for it to be perpetuated. It should be the job of election administration officials to minimize the opportunity for election fraud to occur, not multiply those opportunities especially when the solution is straightforward and simple: staff the drop boxes. (App. Ex. 19, Expert Report of Greg Riddlemoser).

### 2. Drop Boxes – Past Is Not Prologue Here.

After waiving away the actual evidence from Plaintiffs of ballot harvesting during the primary and the fact that staffed drop boxes prevents it, Defendants then turn to the history of the drop box in other jurisdictions and argue that the lack of any reported tampering with drop boxes there means they will be fine in Pennsylvania.[22] Unfortunately, in the current political environment in which America finds itself, past is not prologue.

Relying on the sweeping and conclusory statements of their expert reports, Defendants argue that regardless of their final form, drop boxes are at least as secure as USPS mailboxes. (*See* Boockvar App. (ECF # 549), Stein Report, p. 19; *id.*, Gronke Rpt. ¶ 30; *id.*, McReynolds Rpt. ¶ 44.) In other words, Defendants admit that drop boxes are as insecure as unmonitored and unstaffed USPS boxes. *See* Supp. App. Ex. 65, pp. 15-16 (photo and article about a U.S. blue

---

[22] Defendants repeat nothing more than their generic observations that in other locations outside of Pennsylvania, they are "unaware" of voter fraud incidents involving the use of drop boxes. (*See* Boockvar App. (ECF # 549), Stein Report, p. 19; *id.*, Gronke Report, ¶ 30; *id.*, McReynolds Report, ¶¶44) They then hope that the same will be true in Pennsylvania's general election. Merely hoping it doesn't happen in Pennsylvania does not protect Pennsylvania voters.

mailbox stolen in front of witnesses).)  What is to stop someone from doing the same to drop box? The answer, of course, is nothing.

In fact, drop boxes are even less secure.  While the physical container of the drop box may have equivalent physical security characteristics to a USPS box, that does not equate to equal security for mail-in ballots contained therein.  What the Defendants and their experts miss is that for anyone intent on destroying ballots (for example, by depositing a firecracker or pouring bleach, acid, gasoline, or some other contaminant into a ballot receptacle), they must always guess whether a particular USPS mailbox contains any ballots at all.  In contrast, a drop box contains only voted and returns ballots; thus, it is indisputable that anyone set on spoiling voted ballots will never need to guess about what a drop box contains.  Drop boxes are convenient and well-marked targets. Moreover, increasing the number of available drop boxes exacerbates this risk.  Each new drop box is a new target and another opportunity for mischief directed at voter ballots.  That risk increases where drop boxes are available 24/7, and remain unstaffed and unmonitored.  To this extent, drop boxes are less secure than USPS boxes with respect to voters' ballots.  None of the Defendants' experts contemplate this contingency – they merely make the conclusory statement that drop boxes are at least as secure as USPS mailboxes.  They are not.

Defendants claim there is no evidence that any counties using drop boxes are using drop boxes that would allow vandalism.  (Boockvar Brief Support Summ. J. (ECF # 547), pp. 45-46.) The Defendants' position, and the expert reports upon which it relies, suffer from this same flaw – in coming to their conclusions, none of the experts express any understanding of what type of drop boxes will be used by Pennsylvania counties in the upcoming general election.  Indeed, many counties do not yet know what type of drop boxes they will be using. (*See* Montgomery County 30(b)(6) Dep. 27:9-16; Delaware County 30(b)(6) Dep. 28:4-24.)  Yet the Defendants' experts make broad, conclusory statements about the purported security of drop boxes, but none of these

opinions are based on their knowledge of contemporary facts in Pennsylvania.  Moreover, even assuming every drop box that is used will be bolted to the ground and physically secured as directed by the Secretary does not make them immune from destruction or theft.  The U.S. blue mailbox was secured to a cement base, but it was stolen.  *See* Supp. App. Ex. 65, pp. 15-16.) Further, myriad statues, more securely attached to their bases than the drop boxes will be, have been toppled and damaged in the past months.  *Id*.  And police cars, which weigh more the drop boxes at issue, have been flipped and set ablaze.  *Id*.

Also something ignored by the Defendants is that the location of a drop box contributes to the increased security risk to voter ballots.  The Secretary's guidance advises counties to place drop boxes in areas that are "heavily populated" and "easily accessible."  (Boockvar Brief Support Summ. J. (ECF # 547), ¶ 59.).  Where a drop box is placed in an area of high concentration of a particular party or group, the likelihood that the drop box will be used by voters of that party or group to return mail-in ballots increases as well.  Under such circumstances, anyone with criminal intent knows not only that the drop box contains completed mail-in ballots, but is also aware that it likely contains a concentration of ballots of a particular party or a particular group.  For example, according to one of Defendants' reports, drop boxes may be a tool to facilitate voting by Black and Latino communities; however, those same unstaffed drop boxes in Black and Latino communities become easily accessible and raw targets for anyone bent on destroying such ballots to the detriment of these populations.  Far from eliminating this risk, drop boxes actually create this risk.  This increased risk of damage to ballots that are highly concentrated in drop boxes is unaddressed by any of the Defendants' experts.

For the general election, staffed drop boxes are the exception as most counties will not staff their drop boxes.  (*See* Boockvar App. (ECF # 549), Barreto Rpt., ¶ 19; Gronke Rpt., ¶ 9).  Thus, absent anything other than static signage, deterrent measures will be minimal.  Further, counties

who are opting to use video, they do not know where the video feed will go and whether the video will be actively monitored.  (*See* Montgomery County 30(b)(6) Dep. 27:9-16; Delaware County 30(b)(6) Dep. 28:4-24.)  Without active or dynamic monitoring, no county will be able to take timely action to stop it.  These static and passive measures cannot stop what can easily be achieved by anyone—the deposit of multiple ballots by a single voter.  And once such ballots are placed in the drop box and mixed with all of the other ballots, it is impossible to segregate them.  As the Philly Board of Elections stated, "once the egg is cracked, you can't unscramble it." (Philadelphia County 30(b)(6) Dep. 50:1-7.)

One additional concern not addressed by the Secretary's guidance about drop boxes is the return of ballots to the county board of elections.  While there is chain-of-custody discussed in the guidance, there is nothing to address a repeat of an incident in Philadelphia during the primary election where official poll books did not make it back to the County Board of Elections after the election.  At least one of the poll books was in a car that was stolen on the way back to the Board's offices.  *See* https://www.youtube.com/watch?v=doNl98vOURQ.  If the same happened after a drop box had been emptied (or multiple boxes had been emptied), unknown numbers of ballots would be lost forever.

It boils down to the Secretary and Defendants being comfortable gambling with the sanctity and security of hundreds or thousands of ballots and hoping that past is prologue.  Plaintiffs, on the other hand, want to ensure that anyone (regardless of political affiliation or candidate preference) who validly deposits a ballot into a drop box can be sure that ballot is received by the county board of elections.  Unlike statues that can be repaired or replaced and unlike cars that can be replaced, the ballots inside a drop box cannot be replaced.  Once a voter's ballot is destroyed, there is no undoing that harm.  All of which can be avoided with the simple solution of staffing a drop box at all times that it is open for receipt of ballots.

## VII.   POLL WATCHING, AS-APPLIED AND PROVED BY PLAINTIFFS IN THIS CASE, IMPLICATES CONSTITUTIONALLY-PROTECTED RIGHTS.

Although numerous Defendants have taken issue with Plaintiffs' challenges to the residency requirement as applied to the upcoming 2020 November election, the challenges largely fall into two categories, none of which have merit.  First, Defendants argue that a statute, as applied to the facts of the upcoming election, that limits or potentially precludes certain parties from staffing poll worker positions does not implicate Constitutionally-protected rights.  Second, assuming that the Constitution is implicated, Defendants argue that Plaintiffs have failed to demonstrate any injury because their evidence is insufficient to demonstrate that application of the residency requirement will impact their practical ability to observe the election process.  Neither position has merit.

> **A.   Although Defendants Claim That Poll Watchers Have No First Amendment Right To Watch Polls, Defendants Do Not Dispute That Candidates And Voters Have A Constitutionally-Guaranteed Right To A Free And Untainted Election.**

As set forth at length in Plaintiffs' Motion for Summary Judgment, the United States Constitution lends Constitutional protection to the election process reasoning that a process tainted by fraud dilutes legitimate votes and interferes with an individual's right to elect his or her public officials.  (*See generally* Plaintiffs' Motion Summary Judgment (ECF # 509).)  In addition, candidates have a right to have their candidacy judged on the merits rather than a partisan and unequal polling platform with preference being granted to one candidate or party even if such inequality emanates from a seemingly neutral classification or restriction.  (*Id.* at 62-63.)  Such are the nature of "as applied" challenges when a statutory requirement portends a result that is unequal or denies individuals fair access to process.

Many of the Defendants' briefs argue that the decisions in *Cortes* and *Boockvar* preclude any "as applied" challenge to the residency requirement of the poll watcher statute because no

74

Constitutional rights are implicated.  (*See, e.g.,* Boockvar Brief Support Summ. J. (ECF # 547), pp. 60-66; Crossey Brief Support Summ. J. (ECF # 525), p. 22.)  But, these briefs do not, because they cannot, deny that the candidates and voters also have a right to equal protection and due process separate from any right held by those who wish to serve as poll watchers.  Moreover, Defendants do not dispute that while *Cortes* and *Boockvar* rejected the interests of poll watchers as having Constitutional dimension, neither of these cases held that candidates, parties, or voters did not have Constitutional rights to a full and fair process in which these candidates and parties should have equal access to the process and votes should be free from dilution related to fraudulent processes.  (*See* Plaintiffs' Brief Support Summ. J. (ECF # 509), pp. 63-68.)

Defendants address this point by arguing that a Constitutional question affecting candidates or voters is not "ripe" until Plaintiffs come forward with conclusive evidence of fraud or, more sweepingly, that because fraud is not an issue in Pennsylvania (nor could become one because of the good-hearted nature of the Secretary), the poll watching statute does not implicate rights to a full and untainted election.  *See, e.g.* Boockvar Brief Support Summ. J. (ECF # 547), pp. 3-4; Bucks, Chester, Montgomery, and Philadelphia Boards Brief Support Summ. J. (ECF # 543), pp. 18-19.  Simply put, there is no requirement for a party to establish that fraud has occurred when the issue is equal access and ability to observe the polling process to preclude that very fraud. Indeed, under Defendants' world view, the Commonwealth or the Secretary could Constitutionally preclude observation of the process by one or multiple parties.  Having gained superior or sole access to poll monitoring, it is unlikely that any fraud or irregularity by the preferred party would come to light.  And, this is all fine with Defendants because, in their view, absent *a fortiori* proof of fraud, no Constitutional issue is present.

Plaintiffs' claim looks to gain equal access to the process in November of 2020 by permitting access to a greater number of potential candidates to fulfill the roll of poll watcher.

CITE.  Defendants can articulate no down-side to allowing all parties the maximum ability to field those to serve as poll watchers or advantage to unilaterally favoring one party over another.[23] Indeed, Defendants cannot credibly claim that the purpose of poll watching is distinct from affording a process that is designed to provide a full, transparent, and free election.  As Defendants concede, poll watchers serve numerous important rolls including: checking voter rolls to encourage turnout, challenging voters as to identity or residency; and monitor various election activities. (Crossey Brief Support Summ. J. (ECF # 525), p. 3-4).  Indeed, as the Crossey Intervenors recognize, poll watchers are "similar" to "overseers" whose purpose is to "secure the purity and fairness" of the election.  (Crossey Brief Support Summ. J. (ECF # 525), p. 4.)

Given this admission that the purpose of poll watchers is to ensure a "pure" and "fair" vote, it follows that a residential requirement that preferentially denies that ability to certain parties or requirement parties the ability to observe and engage in these activities in some areas but not others raises a question of Constitutional magnitude.

> **B.     Defendants Do Not Deny That The Residency Requirement In The Poll Watching Statute Significantly Limits The Supply Of Individuals Qualified To Serve In That Roll.**

Defendants cannot dispute that the residency requirements substantially limits the number of citizens, otherwise qualified, who could serve at the thousands of polling places across the Commonwealth.  Indeed, by virtue of this one restriction, residents of 66 counties cannot observe elections as appointed poll watchers in counties where they may be needed.  Rather, multiple

---

[23]     The notable exception is the Crossey Intervenors who spend pages apparently trying to justify keeping GOP poll watchers from the poll by scurrilously charging that the GOP wish to employ non-resident poll watchers to engage in witness intimidation and suppression of the vote. (Crossey Brief Support Summ. J. (ECF # 525), p. 22-34.)  Aside from a tacit recognition that the residency requirement will disproportionately cause the GOP to be unable to monitor election day activities, such arguments are wholly unfounded.  Rather they suggest the true motive of Defendants which is to disproportionately deny GOP candidates the same access provided to their preferred candidates and parties.

Defendants claim that Plaintiffs submitted insufficient information to conclusively demonstrate that the Republican Party will be unable to recruit sufficient poll watchers.  (Crossey Brief Support Summ. J. (ECF # 525), p. 22-23.)

Of course, given that the election still remains a month in the future, it is difficult to conclusively demonstrate what the state of affairs may be, particularly with uncertainty associated with the pandemic.  Thus, it would be impossible for Plaintiffs to guarantee at this time that it could not recruit poll watchers for a given polling place.  Indeed, it will only be once an actual list of candidates has been developed that it will be possible to allocate the limited resources present.

But, notwithstanding the uncertainty of future events, Plaintiffs have proffered a wealth of evidence supporting their contention that polls will go unstaffed by watchers at this general election.  The reality is that Plaintiffs will unlikely be able to recruit a sufficient number of poll watchers for the General Election with the residence requirement in place.  (App. Ex. 4, Decl. Glenn Thompson ¶¶ 19-20; App. Ex. 2, Decl. James J. Fitzpatrick ¶¶ 20, 21; App. Ex. 6, Decl. Guy Lorin Reschenthaler ¶ 12.)  This concern is not just theoretical as the Trump Campaign has previously identified poll watchers from other counties to serve that were not permitted to do so due to the residency requirement.  (App. Ex. 2, Decl. James J. Fitzpatrick ¶ 21.)  Sans the residency requirement, eligible poll watchers are willing and able to watch polls in other counties and can properly fulfill their very crucial duty of safeguarding the integrity of the General Election.  (App. Ex. 5, Decl. George Joseph Kelly, Jr. ¶ 16; App. Ex. 3, Aff. Melanie Stringhill Patterson ¶¶ 9, 10; App. Ex. 2, Decl. James J. Fitzpatrick ¶¶ 20-21, 24; App. Ex. 6, Decl. Guy Lorin Reschenthaler ¶ 13.)

In contrast to the evidentiary showing by Plaintiffs, Defendants have merely noted how many registered party members are in particular counties and ask this Court to conclude that whatever that number is, it should suffice.  (*See, e.g.,* Crossey Brief Support Summ. J. (ECF #

525), p. 26-27; Pa. Dems. Brief Support Summ. J. (ECF # 529), p. 11-13.).  But Defendants have proffered no evidence to suggest how likely a given party member would serve as a poll watcher under these circumstances let alone evidence that contradicts the difficulty that Plaintiffs' witnesses have testified to regarding that unequal staffing of the polling places will occur.

Plaintiffs do not maintain that poll watchers are Constitutionally required.  However, if a state puts in place a poll watching system, it cannot do so in a manner that circumstances will cause to be unequally applied across election participants, as the residency requirement will do.[24]

In barring application of a residency requirement for poll workers in the upcoming election, the United States District Court for the Western District of Wisconsin noted that these unusual times present a "tricky and fluid barrier" to recruit residents to serve at the polls.  *Bostelmann*, 2020 U.S. Dist. LEXIS 172330 at *86.  Eliminating the residency requirement "provide[s] greater flexibility across the state to meeting unanticipated last-minute demands due to COVID-19 outbreaks or fear." *Id.* at *85.  Unfortunately, the fluid situation upon which the court relied on in *Bostelmann* exists in Pennsylvania, as elsewhere, and it is impossible to say, with precision, what set of facts will prevail in November.  Nevertheless, to enhance the likelihood that the Plaintiffs will be afforded the ability to observe the election process and satisfy themselves that they have had the process protected by the Constitution, and to allow voters a procedure transparent to all, removal of the residency requirement is warranted.

---

[24] Defendants brush away the impact these requirements will have on minor party participants noting that the GOP has opposed other efforts of these parties.  (*See, e.g.,* Crossey Brief Support Summ. J. (ECF # 525), p. 19.)  While the GOP may not be aligned with all parties on certain issues, upholding a free, full, and transparent election process should be the goal of all parties and candidates.  In this regard, it appears that the Defendants are seeking to skew the process to favor their preferred parties and outcome.

## **CONCLUSION**

Defendants' generalized legal arguments concerning Plaintiffs' purported non-entitlement to relief are without merit. Accordingly, the undisputed facts show Plaintiffs are entitled to the three distinct remedies from this Court as a matter of law. *First*, Plaintiffs are entitled to: (a) a declaration that Secretary Boockvar's guidance memos dispensing with the signature verification of absentee and mail-in applications and ballots are unconstitutional; and (b) an injunction enjoining all defendant county boards of election from following that guidance memo. *Second*, Plaintiffs are entitled to: (a) a declaration that all drop boxes and/or mobile collection sites for the return of absentee and mail-in ballots must be staffed, secured, and employed consistently within and across all 67 of Pennsylvania's counties to prevent third-party delivery and other improperly cast absentee or mail-in ballots; and (b) an injunction enjoining any contrary use and segregating any improperly cast ballots. *Third*, Plaintiffs are entitled to: (a) a declaration that the county residency restriction for watchers is unconstitutional as applied to the upcoming General Election; and (b) an injunction preventing its application, because of the burden on the fundamental right to vote and to a free and fair election will leave myriad locations unwatched and foster an environment ripe for voter fraud.

For these reasons, as fully set forth above and in their initial supporting legal memorandum, Plaintiffs respectfully request the Court to grant their Motion for Summary Judgment in its entirety and deny Defendants' Cross-Motions for Summary Judgment.

Respectfully submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

Date: October 4, 2020          By:   */s/ Ronald L. Hicks, Jr.*
                                     Ronald L. Hicks, Jr. (PA #49520)
                                     Jeremy  A. Mercer (PA #86480)
                                     Carolyn B. McGee (PA #208815)
                                     Six PPG Place, Third Floor
                                     Pittsburgh, PA 15222
                                     (412) 235-4500 (Telephone)
                                     (412) 235-4510 (Fax)
                                     rhicks@porterwright.com
                                     jmercer@porterwright.com
                                     cmcgee@porterwright.com

                                     and

                                     Matthew E. Morgan (DC #989591)
                                     (admitted pro hac vice – ECF #10)
                                     Justin Clark (DC #499621)
                                     (admitted pro hac vice – ECF #31)
                                     Elections, LLC
                                     1000 Maine Ave., SW, 4th Floor
                                     Washington, DC 20224
                                     (202) 844-3812 (Telephone)
                                     matthew.morgan@electionlawllc.com
                                     justin.clark@electionlawllc.com

                                     *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing Response/Reply to be filed on October 4, 2020, via ECF, which system will serve notice of same on all parties registered to receive same via the ECF system.  For any party who has yet to enter an appearance, the undersigned certifies that a copy of the foregoing filing will be served on that party via First Class Mail and a copy sent to the County Solicitor, if known, via email or fax.

Respectfully submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

By: */s/ Ronald L. Hicks, Jr.*
Ronald L. Hicks, Jr. (PA #49520)
Jeremy A. Mercer (PA #86480)
Carolyn B. McGee (PA #208815)
Six PPG Place, Third Floor
Pittsburgh, PA 15222
(412) 235-4500 (Telephone)
(412) 235-4510 (Fax)
rhicks@porterwright.com
jmercer@porterwright.com
cmcgee@porterwright.com

and

Matthew E. Morgan (DC #989591)
(admitted pro hac vice – ECF #10)
Justin Clark (DC #499621)
(admitted pro hac vice – ECF #31)
Elections, LLC
1000 Maine Ave., SW, 4th Floor
Washington, DC 20224
(202) 844-3812 (Telephone)
matthew.morgan@electionlawllc.com
justin.clark@electionlawllc.com

*Counsel for Plaintiffs*

13778965v1