## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 2:20-cv-00966-NR ) |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania, *et al.*, | ) Judge J. Nicholas Ranjan ) ) ) |
| Defendants. | ) ) ) |

## SECRETARY OF THE COMMONWEALTH KATHY BOOCKVAR'S
## REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

The pleadings and discovery in this proceeding confirm that Plaintiffs' various remaining challenges to the Commonwealth's mail-in and in-person voting rules are legally flawed and fatally unsupported in fact. Plaintiffs' Opposition seeks to escape that reality by fundamentally distorting the legal standards governing their claims as well as their assertion of Article III standing; attempting to poison the well with new—but highly irrelevant—"evidence" regarding their drop box claims (while failing to refute the lack of relevant evidence underlying those claims); and distorting the very nature of their signature analysis claims in a futile effort to avoid abstention. And despite spending nearly 80 pages on briefing, Plaintiffs do not respond to numerous of the Secretary's arguments and entirely fail to defend several of their claims.

Given the plethora of briefing the Court has received, the Secretary does not endeavor to respond to every desperate argument made by Plaintiffs and will not repeat each of her summary judgment arguments. The Secretary instead focuses her reply on key points highlighting what is now clear: Plaintiffs' remaining claims are ripe for summary judgment in the Secretary's favor.

I.    **PLAINTIFFS APPLY THE WRONG STANDARDS TO ATTEMPT TO MANUFACTURE STANDING AND ESTABLISH THEIR CLAIMS.**

At the outset, Plaintiffs' opposition distorts the governing Article III standing doctrine and the substantive legal standards applicable to their voting-related claims—legal errors that infect the analysis of each of the buckets of remaining claims.

*First*, Plaintiffs incorrectly posit that vote dilution writ-large is a cognizable Article III injury, as opposed to a speculative generalized grievance.  It is not.  Plaintiffs' asserted injury— that legitimately cast votes will be "dilut[ed]" or "debase[d]" by "illegal" mail-in votes if election officials do not (i) "man" ballot drop boxes, (ii authorize their preferred form of poll watchers, and (iii) scrutinize voter signatures in their preferred manner—is no more particularized than the injuries asserted—and rejected by the Supreme Court—in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), where the Supreme Court recently discussed standing in the elections context.  There, like here, plaintiffs' claims "turn[ed] on allegations that their votes ha[d] been diluted" (in that case, due to alleged partisan gerrymandering).  *Id.* at 1930-31.  The Supreme Court rejected that theory, stating: "[O]ur cases to date have not found that this presents an individual and personal injury of the kind required for Article III standing," but rather "'the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.'"  *Id.* at 1933 (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam)).  Like the injury asserted in *Gill*, Plaintiffs' theory of vote-dilution via alleged voter fraud does not "address the effect that [so-called voter fraud] has on the votes of particular citizens," *id.*, just as in numerous recent cases similar to this one where lower federal courts have applied *Gill* to preclude standing.  *See, e.g.*, *Martel v. Condos*, --- F. Supp. 3d ----, 2020 WL 5755289, *4-5 (D. Vt. Sept. 16, 2020); *Democratic Party of Wisc. v. Vos*, 408 F. Supp. 3d 951, 955-56 (W.D. Wis. 2019), *aff'd*, 966 F.3d 581 (7th Cir. 2020); *Tafuto v. Donald J. Trump for President, Inc.*, --- F. App'x ----, 2020 WL 5614433, *1-2

(2d Cir. Sept. 21, 2020).  Instead, Plaintiffs' claimed injury here is similarly "abstract and indefinite [in] nature," and thus insufficient to procure standing.  *FEC v. Akins*, 524 U.S. 11, 23-24 (1998).

*Second*, Plaintiffs wrongly assert strict scrutiny applies to their constitutional claims.  *See* ECF No. 552 ("Opp'n") at 53-56.  Instead, the *Anderson-Burdick* sliding scale framework is the governing legal framework for this kind of "fundamental voting rights" case, as all nine Supreme Court Justices agreed in *Crawford v. Marion County Election Board* in rejecting a challenge to Indiana's voter identification law.  *See* 553 U.S. 181 (2008).  Notably, the litigants in *Crawford* (like Plaintiffs here) suggested that the challenged voter ID law would "unevenly" impact certain groups of voters, but the Supreme Court nonetheless declined to apply strict scrutiny.  Indeed, Plaintiffs have virtually no citation for their erroneous proposition that strict scrutiny applies here, instead relying on: two 50-year old Supreme Court cases involving legislative apportionment— unique practices not at issue here, Opp'n at 63 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) & *Gray v. Sanders*, 372 U.S. 368, 380 (1963)); a Ninth Circuit case that applied *Anderson-Burdick* and observed the limited application of strict scrutiny, Opp'n at 54 (citing *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008)); a district court decision involving claims by Latino and African-American voters (*i.e.* suspect classes), Opp'n at 54 (citing *Black v. McGuffage*, 209 F. Supp. 2d 889, 898 (N.D. Ill. 2002)); a vacated Sixth Circuit order, Opp'n at 54, 63 (citing *Stewart v. Blackwell*, 444 F.3d 843, 868 (6th Cir. 2006)); and two 70-year old Supreme Court dissents, Opp'n at 55 (citing *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting) & *Colegrove v. Green*, 328 U.S. 549, 570 (1946) (Black, J., dissenting)).  Clearly none of these authorities mandate the application of strict scrutiny here.

Rather than apply strict scrutiny to the challenged voting procedures (as Plaintiffs baselessly urge), the "flexible" *Anderson-Burdick* framework applies and requires only that the

Court weigh any burdens placed on the right to vote against the State's interest in maintaining the supposedly offending law or policy, with due deference to a state's traditional regulatory interests and authority with respect to administering its own elections. *See Crawford*, 553 U.S. at 190-91 & n.8; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("[T]he state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions."). Indeed, in a challenge remarkably similar to this case, the Ninth Circuit applied *Anderson-Burdick* to uphold California's use of a pilot program that permitted voters in some (but not all) counties to automatically receive a ballot by mail, while voters in other counties had to apply for one. *See Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018). Plaintiffs there argued that such system "inequitably dilutes votes in disfavored counties" and requested strict scrutiny, which the Ninth Circuit denied, instead applying *Anderson-Burdick*, and finding that the pilot program "does not burden anyone's right to vote," but "[i]nstead, it makes it easier for some voters to cast their ballots by mail, something that California voters already can do." *Id.* ("As for voters outside the counties that have opted in to the all-mailed system, their access to the ballot is exactly the same as it was prior to the VCA's enactment."). Such should be the case here, where the challenged practices do not remotely rise to the level of burdening voters or votes, but rather indisputably aid in *expanding* the franchise. In fact, Plaintiffs cite no case—and, indeed, the Secretary is not aware of any— where a court has found that offering a new procedure (like drop boxes) that makes voting *more* accessible (rather than burdening it) runs afoul of *Anderson-Burdick*.

## II.     THE SECRETARY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR EACH REMAINING ISSUE.

### A.     Plaintiffs' Drop Box Claims Fail.

Plaintiffs' opposition is wrong both on the facts and the law as it relates to their drop box claims, whether brought under a vote-dilution or uneven-use-across-counties theory. Specifically,

Plaintiffs' opposition confirms at least the following:

- **Plaintiffs nowhere dispute the benefits of drop boxes.** The Secretary's motion (and her own declaration) set forth numerous benefits of—or rationales for—ballot drop boxes, including that they (i) increase turnout, (ii) protect voters' health, particularly in the midst of the ongoing pandemic, (iii) increase voter satisfaction, particularly in light of ongoing U.S. Postal Service issues, and (iv) reduce costs for counties. *See* Secy.'s Mem. ("Mot.") (ECF No. 547) at 22-25 (SF ¶¶ 54-65); Secy.'s App. Ex. 2, Boockvar Decl. (ECF No. 549-2) ¶¶ 36-39, 42-44. In 79 pages of briefing, Plaintiffs do not contest a single one of those benefits.

- **Plaintiffs remain unwavering in their commitment to a definition of "voter fraud" that is plainly wrong and overbroad.** Plaintiffs' constitutional hook for their claim that drop boxes should be banned is that they invite voter fraud to a level that might cause vote dilution of "non-fraudulent" votes. But their allegations fail out of the gate by equating fraud with mere anecdotal violations of the Election Code. *See, e.g.*, Opp'n at 67-69. The unintentional violation of the Election Code by individual voters, especially when coupled with Commonwealth officials' good faith attempts to educate counties and voters on how to follow the Election Code, does not by itself constitute "fraud" or implicate any constitutional violation. *See Paher v. Cegavske*, --- F. Supp. 3d ----, 2020 WL 2089813, *5 & n.7 (D. Nev. Apr. 30, 2020). If it did, the black letter rule that a federal court cannot force a state to enforce its own laws would be eviscerated and federal courts would be mired in micromanaging state and local elections. *See* Mot. at 67-68.

- **Plaintiffs have no evidence of drop box or ballot destruction whatsoever, and instead continue to rely on outlandish criminal hypotheticals.** While conceding that Article III requires them to "'demonstrate a *realistic* danger of sustaining a direct injury as a result' of the challenged conduct," Opp'n at 10 (emphasis added) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)), Plaintiffs readily admit that there is no historical evidence whatsoever of any criminal conduct of the sort they insist *could* befall ballot drop boxes. *See* Opp'n at 70. Apparently undeterred by the lack of evidence that any of their original round of far-fetched hypotheticals ever actually occurred anywhere in the history of ballot drop box usage, Plaintiffs double down with yet-more unfounded suppositions—firecrackers! bleach! acid! "some other contaminant"!—for which they also have no evidence or for which there is no "realistic danger" of occurrence. *See* Opp'n at 71. What is more, they then proceed to take their fear-mongering one step further by referring to felled statues and other vandalism, suggesting it seems that if one type of crime can occur in America, other crime can occur as well. *See* ECF No. 550-7. [1]

Plaintiffs' scare tactics do not justify Article III standing on the basis of a "certainly impending" injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis

---

[1] Plaintiffs' Exhibit 65 is so outside the realm of relevancy and so unduly prejudicial that it should be stricken under Federal Rules of Evidence 402 and 403 and not considered by this Court.

omitted), nor do they remotely support Plaintiffs' claims on the merits. The Secretary does not deny that if some criminal mastermind wanted to, he or she could perform any of the illegal acts Plaintiffs imagine regarding drop boxes—just as the same criminal terrorist could target an Election Day polling place or county board of elections office housing mail-in or absentee ballots. *See* Mot. at 47 n.7. But the law does not cater to forbidding that with which a would-be criminal might intentionally interfere. Indeed, if Commonwealth elections had to be planned around every possible bad actor who might seek to disrupt democracy, it is hard to fathom an election procedure that would not be actionable in Plaintiffs' view. Put simply, Plaintiffs' assertions would justify any manner of federal judicial overreach on the basis of fears of hypothetical criminal conduct—a principle antithetical to the Constitution.

- **Plaintiffs offer no distinction between ballot drop boxes and the long-accepted (and unchallenged) use of U.S. Postal Service mail return.** Plaintiffs offer no explanation of how ballot drop boxes "encourage" any additional ballot "harvesting" than might already exist with U.S. Postal Service mailboxes. Yet Plaintiffs admittedly do not challenge "the time-honored practices of returning absentee or mail-in ballots through the mail," instead conceded that people should be expected to follow the law. Secy.'s App. Ex. 3, Fitzpatrick Dep. Tr. 133:23-135:1. In that respect, ballot drop boxes do not "create[] yet another opportunity for third party abuse of the mail-in ballot process," Opp'n at 70, any more than the U.S. Postal Service's installation of a new collection box in a new Pennsylvania supermarket plaza would. Plaintiffs cannot distinguish the two collection mechanisms as it relates to so-called ballot "harvesting."

- **Almost all of Plaintiffs' examples of "fraud" have nothing to do with the practices they challenge in this case.** While coming up with no evidence to support their hypotheticals regarding the supposed risk of ballot destruction, Plaintiffs purport to catalog a series of "voter fraud/irregularit[ies]" that they gratuitously submit as part of a new "summary" exhibit. *See* ECF No. 550-9. But even a cursory review of this "exhibit" reflects that it is almost entirely inapposite to the remaining claims. For instance, the majority of instances described involved in-person voting, which plaintiffs do not challenge in this case. And numerous of the instances of election fraud Plaintiffs identify were investigated and prosecuted, demonstrating Pennsylvania's commitment to ensuring free and fair elections.

- **Localized distinctions amongst election procedures, like the use of differing equipment, are constitutionally permissible.** Plaintiffs make no effort to distinguish the well-settled precedent highlighted in the Secretary's brief confirming that localized differences in procedures for how voters cast ballots do not rise to the level of federal constitutional concerns. *See* Mot. at 56 (citing five cases, none of which Plaintiffs mention or attempt to distinguish). Instead, Plaintiffs attempt to stretch three inapt cases (including two from the early 1960s) for the principle that, in their view, "facilitation of unequal voting schemes across the geographical unit of the election" is unconstitutional. Opp'n at 63. But unlike the numerous cases cited by the Secretary and other Defendant-Intervenors Plaintiffs' cases bear no resemblance to the challenged practices in this case. *See* Opp'n at 64 (citing race discrimination and legislative apportionment cases).

- **The Constitution does not require Pennsylvania's counties to cater to the least accommodating county.** Plaintiffs cannot dispute that the Secretary's guidance and Pennsylvania Supreme Court's decision authorize *every* Pennsylvania county to use drop boxes. Unable to contest that every county has such option, Plaintiffs' argument boils down to the assertion that because not all Pennsylvania counties actually exercise that option, none of them can. *See* Opp'n at 44 (arguing that the "in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes"). But election practices need not cater to the lowest common denominator, and Plaintiffs' arguments would improperly penalize those counties who are further enfranchising voters by offering a safe and convenient alternative to in-person voting that enhances voter confidence.

- **Plaintiffs want this Federal Court to micromanage counties' operation of elections.** At the end of the day, Plaintiffs' drop box challenge amount to a request for this Court to interfere with local counties' implementation of an election process that the state's highest court has recently determined is authorized. *See, e.g.*, Opp'n at 73 (complaining about adequacy of Secretary's chain-of-custody guidance). That is not the role of federal courts. *See, e.g.*, *Short*, 893 F.3d at 679 ("Under [plaintiffs'] theory, unless California foists a new system on all fifty-eight counties at once, it creates unconstitutional vote-dilution in counties that do not participate in the pilot plan. Nothing in the Constitution [or] the Supreme Court's controlling precedent . . . suggests that we can micromanage a state's election process to this degree."). The Constitution—and Pennsylvania Election Code—permits each county to decide for itself whether, where, and how to use drop boxes. *See* Secy.'s App. Ex. 2, Boockvar Decl. ¶¶ 38, 57-60. The Court should honor that delegation and settled federalism.

At bottom, this Court need not succumb to Plaintiffs' outlandish (and, frankly, reckless) hypotheticals regarding the use of drop boxes, but should instead dismiss their claims.

### B.    Plaintiffs' Poll-Watcher Claims Fail.

The Secretary's motion detailed why each of the challenges Plaintiffs previously identified pertaining to poll watchers fails: (i) their "as-applied" challenge to the county residency requirement, (ii) their demand that poll watchers be permitted at "all locations" voters register and cast or return ballots (including ballot drop box locations), and (iii) their request that poll watchers be permitted to attend county pre-canvassing and canvassing meetings. Plaintiffs' opposition wholly ignores the latter two theories—alone justifying summary judgment in favor of the Secretary—and their opposition regarding the first issue falls woefully short.

1.    <u>County residency requirement</u>

The Secretary's motion highlighted Plaintiffs' failure to (1) identify a single county where they will be unable to fully staff the polls, (2) identify any actual harm they would suffer from such (hypothetical) shortage, and (3) dispute the rational nature of the county residency requirement.  Mot. at 60-66.  Plaintiffs' opposition does not remedy any of these issues:

**Plaintiffs still cannot identify any county in which they will be unable to fully staff the polls, which is their burden.**  Notwithstanding their self-proclaimed assertion that there is a "wealth of evidence supporting their contention that polls will go unstaffed," Opp'n at 77, Plaintiffs still do not identify any county in which they will be unable to staff the polls this November.  Not only do Plaintiffs lack any evidence regarding the *upcoming election*, they do not even point to *historic* evidence of poll watcher shortages (such as during the hotly-contested 2016 presidential or 2018 mid-term elections, when presumably the same party registration "gaps" existed).  Instead, Plaintiffs try to flip the question by claiming they are injured because they have "previously identified poll watchers from other counties to serve [as poll watchers] that were not permitted to do so due to the residency requirement."  Opp'n at 77.  But whether outsiders are being deprived the right to poll watch in foreign counties is entirely irrelevant; what matters is whether Plaintiffs can establish that they could not actually staff the polls with qualifying residents—something Plaintiffs have entirely failed to do.

- **Plaintiffs' claims of unequal access are untrue.**  Plaintiffs irresponsibly allege that the law deprives them of "equal access and ability to observe the polling process," and that the Secretary is advocating for a system whereby she could "preclude observation of the process by one or multiple parties."  Opp'n at 75; *see also id.* at 76 (accusing the state of "preferentially den[ying]" access).  The Election Code does no such thing.  The rules are of course the same for all candidates and all political parties.  And Plaintiffs surely have no right to claim "unequal access" when the undisputed facts show that they have in excess of 100,000 party registrants in the very counties they identify where they allegedly might fail to recruit watchers.  *See* Mot. 62-63.

- **Plaintiffs offer no evidence of in-person voting issues necessitating a full slate of poll watchers to stave off constitutional harm.**  Even crediting Plaintiffs' unsupported assertion that they will be unable to staff polling places this November, that in and of itself is not a harm; rather, Plaintiffs' claimed harm is that because they will be unable to fully staff every election district, in-person voting fraud or other irregularities will not be caught, thus leading to a fundamentally unfair election.  *See* Opp'n at 74.  But Plaintiffs fail to present any evidence whatsoever that Pennsylvania's in-person voting procedures are so rife with fraud that the inability to have "fully staffed" poll watchers will lead the election to be "tainted by fraud."  *Id.*  And two courts in Pennsylvania have already considered and dismissed this attenuated claim of harm.  *See Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 407 (E.D. Pa. 2016); *Pa. Dem. Party v. Boockvar*, --- A.3d ----, 2020 WL 5554644, *30 (Pa. Sept. 17, 2020).

- **Plaintiffs do contest the rationality of the county residency requirement.** Plaintiffs readily admit that they "do not maintain that poll watchers are constitutionally required." Mot. at 78. As a result, and because the requirement does not otherwise infringe any fundamental right, the residency requirement is subject to only rational basis review, *Pa. Democratic Party*, 2020 WL 5554644, at *30, which the state has met here, *see* Mot. at 65-66. Rather than contest the law's valid rationales, Plaintiffs yet again try to flip the burden by asserting that the Secretary has not "articulate[d] [any] down-side" to allowing out-of-county watchers. Opp'n at 76. For one, the Secretary has done just that, *see* Mot. at 66 (pointing to avoidance of voter intimidation and importance of local knowledge), but in any event, under rational basis review, a state need only identify a legitimate state objective that is rationally related to the challenged action. *See, e.g.*, *Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 685 (M.D. Pa. 2020). The fact that Plaintiffs think a different policy would be better is of no moment and is an issue better addressed to the legislature.

- ***Bostelmann* is inapposite.** Finally, Plaintiffs' citation to a Wisconsin case involving a residency requirement for election officials (*i.e.* poll *workers*) is distinguishable. *See* Opp'n at 78. For one, the court in that case noted the challengers' identification of actual evidence that there was an actual shortage of such officials in recent elections— something Plaintiffs have not attempted to do here. *See Democratic Nat'l Comm. v. Bostelmann*, --- F. Supp. 3d ----, 2020 WL 5627186, *25-26 (W.D. Wis. Sept. 21, 2020). Moreover, there is a substantial difference between relaxing requirements for nonpartisan *election officials* (as was at issue in *Bostelmann*), without whom in-person elections could not proceed, versus poll *watchers* (at issue here), who merely serve a partisan oversight role but without whom voting can surely proceed.

     2.     <u>Requests for poll watchers to be permitted in "all locations" where votes are cast/returned and in pre-canvass/canvass meetings</u>

Plaintiffs make no effort in their opposition to justify either (1) their substantially overbroad request for poll watchers to be permitted in "all locations" where voters are registering, applying for ballots, voting, or returning ballots (including at drop box locations), nor (2) their request for poll watchers to be permitted at county pre-canvass and canvass meetings. *See, e.g.*, SAC ¶ 209 & p. 81 (Prayer for Relief at I); ECF No. 503-1 at 3 (Plaintiffs' proposed SJ order). Plaintiffs' failure to respond to the Secretary's detailed arguments regarding either of these issues, *see* Mot. at 34 (SF ¶ 99); Secy.'s App. Ex. 2, Boockvar Decl. ¶¶ 86-88, alone constitutes waiver and justifies summary judgment in the Secretary's favor on these issues. *See, e.g.*, *Clarity Software, LLC v. Allianz Life Ins. Co. of N. Am.*, 2006 WL 2346292, *6 (W.D. Pa. Aug. 11, 2006).

9

Because the reply asserts tangential issues, however, the Secretary briefly replies:

- **These requests only seek compliance with Plaintiffs' view of the Election Code, which the Eleventh Amendment bars this Court from ordering, or which at least merit abstention.**  As the Secretary's motion made clear, the question of where the Election Code permits poll watchers to perform their duties is purely a question of state law, and any non-compliance with such provisions must be addressed in state court. *See* Mot. at 66-73.  In fact, Plaintiffs readily admit in their Opposition that the purported basis for their claim that they are entitled to poll watchers is because such drop box locations constitute "polling place[s]" under the Election Code, Opp'n at 35-36— a question this Court already abstained from.  *Donald J. Trump for President, Inc. v. Boockvar*, 2020 WL 5658392, *3 (W.D. Pa. Sept. 23, 2020) ("*Boockvar III*").  Indeed, certain of the Plaintiffs here (represented by the same lead counsel as in this case) have already filed a lawsuit in Philadelphia County seeking such relief.  Plaintiffs should pursue their claims in that forum, not this federal one.

- **Limits on where poll watchers are permitted are rational.**  Just as with the county residency requirement, because regulation of poll watching does not infringe on a fundamental right, the Election Code's prescriptions on where poll watching may occur is subject only to rational basis review.  *Cortés*, 218 F. Supp. 3d at 407.  Plaintiffs offer no response at all to the common-sense rationales put forth by the Secretary for not allowing roving poll watchers on the streets of the Commonwealth or in county board offices.  Mot. at 70-71; *see also* ECF 543 (Bucks County Board of Elections et al.'s Brief) at 21-23.  That alone should be enough to resolve these claims.

### C.    Plaintiffs' Signature-Comparison Claims Fail.

Finally, the Secretary's motion outlined why she was entitled to summary judgment on Plaintiffs' claims related to signature analysis, or why, at the very least, this Court should abstain from this issue.  Mot. at 73-83.  In particular, the Secretary addressed Plaintiffs' three challenges related to the Commonwealth's canvassing rules, as she understood them: (i) that the Secretary's guidance contravenes with the Election Code, (ii) that counties are unevenly applying the rules, and (iii) that the guidance would create impermissible distinctions between in-person and mail-in/absentee voters.  While purporting to disclaim the first of these challenges, Opp'n at 44, Plaintiffs' spend page after page (including lengthy footnotes) setting forth their preferred interpretation of the Code and the history of signature analysis in Pennsylvania, *see* Opp'n at 32-

34, 58-60 & n.16—analysis that, although flawed, only confirms this issue should be resolved in state court.  Plaintiffs' various arguments on these issues still fail or merit abstention:

- **Abstention regarding these claims is warranted because a ruling from the Pennsylvania Supreme Court would eliminate or substantially narrow Plaintiffs' claims.**  Notwithstanding Plaintiffs' assertions to the contrary, each of Plaintiffs' theories above could be resolved (or substantially narrowed) by a ruling from the Pennsylvania Supreme Court in response to the Secretary's now-pending King's Bench petition.  Secy.'s Suppl. App. Ex. 38, Oct. 4, 2020 Appl. for Invocation of King's Bench Power to Declare Proper Construction of Election Code.

  - First, to the extent Plaintiffs assert the Secretary's guidance is contrary to the Code, that is precisely the issue the Supreme Court is being asked to resolve.

  - Second, Plaintiffs' claims of "uneven" application of the guidance and the rules related to canvassing across Pennsylvania counties would be mooted by a Pennsylvania Supreme Court decision.  In that scenario, the situation would be no different than this Court observed following the Supreme Court's recent ruling on the "naked" ballot issue: any claim pertaining to supposed differences between counties would be obviated because the state's highest court will have "conclusively interpreted Pennsylvania law," there would be no plausible argument that counties would ignore such ruling, and if they did, "state law [would] afford[] Plaintiffs a total, unambiguous remedy (*i.e.*, enforcement through state-court proceedings)."  *See Boockvar III*, 2020 WL 5658392, at *3.

  - Third, Plaintiffs' "different classes of voters" argument (which is wrong in any event, see below) will also be moot if the Pennsylvania Supreme Court determines that the Election Code does require counties to perform signature comparison on mail-in and absentee ballots (as Plaintiffs insist), which would ostensibly bring the scrutiny of those ballots in line with the rules for in-person voters, thus mooting Plaintiffs' claim.

  Thus, each of these theories cautions waiting for a definitive interpretation of Commonwealth law, as the Secretary has requested.  By contrast, this Court publishing its own interpretation of a state-law issue squarely presented in an active application before the state's highest court could only risk greater confusion and inconsistency as to whose dictate governs. The Court should avoid that risk.

- **There was no "litigation gamesmanship."**  Plaintiffs' accusations of "litigation gamesmanship" ring hollow.  While Plaintiffs are undoubtedly correct that the signature issue was not presented in the last Pennsylvania Supreme Court petition, that's because *Plaintiffs did not raise this issue until after the Supreme Court rendered that decision*.  The timeline here is clear and indisputable:

1. The Secretary issued her first signature guidance on <u>September 11</u>, while the prior petition was pending before the Pennsylvania Supreme Court. Plaintiffs took no action at that time to challenge the guidance in this Court or state court.

2. The Supreme Court issued its decision on the prior petition on <u>September 17</u>.

3. After the Court lifted the stay in this case, Plaintiffs raised a challenge to the signature guidance for the first time in their <u>September 20</u> notice regarding their remaining claims, requesting—again, for the first time—to amend their complaint to add claims related to this issue. ECF No. 448 at 11-13.

4. In the Secretary's response on <u>September 22</u>, she indicated that given the new challenge to this issue (which turns on an interpretation of Commonwealth law), she was preparing another King's Bench Application. ECF No. 452 at 19.

5. The Secretary has been busily preparing that application—subject to other demands, including preparing for the election and being forced to sit for deposition again last week by Plaintiffs in this case—and filed it <u>yesterday</u>, just two weeks after Plaintiffs first raised the issue.

The record simply belies any notion of delay or gamesmanship; if anything, it was *Plaintiffs* who delayed raising their objection to the September 11 guidance before the Pennsylvania Supreme Court ruled or any other time before September 20.

- **Ample time remains.** Notwithstanding Plaintiffs' protestations, there is time for the Pennsylvania Supreme Court to resolve this issue. The Court has already proven it can act quickly, and the present petition presents narrow legal issues. Moreover, the Pennsylvania Supreme Court is obviously well aware of the pending election, and the Secretary has advised that court of the pendency of these proceedings as well. *See* Secy.'s Suppl. App. Ex. 38 at 4-6, 14-15. Moreover, Plaintiffs' rush to judgment is illusory: by state law, mail-in ballots cannot be pre-canvassed until the morning of Election Day—still 29 days away—so there is no need for this Court to rush ahead of the state's highest court.

- **The Secretary's guidance does not impermissibly create different classes of voters.** In any event, with regard to the lone issue for which a ruling from the Pennsylvania Supreme Court may not resolve all of Plaintiffs' claims—their accusation that the Secretary's guidance, if upheld, would create impermissible distinctions between in-person and mail-in voters—Plaintiffs fail to offer any rebuttal to the Secretary's arguments other than baldly repeating their talking point that "Secretary Boockvar is impermissibly creating different classes of voters based on the manner the voter chooses to vote." *See* Opp'n at 37 (citing no cases). The Secretary's motion explained over the course of more than two pages, and citing numerous cases, why distinctions between procedures for in-person and mail-in voting were permissible, and explained the unique security mechanisms in Pennsylvania's mail-in/absentee voting system (including the need for such voters, unlike in-person voters, to apply for their ballots and provide certain identifying information). *See* Mot. at 80-82; *see also* Secy.'s App.

Ex. 2, Boockvar Decl. ¶¶ 61-70.  As part of that, the Secretary also explained the indisputable truth that the mail-in/absentee system cannot be discriminatory because all Pennsylvanians can now opt into that procedure for any reason or no reason at all or else vote in person.  *See* Mot. at 82 (citing case).  Plaintiffs roundly ignore all of the Secretary's well-supported arguments, which again justifies summary judgment in the Secretary's favor if the Court does not abstain.

Summary judgment for the Secretary—or, at the very least, this Court's abstention from—

Plaintiffs' signature-analysis claims is therefore warranted here.

## CONCLUSION

For the foregoing reasons and those set forth in the Secretary's opening memorandum, the Court should grant judgment in favor of Defendants and deny Plaintiffs' motion.[2]

---

[2] Plaintiffs' request that the Court strike or disregard the Secretary's arguments because her brief in support was filed minutes after the deadline is unreasonable and not made in good faith.  Not only was the Secretary's motion itself filed before the deadline, ECF No. 536, but Plaintiffs suffered no prejudice from the minutes-delayed filing of her memorandum, as confirmed by their extensive citations to the Secretary's brief peppered throughout their opposition.  Nor did Plaintiffs (who themselves were forced to file multiple, post-deadline errata with their briefs) attempt to meet and confer with the Secretary to request a reasonable extension to give them a full 24 hours to respond, which the Secretary surely would have agreed to.

Dated:  October 5, 2020

KIRKLAND & ELLIS LLP

By:   */s/ Daniel T. Donovan*
      Daniel T. Donovan
      Michael A. Glick
      Susan M. Davies
      Kristen L. Bokhan
      Caroline Darmody
      1301 Pennsylvania Avenue, N.W.
      Washington, DC 20004
      (202) 389-5000 (telephone)
      (202) 389-5200 (facsimile)
      daniel.donovan@kirkland.com
      michael.glick@kirkland.com
      susan.davies@kirkland.com
      kristen.bokhan@kirkland.com
      caroline.darmody@kirkland.com

      Madelyn A. Morris
      Sara S. Tatum
      Jaywin Singh Malhi
      601 Lexington Avenue
      New York, NY 10022
      (212) 446-4800 (telephone)
      (212) 446-4900 (facsimile)
      madelyn.morris@kirkland.com
      sara.tatum@kirkland.com
      jaywin.malhi@kirkland.com

Respectfully submitted,

PENNSYLVANIA OFFICE OF
ATTORNEY GENERAL

By:    */s/ Karen M. Romano*
      Karen M. Romano
      Keli M. Neary
      Howard G. Hopkirk
      Nicole Boland
      Stephen Moniak
      15th Floor, Strawberry Square
      Harrisburg, PA 17120
      (717) 787-2717 (telephone)
      (717) 772-4526 (facsimile)
      kromano@attorneygeneral.gov
      kneary@attorneygeneral.gov
      hhopkirk@attorneygeneral.gov
      nboland@attorneygeneral.gov
      smoniak@attorneygeneral.gov

MYERS BRIER & KELLY LLP

By:    *Daniel T. Brier*
      Daniel T. Brier
      Donna A. Walsh
      425 Spruce Street, Suite 200
      Scranton, PA 18503
      (570) 342-6100 (telephone)
      (570) 342-6147 (facsimile)
      dbrier@mbklaw.com
      dwalsh@mbklaw.com

*Counsel for Kathy Boockvar*
*Secretary of the Commonwealth of*
*Pennsylvania*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties who have appeared in this action via the Court's

electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Daniel T. Donovan*
Daniel T. Donovan

*Counsel for Kathy Boockvar*
*Secretary of the Commonwealth of*
*Pennsylvania*